**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| RASHAD WALSTON, on behalf of himself and all others similarly situated, | : | Case No. 1:24-cv-00083 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NATIONAL RETAIL SOLUTIONS, INC. D/B/A NRS PAY, | : | |
| | : | |
| Defendant. | : | |
| _____/ | | |

**DEFENDANT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT**

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................................1

II. BACKGROUND ....................................................................................................................2

III. LEGAL STANDARD .............................................................................................................4

IV. ARGUMENT ..........................................................................................................................5

    A. Plaintiff Made a Valid Offer to Settle his TCPA Claims Against NRS. ........................5

    B. NRS Accepted Plaintiff's Offer and There was a Meeting of the Minds on All Material Terms. ..................................................................................6

V. CONCLUSION .......................................................................................................................8

i

Defendant National Retail Solutions, Inc. d/b/a NRS Pay hereby moves this Court to enforce the settlement it entered with Plaintiff Rashad Walston on January 3, 2024, and to dismiss this action. In support of this motion, Defendant states as follows:

## I.     INTRODUCTION

NRS provides administrative equipment and transaction services to merchants. NRS has never before been sued for violating the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"). Thus, when NRS received Mr. Walston's October 19, 2023 correspondence, accusing it of violating the TCPA and demanding $9,800, NRS took his allegations seriously and initiated a thorough investigation. Through this process, NRS communicated with Plaintiff in good faith—even going so far as to have NRS's CEO call Plaintiff personally about his demand.

During that November 13, 2023 phone call with NRS's CEO, Plaintiff made a renewed demand—this time for at least $5,000, which the parties acknowledged would be kept confidential like Plaintiffs' settlements with other companies, and that NRS would follow up with Plainiff after considering his offer. Plaintiff's counsel then contacted NRS and the parties continued amicable discussions, conducting a continued investigation as to the origin of Plaintiff's number throughout the end-of-year holiday season.

Ultimately, NRS determined that settling the dispute would be far more cost-effective than prolonged litigation, regardless of the merits of the case. Accordingly, on January 3, 2024, NRS formally accepted Plaintiff's November 13, 2023 offer, agreeing to pay $9,800—the amount of Plaintiff's initial demand and far more than Plaintiff's pending demand. It was not until *after* NRS's clear acceptance that Plaintiff's counsel purported to rescind "all settlement offers made or exchanged prior to [his] involvement in the case[.]"

These facts, which are memorialized by Mr. Walston's own testimony and the other evidence attached hereto, establish that (a) Mr. Walston made a valid settlement offer on November 13, 2023, and (b) neither he nor his counsel purported to revoke that offer until after NRS accepted. Under Illinois law, this created a binding contract. Plaintiff breached that contract when he initiated this action. NRS therefore asks the Court to enforce the parties' agreement and dismiss Plaintiff's Complaint.

## II. BACKGROUND

NRS markets and sells a variety of administrative tools for businesses, including point of sale systems (*i.e.*, credit card readers, receipt printers, cash drawers, barcode scanners, etc.) and payroll management services. Declaration of Elie Katz, attached as Exhibit 1 ("Katz Decl."). NRS's has marketed its products and services through various means, including, for a brief period, via ringless voicemail messages to prospective customers. *Id.* ¶ 4.

On October 19, 2023, Mr. Walston wrote to NRS claiming it violated the TCPA by sending him seven prerecorded voice messages to his cell phone number ending in 4088 between March 7, 2022 and October 12, 2023 (the "Subject Number" and "Subject Communications"). *See* Katz Decl., Ex. A. (October 19, 2023 Correspondence). Mr. Walston threatened that NRS was potentially subject to statutory damages and class liability. *Id.* at 2-3. However, he further advised that he was willing to settle his claims in exchange for $9,800, so long as he received "every assurance that the offending communications that are the subject of this matter be the very last that I receive." *Id.* at 2-3.

NRS investigated Mr. Walston's allegations and placed the Subject Number on its do-not-call list. Katz Decl. ¶ 7. On November 13, 2023, NRS's CEO, Elie Katz, reached out to Mr. Walston by telephone and first assured him that he would not receive additional communications from NRS. *Id.* ¶ 8. Mr. Katz then offered Mr. Walston $800 to resolve his claim, informing him

2

that the settlement would need to be confidential. *Id.* Mr. Walston was fine with confidentiality, but noted that the amount "is not good enough" and that he needed at least $5,000 to resolve his claims (the "November Offer"). Desposition of Rashad Walston, attached as Exhibit 2 ("Walston Dep."), at 123:22-124:8, 125:10-:15; Katz Decl. ¶ 9. Mr. Katz told Mr. Walston that he didn't have authority to accept that offer on the spot, but the parties agreed that NRS would follow up with Mr. Walston after completing its investigation. Katz Decl. ¶ 10; Walston Dep. at 126:3-:7 (acknowledging that there would be another discussion).

On November 22, 2023, Plaintiff's counsel, Jeremy Glapion, reached out to NRS advising that he was retained to represent Mr. Walston regarding the Subject Communications and wanted "to figure out what happened, how to prevent this from occurring in the future, and where we go from here." Katz Decl., Ex. B (November 22, 2023 Correspondence). After some back and forth and coordinating both parties' schedules during the Thanksgiving holiday season, Mr. Glapion and NRS's counsel, Menachem Ash, had a telephone conference on December 8, 2023. Declaration of Menachem Ash, attached as Exhibit 3 ("Ash Decl."). Mr. Glapion followed up by explaining that he wanted "to figure out how idt [NRS's parent company] obtained my client's telephone number[.]" Ash Decl., Ex. A (Email Correspondence). NRS and Mr. Glapion then had a follow-up conference on December 19, 2023. *Id.* ¶ 7. At no time during these conferences or email exchanges did Mr. Glapion ever rescind the November Offer or state that Mr. Walston was no longer willing to resolve his claims for the previously stated amount. *Id.* ¶ 12.

After the holidays, NRS concluded that regardless of its defenses to TCPA liability, Mr. Walston's threatened lawsuit would cost far more to defend than just paying his November Offer. Ash Decl. ¶ 9. Thus, while the parties were in the midst of their joint investigation, NRS accepted the November Offer, agreeing to pay Mr. Walston $9,800—far exceeding the $5,000 he conveyed

3

would be needed to resolve the matter—in exchange for a "full release of claims, confidentiality provisions, and other customary terms," as the parties agreed during the November 13, 2023 call. Ash Decl., Ex. B (January 3, 2024 Correspondence); Katz Decl. ¶¶ 8-9.

It was only after NRS accepted the November Offer that Mr. Glapion purported to rescind "all settlement offers made or exchanged prior to my involvement in the case (i.e. my client's retention of counsel)[.]" Ash Decl., Ex. B.

Plaintiff then breached the Agreement by initiating this action. ECF No. 1. NRS quickly sought to obtain evidence to establish that the parties entered into an agreement resolving Plaintiff's claims before he filed suit, including by noticing Plaintiff's deposition. Once Mr. Walston confirmed the November Offer at his deposition, NRS prepared the instant motion, which seeks to enforce the parties' settlement.

### III. LEGAL STANDARD

District courts have "the inherent or equitable power to enforce a settlement agreement in a case before it." *Wilson v. Wilson*, 46 F.3d 660, 664 (7th Cir. 1995). Settlement agreements are contracts and are interpreted according to the law of the jurisdiction in which the contract was created, which in this case is Illinois. *Leibowitz v. Trebels*, 2012 WL 5559554, at *3 (N.D. Ill. Nov. 14, 2012).

Under Illinois law, an oral settlement agreement is valid and binding so long as "there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement." *Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 507 (7th Cir. 2007) (internal citation omitted) (citing *Brewer v. Nat'l R.R. Corp.*, 628 N.E.2d 331, 335 (Ill. Ct. App. 1993)). A formal writing is not required for a valid settlement agreement, and the "fact that a formal written document is anticipated does not preclude enforcement of a specific preliminary promise."

4

*Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992); *see also Pohl v. United Airlines, Inc.*, 213 F.3d 336, 337 (7th Cir. 2000) (explaining that "the belief of some litigants in pursuing settlement of their claims that they can change their mind at any time before they actually sign the settlement agreement . . . is often unfounded in law.").

"Voluntary resolution of litigation, through settlement, is favored by courts. A settlement agreement is a contract, which cannot be unilaterally repudiated by any of the parties." *Steadfast Ins. Co. v. Auto Marketing Network, Inc.*, 2004 WL 906118, *4 (N.D. Ill., April 28, 2004). Indeed, the Seventh Circuit has "observed that Illinois courts have not been shy about enforcing promises made in the context of ongoing negotiations and often involving preliminary or incomplete agreements." *Beverly v. Abbott Lab'ys*, 817 F.3d 328, 334 (7th Cir. 2016) (internal quotation omitted); *K4 Enter., Inc. v. Grater, Inc.*, 914 N.E.2d 617, 626 (Ill. App. Ct. 2009) ("[A] settlement agreement that sets forth essential and material obligations of the parties is enforceable even if some of the terms are missing or left to be agreed upon."). "Absent mistake or fraud, a settlement agreement will not be disturbed or set aside lightly." *See LaSalle Nat. Trust, N.A. v. Lamet*, 2014 WL 1047881, at *8 (Ill. Ct. App. 2014).

### IV. ARGUMENT

Here, the parties entered into a valid and binding settlement agreement because all of the essential elements of an offer, acceptance, and mutual assent are present. Accordingly, the Court must enforce that agreement and dismiss this action.

### A. Plaintiff Made a Valid Offer to Settle his TCPA Claims Against NRS.

First, Plaintiff's November Offer constitutes a valid, binding offer to settle his claims against NRS. Illinois law confirms that no "formal terms" are necessary to make an offer, and a claimant's oral statement that he is willing to settle claims for a certain amount creates a valid and binding settlement offer. *Beverly v. Abbott Lab.*, 817 F.3d 328, 335 (7th Cir. 2016) (enforcing

5

settlement where plaintiff offered "to resolve this matter" in exchange for monetary payment, because that phrase "adequately conveys [plaintiff's] offer to abandon her claims against [defendant]."); *see also Wilson*, 46 F.3d at 667 (where the court enforced plaintiff's oral offer to settle his claims for a monetary amount, finding "no more is required"); *Dillard*, 483 F.3d at 507 (enforcing oral offer of settlement). An oral offer need only be "reasonably certain and reasonably ascertainable from the acts and words of the parties." *Taylor v. Gordon Flesch Co.*, 793 F.2d 858, 862 (7th Cir. 1986) (internal quotation omitted).

Here, Mr. Walston explicitly stated that he would accept a sum of money—at least $5,000—to privately settle his threatened TCPA claims against NRS. Walston Dep. at 125:10-:15; Katz Decl. ¶¶ 8-9. Plaintiff's offer conveyed reasonably certain and ascertainable terms and thus qualified as a valid offer. *See, e.g.*, *Dillard*, 483 F.3d at 507 (enforcing oral offer of settlement that plaintiff "would not accept less than $65,000[.]"). NRS was therefore authorized to resolve Plaintiff's claims arising out of its alleged TCPA liability by agreeing to pay him more than $5,000.

**B. NRS Accepted Plaintiff's Offer and There was a Meeting of the Minds on All Material Terms.**

Next, after further investigating Plaintiff's claims, NRS accepted Plaintiff's November Offer by sending a written correspondence to his counsel on January 3, 2024. Where an offer does not contain a time limit, as here, it won't lapse so long as it is accepted within a reasonable time. *See Kirchhoff v. Rosen*, 592 N.E.2d 371, 376 (Ill. Ct. App. 1992) (enforcing recission agreement that was accepted 18 days after the offer, despite the offer letter demanding a response within seven days). Whether a party's acceptance has come within a reasonable time "depends upon a multiplicity of circumstances" existing when the offer and acceptance are made. *Id*.; *see also* Restatement (Second) of Contracts § 41; *In re Davis*, 1998 WL 34069396, at *1 (Bankr. C.D. Ill. July 10, 1998) (acceptance eight weeks after offer was reasonable where "Defendant did not take

any actions during this time period which were inconsistent with his intent to follow through with the proposed settlement."); *Zaniecki v. P.A. Bergner & Co. of Illinois*, 493 N.E.2d 419, 423 (Ill. Ct. App. 1986) (refusing to find that offer lapsed, explaining "we cannot say as a matter of law that nine months was an unreasonable amount of time.").

Here, NRS accepted Plaintiff's offer within six weeks, which is reasonable given the ongoing discussions with Plaintiff and his attorney and that there were multiple holidays between November 13, 2023 and January 3, 2024. During the November 13, 2023 call, the parties understood NRS would respond to Plaintiff's November Offer after such investigation and conferral process. Walston Dep. at 126:3-:7; Katz Decl. ¶ 10. Plaintiff's counsel then reached out to NRS and the parties actively engaged in ongoing discussions regarding the factual underpinnings of Plaintiff's November Offer. Katz Decl. ¶ 11; Ash Decl. ¶¶ 5-7. Plaintiff's counsel knew NRS "had been discussing [Mr. Walston's claims] with him[.]" Ash Decl., Ex. A. Nevertheless, during all their email and phone conferences, Plaintiff's counsel never rescinded the November Offer. Ash Decl. ¶ 12. Accordingly, NRS's January 3, 2024 acceptance of Plaintiff's November Offer was proper.

Moreover, NRS and Plaintiff had a meeting of the minds on all essential terms of the settlement agreement. To that end, whether there is a meeting of the minds "depends on the parties' objective conduct, not their subjective beliefs." *Dillard*, 483 F.3d at 507; *Paxton–Buckley–Loda Educ. Ass'n, IEA–NEA v. Ill. Educ. Labor Relations Bd.*, 710 N.E.2d 538, 544 (Ill. Ct. App. 1999) ("[A] test based on subjective beliefs would enable a party to evade its contractual commitments."). A meeting of the minds doesn't require the parties agree on "[e]very feasible contingency that might arise in the future[.]" *Pritchett v. Asbestos Claims Mgmt. Corp.*, 773 N.E.2d 1277, 1282 (Ill. Ct. App. 2002). In fact, a settlement agreement is enforceable "despite the

7

omission of certain terms so long as those terms are not material." *Beverly*, 817 F.3d at 334–35; *Pritchett,* 773 N.E.2d at 1282 ("Ambiguity will prevent the enforcement of a contract only where the ambiguity affects the material terms of the contract."). Thus, "settlement agreements that do not explicitly resolve ancillary issues can nonetheless be enforceable." *Robin v. Robin*, 2004 WL 170318, at *5 (N.D. Ill. Jan. 21, 2004).

Here, the parties came to a meeting of the minds on the material terms of the Agreement—that Plaintiff would drop his claims arising out of the alleged TCPA violations by NRS in exchange for a payment of at least $5,000, which NRS's acceptance far exceeded. Katz Decl. ¶¶ 8-9. Regardless of Plaintiff's counsel's subjective beliefs, Plaintiff never rescinded the November Offer until after NRS accepted it. Ash Decl. ¶ 12, Ex. B.

## V. CONCLUSION

The Court shoud affirm the validity of the pre-litigation settlement agreement between NRS and Plaintiff. The undisputed facts establish that Plaintiff made a valid offer to NRS prior to filing suit, and that NRS unequivocally accepted it. The essential terms—that Plaintiff releases NRS from TCPA liability in exchange for a $9,800 payment——were clearly defined and were all that was needed for a valid settlement agreement under Illinois law. The Court should therefore enforce those terms and give NRS an opportunity to remit payment to Plaintiff and dismiss Plaintiff's claims.

*[Signature Appears on Following Page]*

8

DATED: May 28, 2024.

                Respectfully submitted,

                */s/ Ryan D. Watstein*
                Ryan D. Watstein (*pro hac vice*)
                ryan@wtlaw.com
                Patrick J. Fitzgerald (*pro hac vice*)
                pfitzgerald@wtlaw.com
                **WATSTEIN TEREPKA LLP**
                1055 Howell Mill Road, 8th Floor
                Atlanta, Georgia 30318
                Tel: (404) 782-9821
                Fax: (404) 537-1650
                Justin M. Penn, ARDC 6283726
                jpenn@hinshawlaw.com
                **HINSHAW & CULBERTSON LLP**
                151 North Franklin Street, Suite 2500
                Chicago, Illinois 60606
                Tel:  (312) 704-3000

                *Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2024, I caused to be electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

                                                      */s/ Ryan D. Watstein*
                                                      Ryan D. Watstein