IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| RASHAD WALSTON, on behalf of himself and all others similarly situated, | : | Case No. 1:24-cv-00083 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NATIONAL RETAIL SOLUTIONS, INC. D/B/A NRS PAY, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S REPLY IN SUPPPORT OF
MOTION TO ENFORCE SETTLEMENT AGREEMENT**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................. 1

II. ARGUMENT ........................................................................................................................ 3

    A. The Evidence Shows that the November Offer was Open and Existing. ................ 3

    B. The January Letter Accepted the November Offer. ................................................ 6

        1. The January Letter Targeted the November Offer. ..................................... 6

        2. NRS Manifested its Assent to be Bound. ..................................................... 6

        3. The Letter Complied With the Mirror Image Rule. .................................... 8

    C. Public Policy Supports Enforcing the Settlement Agreement. ............................. 10

III. CONCLUSION .................................................................................................................. 12

### I. INTRODUCTION

Defendant NRS's Motion to Enforce Settlement established that, after previously demanding $9,800, Plaintiff offered to resolve his TCPA claims against NRS in exchange for a payment of at least $5,000, which the parties would keep confidential. Despite knowing about the parties' negotiations, Plaintiff's counsel did not purport to rescind the November Offer until *after* NRS tendered its January 3, 2024 letter agreeing to pay Plaintiff what he wanted, $9,800 (the "January Letter"). These points are undisputed.

In fact, despite the Opposition's hyperbole and false indignation, Plaintiff himself doesn't dispute *any* salient points, since he doesn't submit a declaration with the Opposition. Rather, his counsel—in line with his own financial incentives—submits *argument* that NRS's CEO, Elie Katz, rejected the November Offer when he spoke with Plaintiff and that the January Letter was not an acceptance. Neither of these points has merit.

As to the first, the Opposition references only Plaintiff's alleged subjective belief that Mr. Katz's statement that he "will have to get authority" meant that he was rejecting the offer. Setting aside that this is Plaintiff's counsel's incorrect interpretation of his client's testimony, Plaintiff's subjective belief isn't the applicable legal standard, under binding authority. Rather, contract formation is governed by the parties' objective conduct, and no reasonable person could believe that Mr. Katz rejected the November Offer based on Plaintiff's testimony. Rather, Mr. Katz stating he "will have to get authority" and planning a follow up call shows he was taking the November Offer under further advisement, which the Restatement makes clear is *not* rejection. But even if the parties' subjective interpretations mattered legally, Mr. Katz testified that the November Offer was open when the parties ended their phone call. Thus, at the very least, there would be a question of fact that the Court must resolve through an evidentiary hearing (though the unrebutted evidence shows Mr. Katz was taking the November Offer under advisement, meaning it was open).

1

As to the Opposition's second point, the January Letter accepted the November Offer. The Letter manifested NRS's assent to be bound by the same terms the parties both agreed to—paying Plaintiff "at least" $5,000 in exchange for confidentially releasing his claims. Accordingly, the January Letter complies with the mirror image rule, notwithstanding the fact that NRS, accepting an oral demand qualified by an "at least," erred on the side of caution and agreed to pay the $9,800 Plaintiff initially asked for. $9,800, of course, is "at least" $5,000.

Finally, Plaintiff's counsel, who tried to back his client out of the agreement by filing suit, accuses NRS of springing the agreement and asks the Court to set it aside as a matter of public policy. NRS did not delay bringing this Motion and public policy supports *NRS's* argument, not Plaintiff's counsel's. Of course NRS didn't saber rattle over its intent to move to enforce the settlement. NRS's litigation counsel understood that *Plaintiff's counsel* strongly opposed an individual settlement, no matter how good for his client, and instead hoped for a large payout from a class resolution, so NRS knew what counsel's reaction would be. But NRS didn't have *Mr. Walston*'s story about those negotiations. So NRS took his deposition, which confirmed a settlement had occurred as NRS had indicated, and then NRS promptly filed this motion. Though legally irrelevant, Plaintiff's counsel is also wrong that NRS didn't raise this issue earlier, as NRS has been consistent about the existence of a settlement since it raised that exact point in its Answer. ECF No. 11 at 22.

Plaintiff's counsel may be disappointed that he cannot proceed with a class action and potentially recover a greater payout for himself (but likely less for Plaintiff, as is generally the case with class settlements).[1] But NRS agreed to all of Mr. Walston's demands, and Plaintiff's counsel

---

[1] NRS vehemently disputes that there is any merit to Plaintiff's claims or that a class could ever be certified in this case, but that is beside the point for purposes of this motion.

2

concedes that neither he nor his client previously rescinded the November Offer. NRS is not clairvoyant—it had no objective reason to think the November Offer was off the table until after it accepted it. Plaintiff's counsel, on the other hand, admittedly knew about those discussions, and if he wanted to avoid this outcome, all he needed to do was confer with his client and (assuming his client agreed) withdraw the November Offer. But he failed to take action until after NRS tendered its acceptance on terms his client previously agreed were acceptable.

## II. ARGUMENT

### A. The Evidence Shows that the November Offer was Open and Existing.

Mr. Walston and Mr. Katz's objective conduct establishes that the November Offer was open and existing at the conclusion of their November telephone conference. To that end, contract formation is governed by the parties' objective conduct, not their subjective beliefs. *Bailey v. Worthington Cylinder Corp.*, 2022 WL 3213232, at *2 (N.D. Ill. May 19, 2022) ("Illinois follows the objective theory of intent in which the written records of the parties' actions – rather than their subjective mental processes – drive the inquiry."); *Baker v. Elmwood Distrib., Inc.*, 1990 WL 71037, at *3 (N.D. Ill. May 11, 1990) ("[O]bjective manifestations of intent—not subject belief— is controlling in determining whether a contract has been formed."). Thus, the existence of an agreement "depends on what the parties express to each other and to the world, not on what they keep to themselves." *Newkirk v. Vill. of Steger*, 536 F.3d 771, 774 (7th Cir. 2008).

Here, Plaintiff maintains (at 7-8) that NRS rejected the November Offer during their phone conference. But the testimony shows otherwise:

> Q. Okay. So basically, let me see if I can accurately summarize.
>
> Basically, he offered you $800.00 and you came back with something like that's not good enough; it's going to have to be higher than that, maybe $4,000.00, $5,000.00, something like that, and he said I'll get back to you?

3

> A. No, that's not what he said. What he said is, come on -- this is generally what he said. He said, "Come on, man." But I do remember specifically, he said, "We're a small company. We can't afford this type of money. Let's make today a good day." And he asked me to call him back. But he reiterated, he said that he was NRS Pay. They are a small company. That he would have to get approval to issue out anything over $800.00. And he asked me, and I said that's not good enough. So he asked me to call him back at some point.
>
> He said he will be in and out of meetings that day; to give him a call back. And I said, "I'll give you a call back." I said, "I'll give you a call back."
>
> Q. Okay. So I think I understand now. So basically, he offered $800.00. You said that's not good enough. It's going to take something more like $4,000.00 or $5,000.00?
>
> A. At least, at least.
>
> Q. At least. Okay. And then he said, "I have to get authority for that, or see if I can get authority for that; why don't you call me back?"
>
> A. No. He said, "We're a small company. We cannot afford that. I would have to get authority to do anything over $800.00." He never said that he's going to check to get authority. He said, "I will have to get authority." He made it seem like that was it, $800.00 flat, that's it."
>
> Q. Okay. But he said he would have to get authority for something over $800.00, and the way that you guys left it was there would potentially be another discussion?
>
> A. I believe so, yes.

Walston Dep. at 124:9-126:7.

Plaintiff's testimony that Mr. Katz said he would "have to get authority" to respond to Plaintiff's renewed offer compels the conclusion that Mr. Katz was taking the November Offer under advisement, not rejecting it. That alone precludes finding that NRS rejected the November Offer. Indeed, as the Restatement makes clear, "[a] manifestation of intention not to accept an offer is a rejection **unless the offeree manifests an intention to take it under further advisement**," exactly as happened here. Restatement (Second) Contracts § 38 (2) (emphasis added); *see also*

4

*Collins v. Thompson*, 679 F.2d 168, 172 (9th Cir. 1982) (refusing to find rejection where offeree indicated that they were considering offer); *Paris v. Ford Motor Co.*, 2007 WL 4969148, at *3 (D.N.M. June 19, 2007) (finding there was no rejection where response stated that client "will make their determinations known timely," which indicated intent to take offer under advisement). Thus, regardless of Plaintiff's subjective belief that he mistakenly thought "that was it, $800 flat[,]" Mr. Katz's *objective conduct* in stating that he would "have to get authority" shows that he was considering the November Offer, meaning the offer was open and existing at the end of the call.

Even if Plaintiff's testimony established that Mr. Katz NRS rejected the November Offer based on his objective conduct (it doesn't), Mr. Katz remembers the conversation differently. Though Mr. Katz acknowledged he didn't have authority to "accept his offer on the spot," he testified NRS would follow up with Plaintiff about his offer, which Mr. Katz confirmed was acceptable to Plaintiff. Katz Decl. ¶ 10. This is consistent with the length of the call, as verified by Plaintiff's own phone records—if Mr. Katz flatly rejected Plaintiff's demand, why did it take seven minutes to do that? *Id.* ¶ 8. Accordingly, Mr. Katz's declaration establishes that the November Offer was open and existing at the end of their call. So even assuming there was conflicting material evidence—there is not given Plaintiff's testimony confirming that, objectively, his offer remained open at the end of the call—the Court must at least "conduct an evidentiary hearing" to resolve a disputed fact. *Sims-Madison v. Inland Paperboard & Packaging, Inc.*, 379 F.3d 445, 449 (7th Cir. 2004) ("Although a district court has the inherent authority to summarily enforce a settlement agreement, when the existence or terms of a settlement agreement are in dispute, the district court should hold an evidentiary hearing to resolve the disputes or ambiguities."); *Cty. Line Nurs. and Landsc., Inc. v. Glencoe Park Distr.*, 46 N.E.3d 925, 932 (Il. Ct. App. 2015) (it is "reversible error" not to conduct evidentiary hearing on motion to enforce

5

settlement agreement if there are "disputed issues of material fact"). Once again, Plaintiff has not submitted any declaration to the contrary.

**B.     The January Letter Accepted the November Offer.**

Next, the January Letter complied with the terms that the parties agreed to during the November call, namely NRS paying Mr. Walston "at least" $5,000 in exchange for a confidential release of his TCPA claims (a term included in Plaintiff's numerous settlements with other companies, all of which were also memorialized by long-form agreements). The Opposition maintains that the January Letter wasn't proper acceptance as it attempted to accept Mr. Walston's earlier October 19, 2023 demand, did not properly manifest assent, and did not match the terms of the November Offer, thereby violating the mirror image rule. Each of these points is wrong.

**1.     *The January Letter Targeted the November Offer*.**

First, the January Letter accepted the November Offer, which was the only offer existing at the time. The Opposition's claim (at 6-7) that the January Letter was an attempt to accept the October 19, 2023 offer for $9,800 ignores the circumstances of the parties' negotiations. NRS was accepting an oral offer a few weeks after the November call. Rather than run the risk of identifying a figure lower than what Mr. Walston demanded, NRS erred on the side of caution and agreed to pay the full amount Plaintiff originally wanted: $9,800.

**2.     *NRS Manifested its Assent to be Bound.***

Next, the January Letter manifested NRS's assent to be bound and therefore properly accepted the November Offer. Absent a limitation "fixed in the offer" itself, acceptance does not need to be in any particular form or wording. *Calo, Inc. v. AMF Pinspotters, Inc.*, 176 N.E.2d 1, 5 (Ill. Ct. App. 1961). The offeree doesn't need to use any special language so long as it "manifest[s] its assent to the offer's . . . terms." *Sipi Metals Corp. v. Aransas Pass Precious Metal Recovery LLC*, 2023 WL 4352454, at *2 (N.D. Ill. July 5, 2023).

6

Plaintiff maintains (at 9) that because NRS's prior counsel stated that she "ha[d] authority" to accept the November Offer, the January Letter wasn't acceptance. But Plaintiff doesn't maintain that he understood "have authority" as a conditional statement, and his counsel's construction ignores the context. NRS's counsel stated, "I have authority on behalf of National Retail Solutions, Inc. to accept Mr. Walston's settlement demand of $9,800 to *fully and finally resolve the parties' disputes*." ECF No. 22-3 at 18. NRS's counsel was acting as its agent and she expressed her authorization, accepting Plaintiff's offer. As the Court knows, this is standard language used in accepting a settlement offer. An attorney's power to settle a claim depends on authority conferred by his client. *Brewer v. National R.R. Passenger Corp.*, 649 N.E.2d 1331 (Ill. 1995). Accordingly, an attorney's response to a settlement offer, confirming they have such authority, is a manifestation of its client's assent to accept the offer.[2] This is the exact conclusion reached by the only published decision the undersigned could find examining this issue. *See, e.g., O'Neill v. Herrington*, 317 P.3d 139, 143, 147 (Kan. Ct. App. 2014). There, the Court held that a lawyer's statement that "I have authority to settle . . . on those terms" "accepted the offer[.]" *Id.*

The cases Plaintiff cites are inapposite and do not establish that "have authority" is conditional statement that cannot amount to valid acceptance. *Vincent DiVito, Inc. v. Vollmar Clay Prod. Co.* involved a dispute between a contractor, DiVito, which submitted a bid for a municipal sewer project using prices supplied by its piping subcontractor, Vollmar. 534 N.E.2d 575, 577 (Ill. Ct. App. 1989). DiVito maintained that the parties entered into an agreement when it told a Vollmar representative that DiVito was "going to use [Vollmar's] number" in its bid to

---

[2] And because the parties reached an agreement, Plaintiff's reference to their *subsequent* email communications, where NRS's counsel carelessly referred to the January Letter as a "good faith settlement offer," is irrelevant. *Parker v. Ritz*, 2023 WL 1447807, at *2 (S.D. Ill. Feb. 1, 2023) (post-settlement statement that the "deal won't be final until all parties have signed" didn't make the writing a condition precedent to settlement).

7

the city's sewar project. Both parties understood the city needed to accept DiVito's bid before their agreement ripened and thus Volmar could not treat DeVito's "response as an acceptance."

Unlike *DiVito*, NRS and Plaintiff didn't need a third-party to approve their agreement. That NRS's counsel mentioned preparing a formal release and which party would prepare it, listing terms the parties had already agreed to during the November call, does not undermine the enforceability of their agreement. *Beverly v. Abbott Lab'ys*, 817 F.3d 328, 334 (7th Cir. 2016) ("[A]nticipation of a more formal future writing does not nullify an otherwise binding agreement."); *Glencoe Park Dist.*, 46 N.E.3d at 928 (Ill. Ct. App. 2015) (enforcing oral settlement agreement lawyer for moving party accepted agreement, stating "pending confirmation of the [client's] agreement, he considered the case settled."); *Parker*, 2023 WL 1447807, at *2 ("[W]here the parties have assented to all the terms of the oral agreement the mere reference to a future written document does not negate the existence of a present contract[.]").

*USA Satellite & Cable, Inc. v. MacNaughton* likewise does not help Plaintiff. 2018 WL 665397, at *1 (N.D. Ill. Jan. 9, 2018). In *USA Satellite*, the plaintiff allegedly made a demand to settle for $40,000 and defense counsel emailed plaintiff, stating "[t]he insurance company *will* go to $40,000 *if* I can make a deal to settle everything with you." *Id.* at *1 n.3. Unlike this case, the client there hadn't even supplied counsel with authority to accept the settlement offer. The court therefore concluded that the conditional language of a future deal didn't amount to acceptance.

In contrast to these cases, NRS made clear in language that any lawyer would understand that it was accepting the November Offer. The January Letter thus adequately manifested NRS's assent. *Herrington*, 317 P.3d at 143.

### 3. The Letter Complied With the Mirror Image Rule.

Finally, the January Letter contained the terms to which the parties agreed in the November call and therefore complied with the mirror image rule. Plaintiff maintains (at 10-11) that because

8

NRS agreed to pay Plaintiff *more* than Mr. Walston demanded in the November Offer and referenced terms the parties already agreed to, the January Letter violates the mirror image rule. Neither of these arguments have merit.

Plaintiff concedes the November Offer was effective and thus accepts that "at least" $5,000 is a valid term. NRS could thus tender acceptance in any form so long as the payment was equal to or greater than $5,000. That is consistent with the plain meaning of the phrase "at least"—which is "at the minimum." *At least*, Meriam-Webster; *see also Yoder v. Rock Island Bank*, 362 N.E.2d 68, 72 (Ill. Ct. App. 1977) (finding acceptance valid where it complied with terms set forth in offer); Restatement (Second) of Contracts § 58, cmt. a (1981) ("[A] variation clearly to the offeror's advantage . . . may be within the scope of the offer."). Plaintiff himself acknowledged that he didn't set a fixed amount, but rather his desire was to be paid between at least several thousand and $9,800: "I did not say he had to pay $9,800.00. . . . I maybe have thrown out some amounts of maybe $3,000.00 or $4,000.00, in that range, $5,000.00. But I never said you have to give me $9,800.00, exactly what's in this letter." Walston Dep. at 124:3-:8. Plaintiff continued, testifying that he wanted "at least" $5,000. *Id.* at 125:11-:15.

Plaintiff's counsel doesn't argue that his client intended to limit NRS's acceptance to $5,000 flat, nor could he based on his client's testimony. Nor does he identify any law suggesting that where one party asks for "at least" a certain amount, the offeree may only accept by paying that exact figure. Instead, Plaintiff's counsel tries to avoid the plain language of the November Offer by speculating (at 10-11) about situations in which a person, not his client, might object to receiving more money than they stated. But if that was the case, Mr. Walston was free to limit his offer to $5,000 flat. These hypotheticals, again, entirely ignore the record in *this case*, where Plaintiff wanted $9,800 but would have taken "at least" $5,000.

9

The other items set forth in the January Letter are terms Mr. Walston agreed to during the November Call—confidentiality and a release of Mr. Walston's TCPA claims—and thus do not violate the mirror image rule. Plaintiff's counsel attempts to inject additional terms, like NRS disclaiming liability and Plaintiff's confirmation. As for the former, NRS simply stated that it "denie[d] liability to Mr. Walston[.]" There is nothing in the January Letter to suggest Mr. Walston wouldn't receive payment if he didn't accept NRS's position on liability. That NRS expressed its understandable expectation that the parties would prepare a formal release doesn't make its acceptance conditional. Again, an "agreement is not invalid simply because it calls for the parties to reach another agreement in the future." *Mattingly v. City of Chicago*, 897 F. Supp. 375, 377 (N.D. Ill. 1995); *see also Robin v. Robin*, 2004 WL 170318, at *9 (N.D. Ill. Jan. 21, 2004) (email accepting offer and asking to discuss "mechanics of entering into a final and binding agreement" was valid acceptance, notwithstanding the fact that the parties could not agree on a release). So the parties' agreement here isn't unenforceable just because the confidentiality and payment terms they already agreed to would ultimately be fleshed out in a written agreement that contained, for example, the address to which the check would be sent.[3]

### C. Public Policy Supports Enforcing the Settlement Agreement.

Finally, Plaintiff's counsel seeks to undermine the strong public policy favoring settlement by backing out of a binding settlement that would prevent him from recovering the attorney's fees he might realize in a class action.

---

[3] Plaintiff is wrong to make much of the statement in the January Letter that NRS would send a draft agreement, and suggests that NRS's failure to send that agreement or make payment must mean that no settlement was reached. Given the possibility that Plaintiff's counsel would be hostile to a settlement that was less beneficial to him financially as his desired class resolution would be, it made perfect sense for NRS to wait for Plaintiff's counsel to confirm there wouldn't be a fight over NRS's acceptance before proposing the draft that memorialized the terms Plaintiff and NRS had agreed to. This turned out to be a wise decision, given Plaintiff's counsel immediately tried to back his client out of the settlement that Plaintiff himself had proposed in the first place.

Plaintiff's claim (at 12-13) that NRS is trying to use the parties' pre-suit negotiations to foist a settlement on Plaintiff totally rewrites history. To start, it was *Plaintiff* who approached NRS about settlement, not the other way around, and NRS ultimately agreed to pay him exactly what he wanted. And Plaintiff's counsel knew Mr. Katz "had been discussing [the TCPA claim] with [Mr. Walston.]" ECF No. 22-1 at 24. NRS reasonably took this to mean Plaintiff's counsel was aware of the November Offer. If Plaintiff's counsel wanted to rescind that offer (and that's what his client wanted), he needed to tell NRS. Regardless of the public policy in favor of pre-litigation negotiations, courts don't assume a "paternalistic role," protecting counsel from his own apparent mistakes. *All Am. Roofing, Inc. v. Zurich Am. Ins. Co.*, 934 N.E.2d 679, 688 (Ill. Ct. App. 2010) (acknowledging that courts have refused to find that a party must advise a counterparty about the terms of an agreement). Thus, Plaintiff's reliance on *Sharp v. Keeling* is misplaced as NRS wasn't negotiating with a pro se claimant when it tendered its acceptance. 2019 WL 1865031, at *2 (S.D. Ill. Apr. 25, 2019).

Moreover, and contrary to Plaintiff's counsel's claims, NRS has been clear that the parties' settlement was a defense to liability. NRS asserted that defense in its Answer, alleging "Plaintiff is barred from pursuing any claim . . . pursuant to an agreement whereby he released liability alleged against Defendant." ECF No. 11 at 22. Plaintiff's counsel even served discovery requests on that specific defense, so he knew NRS was going to raise this issue and his false indignation otherwise is disingenuous.

NRS likewise exercised reasonable diligence in pursuing its defense and filing this Motion. NRS knew that Plaintiff's counsel, who has incentive to litigate this matter as a class action, denied that the parties reached an agreement. However, NRS didn't know how Mr. Walston viewed the parties' settlement discussions. So NRS quickly noticed Mr. Walston's deposition, where it

11

confirmed that he made a valid offer and prepared and filed this motion shortly thereafter, nearly right after discovery opened. NRS's actions are thus nothing like in *McKinney v. Holmes*, where a party tried to enforce a settlement after litigating the case for "three to four years." 2021 WL 6049623, at *2 (D.N.J. Dec. 20, 2021).

### III. CONCLUSION

The evidence shows Plaintiff made a valid offer to confidentially settle this case for "at least" $5,000, and NRS tendered its acceptance through the January Letter. The January Letter complied with all the terms set forth in the November Offer and therefore ripened into an enforceable agreement. As Plaintiff agreed to release TCPA claims, the Court should grant the Motion and, upon NRS's remittance of payment, dismiss this case.

DATED: June 10, 2024.

Respectfully submitted,

*/s/ Ryan D. Watstein*
Ryan D. Watstein (*pro hac vice*)
ryan@wtlaw.com
Patrick J. Fitzgerald (*pro hac vice*)
pfitzgerald@wtlaw.com
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-9821
Fax: (404) 537-1650
Justin M. Penn, ARDC 6283726
jpenn@hinshawlaw.com
**HINSHAW & CULBERTSON LLP**
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
Tel: (312) 704-3000

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

      I hereby certify that on June 10, 2024, I caused to be electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

                                                           */s/ Ryan D. Watstein*
                                                           Ryan D. Watstein