## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

RASHAD WALSTON, on behalf of himself :    Case No. 1:24-cv-00083
and all others similarly situated,      :
                                    :
       Plaintiff,           :
                                      :
v.                                  :
                                      :
NATIONAL RETAIL SOLUTIONS, INC.  :
D/B/A NRS PAY,          :
                                      :
       Defendant.       :

_____/

## DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................. 4

     A.     Counsel Repeatedly Put his Personal Interests Before his Client, Prohibiting Him From Following Through with the Individual Settlement that Plaintiff Himself Twice Said He Wanted. ...................................................................................... 4

     B.     Counsel Resisted NRS's Effort to Obtain Plaintiff's Retainer Agreement and Tried to Conceal his Misconduct. .......................................................................... 6

     C.     Caught Red-Handed, Counsel Continued to Try to Conceal the Unethical Engagement Letters by Seeking to Preemptively Seal this Motion........................ 9

III.    STANDARD......................................................................................................... 10

IV.    ARGUMENT ...................................................................................................... 10

     A.     Counsel Employed Terms Placing His Interests Above His Client's................... 12

          1.     The Springing Fee ..................................................................................... 13

          2.     The Statutory Cap and Reasonable Offer Restriction ................................ 15

     B.     Counsel Violated His Duty of Candor to the Tribunal. ....................................... 17

     C.     Counsel's Ethical Violations Preclude Both Plaintiff and Counsel from Showing They Can Adequately Represent a Class. ............................................................ 18

     D.     Counsel Cannot Cure Violations by Amending the Engagement Letter and Holding Otherwise Would Encourage Similar Misconduct. ................................ 20

V.     CONCLUSION.................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Blaise v. Transworld Sys.*,
  2022 WL 3026946 (N.D. Ill. Aug. 1, 2022) ............................................................ 7, 22

*Compton v. Kittleson*,
  171 P.3d 172 (Alaska 2007) ..................................................................... 12, 14, 15

*Cook Cty. Coll. Teachers Union v. Byrd*,
  456 F.2d 882 (7th Cir. 1972) ............................................................................ 10

*Creative Montessori Learning Centers v. Ashford Gear LLC*,
  662 F.3d 913 (7th Cir. 2011) ................................................................. 3, 4, 11, 21

*Deadwyler v. Volkswagen of Am., Inc.*,
  134 F.R.D. 128 (W.D.N.C. 1991) ........................................................................ 18

*Derzack v. Cnty. of Allegheny, Pa.*,
  173 F.R.D. 400 (W.D. Pa. 1996) ........................................................................ 21

*First Nat. Bank of LaGrange v. Lowrey*,
  872 N.E.2d 447 (Ill. Ct. App. 2007) .................................................................. 16

*Greenfield v. Villager Indus., Inc.*,
  483 F.2d 824 (3d Cir. 1973) ............................................................................ 11

*In re Discipline of Tornow*,
  835 N.W.2d 912 (S.D. 2013) ............................................................................ 17

*In re Grievance Proceeding*,
  171 F. Supp. 2d 81 (D. Conn. 2001) .................................................................. 16

*In re Mid-Atlantic Toyota Antitrust Litig.*,
  93 FRD 485 (D. Md. 1982) ............................................................................. 18

*Kasalo v. Harris & Harris, Ltd.*,
  656 F.3d 557 (7th Cir. 2011) ........................................................................... 10

*Kulig v. Midland Funding, LLC*,
  2014 WL 5017817 (S.D.N.Y. Sept. 26, 2014) .......................................................... 18

*Lukis v. Whitepages Inc.*,
  549 F. Supp. 3d 798 (N.D. Ill. 2021) .................................................................. 14

*Moore v. Bd. of Pro. Resp. of Supreme Ct. of Tenn.*,
  576 S.W.3d 341 (Tenn. 2019) ........................................................................... 13

*Morlan v. Universal Guar. Life Ins. Co.*,
    298 F.3d 609 (7th Cir. 2002) ...................................................................... 14

*Nehad v. Mukasey*,
    535 F.3d 962 (9th Cir. 2008) ...................................................................... 13

*Payne v. Wood*, 775 F.2d 202 (7th Cir.1985)........................................... 21, 22

*Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*,
    254 F. Supp. 3d 1007 (N.D. Ill. 2017) ....................................................... 19

*Pope v. Harvard Banschares, Inc.*,
    240 F.R.D. 383 (N.D. Ill. 2006) ........................................................... 10, 12

*Reliable Money Ord., Inc. v. McKnight Sales Co.*,
    704 F.3d 489 (7th Cir. 2013) ...................................................................... 11

*Sanchez & Daniels v. Koresko & Assocs.*,
    2006 WL 3240105 (N.D. Ill. Sept. 14, 2006) ............................................ 12

*Sliwa v. Bright House Networks, LLC*,
    333 F.R.D. 255 (M.D. Fla. 2019) ......................................................... 21, 22

*State v. Bradley*,
    2018 WL 3518265 (Conn. Super. Ct. July 3, 2018)................................ 13, 15

*Tataru v. RGS Fin.*,
    2021 WL 38142 (N.D. Ill. Jan. 4, 2021) ..................................................... 21

*Vinole v. Countrywide Home Loans, Inc.*,
    246 F.R.D. 637 (S.D. Cal. 2007)................................................................. 10

*Weisman v. Darneille*,
    78 F.R.D. 669 (S.D.N.Y. 1978) .................................................................. 19

*Williams v. Bd. of Educ. of City of Chicago*,
    2022 WL 4182434 (N.D. Ill. Sept. 13, 2022) ............................. 11, 12, 16, 19

*Zylstra v. Safeway Stores, Inc.*,
    578 F.2d 102 (5th Cir. 1978) ...................................................................... 18

**Statutes**

28 U.S.C. § 1658.......................................................................................... 20

**Rules**

Fed. R. Civ. P. 23 .............................................................................. 10, 11, 12

LR 83.50.1 ........................................................................................................ 12

**Other Authorities**

ABA Rule 1.4;................................................................................................... 16

Ann. Mod. Rules Prof. Cond. § 3.3 ................................................................. 17

Model R. Prof. Cond. 3.3................................................................................... 17

Restatement (Third) of the Law Governing Lawyers § 22 (2000) ...................... 12

## I.    INTRODUCTION

Several months ago during a hearing, this Court ordered Plaintiff Rashad Walston's counsel, Jeremy Glapion ("Counsel"), to ask his client if he wanted to settle his individual claims and then report back.  ECF No. 51 at 11:5–7.  Counsel claimed his client wasn't "interested," but the Court was skeptical.  After all, Mr. Walston made an individual demand "a mere . . . six, seven months ago[,]" so "why not try to do that now[?]"  *Id.*  Counsel played along, knowing all the while that he, not Plaintiff, would decide whether to settle his client's claims.  And that is precisely what he did.

Per the Court's directive, the day after the hearing, NRS made an opening offer to resolve Plaintiff's individual claims for $35,000.  That is three and a half times Mr. Walston's initial demand and more than he could recover on his best day in court.  Barely an hour later, Counsel rejected the offer out of hand without any counter.[1]

Unbeknownst to NRS or the Court at the time, Plaintiff couldn't settle his own claims. Counsel employed an engagement letter that improperly seized control of his client's claims and the power to settle them.  Specifically, the agreement (1) penalized Plaintiff for settling against Counsel's advice by charging him an exorbitant "Springing Fee" equal to his counsel's lodestar at $650/hr; (2) capped his own client's recovery to "statutory damages"; and (3) limited Counsel's duty to convey only what he deemed "reasonable" settlement offers to his client.  Declaration of Patrick Fitzgerald, attached as Exhibit 1, Ex. L at 3–4.

As the attached expert opinions confirm, Counsel violated a host of ethical obligations under the applicable Rules of Professional Conduct.  The Springing Fee retroactively converted a standard contingency fee into an hourly rate as punishment for Plaintiff exercising

---

[1] Notably, Counsel did not say his client rejected the offer.  Fitzgerald Decl., Ex. A.

his unfettered right to settle his claims, violating Rules of Professional Conduct 1.2(a) and 1.5(a). Even if Counsel conveyed NRS's June offer before rejecting it (he didn't), there was no way Plaintiff could settle because Counsel's fees would have exceeded his recovery, leaving him indebted to his own lawyer—a contractual vise meant to wrest any settlement decision from the client and put it in the hands of his lawyer.

The Statutory Cap is even more troubling. It gave Counsel an improper proprietary interest in this case, created a conflict of interest between Plaintiff and Counsel, and interfered with Plaintiff's settlement authority by limiting his recovery to $10,500,[2] violating Rules 1.2(a), 1.5(a), 1.7(a), and 1.8(i). That arrangement could leave Counsel with 70, 80, or even 90+% of a settlement, given the amounts that some putative class actions settle for. And because Plaintiff's recovery would be the same regardless of how much NRS offered, the Statutory Cap and "reasonable settlement offer" limit effectively relieved Counsel from having to convey any individual offers, violating Rule 1.4.

Finally, in light of the control Counsel had over his client's claims, his statements to the Court—that his client didn't want to settle his claims but Counsel would ask anyway— were at least misleading, if not intentionally false, violating his duty of candor under Rule 3.3.

What makes this misconduct especially pernicious is that Counsel knew the terms were unethical, concealed the engagement letter as long as possible, and then amended the agreement multiple times only after he was caught. He initially refused to produce the agreement, claiming NRS failed to make a preliminary showing of need and relevance. It was only by chance that NRS obtained testimony from Plaintiff to make that showing, leaving

---

[2] In the Second Amended Complaint, Plaintiff alleges he received seven ringless voice messages. Second Am. Compl., ECF No. 61 ¶ 17.

2

Counsel with no choice but to disclose or face a motion to compel. But before doing so, Counsel amended the agreement to remove the Springing Fee. He kept the Statutory Cap and reasonable offer limit, at first (despite repeatedly insisting Plaintiff didn't want to settle), but ultimately conceded those terms were similarly unethical and removed them too.

And if that weren't enough, Counsel then preemptively moved to seal *this entire motion*, claiming that publicly discussing the terms he employed would damage his "reputation." ECF No. 63 ¶ 3. Counsel used the delay to make a classwide settlement demand that would net him a significant amount of fees but leave his client with only $2,450—a *fraction* of what NRS offered to pay him months before (while the settlement restrictions were in place).

Counsel's repeated violations of the Rules of Professional Conduct and Plaintiff's failure to police that conduct disqualify them from serving as class representatives. The violations create a "serious doubt that counsel will represent the class loyally" and "requires denial of class certification." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) (Posner, J.). Counsel usurped Plaintiff's duty to decide whether settling is in his and/or the putative class's interests. While counsel can and is obligated to tell his client what he believes is in his client and the putative class's best interest, the client needs to make that choice. Counsel cannot use a contract to handcuff Plaintiff, allowing him to seize control of the claims for more than nine months, and turn around and ask the Court to trust that he will fairly represent the interests of possibly thousands of absent class members. And for his part, Plaintiff has also proven he is unwilling to police his lawyer's conduct and will blindly defer to him about settlement.

Counsel's misconduct was spurred by his unflinching belief that, no matter how unreasonable the restrictions he imposed, he could amend the engagement letter and the

3

Court would rubber stamp the case proceeding as a class action. But the Rules demand more from class counsel, and allowing this case to proceed as a class action will "condone, and by condoning invite, [similar] unethical conduct." *Creative Montessori*, 622 F. 3d at 918. Class representatives must be allowed to freely decide what is in the best interest of the class, even if that means settling claims against their lawyer's interest.

To protect the integrity of this process, the Court must deter attorneys from using similar terms. And considering the financial incentives—including substantial fees through a certified class action that would have otherwise settled—and the difficulty of detecting the misconduct in the first place (given the heightened standard for discovering engagement letters), the only way to effectively do that here is by denying certification. Plaintiff is free to pursue his claims and any putative class members who believe they were wronged can pursue a class action. But Plaintiff and his counsel may not serve as class representative or counsel.

## II.    BACKGROUND

### A.    Counsel Repeatedly Put his Personal Interests Before his Client, Prohibiting Him From Following Through with the Individual Settlement that Plaintiff Himself Twice Said He Wanted.

At the outset of this dispute, Plaintiff expressly sought an individual settlement. Using an online form he obtained through the "Robo Calls Cash Forum," Mr. Walston claimed NRS sent him seven prerecorded voice messages to his cell phone in alleged violation of the TCPA. Deposition of Rashad Walston, attached as Exhibit 2, at 75:15–20. He demanded $9,800 to resolve his claims. ECF No. 22-1 at 6. He later reiterated his desire to settle the case, indicating he would take even less. Walston Dep. 126:3–12.

Then Plaintiff's counsel got involved. Plaintiff suddenly had no interest in settling the case individually—at least according to his lawyer—even though he has settled numerous

other cases individually, even though he had that interest here before, and even though it was in his financial interest. Walston Dep. at 91:16–92:7. Regarding the latter: Plaintiff has been self-employed since 2013, operating multiple unsuccessful businesses, he has been named as a defendant in multiple collections actions, and declared bankruptcy in 2004. Walston Dep. 43:6–44:23, 55:22–56:11, 63:4–24, 77:7–23, 81:2–82:7, 88:17–24. Notwithstanding all this, during deposition he parroted Counsel's position that he wasn't interested in individual settlement and wanted "justice for other people[.]" *Id.* at 155:21–23. When NRS asked why, Plaintiff explained that it was after "speaking with legal counsel, Mr. Glapion," and that any individual settlement is "something I have to discuss with my legal team, Mr. Glapion." *Id.* at 161:6–162:21, 167:23–168:9.[3]

The Court likewise inquired about Plaintiff's apparent change of heart during the June 11, 2024 hearing on NRS's Motion to Enforce Settlement:

> [P]laintiff's counsel, it wasn't that long ago that your client was interested in an individual basis settlement … a mere maybe six, seven months ago. Why not try to actually start that up? I don't know what the number is going to be and, you know, you'd work out what that number is. It doesn't have to necessarily be the number here but is your client at all interested in that?

ECF No. 51 at 11:5–7. Counsel answered:

> I think the client's head is in that representing others in this situation. Obviously I am always happy to confirm, clarify, double, triple check with the client but we've had these conversations repeatedly and he's – he's in that mode of not interested at the moment.

*Id.* at 10:11–11:4. The Court took Counsel up on his offer, ordering:

> [W]hy don't you check with your client and say, you know, the Judge has asked about settlement, you were interested a mere, you know, six, seven months ago,

---

[3] Plaintiff testified he was upset by a call with NRS's CEO, Elie Katz. Walston Dep. 163:10–164:7. But he also testified he was willing to accept an individual settlement for several thousand dollars at the end of that call. *Id.* at 126:3–12.

why not try to do that now. You know, your case still has quite a ways to go. I can help you get a mediator Magistrate Judge to negotiate that.

If your client is willing, send me an email by Friday to my Courtroom Deputy and say, you know, we are interested in a settlement on an individual basis. . . . But at least confirm for me that you have conveyed my message.

Anytime people are fighting over whether there's a settlement in place or not based on settlement discussions ahead of time, my reaction is why don't you just try to settle it for real, if you will, rather than fighting over what -- who said what to who. So just think about that and let me know by Friday. . . .

*Id.* at 11:5–22.

Consistent with the Court's direction, NRS emailed Counsel and made an opening offer to settle this matter for $35,000. Fitzgerald Decl., Ex. A (June 12, 2024 Settlement Offer). Barely an hour later, Counsel rejected the offer out of hand. *Id.* Even though NRS's offer was more than three times what *Mr. Walston* had asked for to settle his claims, Counsel stated that Plaintiff had "zero interest in an individual settlement." *Id.* However, Counsel didn't tell NRS that he conveyed the June 12 offer to his client until long after he rejected it. *Id.* ¶ 6. Counsel then told the Court (in an email he didn't copy NRS on) that he spoke with his client on *June 11* and that he "does not have any interest in an individual settlement[.]" *Id.*, Ex. B. In retrospect this is unsurprising, since unbeknownst to NRS or the Court at the time, Plaintiff's engagement letter made it impossible for him to accept the June 12 offer without risking tens of thousands in liability to his own counsel, if not more.

**B.    Counsel Resisted NRS's Effort to Obtain Plaintiff's Retainer Agreement and Tried to Conceal his Misconduct.**

NRS spent months trying to obtain Plaintiff's engagement letter. NRS requested the agreement in its First Set of Requests for Production, which it served on March 13, 2024. Fitzgerald Decl. ¶ 7. But Plaintiff objected, maintaining that NRS needed to make a

heightened showing of both relevance and need to obtain the engagement letter. *Id.* ¶ 7, Ex. C at 24 (citing *Blaise v. Transworld Sys.*, 2022 WL 3026946, *3 (N.D. Ill. Aug. 1, 2022)).

NRS continued to insist that Plaintiff produce his engagement letter. Fitzgerald Decl. ¶ 8, Ex. D (July 23, 2024 Eml.). NRS pointed out that Plaintiff's testimony confirmed that the engagement letter is highly relevant, including on the question of Counsel's adequacy to represent a class. *Id.*, Ex. D at 5–7. Though he claimed he was not "100 percent sure" about the terms, Plaintiff testified that the letter "probably does" require Counsel to approve settlement, for example. Walston Dep. 166:23–168:13.

After NRS threatened to move to compel, Counsel ultimately produced *three* engagement letters: one dated November 21, 2023, one dated December 19, 2023, and one dated July 30, 2024. Fitzgerald Decl. ¶ 9, Exs. E & F. They were all heavily redacted. *Id.* Counsel affirmatively noted that the "recent [July 30] amendment is made out of an abundance of caution[.]" *Id.*, Ex. E. The redacted agreements revealed the Springing Fee, which Counsel appeared to remove in the July 30 amendment (though it was impossible to confirm, given the redactions) and that Counsel was required to convey only "reasonable settlement offer[s.]" *Id.,* Ex. F at 11.

Given the Springing Fee in the December 19 letter and the heavy redactions, NRS demanded an unredacted copy of Plaintiff's engagement letter. Fitzgerald Decl., Ex. G (Aug. 13, 2024 Ltr.). Counsel initially refused, maintaining among other things "that issues with the retainer agreement [impacting adequacy] can be cured by amendment" and NRS's request to see behind the redactions was "silly." *Id.*, Ex. D. The parties met and conferred, and

Counsel admitted that the Springing Fee was meant to prevent clients from settling the case individually if Counsel didn't want to.[4] *Id.* ¶ 11.

Counsel relented on August 21 in response to NRS's further demands, disclosing the unredacted July 30, 2024 agreement. *Id.*, Ex. D. The unredacted agreement contains the Statutory Cap, stating that Counsel will recover at least the "*difference between the total settlement amount and your maximum permitted statutory damages.*" Fitzgerald Decl., Ex. H (emphasis added). In this manner, Counsel ensured that no matter how much NRS offered to resolve Plaintiff's individual claim, the most Plaintiff would ever recover is $10,500—and Counsel would get the rest.

In light of the ethical concerns apparent in the engagement letters, NRS consulted the preeminent legal ethics experts in the field, Mary Robinson and Sari Montgomery at Robinson, Stewart, Montgomery & Doppke, LLC. Fitzgerald Decl., Ex. M ("RSMD Report"); RSMD Report, attached as Exhibit 3. Once they confirmed NRS's belief that the agreements violated multiple rules of professional conduct, NRS prepared this Motion.

For his part, Counsel flippantly dismissed his misconduct. Fitzgerald Decl., Ex. I. Counsel claimed NRS's concerns were "silly" and repeatedly asserted that, so long as he removes the disputed terms, the Court will rubber-stamp adequacy, allowing him to continue to serve as putative class counsel. *Id.* And when NRS complained that he sabotaged the parties' ability to settle Plaintiff's claims before investing substantial time and resources, Counsel implied that any prejudice is "plainly curable" because NRS can "re-make [its] offer again" once he removed the unethical terms. *Id.*

---

[4] Counsel now denies making this statement and instead claims the Springing Fee was designed to stop defendants from "buy[ing] their way out of pre-certification class actions." ECF No. 57-1 ¶ 18. Regardless, the Springing Fee penalizes Counsel's client for exercising his authority to settle individually—which is precisely what Plaintiff wanted to do before his lawyer interfered.

Counsel's numerous revisions to the engagement letter, however, show that he knows he improperly seized control of his client's claims with unfairly restrictive terms in the engagement letter. Counsel revised the letter no less than three times to eliminate unethical terms. In the third revision (the fourth agreement), Counsel finally removed the Statutory Cap and the limit on conveying "reasonable" settlement offers. Fitzgerald Decl., Ex. K.

### C. Caught Red-Handed, Counsel Continued to Try to Conceal the Unethical Engagement Letters by Seeking to Preemptively Seal this Motion.

In a further effort to conceal his conduct, Counsel even filed an "emergency" motion to preemptively seal this filing. Therein, he claimed NRS questioning the terms he chose to employ would be an unfair attack on his "character." ECF No. 63 ¶ 8.[5] And in a transparent attempt to shift focus away from his misconduct in this case, Plaintiff scrambled to identify instances where someone questioned NRS counsel's conduct. ECF No. 69 at 3-5. He even suggested that NRS violated the Court's temporary seal simply by responding to his emergency motion. *Id.* at 1. All of this vastly and inappropriately increased NRS's expenses.

In addition, Counsel used the delay from his emergency motion to continue pursuing his own financial interests. On October 9, he made a classwide settlement demand that would have netted him substantial attorney's fees. Fitzgerald Decl. ¶ 16, Ex. N. Counsel didn't even propose an incentive award for his client, so Plaintiff would recover only $2,450.[6]

NRS now moves to deny class certification under Federal Rule of Civil Procedure 23 because both Plaintiff and his counsel are inadequate to represent a class.

---

[5] As a precaution, NRS chose to delay filing this motion, even under a temporary seal. ECF Nos. 65, 66.

[6] Counsel likewise continued to press forward with discovery, including by unilaterally contacting a former NRS employee—who Counsel suspected was one of the persons behind the ringless voicemails—who is and was represented by NRS's counsel. ECF No. 73-1 at 10-11.

### III.    STANDARD

A court must determine whether to certify a class action "[a]t an early practicable time after a person sues . . . as a class representative."  Fed. R. Civ. P. 23(c)(1)(A).  Accordingly, a defendant "may move for an order determining that the action may not be maintained as a class suit."  *Cook Cty. Coll. Teachers Union v. Byrd*, 456 F.2d 882, 885 (7th Cir. 1972); *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011) ("[A] court may deny class certification even before the plaintiff files a motion requesting certification" and "need not delay a ruling on certification if it thinks that additional discovery would not be useful in resolving the class determination.").  "[A] defense-driven determination of class certification is appropriate when awaiting further discovery will only cause needless delay and expense." *Vinole v. Countrywide Home Loans, Inc.*, 246 F.R.D. 637, 639 (S.D. Cal. 2007) (cleaned up).

Although class certification should be denied on numerous grounds, most of those will take many months of additional discovery, including depositions of two ill NRS employees that Counsel insists on examining.  When, as here, it is clear that Plaintiff and Counsel will never be able to establish adequacy, the Court should deny class certification on that basis now, rather than forcing the parties to continue engaging in further discovery.

### IV.    ARGUMENT

To satisfy Rule 23, Plaintiff and his Counsel bear the burden of establishing they will fairly and adequately represent the class.  Fed. R. Civ. P. 23(a)(4), (g).  "Adequacy of representation is perhaps the most significant of the prerequisites to a determination of class certification." *Pope v. Harvard Banschares, Inc.*, 240 F.R.D. 383, 390 (N.D. Ill. 2006) (cleaned up).

For counsel, "[a]nything 'pertinent to counsel's ability to fairly and adequately represent the interests of the class' bears on the class certification decision." *Reliable Money Ord., Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 (7th Cir. 2013) (quoting Fed. R. Civ. P. 23(g)). Class counsel owes "a fiduciary obligation of particular significance to their clients when the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf." *Creative Montessori*, 622 F. 3d at 918. Thus, "an attorney's misconduct or ethical breach is pertinent [to adequacy.]" *Reliable Money*, 704 F.3d at 499. In fact, class counsel's integrity is more important than the class representative given they "direct and manage these actions." *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 832 n.9 (3d Cir. 1973). Thus, "[m]isconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification." *Creative Montessori*, 622 F. 3d at 918. Where class counsel "demonstrate[s] a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Id.*

The Court should therefore deny certification for (1) "misconduct that prejudices the class or creates a direct conflict between counsel and the class" or (2) an ethical breach that "jeopardize[s] the integrity of the judicial proceedings[.]" *Reliable Money*, 704 F.3d at 499. As explained below, Counsel employed terms in his engagement letter to seize control of his client's claim for Counsel's own benefit—to the detriment of Plaintiff and the class. *Williams v. Bd. of Educ. of Chicago*, 2022 WL 4182434, at *5 (N.D. Ill. Sept. 13, 2022) (engagement letter that removed plaintiff's decision-making authority rendered him an inadequate representative). What's more, Counsel concealed those terms when the Court ordered him to ask his client about individual settlement, allowing the Court to falsely believe that Plaintiff

11

was free to make that decision. Allowing Plaintiff to simply amend the engagement letter and proceed with his class claims would condone Counsel's misconduct and allow it to continue, often undetected, in other matters.

For Plaintiff, he must prove that he can be a trusted fiduciary and is expected to ensure a "fair and just resolution of the dispute." *Pope*, 240 F.R.D. at 390. A representative cannot be a mere "figurehead" and must "monitor counsel[.]" *Williams,* 2022 WL 4182434, at *5. The role is the key to the integrity of class action litigation, not only in pragmatic terms of the efficiency and thoroughness of the proceedings, but far more importantly in relation to the fair and just resolution of the dispute." *Pope*, 240 F.R.D. at 390.

### A. Counsel Employed Terms Placing His Interests Above His Client's.

Counsel employed terms in the engagement letter that placed his interests above his client's and violated the Local Rules of Professional Conduct. LR 83.50.1 ("Applicable disciplinary rules are the Model Rules adopted by the American Bar Association."). It is hornbook law that a client has an "'absolute right' to settle her case without her attorney's consent." *Sanchez & Daniels v. Koresko & Assocs.,* 2006 WL 3240105, at *23–24 (N.D. Ill. Sept. 14, 2006) (criticizing counsel for efforts to prevent client from settling individual claims). While the lawyer can (and has a duty to) advise the client about settling, the final decision *must* remain with the client. "The decision to settle is reserved to the client ... because a settlement definitively disposes of client rights." Restatement (Third) of the Law Governing Lawyers § 22, cmts. c & d (2000). An attorney cannot circumvent this by "demand[ing] relinquishment of the right as a condition of representation." *Compton v. Kittleson*, 171 P.3d 172, 173 (Alaska 2007).

With this in mind, terms that burden the client's rights, including by "ratchet[ing] up the cost of representation" based on the client's decision to settle, are unethical. *See, e.g.*, *Nehad v. Mukasey*, 535 F.3d 962, 971 (9th Cir. 2008) (collecting cases and bar opinions); *State v. Bradley*, 2018 WL 3518265, at *6 (Conn. Super. Ct. July 3, 2018) (fee agreement that converted from contingency to hourly rate upon client's decision to settle violated public policy); *Moore v. Bd. of Pro. Resp. of Supreme Ct. of Tenn.*, 576 S.W.3d 341, 348 (Tenn. 2019) (sanctioning attorney for employing retainer agreement that required client to pay lawyer fees if client failed to accept an offer the "attorneys advise . . . is reasonable and should be taken[.]"); *see also* RSMD Report 10. In this case, Counsel knowingly violated ethical obligations by employing multiple terms that burdened his client's right to settle, created a conflict of interest with his client, gave him an improper proprietary interest in this case, *and* amounted to an unreasonable fee.

1. <em>The Springing Fee</em>

First, the Springing Fee underhandedly transformed the fee arrangement to a retroactive-hourly-fee penalty should Plaintiff decide to settle his claims against Counsel's advice. Until July 30, the engagement letter stated:

> **Settlement**
> * * *
> While you retain the right to accept any settlement offer from defendant, you further agree that if you accept a settlement offer against the written advice of the firm, and the settlement offer does not provide for a payment of attorney's fees equaling or exceeding the base lodestar amount, *you will be responsible for payment of our base lodestar amount* [$650 an hour].

Fitzgerald Decl., Ex. L at 11 (emphasis added). In effect, this term prohibited Plaintiff from settling the case individually for any reason, lest he face tens of thousands of dollars of liability to his own counsel that he could never afford to pay—even if he believed a settlement would

13

be in his *and* the class's best interest.  More troubling, given the traditional variables involved in litigation, there is no way Plaintiff "would be able to appreciate the risks and benefits" of this provision. *Compton*, 171 P.3d at 178.  Counsel knew this was unreasonable, which is why he removed the Springing Fee when NRS threatened to file a motion to compel its production—*before NRS even saw the engagement letters*.  Fitzgerald Decl.  ¶ 9, Ex. E.

Counsel further acknowledged that the Springing Fee was *designed* to stop clients from settling individual claims.  Fitzgerald Decl. ¶ 11.  Counsel tries to reframe this, claiming the term was meant to stop defendants from "buy[ing] their way out of pre-certification class actions" (even though the *vast* majority of putative class actions settle individually, and for good reason).  ECF No. 57-1 ¶ 18.  But that doesn't justify "compromis[ing] the procedural rights of [his] client[]—the part[y] whose rights the law ultimately strives to promote." *Compton*, 171 P.3d at 178 (similar term not justified by alleged need to deter "a 'divide and conquer' strategy that aims to encourage early settlement by clients for modest sums[.]").

Whatever Counsel's intention, he improperly restricted his client's right to settle. RSMD Report 11.  And he did so to protect his own interest in the fees he might obtain if a class were certified.  Counsel even proposed a class-wide settlement where he would get substantially more fees but his client would recover only $2,400, a fraction of what NRS offered.  Fitzgerald Decl., Ex. N.  He thus prejudiced the rights of his own client to protect himself, not the interest of an uncertified class, who aren't his clients and with whom he has no relationship. *Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002) ("[U]ntil certification there is no class action but merely the prospect of one; the only action is the suit by the named plaintiffs."); *Lukis v. Whitepages Inc.*, 549 F. Supp. 3d 798, 808 (N.D. Ill. 2021) ("Before class certification, there is no class and no class counsel.").

14

The Springing Fee unfairly burdened Plaintiff's right to settle, violating Rule 1.2, and penalized Plaintiff for exercising his right as a client, further violating Rule 1.5. RSMD Report 11, 16. Unsurprisingly, courts dealing with similar penalty provisions have found they are unethical. *Compton*, 171 P.3d at 174 (term requiring client to pay hourly rate if settlement did not provide attorney's fees unfairly burdened client's right to settle); *Bradley*, 2018 WL 3518265, at *3 (agreement providing that, upon settlement, attorney would be entitled to the "greater of a 40 percent contingent fee or the amount of attorneys fees earned through the time of the settlement, computed by multiplying the number of hours worked by the defendant's $325 hourly rate" violated Connecticut law).

### 2. The Statutory Cap and Reasonable Offer Restriction

The Statutory Cap violates Rules 1.2(a), 1.5(a), 1.7(a), and 1.8(i) because it deters any interest in settlement, creates a conflict between Plaintiff and Counsel, gave Counsel an improper proprietary interest in this case, and virtually guaranteed Counsel would recover vastly more than his client. The Statutory Cap states that Counsel will recover:

> *the greater of* 1) the firm's hourly rate (currently $650/hour) times hours worked . . ., 2) our actual costs plus one-third (1/3) of the full amount of any settlement or judgment, or 3) in a case in which your damages are primarily or exclusively statutory in nature, the *difference between the total settlement amount and your maximum permitted statutory damages.*

Fitzgerald Decl., Ex. H at 3 (emphasis added). Thus, regardless of whether NRS offers $35,000 or $350,000, the most Plaintiff would recover is $10,500. By ***capping his own client's recovery***—something that should be unthinkable to members of any Bar—Counsel stifled his own client's ability to consider the benefits of an individual settlement beyond his own statutory damages, violating Rule 1.2. RSMD Report 12. Counsel likewise obtained an impermissible proprietary interest in this case (one other than a "reasonable contingent fee"),

which "for all intents and purposes" put "Counsel, and not Walston," in "control[] [of] the prosecution and settlement [of Plaintiff's claims.]" *Id.* at 17. The cap also ensured that Counsel would recover more than his client in any settlement that exceeded $21,000, making the Statutory Cap increasingly unreasonable. *Id.* at 15–16. Indeed, building on the foregoing example, if NRS offered Plaintiff a life-changing settlement of $350,000, Counsel would get $339,500 (97% of the recovery) and his client would get $10,500 (3% of the recovery).

Compounding the concerns related to the Statutory Cap, the engagement letter required that Counsel communicate only "reasonable settlement offer[s]" to his client. Fitzgerald Decl., Ex. H at 4. But a lawyer has a duty to communicate all settlement offers to his client, not just those the lawyer might like. ABA Rule 1.4; *First Nat. Bank of LaGrange v. Lowrey*, 872 N.E.2d 447, 460 (Ill. Ct. App. 2007). While a client may reject a particular offer in advance, the client may not "completely surrender . . . settlement authority to a lawyer[.]" *In re Grievance Proceeding*, 171 F. Supp. 2d 81, 84 (D. Conn. 2001); *see also Williams*, 2022 WL 4182434, at *5 (class representative inadequate where he surrendered settlement authority to attorneys).

The "reasonable settlement offer" limitation, combined with the Statutory Cap, amounts to a complete surrender of Plaintiff's settlement authority, violating Rules 1.2 and 1.4. RSMD Report at 12–13. Regardless of the size of an individual offer, the most Plaintiff could recover was $10,500. As Plaintiff's recovery would be the same whether it's a $35,000 or $350,000 offer, Counsel had no obligation to convey any individual settlement offer. And Counsel took advantage of that by refusing to communicate legitimate, lucrative offers to his client. Counsel failed to promptly convey NRS's $35,000 offer, for example. He instead rejected it just an hour after NRS made it and apparently told Plaintiff about it later.

16

Fitzgerald Decl. ¶ 6.  The Statutory Cap and "reasonable settlement offer" limitation therefore amounted to an improper surrender of Plaintiff's settlement authority.

### B. Counsel Violated His Duty of Candor to the Tribunal.

Separate from violating the obligations to his client, Counsel also violated his duty of candor when he misrepresented Plaintiff's authority to settle his claims.  Model R. Prof. Cond. 3.3 confirms that a lawyer shall not knowingly "make a false statement of fact or law to a tribunal" or "fail to correct a false statement of fact" he previously made.  Model R. Prof. Cond. 3.3.  An omission can be "the equivalent of an affirmative misrepresentation," so "[a]ny difference[] between 'false' and "'misleading' statements [is] irrelevant for Rule 3.3(a)(1) purposes[.]"  Ann. Mod. Rules Prof. Cond. § 3.3 ("Courts routinely employ Rule 3.3(a)(1) and equivalent rules to discipline lawyers who have misled through their silence."). In other words, "[c]andor goes beyond telling a portion of the truth"; an attorney must be "fully honest and forthright."  *In re Discipline of Tornow*, 835 N.W.2d 912, 924 (S.D. 2013).

Counsel's representations to the Court during the June 11 hearing and his subsequent email communication violated his duty of candor.  RSMD Report 19–21.  Counsel stated that his client had no interest in individual settlement and never mentioned that he could effectively veto any individual settlement offer, just as he did days before, allowing the Court to wrongly believe Plaintiff was free to make that call.  ECF No. 51 at 10:11–11:4; Fitzgerald Decl., Ex. B.  At the time, only Counsel and Plaintiff knew about the contested terms.

The impact of Counsel's misrepresentation is evidenced by the Court ordering him to "check with your client [whether he was interested in individual settlement,]" notwithstanding Counsel's representation that his client wasn't interested.  ECF No. 51 at 9:22–11:22.  Had Counsel disclosed that Plaintiff *couldn't* settle without his approval, lest he

was willing to pay six months of attorney's fees at $650 an hour, the Court would have realized the futility of its order and likely ordered Counsel strike those terms then and there.

### C. Counsel's Ethical Violations Preclude Both Plaintiff and Counsel from Showing They Can Adequately Represent a Class.

Given these egregious ethical violations, Plaintiff and Counsel cannot meet their burden to prove they are adequate representatives. Counsel's ethical violations cast serious doubt about his ability to loyally represent the putative class and condoning them would negatively affect the integrity of class actions in general. *See infra*, part IV, D. Courts have refused to certify class actions where an attorney usurped the class representative's role and controlled litigation, like Counsel did here. *See, e.g.*, *Kulig v. Midland Funding, LLC*, 2014 WL 5017817, at *5–6 (S.D.N.Y. Sept. 26, 2014) (counsel not adequate where engagement letter implied that accepting an individual settlement was a wrongful act, describing settlement like "a politician [who] shouldn't sell out his constituents by taking a bribe, you need to think of the class before settling the case"); *In re Mid-Atlantic Toyota Antitrust Litig.*, 93 F.R.D. 485, 489–90 (D. Md. 1982) (denying certification where fee arrangement violated disciplinary rules, giving attorneys free rein over the prosecution of action); *see also Deadwyler v. Volkswagen of Am., Inc.*, 134 F.R.D. 128, 140 (W.D.N.C. 1991) (imposing sanctions for failing to communicate settlement offers). Such an arrangement is tantamount to the attorney being a member of the class *and* serving as counsel. *Mid-Atlantic*, 93 F.R.D. at 490 (citing *Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102 (5th Cir. 1978) (attorney member of class creates an impermissible appearance of impropriety)).

Counsel's misconduct in sabotaging the parties' ability to settle these claims proves he lacks the integrity to represent the interests of absent class members. As the Court implied during the hearing: It's easier to settle claims when a case is in its infancy, where the parties

18

still have "quite a ways to go[.]" ECF No. 51 at 11:5–22. Counsel was obligated to convey settlement offers, advise his client about what he believed was in his client and the putative class's best interest, and, critically, let Plaintiff make the final decision. But that was too hard and unpredictable—Plaintiff might decide that he couldn't afford to wait years for a recovery. Accordingly, Counsel used the engagement agreement's contested terms to protect his own interests, making an early settlement impossible regardless of what his client may have wanted. That Plaintiff now has a "choice" to settle his claims doesn't wipe away that misconduct. It doesn't erase the prejudice either: it could very well be that it is too late for NRS to consider paying a substantial settlement to Plaintiff, given the enormous expense it incurred in the past nine months of litigation when the unethical terms were in place. In any event, by shirking his ethical obligations to his own client, Counsel has proven he cannot be trusted to act in the best interest of the proposed class.

And for his part, Plaintiff voluntarily surrendered his obligation to decide whether settling his claims was in the best interest of the class. A class representative must be willing to "check the otherwise unfettered discretion of counsel in prosecuting the suit[.]" *Weisman v. Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978). As such, "[a] plaintiff who seeks to be the class representative cannot simply shift its duties to class counsel." *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.,* 254 F. Supp. 3d 1007, 1023 (N.D. Ill. 2017). By doing so, the plaintiff becomes a mere figurehead and cannot adequately represent the class. *Williams,* 2022 WL 4182434, at *5 (denying certification, rejecting that plaintiff's ability to terminate his attorney negated plaintiff abdicating his duty to police his counsel).

Here, despite repeatedly stating that he wasn't "100 percent sure" about the actual terms of the agreement, Plaintiff testified that the decision to settle would be something both

he and his attorney needed to approve. Walston Dep. 167:23–168:13. Accordingly, regardless of whether Plaintiff was aware of the actual terms, he was willing to abandon his duty to decide whether settling his claims was in his and the class's best interest. By agreeing to the engagement letters and surrendering his responsibility, Plaintiff proved he was unwilling to check Counsel and is not an adequate representative.

Plaintiff's inadequacy undermines the integrity of the class action process. The whole point of having a class representative—instead of just allowing attorneys to bring claims on their own—is to have an objective advocate who decides what is in the best interest of the class. For numerous reasons (*e.g.*, a bad forum, an unfavorable judge, the representative's personal circumstances, etc.), including ones counsel might not agree with, the representative may decide an individual settlement is in the *class's* best interest, in addition to her own. But Plaintiff agreed to terms that preclude such impartial decision-making, proving he cannot be trusted to represent the class.

Finally, denying certification will work no prejudice to anyone other than Counsel: Plaintiff, of course, will still be free to pursue his individual claim. And to the extent any other persons feel NRS has wronged them (no one else has come forward), they may file their own claims or even their own putative class action, since all the conduct at issue is still within the TCPA's four-year statute of limitations. 28 U.S.C. § 1658.

## D. Counsel Cannot Cure Violations by Amending the Engagement Letter and Holding Otherwise Would Encourage Similar Misconduct.

Finally, Counsel's attempts to cover up his unethical engagement letters by rewriting them after he was exposed do not cure the ethical violations or establish that he and Plaintiff are fit to represent the proposed class.

Initially, Counsel amended the engagement letter only because NRS raised its serious ethical concerns. A party does not get credit for doing the right thing only after he has been caught. *See, e.g.*, *Payne v. Wood*, 775 F.2d 202, 205 (7th Cir.1985) ("The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive."); *Derzack v. Cnty. of Allegheny, Pa.*, 173 F.R.D. 400, 415 (W.D. Pa. 1996) (refusing to credit plaintiffs for ceasing misconduct after they "knew they had been caught"). In this case, Counsel didn't revise the engagement letter on his own. He waited as long as he could, ensuring his client *couldn't* settle (despite repeatedly claiming he wasn't "interested") until it was clear that NRS planned to raise this issue with the Court.

Moreover, allowing Plaintiff to cure these violations by amendment would strongly encourage similar misconduct. In *Creative Montessori*, the Seventh Circuit reversed the district court's holding that only the "most egregious misconduct by class counsel should require denial of class certification," explaining that would "condone, and by condoning invite, unethical conduct." 622 F. 3d at 918. The court warned that class actions are susceptible to abuse, so "[w]hen class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Id.*

Nevertheless, some district courts have failed to heed that warning, finding that because an amendment resolves the immediate conflict of interest between plaintiff, counsel, and the putative class, the courts can rely on their respective state bars to address class counsel's misconduct. *See, e.g.*, *Tataru v. RGS Fin.*, 2021 WL 38142, at *7 (N.D. Ill. Jan. 4, 2021); *Sliwa v. Bright House Networks, LLC*, 333 F.R.D. 255, 278 (M.D. Fla. 2019) (denying certification on other grounds, but noting in dicta that amended agreement resolved adequacy

21

concern).[7] Setting aside that neither of these cases involved the degree of unethical terms and conduct at issue here, those courts considered only conflicts of interest between attorney and client and did not analyze the ethical violations that could separately render counsel inadequate. And they signaled to lawyers that they are free to adopt unethical engagement agreements so long as, in the unlikely event they are discovered, they amend the agreement. That encourages similar misconduct, which undermines the integrity of the judicial process. *See also* RSDM Report 21 (disciplinary authorities are not equipped to address issues that impact ongoing court proceedings).

What makes Counsel's misconduct especially malign is that many courts hold engagement letters are not discoverable absent a showing of relevance and need, making it harder to identify the misconduct in the first place. *Blaise*, 2022 WL 3026946 at *2 (collecting cases). Where "it is hard to detect an effort to evade the law, the penalty **must exceed the profits of the evasion**." *Payne*, 775 F.2d at 205 (emphasis added). Counsel used that caselaw to resist NRS's attempts to discover the engagement letter. It was only by random chance that Plaintiff—who repeatedly said he wasn't "100 percent sure" about the engagement letter's terms—testified that it "probably does" require Counsel to approve settlement. Walston Dep. 166:23–168:4. Had the testimony been different, Counsel may have gotten away with having unethical terms in his engagement agreement that stifled his client's right to settle.

---

[7] While the *Sliwa* court ultimately decided that the engagement letter did not defeat adequacy, denying certification on other grounds, the court was nevertheless disturbed by counsel's misconduct. During a hearing on certification, the court criticized a similar springing fee term, stating that plaintiff's counsel "made pretty sure that [plaintiff] wasn't going to accept [an individual offer] by this provision." *Sliwa v. Bright House Networks, LLC*, Tr. 62:25–63:1, attached as Ex. 3.

Given the difficulty of detecting this misconduct, along with Counsel's large monetary incentive to employ terms that give him effectively unfettered control over settlement, Plaintiff and Counsel have proven they cannot handle the responsibility and privilege of representing a class.

## V.    CONCLUSION

Counsel repeatedly violated his ethical obligations by imposing terms on his client that took away his right to settle the case—and then misleading the Court to believe otherwise. These violations undermine the integrity of this action and create serious doubt that Counsel will represent the class loyally.  That Counsel revised the engagement letter only after NRS caught him does nothing to mitigate the harm he caused by employing those terms for more than nine months.  Because neither Plaintiff nor Counsel can establish the requisite adequacy to carry their burden under Rule 23, the Court should grant NRS's motion to deny certification.

DATED:      October 18, 2024.

Respectfully submitted,

*/s/ Ryan D. Watstein*
Ryan D. Watstein (*admitted pro hac vice*)
ryan@wtlaw.com
Patrick J. Fitzgerald (*admitted pro hac vice*)
pfitzgerald@wtlaw.com
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318
Tel: (404) 782-9821
Fax: (404) 537-1650

Justin M. Penn, ARDC 6283726
jpenn@hinshawlaw.com
**HINSHAW & CULBERTSON LLP**
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606

Tel:  (312) 704-3000

*Counsel for Defendant*

## CERTIFICATE OF CONFERRAL

Defendant certifies that it conferred with Plaintiff's counsel regarding this motion. Through several emails, beginning September 17, 2024, NRS explained its position that the adequacy issues related to his engagement letters could not be cured by amendment. Plaintiff disagreed.

*/s/ Patrick J. Fitzgerald*
Patrick J. Fitzgerald

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2024, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ Patrick J. Fitzgerald*
Patrick J. Fitzgerald