# EXHIBIT 2

1       IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3

4   RASHAD WALSTON,            )
                               )
5           Plaintiff,     )
                               )
6    vs.              ) No.
                     ) 1:24-CV-00083
7   NATIONAL RETAIL SOLUTIONS,  )
     INC.,               )
8                        )
          Defendant.     )
9                         )

10

11          THE DISCOVERY DEPOSITION OF
             RAHAD W. WALSTON
              April 26, 2024
12               9:00 A.M.

13

14        Called as a witness by the Defendant

15    herein, pursuant to the provisions of the

16    Federal Rules of Civil Procedure pertaining

17    to the taking of depositions for the

18    purpose of discovery, before GLORIA

19    APOSTOLOS SIOLIDIS, C.S.R. License

20    #084-001205, duly qualified and

21    commissioned for the State of Illinois.

22

23

24

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 2

1  PRESENT:
2
3     THE GLAPION LAW FIRM, by
      MR. JEREMY GLAPION
4     1704 Maxwell Drive
      Wall, New Jersey  07719
5     jmg@glapionlaw.com
6        appeared on behalf of the Plaintiff.
7
8     WATSTEIN TEREPKA, LLP, by
      MR. RYAN WATSTEIN
9     1055 Howell Mill Road
      Atlanta, GA  30318
10    ryan@wtlaw.com
11       appeared on behalf of the Defendant.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1        I N D E X
2
   WITNESS:  RAHAD W. WALSTON
3                             Page No.
4  EXAMINATION BY:
5     MR. WATSTEIN            5, 191
      MR. GLAPION             177
6
7        E X H I B I T S
8                             Page No.
9
   Exhibit No. 1             43
10
   Exhibit No. 2             52
11
   Exhibit No. 3             58
12
   Exhibit No. 4             92
13
   Exhibit No. 5             105
14
   Exhibit No. 6             116
15
   Exhibit No. 7             152
16
   Exhibit No. 8             156
17
   Exhibit No. 9             168
18
19      *****EXHIBITS RETAINED*****
20
21
22
23
24

Page 4

1        VIDEOGRAPHER:  This is Anthony
2  representing Huseby Reporting.  I am the
3  operator of this camera.  We are on the
4  record on April 26, 2024.  The time is
5  9:09 A.M., as indicated on the video
6  screen.
7        We are located at 111 West
8  Jackson Boulevard, Chicago, Illinois.
9        This is the video deep of Rashad
10  Walston that is being taken pursuant to
11  Federal Rules of Civil Procedure on behalf
12  of defendant.
13        This case is captioned Rashad
14  Walston versus National Retail Solution
15  Inc., et al. case number 1:24-CV-00083.
16        Will counsel plead identify
17  themselves for the video record?
18        MR. WATSTEIN:  Yes.  Ryan Watstein for
19  the defendant.  And my colleague Pat
20  Fitzgerald is here as well.
21        MR. GLAPION:  Jeremy Glapion for the
22  plaintiff.
23        VIDEOGRAPHER:  Our court reporter
24  today is Gloria Siolidis with Huseby

Page 5

1  Reporting.  Please swear in the witness.
2        THE COURT REPORTER:  Raise your right
3  hand, please.
4        (The oath was thereupon duly
5         administered to the witness by
6         the Notary.)
7        RAHAD W. WALSTON,
8  Called as a witness by the Defendant
9  herein, having been first duly sworn, was
10  examined and testified as follows:
11        EXAMINATION
12        By: Mr. Watstein
13    Q  Good morning.  Would you please state
14  your full name for the record?
15    A  Rashad Walid Walston.
16        MR. GLAPION:  And before we jump in, I
17  just wanted to get on the record that in
18  terms of objections, we've agreed that
19  objections to form are sufficient to
20  preserve objections unless you ask for a
21  clarification or details on that.
22        MR. WATSTEIN:  Unless I ask for the
23  basis.
24        MR. GLAPION:  Yes.  That's what I

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 38

1  Al Raby was Feemie -- she's changed her
2  name.  At the time it was Feemie Spearman.
3   Q  And you said her name has changed?
4   A  Right.  I believe she got married, so
5  it's changed.
6   Q  Do you know her married name, or no?
7   A  I believe now it's Shang.
8   Q  And when you were a substitute teacher
9  from 2013 to the present on and off, did
10  you report to like an agency?
11      MR. GLAPION:  Just before he answers,
12  is it possible when we do names, just for
13  your benefit --
14      MR. WATSTEIN:  That he spells them.
15      MR. GLAPION:  If you know the spelling
16  of it?  Because she's taking it down
17  phonetically, and it will save some time if
18  you spell it rather than have me go back
19  and correct it later.
20      MR. WATSTEIN:  We'll do that going
21  forward.
22      MR. GLAPION:  Yeah, that works.
23      MR. WATSTEIN:  Would you mind reading
24  back my last question?

Page 39

1      (The record was so read
2       by the court reporter.)
3      THE WITNESS:  They have what's called
4  a sub center and they have a selection of
5  schools.  It's been different setups over
6  the years, but for the most part, you call
7  in, choose a school, according to my
8  recollection, and you just go into the
9  school for that day.
10      BY MR. WATSTEIN:
11   Q  Okay.  So do you report to like a
12  particular -- do you have a supervisor?
13   A  Not really.  You just go into the main
14  office, talk to, most of the time it's the
15  head clerk.  It could be anybody who's at
16  the school, talk to them.  You go to the
17  classroom and you pray for the best for
18  that day.
19   Q  I hear you.  I have a five-year old in
20  Kindergarten, so I hear you.  My mom was a
21  teacher.
22   A  Oh, that's great.  That's good.
23   Q  She was a middle school teacher and
24  she was in -- her school was tough.  And it

Page 40

1  got more difficult.  Anyway, we can talk
2  about that later.  She's retired now.
3      Okay.  Do you remember who --
4  when you worked during undergrad at the
5  University, did you have one supervisor,
6  many?
7   A  At the University I had different
8  jobs, different locations.  So yeah, those
9  were different.  I had different
10  supervisors at the different jobs, yes, I
11  did.
12   Q  Do you remember any of your
13  supervisors from your time in college?
14   A  Only one at the last job I had during
15  maintenance.  His name was Scott Morse.
16   Q  Can you spell that for the court
17  reporter?
18   A  M-o-r-s-e, I believe.
19   Q  And what about when you worked at
20  Amazon for brief periods of time, did you
21  have a supervisor there that you reported
22  to?
23   A  It wasn't one particular supervisor, I
24  had multiple supervisors that told me what

Page 41

1  to do and ran you around.  So I can't
2  recall just one person.
3   Q  Okay.  Well, can you recall the names
4  of those folks who you reported to over
5  time?
6   A  No, I can't.
7   Q  Okay.  What about at USPS when you
8  were there for a brief period of time, do
9  you remember who your supervisor was there?
10   A  I can't think of her name off the top
11  of my head.  I'm sorry, I can't recall
12  right now.  Maybe down in the deposition I
13  may be able to remember, but I just can't
14  think of her name at this time.
15   Q  Okay.  Just let me know if it comes to
16  you.
17   A  Okay.
18   Q  During the time that you've been
19  self-employed, have you had any employees?
20   A  Official employees, no.  I have worked
21  with like subcontractors, like outsourced
22  work.
23   Q  What type of work have you outsourced?
24   A  Graphic design and some things of that

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 42

1 nature.
2 Q Okay. Other than the folks that we've
3 talked about so far, can you recall any of
4 your other supervisors, the names of any of
5 your other supervisors at your various
6 jobs?
7 A Honestly, no, I can't. I can't
8 recall.
9 Q Okay. Will you let me know if anybody
10 comes to you?
11 A Yes, I will.
12 Q Thank you.
13     Okay. So going back to Lakefront
14 Marketing. Did you do any affiliate
15 marketing before you started Lakefront
16 Marketing?
17   A I've had experience in that field
18 before, yes.
19   Q And how did you come to have
20 experience in that field?
21   A Just by researching and learning,
22 looking at videos online, reading, you
23 know, going to online websites.
24 Q Okay.

Page 43

1     MR. WATSTEIN: This will be Defendant's
2 Exhibit No. 1.
3     (The document was so marked
4     by the court reporter.)
5     BY MR. WATSTEIN:
6   Q Let me know once you've had a chance
7 to look at what's been marked as
8 Defendant's Exhibit No. 1.
9   A Okay.
10   Q Are you familiar with this document?
11   A Yeah, that's my website.
12   Q Okay, yeah. It is your website. It's
13 screenshots of your website. So you know,
14 it looks a little bit different I guess
15 than it would, but you recognize this as
16 being your website?
17   A Yes, I do.
18   Q Okay. And if I could ask you to turn
19 to page 4 of 7 where it says our case
20 studies, do you see that?
21   A Correct.
22   Q And it says Expert Electronics. Do
23 you see that?
24   A Yes, I do.

Page 44

1   Q What is Expert Electronics?
2   A Just a company.
3   Q Is it a company that Lakefront
4 Marketing, LLC has done work for?
5   A No. Actually, it's not.
6   Q Okay. So this says here below the
7 Expert Electronics caption, it says, "They
8 approached our digital marketing agency
9 with the goal of increasing their online
10 sales and market share." Do you see that?
11   A Yes.
12   Q Okay. So is that incorrect then, if
13 you've never done work for Expert
14 Electronics?
15    A I just used a template for this
16 website and that was part of the template
17 information.
18   Q Okay. So just to answer my question,
19 it's not correct that someone named Expert
20 Electronics approached Lakefront Marketing
21 with the goal of increasing their online
22 sales and market share?
23   A That's correct.
24   Q In other words, that statement is not

Page 45

1 correct? You're agreeing with me?
2   A Yes, I'm agreeing with you.
3   Q Okay. And if you turn the page to the
4 next page, 5 of 7, you'll see the Corner
5 Bistro. Do you see that?
6   A I do.
7   Q Have you done work for the Corner
8 Bistro?
9   A No, I haven't.
10   Q Okay. We may come back to that a
11 little bit later, but I just want to walk
12 through kind of your business history.
13     So what other businesses have you
14 started or been involved in, not as an
15 employee though, as a business owner, if
16 you will?
17   A I had a printing business, printing
18 design. Also promotional, fraternal,
19 product sales.
20   Q Is that all one package that you just
21 mentioned, or is that separate businesses?
22   A One business focused on fraternal and
23 promotional product sales, 357 Designs.
24   Q Okay. So just so the record is clear,

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 46

1 the printing design business is 357
2 Designs?
3   A  Correct.
4   Q  Okay.  What other businesses?
5   A  I just had a, also had a previous
6 printing business focused on sublimation
7 printing.  And over the years, I've kind of
8 combined some of them into one entity.
9   Q  Okay.  What was the name of the
10 sublimation printing business?
11   A  Shoreway Printing, LLC.  But I want to
12 clarify that.  Even though I did work with
13 Shoreway Printing, I did the sublimation
14 printing and things of that nature.  I also
15 did similar work with 357 Designs, Inc.
16 And I still occasionally sometimes do all
17 of this, yeah.
18   Q  So what exactly does that entail, that
19 type of printing?
20   A  Sublimation printing is just basically
21 for the most part printing on hard
22 surfaces.  You have a special printer,
23 special ink, print out the design, and
24 generally, you press it on hard surfaces

Page 47

1 like license plates, mugs.  Sometimes you
2 can do soft things like face masks, things
3 of that nature.
4   Q  Okay.  What other businesses have you
5 been involved in or have you started over
6 the years?
7   A  I also had a tax business.
8   Q  What was that called?
9   A  Shoreway Tax, LLC.
10   Q  And what did that do?  What was the
11 purpose of that business?
12   A  Just general tax preparation.
13   Q  Like preparing taxes for others?
14   A  Yes.
15   Q  Okay.  Is that like an accounting
16 business, or is it different than an
17 accounting business?
18   A  No, it's not an accounting business;
19 just yearly tax services for individuals.
20   Q  Do you still do that?
21   A  No, I don't.  I don't.
22   Q  Why did you stop doing that?
23   A  I didn't particularly like the
24 business.  It was more a hassle than it was

Page 48

1 worth, in my opinion.
2   Q  Okay.  What other businesses other
3 than the ones we've talked about have you
4 been involved in?
5   A  I did have a previous company called
6 Greenwave Marketing, LLC.
7   Q  Was that Greenwave?
8   A  Yes, Greenwave.
9   Q  And what did that business do?
10   A  It also involved digital and affiliate
11 marketing, but also I was working on
12 business funding as well.  That had a d/b/a
13 name attached to that, so I was working on
14 getting money for businesses.
15   Q  What was the d/b/a?
16   A  Greenway Funding.
17   Q  And I'm somewhat familiar with that
18 business model.  Let me see if I can
19 accurately characterize it.
20        As I understand it, it would be
21 kind of like the sales arm of getting
22 funding for businesses, and then you would
23 place the businesses with the actual loan
24 originator; is that right?

Page 49

1   MR. GLAPION:  Objection, form.  You
2 can answer.
3        THE WITNESS:  I believe what you're
4 saying is correct.
5   BY MR. WATSTEIN:
6   Q  In other words, you weren't
7 originating funding for businesses?
8   A  No.  That falls into the category also
9 of affiliate marketing.  I would work with
10 other companies.
11   Q  Okay.
12   A  Trying to get people to sign up with
13 them, and they'll pay me a commission from
14 that.
15   Q  Okay.  And then again similar
16 questions to what I asked earlier in the
17 deposition about affiliate marketing.  What
18 type of affiliate marketing did you do
19 under the Greenway Funding d/b/a in terms
20 of what were the marketing tactics you
21 used?
22   A  Online, trying to talk to people,
23 social media, trying to interact with
24 people.  I tried SEO, search engine

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 50

1 optimization, just to get ranked higher.
2 That's all I can think of right now.
3 Q No telemarketing then?
4 A No. I've never done anything with the
5 phone calling people.
6 Q What about email marketing?
7 A At that time I didn't do any at all.
8 Q What entities have you done email
9 marketing in connection with?
10 MR. GLAPION: Objection, form.
11 THE WITNESS: With 357 Designs, I
12 believe I have.
13 BY MR. WATSTEIN:
14 Q Okay. And when you did email
15 marketing there, was that like cold email
16 marketing, like you bought a list, or how
17 did that work?
18 A No. These are previous customers, the
19 357 Designs, I was selling promotional
20 fraternal products primarily fraternal
21 products.
22 I don't know if you're familiar
23 with Free Masons and Order of the Eastern
24 Star and Shiners and things of that nature?

Page 51

1 Q Yes.
2 A That's one of the things, I created
3 products for them. And I was selling
4 online via my website, Ebay, Amazon, Etsy,
5 things of that nature. So I would have
6 customers' information and I would just
7 send out to them new products; things of
8 that nature.
9 Q Okay. What other entities have you
10 been involved in, other than the ones that
11 we've discussed?
12 A Throughout my entire life?
13 Q Yes.
14 A I know I had a technology business for
15 a short period of time after I left Chicago
16 Public Schools.
17 Q And what did that entity do?
18 A I was just trying to get customers,
19 computer repair type stuff.
20 Q An affiliate marketing-type situation?
21 A No, that wasn't affiliate. That was
22 attempts to try to fix people's computers.
23 And I was trying to maybe possibly get
24 business contracts and things of that

Page 52

1 nature.
2 Q Okay. What was that business called?
3 A Shorco Technologies, I believe.
4 S-h-o-r-c-o. That's to the best of my
5 recollection.
6 Q Okay. What other businesses?
7 A That's all I can think of at this
8 time. I did mention the printing. I did
9 mention the printing. Yeah, that's all I
10 can think of at this time.
11 MR. WATSTEIN: This will be
12 Defendant's Exhibit No 2.
13 (The document was so marked
14 by the court reporter.)
15 BY MR. WATSTEIN:
16 Q This is a printout of businesses that
17 you've been associated with. It might not
18 be an exhaustive list, but it's at least
19 some of them. For example, you'll see on
20 the first page, this is 357 Designs, Inc.,
21 Secretary of State main page. Do you see
22 that?
23 A Yeah, I do.
24 Q Okay. I'd just like to walk through

Page 53

1 this to make sure we've covered everything.
2 So we talked about the 357
3 Designs, Inc. on the first page. If you
4 can flip forward to the third page, you'll
5 see there's an entity called the BCH
6 Foundation?
7 A Yeah.
8 Q And it says it's a not-for-profit?
9 A Yeah.
10 Q Pretty old. It was dissolved in 2004.
11 Can you tell me what the BCH Foundation
12 was?
13 A Yeah. I totally forgot about that.
14 A friend of mine, we were
15 interested in doing non-profit services,
16 helping kids. But it fell apart right
17 away. We did no type of work for it. I
18 just basically registered it. We did
19 nothing. Nothing came to fruition, and I
20 dissolved it. And I didn't even remember
21 this.
22 Q Got it.
23 What type of work were you
24 anticipating through that entity?

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
Rahad W. Walston on 04/26/2024

Page 54

1  A  We wanted to do a non-profit, helping
2  kids in some way.  This was in 2004?
3  Q  2003, 2004.
4  A  Yeah.  This was 20 years ago.  A
5  friend of mine I went to high school with,
6  we was thinking about doing something for
7  kids.  But it never came to anything.
8  Q  Got it.
9  A  So it was dissolved in 2004.  Opened
10  in 2003.  June 30th, 2003 dissolved.
11  February 17th, 2004.  Yeah.
12  Q  Okay.  And if you flip to the next
13  page which is two pages later, there's an
14  entity called the Maroon Community
15  Corporation.  It says it was incorporated
16  on 3/31/2004, dissolved on January 3rd,
17  2005.  Can you tell me what that is, the
18  Maroon Community Corporation?
19  A  I really don't remember.  It's
20  something that never came to fruition.  I
21  can't even remember exactly what I was
22  going to do with that business, but I did
23  no business.
24       And the reason why I don't

Page 55

1  remember some of this stuff is because I
2  did no business, no business transactions
3  or anything with these.  This is just me
4  registering, having an idea and it falling
5  apart, or I move on to something else.  But
6  these are no businesses that I've done any
7  type of businesses or transactions or
8  anything like that.
9  Q  Got it.
10       And I'm just flipping through
11  because we've already talked about a lot of
12  these.
13       The next one that I just want to
14  talk about briefly is Maroon Technologies,
15  Inc.  If you want to flip through until you
16  find it, it's a little bit more than
17  halfway through?
18       MR. GLAPION:  I'll just let him look
19  at mine rather than --
20       MR. WATSTEIN:  Sure.
21       BY MR. WATSTEIN:
22  Q  It says this was incorporated in
23  September of '08, dissolved in April of
24  '09.  Can you tell me what Maroon

Page 56

1  Technologies, Inc. is or was?
2  A  Another company I was thinking about
3  doing IT work that nothing came to
4  fruition.  Incorporated in September 30th
5  of 2008, dissolved in April 7th, 2009.  Did
6  no business with it.
7       I'm looking at this.  Man, I wish
8  I could have had better plans with these; I
9  could get my money back from all this
10  wasted money I spent, because I did
11  absolutely nothing with these companies.
12  Q  Okay.  Any other entities that you've
13  been involved with or that you've started
14  that we haven't talked about today?
15  A  Not to my recollection, no.
16       MR. WATSTEIN:  This will be
17  Defendant's -- well, that's not right.
18       Can we go off the record for just
19  one second?  I just want to ask my
20  colleague something.
21       VIDEOGRAPHER:  We are off the record
22  at 10:18 A.M.
23
24

Page 57

1       (There was a discussion held off the
2       record, after which the deposition
3       resumed as follows:)
4       VIDEOGRAPHER:  We are back on the
5  record at 10:20 A.M.
6       BY MR. WATSTEIN:
7  Q  Okay.  You said a minute ago that you
8  couldn't remember any other entities that
9  you've been involved with.  What about
10  Lakefront Credit?
11  A  That's part of Lakefront Marketing.
12  That's the d/b/a.
13  Q  So Lakefront Credit is not its own
14  entity?
15  A  No, it's not.
16  Q  Okay.  And what is Lakefront Credit?
17  What does the d/b/a Lakefront Credit do?
18  A  Initially, I was thinking about doing
19  credit repair, helping people fix their
20  credit, but I've changed that.  I want to
21  more so give --
22       I know a lot about credit and
23  issues with credit, so what I want to do --
24  and I've overcome those issues.  What I

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 58

1  want to do is try to help people as much as
2  possible giving them free information on
3  how they can fix their credit and not be in
4  a situation.
5      MR. WATSTEIN:  Okay.  This will be
6  Defendant's Exhibit No. 3.
7      (The document was so marked
8      by the court reporter.)
9  BY MR. WATSTEIN:
10   Q  Okay.  So Defendant's Exhibit No. 3 is
11  titled the Lakefront Credit Repair Kit, and
12  that came from LakefrontCredit.com.  Is
13  LakefrontCredit.com your website?
14   A  It is, yes.
15   Q  Okay.  And is this Defendant's Exhibit
16  No. 3, this Lakefront Credit Repair Kit, is
17  this available on your website?
18   A  It is.  This is not a direct link.
19      You go to Lakefrontcredit.com and
20  then you hit this and it goes to my system,
21  that IO which is like a different platform,
22  but it houses this, so if somebody wants to
23  purchase this and pay for it, they can.
24   Q  Okay.  So just to make sure the record

Page 59

1  is clear, I think I know what you're
2  saying, but I want to make sure it's clear.
3      This document that's marked as
4  Defendant's Exhibit No. 3, this is
5  basically a printout of the credit repair
6  can it tab from the LakefrontCredit.com
7  website, right?
8   A  That's correct.
9   Q  Okay.  But if you wanted to actually
10  purchase a credit repair kit, or if you
11  wanted to obtain a credit repair kit, you
12  would click on a link that says like
13  purchase now, right?
14   A  What you're going to do is you go to
15  my main website and click on the tab, and
16  it will take you to -- it's just like a
17  platform.
18      I don't know if you've ever heard
19  of click funnels or stuff like that.  The
20  platform that I have is housed on the
21  system that I own.
22      So you click on my main website.
23  You go there, you read the description.  If
24  you want to purchase, you purchase.

Page 60

1   Q  Okay.  But in other words, the credit
2  repair kit itself is not available without
3  purchase, right?
4   A  Correct.  That's one of the only
5  things that I have that you have to pay
6  for.
7   Q  And the credit repair kit that is
8  housed on a different website, did you
9  create that?
10   A  As far as the texts and images and
11  things of that nature?
12   Q  In the repair kit.
13   A  Yes.
14   Q  Okay.
15   A  I created and purchased some of the
16  information from other places, but it's a
17  combination of my knowledge and purchases
18  from other places where I had resale rights
19  to distribute.
20   Q  Okay.  And so if you go to page 3 of
21  this document, this Defendant's Exhibit
22  No. 3, is that a picture of the credit
23  repair kit?
24   A  No, the credit repair kit is a file in

Page 61

1  different documents.  That's just a cover
2  that I use in a lot of the files.  It's not
3  an actual physical book that's going to be
4  sent out to you.
5   Q  Got it.  Okay.  So it's like a Pdf?
6   A  It's a lot of Pdfs.
7   Q  A lot of Pdfs.
8   A  Word documents, a ton of documents.
9   Q  Okay.  And what is in that credit
10  repair kit packet that people can purchase?
11      MR. GLAPION:  Objection to form.
12      THE WITNESS:  I mean it talks about
13  different ways to dispute if you are having
14  issues.  If you are having errors and
15  things on your credit report, things that
16  shouldn't be there, different ways you can
17  contact the Credit Bureau, or if you need
18  to contact an attorney, or ways that you
19  can help yourself to try to get yourself
20  out of situations if you have errors on
21  your credit report.
22      BY MR. WATSTEIN:
23   Q  Okay.  And so as I understand it, you
24  said that the credit repair kit is a

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 62

1 combination of information, some of which
2 you created, and some of which you
3 purchased?
4   A That is correct.
5   Q Okay. What information in that credit
6 repair kit did you create?
7   A I can't sit here and go through the
8 entirety of what I created.
9   Q Can you name anything in there that
10 you created?
11   A Some of the dispute letters, the
12 repair manual. I'll say some of the
13 dispute letters, some of the information --
14 it's a lot of visual information where you
15 read about different tactics and things of
16 that nature. So what I created, I'd say
17 like some of the dispute guides, the credit
18 repair manual. That's all I can think of
19 at this time.
20   Q Okay. And then where did you get the
21 rest of the materials that are in that
22 handbook from?
23   A I purchased the remaining information
24 from -- I don't remember what the platform

Page 63

1 was, but I made sure that I had resale
2 rights and I could repackage it and resell
3 it if I need to, so I made sure of that.
4   Q Okay. And then on page 4 of this
5 document it says among other things, "Free
6 lifetime access." Do you see that?
7   A Yes.
8   Q Okay. It says, "Pay once and get free
9 lifetime updates." Do you see that
10 language?
11   A Yes, I do.
12   Q What does that mean?
13   A You buy the kit once, and every time
14 there's an update to the kit, you'll get it
15 sent to you via email.
16   Q Okay. Have you sold any copies of the
17 kit?
18   A Not as of yet, no.
19   Q Okay.
20   A Other than myself, just to make sure
21 the website worked.
22   Q Right. And so you haven't sent out
23 any updates yet?
24   A No, I haven't.

Page 64

1   Q Okay. And if you look at the next
2 page under that second bullet, the last
3 sentence it says, "Include sample dispute
4 letters." Do you see that?
5   A What page is that? At the bottom it
6 have a page number.
7   Q Yeah. It says 5 of 15.
8   A Okay.
9   Q And I'm talking about right there, you
10 see it says, "Include sample dispute
11 letters."
12   A Is that correct.
13   Q Okay. What is a sample dispute
14 letter?
15   A Just a sample of a dispute letter, a
16 generic dispute letter.
17   Q A dispute about a debt?
18   A Correct. A debt, or maybe an error on
19 your credit report.
20   Q So basically like one of the things
21 that would be in the packet are examples of
22 letters that consumers could send to
23 companies that were seeking to collect
24 money from them, or companies that reported

Page 65

1 to the consumer reporting agencies?
2     MR. GLAPION: Objection, form.
3     THE WITNESS: Either to the companies
4 who may be in error, asking them for money,
5 or also the Credit Bureau.
6     BY MR. WATSTEIN:
7   Q And then on the next bullet it says,
8 "No matter the situation, you have the
9 letter to dispute it." Do you see that?
10   A Yes.
11   Q Okay. So would that involve like --
12 I'm just trying to understand what that
13 means. Like what if somebody actually owes
14 money to a company? Is there a letter for
15 that, too?
16     MR. GLAPION: Objection, form.
17     THE WITNESS: If somebody actually
18 owes money, more than likely.
19     BY MR. WATSTEIN:
20   Q Okay. And then on the next page under
21 that first bullet it says, "Learn the law
22 violations that can put hard cold cash in
23 your pocket." Do you see that?
24   A Yes.

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 66

1   Q Can you explain to me what that means?
2   A Well, sometimes creditors, collection
3   agencies, they send illegal letters. They
4   use illegal tactics to harass consumers.
5   And this is just helping the average
6   citizen like myself learn how to stop these
7   big companies from violating their rights.
8   Q Okay. And if you can flip now to
9   page 8 of 15? Do you see here it says,
10  "We've helped tons of people across the
11  nation?"
12  A Correct.
13  Q Okay. But you said you haven't
14  actually sold any of the credit repair
15  packet, right?
16  A That's correct. But I'm also
17  affiliated with a company that does credit
18  repair, and they said that you can use, you
19  can use some of their testimonies and
20  things of that nature. I'm not saying that
21  this is one of them, but there's a company
22  I'm still working with, even though I'm not
23  doing credit repair.
24  Q Okay. But just again so that the

Page 67

1   record is clear, this statement on your
2   website that says, "We've helped tons of
3   people across the nation," is not correct,
4   right?
5   MR. GLAPION: Objection, form.
6   THE WITNESS: Me alone with this
7   repair kit, no, that would not be correct.
8   But the company that I'm affiliated with,
9   they've helped people across the nation.
10  BY MR. WATSTEIN:
11  Q And what's the company that you're
12  affiliated with?
13  A It's actually a dispute software
14  called Client Dispute Manager, I believe.
15  Q And what is the nature of your
16  relationship with the Client Dispute
17  Manager software?
18  A I just pay for the software access for
19  a year.
20  Q And what does that software do?
21  A It just basically houses people's
22  information.
23  When you get a client to do
24  actual credit repair work, it just it's the

Page 68

1   software that houses their information.
2   They do have some sample dispute
3   letters as well. And it's a variety of
4   things. I can't think of everything that's
5   part of the software.
6   Q Have you ever used that software on
7   behalf of a client?
8   A No, I haven't. I only have like my
9   information in there.
10  Q Okay. So and if you look down below,
11  or well, it says here, it says, "Here's
12  what they have to say." And they is
13  referring I guess to the people across the
14  nation, right?
15  A Correct.
16  Q Okay. And then below that is a
17  review, right, called Life-Changing Guide
18  to Financial Freedom. Do you see that?
19  A Yes, I do.
20  Q Where did this review come from?
21  A This is all just template stuff. This
22  is stuff that came with this template
23  stuff.
24  Q Okay. So in other words, this is not

Page 69

1   a real review of your website or your
2   services?
3   A That's correct.
4   Q Okay. And the same goes for the
5   remaining reviews over the next few pages,
6   right?
7   A That's correct.
8   Q Okay. And then if you go to page 14
9   of 15, do you see at the top it says
10  regular price is $247, but today you can
11  get it for just $97? "Do you see that?
12  A Yes, I do.
13  Q To be clear, though, you've never
14  charged anyone $247 for the product, right?
15  A No, I have not.
16  Q I just want to get a little bit more
17  background information, and we'll take a
18  break and then we'll move into kind of the
19  meat of what the case is about, try to get
20  you out of here.
21  You said you were married, yes?
22  A That's correct.
23  Q Okay. And you've only been married
24  once?

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 70

1 A That's correct.
2 Q And do you have any children?
3 A Yes, I do.
4 Q How many?
5 A One.
6 Q How old?
7 A 14.
8 Q Who else other than your lawyer have
9 you discussed this lawsuit that we're here
10 about today with?
11 MR. GLAPION: Objection to form.
12 THE WITNESS: Nobody other than my
13 wife. I have not discussed any details,
14 but she knows I'm involved in a lawsuit,
15 and she knows I'm at a deposition today.
16 BY MR. WATSTEIN:
17 Q Okay. But other than your wife and
18 your lawyer, you have not discussed this
19 lawsuit about the phone calls with anybody?
20 A No. I did inquire where I could find
21 a competent and good attorney, but I
22 didn't -- after that, I haven't said
23 anything.
24 MR. GLAPION: Thank you.

Page 71

1 THE WITNESS: You're very welcome.
2 MR. WATSTEIN: He didn't say he found
3 a competent attorney.
4 MR. GLAPION: True. I jumped the gun
5 there.
6 THE WITNESS: No, but that's accurate.
7 BY MR. WATSTEIN:
8 Q And who referred you to Mr. Glapion?
9 A I went on a website. I joined a
10 forum. And he was recommended to me as a
11 highly-skilled attorney.
12 Q What forum was that?
13 A The forum is Robo Calls Cash Form, or
14 something in that area. That may not be
15 the specific name, but I think it was like
16 Robo Cash Form.
17 Q Let me see if I can find the exact
18 name. I've heard of that before. Is it
19 RoboCalls.Cash?
20 A Yes, I believe so. Doc Compton's
21 website and forum.
22 Q Okay. And does it cost money to
23 become a member of that forum?
24 A It does.

Page 72

1 Q Okay. And so are you a current member
2 of that forum?
3 A No. I was only a member for a short
4 period of time.
5 Q Okay. What did you use the forum for?
6 A I wanted to gather information about
7 what I could do to defend myself from
8 unwanted calls.
9 Q Unwanted calls generally, or just
10 unwanted calls at issue in this case?
11 A Just in general.
12 Q Okay. And so did you use it to
13 like -- I guess I'm just trying to
14 understand, because I'm not that familiar
15 with it, so walk me through like what your
16 interaction with the forum would have been.
17 Reading articles, posting, sending
18 messages?
19 MR. GLAPION: Objection to form.
20 BY MR. WATSTEIN:
21 Q All the above?
22 MR. GLAPION: Sorry. Objection to
23 form.
24 THE WITNESS: Okay. So it begins with

Page 73

1 you purchasing a kit. The kit tells you
2 about some of the different things that
3 these companies do that violate your rights
4 as an American citizen.
5 So you purchase the kit
6 initially, and then from that they have an
7 additional -- there's an additional layer
8 where if you want more information, you can
9 join the forum.
10 So originally I bought the kit on
11 that information. After that, I decided to
12 join the forum for a brief period. So
13 that's what it consists of.
14 BY MR. WATSTEIN:
15 Q Did you post on the forum?
16 A I did, a couple of times, yes, I did.
17 Q Did you send messages on the forum?
18 A You mean like private messages?
19 Q Yeah.
20 A Not to my recollection. I just made
21 one general post, I believe.
22 Q What was the post about?
23 A I was looking for an attorney in New
24 Jersey.

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 74

1   Q  Okay.  And that's how you got referred
2   to Mr. Glapion?
3   A  That's correct.
4   Q  Do you remember who on the forum
5   referred you to him?
6   A  Everybody uses handles.  People
7   generally don't use actual names, so I
8   don't remember the person's name.
9   Q  Got it.
10        Did you use the Robo Calls Cash
11  forum or website for anything else?
12  A  Not that I can think of.
13        I was just primarily --
14  initially, I signed up, I just wanted to
15  see the information what other people were
16  going through, what other average American
17  citizens were going through without being
18  harassed by unwanted calls by major
19  companies.  So I just wanted to kind of see
20  their stories.
21        And at some point I said I would
22  like to try to find an attorney for a
23  situation that I'm having.
24  Q  Okay.  Did you download any sort of

Page 75

1   like form demand letter from the forum, or
2   anything like that?
3   A  I didn't download that from the forum.
4   I believe it came with the kit.  The kit
5   comes with information, and it also comes
6   with different forms that you can send to
7   companies if you are being harassed
8   illegally, allegedly.
9   Q  Okay.  And we'll talk about this, and
10  I'll introduce it later as an exhibit, but
11  before you filed this lawsuit, you sent a
12  demand letter to NRS, right?  Do you
13  remember that?
14  A  That is correct.
15  Q  Is that demand letter based on a form
16  that you obtained from Robo Calls Cash?
17  A  It didn't come from the form, it came
18  from the kit.
19  Q  From the kit, I'm sorry.
20  A  Yeah.
21  Q  It came from the kit?
22  A  I believe it came from the kit, yes.
23  Q  Have you sent letters like that to
24  other attorneys other than NRS?

Page 76

1   A  Never have I before.
2   Q  Okay.  So NRS to date is the only
3   company you've ever sent TCPA demand letter
4   to?
5   A  That is correct.
6   Q  Have you ever received what you would
7   characterize as unwanted calls from other
8   companies other than NRS?
9   A  I'm sure I have.  Everybody has.  I
10  have in the past, just like everybody else.
11  Q  Okay.  So I guess that begs the
12  question that I'll ask of why would you
13  have only sent the demand letter to NRS,
14  as opposed to the other companies that
15  might have made calls to you that you
16  didn't want?
17  A  A lot of those were in the past, and I
18  never had the frequency of calls like I
19  have of NRS Pay.  And I just simply got
20  tired of it.
21        I had some documented.  I believe
22  I had seven calls documented.  But I knew
23  it was far more than that.  And I was just
24  tired.  I was just tired of it.

Page 77

1   Q  Okay.  Just a few more background
2   questions before we take a break and then
3   get into the lawsuit itself.
4        Have you ever been arrested or
5   charged with a crime?
6   A  No.
7   Q  Have you ever filed for bankruptcy?
8   A  I have.
9   Q  How many times?
10  A  One time in 2004.
11  Q  Okay.  And can you just briefly
12  describe the circumstances leading up to
13  that?  Like what caused you to file for
14  bankruptcy?
15  A  Fresh out of undergraduate studies, I
16  just had a lot of debt.  You know back in
17  the late '90s, early 2000s they had a lot
18  of predatory credit card companies that
19  would come to college campuses and prey on
20  students.  So that was part of, I got
21  caught up in that, unfortunately.  And in
22  2004, right after I graduated, I had to
23  unfortunately file for bankruptcy.
24  Q  And did you get discharged?

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 78

1   A  Yes, I did.
2   Q  And okay.  So other than the
3  bankruptcy, what other lawsuits have you
4  been involved in?
5   A  I have several lawsuits regarding
6  FCRA, Fair Credit Reporting Act, and FDCPA,
7  Fair Debt Collection Practice Act, I
8  believe that is.
9      So I have several of those due to
10 illegal letters that were sent to me,
11 harassing phone calls, things of that
12 nature.  So I do have suits stemming from
13 that, because I'm an average American
14 citizen, and I try to do everything I can
15 to enforce my rights.
16  Q  Understood.
17     So let me back up and then we'll
18 come back to that.
19     We talked about the bankruptcy in
20 '04.  Then there was, I guess in 2011 there
21 was a workplace injury that you received a
22 settlement for?
23  A  I did.
24  Q  Okay.  Tell me a little bit about

Page 79

1  that.  What was the injury?  What was the
2  employer?
3   A  I work for Chicago Public Schools as a
4  technology coordinator, and I deal with a
5  lot of heavy equipment.  You don't think
6  about technology being a lot of heavy
7  stuff, but it's like massive printers.  And
8  I got in a situation, I picked up a printer
9  the wrong way, and I twisted my back, and
10 it took me out for a while.
11  Q  And did you hire a lawyer?
12  A  I did.
13  Q  Okay.  But there was no lawsuit filed?
14  A  I don't believe so.  There was a --
15 yeah, there was no official lawsuit, I
16 don't think.
17  Q  You think there was like a settlement
18 demand for something like that, pre-suit
19 type demand?
20  A  I'm not sure.
21  Q  But there was some sort of threatened
22 legal action, right, that resulted in a
23 settlement?
24  A  Honestly, I'm not 100 percent sure

Page 80

1  what tactics and techniques the law office
2  that I obtained services from.  I don't
3  know how they went about --
4   Q  But they obtain a settlement for you?
5   A  They did.
6   Q  Okay.  What was the settlement, if you
7  remember?
8   A  It was for some thousands of dollars.
9   Q  Less than $10,000.00?
10  A  It may have been right around
11 $10,000.00.  $10,000.00 or $11,000.00,
12 something like that.
13  Q  Okay.  And then it looks like you --
14 all right.  Let's talk about, have you been
15 a defendant in lawsuits?
16  A  You mean has anybody sued me?
17  Q  Yes.
18  A  Do you mean as far as just like
19 bringing something to court, or me actually
20 being in court against the plaintiff, like
21 actually being in a court situation where
22 I'm a defendant and there's a plaintiff
23 suing me for something?  So I'm not
24 100 percent sure.

Page 81

1   Q  Yeah.  Let me clarify.
2      So I'm talking about not have you
3  been physically in court as a defendant
4  before; I'm talking about has any person or
5  company ever filed a lawsuit, so a
6  Complaint like the one that you filed here?
7   A  Right, right.
8   Q  To initial a civil litigation against
9  you as a defendant?
10  A  I believe so.  And when I say believe,
11 if what I'm referring to is correct, then
12 yes, because I have had old debts when
13 credit companies that were in the process
14 of trying to sue me.  So I'm not
15 100 percent if that falls within those
16 parameters.  That's why I'm unsure.
17  Q  Okay.  So I can tell you there's some
18 actions that we found a couple of lawsuits
19 that were filed by Capital One.
20  A  Right.
21  Q  Does that ring a bell?
22  A  Yeah.  So those --
23  Q  Collections actions?
24  A  Correct.  I didn't know if I was

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 82

1  actually considered a defendant in that, or
2  it was just --
3    Q  Yeah.  Okay.  Understood.
4    A  Okay.
5    Q  So I saw four actions filed by Capital
6  One and one action filed by Barclays?
7    A  Yes.  I remember those.
8      MR. GLAPION:  I don't have that.  I
9  don't know if you plan to enter that,
10  but --
11      MR. WATSTEIN:  I don't.
12      MR. GLAPION:  To the extent that it
13  carries beyond anything substantive, I
14  would want that entered.
15      MR. WATSTEIN:  Sure.
16      MR. GLAPION:  But for now I think it's
17  fine.
18      BY MR. WATSTEIN:
19    Q  Okay.  So does that sound about right
20  to you that --
21      I guess my first question is,
22  we've seen four lawsuits filed by Capital
23  One against you and one filed by Barclays,
24  for a total of five collection actions.

Page 83

1  Does that sound right to you?
2    A  I believe so, yes, that sounds right.
3    Q  Are there any that you think I'm
4  missing?  Have there been any other credit
5  card companies or creditors that have sued
6  you?
7    A  Not that I can think of.  But is that
8  really considered suing?  Really, for my
9  records, for my knowledge, is that
10  considered suing versus them just sending
11  demand and threatening to sue me?  That's
12  why I thought it was more of a threat to
13  sue.
14    Q  Sure.  And you can ask Jeremy about
15  that at a break, but these are filed
16  lawsuits.  There's dockets.
17    A  Okay.
18    Q  I mean it looks like those were
19  resolved without too much litigation.
20      MR. GLAPION:  In lieu of entering
21  those into the record, can we read the file
22  dates of the lawsuits into the record?
23      MR. WATSTEIN:  Yes.  So what I see are
24  several that were filed on February 21st,

Page 84

1  2018, and one that was filed on July 12th,
2  2010.
3      BY MR. WATSTEIN:
4    Q  And again, does that sound right to
5  you as well?
6    A  Yeah, it does.
7    Q  Let me ask you this.  It appears that
8  four of these are clustered into 2018?
9    A  Yes.
10    Q  Why is that?
11    A  Just a bad period when I had
12  significant debts that I couldn't pay at
13  that time.
14    Q  Okay.  What were you doing for work at
15  that time?
16    A  I believe I was still doing some
17  part-time work.  Around 2018, I was doing
18  some substitute teaching.
19      But I just accumulated some extra
20  debts that I wasn't able to pay at the
21  time.  But all of those were resolved.
22  None of those went to court.  I paid
23  everything off, and everything has been
24  paid in full.

Page 85

1    Q  Okay.  Yeah, so that was going to be
2  my next question.  It looks like those
3  actions resulted in some sort of payment
4  plans; is that right?
5    A  Yeah, I had to go on payment plans for
6  a while.
7    Q  And then you paid them off?
8    A  I paid off everything.
9    Q  So then I want to shift to the
10  lawsuits that you've filed.  It looks like
11  there was a case called Walston V Blitt and
12  Gains?
13    A  Blitt and Gaines, yes.
14    Q  Do you remember that?
15    A  That stems from I believe Capital One.
16  See, when I get some of those debts, some
17  of those issues, their collection tactics,
18  a lot of them were illegal.  So that's why
19  I have that cluster of FCRA and FDCPA
20  lawsuits was all within the same cluster of
21  time with those debts.
22    Q  Okay.  Can you tell me what you
23  believe it is that the collection attorneys
24  or creditors did that was illegal or

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 86

1 wrongful?
2 A It's difficult for me to remember
3 everything that they did for all creditors.
4 I know some sent what you call dunning
5 letters. There's a legal language in the
6 letters. Some placed illegal calls. Some
7 left illegal voicemails. It was a variety
8 of things these different creditors and
9 collection agencies did.
10 Q Okay. But can you point specifically
11 to what you think they did that was
12 wrongful?
13 A Blitt and Gaines specifically?
14 Q Any of the creditors?
15 A Yeah. Just the stuff I mentioned like
16 sending dunning letters, illegal calls
17 maybe before or after a certain time. Some
18 had illegal voicemail messages. So it was
19 a variety of things.
20 Q Right. And I guess as a followup,
21 what I'm interesting in is as opposed to
22 you just saying they were illegal, what is
23 it that harmed you? What is it that you
24 took issue with from like and ordinary

Page 87

1 citizen perspective, stepping away from
2 what's legal and illegal?
3 MR. GLAPION: Objection to form. But
4 you can answer if you understand it.
5 THE WITNESS: Yeah, I don't really
6 understand that question.
7 BY MR. WATSTEIN:
8 Q Sure. So what is the conduct that you
9 took issue with that these creditors
10 engaged in?
11 A They engaged in practices to try to
12 collect funds from me illegally.
13 And I believe that the majority,
14 if not all citizens in my position want to
15 have a right to defend themselves. Many
16 people don't know. But me in particular, I
17 try to find out solutions so I'm not being
18 harmed in that way.
19 So I guess to sum up your
20 question is just they were trying to
21 collect funds from me in an illegal way
22 that I felt wasn't acceptable.
23 Q Okay. And again, what I'm trying to
24 figure out is what is it that you took

Page 88

1 issue with about their collection --
2 specifically, what conduct by them did you
3 deem to be harmful or illegal?
4 MR. GLAPION: Objection to form.
5 THE WITNESS: Harassing calls.
6 Harassing voicemail messages. Harassing
7 letters. Things to try to hurt and
8 intimidate me.
9 BY MR. WATSTEIN:
10 Q Can you give me any examples?
11 A Honestly, not at this time. I don't
12 have the letters in front of me. That was
13 a while ago. But everything that I've just
14 mentioned are things that would hurt the
15 average American citizen. That's what I
16 am, just an average Joe.
17 Q Okay. But you don't dispute that you
18 owed money in all of those instances,
19 right?
20 MR. GLAPION: Objection to form.
21 THE WITNESS: I did owe money.
22 BY MR. WATSTEIN:
23 Q You did?
24 A Yes. And that's why I paid it back.

Page 89

1 Q But you also filed lawsuits and
2 received several settlements from the
3 creditors, right?
4 MR. GLAPION: Objection to form.
5 THE WITNESS: Correct. But it's only
6 a standard payment. They didn't dare.
7 There's only one set amount that you get if
8 you violate the laws that they violated.
9 BY MR. WATSTEIN:
10 Q Okay. So let me drill down on that.
11 MR. GLAPION: Can we go off the record
12 briefly before we get into those?
13 MR. WATSTEIN: Why don't we just
14 finish this line of question.
15 MR. GLAPION: If it relates to where I
16 suspect this is going, I'd rather have the
17 break before --
18 MR. WATSTEIN: Okay, that's fine. We
19 can go off the record.
20 VIDEOGRAPHER: We are off the record
21 at 10:53 A.M.
22 (There was a discussion held off the
23 record, after which the deposition
24 resumed as follows:)

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 90

1    VIDEOGRAPHER: We are back on the
2   record at 11:09 A.M.
3      BY MR. WATSTEIN:
4    Q  Okay, Mr. Walston.  When we went off
5   the record, we were talking about the
6   lawsuits that you have filed.  We
7   identified five -- I'm sorry.  We
8   identified six FDCPA and FCRA cases that
9   you've filed in the 2018 to 2021 time
10  period.  Does that sound right to you?
11   A  Approximately, yes, yes.
12   Q  Okay.  Have all those lawsuits that
13  you filed been in Federal Court?
14   A  I believe so.  I can't verify the
15  percent.
16   Q  Have you ever filed a lawsuit --
17  setting aside this TCPA case, have you ever
18  filed anything other than an FCRA or FDCPA
19  case?
20   A  No.
21   Q  And do you know approximately how
22  much -- well, let me ask you this.  Did you
23  receive settlement payments in every one of
24  the lawsuits that you filed?

Page 91

1    A  I believe so.  All except for one, I
2   believe.
3    Q  And in the one that you didn't receive
4   a settlement payment in, do you remember
5   the name of that case, or who the defendant
6   was?
7    A  It may have been Nationwide Credit, I
8   believe.  I'm not 100 percent sure about
9   that.
10      MR. GLAPION: I don't mean to testify
11  for the witness.  There is one where there
12  was a dismissal on the merits.  So it would
13  be public.
14      MR. WATSTEIN: Okay.  Got you.
15      BY MR. GLAPION:
16   Q  Do you only how much you received
17  total in all of the FDCPA and FCRA cases
18  that you filed?
19   A  I only got the standard alottment of
20  $1,000.00.
21   Q  Okay.
22   A  That's as much as you can get,
23  legally.
24   Q  Okay.  That's your understanding is

Page 92

1   that you can't get more than $1,000.00 per
2   case?
3    A  That's my understanding, yes, unless
4   something -- actually, for where I'm at,
5   where I was at with those cases, I believe
6   the standard that you can get is only
7   $1,000.00 per case.
8    Q  Okay.  Do you know what your attorneys
9   got?
10   A  They had it listed.  They sent me an
11  accounting sheet at the end of each case.
12  I don't know those numbers off the top of
13  my head.
14      MR. WATSTEIN:  This will be
15  Defendant's Exhibit No. 4.
16      (The document was so marked
17       by the court reporter.)
18      BY MR. WATSTEIN:
19   Q  Mr. Walston, do you recognize this
20  document?
21   A  Yes, I do.
22   Q  Is this the Complaint that you filed
23  to initiate this action against NRS?
24   A  With my attorney, yes.

Page 93

1    Q  And how would you describe this
2   lawsuit, or what would you describe it to
3   be about?
4      MR. GLAPION:  Objection to form.  Go
5   ahead.
6      THE WITNESS:  TCPA loan.
7      BY MR. WATSTEIN:
8    Q  Okay.  Understood.  That's the Federal
9   Statute you're suing under, right?
10   A  Correct.
11   Q  And I guess my question is more of why
12  did you file this lawsuit?
13   A  I was tired of being harassed by your
14  client, by -- I'll just refer to them as
15  NRS Pay.  I was tired of being harassed by
16  them.
17   Q  And it's about telephone calls, right?
18   A  Correct.  And also voicemail messages.
19   Q  Okay.  And actually, to put a finer
20  point on that, you say the case is about
21  voicemail messages, right?
22   A  Illegal robotic voicemail messages.
23   Q  Right.  And just to be clear, though,
24  you never actually received a phone call

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 94

1  from NRS that you picked up; these were
2  voicemails, right?
3      MR. GLAPION: Objection to form.
4      THE WITNESS: Not that I can recall.
5  But I may have at one point. I have
6  documentation. I don't know -- I'll just
7  wait see if you go over it and I'll answer
8  it.
9      BY MR. WATSTEIN:
10   Q  Yeah. But just to be clear in terms
11  of the answer to my question, as far as you
12  can recall, you never received a phone call
13  from NRS; instead, you received voice
14  messages, correct?
15     MR. GLAPION: Objection to form.
16     THE WITNESS: If I don't answer the
17  phone, of course it's going to go to
18  voicemail.
19         I can't recall of a time I may
20  have had a period that I picked up the
21  phone once and may have hung up. I can't
22  recall that.
23     BY MR. WATSTEIN:
24   Q  Do you recall your phone ringing as a

Page 95

1  result of these communications?
2   A  Yes.
3   Q  Okay. So your testimony is that the
4  communications from NRS caused your phone
5  to ring?
6      MR. GLAPION: Objection to the form.
7      THE WITNESS: It caused my phone to
8  ring, and they also left voicemail
9  messages.
10     BY MR. WATSTEIN:
11   Q  Okay. So both?
12   A  Correct.
13   Q  And if you can turn to page 3, please?
14  You'll see Paragraphs 19 and 20, those are,
15  or purport to be transcriptions of the
16  voicemails that were left to you by NRS?
17   A  Correct.
18   Q  Do you see at the end it says, "Or you
19  can call me back at this number?"
20   A  Yes, do I.
21   Q  Did you ever call that number back?
22   A  I don't believe so, no.
23   Q  Okay. I believe you already
24  testified, but just to confirm, you never

Page 96

1  picked up the phone and attempted to speak
2  to anyone when you received one of these
3  communications, right?
4      MR. GLAPION: Objection to form.
5      THE WITNESS: Not that I can recall.
6  I was called many times. I don't recall
7  picking up the phone and talking to anybody
8  off the top of my head.
9      BY MR. WATSTEIN:
10   Q  And you say you were called many
11  times, but I want to put a finer point on
12  that.
13         My understanding is that these
14  communications were not -- these
15  communications were ringless voicemails,
16  and as the name implies, they wouldn't ring
17  to your phone, they would be deposited in
18  your voicemail. Does that refresh your
19  recollection as to whether they caused your
20  phone to ring?
21     MR. GLAPION: Objection to form.
22     THE WITNESS: Initially, I believe the
23  phone rang, but I added the number to my
24  block list. So once I added their number

Page 97

1  to my block list, the phone wouldn't ring
2  any more, it would go straight to voicemail
3  because it's in my blocked calls.
4      BY MR. WATSTEIN:
5   Q  How soon after you received the first
6  communication did you put the number on
7  your blocked list?
8   A  Honestly, I don't remember. It was at
9  some point I kept getting the calls and I
10  put the block. Because I do that with a
11  lot of calls.
12         All of us get calls from scammers
13  from India and all this, especially during
14  that period. So I just put stuff on block,
15  just block, just block the numbers, for the
16  most part.
17   Q  And then when you have a number
18  blocked, how do you know that you've even
19  received a communication? Or do you
20  necessarily know?
21     MR. GLAPION: Objection to form.
22     THE WITNESS: I have to go into my
23  blocked calls section of my iPhone.
24

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 98

1    BY MR. WATSTEIN:
2    Q  Okay.  So if you have a number
3  blocked, it won't display on your phone as
4  a missed call; you've got to go check
5  blocked calls?
6    A  Correct.
7    Q  Okay.  And the same for voicemails?
8    A  Correct.
9    Q  Okay.  So if you have a voicemail in
10  your blocked number, it doesn't display in
11  your regular voicemail; you have to go into
12  the blocked voicemail?
13    A  Correct.
14    Q  But to be clear, so you found these
15  communications annoying?
16    A  Extremely annoying.
17    Q  Okay.  And you wanted them to stop?
18    A  Correct.
19    Q  Okay.  So why is it that you never
20  called the number back as the voicemail
21  said and talked to somebody and asked them
22  to stop calling?
23    MR. GLAPION:  Objection to form.
24    THE WITNESS:  I don't know why I

Page 99

1  should go through all that if I never
2  signed up for anything in the first place.
3  You're not supposed to send me anything or
4  call me in any capacity if I haven't asked
5  for your services.  I never used you in
6  business; I never asked for this, so why
7  should I waste my time, energy, effort,
8  minutes in calling the number back?
9    BY MR. WATSTEIN:
10    Q  Understood.  So let me ask you this.
11  I think I know the answer, but let me
12  confirm.  I know that you contend that
13  these were pre-recorded messages, right?
14    A  Correct.
15    Q  But if this was actually a person
16  named Alex who had left this voicemail and
17  you didn't provide consent to NRS PAY OR
18  Alex to call you, you still would have been
19  annoyed by that, right?
20    MR. GLAPION:  Objection to form.
21    THE WITNESS:  Are you saying -- I
22  don't understand your question.
23    BY MR. WATSTEIN:
24    Q  I guess what I'm trying to say is your

Page 100

1  annoyance, correct me if I'm wrong, our
2  annoyance stems from the receipt of these
3  communications, as you phrase it, without
4  consent, rather than the fact of who it was
5  that was calling you, or how they were
6  calling you?
7    A  I really don't like either, but I
8  definitely don't want any type of a robotic
9  voicemail messages from a company I never
10  asked to call me in the first place.
11    Say, for example, I ordered a
12  pizza from Domino's.  I ate the Domino's.
13  Domino's called me two weeks later with
14  their robo voicemail message.  I wouldn't
15  like that either.
16    Q  Right.  But I guess what I'm trying to
17  figure out is does your frustration stem
18  from the fact that the voicemails were
19  robotic, as you put it, or would you still
20  have been annoyed if you had received
21  repeated voicemails from a person named
22  Alex if you didn't give him your consent?
23    A  Probably both.
24    And also with the voicemail, it

Page 101

1  was more than just a message.  At the
2  beginning of each message they started off
3  with doo doo doo, and that's a dead
4  giveaway that that's a robo call.  So each
5  one of the messages I received had that at
6  the beginning.  And yes, that's extremely
7  annoying.
8    Q  Okay.  But just to be clear, you would
9  have filed a lawsuit regardless of whether
10  the messages had a recording, or whether
11  they were actually left by somebody named
12  Alex, assuming you didn't consent to them?
13    MR. GLAPION:  Objection to form.
14    THE WITNESS:  More than likely.
15    BY MR. WATSTEIN:
16    Q  If you can turn to the next page, No.
17  4?  You see there's, I guess it looks like
18  what's called a waveform analysis.  Do you
19  see that?
20    A  Yes.
21    Q  Did you do that?
22    A  Did I actually create this?
23    Q  Yes.
24    A  No, I did not.

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 114

1 saving the voicemails?
2   A  Those were just voicemails that just
3 happened to be on my phone.  And at one
4 point I just went through my phone, and the
5 voicemails that I had, I documented.
6       So like I said, I may have
7 received previous voicemails, but they may
8 have somehow gotten deleted, or things of
9 that nature.  But when I went through my
10 phone, this is what I had.
11   Q  Okay.  And what caused you to go
12 through your phone to document the
13 voicemails that you had?
14   A  Tired of the communications.  You
15 know -- tired of the communications.
16   Q  Okay.  But at some point you blocked
17 the NRS number, yes?
18   A  That's correct.
19   Q  Okay.  Did you go through your
20 phone -- did you go through the voicemails
21 in your phone before or after you blocked
22 the NRS number?
23   A  After.  So I blocked their number, and
24 at some point I went through my blocked

Page 115

1 calls and voicemails, yes.
2   Q  Okay.  So just to be clear, though,
3 you are not sure -- you have these seven
4 voicemail messages from NRS, yes?
5   A  Correct.
6   Q  Okay.  And you're not sure whether
7 there were ever any additional voicemail
8 messages that were left on your phone from
9 NRS, correct?
10   A  I can't say 100 percent sure, but more
11 than likely.  But I can't say 100 percent.
12 Like I can't with these seven.
13       Of course I know that you guys
14 called -- I'm sorry.  Your client called
15 me, you know, 18 times.
16   Q  And you know that from looking at your
17 records that Cricket Wireless produced?
18   A  Correct.
19   Q  Okay.  But you don't know whether you
20 saw those communications on your phone
21 contemporaneously with them occurring?
22       MR. GLAPION:  Objection to form.
23       THE WITNESS:  I can't say.
24

Page 116

1       BY MR. WATSTEIN:
2   Q  Okay.  And you don't know that there
3 was a voicemail left contemporaneously with
4 them occurring, correct?
5   A  Yeah, that's correct.
6   Q  Okay.  And you don't have any
7 voicemails from NRS other than the seven
8 that you've provided to your attorney,
9 correct?
10   A  I believe that's correct, yes.
11   Q  Okay.  Did you ever intentionally
12 delete any NRS voicemails?
13   A  More than likely.  I can't say
14 100 percent sure that I deleted some of
15 their voicemail messages, but I'm sure at
16 some point I got tired of the calls and the
17 voicemail messages, and I may have just
18 deleted.  I may have just deleted them
19 initially unknowing that this will continue
20 on for years.  So maybe initially, I did
21 delete some.
22   Q  So you just don't have a specific
23 recollection one way or another?
24   A  No, I don't.

Page 117

1   Q  Okay.
2       MR. WATSTEIN:  This will be
3 Defendant's Exhibit No. 6.
4       (The document was so marked
5       by the court reporter.)
6       BY MR. WATSTEIN:
7   Q  Okay.  So at some point, Mr. Walston,
8 you sent a letter to NRS Pay about the
9 communications; is that correct?
10   A  That is correct.
11   Q  And is that letter what is reflected
12 on Defendant's Exhibit No. 6?
13   A  Yes.
14   Q  Okay.  And so you sent this letter to
15 Mr. Eli Korn who is the Chief Operating
16 Officer of NRS?
17   A  That's correct.
18   Q  Why did you send the letter to
19 Mr. Korn?
20   A  He is listed as one of the officers.
21 I went to the new Jersey business website,
22 and he was the officer that was listed that
23 I really just chose to send it to him.
24       I thought as a chief operation

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 118

1  officer, that's somebody that's going to be
2  on-site, you know, day-to-day every day.
3  President, vice president may not be. So
4  that's what -- I think that was my mindset
5  of sending it to him, specifically.
6    Q  Okay. And is this letter the form
7  that you obtained from or based on the form
8  that you obtained from robocallsforcash?
9    A  That is correct, yes.
10   Q  Okay. Did you presumably alter it in
11 some ways, edit it?
12     MR. GLAPION: I'm just going to object
13 to that previous question. It's
14 robocalls.cash. You said robocallsforcash.
15     MR. WATSTEIN: Got it.
16     MR. GLAPION: Just to clarify.
17     THE WITNESS: Yeah, I did have to edit
18 instead of put in my specific information
19 as far as the date, telephone number, and
20 also the amount that I was asking for. So
21 I had to edit those areas. But other than
22 that, I don't think I edited. And my name
23 and address, email account. Other than
24 that, I don't believe I edited anything

Page 119

1  else.
2    BY MR. WATSTEIN:
3    Q  Okay. So in this letter on page 1,
4  you document communications that you
5  received between March, 2022 and October,
6  2023. Do you see that?
7    A  Yes.
8    Q  Okay. And this letter is dated
9  October 19th, 2023, yes?
10   A  Yes.
11   Q  So why did you wait so long to send a
12 communication like this?
13     MR. GLAPION: Objection to form.
14     THE WITNESS: It wasn't that I
15 necessarily waited so long. Around October
16 of 2023 is when I got fed up. I got fed up
17 with the calls. And I looked back. I said
18 to myself, let me see how many times this
19 company has called me.
20     So it was not like I waited.
21 It's not like I said it's 2022, let me wait
22 and see how many times NRS Pay calls me.
23     It just got to a point where I
24 said I'm sick of this, and that's exactly

Page 120

1  when I went to go find information about
2  how to prevent robo calls.
3    BY MR. WATSTEIN:
4    Q  Okay. Understood.
5        And if you can turn to the second
6  page of this letter, second paragraph from
7  the bottom, it says, "Based on the number
8  of communications detailed above, the
9  statutory penalties to which I would be
10 entitled total $10,500.00." Do you see
11 that?
12   A  Yes.
13   Q  And then it says, "However, in the
14 interest of helping you avoid the
15 imposition and expense of civil litigation,
16 I would like to afford you an opportunity
17 to settle this matter for the amount of
18 $9,800.00." Do you see that?
19   A  Yes.
20   Q  Okay. And is that number in line --
21 to you in line with the harm that you claim
22 to have suffered in the case, or as a
23 result of the communications?
24     MR. GLAPION: Objection to form.

Page 121

1    THE WITNESS: Yes. I believe that I
2  was entitled to $1,500.00 per violation,
3  because $1,500.00 is the amount if it's
4  willfully and maliciously.
5        So I just multiplied that times
6  seven. That's how I got the $10,500.00.
7    Q  Right.
8    A  But I was willing to settle for the
9  $9,800.00.
10   Q  Right. And I guess I was trying to
11 figure out how you came to that $9,800.00
12 figure?
13   A  It was something under $10,000.00, and
14 it's something that I thought I would be
15 able to get, potentially.
16   Q  A slight discount?
17   A  Right.
18   Q  Okay. And then at some point after
19 you sent this letter, you actually got a
20 call -- well, it was in -- you can confirm
21 for me, I believe it was in early November
22 you got a call from someone at NRS,
23 correct?
24     MR. GLAPION: Objection to form.

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 122

1 THE WITNESS: That is correct.

2 BY MR. WATSTEIN:

3 Q Okay. And it was the CEO named Elie,

4 right?

5 A That is correct.

6 Q Okay. And as I understand the

7 conversation, Elie apologized for any

8 inconvenience to you; is that right?

9 MR. GLAPION: Objection to form.

10 THE WITNESS: I don't remember an

11 apology, no.

12 BY MR. WATSTEIN:

13 Q Okay. And as I understand it -- well,

14 let me back up. You say you don't remember

15 an apology. You don't remember one way or

16 another?

17 A I don't remember him apologizing.

18 Q Okay. Do you remember him not

19 apologizing? Are you saying he did not

20 apologize?

21 MR. GLAPION: Objection to form.

22 THE WITNESS: I'm saying that I cannot

23 recall him apologizing. I can't recall him

24 saying hey, man, I'm sorry that my company

Page 123

1 called you. I don't remember that at all.

2 BY MR. WATSTEIN:

3 Q Okay. Do you remember Elie saying

4 that NRS wanted to make it right for your

5 frustration, or something to that effect?

6 MR. GLAPION: Objection to form.

7 THE WITNESS: Something similar to

8 that, yes.

9 BY MR. WATSTEIN:

10 Q Okay. And as I understand it, he

11 offered you some amount of money; is that

12 right?

13 A That is correct.

14 Q Okay. And in your view, it wasn't

15 sufficient; then you effectively reiterated

16 that basically, it's going to take

17 $9,800.00 to resolve this?

18 MR. GLAPION: Objection to form.

19 THE WITNESS: That is not correct.

20 BY MR. WATSTEIN:

21 Q Okay. What's incorrect about that?

22 A I did not say he had to pay $9,800.00.

23 Q Okay. Well, what did you say then?

24 A I said that what he offered me was

Page 124

1 $800.00.

2 Q Okay.

3 A And I said $800.00 is not good enough.

4 And I maybe have thrown out some amounts of

5 maybe $3,000.00 or $4,000.00, in that

6 range, $5,000.00. But I never said you

7 have to give me $9,800.00, exactly what's

8 in this letter. I did not say that.

9 Q Okay. So basically, let me see if I

10 can accurately summarize.

11 Basically, he offered you $800.00

12 and you came back with something like

13 that's not good enough; it's going to have

14 to be higher than that, maybe $4,000.00,

15 $5,000.00, something like that, and he said

16 I'll get back to you?

17 A No, that's not what he said. What he

18 said is, come on -- this is generally what

19 he said. He said, "Come on, man." But I

20 do remember specifically, he said, "We're a

21 small company. We can't afford this type

22 of money. Let's make today a good day."

23 And he asked me to call him back.

24 But he reiterated, he said that

Page 125

1 he was NRS Pay. They are a small company.

2 That he would have to get approval to issue

3 out anything over $800.00. And he asked

4 me, and I said that's not good enough. So

5 he asked me to call him back at some point.

6 He said he will be in and out of

7 meetings that day; to give him a call back.

8 And I said, "I'll give you a call back." I

9 said, "I'll give you a call back."

10 Q Okay. So I think I understand now.

11 So basically, he offered $800.00.

12 You said that's not good enough. It's

13 going to take something more like $4,000.00

14 or $5,000.00?

15 A At least, at least.

16 Q At least. Okay. And then he said, "I

17 have to get authority for that, or see if I

18 can get authority for that; why don't you

19 call me back?"

20 A No. He said, "We're a small company.

21 We cannot afford that. I would have to get

22 authority to do anything over $800.00." He

23 never said that he's going to check to get

24 authority. He said, "I will have to get

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 126

1  authority." He made it seem like that was
2  it, $800.00 flat, that's it.
3    Q  Okay.  But he said he would have to
4  get authority for something over $800.00,
5  and the way that you guys left it was there
6  would potentially be another discussion?
7    A  I believe so, yes.
8    Q  Okay.  So you made clear that your
9  position was you didn't need the whole
10  $9,800.00, but you needed it to be several
11  thousands?
12    A  At least, yes, for -- yeah.
13    Q  Okay.  Oh, one more thing.
14       Okay.  So if you can turn to the
15  attachments to Defendant's Exhibit No. 6?
16  So you can go to Page No. 4.
17    A  Okay.
18    Q  So you see, is this a screenshot of
19  your phone?
20    A  It is, yes.
21    Q  Okay.  And it says blocked in the
22  upper left-hand corner, right?
23    A  That is correct.
24    Q  Okay.  And so can you explain to me

Page 127

1  how you navigate to this page on your
2  phone?
3    MR. GLAPION:  Objection to form.
4    THE WITNESS:  This is off my old
5  phone.  This is an iPhone 6.  I don't
6  currently have that phone right now.
7       Are you asking me to pull out my
8  phone and navigate it?
9    BY MR. WATSTEIN:
10    Q  No.  I'm just asking if you can recall
11  how you navigated to this page effectively?
12    A  Yes.  What you do is you go to your
13  call history.  Scroll all the way down to
14  the bottom half section.  I believe it's
15  deleted messages.  Then you have blocked
16  calls.  You hit blocked calls, and it shows
17  all your blocked calls and all your blocked
18  voicemail messages.  It's something in that
19  realm.
20    BY MR. WATSTEIN:
21    Q  Okay.  And to be clear, you weren't
22  using any sort of call blocking app, it was
23  just what comes standard on the iPhone?
24    A  Yeah.  Just the standard iPhone

Page 128

1  blocking feature.
2    Q  Okay.  And if you scroll through these
3  screenshots that are attached to this
4  demand letter, you'll see that there are
5  screenshots of, it looks like seven
6  communications from what you contend is
7  that NRS Pay number; is that right?
8    A  Correct.
9    Q  Okay.  And they are numbered 1
10  through 7 at the top right.  Do you see
11  that?
12    A  Correct, yes.
13    Q  Did you put that numbering on there?
14    A  The number in the circle, yes.
15    Q  Okay.  That's your handwriting?
16    A  Yes.
17    Q  Okay.  And what you'll see is the
18  numbers 1 through 6 for the calls that are
19  labeled in the upper right-hand corner,
20  number 1 through 6 all say blocked?
21    A  Right.
22    Q  And the seventh one says voicemail in
23  the upper left-hand corner?
24    A  Yes.

Page 129

1    Q  So help me understand why the first
2  six say blocked and the last one that's
3  labeled number 7 says voicemail.
4    MR. GLAPION:  Objection to form.
5    THE WITNESS:  Because I unlocked that
6  number.
7    BY MR. WATSTEIN:
8    Q  Oh, you unblocked the NRS Pay number?
9    A  At some point I did, yes.
10    Q  Why did you do that?
11    A  You know, I'm going to tell you why I
12  even went to my blocked numbers.
13       I had a friend of mine that was
14  trying to contact me.  He said he was
15  sending me messages, things of that nature,
16  and I wasn't getting them.  So that's what
17  made me initially go to my blocked calls to
18  even look for it.
19       I saw that his number was somehow
20  blocked, and that's when I saw all of these
21  numbers listed.  And I was like I'm sick
22  and tired of this.  So the next time these
23  people call me, I'm going to make sure that
24  I know.  So I moved that number, so the

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 130

1 next time that they called me, I would have
2 documentation of it. And that's why I
3 removed that number from the blocked calls.
4  Q Okay. So basically, you didn't
5 discover the NRS Pay calls and voicemails
6 until a friend was trying to get in contact
7 with you, and that caused you to go into
8 your blocked calls, and then you saw oh, I
9 have all these blocked communications from
10 NRS Pay?
11  MR. GLAPION: Objection to form.
12  THE WITNESS: I knew that they were
13 contacting me beforehand. That's why I put
14 them on blocked in the first place.
15  BY MR. WATSTEIN:
16  Q Okay.
17  A Like I say, I don't have all those
18 records. I probably ended up deleting
19 them.
20  But I knew that this company had
21 been calling me for a very long time. When
22 I went to the blocked voicemail messages
23 and I saw all those voicemails that they
24 were continuing to call me, I really got

Page 131

1 fed up, and I said the next time these
2 people contact me, I'm going to do
3 something about it.
4  Q Okay. And if you can turn to the next
5 page, on the next page there's for the next
6 seven pages, there's a separate set of
7 phone records labeled 1 through 7. Do you
8 see that?
9  A Yes.
10  Q And they are redacted. Do you see
11 that?
12  A Yes, I do.
13  I'm going to let you know what's
14 redacted are the telephone numbers.
15  Q Okay.
16  A That's what's redacted. And I just
17 have displayed their telephone numbers. So
18 I just didn't want to send any random
19 person telephone numbers on my phone.
20  Q Okay. You answered my question.
21 That's what I was trying to figure out.
22  Let's go back to Defendant's
23 Exhibit No. 5 which are the
24 Interrogatories. Interrogatory No. 1 asks

Page 132

1 for you to identify every document that
2 relates to, refers to, concerns, evidences,
3 or supports or refutes the allegations and
4 claims set forth in the Complaint, and the
5 defenses set forth in the answer." Do you
6 see that?
7  A Yes.
8  Q Okay. What did you do to locate
9 documents that were responsive to this
10 request?
11  A The only documents that I have are the
12 screenshots and the voicemail messages, and
13 also the document that I sent to NRS Pay.
14  Q Okay. So that doesn't quite answer my
15 question, but I think I understand what
16 you're saying. I guess my question is,
17 what did you do to look for documents that
18 are responsive to this?
19  A Do you have any documents in
20 particular that you're referring to?
21  Q I'm trying to understand what your
22 process was when you received this to try
23 to figure out what you thought was relevant
24 and what you did look for. I can't really

Page 133

1 answer that.
2  A Okay. Screenshots that I have
3 attached to this demand letter, the demand
4 letter. That's about all that I can recall
5 right now.
6  Q Okay. Have you ever emailed or texted
7 with anybody else about the claims in your
8 Complaint, other than your counsel?
9  A Emailed or texted, no.
10  Q Like a friend? Have you ever talked
11 to a friend about this lawsuit, or the
12 calls from NRS?
13  MR. GLAPION: Object to the form.
14  THE WITNESS: No. The only con -- no,
15 I haven't.
16  BY MR. WATSTEIN:
17  Q Do you have any other phone numbers
18 other than the phone number that's at issue
19 in this case, which I understand to end in
20 4088?
21  A As far as personal telephone number,
22 yes, that's it. But I've had other
23 business telephone numbers.
24  Q Okay. So the 4088, is that your

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 154

1  your counsel has gotten in other cases?
2   A  I believe so, yes.
3   Q  Okay.  Have you ever seen this
4  document before that I've marked as
5  Defendant's Exhibit No. 7?
6   A  Not to my recollection, no.
7   Q  Okay.
8      MR. WATSTEIN:  Let the record reflect
9  that this is Plaintiff's Motion and
10  Supporting Memorandum For Attorney's Fees
11  Costs and Service Awards in the Allard
12  versus SCI Direct case.
13     BY MR. WATSTEIN:
14   Q  So I'll represent to you that this --
15  okay.  So why don't you turn to page 15?
16   A  Okay.
17   Q  Do you see on page 15 at the top under
18  section B, second sentence, it says, "The
19  settlement provides exceptional relief to
20  class members with amounts likely exceeding
21  $100.00 per claimant after the requested
22  fees and administrative costs."  Do you see
23  that?
24   A  Yes, I do.

Page 155

1   Q  Okay.  Why don't you turn to page 17.
2  At the top it says, second sentence, "Class
3  counsel requests 36 percent of the first
4  $10 million and 28 percent of the remaining
5  $5 million, for a total of $5 million."  Do
6  you see that?
7   A  Yes, I do.
8   Q  As the class representative in this
9  case whose job is to look out for the
10  class, do you think it's fair that an
11  attorney can request $5 million in fees
12  when he has obtained $100.00 per claimant
13  in damages?
14     MR. GLAPION:  Objection to form.
15     THE WITNESS:  The attorney is taking
16  all the risk.  It takes a lot of time and
17  effort to file lawsuits.  Things of that
18  nature.  So I believe they are compensating
19  their costs.  Of course they deserve to
20  make a living as well.
21     So what I think is fair is what
22  the justice system or the Judge allows.
23  That's my definition of what's fair.
24

Page 156

1     BY MR. WATSTEIN:
2   Q  So in your view then, a good recovery
3  in this case would be $100.00 per person
4  who received phone calls?
5     MR. GLAPION:  Objection to form.
6     THE WITNESS:  I've never seen the
7  document before.  I would have to review
8  all of these documents, not even as an
9  attorney, just as a regular citizen, before
10  I can make any type of answer on who should
11  receive what.  I'm not versed enough.  I
12  have not seen this information before.  I
13  would need to review the documents and come
14  up with what I think would be best from a
15  non-legal perspective, because I'm not an
16  attorney.
17     BY MR. WATSTEIN:
18   Q  Okay.  Well, then let me ask you that.
19  Do you think that a $100.00 payment to you
20  would be a fair amount to resolve this
21  case?
22     MR. GLAPION:  Objection to form.
23     THE WITNESS:  This case is not over
24  with.  We're not at the settlement or end,

Page 157

1  so that's something I cannot answer.
2     MR. WATSTEIN:  Next exhibit.
3     (The document was so marked
4      by the court reporter.)
5     BY MR. WATSTEIN:
6   Q  Defendant's Exhibit No. 8 is an Order
7  granting a motion for attorney's fees and
8  reimbursement of expenses in the Tait V BSH
9  Home case.  Do you see that, Mr. Walston?
10   A  Yes, I do.
11   Q  Have you ever seen this before?
12   A  No, I haven't.
13   Q  Okay.  Have you ever seen any fee
14  awards or documents from the Christy
15  Griffith versus ContextMedia case?
16   A  I don't believe so.
17   Q  Okay.  And the same question for the
18  Walker versus Highmark case?
19   A  I don't believe so.
20   Q  Okay.  So would it surprise you that
21  in that case which was a case that your
22  counsel handled, that the lawyers got
23  $600,000.00 and the named plaintiffs, those
24  are the folks in your shoes, there were

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 158

1  three of them there, got $2,500.00,
2  $2,500.00 and $10,000.00?  Would that
3  surprise you?
4    A  Now, who are those people that you're
5  mentioning?
6    Q  The named plaintiffs, the class
7  representatives.
8    A  Oh, class, okay.  You asked me -- I
9  don't understand the question.  You asked
10  me if that surprises me?
11    Q  Yes.
12    MR. GLAPION:  Object to the form.
13    THE WITNESS:  Not really.  I'm not
14  expecting anything, so I can't be
15  surprised.
16    BY MR. WATSTEIN:
17    Q  Are you being paid in any way by
18  anyone for your services in this case?
19    A  No.
20    Q  Have you been promised anything, any
21  type of payment in connection with your
22  services for this case?
23    A  No.
24    Q  Any type of consulting fee?

Page 159

1    A  No.
2    Q  Okay.  How about any entity or person
3  affiliated with you?  Has any entity or
4  person affiliated with you that promised
5  any type of fee or compensation for your
6  participation in this case?
7    A  No.
8    Q  In the Tait document that's marked as
9  Exhibit No. 8, would it surprise you to
10  know that each class member got around
11  $55.00 and the lawyers got $4 million in
12  fees after fives years of litigation?
13    A  That's a long time of litigation.  A
14  lot of legal fees will be wracked up during
15  that time.  I'm glad you told me how long
16  it was.  No, I mean I'm not an attorney.
17  You already know how much you guys charge,
18  so I'm not surprised it's a huge amount.
19    Q  Nobody pays me $4 million or
20  $5 million to handle these cases, I'll tell
21  you that.
22    A  I'm sorry to hear that.
23    Q  Do you have some sort of a written
24  agreement with your lawyer, like an

Page 160

1  engagement letter?
2    A  I believe so, yes.  There is a
3  document that I had to sign, yes.
4    Q  When did you sign those,
5  approximately?
6    A  On two occasions.  When Mr. Glapion
7  first decided to investigate on my behalf,
8  and then after that there was another
9  document I had to sign.
10    Q  Was the second document like a
11  document totally engaging him to represent
12  you in a lawsuit?
13    A  I believe so.  If I'm not mistaken, I
14  believe so, yes.
15    Q  And do you know how Mr. Glapion is to
16  be compensated under the agreement?
17    A  He will receive attorney fees if there
18  is some type of settlement.
19    Q  Okay.  If there's a class settlement,
20  he would get some percentage of it?
21    A  Correct.
22    Q  What if you decided that you wanted to
23  settle the case individually?
24    A  That's not --

Page 161

1    MR. GLAPION:  Objection to form.  Go
2  ahead.
3    THE WITNESS:  That's not something I
4  would want to do.
5    BY MR. WATSTEIN:
6    Q  But what if you decided that?  What if
7  you learned that you didn't have a good
8  case and you decide that you wanted to
9  settle individually?  Would you be able to
10  do that?
11    A  That's not something I would be
12  interested in doing.
13    Q  Why not?
14    A  Not at this time.  And especially
15  speaking with legal counsel, Mr. Glapion, I
16  wouldn't be interested in any type of
17  individual settlement.
18    Q  So based on your conversations with
19  your lawyer, you're not interested in any
20  type of individual settlement?
21    MR. GLAPION:  Objection to form and
22  attorney/client privilege.
23    MR. WATSTEIN:  Well, he opened the
24  door.

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 162

1     MR. GLAPION: You were asking about an
2 agreement and he said he would need to --
3 we can read that back. I believe he said
4 without consulting with attorneys, he would
5 not want to settle anything individually.
6     MR. WATSTEIN: Why don't you read back
7 what he said?
8     (The record was so read
9     by the court reporter.)
10     MR. GLAPION: And I will renew that
11 objection in terms of any attorney/client
12 privilege. I think that's what you were
13 asking for, correct?
14     MR. WATSTEIN: You know what? Strike
15 my question, because he's already answered
16 it before I even asked it.
17     BY MR. WATSTEIN:
18     Q So why is it that you would not be
19 willing to settle this case individually?
20     A That's something I have to discuss
21 with my legal team, Mr. Glapion.
22     Q But I'm not asking your legal team,
23 I'm asking you, and that's something --
24     You know part of this process is

Page 163

1 I have the right to ask you questions, and
2 that's what I'm doing now. I'm not
3 interested in his answer. I can get that
4 answer from him separately. I'm interested
5 in your answer.
6     If what you're telling me is that
7 this is your lawyer's decision, fine. But
8 --
9     A No, that's not what I was telling you.
10     Q Okay. Then tell me, why is it that
11 you would not be interested in settling the
12 case individually?
13     A You know what? I want other people to
14 get justice. It hasn't been me that's just
15 been harmed by this company, in my opinion.
16     One thing I didn't mention
17 earlier, the phone call I got from Mr. Elie
18 Katz, he initially, you know, asked me my
19 name and did I live at this address, and
20 attempted to try to intimidate me, belittle
21 me, make me feel less than. I didn't
22 mention that. And you know, that was
23 hurtful to me.
24     So after that conversation, what

Page 164

1 went through my head, I thought if they're
2 willing to do this to me, have they done
3 this to other people? Will they do this to
4 other people?
5     So I'm at the point now where I
6 like to see justice for multiple people,
7 not just myself.
8     Q Let me understand. I don't
9 understand. What you're saying is that
10 Mr. Katz called you to see -- you got a
11 phone call. You sent a letter and you got
12 a phone call back from the CEO of a
13 company, right?
14     A That's correct. But in the demand
15 letter I specified to do not call me. I
16 specified to email me to make sure that any
17 contact with me should be via email.
18     So a direct phone call from
19 Mr. Elie Katz from the jump was a form of
20 intimidation and try and push me around.
21     I insisted specifically do not
22 contact me, via email. He deviated from
23 that.
24     Q Okay. Don't you think, though -- I'm

Page 165

1 not trying to argue with you; I'm just
2 saying don't you think that a lot of people
3 would appreciate getting a call from the
4 CEO because it shows that somebody at that
5 level is taking your letter seriously
6 enough to spend the time on it?
7     MR. GLAPION: Objection to form.
8     THE WITNESS: Absolutely not. Not in
9 the manner he called, no.
10     BY MR. WATSTEIN:
11     Q And you say that the manner was
12 intimidating because he confirmed that he
13 was speaking to the right person? I'm not
14 sure I follow.
15     A He said is this Rashad Walston from
16 some address, and attempts to him saying,
17 what I got from it was that yes, I know who
18 you are; I know where you live. He said an
19 incorrect address.
20     I said, "This is Rashad. I don't
21 stay at that address." I think I asked
22 who's calling. And then he said, "Is this
23 R. W. Walston as well?" And I said, "Yes.
24 Who is this?" And then that's when we

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 166

1 began talking.
2        But like I said, in the demand
3 letter I asked for nobody to call me. I
4 asked for all communication via email.
5 That's it.
6        So in my view, I felt that was a
7 form of just another attempt at being
8 harassed, trying to be intimidated, trying
9 to be pushed around.
10   Q  Okay. I understand what you're
11 saying, I guess. I wouldn't necessarily
12 interpret that the same way. Usually when
13 I take the time to pick up the phone and
14 call somebody and speak to them, it's
15 because it's out of a showing of respect.
16      MR. GLAPION: Objection.
17 BY MR. WATSTEIN:
18   Q  So anyways, I'm not here to testify.
19 I'm not like I said here to argue with you.
20 It's interesting that you took it that way.
21      MR. GLAPION: Objection to form.
22      BY MR. WATSTEIN:
23   Q  Do you know if the engagement letter
24 permits you to settle your case

Page 167

1 individually, should you want to, without a
2 monetary penalty?
3   A  I'm not 100 percent sure of that. I
4 don't know.
5   Q  Do you know whether it gives your
6 lawyer the ability to approve any sort of
7 settlement that you might want to enter
8 into?
9   A  Without my knowledge?
10   Q  Not without your knowledge, but do you
11 know whether it gives your lawyer a right
12 to approve or reject any sort of settlement
13 that you might want to enter into?
14   A  I'm not 100 percent sure, but it
15 probably does.
16      I mean I don't know if you're
17 asking just if he can just make the
18 decision without consulting with me? Is
19 that what you're asking? Or just we both
20 come up with a settlement or an amount or
21 something like that, and we agree upon it?
22 So I'm not 100 percent sure.
23   Q  Well, why don't you just explain to me
24 in other words what the engagement letter

Page 168

1 provides about how settlement discussions
2 will be conducted?
3   A  It will be a conversation with me and
4 the legal team.
5   Q  Okay. But who gets to make the final
6 decision as to whether or not it settles,
7 do you know?
8   A  I'm saying it would be both of us. It
9 would be a collaborative.
10   Q  Okay. So both have to agree is your
11 assumption?
12   A  Correct. I'm not 100 percent sure,
13 but that's my assumption, yes.
14   Q  Okay.
15      MR. WATSTEIN: This will be Defendant's
16 Exhibit No. 9.
17      (The document was so marked
18      by the court reporter.)
19      BY MR. WATSTEIN:
20   Q  Let me know once you've had a chance
21 to review this document that's been marked
22 as Defendant's Exhibit No. 9, Mr. Walston.
23   A  Okay.
24   Q  Do you recognize this letter,

Page 169

1 Mr. Walston?
2   A  No, I've never seen this letter
3 before.
4   Q  Do you keep your voicemail clear
5 regularly, or do you ever allow your
6 voicemail to get full such that you can't
7 receive additional messages?
8   A  It depends. I generally try to
9 delete. Sometimes I want to delete
10 unwanted voicemails. Sometimes I don't.
11 Sometimes it just accumulates. So it
12 depends.
13      I don't have any hey, this is
14 a -- it's a weekly thing or every month,
15 hey, I've got to go through and clean up my
16 phone; I don't necessarily do that. It's
17 just on occasion.
18   Q  Okay. But are there occasions over
19 the last few years that your voicemail has
20 become full?
21   A  Pretty close to, yes.
22   Q  Well, pretty close to, or full? Two
23 different things.
24      MR. GLAPION: Objection to form.

**RASHAD WALSTON vs NATIONAL RETAIL SOLUTIONS, INC.**
**Rahad W. Walston on 04/26/2024**

Page 170

1    THE WITNESS: I can't think of a time
2 where my voicemail messages were at maximum
3 where I couldn't receive any voicemail
4 messages, but my storage was extremely
5 limited from voicemail and other data and
6 stuff, so I had to delete.
7    BY MR. WATSTEIN:
8    Q  Okay. So because you did that,
9 cleared out your voicemail before you got
10 to max capacity, you can't speak to what
11 would happen if one of these communications
12 from NRS was sent to a phone with full
13 voicemail, right?
14    MR. GLAPION: Objection to form.
15    THE WITNESS: So you're asking me do I
16 understand the ramifications of somebody
17 sending a robo call, a robo voicemail
18 message to somebody whose voicemail box is
19 already full?
20    BY MR. WATSTEIN:
21    Q  Correct. I'm asking if you could
22 speak to what would occur if NRS tried to
23 send one of these communications to
24 somebody with a full mailbox. Can you

Page 171

1 speak to that?
2    A  My assumption is that they probably
3 wouldn't get the voicemail. It probably
4 might say voicemail box is full.
5    Q  Right. But again, just to answer my
6 question, that's an assumption, and you
7 can't speak to it because you've not
8 experienced it?
9    A  That's correct.
10    MR. GLAPION: Objection to form.
11    BY MR. WATSTEIN:
12    Q  And you can't speak to whether others
13 who receive these exact same messages might
14 have requested them or opted into them or
15 found them helpful or useful?
16    MR. GLAPION: Objection to form.
17    THE WITNESS: No, I'm not one of those
18 people, because I did not ask for
19 solicitation from National Retail Solution,
20 NRS Pay.
21    Q  Right. Understood.
22       And I guess my follow-up question
23 to that is you can't speak to what it would
24 have been like to receive one of these if

Page 172

1 you had been requesting them or had
2 welcomed communications from NRS, right,
3 because that wasn't your situation?
4    A  Correct.
5    Q  And you can't speak to what would have
6 happened or what would have occurred on
7 your phone, what would have been displayed,
8 if you had been using a different type of
9 call-blocking software like Nomorobo or
10 something like that, right?
11    MR. GLAPION: Objection to form.
12    THE WITNESS: No, I can't, because I
13 don't have that.
14    MR. WATSTEIN: Why don't we take a
15 quick break. I'm getting close to done.
16    MR. GLAPION: Okay.
17    VIDEOGRAPHER: We are off the record
18 at 1:37 P.M.
19    (There was a discussion held off the
20     record, after which the deposition
21     resumed as follows:)
22    VIDEOGRAPHER: We are back on the
23 record at 1:59 P.M.
24

Page 173

1    BY MR. WATSTEIN:
2    Q  Mr. Walston, when you are at home, do
3 you switch your phone to wifi calling?
4    A  No, I don't.
5    Q  So you always use the cellular network
6 even when you're near wifi?
7    A  Correct.
8    MR. GLAPION: Object to form.
9    BY MR. WATSTEIN:
10    Q  Okay.
11    A  Correct, yes.
12    Q  After the conversation that you had
13 with Mr. Katz that we talked about in early
14 November of 2023, you never spoke with
15 anyone from NRS again, correct?
16    A  That's correct.
17    Q  Okay. And before I showed you the
18 letter that was marked as Defendant's
19 Exhibit No. 9 that you said you hadn't seen
20 before, before I showed you that letter
21 today, were you aware that NRS had
22 eventually agreed to pay the entire
23 $9,800.00 that you had asked for?
24    A  Yes. I discussed it.