# EXHIBIT 4

1

```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF FLORIDA
2                        FORT MYERS DIVISION

3

4    STEPHAN H. SLIWA, individually )
     and on behalf of all others    )
5    similarly situated,            )
                                    )
6          Plaintiff,               )
                                    )
7    -vs-                           )  Case No. 2:16-CV-235-FtM-29
                                    )
8    BRIGHT HOUSE NETWORKS, LLC and )
     ADVANCED TELESOLUTIONS, INC.,  )  May 24, 2019
9                                   )  Fort Myers, Florida
           Defendants.             )  9:30 a.m.
10   _____ )

11

12

13                TRANSCRIPT OF THE PROCEEDINGS
               BEFORE THE HONORABLE JOHN E. STEELE
14                  U.S. DISTRICT COURT JUDGE

15

16   APPEARANCES OF COUNSEL:

17   On behalf of the Plaintiff:    Keith J. Keogh, Esq.
                                     William P. Howard, Esq.
18   On behalf of the Defendants:   Ryan D. Watstein, Esq.
                                     Justin M. Penn, Esq.
19

20

21

22        Proceedings recorded by mechanical stenography
             and computer-aided transcript produced by
23
                    Susan C. Baker, RMR, CRR
24                      Court Reporter

25
```

2

```
 1                        -  -  -

 2                  P R O C E E D I N G S

 3                        -  -  -

 4           THE COURT:  This is the case of Stephan H -- is it

 5   Sliwa?  Is that how you say that?

 6           MR. HOWARD:  You say it Sliwa, Your Honor.

 7           THE COURT:  Sliwa?

 8           MR. HOWARD:  Yes, sir.

 9           THE COURT:  Thank you.

10           -- versus Bright House Networks, LLC and Advanced

11   Telesolutions, Inc., Case Number 2:16-CV-235.

12           Counsel, if you'd identify yourselves and your

13   respective clients beginning with counsel for Plaintiff.

14           MR. KEOGH:  Good morning, Your Honor.  Keith Keogh on

15   behalf of the Plaintiff.

16           MR. HOWARD:  Good morning, Your Honor.  Bill Howard

17   also on behalf of the Plaintiff.

18           MR. WATSTEIN:  Good morning, Your Honor.  Ryan

19   Watstein on behalf of Defendant Bright House Networks.  And our

20   client, Christy Schnier, is here as well.

21           THE COURT:  All right.

22           MR. PENN:  Good morning, Your Honor.  Justin Penn on

23   behalf of the Defendant ATS.

24           THE COURT:  All right.  Good morning.

25           We are here for oral argument on two motions.  One is
```

3

```
1    a motion for class certification.  The other is a motion to
2    exclude Plaintiff's expert report or maybe just the expert
3    testimony.  I know the motions are interconnected, but let's
4    start with the Plaintiff's motion for class certification.  So
5    we will hear from Plaintiffs first, then kind of go back and
6    forth as we need to.
7            MR. KEOGH:  Thank you, Your Honor.
8            I don't intend, unless the Court has different
9    issues, of repeating everything in the briefs.  Obviously, this
10   has been briefed ad nauseam with numerous supplemental notices
11   of authority and whatnot.  And what I'm going to focus on is
12   really what seems to be the core of the dispute here.  And part
13   of that core dispute is illustrated by Plaintiff's individual
14   case.
15           Plaintiff did not file this lawsuit after getting one
16   call from Defendants.  Plaintiff filed this lawsuit after
17   getting dozens of pre-recorded calls, after repeatedly telling
18   Defendants, "I'm not your customer, stop calling me."
19           THE COURT:  None of that matters, right?
20           MR. KEOGH:  Well, it matters as far as how they
21   recorded those calls and how they keep records of it.
22           THE COURT:  I mean, that's the issue.  As I see it --
23   well, there's a number of technical issues raised.  But in
24   terms of your proposed class, the putative class members have
25   to be persons or entities who didn't give consent, correct?
```

4

1          MR. KEOGH:  That's right, Your Honor.

2          THE COURT:  And your way of expressing that in the

3    definition of the class is to refer to them as non-customers?

4          MR. KEOGH:  Well, non-customers who were also called

5    after the wrong number of codes.  So it's not just

6    non-customers; it's non-customers who were called after the

7    wrong number of codes.  And that's why for Plaintiff's count

8    there's 14 notations of bad phone, cease contact.  And going

9    into -- I will jump to that point right now.

10          Defendants pointed out in their response or I think

11   in their surreply that bad phone can mean other things.  Well,

12   that's beside the point.  Because if you look at

13   Mr. Biggerstaff's accurate report, he has on page 7 a list of

14   the possible bad phone results.

15          This is a drop-down menu.  You know, someone calls,

16   the Defendants.  They say I'm not the customer or whatever it

17   is.  There's a drop-down menu with different options.  There's

18   a bad phone accounts with attempts, bad phone accounts with

19   disputes.

20          That's great.  But it has nothing to do with what we

21   talked about here.  Mr. Biggerstaff testified and put in his

22   report he limited the accounts to bad phone, incorrect number,

23   live answer.  So the other possibilities what a bad phone

24   number can mean are not present in the 9,406 unique phone

25   numbers he identified.

5

1          THE COURT:  And do I recall correctly that these are

2     only calls made by Advanced Telesolutions?

3          MR. KEOGH:  Advanced Telesolutions handled the calls

4     for Bright House.  So if I called Bright House, I was speaking

5     to Advanced Telesolutions.  They said -- so when they call,

6     they say, "This is Bright House."  But it's actually Advanced

7     Telesolutions.  So --

8          THE COURT:  Well, there actually -- again, as I

9     recall, there were actually some calls made by Bright House

10    in-house either before the contract with Telesolutions or

11    perhaps afterwards as well.  But I thought somewhere I read

12    that your position was that the offending calls were all by

13    Advanced Telesolutions.

14         MR. KEOGH:  Yes.  The data we have was where the

15    calls were Advanced Telesolutions sends out the pre-recorded

16    call.  They have in their account notes then bad phone,

17    incorrect number, live answer.  They then send that to Bright

18    House.  Bright House then in order to fit that criteria had to

19    have that coded as incorrect number.  And then after that

20    Bright House sent it back to ATS to call again, and only the

21    call again was part of that criteria.

22         And on top of that, Mr. Biggerstaff took a

23    superconservative approach by then excluding any number that

24    where they reached a customer not only after a wrong number

25    code but before.  So if they ever reached a customer at these

6

1    numbers, they were excluded.

2         To be very clear, the phone number they are calling

3    Mr. Sliwa on they never reach their customer, not before or

4    after.  And that holds true for the 9,406.  The only caveat to

5    that, Your Honor, is in their surreply they attached an

6    affidavit saying that, well, 69 of these numbers the person

7    pressed one to speak to a live agent.  They got a pre-recorded

8    call.  And they may or may not be a customer.

9         I think that's another red herring because if you

10   look at the phone chart they have there's no option except to

11   press one to speak to an agent.  So if I'm ATS calling their

12   number, the only way you can tell them you're a wrong number is

13   to press one, speak to an agent.  There's no option, press two,

14   stop calling, or press three, stop calling.

15        And so their rebuttal showing that 69 of those

16   numbers, you know, press one doesn't get them to show that

17   they're customers.  I think it's very important that they never

18   actually showed us in their surreply what the account notes

19   were for those.  After they press one, what happened?

20        There's a record of that.

21        Do they then say I'm not the customer for all 69 of

22   them?

23        We don't know because that was never produced in

24   discovery.  But in any event, let's assume for sake of argument

25   that all 69 of those may be customers.  They can be excluded

7

1    from the class.  I don't think you have to do that.  But that's

2    all they have shown.  Out of the 9,406 or 7 people at issue

3    here, 69 pressed one and may be a customer.

4            THE COURT:  But isn't it clear that customers cannot

5    be included in the class?

6            MR. KEOGH:  Yes.

7            THE COURT:  Okay.

8            MR. KEOGH:  But they pressed one to speak to an

9    agent.  So I don't think that shows they are a customer.  They

10   didn't produce the account notes afterwards showing what they

11   said.  And we can easily exclude it then because, you know, we

12   have already excluded everyone else who called who they ever

13   reached another customer on that number from.

14           So that even includes there was tons of people who

15   they reached customers and then, you know, phone numbers are

16   reassigned; and then they get a wrong number and never reach a

17   customer again.  We even excluded those numbers in an abundance

18   of caution to narrow this class as much as possible.  And their

19   evidence in their surreply doesn't do it.  Their evidence

20   simply shows someone pressed one to talk to an agent.  It

21   purposely did not include what happened afterwards.

22           But, once again, for sake of argument, let's assume

23   they may or may not be customers.  You know, that only impacts

24   69 out of the 9,407.

25           But we propose to go even farther, and we think these

8

1    steps are more than sufficient to identify the class or to

2    ascertain the class under whatever test this Court wants to

3    adopt.  We then said we can subpoena the carriers.  The

4    telephone carriers have the subscriber and user information

5    available.  And we can remove anybody whose name or address

6    matches.

7            So if, you know, I live at home and my parents have,

8    you know, Bright House cable and they gave my number, I would

9    be excluded.  If the name matches, I would be excluded.

10           So that is I could say a double verifier or whatever

11   we called it in the briefing.  The point is that it's really

12   putting beyond a doubt that these people aren't customers.  And

13   we said, finally, if that's still not sufficient to address any

14   of these issues you could have an attestation in a declaration

15   of the claim process which is very common to say in order to

16   partake in any judgment that you attest, you know, swear under

17   penalties of perjury that you are not the customer of the

18   Bright House and, you know, whatever language the Court wants

19   in there.

20           So that goes far and above and beyond the other cases

21   that have been certified, you know.  As we pointed out, you

22   know, the *Reyes* case in this circuit talks about the wrong

23   number ones.  You know, since this case has been briefed, you

24   know, the *Keim vs. ADF*, now that was not a wrong number TCPA

25   case.  It was a telemarketing case.  But the arguments were

9

1   very similar.  And in that case, in *Keim*, Defendants argued,

2   well, we may have consent because the person who provided the

3   cell phone number may have been given consent by the user or

4   someone else.

5          So the judge in that case adopted Mr. Biggerstaff's

6   approach who was the expert in both cases and said that you can

7   just subpoena the carriers and you can exclude anybody where

8   the subscribers or users were on the same plans, and you can

9   check that box off and remove that defense.  And that's an

10  administrative process.

11         And in that case, we're doing that.  We have orders

12  compelling or consent orders with AT&T, Verizon, Sprint,

13  T-Mobile -- I'm sure I'm missing one of the big ones -- to

14  produce that information.  And that's an administrative

15  process.  That is not an individual issue.  That does not

16  predominate.

17         You know, kind of taking a step back here, there were

18  class actions before computers -- and I'm not being flippant,

19  Your Honor -- where you would have to go to warehouses and you

20  would go through the files to see who had a contract, who made

21  a purchase.  And you compile that.  Now there seems to be an

22  argument on the defense side that you have to be able to hit a

23  button and generate a bulletproof list.

24         That's not the standard.  That's not the standard in

25  any circuit.  And we have really shown that the class is

10

1   ascertainable, as well as we contend direct notice.  Still

2   going back to that issue of direct notice, Rule 23 explicitly

3   provides publication notice when you don't know who the class

4   is.  You know, so the courts have approved, well, if we don't

5   know any of the class members.  You could have a hundred

6   percent publication notice.  That's provided in the rules.

7           So here we have a class that is -- I don't want to

8   say bulletproof but close to bulletproof, and we have

9   safeguards in place to then further test that.  And all the

10  Defendants have said is -- you know, they have nibbled around

11  the edges, maybe a couple here, maybe a couple there.  But

12  that's part of the claim process.  I think for certification is

13  we establish the universe, and the claim process takes care of

14  any outliers.

15          So bear with me, Your Honor, one second here.

16          And I guess I will leave -- part of this goes to the

17  Biggerstaff report.  But everything we have shown is that the

18  class is certifiable.  And the only evidence is the class

19  certification briefing.  Now, they had 39 pages in a report

20  that these 69 people may have pressed one.  That's it.

21          This is not like *Tillman* where we saw customers and

22  non-customers and we didn't have the evidence before you in

23  *Tillman*.  And that's why after the data and everything else

24  this is -- they are two different animals, and that's why we'd

25  ask the Court to certify the class.

11

1          Is there any other areas you want me to get into?

2          THE COURT:  Well, I do have a couple questions in

3     terms of your definition of the class.  You refer to one of

4     your components was that they were using substantially the same

5     dialing systems.

6          Is there any reason not to just include the dialing

7     system?

8          There's only one as I understand it.

9          MR. KEOGH:  There's no reason whatsoever.  We can

10    name the ATS system.

11         THE COURT:  And then you talk about or the definition

12    talks about four years from the filing of the Complaint.  You

13    really mean the Amended Complaint, don't you?

14         MR. KEOGH:  Yes, Your Honor.

15         THE COURT:  So whatever that date is, we can insert

16    that.

17         There is an argument, as I recall, saying that your

18    proposed definition for the second class, the pre-recorded

19    voice class, is new in the sense it wasn't in the Amended

20    Complaint and there's legal problems as a result of that.  Talk

21    to me about that a little bit if you would.

22         MR. KEOGH:  Sure, Your Honor.

23         The other class included the calls.  It didn't

24    differentiate between the pre-recorded or the type of calls.

25    And this one we just separated them out.  The pre-recorded

12

1    class is narrower.  There are 9,406 people in the -- I guess

2    both classes, Your Honor.

3            And what it is is there's 47,000-odd calls.

4    Forty-five thousand calls are pre-recorded.  So you have the

5    exact same class members, and 45,000 out of 47,000 are

6    pre-recorded.  So it's narrower than the overall class, and we

7    just tweaked the class definition to exclusively set it out and

8    simplify it.

9            THE COURT:  But I guess my question is was a

10   pre-recorded class set forth in the Amended Complaint?

11           MR. KEOGH:  It was the calls by consent.  The call is

12   a pre-recorded call.  We didn't differentiate between ATS calls

13   or pre-recorded calls, so it was inclusive of that.  Because

14   that was Plaintiff's complaint.  Plaintiff alleged they made

15   pre-recorded calls to him.  He alleged that there's

16   pre-recorded calls to the class.  And the original class

17   definition talks about who were called on their cell phone.

18           So this case the reason why we separated the ATDS and

19   pre-recorded issue is there's a lot of litigation on what's an

20   ATDS right now, so it's just clarifying it and making it more

21   efficient.  But it was the original definition includes -- it's

22   just calls, so it includes both.  And there's allegations of

23   pre-recorded calls in there.

24           THE COURT:  All right.  Let me check my notes here.

25           I may come back to you after hearing from counsel

                                                                    13

1    with regard to your expert, but we will see how it goes.

2              MR. KEOGH:  Thank you, Your Honor.

3              THE COURT:  All right.  Mr. Watstein, is it?

4              MR. WATSTEIN:  Yes, Your Honor.

5              THE COURT:  So is there any reason I shouldn't

6    certify the class?

7              MR. WATSTEIN:  There are a few, Your Honor.

8              THE COURT:  All right.  Let's start with number one

9    and --

10             MR. WATSTEIN:  Sure.

11             THE COURT:  -- stop when you're through.

12             MR. WATSTEIN:  Sure.  I just want to say thanks for

13   accommodating us with the initial date that the Court had set

14   for the hearing.  You would not have wanted me in your

15   courtroom that time around.  I got the Norovirus from my

16   one-year-old daughter, so...

17             THE COURT:  We can move that podium back further if

18   you still have it.

19             MR. WATSTEIN:  I'm good now.  I'm totally good now.

20             THE COURT:  All right.

21             MR. WATSTEIN:  So just let me start out by saying

22   that I will be addressing all of our class certification

23   opposition arguments except for the adequacy argument.

24   Mr. Penn, counsel for ATS, will be addressing that argument if

25   that's okay with the Court.

14

1          THE COURT:  That's fine.

2          MR. WATSTEIN:  So it had been a while since we had

3    looked at the briefing because the briefing started back in

4    2018.  So when I went back and read everything in preparation

5    for the hearing, I realized a couple of things.  The first

6    thing I realized is that there are 15 reasons that class

7    certification could and should be denied in this case.  Most of

8    those reasons were not at issue in any of the other

9    wrong-number cases that have ever been decided, including this

10   Court's decision in *Tillman*.  Most of them are very unique to

11   this particular case.

12          Now, the reasons are spread out over a lot of

13   briefing.  There's supplemental briefing as Your Honor knows.

14   There's our *Daubert* motion.  There are replies and surreplies.

15          Some of those reasons are really simple and basic,

16   for example, Plaintiff's failure to identify a single person

17   who falls within his new class definition which he has changed

18   for the third time after three years of litigation in his reply

19   brief.  He hasn't proposed a way to identify a single person.

20   Not only has he not identified them, he hasn't proposed a way

21   with evidence to identify them.  In his newest definition, he

22   proposes excluding customers.

23          We have no idea what he means.  Former customers?

24   Current customers?  Does he mean users?

25          Because users are also customers.  And I will come

15

1   back to this point, Your Honor, and show you work orders where

2   on the same account work orders for the customer we were trying

3   to reach in this case where four separate people who are not

4   listed on the account all signed the work order saying, "I am

5   the customer, I agree to be bound by the terms and conditions,"

6   including an arbitration provision and class action waiver and

7   a consent to contact provision.

8          They haven't told us what they mean by customers, but

9   yet they purport to be able to exclude them.  They didn't ask

10  us for any of our customer records in discovery.  They didn't

11  ask our 30(b)(6) representative about how they might search our

12  customer records.  We went a step beyond and proved with

13  evidence in a declaration that you can't do what you are

14  purporting to do even if you mean you just want to remove

15  account holders.

16         THE COURT:  Well, isn't customer being used as an

17  alternative way of saying a person who did not give consent?

18         MR. WATSTEIN:  I think maybe that's what they are

19  trying to say, but that doesn't -- that doesn't make any sense

20  to me.

21         THE COURT:  Well, it may not make sense; but isn't

22  that what's required?

23         I mean, the element is that there not be consent.

24         MR. WATSTEIN:  That's correct.

25         THE COURT:  If there's consent, your clients are

16

1    golden.

2           MR. WATSTEIN:  That's correct.  Now, we have other

3    liability defenses as well obviously.  But consent is the

4    primary one we are talking about today.

5           If they had a way to remove every person who owned or

6    used a number that we had consent to call, then maybe the class

7    could be certified.  I concede that.  Removing customers does

8    nothing to resolve the problem of consent.

9           And, by the way, this was proposed on their motion

10   for reconsideration in *Tillman*.  And Your Honor denied the

11   motion and said removing customers doesn't resolve the

12   individual issue of consent.  And that is a much more

13   problematic issue in this case because, unlike that case where

14   you were dealing with Ally Financial, a financial institution

15   where there's usually one person who interacts with the

16   company, here you have households full of users, all of whom

17   interact with Bright House, all of whom provide information to

18   Bright House.

19          And we've proven this with evidence.  We've proven

20   with evidence, including the work orders that I mentioned just

21   a minute ago where we have four separate people signing four

22   separate names confirming they are customers; but there's only

23   one listed customer.  Any of those people can provide their

24   phone number and do provide their phone numbers and consent to

25   call those phone numbers to Bright House.  They have no --

17

1   there's no way to resolve that problem.  They have never

2   proposed a way, and there is no way.

3          But, anyways, going back to sort of some of the

4   simple reasons that class certification could be denied that

5   are separate from this consent issue but intertwined with it,

6   because they failed to identify a single person that falls

7   within their class definition -- which, by the way, is not

8   coextensive of this Group A of their expert report because that

9   Group A does not exclude customers -- because they haven't

10  identified a single customer they haven't proven with evidence

11  as they are required to do under Supreme Court precedent

12  something as basic as numerosity which is generally not

13  disputed in these cases.  They haven't proven that there's one

14  person in Group A of their expert report with the potential

15  exception of Plaintiff -- and I say potential because we

16  believe he is excluded from the class under their expert's

17  proper analysis -- but in any event, they haven't identified a

18  single person other than potentially Plaintiff who falls within

19  that class definition, not one.

20         So how can they prove that the class when customers

21  are removed, when it's limited to subscribers as they proposed

22  on reply, is going to be so numerous that joinder is

23  impracticable?

24         They have no evidence of that, and they're required.

25  And there's two decisions out of this circuit that we cited on

18

1    April 8th in a notice of supplemental authority.  They were

2    three-page decisions.  The Court said, look, you haven't

3    presented -- you haven't presented any evidence that you can

4    use Defendant's records for what you say you can use them for.

5    You lose.  That's the end of the story.

6           In this case, the normal rule, as Your Honor knows,

7    is that Plaintiffs have 90 days to file a motion for class

8    certification.  They had three years.  They took almost no

9    discovery.  They didn't ask any of the questions that they knew

10   they wouldn't like the answer to.

11          They didn't even ask the circumstances in which a BP,

12   bad phone, incorrect number, live answer combination was used.

13   They have no evidentiary foundation for their assumption that a

14   BPINLA code signifies that a wrong number was reached.  And we

15   have proven with evidence far beyond the 69 post disconnect

16   Bright House phone calls that a BPINLA code absolutely does not

17   mean a wrong number was called.

18          Can it?

19          Sure, it absolutely can, as Your Honor recognized in

20   *Tillman*.  But we've presented six, seven, eight sources of

21   evidence that prove it's not -- it doesn't automatically mean

22   that, and it doesn't mean that a huge percentage of the time.

23   And the only way to determine the times that it does mean a

24   wrong number was reached is to conduct an individualized

25   inquiry which we have conducted in cases for this very client

19

1    as our client knows.

2           We've had lawsuits filed against us where somebody

3    claims this is a wrong-number TCPA case, you called the wrong

4    number.  We litigate the case.  We take depositions, written

5    discovery as to the named Plaintiff.  And we establish -- the

6    *Benedetti* case is one example that we cite in our declarations.

7    There we establish that the number was provided by the

8    customer; but it was the nanny's, the live-in nanny's phone

9    number.  And so what we were able to show through discovery is

10   that this isn't actually a wrong-number case.  We were calling

11   exactly the number that was provided to us with consent.

12          And, interestingly, we filed for summary judgment and

13   we lost.  The Court held this is an individualized issue, but

14   it's a fact question.  And there is a fact question with

15   respect to whether each of those BPINLA codes is indicative of

16   a wrong-number call.

17          One thing that we did that Plaintiff's counsel has

18   never addressed is we actually -- even though they haven't

19   identified who are class members to date, as I explained a

20   minute ago, we guessed at who might be class members.  We had

21   our experts take a random sample of 100 telephone numbers in

22   Group A.  We called 50 of those numbers.  Out of 50 calls, we

23   made contact with 21 people.

24          Out of those 21, 19 people still today five to ten

25   years after the class period are still associated with the

20

1  Bright House account that we were calling about showing they

2  were not wrong-number calls.  One step further, that survey

3  also shows that removal of customers, whatever that means, does

4  nothing to resolve the individualized issues of consent.

5          Why is that?

6          Well, because a lot of the people that we spoke to

7  said, "Oh, I'm not a listed account holder.  I'm a user of

8  Bright House's services.  I provided my number to Bright House,

9  either myself or through the subscriber."

10          I mean, that is a common occurrence.  And we have

11 provided evidence of that in the form of declarations from our

12 client, results of actual conversations with class members, the

13 69 accounts that Plaintiff's counsel refers to.

14          And, by the way, it seems like what they're saying is

15 that if we don't disprove the claim of every class member they

16 get to proceed as a class action with everyone else.  That

17 totally misunderstands their burden and our burden.

18          Their burden is to show that every Rule 23 element is

19 satisfied with evidence which they haven't done.  We've gone

20 above and beyond that, far above and beyond the evidence that

21 the Defendants presented in *Tillman*, and actually negated their

22 proposal, their methodology for class certification which

23 wasn't supported by any evidence to begin with.  We have

24 negated it with a bunch of different sources of evidence.

25          What we did is we looked at Your Honor's decision in

21

1    *Tillman* and said what do we need to do to be able to walk into

2    Judge Steele's courtroom and tell him we've done -- we have

3    done seven times what was done in that case to disprove their

4    class certification proposal so that we're comfortable with our

5    case, and that's exactly what we did.

6         So I got a little bit off track and jumped around.

7    But I mentioned that there were some simple reasons, for

8    example, the lack of numerosity because they just don't have

9    evidence of it. For that same reason, they don't have evidence

10   that they could satisfy ascertainability under any circuit's

11   standard.

12        As Your Honor knows, in an unpublished decision the

13   Eleventh Circuit says, look, you have to have an

14   administratively feasible way of identifying class members.

15        THE COURT: Doesn't that make sense?

16        MR. WATSTEIN: It does make sense. And it's mixed in

17   with predominance because you have to have a way of trying the

18   case on a classwide basis.

19        But under any circuit's standard of ascertainability,

20   under the least stringent standard of ascertainability, they

21   have no evidence to satisfy that standard. And, again, those

22   decisions that we cited as supplemental authority on April 8th

23   go to this exact point.

24        Now, along those same lines, we still don't know what

25   Plaintiff's class definition is for a couple different reasons.

22

1    I mentioned their exclusion of customers, which we don't know

2    what they mean by that.  They also say their class is tied to

3    people who are called only after a wrong number was notated in

4    Defendant's records.

5         I have no idea what that means because they also say

6    their class is Group A of their expert's report, but Group A of

7    the expert report is not all the calls that occurred after the

8    entry of a BPINLA code.  So as I'm standing here today I don't

9    know what it is that they are proposing as far as several

10    prongs of their class definition.  And then going back to the

11    things that I realized as I was rereading the briefing, you

12    know, some of the reasons are more complicated but they're much

13    more fundamental like the issue of individualized issue of

14    consent, the individualized issue of arbitration.

15         The second thing that I realized when I was reading

16    through all the briefing is that Plaintiff's arguments to the

17    contrary are based on demonstrably false statements, many of

18    which were just repeated.  For example, they make the statement

19    in their briefing that Bright House made a determination that

20    calls that were coded BPINLA were wrong numbers.

21         That is simply false.  There is no record evidence of

22    that.  At most -- at most, a BPINLA code could appear in the

23    circumstance when somebody said in an out-of-court statement by

24    a third party who's adverse to us, when somebody said, "You

25    called a wrong number," or "Stop calling me."

23

1          So unlike, you know, Cox Communications, for example,

2   in the *Knapper* case which was certified, Bright House didn't

3   make any sort of contemporaneous evidentiary determination as

4   to whether someone's statement that they were calling a wrong

5   number was correct like a contemporaneous reverse lookup of the

6   telephone number.  That didn't occur here because there's no

7   evidence of that, and it didn't happen.

8          Another particularly egregious statement that was

9   made and repeated was their expert's statement that he

10  identified wrong-number calls -- and I quote his report,

11  although they tried to attribute this statement to us -- to a

12  high degree of scientific certainty.  I have never seen

13  anything like that, and we couldn't find in the case law any

14  scenario like that.

15         Their expert didn't know, never asked what a BPINLA

16  code meant, didn't ask what circumstances any of the codes that

17  he worked with were used under.  They didn't ask those

18  questions of ATS at deposition.  They didn't depose the call

19  center manager that ATS's 30(b)(6) representative said had all

20  this information about the codes.

21         Instead, the expert quote-unquote purported to be

22  able to identify all wrong-number calls based on those codes

23  that he didn't know anything about to a high degree of

24  scientific certainty.  And then he admitted -- I asked him,

25  "Did you test one number in Group A, one number to see if one

24

1    of them was actually a wrong-number call?"  "No, I didn't do

2    that."

3          So he thinks he has identified the wrong-number calls

4    to a high degree of certainty even though he has absolutely no

5    idea whether one of them was an actual wrong-number call, has

6    no idea what the codes actually meant or were used for by ATS,

7    not other companies out in the world.  And we proved over and

8    over and over again with evidence that BPINLA does not mean

9    wrong number, and I talked about some of the evidence already.

10         But some of the other evidence is the Plaintiff's

11   expert's own kill list.  He recognized when he put together the

12   data, he said, oh, wait a second, BPINLA can't mean wrong

13   number because I see instances where somebody was making a

14   payment to ATS from the same number after a BPINLA code.

15         Well, nobody would make a payment if they received a

16   wrong-number call for somebody they had no affiliation with.

17   So he realized, well, I have to do something to eliminate these

18   false positives.  So he created the kill list which disproves

19   his underlying assumption which is that a BP code always means

20   a lack of consent.

21         What he didn't do was fix the problem.  All he

22   captured with his kill list was instances where contact with

23   ATS, a vendor of Bright House, one of hundreds of vendors of

24   Bright House, suggested that the BPINLA code did not indicate a

25   wrong-number call.  He didn't look at any of our

25

1    post-disconnect calls which we introduced evidence of.

2            And, by the way, those post-disconnect calls were

3    only made to a fraction of accounts because it actually has to

4    be disconnected.  So it's only a fraction of the 9,000 that we

5    even have available data for.  It's not like we pulled 69 out

6    of 9,400.  We pulled 69 out of a much, much smaller universe of

7    available data.

8            And so, Your Honor, to go back to my point, the

9    representations that they've made are just false.  And the

10   reason why they need to do that is because they didn't take any

11   discovery.  They didn't ask the questions that they needed to

12   ask in order to come up with the evidence that they would need

13   to to present a viable proposal for class certification which,

14   by the way, we've proven there is no viable proposal for class

15   certification in this case.

16           Now, one thing that we did, Your Honor, because we

17   realized there's a lot of briefing in the case is we distilled

18   the evidence that we've presented in various places into one

19   notebook.  And if it's okay with Your Honor, I'd like to hand

20   this to you because I may refer to it.

21           MR. KEOGH:  They didn't tender this beforehand, Your

22   Honor.

23           THE COURT:  I'm sorry.  Say that --

24           MR. KEOGH:  I would object.  They didn't give this to

25   us beforehand.  We have never seen or heard of this, what they

26

1    are tendering.

2             MR. WATSTEIN:  It's just evidence that's in the

3    record already.

4             THE COURT:  All right.  Your objection is overruled.

5             You want that marked as an exhibit?

6             MR. WATSTEIN:  Sure.  That would be great.

7             THE COURT:  We will call it the Defendant's 1.

8             MR. WATSTEIN:  Thank you.

9             So what this has, and just so Your Honor knows, is

10   there's a bulletpoint list of select evidence that supports our

11   points and rebuts all the Plaintiff's statements about what our

12   evidence does or doesn't show.  And then after that bulletpoint

13   list are tabs that have the actual evidence in it.  And on the

14   bulletpoint list it points the Court to the tabs where the

15   evidence appears.

16            THE COURT:  Is your bulletpoint list the 15 reasons

17   that you mentioned in the beginning, or is that --

18            MR. WATSTEIN:  No.  That's a third --

19            THE COURT:  Is that a literary license you were using

20   when you said 15 reasons?

21            MR. WATSTEIN:  Well, it was -- we do believe we have

22   15 reasons.  But it is somewhat argument, yes, Your Honor.

23            THE COURT:  Well, I want a list of your 15 reasons.

24   I mean --

25            MR. WATSTEIN:  Sure.

27

1          THE COURT:  If you got 15 reasons, I need to resolve

2     all 15.

3          MR. WATSTEIN:  Yeah.

4          THE COURT:  And so somewhere -- I mean, I thought

5     your book was going to, you know, be reading my mind, but maybe

6     not.

7          MR. WATSTEIN:  So let me do this.  Let me tick

8     through all 15 reasons, and you can ask any questions you have

9     about each reason.

10         So we talked a little bit about -- let's start with

11    predominance.  We talked a little bit about the individualized

12    issue of consent.  But what it boils down to is that at the

13    class certification stage the Plaintiff has to present a method

14    supported by evidence which shows that he can try the case on a

15    classwide basis without the need for individualized inquiries.

16         And what he needs to show in this case is he needs to

17    show a way to prove that Bright House lost the consent that it

18    had to call a subgroup of numbers because Bright House doesn't

19    skiptrace.  It doesn't call random people.  This isn't a blast

20    marketing case.  They only call numbers that are provided by

21    their customers, by their users who are also customers which

22    provides them with consent as a matter of law.

23         So that's the starting point, consent.  They have to

24    prove we have a viable classwide way of resolving that issue of

25    consent at trial without the need for us to call 10,000-plus

28

1  witnesses, and it would be more than that. And they haven't

2  established that.

3       I mean, I talked briefly about the evidence that we

4  have on that point. You know, it's tabbed in the notebook. We

5  have declarations. We have calls that we made to the numbers

6  that we believe will be included in the class even though we

7  still don't yet know the definition. And none of our evidence,

8  none of it has been rebutted, none of it. All they say is we

9  want more.

10      We're not required to prove -- we're not required to

11  negate the claim of every single person who's in the class even

12  if we knew who was in the class, and we don't. So that's

13  really sort of this nutshell summary of the reason number one

14  which is the individualized issue of consent.

15      Do you have any questions on that point, Your Honor?

16      THE COURT: I'll come back if I do.

17      MR. WATSTEIN: Okay. The second predominance problem

18  is the individualized issue of arbitration which I also touched

19  on briefly, so I won't spend too much time on it. But the

20  bottom line is that, given the industry that Bright House is in

21  and the way their customer relationships work that they provide

22  services to households full of people and generally have a

23  large market share in the areas in which they operate, a huge

24  portion of the class that's proposed, which, again, we still

25  don't know what it is, is going to be bound by an arbitration

29

1   provision and a class action waiver.

2          And if you turn to Tab 2 of the notebook, Your Honor,

3   the second page from the last page and the last page of Tab

4   2 -- are you there?

5          So this is an example of a work order on the account

6   that we were trying to reach -- the account we were calling

7   about where we inadvertently reached Mr. Sliwa.  You will see

8   that the signature on this work order is -- it's not even

9   legible, but it's not Customer H.  His first name is Warren.

10          And you will see here that what this person is

11   attesting is that by providing my signature below I understand

12   and acknowledge that as a Bright House Networks customer I have

13   been provided the agreement for residential services.  That's

14   the agreement with the consent to contact provision in the

15   class action waiver which is given to people when there's a

16   service appointment.  The acceptable use policy, et cetera, et

17   cetera, et cetera, I agree to them.

18          There are several examples in this tab of work orders

19   on Customer H's account, Warren H's account, that were signed

20   by other people who we have no idea who they are.  We can't

21   even read their handwriting, so we can't figure out who they

22   are.  There's certainly no way to remove everybody like this

23   from the class, especially since these calls are so historic

24   and many of these work orders don't even exist anymore.

25          But this highlights the individualized issue of

30

1    arbitration that they have no answer to -- none.  They can't

2    remove people like this from the class, but they must have a

3    way to do that on a classwide basis.  We have proven that with

4    evidence, none of which has been rebutted.

5         The third predominance reason why we prevail is that

6    there would also have to be individualized inquiries into other

7    things such as whether a pre-recorded message played on a

8    particular call because, as the Fifth Circuit has said, there

9    can only be liability where the pre-recorded voice actually

10    plays, whether subscribers have standing.  Because what

11    Plaintiffs have done to try to resolve other problems on reply

12    is they've amended their class definition to include only the

13    subscribers to cell phone numbers, which doesn't solve any of

14    the other problems, but it creates another crippling problem of

15    predominance and another problem of due process that I'll get

16    to later.

17         But the predominance problem is this.  Almost all

18    cell phone plans in the United States are group plans.  We have

19    proven that by unrebutted declarations of two of the nation's

20    largest carriers.  That means that most people are users, not

21    subscribers.  It's the same way in my family where one person

22    subscribes and there are many different users.

23         By including only subscribers in the class and

24    excluding all users, they have proposed excluding from recovery

25    permanently and barring them from ever being able to recover

31

1   because you can only be liable for a TCPA claim once the people

2   who actually received the calls in favor of subscribers like

3   employers who may not have ever known about the call, certainly

4   were not annoyed by it, couldn't have been harassed by it.  And

5   so what that creates is that move that they made on reply

6   creates additional individualized issues that will predominate

7   over common questions, issues of standing.

8           And Your Honor has recognized in I think it was the

9   *JDW Automotive* case maybe Your Honor had a serious problem with

10  certifying a class that included -- it was a TCPA facts case.

11  I think you were thinking about certifying the class for

12  settlement purposes, and you had a serious problem with the

13  idea of including people who might get a recovery who arguably

14  weren't the actual recipients of the facts.

15          Well, that's exactly what they have done here.  They

16  said in an effort to make our case more certifiable we will

17  exclude all the users, the people who actually received the

18  calls.  So that is -- that's the third predominance reason.

19  And it's really two or three reasons in there, the pre-recorded

20  voice issue, the subscriber issue.

21          THE COURT:  Let me ask about that.  Under the

22  Telephone Consumer Protection Act, I think the name of it is,

23  who has standing for that?  Is it a subscriber or just the

24  user?

25          MR. WATSTEIN:  So, as Your Honor knows, Article III

32

1    requires some degree of harm.  And we would -- we contend that

2    in a circumstance like this where you have one subscriber to a

3    cellular phone plan and several users if there are

4    circumstances where the subscriber doesn't know about the calls

5    and the subscriber was never charged for them in that case only

6    the user who received the calls would have standing because

7    there's no possible harm that the subscriber suffered.  And

8    that's just an Article III *Spokeo* argument.

9            To answer Your Honor's question more directly,

10   there's not a direct answer from the courts on this point.

11   There's not a binding decision that says, you know,

12   subscribers, end users both have standing in all circumstances.

13   No court's ever made that blanket statement.

14           The Fifth Circuit has said we have to look at the

15   facts and apportion damages between users and subscribers, and

16   you can see how that would be problematic in a case like this.

17   Because if you certify the class that it's subscriber only, it

18   extinguishes the claim of the user who received the call

19   permanently without notice which Rule 23 prohibits and which is

20   a separate reason, due process reason that a class that's

21   proposed can't be certified.

22           THE COURT:  I guess my question is more basic.

23           As a matter of statutory construction, does a user

24   have a cause of action under the statute?

25           MR. WATSTEIN:  The statute does not specify who has a

33

1    cause of action, but we interpreted it to mean the person who

2    actually receives or is charged for the call.

3            THE COURT:  Which could be two different people.

4            MR. WATSTEIN:  Correct.

5            THE COURT:  Multiple different people --

6            MR. WATSTEIN:  Correct.  It could be multiple

7    different people, especially given that some people have -- we

8    have a cellular phone -- my wife and I have a cellular phone

9    that's used as a house phone essentially.  A lot of people

10   don't have house phones anymore, so they're shared.

11           THE COURT:  Is there any case law under the statute

12   that says either that only a subscriber has a cause of action

13   or that says a user does as well?

14           MR. WATSTEIN:  I am not aware of any case that says

15   the cause of action is limited to either the cases that I've

16   seen or that in most circumstances, depending on the facts,

17   either or both could have a claim.  And that's why the Fifth

18   Circuit said really the most appropriate approach is to

19   apportion damages between the two.

20           THE COURT:  Okay.

21           MR. WATSTEIN:  And if one is excluded from the class,

22   you obviously can't apportion damages between the two.  So

23   that's -- in addition to the predominance issue, that is a

24   separate one of the 15 reasons.  They have created a due

25   process issue actually for the people who are potentially

34

1   harmed.

2          It's also an adequacy issue, Your Honor, which

3   Mr. Penn can talk about in a few moments.  But Plaintiff said,

4   you know, I'm bringing this as a class action because, you

5   know, I want to stand up for the people who received harassing

6   phone calls.

7          There's no way the Plaintiff knows that his lawyers

8   proposed excluding all those people from the class.  There's no

9   way.  And so either he is not adequately controlling the

10  litigation or, you know, it goes to counsel's adequacy.  Either

11  way, it's a problem.

12         Moving on to ascertainability, we have three

13  ascertainability points.  Number one, every circuit in the

14  country says you've got to have a non-vague class definition

15  that's defined by objective criteria.  We already talked a

16  little bit about why that's not the case here.  We still don't

17  know what the wrong-number notations are, and that's a

18  prerequisite of class membership.  It can't be Group A because

19  that's no coextensive with calls after a BPINLA code.  Number

20  two, Plaintiff purports to exclude customers.  But we have no

21  idea what that means, and he has no way to exclude customers

22  anyways.

23         The second piece of the ascertainability requirement

24  that's not satisfied is, as I mentioned, the Eleventh Circuit

25  has the administrative feasibility standard; but under any

35

1   circuit standard you have to have a way to identify, even if
2   not in an administratively feasible manner, the majority of
3   class members.  Counsel says Rule 23 provides for 100 percent
4   publication notice.  That is categorically false, Your Honor.
5   That is a misstatement of the law.
6          Rule 23 requires notice.  There are cases that say in
7   limited circumstances where you can't identify 10 percent of
8   the class, 15 percent of the class, you can provide publication
9   notice depending on the facts and circumstances.
10         There is no authority for the proposition that in a
11  case like this they could extinguish the claims of all of these
12  people without ever providing them notice.  That's the
13  requirement of Rule 23.  That is why every circuit that's
14  addressed the question has employed some sort of
15  ascertainability standard.  And here they can't meet any
16  circuit's ascertainability standard for the reasons I have
17  already discussed.
18         And, by the way, they cite cases that say, well, we
19  have this list of numbers and that's enough.  A list of numbers
20  might be enough if all your class definition is is a list of
21  numbers like in some of the blast fax cases they cite, blast
22  telemarketing cases.
23         Here they have created other requirements for class
24  membership.  They have to be able to show Your Honor with
25  evidence that they can show who falls within the class, and

36

1    they haven't done that, and they can't do it.  Discovery's

2    closed.

3                And we've also shown with evidence that there's no

4    way to do it anyway.  Carrier declarations, unrebutted carrier

5    declarations -- which, by the way, another example of how we

6    disclosed evidence, we said cellular carriers might have

7    information relevant to our case.

8                They didn't seek to depose the cellular carriers

9    because they knew the information that they would have wouldn't

10   be helpful to us.  And they have the audacity to say that the

11   cellular carrier affidavits from Verizon and AT&T are false.  I

12   mean, that's outrageous.

13               The third ascertainability reason that we could

14   independently win on -- and this is sort of -- falls in the

15   other category; it sort of falls in the ascertainability

16   category -- is that they proposed broader classes after the

17   close of discovery three years into the litigation, classes

18   that we were never aware of, never had an opportunity to take

19   discovery about.

20               Their own authority, the cases that they cite confirm

21   that that's inappropriate.  They cited a Southern District of

22   Florida case, apparently didn't read it very well because it

23   says you cannot propose a broader class.  And that wasn't even

24   done after the close of discovery.

25               They argue that their classes are not broader.  Their

37

1    initial classes were limited to people we didn't have consent

2    to call.  Their new classes are tied to the use of a BPINLA

3    code which we've proven 59 percent of the time based just on

4    available evidence and not doing the individualized inquiries

5    that would be needed does not mean a wrong number was called.

6    We have provided the Court examples of particular numbers out

7    of a sample of just 50 calls that we had consent to call that

8    are not people with claims against us.

9            THE COURT:  Why is that a problem with definition as

10   opposed to a problem with proof?

11           MR. WATSTEIN:  That's why I said it kind of falls

12   into an other category.  It's not really necessarily an

13   ascertainability problem.  It's almost more of a predominance

14   -- it's almost more of a due process problem.

15           THE COURT:  Okay.

16           MR. WATSTEIN:  But it's the sixth reason that we have

17   talked about so far.

18           The seventh reason is -- moving on to another Rule 23

19   element is numerosity.  And I already talked about it.  I'm not

20   going to go through it again in detail.  But suffice it to say

21   this is one of the few cases where they've done so little in

22   the case over three years which is 600 percent more time than

23   they are normally allotted under the Middle District of Florida

24   rules to move to certify a class that they don't even have

25   evidence that the class is so limited by them it includes

38

1   enough people to be sufficiently numerous that joinder is not

2   practicable.

3           The eighth and ninth reason both relate to

4   typicality.  The first is Plaintiff isn't typical because there

5   are unique defenses to his claim that will distract the

6   fact-finder.  And the reason for that is it goes back to these

7   work orders that we looked at a minute ago.  You will see that

8   on one of these work orders the phone number at issue was

9   handwritten in presumably by the person who signed it or

10  verified -- either way, or verified by the person who signed it

11  as being a correct contact number for that account.  It was

12  also provided to us when the account holder opened new

13  accounts.

14          Now, the reason why that's significant is this all

15  happened after the number had apparently been reassigned to the

16  Plaintiff.  That's a problem in our industry and any big

17  company, for any big company really is that people don't always

18  tell you when they abandon their cell phone.  And there's not

19  good technology out there to determine whether a number has, in

20  fact, been reassigned.

21          And so this -- we have this defense that, look, we

22  were -- this is a good-faith defense.  We were provided this

23  number over and over again.  It put us in an impossible

24  Catch-22.  We removed the number that somebody is saying is

25  incorrect but that the customer keeps giving to us and that a

39

1    user on the account affirmed was correct recently in a work

2    order.

3            So it places companies in a very difficult situation,

4    which, by the way, the brief aside, today right now the FCC is

5    developing a reassigned number database -- the Court may have

6    heard about this -- to solve this very problem.  The FCC has

7    recognized cellular numbers are being reassigned at a rapid

8    rate, and there's no technology to show when a number is

9    reassigned.  So they are creating a database.

10           My colleague, Ms. Romero, can hold up -- that's the

11   FCC's order on this that they are developing it right now.

12   It's supposed to be in use next year.  Bright House is going to

13   scrub against that database to prevent, you know, one-off cases

14   like this where we accidentally call a wrong number.

15           But what that shows is that right now the FCC has

16   recognized there's no way to do that today, much less was there

17   a technologically feasible way to do it five to ten years ago

18   during the class period at issue in this case.  So that's one

19   of our typicality arguments.

20           The other is that Plaintiff's own expert 's intended

21   analysis actually excludes the Plaintiff from the class.  And

22   as a California District Court recognized recently, that's a

23   big problem.  We have cited case law for the proposition that a

24   Plaintiff, a named Plaintiff, is not typical if he is excluded

25   from his own class.  And in the California case, *Revitch v.*

40

1  *Citibank*, the Plaintiff's lawyers actually tried to change

2  their class definition at the end of the day to be XYZ plus

3  Mr. Revitch.

4          And the Court said, wait a second, if you have to say

5  this is my class definition plus the named Plaintiff, he's not

6  -- you know, you've got far bigger problems in terms of your

7  classwide methodology of proving liability because he's not --

8  you haven't picked up the Plaintiff in your proposed

9  methodology.  And that's exactly what's happened here.

10          Moving on to --

11          THE COURT:  Let me stop you.  Tell me why that's

12  exactly what happened here.

13          MR. WATSTEIN:  Sure.

14          THE COURT:  Tell me why Plaintiff is excluded from

15  the proposed class.

16          MR. WATSTEIN:  Sure.  And so this is maybe the most

17  technically complicated piece out of all the briefing.  Our

18  expert explains it pretty eloquently.

19          THE COURT:  No wonder I didn't understand it.

20          MR. WATSTEIN:  So let me see if I can do a better

21  job.  So what Mr. Biggerstaff did is he developed -- he paired

22  accounts with phone numbers, and he called that a phone number

23  account tuple.  And if there was a BPINLA code on an account

24  tuple but somewhere else there was a code that he thought

25  indicated there was consent, he killed it.  He eliminated that

41

1    tuple.

2            Are you with me so far?

3            THE COURT:  So far.

4            MR. WATSTEIN:  Okay.  What he didn't do and conceded

5    he probably should have done is he didn't look at other

6    accounts with the same customer and the same phone number.  If

7    on Account Tuple A he had killed it because he said, you know

8    what, there was consent to call that person at that number, he

9    necessarily has to exclude any other account that also has the

10   same customer and same phone number.  He conceded that.

11           Why that's relevant here is that there is a kill code

12   on one of Customer H's five underlying accounts.  So by his own

13   logic, because that kill code indicates there was consent, it

14   should have killed all bad phone entries in the underlying

15   account at issue in this case.

16           Does that make sense?

17           THE COURT:  Which would have killed Plaintiff -- if

18   he didn't know about Plaintiff, would have killed consideration

19   of him as a class member?

20           MR. WATSTEIN:  It would have excluded him from every

21   single class.

22           THE COURT:  All right.  Thank you.

23           MR. WATSTEIN:  You're welcome.

24           Moving on to adequacy, I don't want to get too far

25   into Mr. Penn's territory, but there's two adequacy reasons

42

1    which would alone be sufficient to deny class certification.

2    One is that the Plaintiff is inadequate.  He has a conflict of

3    interest with the class by virtue of this settlement

4    restriction which we find particularly egregious.

5              Interestingly, there was a Forbes article that

6    referenced the settlement restriction recently.  I'll let

7    Mr. Penn talk about that in more detail.

8              The other is that counsel is not adequate for similar

9    reasons and the additional reason that they're now trying to

10   exclude the people who were actually potentially harmed from

11   the class and extinguish their claims permanently.

12             So moving on from adequacy, Reason Number 12,

13   superiority, this is kind of mixed in with everything else that

14   we have already talked about.  But the bottom line is there is

15   absolutely no way that this case could ever be tried on a

16   classwide basis without violating our client's due process

17   rights and the due process rights of the absent class members

18   and/or the people who received the phone calls.  And that is

19   why there's been no legitimate trial plan proposed even though

20   we've called out the lack of a trial plan several times.

21             The only way to try this case is for us to take years

22   of discovery, would cost millions and millions of dollars, and

23   then to call tens of thousands of witnesses at trial.  We have

24   to be able to disprove the theory that these people in Group A

25   which is not even in their class that we didn't have consent to

43

1    call those numbers.  And we have already proven with

2    declarations to Your Honor that we did have consent to call

3    those people.

4            One thing that I forgot to mention that's extremely

5    important and perhaps one of the most important reasons is that

6    their entire class certification theory rests on their expert's

7    report which is based on the presumption that a BPINLA code

8    proves a wrong number was called.  Those BPINLA codes are rank

9    hearsay.

10           What they are saying is, Your Honor, we're going to

11   go to trial and we're going to tell the jury that in this

12   instance on day one there was a BPINLA code.  That means not

13   only were we told by a third party that a wrong number was

14   called; they're using -- they have to use it at trial.  It's

15   their only classwide method of proof.  They have to use it at

16   trial to prove the truth of the matter asserted by an adverse

17   third party.

18           That's completely prohibited.  And Judge Jung

19   recognized that in the recent *Wilson* case where he denied class

20   certification.  And it bears mentioning that that case was the

21   most similar to this one and same Plaintiff's lawyers.  They

22   didn't appeal the class certification denial.

23           They also didn't appeal Your Honor's decision in

24   *Tillman*.  And the reason for that is simple.  They know the

25   Eleventh Circuit would never -- would never tolerate this case

44

1   being tried on a classwide basis.

2           THE COURT:  It's not as immediately apparent to me as

3   apparently it was to Judge Jung as to why that would be a

4   problem.  Why wouldn't that ultimately come in as a business

5   record?

6           MR. WATSTEIN:  So it's because there are multiple

7   levels of hearsay.

8           THE COURT:  But in the end, your client relied upon

9   it.  No matter how many levels, your client relied upon it and

10  took action based upon those codes as I understand it.

11          MR. WATSTEIN:  And I'm glad you brought that up

12  because that's another misstatement of fact.  There is zero

13  testimony in the record on that point.  The call records --

14          THE COURT:  I'm sorry.  On what point?

15          MR. WATSTEIN:  On the point that we relied on the

16  codes.  So ATS had a -- and Justin, Mr. Penn, might be able to

17  talk about this in more detail.  They had an off-the-shelf

18  calling system that had 20 disposition codes despite the fact

19  that a million different things can be said on a phone call,

20  and it required agents to disposition every single call.  So

21  disposition codes didn't necessarily match up with what was

22  said on a particular call.

23          And I'm sorry, Your Honor.  Your specific question

24  was?

25          THE COURT:  It seemed to me that eventually this

45

1    could all be made admissible as business records in part

2    because no matter how many layers of hearsay that you've got in

3    the end your client relies upon it.

4              MR. WATSTEIN:  That's right.

5              THE COURT:  And the codes get -- I mean, you spent a

6    lot of money to have these guys do these things and include it

7    in these reports, and presumably it adds value to you.  So I'm

8    just questioning -- I'm not saying they are going to be

9    admissible, but I'm questioning that it's not immediately

10   apparent to me that they won't be.

11             MR. WATSTEIN:  That's right.

12             And where I was going with that is the codes were not

13   used -- the BPINLA code that they are relying on to be proven

14   that at least 59 percent of the time based on just the

15   available evidence that we have and without doing

16   individualized inquiries doesn't mean a wrong number was

17   called.  But they want to use it to prove not only that

18   somebody said we were calling a wrong number which would, you

19   know, also be hearsay; they want to use it for the truth of

20   what the third party said.

21             So there's a business record and what we notate in

22   the business -- or what ATS notated in the business record

23   which was not independently verified, and then there's the

24   statement that was made by the third party that triggered that

25   code.  So we've actually shown why the hearsay rule works in

46

1    this circumstance because you can't go to trial and say:  Hold

2    Bright House liable for hundreds of millions of dollars based

3    solely on this code which is on all these accounts so you can

4    decide that all these accounts were called without consent

5    based on this code.

6            That's the whole reason for the hearsay rule so that

7    somebody who's out of court and adverse to us, a person who was

8    called, they can't use that record to prove liability.

9            THE COURT:  Well, what they --

10           MR. WATSTEIN:  It might be different if we had -- I

11   think I see where you are going.  It might be different if

12   Bright House had made an independent verification and said like

13   Cox Communications did in the *Knapper* case we've done this

14   contemporaneous reverse lookup and we've made a determination

15   that we believe as a company this number's wrong.  That would

16   be one level of hearsay.

17           THE COURT:  I guess, assuming they did not do that,

18   that gives me some concern.  I mean, they accepted it as being

19   true.  And if they don't check up on it, so, you know, if they

20   get a code that says wrong number and they treat it as a wrong

21   number and they don't call it back again or they shouldn't call

22   it back again isn't that some evidence that they relied upon

23   the information?

24           MR. WATSTEIN:  And so the parties in this case -- and

25   we explain this in our initial brief which I know there's a

47

1    million briefs -- they had a separate -- the records, the call

2    records that we're talking about right now were not used in the

3    manner in which Your Honor is thinking or which the Plaintiffs

4    have characterized.  They weren't used at the time to take

5    action.  They didn't take action based on those records.

6         THE COURT:  Yeah.  You pay a lot of money to have

7    these guys make phone calls and make records.  They send them

8    to you.  They put them in a closet, and no one looks at them.

9         MR. WATSTEIN:  Unfortunately, yes.

10        THE COURT:  That's not my fault.  I mean, if that's

11   the way you want to run your railroad, that's fine.  But why

12   don't they still become your records?

13        MR. WATSTEIN:  Well, and I think -- so a couple

14   things.  Number one, that's not the way things are done now.  I

15   mean, Charter Communications owns Bright House now.  It's not

16   the way things are done now.  But back then there was a

17   separate process for escalated angry customers, people who

18   claim they were called at a wrong number.  There were e-mails

19   sent from ATS to a supervisor at Charter to actually remove the

20   number because ATS didn't have, I believe, direct access to the

21   systems at the time.

22        So there was a separate path.  These records were

23   only used, for right or wrong, to verify the calls had been

24   made.  And so, you know, that's -- it might not be the best

25   answer, but that's the truth.

48

1          THE COURT:  All right.  We are probably going down a

2     little rabbit trail there.  But I understand your point with

3     regard to the rank hearsay argument.  Go ahead.

4          MR. WATSTEIN:  And so we got a little bit off track.

5     I was talking about superiority before.  I think I sort of

6     finished up my point on superiority.

7          Then there's the due process concern which is a

8     separate issue that they have created with their exclusion of

9     users in favor of subscribers.  We have already talked about

10    that.  I'm just talking about that because it's another number

11    on my list.  It's Number 13.

12         And then, you know, the only remaining Rule 23 factor

13    is commonality which is generally a throwaway.  It's generally

14    predominance in these cases that's a problem, predominance and

15    superiority.  And it is.  But even in this case, even

16    commonality is problematic for them.

17         There's really not any questions that are capable of

18    common answers here except maybe, you know, whether the TCPA

19    violates the First Amendment of the Constitution, which the

20    Fourth Circuit held a couple weeks ago that it did, that it

21    does.  But that's an issue for another day.

22         A lot of the things that they've identified like

23    willfulness, willfulness is not a common issue.  It's not

24    capable of one answer.  I mean, this particular named

25    Plaintiff's claim demonstrates why that's so.

49

1   How can we be willfully violating the law if we're

2   being provided repeatedly the same telephone number by a

3   customer; someone else is telling us to remove it?

4       Again, it places us in an impossible Catch-22.  It's

5   at least a defense that we have.  And it destroys commonality

6   as to willfulness.

7       Same goes with the policies and procedures that they

8   identify as being a common issue.  I mean, there were no like

9   standardized written policies and procedures.  They were

10  applied differently by different managers depending on how an

11  escalation was made about a wrong number request or an upset

12  customer.  So really we think that they've not provided any

13  evidence at all to satisfy any of the Rule 23(a) or 23(b)

14  requirements, and they've created additional problems for

15  themselves that are outside of Rule 23.

16      Unless Your Honor has any questions, I think I've

17  covered everything at a high level.  It would take a lot of

18  time to go into more detail on everything, but I'm happy to

19  answer any questions you have.

20      THE COURT:  Again, I may come back to you after

21  hearing from your co-counsel and again from Plaintiff's

22  counsel.  But at this point, I don't have questions.

23      Thank you.

24      MR. WATSTEIN:  Thank you, Your Honor.

25      MR. PENN:  Good morning again, Your Honor.  I'm

50

1   Justin Penn.  I represent ATS.  I am going to address only one

2   of the 15 points, so I'm going to keep it a little briefer.

3   I'm going to address the adequacy argument.

4           With respect to adequacy, there's not that many facts

5   that are at issue here.  So let me just give you the real brief

6   recitation and timeline of what happened here.  This case is an

7   individual case in 2015.  In 2016, it's changed via class

8   action and my client is added as a Defendant.

9           The Plaintiff then in the summer of 2017, 18 months

10  or so after beginning the case, enters into an engagement with

11  class counsel.  And that engagement has a peculiar provision, a

12  provision that by Plaintiff's own expert explained that --

13  their expert on engagement letters explained that in 40 years

14  of practice he had never seen a provision like this.  And the

15  provision says essentially that if the Plaintiff is to settle

16  the case on an individual basis against the advice of class

17  counsel the Plaintiff is -- the Plaintiff is responsible for

18  all the attorneys' fees and all the costs that have been

19  incurred to date.  So in the summer of 2017, Plaintiff has this

20  springing obligation of 18 months of attorneys' fees ranging

21  between 450 to 600 dollars per hour.

22          The evidence shows that he didn't understand what

23  that meant.  I don't know that he even read it.  He didn't

24  recall negotiating it.  He didn't know what the rates were.  He

25  didn't have any way to pay for it certainly.  So, obviously, he

51

1   was not advised to consult with another attorney about whether

2   or not he should enter into this agreement.

3            This is problematic.  This is problematic for a lot

4   of reasons.  As we explained, we have an expert that we

5   disclosed.  It violates, in our expert's opinion, the Rules of

6   Professional Conduct, Rule 4-1.5.  You can't charge a clearly

7   excessive fee.  You can't bind a client to 18 months' worth of

8   clearly excessive fees in a springing obligation.  You can't

9   penalize a client for doing something that's not in the

10  attorney's best interest.

11           Rule 4-1.2, the client owns the case.  And Mr. Sliwa

12  is the client here.  The client can settle the case anytime he

13  wants to.  The client can abandon the case anytime he wants to.

14  The client can settle individually if he wants to.  This is the

15  risk of this litigation.  This is the cost for class counsel.

16           And there is risk for class counsel.  We fully

17  recognize that.  I mean, that's the nature of this.

18           So let's talk a little bit about why this matters.

19  Because there is sort of a facial ly compelling argument to

20  say, you know what, what's the difference.  You've basically

21  said the class representative has to represent the interests of

22  the class and gives him -- it binds him to do that.

23           But that's not what this does.  What this does is it

24  tethers the Plaintiff entirely to the class.  The Plaintiff can

25  never settle individually.  That's just the reality of this

52

1    situation.  Not only this Plaintiff, but any real class

2    Plaintiff, 18 months of attorneys' fees at 450 to 600 dollars

3    an hour, very few people can -- very few individuals could

4    afford that.  So he's totally tethered to the class.

5           Equally important, and maybe more importantly -- and

6    this is in addition to all the ethical rule considerations,

7    even if this is ethically permissible -- this eliminates a

8    really important check on class counsel.  You know, this idea

9    of class action litigation is created on the belief and the

10   understanding that the class representative works with the

11   class counsel; but the class representative represents the

12   interest of the class.

13          That's important.  It may be that the Plaintiff

14   decides he doesn't have a great case, and it might be in the

15   class's interest for him to settle individually.

16          A third point and a third problem is that -- and this

17   is what we've seen here -- is that it cedes total control of

18   the case to the Plaintiff's attorney.  That's the effect of

19   what it does is that you have a situation where the class

20   representative really can't do anything except show up at a

21   deposition and explain as he explained here that he didn't have

22   any options on that and that he didn't like it.  He said he

23   didn't like it.

24          But here's, I think, the most important one and the

25   fourth point.  Ethical considerations aside, what this does is

53

1    it creates a complete unity, an artificial -- albeit

2    artificial -- but a complete unity of interest between the

3    class counsel and the Plaintiff.

4            So why is that a problem?

5            The problem there is that that puts them adverse to

6    the class, and the reason -- you see, this may not be

7    intuitive.  But when you follow this through on all the

8    obligations that we have and all the restrictions that we have,

9    I'm not allowed to loan my client money.  I'm not allowed to

10   buy an interest in my client's litigation.  I'm not allowed to

11   be a business partner with my client in an area where I'm

12   advising them on business.

13           That unity of interest is important.  It's important

14   because class counsel plays a different role than class

15   representative.  And when you've made them -- when you've

16   restricted them to the point where they have to follow

17   everything class counsel says in regards to settlement and in

18   regards to considering settlement on an individual basis,

19   that's what you've done.  You can't -- there are dozens of

20   cases where they say the class representative can't have a

21   financial interest linked to the financial interest of the

22   class counsel.  So you can't be business partners.

23           You know, it comes up occasionally where a lawyer

24   will represent his partner, and his partner's the class action

25   representative, and the lawyer law firm represents the lawyer.

54

1   And they say you can't do that.  You have the same interest.

2   You're going to just run with this, and you're going to go

3   crazy on attorneys' -- or run this thing to the end because

4   you, class representative, are going to benefit when class

5   counsel recovers.  You can't do that.

6        So there's an argument in that they say, well, we

7   cured it, we fixed it, we got rid of it.  This is a running

8   theme in this motion where they say, okay, well, let's say that

9   we say, okay, you've got all these bad numbers.  You got these

10  bad phones.  But look at this universe of bad phones.  A lot of

11  them paid them after it was marked bad phone.  A lot of these

12  people that are not the customers or not the people, they're

13  bad phone numbers, a lot of them after we marked it bad phone

14  they paid the debt.  So presumably just out of the goodness of

15  their heart these people that don't own these debts actually

16  paid their debt.

17       And the answer is no, that's not -- the reality of it

18  is that's evidence of what's going on here.  That's the

19  evidence.  The evidence of bad phone shows these people are not

20  bad phone numbers.  There's all sorts of reasons, and we

21  touched upon this.  This is the evidence in the case.

22       But my clients signed an affidavit that said this

23  thing -- reviewing these, it's used when the recipient doesn't

24  speak English sometimes.  It's used when somebody is abusive.

25  The idea was this bad phone thing was used to kill calls so

55

1    that they didn't call somebody that for whatever reason they

2    didn't want to call.  The recipient hung up.

3         You know, there's all sorts of instances where they

4    were coded.  And the evidence shows this.  It's paragraph 14 of

5    my client's declaration.  My point of this with respect to the

6    adequacy is, you know, this is the agreement they entered into.

7    This is the agreement they provided.  They can't just cure it.

8    It's all baked in.

9         We've gone through three years of this litigation

10   where the Plaintiff was bound by this, and this is the evidence

11   of their inadequacy.  They can't just go cure it and say, eh,

12   we'll just get rid of that now, we'll just carve it out.

13        Here are the real instances where it happened, and

14   this goes to the facts with respect to this settlement offer.

15   There's this $30,000 settlement offer.  So the evidence shows

16   -- and there's a little bit of a discrepancy between what

17   Plaintiff said and what class counsel claims.  Plaintiff pretty

18   clearly testifies in his deposition that he did not see the

19   individual $30,000 settlement offer until after it expired.

20   That's pretty clear.

21        Class counsel came in with a declaration and phone

22   records that he says shows that he talked to his client for two

23   minutes when it was offered and sent an e-mail confirming that

24   he had rejected it.  I will take Mr. Howard at his word that

25   that call occurred.  It appears by all accounts that it did.

56

1    And the e-mail is what it is.  Your Honor has to weigh that

2    evidence.  There's certainly evidence sufficient to show that

3    the Plaintiff didn't understand the $30,000 offer was made.

4         But in two minutes it seems like it would be

5    challenging to have adequately addressed all of the things that

6    you would need to address to really advise a class

7    representative of his or her rights like that this is more than

8    he could ever receive.  He says -- his class counsel says, and

9    this is unrefuted -- that it wasn't explained to him that the

10   class could still pursue their claims.  They didn't discuss the

11   likelihood of success.

12        So I believe -- you know, I will take Mr. Howard at

13   his word that he did call him.  But it could have been as

14   simple as if you take this you have to pay me all my fees.

15   That's what the agreement was at the time.  And that matters.

16   That's important.

17        Another instance occurred where a request for a

18   settlement conference was made from Defendants' counsel to

19   Plaintiff's counsel, and it was rejected outright.  And it was

20   explained that the reason we want to do this is because Your

21   Honor had ruled on a case showing that they had some

22   challenges.  The D.C. circuit had ruled on a case that presents

23   a lot of challenges and a lot more defenses than we had prior

24   to that.  You know, the legal considerations changed.

25        And we said let's go to a settlement conference.  And

57

1    they said no, said it outright.  I mean, not "Let me talk to my

2    client."  No.  End of conversation.  No.

3         That's a problem.  I mean, that's where this goes;

4    and that's why this matters.  And it's -- you know, I don't

5    relish talking about ethics and I don't enjoy speaking this

6    way.  But I didn't write this engagement agreement, and I think

7    it is wrong, and I think it's problematic for him.

8         And, you know, we have talked about the other ways --

9    it's in our brief -- all the ways the Plaintiff has not been

10   adequate.  I don't think it's so much his own fault.  I think

11   he has just not been advised as to the litigation.  I think he

12   doesn't -- as Mr. Watstein referenced, I doubt very much that

13   he knows the current class definition will have eliminated

14   those who received phone calls if they weren't a subscriber.

15        He may not care.  I don't know.  I mean, but the

16   point is you can't just cede total control of these cases to

17   class counsel.  And that's what this was.

18        And I'm just going to end with this.  There has been

19   no explanation as to why this was in there, this provision

20   about the springing about liability of 18 months' worth of

21   fees.  And I've racked my brain to think of what are the

22   reasons why it would be in there, and it seems like there's

23   only two.  It's either to protect the class from the class

24   representative which indicts the class representative as

25   adequate certainly.  So, in other words, they say -- you'd say,

58

1    look, we have to put that in there.  Otherwise, we're afraid

2    the Plaintiff is going to abandon the class and, you know, the

3    class is going to suffer for that.

4           Well, if you're doing that, you're sort of creating

5    my evidentiary record that the Plaintiff is not an appropriate

6    class representative.  Or it's to protect class counsel from

7    the class representative, and that's not proper.  You can't

8    have an attorney -- you can't have that situation where you

9    say, "I'll represent you, but I'm going to represent you so

10   long as you're tethered to my advice with respect to this

11   point."  That's not the way class actions work.

12          So if Your Honor doesn't have any questions, I don't

13   have a lot more in the way of prepared remarks.

14          THE COURT:  I do.

15          MR. PENN:  Yes.

16          THE COURT:  What would be the status without that

17   contract provision as to the Plaintiff's ability to settle

18   either before or after certification?

19          MR. PENN:  So before certification, certainly the

20   Plaintiff can do anything.  After certification, we would need

21   -- Your Honor is then involved at the point of certification

22   which is why this matters.

23          This goes to an important point as to the removal of

24   this provision.  The removal of the provision at this point is

25   fairly illusory because if Your Honor certifies the class now

59

1    we have to come back before Your Honor to decertify it in any

2    instance.  So I mean, the ability for him to accept an

3    individual settlement after class certification after they have

4    removed this provision is severely hampered because Your Honor

5    will be taking an independent look at what's going on.

6             Once class notice goes out, we will have to give

7    notice to the class of what's going on.  People can come in and

8    object.  It's a very, very complicated process for the

9    Plaintiff at that point.

10            THE COURT:  Thank you.

11            MR. PENN:  All right.  Thank you, Judge.

12            MR. KEOGH:  May I, Your Honor?

13            THE COURT:  Please.

14            MR. KEOGH:  I guess I will start in somewhat reverse

15   order dealing with the adequacy issue first.

16            THE COURT:  Okay.

17            MR. KEOGH:  The provision was designed -- one of the

18   individual claims here is fee shifting where it's consumer law

19   where we are entitled to our attorney fees if we prevail.  And

20   there's -- we cited a bunch of cases where the fees will dwarf

21   the amount allowed for the consumer.  And this clause was put

22   in there to explain that situation.

23            Also, it's not uncommon -- and counsel testified he

24   has done it in other cases -- where they offer some

25   out-of-whack or out-of-context offer to the Plaintiff, a

60

1   six-figure offer when the person's claim is worth a thousand

2   dollars.

3            The retainer provides they can take that, but they

4   have to pay our fee if it's fee shifting.  So if a Plaintiff

5   wants to take that, they have the perfect choice to do so.  So

6   this was designed simply as if you are going to be paid

7   something, paid off basically to go against the class's

8   interest, then you have to pay the fees, not you have to go to

9   the bank and mortgage your house.

10           And this argument has been by actually counsel and

11  his firm it was rejected in the *Jameson* case we cited where the

12  Court held, you know, this end issue we can just amend.  The

13  *Lanteri* case which they cite in their brief, well, the judge

14  certified that class, didn't hold it as a problem and said,

15  well, just to avoid the issue just remove it.  So we did that

16  here.

17           They made a big deal.  They took up 23 affidavits to

18  the Seventh Circuit making this argument that was not taken up

19  by the Seventh Circuit.  So every other judge that's looked at

20  this has held it's not a big deal and it's avoidable by just

21  removing it.

22           So we didn't wait for the next determination here.

23  We just removed it because it wasn't designed to create a

24  problem.  It was designed to give the Plaintiff additional

25  information on what happens.  Because when we do an intake, we

61

1    explain that, you know, you may be -- your interest is in the

2    class.  They may offer you something, basically a bribe to go

3    away.  And you have to decide what to do with that.  So we

4    explained all these things.

5          So there's nothing nefarious about it.  You know,

6    Plaintiff is not handcuffed to the case.  And it's very clear

7    that the Plaintiff has complete control and can accept any

8    offer.

9          Here, mind you, we've only had one offer, one offer

10   that doesn't even cover his entire individual case.  And that's

11   it.  And so everything else is just conjecture and, you know, I

12   guess, throwing mud at the wall by Defendants saying, well, the

13   Plaintiff's not adequate so, therefore, no one can represent

14   the class; we can get away with calling all these people

15   because Plaintiff had permission in his fee agreement that

16   didn't even impact Plaintiff and didn't even impact his case.

17         And that's why the Florida rules provide you are not

18   supposed to use ethical violations in litigation.  Obviously,

19   if there's a problem with that, there's recourse with the bar.

20   That's not the case here, though.  This is just, I think,

21   somewhat of a sideshow.

22         But turning to a lot of what was said in the last

23   hour --

24         THE COURT:  Don't you see that as a problem, that

25   provision?

62

1        I mean, what you're telling your client is if they

2   offer you more money than I could otherwise get you and you

3   take it, I'm going to penalize you by charging you every

4   attorney fee that's incurred in this case, apparently 18

5   months.  But I mean --

6            MR. KEOGH:  Well, first --

7            THE COURT:  That can't be in your client's best

8   interest.

9            MR. KEOGH:  Well, it's a consumer law, Your Honor.

10  That's why they provide for that.  They provide for attorneys'

11  fees on top of that knowing that the Plaintiff's claim is not

12  worth that much.  So what they do is they say if the

13  Plaintiff's claim is worth a thousand dollars you are entitled

14  if you prevail to your attorneys' fees.

15           So it's not -- it's just something set up where

16  there's a lien on it just like Defendants.  You know,

17  Defendants can switch law firms or, you know, they can fire

18  these attorneys.  They still get paid.  So there's no problem

19  with it.

20           And in this case, their offer was less than he can

21  recover.  If this Court awards treble damages, his individual

22  case is worth more than the $30,000 just because he happens to

23  have a lot more calls than most class members do.  So the one

24  offer in this case didn't cover his total possible damages.

25           THE COURT:  And you made pretty sure that he wasn't

63

1  going to accept that by this provision.

2          MR. KEOGH:  No, Your Honor.  They made a big point is

3  the client wasn't even aware of the provision at his

4  deposition.

5          THE COURT:  But you were aware of it.

6          MR. KEOGH:  Yes.  And as we said, the reason why we

7  used this -- we no longer use this in our agreements because it

8  was not created or designed for what they are saying it was

9  designed for.  It was created or designed in the situation

10  explaining it because we didn't have this in our agreements,

11  say, five years ago.

12          And we put them in there because a lot of clients

13  were confused that if someone offered them a hundred grand that

14  they think they're going to keep everything in the case when

15  there's a fee-shifting provision saying, well, no, you know, we

16  are entitled to our work and we are willing to see this case

17  through.  We are willing to go to trial with you and have the

18  Court award fees or not award fees.

19          THE COURT:  I mean, when normally they'd settle for a

20  hundred thousand, wouldn't you have, what, a third, 30 percent,

21  whatever the --

22          MR. KEOGH:  Not under a consumer fee-shifting

23  provision, Your Honor, which is we have an individual case

24  here.  That's why we cited cases where there's awards of

25  hundreds of thousands of dollars in attorneys' fees and 1,000

64

1   for the Plaintiff because no one is going to take -- no one is

2   going to take a case where there's 30 calls here on a TCPA case

3   that's not fee shifting.

4           We combine it with the Florida law as fee shifting.

5   But, you know, you don't do it for a third.  If there was no

6   fee-shifting aspect, you don't litigate a case like this for a

7   third of $30,000.  It's almost impossible with experts.

8           THE COURT:  So he would get -- in this case he would

9   get the $30,000, and you'd get to bill opposing counsel 18

10  months' worth of fees?

11          MR. KEOGH:  If we prevailed, the Court would decide

12  what the fees are.

13          THE COURT:  But I mean, isn't that the -- so the

14  effect of your provision is not that the client has to pay it

15  but that the opposing --

16          MR. KEOGH:  Really he can't work out an agreement to

17  release our attorney lien, that he can't agree to something to

18  release our attorney lien unless we say you can do it.  Because

19  there's cases that, you know, we settle individually; and it's

20  for some fraction of the costs.  You know, we lose our time.

21  We lose our costs.  But it's in the best interest of the

22  client.

23          You know, we have never sued a single client, Your

24  Honor.  I have been doing this for over 20 years.  We've never

25  had -- you know, this has never been a complaint by a single

65

1    client.  And it's no longer in any of our authorizations

2    because it wasn't designed for what they are saying it is, so

3    we just removed it to avoid this issue.

4            And that's what the courts when looked at this said,

5    well, this is -- you know, you are talking about a hypothetical

6    issue that's not present in the case.  And that's why the

7    *Lanteri* courts have removed it and the *Jameson* court said it's

8    not an issue and, one, if it is an issue, it can be removed.

9            So, yes, if you are working against your client's

10   interest, I see the point.  But that wasn't what this was

11   designed to do.  And that's why it's no longer in place.  And

12   it didn't impact a single offer, and the Plaintiff even

13   testified he wasn't aware of it.

14           So to argue that, you know, we somehow used this as a

15   hammer and at the same time just saying, well, you know, your

16   two-minute call with him, he wasn't aware of it -- he was

17   deposed afterwards.  He wasn't aware of it.  You know, this

18   wasn't used against Plaintiff.

19           So that's why I say it's really somewhat of a

20   sideshow, Your Honor, because there is no ethical breach.  And

21   it's also not an ethical breach that impacts adequacy.  It

22   doesn't put the classes -- the class Plaintiff doesn't have any

23   interest antagonistic to the class because of this, and class

24   counsel doesn't have any interest antagonistic to the class.

25           So that's what -- you still have to have something

66

1   adverse to the class which you don't have.  So that doesn't

2   impact certification even though, as we say, we don't think it

3   was an issue before.  It's definitely not an issue now.  We

4   amended the authorization.

5           THE COURT:  All right.

6           MR. KEOGH:  So now these 14 points, Your Honor, I

7   guess, as you noted, you overruled my objections to the

8   introduction.  We didn't see it.  But one thing, I guess to be

9   clear, there's a three-page, single-spaced argument of, you

10  know, summaries and new argument that we have never addressed.

11  And I don't think -- it's in their folder.  I don't know if you

12  have seen it.  But we would ask that this be excluded.

13          THE COURT:  What tab or what --

14          MR. KEOGH:  It was in the pocket of ours.

15          THE COURT:  Oh.  I didn't look at it.  I see one.

16          MR. KEOGH:  So I think this is completely

17  inappropriate, Your Honor.  This is a second surreply that we

18  have not had addressed to see or deal with.  I mean, a lot of

19  it's dealt with in the oral argument; but we don't think it's

20  appropriate to have an additional briefing on it without us

21  getting a response.

22          THE COURT:  Well, counsel, I don't know if you

23  intended to have this in.  This looks like an outline of your

24  argument.

25          MR. WATSTEIN:  Your Honor, may I address it just real

67

1    quickly?

2            THE COURT:  Sure.

3            MR. WATSTEIN:  We're fine.  We put that in there as

4    kind of basically an outline of the reasons why we win

5    consolidated from all of the briefing to make it easier for the

6    Court.  If Your Honor doesn't want to consider it, we have no

7    problem with that.  We have made all those arguments in our

8    papers, and I made them all just now.  It was just to make it

9    easier for the Court.  It's nothing that hasn't been said

10   before.

11           THE COURT:  I'm going to keep it and read this.  This

12   is helpful to get to -- he had said 15.  This is 14.  I

13   probably have a numbering system that's up to about 17.  But in

14   any event, if there's new issues, the Court would not consider

15   them.  But in terms of just a summary of prior documents, I

16   don't have a problem with that.

17           MR. KEOGH:  Well, I think this is a summary of

18   argument.  That's why I think it goes a bit far, but that's

19   fine.

20           THE COURT:  I assume it's argument.  I mean, I

21   haven't read it yet.  But I also assume it's the same argument

22   he has made before.

23           MR. KEOGH:  Somewhat, Your Honor.

24           And really, I guess, those 14 points apparently that

25   really argue this all when you break them down say that you

68

1    can't rely upon our records.  And, you know, when I first got
2    up here, I pointed out that bad phone means several things
3    according to their drop-down menu.  And bad phone, the one we
4    relied upon was incorrect number, live answer.  And counsel
5    makes lots of sweeping statements.  Mr. Biggerstaff had no idea
6    or no evidence what bad phone is.

7            That's not true.  He had a deposition of ATS
8    corporate representative who testified that there's a drop-down
9    menu and they put the bad phone for wrong numbers.  He has the
10   data showing how these are broken out.  He has the e-mails from
11   counsel as well as their experts explaining the data.  So
12   Mr. Biggerstaff had more than enough information to make his
13   analysis.

14           And, you know, let's be very clear here.  These are
15   not freeform notes that they are typing in something.  These
16   are designated position codes to put for different types of
17   calls.  I think he said off the shelf there's only 50
18   possibilities.  I don't know where he's getting that.  But
19   assuming it's true, the ones we're talking about they picked
20   incorrect number, live answer.

21           That is then transferred to Bright House Network.
22   And Bright House Network, though, doesn't just use ATS's code.
23   The computers talk to each other.  And Bright House translates
24   that code and every code into their version of their code for
25   wrong which I believe was incorrect number.  So bad phone,

69

1    incorrect number, live answer for ATS is translated by Bright

2    House's system by their business records contemporaneously as

3    Bright House -- as an incorrect number.

4           So there's a sort of determination of wrong number by

5    ATS that's transferred to Bright House.  Bright House then

6    makes the determination -- and they stand by that -- to send

7    that back to them.  They're saying, well, we ignored it.  It

8    wasn't quite a determination.

9           That's a tomato-tomato thing to me, Your Honor.  It's

10   a systematic process of ATS telling Bright House this is the

11   wrong number, Bright House sending it back in.

12          And the reason is, I think it's apparent, is they

13   don't -- they think everyone's lying to them.  And maybe they

14   are a customer or maybe not, but we're still going to call.

15   And if you sue us individually as he said, they fight it.

16   They're going to fight each one of these things.  And that's

17   why class action's important, Your Honor.

18          And looking at this incorrect number issue, they

19   said, well, it's not our fault.  The underlying account

20   information they kept on providing Mr. Sliwa's number.

21          That's not true.  If you look at their Exhibit 2, so

22   if you look at the documents here, there's a handwriting note

23   they say is not legible.  Right?

24          There's no phone number next to it.  And I'm at

25   Exhibit 2 of their exhibit brief or whatever.  So it's 2B, Your

70

1   Honor.  I'm sorry.  So after the declaration or argument,
2   there's this page here.
3           THE COURT:  I am with you.
4           MR. KEOGH:  So we have, first off, this caller Lori.
5   So there's a name associated with the account.  And it's signed
6   by Lori, looks like Henderson or something.  So this is not an
7   unknown person.  There's no number next to the account.  They
8   said they kept on giving the new number.  They didn't.
9           If you turn to the next page, it said Lori again
10  signed it, no number next to it.
11          Now Warren, who's the account holder they say, he
12  signed this one, no new number.  And each single one of these,
13  Your Honor, there's a name and a number.  Nothing.  Nothing.
14  Nothing.
15          What they have is account information on top that's
16  prepopulated.  Their customer never gave -- kept on giving them
17  the incorrect number again.
18          And, you know, one big point here is you had a lot of
19  anecdotal evidence of the nanny in this case who -- the live-in
20  nanny.  Well, our procedures and our proposals would eliminate
21  the live-in nanny because, as we said, we would subpoena the
22  carriers for the address and name information for each one of
23  the subscribers or users if they have it.  And they would show
24  the live-in nanny is at the same address.  She would be
25  removed.  If it's his daughter, his wife who share a phone

71

1    plan, they would have the same address.  They would be removed.

2          So although I don't think you need it -- I think you

3    can rely upon the business records -- this extra step of the

4    carrier would remove any of these outliers.

5          THE COURT:  Wasn't there a dispute in the paperwork

6    as to whether the carriers could or would do this?

7          MR. KEOGH:  I don't think it's a legitimate dispute,

8    Your Honor.  They have -- we submitted affidavits.  We have the

9    Sprint records, for example, showing Sprint submitted an

10   affidavit from someone saying, well, they may not do it.

11         Well, they have done it in our cases.  Here is a case

12   where they have done it, and we have deposed them on it.  We

13   have over 80,000 subscriber records.  In our *Martin* case in

14   California, we got over two million call records.

15         And in this circuit for *Keim vs. ADF*, if you want, I

16   can file in five minutes five consent orders from AT&T,

17   Verizon, T-Mobile, Sprint -- there's one I'm missing -- that

18   they agreed to produce all the subscriber user information they

19   have for the class in that case.  You know, they don't like

20   doing it.  You know, two of them we had to file motions to

21   compel.  But then we withdrew those once they agreed.

22         So it's not like -- it's like any subpoena, Your

23   Honor.  No third party is happy to do it, but they do.  And we

24   have done it in numerous cases.  And we can -- this really

25   shouldn't be an issue.

72

1          Obviously, the Court is well aware of the powers of

2    the force of subpoena, and no carrier can say we don't want to

3    do it, as well as the cost has been negligible.  We pay a

4    couple hundred bucks to each carrier.  You know, so that's

5    really not an issue.

6          And I'd be happy to file that as, you know,

7    additional authority, just those consent orders, showing that

8    they are agreeing to do it.  And, therefore, we'll get that

9    information back, and we can compare that, and we can remove

10    that -- any matches.  And that'll take care of your live-in

11    nanny.  That'll take care of your spouse.

12          Also, one thing we don't know is how many -- that's

13    not even an issue.  It's kind of the subscriber/user.  We have

14    9,407 numbers here.  There is -- you know, it could very well

15    be that 90 percent of them are single users, that some are

16    family plan.

17          So, you know, that shouldn't be an issue right now.

18    There's been no showing that these specific 9,407 are involved

19    in any kind of multi-use line that would even create this issue

20    between subscriber and user.  One, I don't think that is an

21    issue; but that's not here.

22          Well, since I mentioned subscriber and user, one of

23    their adequacy arguments is saying that for non-customers we

24    said the subscriber has a claim.  And U.S. counsel wants to put

25    the law on that, whether it's subscriber or user.  And, you

73

1    know, first it's *Spokeo*. But the authority is that subscribers

2    have a claim. You know, whether he has an argument on *Spokeo*

3    or not, I don't think he does. But it's the same argument on

4    every subscriber. It's a classwide issue. I don't think it's

5    well taken, but it's a classwide issue.

6            Remember, we have already briefed *Spokeo* ad nauseam

7    here where you disagreed in this case as well as in *Tillman*

8    that they hadn't answered the call. But, once again, it's a

9    classwide issue. And if they are right, they will have a

10   defense to the entire class.

11           Now, the due process considerations he raised, of

12   which I think it's the 15th point regarding the subscriber/user

13   issue, there is no due process, that the plan is and the

14   process we submitted takes into consideration all their

15   concerns, that if we lose anybody who may have been called or

16   may have been a customer -- and that's former or prior

17   customers -- and it removes anybody who even called before and

18   after. And to be very clear, Plaintiff is in the class

19   definition. He is someone who is not a customer, who was --

20   his account notes have those codes in it and was called after.

21   He fits the class definition.

22           THE COURT: I think the point is not that we don't

23   know now that he fits but under the system you're proposing he

24   would be excluded.

25           MR. KEOGH: He would not. What they're saying is one

74

1    of the accounts had "Customer can't be reached" notation next

2    to his number.  That's not an exclusion.  We understood it was

3    as long as they reach the customer.  So they have a named

4    customer in there, and they're saying that should be excluded.

5            "Customer cannot be reached" does not mean that they

6    reached the customer.  So that's why he would not -- we put in

7    our reply saying they misunderstand the process.

8            THE COURT:  Well, was your expert's testimony that he

9    would have excluded that type of an entry or not?

10           MR. KEOGH:  No.  The testimony was he didn't look at

11   the other account.  But it was not one -- that was not on a

12   kill list.  Exclusion list is probably a better way of saying

13   it.  He used the word "kill list."  But he excludes them.  And

14   "Customer not reached" is not on a kill list.

15           So he would be in the class, Your Honor, whether the

16   overall arching class definition, as well as the analysis the

17   expert did.  And nor do I think a notation saying customer

18   cannot be reached when there's no other -- when you have never

19   received a customer at that number, you know, implicates he's a

20   customer.

21           And going also -- circling back to the business

22   records exception, there is no requirement in the business

23   exception, business records hearsay rules that it has to be

24   independently verified, a business record that they rely upon,

25   that they keep notes of it.  Further, the expert is allowed to

75

1    rely upon hearsay.

2            So we think it's clearly a business record.  But if

3    not, experts are allowed to rely upon anything as long as it's

4    standard.  And even their experts say they go through and look

5    at -- reply upon the account notes to determine whether it's

6    consent or not.  They argue they can do it individually, but

7    they say they have to go through and you have to do an account

8    review.

9            So it's something that both experts agree can be

10   relied upon.  So it's clearly a business record.  If not, the

11   experts aren't bound by that anyway.

12           So, also, I think one reason we have this notebook

13   too is some of the information they rely upon here was not in

14   the class certification briefing.  For example, Number 12,

15   declaration of Matthew A. Keilson, that is not in their

16   response or their surreply.  That comes from their *Daubert*

17   motion.

18                THE COURT:  Comes from what?

19                MR. KEOGH:  Their *Daubert* motion to exclude

20   Mr. Biggerstaff.

21           And, you know, so what we have here is counsel makes

22   this big thing saying Plaintiffs didn't do enough discovery

23   here.  Everything they are relying upon to show consent was

24   attached to briefs filed months after close of discovery.  So I

25   don't think you can have it both ways.

76

1          Two, we did quite a bit of discovery, Your Honor.  I

2    flew to Ohio and took the Bright House's corporate deposition.

3    We flew to Texas and took their corporate rep deposition.  We

4    had beyond numerous discovery disputes with motions to compel

5    class discovery.  You know, we worked with our expert to

6    produce -- we had over 21 million records we went through.  And

7    we distilled that down to 9,407.  So we've done quite a bit of

8    work in this case.  But after -- and we did all that before

9    discovery closed.

10          So after discovery closed, and not associated with

11   the class certification briefing, in their *Daubert* motion they

12   have an attorney from the law firm here who does not have an

13   appearance in the case contact class members which is a problem

14   in itself because the Court is the only one that should be

15   approving any kind of contact with class members.  As we cite

16   in our *Daubert* response, there's problems with that because you

17   don't know what was said.  You know, even in his paragraph

18   three, "I called or participated in calls to 50 phone numbers."

19          Who else was on that call?

20          You know, so we have counsel now who doesn't have an

21   appearance in the case becoming a witness, talking to people,

22   who was obviously never disclosed in this case because all of a

23   sudden this is after discovery.

24          So he is saying he reached some people who said they

25   were a customer.  We don't know who he reached.  They didn't

77

1    produce the accounts.  They didn't identify who these were.

2    They didn't identify and show that these were the -- our 9,407

3    who they were.

4           But assuming they are, they would be -- these people

5    would be excluded when they got the information back from the

6    carriers.  These people would also be excluded if they had to

7    sign a declaration of the claim process saying, "I'm not the

8    customer."  Because as this demonstrates, when someone called

9    the person, they said, "Yeah, I was a customer," according to

10   their attorney.

11          Well, these people aren't going to sign a declaration

12   under penalty of perjury, well, I'm their customer now when

13   they freely admit on a phone call they're not.  So, once again,

14   nibbling around the edges is all they're doing here, you know,

15   point-zero percent, point-whatever percent showing there may or

16   may not be something.

17          And, you know, that is why the subpoenas to the

18   carriers will remove any doubt and the declaration will take

19   care of that.  Obviously, we object and think this should be

20   excluded because it's, you know, by counsel after the close of

21   discovery.  But even taking it for what it is, it doesn't show

22   any individual issues or, more precisely, it doesn't show they

23   predominate.

24          Because the issue -- the test isn't whether there's

25   any individual issues.  It's whether they predominate.  And if

78

1   there's a handful of consent issues for their defense for a

2   handful of class members, you know, that's the total

3   baby-with-the-bathwater argument.  We're going to throw baby

4   out with the bathwater because there's a couple individual

5   issues here.  That's not how predominance was designed.

6           Now, two, counsel said we didn't identify the class.

7   First, identifying the class is not an element of Rule 23.

8   It's not an element of ascertainability.  Not a single case

9   holds that you have to identify the class.  It's whether the

10  definition can be for whether someone fits the definition by

11  objective terms, not whether we know whether it's Bob Smith or

12  Sue Smith.

13          Two, counsel is just plain wrong when he says that no

14  other specifications are allowed when you don't know who ten

15  percent of the people are.  There's plenty of cases, fluid

16  recovery cases or price fixing for milk -- there's numerous

17  examples of ones where people are shopping and you have no idea

18  who the class was and they give publication notice for that.

19          So if that's really an issue, we can very quickly,

20  you know, supplement with authority.  But it's not the case

21  where we only know ten percent.  Yes, people use publication

22  notice to supplement notice when you don't have a certain

23  percentage; but you can have it when you don't know anybody.

24          But that's also beside the point because we do know

25  who they are.  We have -- they are identified by their unique

79

1    set of carriers -- sorry -- unique set of telephone numbers,

2    and we have the dates and times they were called.  As far as

3    notice goes, we can obtain that with the carrier information

4    which is what these cases do.

5              Also, dealing with the typicality argument they make,

6    once again, Plaintiff is within the class definition.  He is

7    not excluded by any kill list.  The customer -- but, two,

8    typicality unique facts, they are saying that their unique fact

9    is that their customer kept on giving that number.

10             That's what they say for everybody.  And as I showed

11   you, when you actually look at the exhibit the phone number was

12   blank on each one of those work orders.  There is no unique

13   defense related to Plaintiff, let alone a defense so unique to

14   derail the trial.

15             Because if it's one that is so -- such an issue that

16   is going to derail the trial, and even then the courts have

17   said a unique defense is okay as long as you are not relying

18   upon a credibility issue for the Plaintiff, where if it's -- if

19   you can have a defense like this one that has nothing to do

20   with Plaintiff's credibility because he has no idea what the

21   other person provided, then it doesn't impact the trial.  It's

22   at most five minutes' worth of testimony that their account

23   records were never updated and this person, whether it was Lori

24   or Warren, whoever, no one ever provided the new phone number.

25             Number six was the broader classes.  Counsel said

80

1    that the initial class was everyone who was called without

2    consent, and now they are limiting the class to people who

3    weren't called with consent but only ones who were called after

4    a run in rotation.

5              We limited the class.  We excluded tens of thousands

6    of wrong-number accounts.  To be very clear, the overall

7    wrong-number universe was much larger than 9,406 or 7.  I

8    apologize for keep getting that wrong.  But we narrowed it, and

9    narrowing the definition is clearly not increasing the size of

10   it.

11             And I think everything else, Your Honor, has been

12   addressed over and over again.  And, finally, I'll end with the

13   attacks against Mr. Biggerstaff.  One, I think they're

14   unfounded.  But, two, that goes to credibility.  That does not

15   go to admissibility.

16             Whether he considered something or didn't consider

17   something, which I think he did, that goes to his credibility

18   and the weight given to it.  No court has excluded an expert

19   witness for not, you know, getting it right, if you will.

20             Although, like I said, to be very clear, we think he

21   is right.  He went above and beyond and was extremely

22   conservative.  And I would also point out that they had two

23   experts and one expert -- they never asked their expert to

24   perform any of this analysis.  Everything they are critiquing

25   Mr. Biggerstaff on is attorney work.  Their attorney did

81

1    calculations and called people.  Their attorney did this stuff

2    all after the close of discovery.

3              So I don't think you can use that to attack an

4    expert, and it basically amounts to argument put in the form of

5    evidence which should not be any type of test.  So with that,

6    unless the Court has either concerns or questions --

7              THE COURT:  I do have one or two questions.

8              Assuming I certify a class or classes as to the

9    Telephone Protection -- Telephone Consumer Protection Act, what

10   happens to the claims based upon the other statutes in your

11   Complaint?

12             MR. KEOGH:  The SCCP was only brought individually.

13   So that is there, and it's up to Plaintiff to decide whether to

14   pursue that or not.  That's the same whether you deny

15   certification.  That claim survives.  So it was never brought

16   as a class in definitely the latest Complaint anyway.

17             THE COURT:  So the remaining claims just proceed with

18   the single Plaintiff?

19             MR. KEOGH:  Correct, Your Honor.

20             THE COURT:  Okay.  Thank you.

21             MR. HOWARD:  Your Honor, may I add something very

22   briefly?

23             THE COURT:  If you must.

24             MR. HOWARD:  I feel like I must just because --

25             THE COURT:  Come on up to the podium.

82

1          MR. HOWARD:  I think, you know, one's reputation --

2          THE COURT:  That's right, you were involved in that

3    aspect.  Sure, go ahead.

4          MR. HOWARD:  Yes, sir.

5          I think the reputation in life and in the legal

6    community especially is one of the most valuable things that

7    you have.  And although I think this whole issue is a red

8    herring, we did hire Scott Tozian who is probably heads and

9    tails the best Florida ethics expert in Florida.  He took an

10   extensive deposition.  And if you really do have an issue, I

11   invite you to read that deposition where he basically says that

12   what they're trying to do here is inappropriate.

13         He also filed a declaration, as did I.  And while

14   Mr. Penn said he is going to take Mr. Howard at his word that

15   there was only one two-minute phone call and he believes what I

16   said, there were more than -- there were actually two phone

17   calls as I stated in my affidavit.  And this was not something

18   that just at the very end happened.  When a Plaintiff like

19   Mr. Sliwa signs up, we know that what a Defendant's going to do

20   is fight to the death and then try to pick you off.  And he

21   knew that from the very beginning.

22         So this was -- and, again, without me testifying, I

23   invite you to go back and look at my affidavit.  This was from

24   the very beginning something that he was aware of.  And, you

25   know, his testimony at deposition was, "I'm going to fight for

83

1    the little guy and I'm going to fight for the class."  And, you

2    know, this contract and offer, you know, did not change that.

3              Thank you, Your Honor.

4              THE COURT:  All right.  Thank you.

5              Mr. Watstein, any, I guess, re-reply or rebuttal or

6    anything?

7              MR. WATSTEIN:  I do.  I think Mr. Penn wanted to

8    address adequacy very briefly, and then I will address the

9    other points if that's okay.

10             THE COURT:  That's fine.

11             MR. WATSTEIN:  Thank you.

12             MR. PENN:  Judge, literally less than two minutes.

13             THE COURT:  All right.

14             MR. PENN:  First, as to the cases where they did what

15   they did here and they amended their agreement, I was involved

16   in those, *Jameson* and *Lanteri*.  They are totally different.

17   Your Honor can read the opinions.  They really don't address

18   it.  But let me say a few things that distinguish those cases.

19             One, none of those cases have expert opinions.  In

20   fact, in *Lanteri* they said specifically that the expert we

21   provided would not be considered.  So they didn't consider

22   expert opinions.

23             Two, it's a different set of authority.  Florida you

24   all have different and more client protection rules I can tell

25   you than other states.  Florida is very, very client protective

84

1   with things like advertising and multiple things.

2         Three, totally different factual situations in those

3   cases.  We didn't have the factual record that we have here of

4   this settlement offer, of the invitation to a settlement

5   conference and all of the corresponding confusion from the

6   Plaintiff.

7         And third -- or fourth, rather, I think those cases

8   are wrong.  I really just think that they are not accurate.  I

9   think that they didn't examine the issue.  None of them really

10  decide the penultimate -- the issue here, the ultimate issue

11  here.  So that's with those cases.  I just wanted to make that

12  point.

13        Second point, Your Honor asked a very pointed

14  question with respect to, if there was a $100,000 settlement,

15  wouldn't Plaintiff receive $33,000 or a third of it.  I don't

16  know if Your Honor remembers that.  But I understood his answer

17  to be no because it was fee shifting, and that's not what the

18  agreement says.

19        What the agreement says is that the attorneys, they

20  will receive the greater of one-third of the total settlement

21  proceeds, award or judgment or the amount of attorneys' fees

22  for claims with a fee-shifting provision.  So they are going to

23  get a third.  They absolutely in that situation would get a

24  third of $100,000.

25        So I don't know if that was a misunderstanding, but

85

1    it seemed important enough for Your Honor to ask the question.
2    I want to make sure that Your Honor understands their agreement
3    provides that they get the greater of a third or the attorneys'
4    fees.
5           Then the last point is -- and this just came up at
6    the end -- counsel said that this provision is in there because
7    they want to protect for the fee-shifting element.  That was
8    the proffered reason.  Counsel just said the fee-shifting claim
9    here under the FCCPA is not a class action claim.
10          This thing that we're arguing about, this provision,
11   is entitled Exception for Individual Settlement Against
12   Attorney's Advice.  And it says, "If the client abandons the
13   class and settles on an individual basis."  It makes no sense
14   that that would be in here to cover them on the fee-shifting
15   claim when there's no class fee-shifting claim.
16          That's not why they had it in here.  It can't be why
17   they had it in here.  Counsel just told you the FCCPA, the
18   statutory fee-shifting claim is an individual claim.  And this
19   says if Mr. Sliwa abandons the class and settles on an
20   individual basis.  He can't do that.  There is no class.
21          So I just point that out because it's just -- you
22   know, it's a little bit of Texas bull's-eye here where we are
23   shooting the fence and then drawing a bull's-eye around it and
24   saying, yeah, we got it.  You know, that's not the way this
25   works.  That's not why that's in there.  It can't be.

86

1          So with that I will let Mr. Watstein -- unless Your

2     Honor has questions.

3          THE COURT:  I do have questions.

4          MR. PENN:  Yes.

5          THE COURT:  Assuming there's a problem here, what is

6     your remedy?  What remedy should the Court impose?

7          MR. PENN:  So Your Honor did say, you know, you

8     wanted to hear all 15 arguments because you need to decide all

9     15 arguments.  I don't think you have to decide all 15

10    arguments.  I think you can have any one of these 15 you could

11    deny class certification.

12         What I'm asking for, what we're asking for is that

13    you deny class certification.  You can say they are inadequate

14    counsel.

15         THE COURT:  What does that do to all the putative

16    class members who I will be punishing based upon the contract

17    between one person and this law firm?

18         MR. PENN:  Absolutely no one is punished.  Everyone

19    still has their rights.  They have the exact same rights that

20    they had the day they came -- the day that Mr. Sliwa filed his

21    individual -- no, the day that he filed the amended claim for

22    class action was brought in.  Those claims are all tolled.

23         THE COURT:  They can all file claims going back four

24    years before the date of the Amended Complaint?

25         MR. PENN:  If they had a day, they have a day left.

87

1    If they had two years, they have two years left.  So it doesn't

2    reset anything.  It's just like you press pause when the class

3    action claim is filed based upon the pleadings.  Then when Your

4    Honor denies it, they have whatever they have left.  So if they

5    had -- they won't get penalized.  They won't get hurt.  You are

6    not punishing anybody.

7               THE COURT:  I understand your answer.

8               MR. PENN:  Okay.  Thank you, Judge.  Anything else?

9               THE COURT:  Not yet.

10              MR. PENN:  Okay.

11              THE COURT:  Mr. Watstein?

12              MR. WATSTEIN:  Thank you, Your Honor.

13          There was a lot of things said and a lot of stuff

14   addressed that are somewhat mixed together, so I apologize in

15   advance if I jump around a little bit.  The first thing --

16   well, let me say this as a general statement.

17          I mentioned that one of the things I realized in

18   rereading the papers is how many misrepresentations of evidence

19   there were and how many statements were made that had no

20   evidentiary support as if if they say it enough times someone

21   will believe it is true.  That continued just now.  One example

22   of that is they claim that the phone number was not handwritten

23   -- the phone number at issue in this case was not handwritten

24   into any of the work orders that I put in Your Honor's binder.

25              It was.  I'm looking at it.  It's Docket Entry -- for

88

1    the record, Docket Entry 161-1 at Exhibit B.  It's the

2    second-to-last page of your binder.  The number, phone number

3    (863) 473-2025, the number that's at issue in this litigation,

4    is handwritten into this work order.  And then it's signed by

5    somebody that looks like Belinda Dorcet.

6            We have no idea who that is.  But they are attesting

7    here that they're a customer on Mr. Harden's account even

8    though they are not listed and there's no way to remove

9    somebody like that from the class.

10           So there's the phone number on there contrary to what

11    they said.  There's a name on here that we can't read contrary

12    to what they said.  This person is not listed in the account

13    contrary to what they said.  There is no way to remove people

14    like this from the class.  There's even less of a way to remove

15    people who we don't have a signed work order for at all

16    anymore.

17           There were four people who signed just for Customer

18    H's account.  Every one of them agreed to a binding arbitration

19    provision here.  None of them can be included in the class.

20    They have zero way to exclude those people, absolutely none.

21    They have not proposed anything.

22           They talk about subscriber subpoenas.  That doesn't

23    remove Belinda Dorcet from the class.  It just doesn't.  It

24    doesn't make any sense.  There's no way to remove people like

25    this.  They haven't proposed any.

89

1        If I may add one thing to the adequacy point, and

2   that's the only thing I will say about it.  The reason why this

3   is so important for me and us is that even if the Plaintiff

4   made an independent determination that the best thing for the

5   putative class was to get rid of his current counsel to settle

6   this case on an individual basis -- for example, what if he

7   decided the claim would be better brought in another

8   jurisdiction?

9        That's his decision to make.

10        What if he decided he didn't like what counsel was

11   doing excluding the claims of people who actually received the

12   calls?  What if he didn't like that?

13        He is powerless under that restriction to do anything

14   about it.  He can't take the money that we offered him which is

15   more money than he is going to recover if a class is certified.

16   He can't do it.  He is prohibited from doing so, and we think

17   that's wrong, and that's why we raised it.

18        And I would add something to what we want the Court

19   to do on that point.  We would like -- regardless of whether

20   that's a reason to deny certification, we would like the Court

21   to address that and really think hard about whether something

22   like that is permissible.  I handle a lot of class actions.  I

23   have never seen another provision like that.

24        Their expert, he has been doing defense work for 40

25   years defending lawyers -- might be 35.  He has never seen a

90

1    provision like that ever.  And that says something.  That's

2    critical.

3         A couple other things.  I mean, most of what I'm

4    going to say is that the things that were said by Plaintiff's

5    counsel are just not right.  They are either contradicted by

6    evidence or unsupported by evidence.  Everything that was said

7    about the codes, the way they're used, that's all made up.

8    None of that exists in the record.

9         The drop-down menu does not include a BPINLA code.

10    It doesn't exist.  That can be easily verified by looking at

11    the drop-down code in the records.  It doesn't exist.  They

12    made it up.  I don't understand it.

13         Bright House never translated any data.  Bright House

14    never translated data.  That's nowhere in the record.  That's

15    another thing that they said.

16         There's no evidence that Bright House used the data

17    for any other purpose other than verifying the calls were made.

18    We explained in discovery -- our client explained at deposition

19    that there was a separate process for wrong numbers being

20    escalated to a manager after the person on the phone tried to

21    verify by asking address information, whatnot, whether it was a

22    true wrong number.  Then they would escalate it.

23         They didn't follow up in discovery on those e-mails

24    because they knew that is exactly the kind of individualized

25    issue that would preclude class certification.  Instead, they

91

1    made up this testimony about a BPINLA combination that their

2    expert relied on being in the drop-down menu in an attempt to

3    pull the wool over the Court's eyes.  And, you know, we think

4    that's pretty egregious.  And we have been fighting these false

5    allegations for this entire litigation.

6           And on that point, it dovetails into another point.

7    This has been litigation by ambush from day one.  They

8    litigated this case for three years.  The proper way to change

9    class definition is to amend your Complaint.  They never did

10   it.  They waited until the class discovery period closed, then

11   they changed their class definition not once but twice.  And

12   now they fault us for mustering evidence after the close of

13   discovery to address their new class definition.  That's

14   another thing that I think is egregious.

15          Counsel made a statement on the point of numerosity

16   that it could be that 90 percent of Group A ends up excluded.

17   That's my point on numerosity.  It could be that 95 percent is

18   excluded, that 100 percent is excluded.  They never took any

19   discovery to establish the potential number of people who fall

20   within their class definition, which we still don't know what

21   it is even after their presentation.  Assuming it's 90 percent

22   or more than that like they said it could be, there's no

23   numerosity.

24          That's a very easy reason to deny class

25   certification.  It's one of the reasons that one of the courts

92

1   that we cited in our April 8th notice of supplemental authority

2   denied class certification on both numerosity and

3   ascertainability grounds, I believe.

4           Counsel said on the standing point that there's

5   authority that says all subscribers have claims.  There's no

6   case, much less any binding case, that has addressed the

7   question of whether -- that I'm aware of, certainly not an

8   Eleventh Circuit case -- whether subscribers always have claims

9   in every circumstance even if they didn't even know about the

10  call and they weren't charged for it.

11          There are cases that say, yes, in most circumstances

12  subscribers have a claim or in some circumstances they do.

13  Like I said, the Fifth Circuit said apportionment of damages

14  seems to us to be the most fair course which is impossible here

15  because of the way they have defined their class definition.

16  They are excluding and forever barring the claims of the people

17  who received the calls.

18          And this idea that this standing defense applies to

19  the entire class, that's ludicrous.  Our whole point is that

20  for subscribers who didn't use the phone number, didn't know

21  about the calls -- for example, my entire family is on my

22  father's plan.  We all pay him because it's cheaper for eight

23  of us to be on one plan.  He doesn't know if I received a

24  robocall that I complained about.  He has no idea.

25          The standing defense is particular to every single

93

1     subscriber.  Some of them may have been the user of the phone.

2     Some of them may have spent hours on the phone dealing with a

3     company that wouldn't stop calling them.  You get where I'm

4     going with this.  The standing defense cannot be decided on a

5     classwide basis.

6           Counsel also said on the typicality point that the

7     code at issue was not on Mr. Biggerstaff's kill list.  I didn't

8     write down exactly what they said the code was, but it was

9     false as a matter of fact.  The code is "Customer not

10    available."  That's a quote from the records.  That was a kill

11    code on their own expert's list.

12          Now that they have realized that under the proper

13    analysis it excludes the Plaintiff from the class now they are

14    disavowing their own expert's opinions and their own expert's

15    kill list.  And it's unsurprising that they would do that

16    because their expert had no idea what "Customer not available"

17    meant because they never asked.  In the three years of

18    discovery they never asked because they knew they wouldn't like

19    the answers to any of these questions.  And it's their burden.

20    It's their burden at class certification.  It's not our burden.

21          As to the definition of the class, he said it's

22    current and former customers.  He didn't address my primary

23    point.  My primary point is how you exclude all the people who

24    are users but not listed account holders, the people who are

25    bound as a matter of Supreme Court authority, including the

94

1  Supreme Court's *Henry Schein* decision from earlier this year to

2  arbitrate their claims.

3          On that point, it's worth noting that we've had

4  cases, I have personally litigated cases where the judge has

5  ordered -- class actions where the judge has ordered discovery

6  as to whether a named Plaintiff who didn't even sign a work

7  order is bound to the terms and conditions and bound to

8  arbitrate, ordered individualized discovery with respect to

9  that one person to see if they used the services enough, were

10 aware enough of the terms and conditions to be bound to

11 arbitrate.  Because the terms themselves do say you are bound

12 by using them; and, of course, that's the only way to have

13 terms and conditions when you provide services to households of

14 people.

15         So that is an issue that we are entitled as a matter

16 of due process to take up with respect to every putative class

17 member.  They have no way to remove any of those people.  They

18 don't know who any of them are.

19         They can't use affidavits to -- they're not

20 admissible at trial.  The concept of the use of an affidavit in

21 a case like this is -- I mean, it would completely violate the

22 Defendant's due process to allow someone to basically say,

23 "Yeah, I fit these characteristics; now pay me $1,500 per

24 call."

25         We can't be held -- our client can't be held liable

95

1    for hundreds of millions of dollars of damages based on an

2    affidavit.  The only circumstances where courts have allowed

3    affidavits are fixed liability cases, for example, underfilled

4    olive oil.  If there's 10,000 bottles of underfilled olive oil

5    and they can't locate most of the class, they could potentially

6    use publication notice at Kroger who sold the olive oil or

7    whatever, and they could potentially use affidavits for class

8    membership.

9            Fixed amount of liability, sold exact number of olive

10   oil bottles that were underfilled is known.  And the affidavits

11   can be verified with records which is a key for all the cases

12   that have allowed affidavits, a receipt, a credit card

13   statement from American Express showing, you know, I made a

14   purchase at this store on X date.  Those are the circumstances

15   where affidavits are allowed.

16           Affidavits aren't allowed in cases where liability

17   turns on our liability.  Whether we violated the law or not,

18   not whether they are a class member or not turns on what they

19   say in the affidavit.

20           They're going to be attesting to whether there was

21   consent or not in these affidavits.  That is determinative of

22   one of our primary defenses in the case.  That's not what

23   happens in an olive oil case where the company admits they sold

24   10,000 bottles of underfilled olive oil and they don't know who

25   they sold it to, totally different scenarios.  There's never

96

1    been a case where affidavits have been used in the manner that

2    they are proposing without evidence that they don't have to

3    authenticate what's stated in the affidavits.

4            What they said about hearsay, again, another false

5    representation.  They say that our records were used for a

6    certain purpose.  It's just nowhere in the record.  They have

7    just made that up.  The records were only used to verify the

8    calls were made.  That's it.

9            There's no way around -- we have cited authority

10   which they have never addressed where several courts have

11   looked at a scenario where somebody calls a bank and says, "I

12   made a payment," and the decisions have said you, of course,

13   can't use that record.  It is a business record.

14           The first layer is admissible.  The underlying layer

15   where somebody told them that they made a payment doesn't prove

16   that they made a payment.  That's ludicrous.  And the decisions

17   that have looked at that have recognized that.  And they

18   haven't addressed any of those cases.

19           The same thing with typicality when we explained that

20   Plaintiff was excluded from the class, we have cited cases that

21   say Plaintiff has to be a member of the class.  They don't

22   respond to them.  They just make some other argument.  It's

23   smoke and mirrors.

24           THE COURT:  Did you cite a case -- and I don't

25   remember which is why I'm asking -- but did you cite a case

97

1    that at the class certification stage the evidence must be such

2    that it would be admissible at a trial?

3            MR. WATSTEIN:  So we -- I don't believe that we

4    addressed that point.  I don't believe it was briefed.  But I

5    can speak to it.

6            THE COURT:  Please.

7            MR. WATSTEIN:  And this is a critical distinction.

8    Evidence that is used as the methodology for trying the case on

9    a classwide basis must be admissible at class certification

10   because it must be admissible at trial.  And they can't use an

11   expert to get in 9,400 codes.  The whole purpose of their

12   expert was to get this hearsay in.

13           I mean, and we're happy to cite supplemental

14   authority on that.  It's funny because, anticipating that they

15   would raise that, we pulled several cases in advance.  I can't

16   quickly access them here, but we're happy to submit

17   supplemental authority on that point.

18           Of course, experts are allowed to rely on very

19   minimal hearsay for things that they have learned in the past,

20   articles they've read, that sort of thing.  They can't get rank

21   hearsay like this in through expert testimony.

22           So contrast that type of evidence with other

23   evidence.  Some evidence can be inadmissible we contend.  I

24   don't think the Eleventh Circuit has spoken to it.  The Ninth

25   has and said it can be, I believe, considered at the class

98

1    certification stage.  Some inadmissible evidence can be

2    considered if it doesn't need to be admissible at trial in

3    order for a Plaintiff to meet their burden.

4           Their theory about BP codes, that is their classwide

5    liability theory.  They have to show Your Honor that they can

6    use that at trial to prove that we're liable for hundreds of

7    millions of dollars worth of calls.

8           Other evidence, for example, the Keilson declaration,

9    are not being used -- are not being used to prove the truth of

10   the matter asserted.  Several -- and this is a good time to

11   talk about that declaration.  We called -- and I was in the

12   room when this happened as an officer of the court for many of

13   the calls, not all of them.  We called the numbers that we --

14   that are included in Group A.  We documented what we were told.

15          We're not introducing those records to prove the

16   truth of what those people told us.  We're introducing that

17   evidence to show the Court they might have been lying.  We

18   don't know.  The only way to determine whether we had consent

19   to call a particular number at a particular point in time, the

20   only way to figure that out is through the detailed discovery

21   that we've taken in cases -- it's cost tens of thousands of

22   dollars; our client knows this -- in each case to show that the

23   alleged wrong-number claim is not a true wrong-number claim.

24   But there's no way to figure it out from the records.

25          Because you have situations where there's a nanny.

99

1    You have documented situations in this case where people who

2    have those numbers today that we called said, "I was not an

3    account holder, but I did give the number. I didn't receive

4    any wrong-number calls."

5            They have no way to address that. Subpoenas don't

6    address that. Subpoenas don't tell us who gave us the number.

7    That's what we have to figure out, who gave us the number,

8    what's their relationship to the account holder. Those things

9    can only be done through an individualized inquiry. They

10   presented no response to that.

11           By the way, if they disbelieved anything that we said

12   in that affidavit which is 100 percent true -- I can say that

13   as a matter -- as an officer of the court -- they could have

14   called those numbers. Everybody who gave us permission to

15   disclose their personal information we disclosed it in the

16   public record. We could all -- Your Honor could call them.

17   The clerks could call them.

18           They know we're telling the truth. They know this is

19   fatal to their case. That's why they didn't call the numbers.

20   And if they thought there was an ethical concern, they could

21   have asked us. I have no problem with them calling the numbers

22   subject to proper restraints which we used such as explaining

23   who we are, et cetera, et cetera. It's all in the

24   declarations. But they are hiding from the evidence.

25           So their actual -- their attack on Mr. Keilson's

100

1   declaration being hearsay proves why the entire case falls

2   apart.  Mr. Keilson's declaration is not being introduced for

3   the truth of the matter asserted, as I've just explained.  The

4   BP codes are being introduced solely to prove the truth of what

5   somebody told Bright House in an out-of-court statement or ATS

6   four to eight years ago to hold us liable for hundreds of

7   millions of dollars, and that's not permissible.

8           As to ascertainability, I believe I already addressed

9   the 100 percent publication point.  There's just no authority

10  for that in a case like this.  It's just not true.  Maybe in

11  the case with fixed liability with the olive oil bottles that I

12  explained.

13          The point that we never asked our experts to identify

14  evidence, our experts' hourly rates are higher than our hourly

15  rates, certainly higher than our associates' hourly rates.

16  None of the things that they wanted our expert to do that we

17  did ourselves require an expert to do them.  There's no reason

18  why we would have paid our expert to do exactly what we did

19  and, frankly, what they did.

20          So as an interesting aside, we were working on the

21  kill list.  We were working on a version of that with our

22  experts until they did it for us.  When we got their report, we

23  said, oh, my gosh, they proved their own underlying assumption

24  false by excluding 35 percent of the numbers with the BPINLA

25  code, but they have proposed no way to exclude any other false

101

1  positives because they can't -- they can't do it.

2          And I want to be perfectly clear.  They say we've

3  nibbled around the edges.  We have shown that 59 percent --

4  now, extrapolating -- but 59 percent of the numbers in Group A

5  are not actual wrong numbers.  And that's based only on the

6  tools that are available to us.

7          We can't call those numbers now and reach the people

8  who held them four to eight years ago.  Sometimes we can if

9  they still have the same number, and that's what we have shown

10  in the declaration where 19 of the 21 contacts we made were

11  with people we had consent to call that they want to hold us

12  liable for.

13          But we can't do the individual -- they want us to do

14  the individualized inquiry, and I don't understand how they can

15  -- they are experienced class action lawyers -- make the

16  argument with a straight face that it's somehow our burden to

17  test the claim at the class certification stage of every person

18  in the class.  It's their burden to show that they can prove

19  liability on a classwide basis.  They have failed.  We have

20  gone above and beyond that with far more evidence than was at

21  issue in *Tillman*, far more, and shown that that can't be done.

22          And, by the way, on the point of *Tillman*, there are

23  numerous arguments in this case and reasons why we win that

24  were not at issue in *Tillman*.  I'm not going to go through them

25  all because I already did.  One thing I will say is on the

102

1    point of a handwritten note that is far more reliable at

2    documenting what actually occurred on a conversation than a

3    drop-down list with 20 options for an infinite number of

4    scenarios, especially when there was no written instruction --

5    this is a fact in the record -- no written instruction about

6    how those codes were to be used.

7            This is an important point too.  We actually produced

8    to Your Honor recordings of calls that were coded BPINLA

9    showing people speaking Spanish, not saying wrong number,

10   showing instances where a live agent reached a voicemail.

11   They're like, What do I do?  No code for that.  Wrong number.

12           So, you know, the idea that we've nibbled around the

13   edges is just preposterous and it's false.  We have proven with

14   seven or eight sources of evidence, declarations from multiple

15   different persons, actual calls to the class and analysis of

16   post-disconnect calls.  We pulled account notes for that sample

17   and proved that the number was provided to Bright House after

18   the BPINLA code.  And this is all after the kill list.  So this

19   is all after his expert supposedly fixed the problem.  All the

20   evidence that we mustered is all after he fixed the problem.

21   And, again, some of that was attached to our *Daubert* motion

22   which must be considered alongside our class certification

23   motion, under binding Eleventh Circuit authority is of no

24   consequence, especially given the litigation by ambush here.

25           Our client has spent a lot of money in this case

103

1   defending against claims that, frankly, are not legitimate.

2   And, you know, we've done everything we can; and we made sure

3   to do more than what we could in *Tillman*.  And if Your Honor

4   has any doubts or any questions, I'm happy to answer any

5   question that you have.

6          THE COURT:  I have a question with regard to your --

7   I think what you are just calling a *Daubert* motion.  I think

8   the motion is captioned a motion to exclude the expert's

9   testimony.  Seems to me there's a difference between excluding

10  the testimony and considering the testimony or finding it to be

11  unreliable.  And the difference may be because you've got a

12  bench -- essentially a mini bench trial on the issue of

13  certification.

14         So I guess my question is do you see any substantial

15  difference in the Court considering the testimony and

16  concluding it's unreliable as opposed to what I think your

17  relief requested of exclusion was?

18         MR. WATSTEIN:  So here's our position on that.  The

19  easiest and probably most appropriate course for the Court to

20  take would be to deny class certification and deny the *Daubert*

21  motion as moot.  Of course, if the Court is considering

22  certifying the class, it has to consider the *Daubert* motion

23  since the entire class motion rests on the *Daubert* motion.

24         THE COURT:  Right.

25         MR. WATSTEIN:  We think, though, that we -- and we

104

1    did a lot of research.  We put a lot of time and effort into

2    the *Daubert* motion.  We couldn't even come up with authority

3    where somebody did what they did, what their expert did.

4         They're correct that the expert is not required to be

5    a hundred percent perfect.  But their expert was paid tens of

6    thousands of dollars to opine facts into existence and labeled

7    it true to a high degree of scientific certainty.

8         That is beyond the pale.  We've proven -- we've

9    proven him wrong 59 percent of the time based only on a minimal

10   set of evidence.  So we would contend that the proper remedy in

11   this case is, in fact, exclusion.  And there have been -- you

12   know, there was a recent case out of the Third Circuit.  It was

13   a TCPA case, the *Dominguez* case.  It was, I believe, an appeal

14   from the grant of summary judgment.  They affirmed summary

15   judgment.  It was on the automatic telephone dialing system

16   issue.

17        But several of the Plaintiff's experts tendered this

18   expert opinion about the functionality of the system, and the

19   court excluded.  The Third Circuit affirmed the exclusion and

20   said you can't just make up what you think it does.  You have

21   to examine it.  You have to have a factual basis.

22        Here he didn't have a factual basis.  He never --

23   they never asked what any of the codes meant.  Without doing

24   that minimal amount of work, they cannot tender an expert to

25   come in and say to a high degree of scientific certainty you

105

1   have to hold them liable for 300 million dollars of liability

2   even though the Defendants have proven with limited evidence

3   that I'm wrong 60 percent of the time and even though I didn't

4   confirm that a single call in Group A was actually made without

5   consent.

6           THE COURT:  All right.

7           MR. KEOGH:  Your Honor, if I may since it's our

8   motion, I think we should have the last word.

9           THE COURT:  You do, eh?

10          MR. KEOGH:  Well, I would like to address some

11  issues.

12          THE COURT:  I may not be done with the other guys, so

13  have a seat.

14          Mr. Watstein, I do have another question.  With

15  regard to the subpoenas, the proposed subpoenas to carriers, as

16  I noted before, there seems to be a conflict as to whether it's

17  a relatively simple matter given computers today or something

18  that can't really be done.

19          MR. WATSTEIN:  Right.

20          THE COURT:  I don't know what side of that you weigh

21  in on.  Is that still your position that it just can't be done?

22          MR. WATSTEIN:  So it is -- so this is -- let me

23  unpack this.  Subpoenas, the only thing that subpoenas are

24  meant to address in this case is their new exclusion of -- or

25  limitation of class members and subscribers.  They want to send

106

1   out subpoenas to identify historic subscribers, which, of

2   course, tells us -- the fundamental problem is it tells us

3   absolutely nothing about how we obtained the number and whether

4   we had consent to call it.  A subpoena to a subscriber doesn't

5   answer that question.

6          In none of the -- in none of the instances that we

7   have demonstrated with evidence of people, you know, through

8   the affidavit of Mr. Keilson, in none of those cases would a

9   subpoena even if it did identify the subscriber accomplish

10  anything.  It wouldn't exclude a class member who we had

11  consent to call because class members -- there's several people

12  who we identified in a sample of just 21 people we made contact

13  with who they didn't subscribe to the phone number.  They used

14  the phone number, just like I used a phone number that my

15  father subscribes to.  So identifying a subscriber does

16  absolutely nothing to resolve the issue of consent.

17         Let me answer your question directly --

18         THE COURT:  I was going to say that's not my question

19  so far, but go ahead.

20         MR. WATSTEIN:  -- because I think it can be done.

21         Carriers can identify some subscriber information,

22  yes.  Our declarations say that.  There is a huge amount of

23  subscriber information that they cannot identify.  They almost

24  never can identify user information.  We identified the

25  carriers as witnesses.

107

1          THE COURT:  Let me stop you.

2          Is the short answer to my question, yes, they can do

3     it, but it's not going to be successful in giving you the

4     information that they claim?

5          MR. WATSTEIN:  That's correct, with the additional

6     caveat that they bear the burden of proving with evidence that

7     what they want to do in this case, not in *Keim* or whatever

8     other case can be done, in this case, and they haven't done

9     that.  They didn't even put in a declaration of counsel.  They

10    cited to a case -- and, by the way, the cases that they cite to

11    are either -- for the large part are completely settlement

12    cases.

13         These cases, you know, will often settle on a

14    classwide basis for a fraction, a fraction of the total amount

15    of liability.  And as part of that, the Defendant recognizes

16    that it's not going to be perfect.

17         But what do they care?  They bought a release for the

18    entire class.  We want the release as broad as possible.  We

19    want to pay the class members as little as possible.  That's

20    what happens in these cases.

21         But you know who benefits?

22         Class counsel benefits.  And that's why the argument

23    about we had to be compensated, you know, is a farce because

24    that's a risk you take.

25         THE COURT:  You are getting pretty far afield.  Let

108

1    me come back to my subpoena.

2              MR. WATSTEIN:  I understand.

3              THE COURT:  Am I right that technically the carriers

4    can do what Plaintiffs say?

5              And if the answer is yes, then I understand your

6    argument that it doesn't matter because what they are doing

7    isn't going to help further Plaintiff's position.

8              MR. WATSTEIN:  Right.  So they can do some of what --

9    they can identify some subscribers.  They can't identify any

10   prepaid subscribers.  And prepaid is very important in a case

11   like this because these are debt collection calls.  As our

12   experts testified, in the debt collection context the number of

13   people who have prepaid plans is enormous.  And, also, we have

14   testimony from the carriers that this case has a very historic

15   class period.  We don't have a --

16             THE COURT:  Has a very what?

17             MR. WATSTEIN:  Historic class period.  It would be

18   different if the class period went back four years from today,

19   but it doesn't.

20             So the short answer is they can obtain some of it.

21   They can't obtain all of it, but they can obtain what they need

22   in order to resolve the individualized issues.

23             THE COURT:  All right.

24             MR. WATSTEIN:  Thank you, Your Honor.

25             THE COURT:  Counsel?

109

1        MR. KEOGH:  Thank you, Your Honor.

2        THE COURT:  You wanted the last word.  You may have

3   it.

4        MR. KEOGH:  I apologize for the way I said that, Your

5   Honor.

6        THE COURT:  That's not a problem.

7        MR. KEOGH:  There's a lot to unpack there.  I guess

8   if name caller and righteous indignation rule the day we would

9   lose.  But let's look at what was actually said and what the

10  facts are.

11       Counsel said we have no evidence showing we could

12  subpoena the carriers.  Mr. Biggerstaff's report lists this in

13  there that you can subpoena the carriers for this information.

14  That's attached to our class motion.  We also submitted the

15  affidavit, what is used in *Johnson vs. Yahoo*, which is not a

16  settlement.

17       So, you know, the fact that we said, yes, we can

18  produce orders as recently as a couple weeks ago from the same

19  carriers is just additional information we brought the Court.

20  But our moving papers filed last August or October, whatever it

21  was, had that information on there.

22       You know, when counsel got up here and said that I

23  was lying about what I told you and I pointed out that he told

24  you that Exhibit 2 these people provided their phone numbers,

25  these work orders, and there's ten sheets, and I pointed out

110

1    that none of the phone number spots next to the name included
2    the phone number, they still don't.
3              What he's talking about is what he says that I lied
4    is one work order in a location spot scribbles down the phone
5    number.  It doesn't say whose handwriting.  It's not where the
6    person's signing.  So I don't understand the point.  And it
7    clearly doesn't refute what I said that none of these where
8    people signed did they write their own phone number.
9              So, you know, it's a constant chugging.  Every time
10   we get up and say something it runs away that way.
11             Along that line, I am very surprised counsel just
12   told you that he was contacting class members, that he was the
13   one on the calls for the affidavit that don't bear his
14   signature when you need Court permission to contact class
15   members.  You know, there's a handful of outlier cases; but
16   most say if you are going to contact class members, whether
17   it's Plaintiff or Defendant, they want it in writing and they
18   -- you need to seek relief of it.
19             THE COURT:  I don't think he said he contacted them.
20   He said he was in the room.
21             MR. KEOGH:  Well, the declaration states that the
22   person signing it said that some of the calls he participated
23   in.  So if it wasn't the person signing that declaration, he is
24   in the room.  Either way, we don't think that's appropriate.
25             But we also make a point that we could have done it

111

1  too.  Well, one, we wouldn't have done it without asking the

2  Court to do it.  But I don't know how we would have when this

3  was filed not in response to class certification as part of a

4  *Daubert* motion and their exhibit doesn't include any phone

5  numbers and has anonymous accounts.

6         What are we supposed to do with that?

7         We have the last four digits of a phone number.  We

8  couldn't test this if we wanted to.  So I don't understand what

9  he is saying -- I guess we could have asked them for the

10 underlying information or asked the Court, but that's besides

11 the point.

12        And out of this, he's saying 59 percent of the class

13 is wrong.  I don't know how he is doing the math.  But that's

14 not what the declaration states.  The math doesn't work out for

15 a handful of people who say they're customers.

16        But one thing that's very clear is he said the

17 declarations state that some of these people said they were

18 just the user of the phone; it wasn't their phone number.  That

19 is not in this declaration.  It says that some people were

20 customers and they don't remember getting the calls.  But it

21 doesn't say they weren't the user and they are just using the

22 phone number.

23        But in any event, we submit that even if they did,

24 they are living at the edge.  If they sign some work order,

25 it's going to be in the carrier information.  It's going to

112

1 come back, and it's going to show whether, you know -- this is

2 cable service. That's cable service to a home. And this is

3 not some random debt where somebody moves around. If the

4 subscriber or users live on that property and that's just their

5 customer records, then that'll be an exclusion. If their name

6 or last name matches, that'll be an exclusion.

7 Also, I think counsel may have misheard me. I

8 pointed out that the distinction between subscriber and user,

9 you know, might not even be applicable to 90 percent. So not

10 that 90 percent would be excluded, but it might not even apply,

11 that there's no evidence besides hypotheticals that a single

12 one of these people is on a multi-use plan. Every 9,407 could

13 be an individual plan.

14 But we are addressing their hypothetical argument

15 saying, well, if it does we can remove it, you know, anybody

16 who matches an address. So I wasn't saying you exclude them.

17 Also, two is the Court always has the power to

18 decertify. And if it turns out that this is not a feasible

19 method, the Court can always revisit class certification.

20 And along those lines is, you know, counsel keeps on

21 mentioning hundreds of millions, 300 million dollars. The

22 class is 9,407 people we are seeking for 47,000 calls. If you

23 do the math, it's 23 million dollars, still a significant

24 amount of money. But those hundreds of millions,

25 300-million-dollar figures are -- even if you treble the

113

1   amount, they're not even close.

2           And, also, you know, they spent a lot of time saying

3   that we are the victim.  You know, the last comment is even

4   this claim is not legitimate.  There is no dispute that

5   Plaintiff has a valid TCPA claim.  They made a pre-recorded

6   call to his cellular telephone.  He told them to stop calling.

7   The records show 14 notations of bad phone numbers he has

8   contacted.  They kept on calling him.  And now to say that's

9   not even legitimate, you know, clearly this impassioned plea

10  is, you know, divorced from the facts of reality.

11          It's their system here who it's designed where ATS

12  takes notation.  They have a drop-down menu.  And, you know,

13  counsel says we didn't ask.  We asked ATS what the codes were.

14  It was, "I don't know.  There's a drop-down menu for that."

15          We looked at the drop-down menu that's in the

16  records, and we showed it earlier when I showed it where the

17  possible bad phones are.  So we did ask the question.  I flew

18  to Dallas to ask that question, and we got the answer.  It's in

19  the drop-down menu.

20          And there's also testimony where when ATS's system

21  speaks to Bright House's system they translate that

22  information.  They don't use the same codes.  And their

23  translation for Bright House's -- Bright House's translation

24  for bad phone, incorrect, live answer is the incorrect number.

25          So there is testimony for that.  Counsel said there's

114

1    not.  He said I lied to you.  I would be happy to supplement

2    and show you that testimony because clearly ATS and Bright

3    House have different codes for the same call, and they're made

4    by ATS.  The only way for them to do that is by the systems

5    translating that.

6            But it almost doesn't matter because they don't look

7    at them.  He is even telling you they don't look at them.  They

8    just keep on submitting it, and it's a merry-go-round like the

9    Plaintiff found, 31-something calls, 14 asking them to stop

10   calling him.  And those are the victims.

11           And along that line, you asked Mr. Penn what happens

12   to the class if you don't certify.  He told you everyone can

13   file their own lawsuit.  Well, that may be.  But no one else

14   can bring a class because that statute has run under the

15   Supreme Court law, and those 9,407 people have yet to sue.  So

16   it's unlikely they will because if they don't have notice of

17   this class they don't have notice of the claims or their

18   rights.

19           So if you don't certify, what happens is Defendants

20   get away scot-free, that, as you know, there's people suing

21   Bright House in other cases too.  Maybe they have a large

22   number of calls.  The average number of calls after a wrong

23   number as we said is five.  And I don't know -- I'm sure

24   someone sued for five calls, but they would be in the minority.

25           Counsel mentioned also the only time a declaration is

115

1    allowed is for some kind of palm oil/olive case or something
2    like that, some slack-fill case.  That's not true.  The Third
3    Circuit which used to have the most stringent ascertainability
4    requirements which is what the Eleventh Circuit relied upon in
5    its case, the unpublished case, now has the *Citywide BMW* case.
6    And the *Citywide BMW* case was not a slack-fill case.  And
7    that's when the Third Circuit decided you can use declarations
8    of class members when they are associated with records like we
9    have here.  This is not a situation where the Third Circuit
10   said come all, anybody who, you know, signed a declaration
11   without any other evidence.
12          Here we already have the other evidence.  We have the
13   notations of wrong number.  We have the calls after wrong
14   number.  We have the carrier saying there's no match or match
15   and so there's exclusion.  So once we boil it down to there,
16   there is no due process concerns regarding declaration.
17          And that's what, you know, the Court in *Reyes* and the
18   other courts that dealt with a lot of those wrong numbers --
19   and this kind of ties into the admissibility of the business
20   records -- is even assuming the wrong number is not
21   demonstrative of wrong number -- let's assume they are ripe for
22   that -- that's just creating the universe to send notice out.
23   And then it's up to us to show that they are not customers, and
24   that's what a trial is for.
25          Really what they are telling you is not only do we

116

1    need -- we need to basically win trial now, that we need to

2    prove our case and put on a trial that every single one of

3    these people wins.  Well, that's not what class certification

4    is.

5           That also goes into your question regarding

6    admissibility for class certification at trial.  They are

7    different.  Counsel mentioned the Ninth Circuit case that said

8    you don't need to have something to be admissible to be

9    considered for class certification.  Then he threw in a

10   gratuitous statement at the end, "if it can be used at trial."

11          That case doesn't hold that.  That's an add-on that's

12   an argument that makes it sound like the case held.  It

13   doesn't.  There's a different standard for admissibility

14   between certification and trial.

15          Once again, we think they are business records.  And

16   whether they are, you know, right or creating the universe or

17   not is, you know, a different issue.

18          The Texas bull's-eye analogy that Mr. Penn made

19   regarding the retainer agreement --

20          THE COURT:  I had never heard that before.  I liked

21   it.

22          MR. KEOGH:  I never heard it either, but I like it as

23   well.  Of course, he is from Chicago.  But, you know, it works.

24          THE COURT:  With your permission, I may use that

25   sometime.

117

1          MR. PENN:  Anytime.

2          THE COURT:  Go ahead.

3          MR. KEOGH:  The thing that counsel presumably knows

4     is we deal with a lot of class fee-shifting cases.  We have

5     pending class actions under the Fair Credit Reporting Act,

6     under FDCPA, under the Fair Debt Collection Practice Act.  All

7     these class claims are fee shifting.

8          So I guess to the extent there is -- it's not as

9     precise as it should have been, that's why because the

10    agreement we have, the language is the same for, you know --

11    was the same anyway; we changed it -- for the FCRA Complaint as

12    it was for the TCPA Complaint.  That's why when I said it was

13    in there for a fee shifting it's accurate, and that's why it

14    applies to the fee-shifting claim.  So there was no Texas

15    bull's-eye going on here.

16         I guess, finally on that point, is counsel said if

17    the Plaintiff wanted to change venue or the Plaintiff wanted to

18    fire us he couldn't.  That provision has nothing to do with

19    that.  The Plaintiff can fire us and will owe us our fees to

20    date.  That's only if he takes an individual settlement against

21    our advice is that kicked in.

22         If the client fires us today or even before we

23    amended the authorization, then, you know, I guess under

24    Florida law we are only allowed the quantum meruit, if that.

25    So that provision wouldn't apply.  So I think that was, you

118

1    know, spoken out of turn.

2          So, once again, the only way that any class member is

3    going to get relief is if the Court certifies a class.  And we

4    put forth, you know, an administratively feasible plan to do

5    that just like we have done -- just like our expert testified

6    in his report, they can find the curators to the information.

7    And if there's still any doubts, you can use a declaration.

8          That's why, you know, we think that Mr. Biggerstaff's

9    report is valid.  It's been used by courts across the

10   country -- his procedures and methods I should say.  And the

11   Court should certify the class.

12         And I have nothing else unless the Court has

13   additional questions.

14         THE COURT:  One question.  Do you know what the

15   docket number is for your expert's report?

16         MR. KEOGH:  I think I have a sealed copy, Your Honor.

17   It doesn't have a docket on there.

18         THE COURT:  Okay.  I can find it, but I was looking

19   for an easy way.

20         MR. KEOGH:  No.  Unfortunately, everything in this

21   case has been under seal, so I have none.

22         MR. WATSTEIN:  Your Honor, I think it's Docket Entry

23   152-1.

24         THE COURT:  152-1.  Thank you.

25         MR. KEOGH:  It's Exhibit 1 to the motion.

119

1           THE COURT:  All right.  That'll help.

2           And, Mr. Watstein, the exhibit -- the notebook that

3 we've introduced as your exhibit, do you have an extra copy of

4 one?

5           MR. WATSTEIN:  We do.  I just -- I would have to

6 check to see if we have one without attorney notes on it.

7           THE COURT:  Yeah.  That's --

8           MR. WATSTEIN:  We can overnight one, though.  I mean,

9 that's not a problem.

10           THE COURT:  I'd like to have one that I can mess up,

11 make notes and stuff on as well as one for the record that

12 obviously doesn't have anybody's notes on it.  So if you could

13 file or provide a clean copy, I'd appreciate it.  And I'll just

14 work on this one.

15           MR. WATSTEIN:  Sure.  We can do that.  Yeah, we can

16 overnight it.

17           THE COURT:  That works.

18           MR. WATSTEIN:  We may need to seal some of the things

19 that we have submitted because there's customer information.

20 So I assume we could just file a motion.  I guess what I would

21 ask is that that not be -- it's already in the record, so I'd

22 ask that it not be put into the docket without us having an

23 opportunity to move to seal portions of it, if that makes

24 sense.

25           THE COURT:  I will let you do that.  But let me tell

120

1    you I am -- I'm trying to think of the right word.  I am not

2    disposed to seal everything like this case has had done even

3    though I suspect I may have signed some of those orders.  I do

4    not intend my order -- my opinion and order to be sealed.  My

5    sense is way more stuff is sealed in this case than need be,

6    and I believe there should be public access.

7            Now, having said that, like I said, I do not intend

8    to seal my opinion and order on this case.  But I will allow

9    this to be -- this meaning your exhibit -- to be filed with a

10   motion to seal.  But that's just my predilection, I guess, for

11   whatever it's worth.

12           MR. WATSTEIN:  Understood, Your Honor.  We agree.  I

13   think that was, you know, maybe some things were sealed that

14   didn't necessarily need to be just because it was maybe easier

15   than redacting whole portions.  But, anyway, we understand the

16   point.

17           THE COURT:  All right.

18           MR. WATSTEIN:  Are you done, or would you like me

19   to --

20           THE COURT:  I'm done.

21           MR. WATSTEIN:  Okay.  You don't want to hear from me

22   again?

23           THE COURT:  Not really.

24           MR. WATSTEIN:  I get it.

25           THE COURT:  I mean, don't take it personal.

121

1          MR. WATSTEIN:  I don't take it personal.

2          THE COURT:  Thank you.

3          I know we had a hard time getting the time together

4   for closing arguments -- oral arguments.  And this is a case --

5   I don't usually set cases for oral arguments, but I felt I

6   needed it and they would be helpful, and they were.

7          So I thank all of you.

8          MR. WATSTEIN:  Thank you, Your Honor.

9          MR. KEOGH:  Thank you, Your Honor.

10          THE COURT:  And we will be in recess.

11          (Proceedings adjourned at 12:25 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

122

1                          C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    MIDDLE DISTRICT OF FLORIDA:

5

6            I hereby certify that the foregoing pages, 1 through

7    121, are a true and correct copy of the proceedings in the case

8    aforesaid.

9            This the 22nd day of September, 2024.

10

11

12

13            /s/ Susan C. Baker

14            Susan C. Baker, RMR, CRR
              Court Reporter
15

16

17

18

19

20

21

22

23

24

25