1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
3                          EASTERN DIVISION

4    RASHAD WALSTON on behalf of himself and )
     all others similarly situated,          ) Case No. 24 C 83
5                                            )
                      Plaintiff,             )
6                                            )
              vs.                            )
7                                            )
     NATIONAL RETAIL SOLUTIONS, INC., doing  ) Chicago, Illinois
8    business as NRS Pay,                    ) October 16, 2024
                                             ) 2:04 P.M.
9                     Defendant.             )

10        TRANSCRIPT OF PROCEEDINGS - In-Person Motion Hearing
        BEFORE THE HONORABLE JEFFREY T. GILBERT, Magistrate Judge
11
     APPEARANCES:
12
     For the Plaintiff:         GLAPION LAW FIRM
13                              1704 Maxwell Drive
                                Wall, New Jersey  07719
14                              BY:  MR. JEREMY GLAPION

15                              JEFFREY GRANT BROWN, P.C.
                                65 West Jackson Boulevard
16                              Suite 107
                                Chicago, Illinois  60604
17                              BY:  MR. JEFFREY GRANT BROWN

18   For the Defendant:         WATSTEIN TEREPKA LLP
                                1055 Howell Mill Road
19                              8th Floor
                                Atlanta, Georgia  30318
20                              BY:  MR. RYAN D. WATSTEIN

21

22                  PAMELA S. WARREN, CSR, RPR
                    Official Court Reporter - Retired
23                  23869 N. High Ridge Drive
                    Lake Zurich, Illinois   60047
24                       312.823.0001

25
     NOTE:  Please notify of correct speaker identification.

```
 1        (Proceedings held in open court:)
 2             THE CLERK:  24 C 83, Walston versus National Retail
 3   Solutions, Incorporated.
 4             THE COURT:  Okay.  Good afternoon, everybody.  Let's
 5   get appearances of counsel.  First for the plaintiffs.
 6             MR. GLAPION:  Jeremy Glapion on behalf of plaintiffs.
 7   Thank you, your Honor.
 8             MR. BROWN:  And I'm Jeff Brown acting as local
 9   counsel, Judge.
10             THE COURT:  Okay.  Good to see you.
11             MR. WATSTEIN:  And good afternoon, your Honor.  Ryan
12   Watstein for defendant NRS.
13             THE COURT:  Great.  Okay.  Thanks for all of you for
14   being here.  I thought this deserved an in-person hearing.
15             Mr. Watstein, can you do me a huge favor and push
16   this -- or, Brenda, why don't you --
17             MR. WATSTEIN:  I got it.
18             THE COURT:  You got it?
19             THE CLERK:  The microphone.
20             MR. WATSTEIN:  Push it down so it is not in --
21             THE COURT:  In your face.
22             MR. WATSTEIN:  -- direct line of sight?
23             THE CLERK:  Thank you.
24             THE COURT:  Okay.  Let me get some stuff out of the
25   way first.  I have the motion -- plaintiff's motion, emergency
```

1   motion for protective order. I have got defendant's motion for

2   oral argument. And then I have the plaintiff's motion to

3   compel.

4        First, on the motion for oral argument, I'm going to

5   grant the motion in part and deny it, Mr. Watstein. I'm going

6   to grant it to the extent that I am very happy to have you

7   respond to my questions and argue in response to my questions.

8   I don't need a 15- or 20-minute presentation on the motion to

9   compel. I have read the motion to compel. I have read the

10   opposition. I have read the reply several times. So I don't

11   need a prepared or any unprepared oral argument on it. Okay?

12        But I'm granting it so that we'll have some oral

13   argument here. I'll ask them questions, I'll ask you

14   questions. But I don't need a formal presentation of oral

15   argument.

16        MR. WATSTEIN: Thank you, your Honor.

17        THE COURT: Understood?

18        MR. WATSTEIN: I wasn't going to waste your time with

19   that anyways.

20        THE COURT: Okay. Well, I mean, sometimes the judge

21   gets on and hasn't read the papers, right? I mean, I practiced

22   law too. But I -- I read the papers.

23        MR. WATSTEIN: We knew coming in that you likely would

24   and took that risk, I guess.

25        THE COURT: Okay.

1        Secondly, on plaintiff's emergency motion for

2   protective order, I'm going to deny it.  And here -- I was

3   going to deny it before I started getting bombarded by

4   Mr. Watstein with other stuff that was coming in.  All right?

5   And, frankly, I haven't read the draft defendant's motion to

6   deny class certification that came with the last -- the last

7   email.

8        But here's why.  Here's why I'm denying the motion for

9   protective order.  The -- the issue is whether a class should

10  be certified in this case or not.  Filings on -- on a motion

11  such as that should be in the public record.  I mean that's

12  quintessentially something that should be in the public record.

13  Putative class members should be able to see what's filed.

14  People on other cases should be able to see what's filed.

15       In this particular case from what I glean from

16  everything that has been filed of record, which is all -- I

17  mean there is a lot of stuff that's already in the public

18  record about defendant's allegations or challenges to the

19  adequacy of plaintiff's counsel to represent a class.  That's a

20  fair issue for a defendant to raise.  That is one of the

21  requirements of a -- of class cert.  But that all should be

22  played out in the public record.

23       And seems to me that if defendant wants to raise

24  issues with respect to the engagement letter between counsel

25  and the named plaintiff or other issues, he can raise them.

1    You're going to respond to them.  It all should be in the

2    record.  And then the Court's decision on that will be in the

3    record as well.

4            And our circuit is pretty clear that matters that

5    are -- that a Court considers in making a dispositive ruling

6    should not be sealed, should be in the record.  The Seventh

7    Circuit, Judge Easterbrook and formerly Judge Posner, were

8    really, really clear on that.

9            So I think that for those reasons I'm going to deny

10   the motion for protective order.  Not because I think the

11   issues that are being raised by the defendant are valid, not

12   because I think they will necessarily result in plaintiff -- a

13   class not being certified or something like that, but just

14   because that's -- those are matters that should be in the

15   public record.  So that's my ruling on that.

16           MR. GLAPION:  Thank you, your Honor.

17           THE COURT:  And I will note though that fact discovery

18   in this case I think doesn't close until December 13th, 2024.

19   The culture in our district, Mr. Watstein, is that usually

20   dispositive motions are not dealt with until fact discovery is

21   concluded.

22           So, you know, I don't know where you are in the

23   discovery process necessarily, but it would seem to me that a

24   motion to -- you know, a motion to, quote, deny class

25   certification is almost a response to a motion for class

1    certification, which I don't think has been filed yet.

2          Right, Mr. Brown?

3          MR. BROWN:  Correct.

4          THE COURT:  You need to have the mic near you.

5          MR. BROWN:  Sorry, Judge.  Correct.

6          THE COURT:  So, you know, I don't know that Judge

7    Harjani is going to take this in the normal -- in the normal

8    course now, you know, and have it briefed with them having to

9    respond to you and say, no, class should be certified.  And

10   then they only get one brief on class certification.

11         MR. WATSTEIN:  Yes, your Honor.  If I may, every time

12   that I have raised an affirmative issue or --

13   affirmative -- every time I have raised a Rule 23 issue

14   affirmatively, I always get the same reaction as I just got

15   from your Honor.  And the response that I always get is, we are

16   always practical about how we tee up Rule 23 issues.  We would

17   never file a motion, for example, asking a Court to rule on a

18   predominance issue before sufficient discovery had played out

19   for the Court to rule on that issue.

20         So for something like that, it is usually correct that

21   the plaintiff files a motion for class certification.  The

22   defendant responds.  The plaintiff replies.  Then the Court

23   rules on it.

24         This is a discrete issue that is already -- it will

25   never be any riper than it is right now.  And our client is

1  incurring 75, 100 thousand dollars of expense every month.  And

2  so I would not be doing my job if I didn't raise that issue,

3  which, again, it is not going to become more developed as

4  discovery goes forward.  We -- all the discovery on that issue

5  has already occurred.

6        I would be, you know -- I would not be doing my job if

7  I wasn't going to raise that now.  So it is not -- it is not

8  your typical, you know, we expect them to raise all their

9  class -- we could have called this motion something else.

10       THE COURT:  Yeah.  Yeah, yeah.  I hear you.  Look,

11  let's be clear, I'm ruling only on the motion for protective

12  order, which was filed in front of Judge Harjani.  He viewed it

13  as a discovery matter.  He kicked it to me.  I have ruled on

14  it.

15       Whether or not he's going to allow you to file this

16  motion to deny class certification or not is very much in front

17  of him.  And I think he realizes that would be in front of him

18  because it is his motion.  Ultimately it is his decision as to

19  whether class should be certified or not.

20       So, you know, whatever you want to do with this is

21  fine, and he will -- and he will --

22       MR. WATSTEIN:  Sure.

23       THE COURT:  -- either accept briefs now on it or not.

24  But that's going to be in front of him.

25       MR. WATSTEIN:  Yeah.

1          THE COURT:  My sole input on this is to deny the

2     motion for protective order.  I have done that.  It is back in

3     his court.

4          MR. WATSTEIN:  If I may say one thing about the

5     protective order issue, your Honor.

6          THE COURT:  Uh-huh.

7          MR. WATSTEIN:  I just want the Court to know that the

8     only reason why we filed the surreply today is last week I am

9     getting ready to take my four year old on a daddy-daughter

10    date.  I get this scathing, scathing attack on me personally

11    that's totally unrelated to anything in this case, totally

12    unrelated to the request to seal, and it is filled with

13    falsehoods.

14         And that's why we filed the surreply today to say,

15    look, none of this has anything to do with this motion to seal,

16    but we need to take the temperature down.  We -- when we were

17    in front of your Honor the first time on a -- reaching a

18    scheduling issue, you noted to plaintiff's counsel, you seem to

19    be baiting defendants with unnecessarily argumentative

20    characterizations of their discovery.  That has gone to a

21    complete extreme.  There is eight references to Mr. Watstein,

22    that's me, and my alleged conduct in other cases.

23         We filed the surreply to say look, none of this is

24    relevant.  But also, it is literally made up.  We can't

25    continue the litigation like that.  We -- we have not done

1   anything improper in this case.  We have not attacked anyone.

2   We are filing a motion on an element that plaintiff bears the

3   burden to prove under Rule 23.

4        The fact that that has engendered such a -- such

5   animosity in response is just not appropriate.  And frankly, I

6   don't want to spend my weekends with my daughter up all night

7   about why my character was attacked having to file a surreply

8   at the last minute.

9        I just think it is unnecessary.  And so I just wanted

10  to say that for the Court.  I hope that we can focus on the

11  issues in the case instead of unnecessary totally gratuitous

12  attacks.

13       THE COURT:  Well, look, number one, thanks for

14  bringing to my attention that you filed today, October 16th, a

15  motion for leave to file surreply to plaintiff's emergency

16  motion for protective order.  I wasn't aware of that until you

17  just brought it up.  I'm going to deny the motion to file

18  surreply, number one.  I have already denied the motion for

19  protective order.  So I don't need to see this.

20       Number two, counsel in this case are locked in a

21  mudslinging contest that is in my experience -- you know, if

22  there is a -- if there is a range of 1 to 10 on mudslinging,

23  with 10 being most mudslinging and one being least, I mean,

24  you're at least an 8.  So I think, you know, the mud is

25  going -- mud is going both ways.

1         But I'm sorry that you -- your weekend was taken up

2 doing this. But I'm not -- I don't know that it was terribly

3 necessary to rise to that -- to rise to that catalyst.

4         But, in any event, I don't need to go through that.

5 I'm going to deny the motion for leave to file the surreply.

6 My ruling will be what it is on the motion for protective

7 order.

8         And we're going to move to the motion to compel, which

9 is plaintiff's motion. And, you know, I -- rather than you

10 guys -- this courtroom is -- or well, I'll let you stand there.

11 Why should you have to sit at the same table since you throw

12 mud at each other. Okay.

13         MR. GLAPION: I would sit -- come sit up there if it

14 easier for the Court.

15         THE COURT: Well --

16         MR. GLAPION: Mr. Watstein and I have worked

17 together --

18         THE COURT: Yeah.

19         MR. GLAPION: We have worked together in previous

20 cases with much --

21         THE COURT: Oh, okay.

22         MR. GLAPION: -- with much less mudslinging.

23         THE COURT: Why don't you both come up to the first

24 table here. Get -- only because it is easier for me to see you

25 and there is still -- you could share a mic on the plaintiff's

1  side and the defendant's side.  I know the court- -- this

2  courtroom particularly is set up --

3         Mr. Brown, there is another seat for you on the end

4  there if you want to sit there.

5         This courtroom is set up poorly for that kind of

6  thing.  I have tried cases in here.  It actually works fine.

7  It is just a little bit different.

8         And I happen to like the fact that it has windows as

9  opposed to all the other courtrooms in the building that don't

10 have windows because we can see the lake.

11        So -- anyway, let's go to the motion to compel.  I

12 read defendant's supplement in opposition to plaintiff's motion

13 to compel, which was a little bit more of an aggressive

14 response to my order that said, you know, tell me what your

15 proposed stipulation is.

16        I'm not -- I don't know that I completely understand

17 it.  But I have a couple of questions.

18        And, Mr. Watstein, I see you're proposing to stipulate

19 to numerosity.  I mean, first, let me -- I think it is

20 Mr. Glapion who is arguing this, right?

21        MR. GLAPION:  Yes, your Honor.

22        THE COURT:  Does his proposal to stipulate to

23 numerosity moot your request for unredacted phone numbers of

24 class members?

25        MR. GLAPION:  No.

1        THE COURT:  Why?

2        MR. GLAPION:  A few reasons.  And if you can give me a

3    few minutes or if you want to jump in with questions.  I think

4    the first thing -- the stipulation is the first time I have

5    actually seen the language of any sort of proposed stipulation.

6    They will point out -- or Mr. Watstein will point out, you

7    know, I rejected their previous proffer of this.

8        But even in that context, my understanding was that

9    the stipulation would be these are the telephone numbers that

10    we provided to VoiceLogic.  These are the telephone numbers

11    that were called.  Of those approximately X number of those are

12    cell phone numbers.

13        I think the mere unanimity of the case law is that

14    I -- even in -- if there was a we don't contest numerosity, I

15    still have an affirmative obligation to tell the Court that

16    numerosity is met and here's why.

17        So even if it is not contested, I still have to give

18    an estimate.  I still have to say, you know, of the 7,000

19    numbers on the list, 5,000 are phone numbers, 3,000 are phone

20    numbers, something along those lines.

21        So simply saying, you know, we stipulate to numerosity

22    doesn't do anything.  What are they stipulating based on?

23        THE COURT:  Let me interrupt you here.  Number one, if

24    you are ever -- I didn't have a court reporter here today, but

25    the proceeding is recorded -- being recorded so you can get a

1    transcript of it.  So I advise both sides, and me included -- I

2    should take my own advice -- to speak slowly if you can.

3            MR. GLAPION:  I'm a fast talker.  I apologize.

4            THE COURT:  Yeah.  You're speaking like a train racing

5    out of a -- a fire truck racing out of the firehouse.  And it

6    will be difficult to capture what you are saying.

7            Two, in your reply, you devote two paragraphs to the

8    issue of numerosity on the issue of phone numbers.  And you

9    say, the full phone numbers are indisputably relevant to

10   determining numerosity.

11           I don't really think that's true that the full phone

12   number is relevant to determining numerosity.  I think what you

13   are saying now is the actual number of calls being made to cell

14   phones is relevant to numerosity, but not the actual number

15   itself.  Right?

16           MR. GLAPION:  Sort of.  And I think -- I don't want to

17   detour too much.  I think one of the things that's relevant to

18   this case is that since the motion was filed I have amended the

19   class definition within the, this is what Judge Harjani allowed

20   on September 30th.

21           Within the class definition, as it stands now, I made

22   two key changes.  One, it was previously limited to calls

23   containing a certain key phrase; and two, it was limited to

24   telephone numbers to whom defendant sent or placed calls.

25           Receipt was always going to be an issue.  The question

1   I had in defining class at this point was:  Do I fight the

2   receipt battle on class certification or is there a way to

3   defer it until after class certification?

4        Consulting with co-counsel, consulting with other

5   attorneys in this space, the consensus was, have that battle

6   now, it is going to come up on class certification anyway.  So

7   the class definition now is people who received calls from

8   defendant.

9        The issue with -- so with respect to determining what

10   number the cell phone with that aspect of numerosity, a

11   stipulation as to the number of cell phone numbers would be

12   sufficient for that aspect of numerosity.  But that's no longer

13   a complete picture of numerosity.  Because then I have to take

14   those cell phone numbers and use the data that defendants

15   provide, that VoiceLogic provides and say, this telephone

16   number, this is a cell phone number.  So a specific telephone

17   number, a cell phone number, received a call.

18        There was -- I have asked -- after I amended this

19   definition and after your Honor ordered this hearing, I went

20   back to defendant and I said, you know, in light of the changed

21   class definition, in light of the hearing, is it possible to

22   stipulate to both aspects of that numerosity, both cell phones

23   and receipt?  Defendant expressed -- said they would ask their

24   client about stipulating to a certain designation appearing for

25   a certain number of cell phone numbers but would not concede

1    that that designation was indicative of receipt.

2         Which leads me sort of to plan Bs and plan Cs.  If I

3    can't determine receipt from the records, I need to determine

4    receipt from comparing specific calls to specific phone numbers

5    and say a certain duration.  If it was longer than the message

6    they used, it probably connected.  If it was shorter, it might

7    have been an error.

8         I need to be able to issue subpoenas to carriers to

9    say, all calls from this number produced a call log to show if

10   they have connected.

11        And while defendant might raise issues of whether

12   that, you know, is acceptable for class certification, those

13   are things that I need to be able to do to determine receipt.

14        So a stipulation as to -- if defendant was unwilling

15   to stipulate to actual number of cell phone numbers, I would

16   need the phone numbers to determine which is a cell phone

17   number.

18        Assuming they are willing to stipulate to an actual

19   number of cell phone numbers, the next question is how can I

20   prove receipt if they are not willing to stipulate to the

21   dispositions on the call logs being accurate.  And if I -- and

22   that we can't agree on that if they intend to challenge that.

23        It is sort of cabining me into one avenue of

24   determining receipt that they are going to then contest.

25        THE COURT:  Where is evidence of receipt?  Is it in

1    VoiceLogic call logs?

2           MR. GLAPION:  So since the motion to compel was filed,

3    defendant produced a voice -- three campaign reports from

4    VoiceLogic.

5           THE COURT:  And who is -- and VoiceLogic is a third

6    party, right?

7           MR. GLAPION:  They are a third-party entity in Canada

8    that defendant allegedly used for its ringless voicemail

9    services.

10          They have produced three of those call logs.  We're

11   currently going through the process, letter rogatory process.

12   It is actually going very smoothly surprisingly.  They have

13   indicated that there are around 84 more of these.

14          Now some of these may predate the class definition.

15   But I'd estimate 70 -- I'd estimate 70-plus more campaign

16   reports.

17          Within those campaign reports, there is the telephone

18   numbers, which, in what defendant produced, they redacted.

19   Which, you know, I said we'll wait for the Court to rule on it,

20   you can redact it.

21          There is a disposition field, which has six or seven

22   dispositions.  One of which voicemail is intended to indicate

23   receipt according to VoiceLogic's sort of legend for what the

24   things mean.

25          There is a date of the call, a time of the call, and

1    there is a duration of the call.

2            So my suggestion to defendant -- and I have my own

3    proposed stipulation, which I showed to defendant prior to this

4    hearing -- was to stipulate to a specific number of cell

5    phones, stipulate to a -- that the voicemail designation was

6    accurate as a determiner of receipt, and that it wouldn't

7    contest those two things later.

8            With -- if that -- if that could be done, then it

9    would in fact moot the need for the numbers, at least for the

10   class certification motion.

11           But if defendant is going to say, well, those

12   VoiceLogic dispositions are inaccurate, I have to be allowed

13   another way to show receipt or to improve the accuracy of

14   the -- those dispositions in VoiceLogic's records.

15           The two that came to mind are the ones I just

16   mentioned, comparing it to the duration, which I would need to

17   link a specific number to a specific call, or subpoenas.

18           I will say this.  The other sort of issue with not

19   having the full numbers is that when you reduce it to the last

20   four, there are a lot of telephone numbers that have the same

21   last four digits.  So when I'm going through these three

22   campaign reports, there are -- the number 0011, for example,

23   the last four, appears 12 times in their campaign reports.

24           I have no way to know if that means one number was

25   called 12 times, four numbers were called three times,

1   some -- which ones were cell phones, which calls go with which

2   cell phones.  Without the full phone number that's very

3   difficult.

4          So that -- it is sort of a -- it wasn't really briefed

5   because, you know, this sort of arose after that.  I know there

6   was talk about amendment within the briefing.  But the

7   amendment didn't change that receipt would be relevant, just

8   sort of changed the placement of that within the analysis.

9          THE COURT:  Yeah.  Mr. Watstein, what about the

10  proposal, as I understand it, to stipulate to the number of

11  cell phones that your records show were called and that the

12  voicemail designation in the VoiceLogic records shows -- is

13  sufficient to show receipt of the voicemail, ringless

14  voicemail?

15         And as I understand it from the complaint, just so I

16  am -- I think what the complaint alleges is this ringless

17  voicemail means there is some -- some technology that allows a

18  company to put a voicemail on somebody's phone without the

19  phone actually ringing, right?  Is that right?

20         MR. WATSTEIN:  That's basically correct, yeah.

21         THE COURT:  Yeah.  That's scary.

22         But putting aside -- putting that aside, what about

23  the proposal to get that information in lieu of the full phone

24  numbers that you are opposing?

25         MR. WATSTEIN:  Sure.  Thank you, your Honor.  Let me

1    start with -- let me start with the num- -- what's essentially

2    the numerosity issue.

3              THE COURT:  Uh-huh.

4              MR. WATSTEIN:  So I don't agree that a stipulation to

5    numerosity is insufficient.  But let's assume that it is.  We

6    would be willing to stipulate that there are more than

7    50 or -- I mean, the gold standard is 40.  If you have got more

8    than 40 potential class members, that's usually what's

9    considered the threshold.  We would be willing to stipulate

10   that it is more than that.

11             We'd probably be willing to stipulate to the total

12   number, but that's not necessary.  That's not necessary.  I

13   mean, that can be -- once numerosity is not contested because

14   the number of cellular phones is greater than 40 or greater

15   than, you know, double 40, 80, there is not going to be a

16   numerosity issue at the class certification stage.  Unless, of

17   course, the class definition changes again.  So --

18             THE COURT:  What about the issue of the number of the

19   cell -- number -- well, number of cell phones, you're -- is

20   equivalent to what -- number of cell phones meaning how many

21   cell phone numbers were called, right, Mr. Glapion?

22             MR. GLAPION:  Correct.  I would want to know how many

23   cell phone numbers were called for the first part of

24   numerosity.  And then obviously we need the second part.

25             THE COURT:  Okay.

1            MR. GLAPION:  Yes.

2            THE COURT:  Second part with respect to, Mr. Watstein,

3    the --

4            MR. WATSTEIN:  Receipt.

5            THE COURT:  Receipt, yeah.

6            MR. WATSTEIN:  Sure.  So, let me -- so let me say a

7    couple things with respect to receipt.  There is --

8            THE COURT:  Well, can I -- can you just answer this

9    question --

10           MR. WATSTEIN:  Sure.

11           THE COURT:  -- and then say -- like answer it and then

12   say but.

13           MR. WATSTEIN:  Sure.

14           THE COURT:  Would you be willing to stipulate that the

15   designation on the VoiceLogic call log that a voicemail was

16   left indicates that a voicemail was received?

17           MR. WATSTEIN:  No.

18           THE COURT:  Okay.  Why?

19           MR. WATSTEIN:  Well, I'll start with the most obvious

20   reason, and it is one that Mr. Glapion already knows.

21   VoiceLogic has already been deposed in U.S. litigation.  It is

22   a Canadian company.  Mr. Glapion has the transcript.

23           As he knows, VoiceLogic will say at deposition, these

24   records that say delivered, they -- they cannot tell you with

25   certainty whether on any particular occasion a message is

1    actually delivered.  So there is no way, no how that we would

2    ever stipulate to an issue that we do not think can ever be

3    resolved in a nonindividualized way.

4           And what I mean by that is, sure, if you went to every

5    single class member and you interviewed them, you deposed

6    them -- putative class member -- and you -- and they could

7    remember everything that happened four years ago and you had

8    the records, maybe then you could come up with some potential

9    evidence about whether a particular call was received or not.

10          Another thing is we know from testimony in this case

11   that NRS employees were also recipients of these ringless

12   voicemails and there were reports that would say that they were

13   delivered but they didn't actually receive them.

14          So, no, we cannot stipulate to receipt.  But what we

15   will stipulate to, and we put in our proposed stipulation, is

16   what plaintiff's counsel said he needed.  He needs a

17   nonindividualized way to show receipt.

18          So what are those ways?  Through the testimony of

19   VoiceLogic.  Well, I just said what that's probably going to

20   say.  But he can find out for himself.

21          The second way, which plaintiff's counsel has

22   proposed, is subpoenas to cellular carriers.  And we have no

23   issue with plaintiff's counsel sending -- if he thinks he can

24   send mass subpoenas to carriers and get them to answer the

25   question of whether their records can show receipt of ringless

1    voicemails, we have no problem with that.  And that's why we
2    proposed that stipulation.
3            But there is no way that he could need every phone
4    number to do that.  Because if what he is saying is I have to
5    have every phone number to analyze every record and talk to
6    every class member, that is self-defeating as to class
7    certification.  He needs a nonindividualized way, which is why
8    he proposed subpoenas to cellular carriers.  We don't object to
9    that.
10           THE COURT:  Well, how can he send subpoena -- I mean,
11   you're suggesting a theoretical subpoena to a cell phone
12   carrier, which is not what Mr. Glapion is talking about.  But
13   your theoretical subpoena would for a 30(b)(6) rep to say
14   whether their records will show receipt, right?
15           MR. WATSTEIN:  Yeah.
16           THE COURT:  Yeah.
17           MR. WATSTEIN:  Yeah.  That's exactly right.
18           THE COURT:  What he's proposing is something
19   different.  He wants to serve them with telephone numbers,
20   right, and get their records for each of those telephone
21   numbers, which then you could look at to show whether or not a
22   call was received or not.
23           Is that what are talking about, Mr. Glapion?
24           MR. GLAPION:  That is one of the options, correct.
25           THE COURT:  Yeah.  Let me clear away some underbrush

1    here so that we can get at -- get down to talking about what

2    really matters.

3            From reading the briefs, I was inclined to deny the

4    motion to compel the individual cell phone numbers because I

5    was not able -- I did not understand from the briefing why

6    plaintiffs needed the individual cell phone numbers to get a

7    class certified on the issue of numerosity or anything else,

8    frankly.

9            I mean, consent is another issue, but it is muddied in

10   the waters here because I didn't -- I don't even know whether

11   defendant at this point is raising or has documents to support

12   a consent defense yet.

13           But so -- and that -- so then it boiled down to the

14   argument that -- and all of this stuff about the amended

15   complaint, which I understand happened while you were briefing

16   this.  None of that was in the motion.  So I am dealing with

17   that on the fly.

18           The only reason really it came down to, Mr. Glapion,

19   that plaintiffs were asking to get numbers was we want to be

20   able to call putative class members and do -- you know, and get

21   information from them that will help us either get a class

22   certified or litigate the case on the merits.

23           No class has been certified here.  And there is

24   a -- you know, a tendency or, I would say, not clear to me that

25   getting individual cell phone numbers for class members in an

1  uncertified class so that plaintiff can then call these people

2  as part of the investigatory process here is proportional to

3  the needs of the case at this point.

4         So you were, you know, very transparent in the

5  briefing saying, look, I want these for -- if for no other

6  reason than I am going to call these people.  And I don't know

7  that that's called for right now.  All right?  I don't know

8  that it is proportional to the needs of the case for plaintiff

9  to have all the cell phone numbers to be able to call all those

10 people.

11         I get -- I get your argument -- and it is not a bad

12 one -- that discovery has not been bifurcated and therefore all

13 discovery, including what I might need for damages and anything

14 else in the case, is ripe right now.  I mean, that can be

15 changed with a stroke of a pen.  All right?

16         But even if all discovery is available now, you are

17 not entitled to take all discovery, even of relevant

18 information, unless it is proportional to the needs of the case

19 and not unduly burdensome for any number of reasons.

20         So I'm not convinced now that I should allow you carte

21 blanche to be taking investigatory discovery of all class

22 members to find out -- and so therefore I should give you the

23 phone numbers to do that.

24         I might be convinced about that, but I wasn't

25 convinced on the briefs.  All right?

1          What I was convinced on the briefs is that you
2    need -- you're entitled to get information to be able to make
3    your best argument or a good argument or the best argument you
4    can make under the circumstances, whatever, for a class
5    certification.  And the defendant's brief agreed with that and
6    made a bunch of statements about information they were willing
7    to give you.

8          But every time they made the statement, that I cited
9    these in my order, it was a different statement.  You know, on
10   page 3, it was, we'll stipulate to the cell phones on the
11   VoiceLogic list.  And we will do the same for any forthcoming
12   ringless voicemail log.  That was on page 3.

13         On page 6 it was, the information NRS is willing to
14   produce, paren, the quantity of cell phones on the VoiceLogic
15   list and any forthcoming ringless voicemail log provides,
16   quote, sufficient information for class certification.

17         And then on page 8, NRS is willing to identify the
18   number of cell phones, the messages intended to be relayed, and
19   to the extent it has the information, the date of those
20   attempted ringless voice messages on the forthcoming ringless
21   voicemail logs.

22         The variety of those statements caused me to issue my
23   order.  And your document says, supplement in opposition, which
24   could have easily said proposed stipulation, didn't answer any
25   of those questions.  Okay?  It said -- to me it went on a

1    different tact.  It said, we're willing to stipulate that the

2    number of persons is sufficient under Rule 23.  Didn't say

3    anything about the number of cell phones or what was going on

4    at voicemail -- logic or anything else.

5           The consent thing, you know -- NRS I'm -- I would

6    assume that NRS raised a consent defense as -- I didn't look at

7    your answer.

8           You probably did, right?

9           MR. WATSTEIN:  We did, your Honor.  And the issue with

10   consent is that we are in the process of doing an ESI search

11   right now.  So our representation there was meant to counter

12   this idea that we would sandbag them, which we won't.

13          And we're willing to put it in writing.  Look, if we

14   discover evidence of consent during our ongoing ESI search,

15   we'll produce it within 14 days.  We are not going to hold it

16   back.

17          THE COURT:  Yeah.  Well, again, I'm not sure where to

18   go with that right now because the issue may not even be ripe

19   because the train is still moving through the station.

20          But, big picture here -- this is why I wanted to bring

21   us up to big picture.  I'm willing to order the defendant to

22   provide plaintiff the information plaintiff is going to need to

23   get -- to argue for class certification.  I'm not sure from the

24   briefing, and I'm still not sure, that you need the individual

25   cell phone numbers to do that.

1          What I am hearing is what you need is -- and I

2    don't -- I would prefer not to -- Mr. Watstein, to go down your

3    path of, we'll stipulate to over 40 or over 50, whatever the

4    threshold is.  I think plaintiffs are entitled to be able to

5    tell the district judge the magnitude of what they are talking

6    about here.  All right?  Not just to get over the threshold of

7    class certification, but to give some color to what they're

8    saying.  There were 5,000, 12,000, 10,000, 17,000.  I think,

9    you know --

10          MR. WATSTEIN:  And we don't have a --

11          THE COURT:  -- whatever it is.  And I think you could

12    do that based upon your records.

13          MR. WATSTEIN:  We can.  And we don't have a problem

14    with that.  I -- to be clear, we weren't trying to not give the

15    Court what you wanted.  We actually thought that we were -- we

16    thought that we were cutting to the heart of the issue and

17    making it easier.  If we made it more difficult, we apologize.

18    We don't have an issue with saying -- with having them run a

19    search and say this is the number of cell phones.

20          THE COURT:  Yeah.  I mean, if I wanted the legal

21    conclusion, I would have asked for it.  I wanted something that

22    was more akin to the factual representations that were in your

23    brief.

24          But that's okay.  We're here today to talk about this.

25          So as long as I can get to a result that gets the

1    plaintiff information and in terms -- both the information, the

2    magnitude, the color, the packaging, and that information, that

3    they will then use on their motion for class certification,

4    that's where I'm going with this.  All right?

5           Now, if for some reason I'm wrong and the only way

6    plaintiff can get that information is by the actual cell phone

7    numbers, then I am not averse to doing that.

8           But that's not my understanding from the briefs.  And

9    I thought a mot- -- one of the motivations for plaintiff's

10   desire to get the individual cell phone numbers was to be able

11   to call the people.  And that is something that I am pushing

12   back on because I don't know that now is the appropriate time

13   to do that.

14          You don't even have a class yet.  And so, you know, as

15   somewhat of a fiduciary for absent class members, I think I

16   have to be cognizant of what kind of invasions of their lives

17   they should be subjected to simply because they are putative

18   members of the class.

19          If a class is certified and then discovery is ongoing

20   on something like that, you know, I think the landscape may

21   change a little bit.

22          But -- and if -- you know, if there is limited

23   discovery of class members -- I mean, I don't know.  But, I

24   mean, to say you could have the numbers because you want to

25   call everybody -- and, PS, in a case -- and this is not a major

1    concern of mine.  Okay?  But I will say it is within the

2    concerns that I am thinking about.  In a case where the

3    defendant has challenged in particular this named

4    plaintiff's adequacy as a class rep, this -- you know, and/or

5    the counsel's adequacy of a class rep, so there may be real

6    reason to try and find other people, I am not sure that I

7    should facilitate that by giving you 17,000 cell phone numbers.

8    Okay?

9           So that's -- so big picture, let me tell you where I'm

10   coming from.  If we could bring it back down, I would like to

11   understand a little bit better.  And I don't know that we're

12   going to craft a stipulation now, but I can order you to do

13   this.

14          For example, if, as Mr. Watstein said, they're willing

15   to give you the number of cell phone numbers that were called,

16   as opposed to theoretically it is more than 40, then I would

17   order them to do that.  Okay?  And that gets more toward what

18   you're looking for on numerosity.  Right?

19          MR. GLAPION:  It -- halfway there.

20          THE COURT:  Halfway.  Okay.

21          The other part -- and this is because I haven't really

22   delved into the amended complaint on this.  The other part is

23   whether the messages -- the ringless voicemail was actually

24   received, right, by the -- those cell phone numbers?

25          MR. GLAPION:  Correct.

1      THE COURT:  And your information on the cell phones

2  is, Mr. Watstein, your client has -- can tell him which numbers

3  we called or had VoiceLogic call, right?

4      MR. WATSTEIN:  Well, I guess I wouldn't use the term

5  called necessarily, just because of the ringless voicemails.

6  But, yes, communicated.  Attempted to send a ringless voicemail

7  to, I think --

8      THE COURT:  Okay.  But --

9      MR. WATSTEIN:  -- that's the better -- best way to put

10  it.

11      THE COURT:  But that global number, that gross number

12  will not tell them of that gross number where we had -- we

13  attempted to send a ringless voicemail, that won't say how many

14  actually were successful, right?

15      MR. WATSTEIN:  So there is actually a -- there is

16  actually a column, and I believe it is in the VoiceLogic

17  reports, directly from VoiceLogic, that says whether the

18  delivery was successful or not, to answer your Honor's question

19  directly.

20      What VoiceLogic will testify to, as I indicated, is

21  that that is not -- that is a -- basically a shorthand, right.

22  It is not definitive.

23      Now plaintiff may argue that it is definitive, and we

24  may argue that it is not.  That's why we can't stipulate to

25  receipt based on that column.

1          THE COURT:  Yeah.  But I don't think he's asking for

2     that stipulation.

3          Is that the disposition column that you were talking

4     about?

5          MR. GLAPION:  Correct, your Honor.

6          THE COURT:  Okay.  So as I understand it, VoiceLogic

7     has testified elsewhere that the disposition column, which

8     at -- on its face could be taken to say whether or not the

9     voicemail actually was left on that phone really doesn't do

10    that.  It just says what, that the -- that the number was

11    called but we don't know if the voicemail actually got in

12    there?

13         MR. GLAPION:  So not -- I am trying to do this -- it

14    is not overly argumentative.

15         THE COURT:  This is called argument.  You can be

16    argumentative.

17         MR. GLAPION:  Right, I know.  But, you know, I'm

18    trying to take it -- trying to take it down.

19         THE COURT:  Uh-huh.

20         MR. GLAPION:  VoiceLogic, what their testimony was,

21    was that the dispositions are 80 percent accurate.

22         THE COURT:  Uh-huh.

23         MR. GLAPION:  Now what I anticipate -- and I, you

24    know, I can't speak for Attorney Watstein.  I anticipate that

25    if I am limited to just that disposition column, when we get to

1    numerosity, the argument in -- against certification of the

2    class will be, you know, how many cell phones there are.  But

3    you have no idea how many of those actually received a

4    voicemail because those disposition columns aren't fully

5    accurate.  You know, they will certainly press pushback on the

6    80 percent representation from a previous disposition.  Try to

7    hone in on a number there.  But they'll say you have no idea.

8         THE COURT:  Well, wait.  If there are -- I mean, how

9    many, Mr. Watstein, round numbers -- I think there was

10   something in one of his briefs that said 17,000 numbers or

11   something like that.

12        I mean, is that right?

13        MR. WATSTEIN:  That's right.  I mean, I don't know

14   exactly what the question -- what -- I don't know exactly what

15   that 17,000 is sitting here today.  But there are basically

16   17,000 numbers at issue in the case.

17        THE COURT:  Okay.  But you're going to be able then --

18   you have said, you can give them a stipulation as to how many

19   numbers were -- are at issue here in terms of numbers of people

20   who were called or ostensibly called, right?

21        MR. WATSTEIN:  Correct.

22        THE COURT:  Okay.  Let's say it is 15,000.  And you

23   have got testimony that says 80 percent of the attempts are

24   successful.  Right?

25        MR. GLAPION:  80 percent -- an individual disposition

1   is 80 percent accurate.  So of the voicemail dispositions, 80

2   percent of those were actually received, at least per

3   VoiceLogic's prior testimony.

4          THE COURT:  Okay.  So that's the company that did it.

5          And 80 percent of 15,000 is 12,000, based upon my

6   iPhone calculator.  All right?

7          Under any concept of numerosity, 12,000 is going to be

8   sufficient.  So if you knew the total number of numbers

9   called -- and right now they are redacted numbers.  You just

10  know there is 15,000, 12,000, 10,000, 8,000, 5,000, 1,000 --

11  80, percent is 800 -- if you knew the total number of

12  calls -- phone numbers at issue and you have the person at

13  Voice- -- and you have testimony from VoiceLogic and -- you

14  know, you're entitled to depose them in this case too, you

15  don't have to take the testimony in some other case, I would

16  think.  But -- and you have testimony that says, we have

17  an -- we could, with an 80 percent certainty, we could say, you

18  know, maybe -- it is different than 80 percent certainly --

19  that 80 percent of the -- what did you tell me, 80 percent of

20  these are successful or something like that?

21         MR. GLAPION:  80 percent of the voicemail

22  designations -- the receipt designations are accurate.

23         And I would be open to a stipulation on that front of

24  there are this many cell phones on the list, this many voice --

25  of those cell phones have at least one voicemail designation,

1    and that voicemail designation is 80 percent accurate.  With

2    those three things, I think that would obviate the immediate

3    need for class certification for the full telephone numbers.

4              THE COURT:  No, for discov- -- immediate need for

5    class certification of those numbers.

6              MR. GLAPION:  Correct.  I think the (unintelligible)

7    phone numbers will prove relevant for other issues.  But I --

8    as your Honor said, the lack of bifurcation could change at a

9    stroke of a pen, so --

10             THE COURT:  Well, I don't know whether Mr. Watstein is

11   willing to give you that -- I can ask him.

12             This is just yes or no because I have another point

13   after that.  Would you give him that stipulation?

14             MR. WATSTEIN:  No, not that exact stipulation.

15             THE COURT:  Yeah.  Okay.  I mean, we could talk about

16   what the exact stipulation means.

17             But why do you need NRS to stipulate to the 80 percent

18   number when -- would you stipulate that the VoiceLogic

19   testimony in the other case is admissible here for purposes of

20   numerosity on class certification?

21             MR. WATSTEIN:  I guess I hadn't considered that.

22             THE COURT:  Yeah.  I mean -- we may break here with

23   you having to talk to each other.  But A -- A is if he couldn't

24   give you that exact stipulation, you know, maybe he could

25   stipulate that, for example -- and I'm just doing this totally

1    off the top of my head -- that VoiceLogic has testified or

2    VoiceLogic has said that 80 percent of the receipt designations

3    are accurate or something like that.  And we know that there

4    were 8,000, 10,000, 15,000, 17,000, 1,000 receipt designations

5    or something like that.

6         I mean, it sounds to me like with that kind of

7    information you could get to a threshold that you could present

8    to Judge Harjani for class certification without spending

9    boatloads of money going out and subpoenaing carriers or going

10   through spending the computer time going through 17,000 phone

11   numbers or all that.  Right?

12        MR. GLAPION:  Can I speak to that for just a moment?

13        THE COURT:  Yeah.

14        MR. GLAPION:  Because I think -- I want to be clear

15   that I think given my preponderance of evidence standard on a

16   class certification, that an accuracy of 80 percent is going to

17   carry a lot of what I need to do.

18        My concern is that when we get -- because we are going

19   to take the deposition of VoiceLogic, if for nothing else than

20   the admissibility of -- and the authentication of their

21   documents, you know, their processes, all of that.

22        What I am concerned about is we go through this whole

23   discovery period, this deposition of VoiceLogic -- and I know

24   you want to do a status report at the end of this -- is going

25   to be we're working on getting it done.  If that -- that

1    accuracy is going to be challenged.  And it is going to be, you

2    know, well, maybe they are not certain.  Maybe it is 60

3    percent.  Maybe it is 50 percent.  Maybe it is 40 percent.

4           And then I'm in a situation where I had no ability to

5    do plan B.  I don't want to subpoena all these carriers.

6           THE COURT:  Uh-huh.

7           MR. GLAPION:  That's miserable.  I've done it before.

8           THE COURT:  Uh-huh.  Uh-huh.

9           MR. GLAPION:  I don't -- I don't want to call class

10   members.  I don't want to do that.

11          But there are other options to prove the accuracy.  I

12   just want to give an example.  Take a campaign where they had a

13   voicemail file that was 90 seconds long.  There is a

14   designation on the records for telephone number 0001 that shows

15   received but it shows a duration of only 30 seconds.  With that

16   comparison, I can say, wait a second, the voicemail was 90

17   seconds long, how is this call only 30 seconds?  It was

18   probably an error.

19          So there are ways, if I can link specific calls to

20   specific phone numbers, I can improve whether it is the 80

21   percent accuracy or whatever accuracy it comes out at the

22   deposition, I can prove that by taking specific calls, looking

23   at specific data within the sheet and comparing it.  I cannot

24   do that without being able to link a specific call to a

25   specific phone number.

1        And if I am -- if I have to wait until that accuracy

2  is challenged, then I'm sort of stuck, left holding the bag.

3  Like I have been asking for this, I have been asking for this,

4  and I can't do anything about it.

5        THE COURT:  Yeah, I understand.

6        MR. GLAPION:  If it helps, your Honor, I have, you

7  know, what I think -- I stand by the fact that all parties have

8  the right to contact unrepresented third-party witnesses.  I

9  have no interest in calling these class members.  My

10  plaintiff -- I have a very good plaintiff.  I have a very good

11  case.  I am not -- I have no need to solicit these plaintiffs.

12  Go out and call these plaintiffs.  I wouldn't do it anyway.

13        So to the extent there are concerns about giving these

14  numbers because I'm going to go call them, I'm happy to have a

15  two-way bar on communicating with class members, at least

16  pending the resolution of this motion to deny adequacy, where I

17  won't use it for any of that information.  I won't call them.

18  I won't contact them.

19        THE COURT:  Yeah.

20        MR. WATSTEIN:  Your Honor, may I respond to that?

21        THE COURT:  No.

22        MR. WATSTEIN:  Okay.  Because --

23        THE COURT:  No.  Because you're going to just dump on

24  him is that he's going to do it.  Let me --

25        MR. WATSTEIN:  A two-way bar --

1          THE COURT:  Let me stop.

2          MR. WATSTEIN:  Okay.

3          THE COURT:  I don't know that I have to go down that

4    road.

5          I don't see on the docket any order -- the case was

6    assigned to Judge Harjani in April when he came -- when he

7    became a district judge.  Prior to that it was Judge

8    Valderrama's.

9          I don't think there is any order on the docket that

10   says we're not going to bifurcate.  There was just a discovery

11   schedule set, and it was -- and it didn't have -- it didn't

12   bifurcate for class cert or anything else.  Correct?

13         MR. GLAPION:  Correct.

14         THE COURT:  Okay.  Hold for a second.

15      (Discussion off the record.)

16         THE COURT:  Okay.  We still will be off the record

17   here for a second?

18         THE CLERK:  Sure.  Sure.  Let me pause it.

19         MR. WATSTEIN:  Especially with this cough.

20         THE COURT:  Huh?

21         MR. WATSTEIN:  And I apologize for my cough.  I'm --

22         THE COURT:  No need to apologize.

23         MR. WATSTEIN:  -- hacking.

24         THE COURT:  Apologize to Glapion.  You have him

25   sitting next to you.

1          MR. WATSTEIN:  Yeah.  It is not contagious.  It is
2    like a reactive cough.
3          THE COURT:  Here, look, guys -- we're back on the
4    record, right?
5          THE CLERK:  Back on the record.
6          THE COURT:  Okay.  To me this is a case that merits
7    bifurcation of discovery for class cert and then merits.  And
8    you have been going down this road for a while.  So I don't
9    want to change the route necessarily.
10          But I understand -- plaintiff makes good arguments
11   that eventually he may need to have some of this information.
12   And eventually it may -- you know, for targeted purposes,
13   whatever.
14          It sounds to me defendant is going to wage a
15   substantial fight on class certification, you know, either
16   before or after a motion for class certification is filed.  One
17   on adequacy of counsel.  That may go nowhere.  But -- also
18   on -- potentially on individualized questions with respect to
19   the calls.  I don't know that that's going anywhere either
20   given the robotic nature of what we're talking about here.
21          But I'm sensitive to a ruling today that can be taken
22   as barring -- as preventing plaintiff from getting discoverable
23   information on the merits.  And as you said, you don't want to
24   be accused of -- you don't want to be sandbagged.  Say, well, I
25   needed that information, I couldn't get it.

1          And you make this point throughout your brief that,

2    you know, discovery is not bifurcated and so I should be able

3    to take everything including, you know, damages evidence on the

4    line.

5          I -- I think this is a case that merits at least

6    strong consideration by the parties and the Court of

7    bifurcating or prioritizing -- I don't have to -- I don't have

8    to -- well, I could bifurcate too.

9          But focusing on discovery.  I mean, it is a -- it is a

10   2024 case, so it is not that old.  But focusing on discovery

11   that first goes to class certification.  Because if there

12   are -- if that's going to become a knock-down drag-out battle,

13   that's something that -- and getting you the information that

14   you need on the plaintiff's side to make the arguments you need

15   to make, and deferring discovery that is solely merits

16   discovery until after we know whether there is going to be a

17   class certified or not.

18         I am also not opposed -- since I don't know what you

19   have done in discovery so far.  I mean, you have responded, I

20   think, to written discovery.  I'm not opposed to having some of

21   that go forward along with class discovery.  But I think by

22   bifurcating it, it will give the plaintiff at least some

23   assurance -- should give it a lot of assurance that it is not

24   going to be foreclosed from discovery if they do get a class

25   certified and the case can't be settled after a class is

1  certified -- because sometimes that happens.  A lot of time

2  that happens -- so that you are not -- you're not stuck without

3  getting the information now.

4          And, you know, a lot of your argument is, well, it is

5  not bifurcated.  But I could do that.  And I could allow you to

6  get information sooner rather than later.

7          And I don't think that gores NRS's ox at all,

8  Mr. Watstein.  Because if you can stipulate to certain of these

9  facts with respect to the calls being -- I mean, that saves you

10  and your client money potentially if you could focus on the

11  issues that you have put front and center, including the

12  adequacy of counsel, and you get that decided.

13          If you win that, you know, then plaintiff has to get

14  another lawyer.  But if you lose it, then we're going forward

15  with the case.  And -- but you will know what the stakes are in

16  the case.

17          So to my proposal here is we can talk more about what

18  stipulat- -- unless you have -- I mean, you say you have worked

19  with Mr. Watstein in other cases.  I can't tell that from the

20  briefing.  Okay.  I mean, from the briefing this is knives out,

21  everybody going for the jugular.

22          And, you know, this -- I mean, I -- I mean, full

23  disclosure, when I was a lawyer in private practice, I didn't

24  do telephone cases or any of these kinds, but I did securities

25  litigation on both sides of the versus.  And this is -- the

1    tenor of these briefs is a lot different than anything I saw

2    when -- in cases where I was working with the other side and

3    had done other cases with them.  But maybe it is different in

4    this -- in this area.

5            But if we could get to a point where I could -- where

6    you could leave here with direction to formalize a stipulation

7    that helps -- that satisfies or, if not satisfies plaintiff,

8    satisfies me that they are getting the information they need

9    on -- for numerosity and get a clear understanding of what

10   discovery is going to go forward and what can be held in

11   abeyance pending class certification, I think we've -- we will

12   have accomplished a good thing for the plaintiffs and we will

13   have accomplished a good thing for the defense because then the

14   case can be -- you know, the cost of the litigation for both

15   sides will be affected by that.

16           Mr. Glapion, from plaintiff's perspective, you willing

17   to think about something like that?

18           MR. GLAPION:  Which part?  The --

19           THE COURT:  The bifurcation part and getting to a

20   stipulation.

21           MR. GLAPION:  So, first, I do want to say that, you

22   know, I apologize to the Court for the tenor of the briefs.  I

23   agree with you --

24           THE COURT:  That's not all your fault.

25           MR. GLAPION:  No, I -- but I played a role in it.

1    THE COURT:  Uh-huh.

2    MR. GLAPION:  And, you know, we -- I have worked with

3  Attorney Watstein before and we have -- in much smaller cases.

4  So I think, you know, stakes go up, maybe temperature goes up

5  unfairly.

6    And, you know, I will do my best -- I mean, this is

7  going to be a contentious case.  There is a lot of money at

8  stake.  He represents at least a subsidiary of a public

9  company.  I mean, they're going to fight tooth and nail to

10 protect their shareholders and bottom line.  I get it.

11   So there are going to be things that are not ideal in

12 terms of accusations of, you know, this, that, or the other.

13 But I will do my best to lower the temperature of my briefing

14 and things of that nature.

15   With respect to bifurcation, I'm not actually fully

16 opposed to the concept.  I think --

17   THE COURT:  Well, that's positive.

18   MR. GLAPION:  Well, no, we actually don't -- we're not

19 that far apart on that.  I think the -- these cases, 99.9

20 percent of the time, these TCPA cases are won or lost on class

21 certification.  Because when you get a class certified and

22 you're looking at hundreds of thousands of calls and you see

23 your potential statutory damages exposure, you know, suddenly

24 you go to mediation and it takes care of itself.  Whether that

25 happens here, we have a long way to go to get there.

1    So I think the focus on class certification is

2    important because a lot of that stuff that may need for that

3    other -- those other things may not happen if we get a class

4    certified.

5    My concerns are that there are lot of overlapping

6    issues that when I serve a request on those it will be a Rule

7    37 fight over is this merits, is this class certification.

8    Take again the -- going back to the numbers that I am

9    asking for.  While having the full numbers is relevant to, you

10   know, ultimately showing who is entitled to what damages, I

11   also believe it is relevant for the reasons that I have

12   articulated in the brief and here in terms of making my best

13   case for numerosity and showing the Court that all of the other

14   elements can be met.

15   We haven't even talked about manageability,

16   superiority, things of that nature.

17   So I am concerned that bifurcating will lead to more,

18   rather than fewer, fights on issues that are joint merits and

19   damages issues.  Especially with the temperature being as high

20   and as somewhat of a two-way lack of trust, I think, in terms

21   of motives of the other side.  As much as we can endeavor to

22   lower that temperature, I am concerned about how that will play

23   out.

24   But I'm not necessarily opposed to the focus on class

25   certification.  I don't necessarily know for the reasons I have

1  said before that that moots my request for the full phone
2  numbers or some way to link specific calls to specific phone
3  numbers that are cell phones.  But I do think in general
4  focusing this case on class certification could be healthy if
5  we can do it in a way that is -- you know, is healthy.

6       THE COURT:  Yeah, I don't -- I mean, bifurcation has
7  one connotation.  Prioritizing discovery on class issues is
8  another way to say it.  Another way to say it is prioritizing
9  discovery relevant to class certification.

10      And to the extent that discovery goes to class
11  certification and -- as well as other issues, I would call
12  those -- that mixed discovery, that the Court is not precluding
13  that discovery, but requires the parties to meet and confer
14  about it and bring it to the Court's attention if the Court has
15  to decide that issue.

16      I mean, you know, I was thinking, as you were saying,
17  you know, the issue can very well rise and fall on class
18  certification.  The tenor of the briefs I have gotten is if you
19  are -- if you get an affirmative decision or a positive
20  decision on class certification, the next thing from the
21  defendant in this case, given the filings to date, is a motion
22  for 1292(b) certification on the class issue.  And then to
23  bring it up to the Seventh Circuit and have the Seventh Circuit
24  then do what it normally does and slap that down and say, no,
25  we're going to take it with the entire case.

1          So, you know, I don't know that class certification

2     will -- is the be all and end all here.

3          But I'm trying to deal with getting discovery in your

4     hands that would get you -- that you could get -- that you

5     could file a motion for class certification, which should be

6     filed as early in the case as you can.

7          Mr. Watstein -- and we can deal with this.  But,

8     assuming that we could get to -- either we could get there

9     today or you could get to a stipulation on -- or provide

10    information that is relevant to class certification, are you

11    opposed, as the defendant in this case, to either prioritizing

12    or bifurcating discovery so first we're dealing with class cert

13    issues?

14         MR. WATSTEIN:  No, your Honor.  I had a hearing in

15    this courthouse today on bifurcation in another case, which is

16    coincidental.  I did it by phone.  And the -- the Court

17    bifurcated discovery at our request.

18         The only reason why we didn't ask for that here is

19    because we just felt it wasn't necessary because the practical

20    approach was to recognize, as I think as your Honor has

21    recognized, that the reality of this -- the reality of Rule 23

22    case is that most -- many or most judges recognize that whether

23    you call it bifurcated or not, generally before the class

24    certification issues are resolved, there are going to be

25    predominance concerns about ordering every single thing to

1    happen and every single piece of discovery to occur before a

2    class is ever certified.

3            So there are cases in which we move -- and there is,

4    as you know, 15 different variations of bifurcation.  So in the

5    case today, we moved because we thought that the issues on the

6    individual plaintiff's claims would be easily resolved in a

7    motion for summary judgment.  The Court agreed and ordered

8    120-day period of discovery.

9            The point is I am totally fine with that.  I think

10   that makes lot of practical sense.  We're not trying to keep

11   information from plaintiff that plaintiff actually needs to

12   decide class certification.  We just, particularly given the

13   adequacy issues, do not want to turn over 17,000 phone numbers.

14           And I would note that even in plaintiff's cases,

15   even -- even in cases unlike this one where production was

16   ordered, which are different cases on the facts for a variety

17   of reasons, in every one of those cases there was a no contact

18   order levied against plaintiff's counsel.  That includes the

19   Judge Harjani case that -- I think it is Hossfeld v. Allstate.

20   It includes both of the prior primary cases that plaintiff

21   relies on.

22           So we haven't even talked about that.  And I don't

23   think we need to.  But I do want to -- I did want to address

24   plaintiff's sort of snuck in proposal for a dual no contact

25   order.  We -- these are our phone numbers.  We already have the

1    phone numbers.

2          What he's asking the Court to do is to order us to

3    produce numbers for the purpose of contacting people.  That is

4    a totally -- it is a totally different issue, but particularly

5    with the pending adequacy challenge.  And that's why multiple

6    courts, including the Judge Harjani decision that plaintiff

7    cites extensively, have said, if we're going to do this, there

8    is going to be a no contact order.

9          THE COURT:  Yeah.  And I'm aware of Hossfeld.  I'm not

10   a huge fan of no contact orders only because why create the

11   seeds of something for a dispute later on?  I didn't contact

12   that person, they contacted me.  And then I am able to

13   call -- I am able to talk to them because they are a putative

14   class member and they contacted me.

15         Or, you know -- you know, is it a prior restraint?  Is

16   it not a prior restraint?  You know, is it within the Court's

17   power and discovery or not?

18         So I mean, I get that you could do that.  I'm not

19   convinced that he needs all the numbers in order to get his

20   class certified.  I am convinced, at last I think -- I

21   understand that there are arguments that down the road there

22   may be a need to be able to -- I mean, I think what you're

23   telling me is the main reason is you need -- you're going to

24   need to link a phone number with a voicemail in the VoiceLogic

25   system.  Right?

1          MR. GLAPION:  A cell phone number to the specific

2     calls made to that cell phone number, yes.

3          THE COURT:  Yeah.  I mean, there are ways to do that.

4     I mean, if the defendant persists in saying you can't get them,

5     I could order the defendant to go through, produce the list to

6     you, or produce a good portion of that list to you with codes,

7     right?  It could be letters.  It could be, you know, triple A

8     on this side, and it links to triple A on the other side.  Or B

9     on this side, right?  I mean, they could give you information

10    that would give you the raw data that you want without giving

11    you a phone number.

12          Isn't that correct?

13          MR. GLAPION:  If --

14          THE COURT:  If they want to go through that burden.

15          MR. GLAPION:  If defendant were willing to -- and I'm

16    thinking on the fly about this.  And it is a big issue in the

17    case, so I want to make sure I get this right.

18          If defendant were willing to stip to produce the

19    campaign reports or a version of the campaign reports, both the

20    ones that they have already produced and the ones that they

21    will receive from VoiceLogic because those are being produced

22    to them directly at first, a version of it with only cell phone

23    numbers in it, still redacted, but that they are stipulating

24    that these are cell numbers, and they are not challenging that

25    these are cell phone numbers, they are not going to later say,

well, we thought they were but they might not be.  If they say,
here is a list of every number from that campaign report
reduced to the last four, some way to distinguish between
duplicates, and here are all the calls to those cell phone
numbers only, that would, I think, alleviate the burden.

But I would have to come -- or excuse me -- alleviate
the need.  But it would have to come with a stipulation these
are cell phones.  We are not challenging that these are cell
phones and -- along those lines.  Because then I wouldn't need
the phone numbers.

I would have -- except if I had to issue subpoenas.
And if it looked like it was going down that road, I suppose we
could come back to this Court and ask for a change in that.

But with other methods to do it, you know, I think
that would cover plan A -- A, B, and C, with subpoenas being
plan D.  And if we get down to that and it seems like we need
to issue those subpoenas, you know, then we can ask the Court
for how to do that -- for a way to do that.

Or maybe we have a status conference on whether that's
looking necessary at that point.

But if defendant is willing to do that, that I think
would go 95 percent of the way there and would be good enough
for, I think, the time being until we revisit this issue later.

THE COURT:  Mr. Watstein, I saw you writing.

MR. WATSTEIN:  Yeah, I was -- I was.  I was writing

1    down the proposal, which I think is basically identifying the

2    numbers on the call lists, comparing them to the call logs, and

3    basically saying for -- for this number, here are the calls.

4             MR. GLAPION:  Sort of.  I don't mean to interrupt.

5             MR. WATSTEIN:  No, go for it.

6             MR. GLAPION:  My proposal would be -- so the campaign

7    reports that were produced in the Excel spreadsheet --

8             MR. WATSTEIN:  Yep.

9             MR. GLAPION:  -- would be -- you produce the exact

10   same thing, just with all noncell phone numbers removed.  So I

11   would know looking at that -- those campaign reports that

12   everything in the campaign report is a cell phone number.

13            And a stipulation alongside that that we're not

14   challenging that these are cell phones.  We agree that these

15   are cell phones for the purpose of this class definition.  And

16   have at it.

17            That way I have no ability to contact them but I can

18   still at least do some level of plan A, looking at the

19   dispositions; plan B, looking at the durations compared to the

20   dispositions.

21            If defendant is willing to do that, not only with the

22   three it produced, but with the 70 plus that are forthcoming.

23   My suspicion -- and I don't want to speak for you -- is that

24   all of the numbers are cell phones.  But I have no stipulation

25   on the record confirming that.

1        THE COURT:  Yeah.

2        MR. GLAPION:  I -- there was an email produced of at

3   least one list that was purchased.  And I don't want to get

4   into confidential issues, so I'll avoid it.  But of at least

5   one list that was designated as cell phones only.

6        So I suspect that will be the case.  And if that's the

7   case, a stipulation that every number on this list is a cell

8   phone would be equally sufficient.

9        But if I have a way -- as long as I have a way to link

10  a cell phone to a call to a duration and perform whatever data

11  analyses that I or an expert wants to do on that to identify

12  receipt, I think that gets me most of the way there, short of

13  the subpoena issue.

14       THE COURT:  And I think it does too.  And I would say

15  that I would -- although you said you would like to know what

16  the duplicates are.  I don't even think you need to know the

17  duplicates.

18       MR. GLAPION:  If all are cell phones, I would not.

19       THE COURT:  Well, even if they are not all cell phones

20  because you're going to get -- you're getting the last four

21  digits on both sides, right?

22       MR. GLAPION:  Excuse me?

23       THE COURT:  You're getting the last four digits of the

24  number both on the voicemail log and on the cell phone -- the

25  call number, right?

1          MR. GLAPION:  The master list that's --

2          THE COURT:  Yeah.

3          MR. GLAPION:  Yeah.  So it was just the last -- all

4    but the last four were redacted.

5          THE COURT:  Right.  So you're getting the last four

6    digits.

7          MR. GLAPION:  Right.

8          THE COURT:  And then you will also have on the

9    VoiceLogic disposition report the last four digits too, right?

10          MR. GLAPION:  Correct.  But some of those last four

11    are appearing --

12          THE COURT:  Multiple times.

13          MR. GLAPION:  On three reports, across 80 reports,

14    they are going to appear hundreds of times.

15          THE COURT:  Okay.  However, it seems me that if you're

16    talking about 10,000 calls and hundreds of them are the same

17    number, but thousands of them are not the same number, that the

18    inference from that is there are at least thousands of calls

19    for people in the class, right?

20          MR. GLAPION:  I think that's -- that's fair.

21          THE COURT:  Yeah.

22          MR. GLAPION:  It --

23          THE COURT:  So, I mean, I guess I don't -- I mean, I

24    don't want to -- I don't want to -- I mean, I think this is a

25    good time to potentially have you guys work out what you can

1   actually stipulate to and give me a proposed stipulation. Or

2   if you disagree about the stipulation -- I don't even want to

3   go down that road. Give me a proposed stipulation on this

4   after you have talked about this.

5        I just don't know whether you need the deduping or the

6   duplication or not. You know the data better than I do. I

7   mean, if you need -- if defendant is going to know what those

8   numbers are, they can go through those computerwise and see

9   which ones are identical, and then you can -- they could tell

10   you X number of these are identical and so you'll know. And I

11   don't -- that probably is not that burdensome.

12        I mean, it seems -- it -- okay. And then with respect

13   to bifurcation, I mean, I'm not trying to force something down

14   your throats here. What I was trying to do was make this cost

15   efficient and focus on what you need to focus on.

16        In many of these cases, most of the discovery does go

17   to class certification and there is not a whole lot that goes

18   to -- there is not a whole lot more that goes to the merits,

19   right? Am I wrong?

20        MR. GLAPION: You're correct. I honestly -- it is a

21   lot messier than I thought it would be in terms of not

22   bifurcating it in terms of what's going to the where and to the

23   what's not. So, you know, if we could rewind the clock, it may

24   have been a different proposal in the joint -- in the initial

25   scheduling conference.

1          THE COURT:  Uh-huh.

2          MR. GLAPION:  But I do think -- like I said, I want to

3     avoid some of these issues with --

4          THE COURT:  Yeah.

5          MR. GLAPION:  -- joint merits, joint class

6     certification so we're going to fight over that.

7          THE COURT:  Well, you probably both see where I'm

8     going.

9          Mr. Watstein, you see what my -- my method is here.  I

10    am trying to get to a stipulation.  Your proposed stipulation

11    doesn't do it for the reasons that we have just talked about.

12    But it seems me that there is a stipulation to be made whether

13    you wordsmith what Mr. Glapion proposed or something else.

14         But it seems to me that you could get to a stipulation

15    with respect to number of cell phones and receipt that would

16    get plaintiff to a comfort level that he has what he needs to

17    argue at least one aspect of Rule 23 certification.  And I'd

18    like to give you time to do that with the benefit of what we

19    have talked about here.

20         If you can't do it, then I'll wade in again and I'll

21    figure out a way to do that.  I don't think the only way to do

22    that is to give unredacted cell phone numbers now.  Okay?

23         With respect to any bifurcation, I'm open to a

24    request.  I mean, you know, if it wasn't -- it wasn't requested

25    before, it wasn't ordered before, but it makes sense

1    before -- now, either if both sides agree or one doesn't agree.

2    But I could see that it makes sense.  I'm not opposed to that.

3    I'm also not opposed to having you continue to just do all the

4    discovery until the end.

5            It was just, you know, I'm reacting more to the gotcha

6    aspect of plaintiff's brief, which is look, no bifurcation.  I

7    get everything now.  And so basically you have got no argument.

8    And my reaction to that as the Judge reading that was, I

9    just -- you know, I issue an order and I say, okay, that's no

10   longer the state of affairs.  The state of affairs is different

11   now.  Now figure out how to deal with that.

12           So, you know, I understand the argument, but that was

13   my reaction to it.

14           So it seems to me that there is room for some way for

15   you to get -- am I wrong, Mr. Watstein?

16           MR. WATSTEIN:  No, no, you're not wrong at all.  I

17   think -- I think you're right.  I mean, I think --

18           THE COURT:  Yeah.

19           MR. WATSTEIN:  I think it was productive to have this

20   in person for that reason, and I -- I am continuing to think

21   about the stipulation that Mr. Glapion proposed.  And I think

22   it is -- I want to think about it and go back and actually look

23   at the records to which he's referring.  But I don't see why

24   that's -- I don't see why something like that is not doable.

25           And then as to the bifurcation point, again, I want to

1    stress that we're not trying to do any gotcha.  And if --

2            THE COURT:  No, you -- I wouldn't say --

3            MR. WATSTEIN:  Yeah.

4            THE COURT:  Excuse me.

5            MR. WATSTEIN:  Yeah.  No, no, I didn't think that was

6    your --

7            THE COURT:  I wasn't saying you were gotcha, it was

8    the plaintiff's gotcha.

9            MR. WATSTEIN:  Yeah.  What I -- so what I would say is

10   if it gives -- if it -- I agree that generally -- that most

11   discovery goes to class certification.  But there are

12   certain -- there are certain strictly merits or strictly

13   procedural postcertification discovery --

14           THE COURT:  Uh-huh.

15           MR. WATSTEIN:  -- particularly as to like actual

16   identification of class members that always goes, you know,

17   postcertification.

18           And so if having an order saying, look, it is

19   bifurcated and so you could be assured that you'll have another

20   opportunity to get this additional stuff that you think you

21   might need, I don't think that hurts either party and I think

22   would be helpful.

23           THE COURT:  Yeah.  And I don't know if the word

24   bifurcation is a bad word.  I'm okay to get -- enter an order

25   that says the parties will focus on prioritizing discovery

1 relevant to class certification. And this does not prevent any

2 party from deferring discov- -- I don't know -- deferring

3 discovery till later. And no party can claim that they're

4 barred from taking that discovery because they -- they waited

5 to -- you know, they didn't take --

6         MR. WATSTEIN: Right.

7         THE COURT: -- or something like that.

8         But I don't -- you know, I would give you the leeway

9 on that language. I'm not going to put it in an order today.

10         Yeah. I want to give you time to work out -- I want

11 to give you time to talk about a stipulation with respect to

12 numerosity, to address the issues in plaintiff's motion to

13 compel.

14         I want -- and now I want to talk about what is

15 happening in discovery. And then I would like your

16 proposal -- what you are going to file also -- to give me a

17 proposal with respect to staging of discovery or phasing of

18 discovery to do what we're talking about accomplishing here.

19         So where are you on this? You have both served

20 written discovery and both responded to it?

21         MR. GLAPION: I -- so I don't know if defendant is

22 going to have a ton more written discovery. These are usually

23 very heavy on defendant in terms of the discovery versus

24 plaintiff.

25         THE COURT: Right.

1          MR. GLAPION:  I think he can -- Attorney Watstein can

2     speak for that.

3          But we have produced -- I tend to go through monthly

4     to make sure there is nothing we need to supplement on.  I

5     don't think there is.  But we have produced everything

6     currently in our possession.

7          With respect to defendant's production -- actually I

8     want to give an update on VoiceLogic, which is going very

9     smoothly, much to the happiness of Canadian counsel who said it

10    doesn't always go this way.  They seem to have identified all

11    of the records they have in their possession.  They have given

12    both parties a count of the documents that they have in their

13    possession broken down by categories.

14         I believe there is a hearing tomorrow.  I know some

15    emails came through while we were sitting here about whether

16    that's still the case.

17         And a final hearing on January 13th which I know is

18    after the current close of discovery.  But I'm -- before -- I

19    know I raised the idea with defendant's counsel of whether we

20    would need to request an extension of that based on that

21    deadline.  But I'm waiting for some certainty -- we're both

22    waiting for some certainty on that timing of that production,

23    not only to defendant, because by agreement it is going to

24    defendant first -- but then from defendant to us, and then our

25    ability to take that deposition.

1    We're moving very quickly.  I don't know if they are

2    going produce before the final hearing in January.  But it

3    seems they're willing to produce pretty quickly thereafter and

4    sit for a remote deposition pretty quickly thereafter.

5          So that is more promising than the six-month estimate

6    I had seen.  And I know Attorney Watstein told me he had seen

7    years-long estimates in other cases.  So this is a very, very

8    optimistic development on that front.

9          With respect to the production I'm awaiting from

10   defendant, I am going to have to let defendants speak to that a

11   little more in my efforts to -- I am a little frustrated by it

12   because we did have the -- you know, there is a lot of

13   documents defendant has to go through.  I acknowledge that

14   completely.

15         But, I mean, on August 28th there was the

16   representation of optimism that it would be completed by

17   September 15th.  And we're now in October and I just yesterday

18   received the first documents I have received in over a month

19   with -- and it was like 40 or 50 emails.

20         Not to say that's intentional.  Not to accuse any

21   wrongdoing.  But there is a pace that's a little slower than I

22   would prefer that it seemed -- than what it seemed like in our

23   last status report that, you know, I would -- hopefully we can

24   get more certainty on here, or at least I can get more

25   certainty on here.

1       If we can stick to the -- I have questions about

2   depositions and stuff as well.  But if you want to stick to

3   written discovery in this conversation right now -- or I can go

4   through my whole --

5       MR. WATSTEIN:  And I can give an update on the --

6       THE COURT:  Yeah, why don't you do this.

7       MR. WATSTEIN:  -- status.

8       Sure.  So -- so let me explain where we're at on the

9   document production which is -- really relates to the ESI

10  search.  Because at this point the documents that are being

11  produced are the result of an ESI search.

12      There is three primary custodians.  The two

13  custodians's accounts have been searched and reviewed.  The

14  third custodian, which -- the third custodian we couldn't

15  upload the documents through our ESI vendor because there was

16  a -- this custodian saves everything and there were a million

17  emails.  And it was just -- it was, as I understand it -- and I

18  don't understand it as well as I probably could -- it was

19  technologically impossible basically.  So we have been having

20  to do basically an in account review, which is more difficult

21  than doing it on a document review platform.

22      THE COURT:  Yeah.  You can't imagine how happy I am to

23  hear that because I have lots of emails that I haven't deleted

24  too and our systems department always calls me on it.  But it

25  is not a million.  So I feel good about that.

1       MR. GLAPION:  I pride myself on inbox zero, and this

2  case has made it challenging to do, I'll say that.

3       MR. WATSTEIN:  Yeah.  I have a ton of emails, but I

4  typically delete a lot of them and file a lot of them or assume

5  somebody else on the case is saving them.

6       But, I mean, we have spent hundreds of hours on

7  document review.  Like I said, we're done with, as I understand

8  it, done with two of the three custodians.  We're working on

9  the third.

10       Obviously we didn't meet the target, but that was

11  largely because of the million -- the million emails in

12  Mr. Katz's email inbox.

13       You know, we -- your Honor, we're now responding to

14  plaintiff's sixth set of RFPs, fifth set of interrogatories,

15  and fifth set of RFAs.  We also had a lot of briefing that we

16  were just doing.

17       So, you know, we have been -- we have -- if you saw

18  the amount of hours that are being put into this case on a

19  monthly basis, they are substantial.  One of the most

20  substantial of any cases that we're working on right now.

21       So it is not that we're not putting significant

22  resources into doing this.  It is just that, you know, when we

23  have respond to a ton of additional written discovery, when we

24  have to respond to a ton of additional briefing about motions

25  to steal and stuff like that, it takes man hours away from

1    finishing the document review.  It just does.  We have a

2    limited number of people.

3         But at this point, just right now there is

4    nothing -- there is no other motions or anything like that in

5    this case that we're working on.  And, you know, assuming it

6    stays that way for the next couple of weeks, I would imagine

7    that the document -- I would imagine the document review and

8    production will be done in, you know, three weeks or so.  Three

9    weeks to a month.  But it shouldn't take longer than that.

10        THE COURT:  On deps, Mr. Glapion, how many do you

11   think you were going to want to take?

12        MR. GLAPION:  So per your Honor's order, I had sent

13   the draft 30(b)(6) notice over to defendant's counsel.

14   I -- similar to looking for supplementation, I -- since then I

15   have gone through -- at least looked at it once a month.  I

16   think it has only been one month since that, or maybe a little

17   more, to see if -- you know, amend the topics, change the

18   topics, update the topics.  I have amended it once.

19        I know defendant indicated that it would get responses

20   to the topic list to me shortly.  I don't remember the exact

21   timing, but -- so that is something we haven't scheduled yet.

22        I did, I think, tentatively ask for November, December

23   dates for the 30(b)(6).  But there are a lot of topics

24   admittedly.  And I'm going to go through based on defendant's

25   responses to see if any can be consolidated, pared down.  But

1   it is a big case.  It is a lot to discuss.

2        The other -- as for other depositions, I have already

3   taken one, Diana Stern's.  And there were three more that I

4   would like to take specifically stemming from Diana Stern's

5   deposition where she had named three different people who had

6   relevant information.  Elie Katz, which is defendant's CEO --

7   usually don't like deposing CEOs, but Mr. Katz seems to be very

8   hands-on in terms of VoiceLogic and the relationship.

9        THE COURT:  It's not surprising since he has saved a

10  million emails.

11       MR. GLAPION:  He is very hands-on.  He's very involved

12  with the particular program.  And I know a lot of the responses

13  from Diana were along that lines of, I wouldn't know that, that

14  would be something Mr. Katz would know.  So that's one I would

15  like to depose.

16       An individual named Louis DeCosta (phonetic), who

17  seems to be the most direct interface with VoiceLogic at NRS

18  and who sort of knows the nuts and bolts of how that

19  relationship worked.

20       And the third one is Michael Hellerman, who is a

21  third-party former employee of defendant.

22       It's proving a bit of a challenge to get their

23  depositions.  And I say this with sensitivity towards the fact

24  that at least -- I mean, Mr. Katz had a medical issue.

25  Mr. DeCosta has a medical issue.  Apparently Mr. Katz can't sit

1    for a deposition at all.

2            So we're trying to figure out -- that's the first for

3    me, recognizing, again, someone's health is obviously more

4    important than litigation, how I get answers from Mr. Katz in a

5    way that is trustworthy and verifiable if he can't sit for a

6    deposition.  So that's something -- that's a challenge.

7            I know there was a discussion of written depositions.

8    I have never seen one done.  I have never done one.  I don't

9    even know the -- how that would -- process would go, a

10   deposition on written questions.

11           But that's something, you know, that if there is a way

12   to get the assurances of that it is Mr. Katz answering the

13   question, rather than a lot of time with interrogatories -- not

14   to accuse them of anything, but, you know, a lot of times it is

15   attorney driven.

16           So with Mr. DeCosta there is another medical issue

17   that's precluding him from sitting for a deposition or at least

18   we're waiting for accommodations.  The medical issue thing has

19   come up.  This is the first time it has come up now.

20           I totally get people's medical issues are important.

21   But I do ultimately have a case to litigate and I don't know

22   how to reconcile -- I don't know how to bridge that gap of

23   medical issues --

24           THE COURT:  Yeah.

25           MR. GLAPION:  -- with my depositions.

1        MR. WATSTEIN:  And just to give some context.  I know

2    the client is sensitive about, so I won't mention the exact

3    medical issues.  But these are not like a cold.  These are

4    like, you know, serious medical issues that have, you know,

5    precluded one of these witnesses from driving.  And so we're in

6    a bit of a jam too because we're getting significant pushback

7    like, you know, including from treating physicians.  So -- and

8    this has all been coming to a head over the last -- because we

9    just received physicians's notes from both Mr. Katz's and

10   Mr. DeCosta's physicians over the last week that we have been

11   asking for.

12        So -- well, that's why we proposed written questions.

13   We also just proposed a 30(b)(6) first because a lot of these

14   things that Mr. Glapion says, well, this witness didn't know

15   the answer to that, a 30(b)(6) resolves that issue because

16   we're required to educate the designee.

17        So in our view it would be better to take a 30(b)(6),

18   see if that provides the information that's needed, and then

19   revisit the two ill individuals at that point.

20        THE COURT:  Okay.  I don't want to get down into the

21   weeds too much.  This gives me a sense of where you are.

22      (Brief interruption.)

23        THE COURT:  Okay.  Here is what I would like you to

24   do.  And you can tell me whether you can do it.  I'd like by

25   the end of the month, 30th, 31st -- I can live with the 31st.

1    I just don't like to make people who may have young kids do

2    anything on Halloween.

3         So I would say on -- by October 30th, which is two

4    weeks from today -- I would like a joint status report from the

5    parties.  I would like that status report to include the

6    following:  Either proposed stipulation that addresses -- well,

7    let me strike that for a second.

8         The motion also talked about what information you

9    needed on consent.  That seems to be premature now.  I mean,

10   they have raised a consent defense.  They don't know if they

11   have documentation to prove it.  Consent I think in this

12   context has to be in writing, right?

13        MR. GLAPION:  Correct.

14        THE COURT:  Yeah.  And so they don't -- so, you know,

15   I don't know that you have progressed -- I mean, if defendant

16   still has to respond to your discovery requests with respect to

17   documentation for written consent, I don't know what to do on

18   that now.

19        Is there anything I can do on that now other than to

20   keep my eye on it?

21        MR. GLAPION:  I -- if defendant is producing its

22   evidence on consent as -- in due course and then, you know,

23   there is nothing produced on consent come class cert, then

24   obviously there is no --

25        THE COURT:  Right.  Mr. Watstein said he doesn't

1  know -- if they -- if they are going to raise the defense,

2  which they have already raised, but if they have documentation

3  to support it, they are going to produce it to you.

4          MR. GLAPION:  Correct.

5          THE COURT:  Right?

6          MR. WATSTEIN:  Yeah.  I have already represented on

7  the record we're not going to raise a consent defense for the

8  first time on class certification and drop a bunch of documents

9  on plaintiff, which is the concern --

10          THE COURT:  Right.

11          MR. WATSTEIN:  -- which we're not going to do.

12          THE COURT:  But I think your stipulation -- your

13  proposed stipulation or supplement in this respect said, to the

14  extent the district court -- no, it wasn't there.

15          NRS is searching for evidence about consent.  To the

16  extent you find that evidence, it will produce the evidence to

17  plaintiff within 14 days.

18          So that was filed on the 16th, which was today.

19          MR. WATSTEIN:  Yes.

20          THE COURT:  So soon -- just so soon we forget.

21          But I take it you're saying we'll produce that by

22  October 30th, right?  14 days from today, October 30th.

23          MR. GLAPION:  Well, I think that --

24          THE COURT:  Or 14 days from when you find it.

25          MR. GLAPION:  14 days from when we find it, right.

1          THE COURT:  Well --

2          MR. GLAPION:  That's right.

3          THE COURT:  Yeah.

4          MR. WATSTEIN:  Yes.  And understanding that we're in

5    the process of the ESI review right now.

6          THE COURT:  Yeah.  Okay.

7          All right.  Go back to the joint status report.

8          I'd like either -- I would like that to contain either

9    a proposed stipulation relating to the numerosity element of

10   Rule 23 class certification or a description of the documents

11   or other information defendant will provide to plaintiff on

12   those issues.

13          And other than -- it doesn't sound right.  Okay.  I

14   mean, what I am looking for in the status report is either a

15   stipulation the parties will enter into with respect to the

16   numerosity issues raised in the motion to compel or an

17   agreement concerning the documents or other information

18   defendant will produce to plaintiff on those issues.  And by

19   that I mean the logs and how you're going to match these things

20   up or something like that.  Or the stipulation that you were

21   proposing that Mr. Watstein was thinking may work.  Okay?

22          I just want something on this stipulation issue, the

23   documents issue, whatever, in a couple of weeks after you have

24   had a chance to talk about it a little bit to see what you

25   would propose.

1          And in this status report, if you are still at odds

2   about something, tell me what it is.  And, you know, if you

3   can't agree -- I mean, I would like for you to agree on

4   something.  But if you can't, you can give me each side's

5   proposal on that too.  Okay?

6          Is that clear?

7          MR. GLAPION:  I think so.

8          MR. WATSTEIN:  Yes, your Honor.

9          MR. BROWN:  Yes, your Honor.

10          THE COURT:  If it is not, let me know.  Because I know

11   it is getting later, and I have been on the bench since 9:45,

12   so...

13          MR. GLAPION:  Yes, your Honor, I -- yeah.  It is

14   clear.

15          THE COURT:  I mean, what I want is if you agree to

16   something.  If you can't agree to it, why.  Do I have to wade

17   into this again.  Either a stipulation or what they're going to

18   give you in order to satisfy -- to get you to class cert.

19   Okay?

20          MR. GLAPION:  Yes, your Honor.

21          THE COURT:  All right.  And if you have questions

22   about this as you're talking about that, tell Brenda you want

23   to get on a call with me, and I'll get you on a call.  Okay?

24          Next, what I want the status report to say is the

25   parties's position as to whether discovery should be bifurcated

1    between class and merits discovery or whether discovery should

2    be phased or prioritized in some way so that discovery on

3    class -- discovery relevant to class certification will be done

4    sooner.  I'll just put a period there.

5          I'm not looking for preclusive.  And so you can come

6    up with some language.  You know, I mean we talked about

7    whether if your prioritizing class issues, you're not --

8    you're not prevented from doing something at the second part of

9    it that really is hybrid or something like that.  All right.

10         And I don't know that you have to get caught up in

11   that.  But I just want to know what your proposal is, if any.

12   And if you don't want to prioritize anything or you don't -- or

13   the parties say, you know, we're already going just fine,

14   that's fine.  I'm not going to -- I don't need to mess with

15   that.  All right.

16         MR. GLAPION:  Yes, your Honor.

17         THE COURT:  My sense is I probably don't have to mess

18   with that, frankly.  And so maybe I don't even need it in your

19   joint status report.  But to the extent somebody wants to raise

20   this, you can raise it.  So don't put it in your status report.

21   But talk about it if you want.

22         MR. GLAPION:  I think if we get hung up on -- I'm

23   actually optimistic given what Attorney Watstein had said a

24   second ago.  If we get hung up on the reproduction of those

25   campaign reports or some stipulation like that, it might matter

1    more.

2            THE COURT:  Right.  But if you could agree to

3    something, that may not.

4            MR. GLAPION:  It may --

5            THE COURT:  I agree.

6            MR. GLAPION:  Yeah.

7            THE COURT:  Okay.  I want a status on parties's

8    progress with written discovery, which means where is defendant

9    on producing the remaining ESI or the other ESI that you have

10   already gone through but maybe have not produced yet.

11           And importantly, given defendant telling me that

12   you're on your fifth set of requests for admission or something

13   like that, I want a date by which no further written discovery

14   requests will be served without leave of Court.  All right?

15   Written discovery by, I think, either my or Judge

16   Harjani's order was supposed to be served by April 1st, I

17   think.  So it was -- but as we get closer to the close of fact

18   discovery, we can't keep serving new -- requests for admission

19   I don't view as discovery.  Okay?  So that I view as different

20   from discovery.

21           But I don't know that new interrogatories and new

22   requests for production 30 days before a fact discovery close

23   date are helpful.

24           MR. GLAPION:  I agree.  I -- with the only caveat

25   being that that -- a lot of the subsequent discovery has

1  resulted from either a deposition or from a rolling -- rolling

2  discovery process.  So certainly, you know, serving --

3  depositions done, defendants rolling production is done, serve

4  requests.  And then suddenly I want to serve way more would

5  be --

6         THE COURT:  Yeah.  Time out.  I am saying without

7  leave of Court.  If somebody testifies to a whole trove of

8  documents that nobody produced or identifies a bunch of stuff

9  and you want to seek production of that stuff with leave of

10  Court, you're not going to -- you're not going to be denied.

11  Okay?  Unless the other side says, look, this has been known

12  for eight years, all right, or ten months or something like

13  that.

14         So I'm not trying to preclude follow-up discovery like

15  that.  What I -- there is a funnel approach here, and I think

16  we got down to, we are done with written discovery except for

17  stuff that the Court is going to allow to happen.

18         So give me a date for that.  And then after that

19  date -- and if I don't like your date, maybe I'll set a

20  different date.  But I just want everybody to know that they

21  are not getting another request for production the next week

22  because somebody just thought of it.

23         MR. GLAPION:  Would your Honor, in the status report,

24  just to get ahead of something that I am -- I think will come

25  up -- be amenable to that date being linked to the date that is

1    given for an estimate of the rolling production from

2    defendant's end?  Something like additional discovery requests

3    served within 30 days or 21 days or something along those lines

4    of defendant's completion of responses to the existing request,

5    or something like that?

6         THE COURT:  Yes.  And then without leave of Court

7    after that or something like that.  Yeah, I would be okay with

8    that.

9         MR. GLAPION:  Okay.

10        THE COURT:  And that's all the information I want.  I

11   don't want to bite off too much.  I want to get some type of a

12   stipulation or agreement as to what they're going to give you

13   done, and I'd like to know what -- I'd like to continue to

14   monitor more closely than I have discovery.

15        And if you can get me that -- I'm going to keep the

16   December 13th -- oh, and then, finally, I think I would like

17   proposed or confirmed dates for any depositions that the

18   parties and the witnesses have calendared before the close of

19   fact discovery.  And if I need to move that date to accommodate

20   whatever is going on, I will.  But I just -- I just want to get

21   a better handle on it than I have had up until now.  Okay?

22        So three things, the stipulation or what you're going

23   to produce to satisfy what we are talking about in the motion

24   to compel.  And I'll enter the motion -- enter and continue the

25   motion to compel until after that status report is filed.

1          And then I want --

2     (Discussion off the record.)

3         THE COURT: And then the status on written discovery.

4 And then the deps.

5         I'm entering and continuing the motion rather than

6 ruling on it. Because if I have to rule on it, then I'll rule

7 on it. But I think, you know, I can -- if you can reach

8 agreement, I will -- I could deny it as moot or deny it without

9 prejudice or something like that.

10         But if you have to then get back into it, then I got

11 to look at it and see where we're going. But I don't think I'm

12 going to have to do that.

13         Okay. Is that -- is 14 days enough time to give you

14 to do this? I'm reluctant to give you a whole lot more,

15 frankly.

16         MR. GLAPION: I'm in Disney with the kids from October

17 30th to the 3rd, so I actually want to get it done sooner than

18 that.

19         THE COURT: Fine.

20         MR. WATSTEIN: And I also have Halloween obligations,

21 so...

22         THE COURT: Great.

23         MR. WATSTEIN: So October 30th is fine.

24         THE COURT: Okay. So try not to screw each other's

25 plans up on this, okay, with stuff coming over the transom or

1    letters or something like that.  Okay?

2           I hope -- I hope there is not another hurricane at

3    Disney.  And I hope you have good break plans as well.

4           Okay.  I think that's about as much as we can

5    accomplish today.

6           All right.  Anything more from the plaintiff?

7           MR. GLAPION:  No, your Honor.

8           THE COURT:  Defense?

9           MR. WATSTEIN:  Nothing more, your Honor.

10          THE COURT:  Okay.  I do appreciate you coming in.  I

11   did note that you said you had another hearing by telephone

12   with another judge here.  We are -- we're mixed here in this

13   court.  I am old-fashioned.  And I know you -- you know, you

14   both came in from out of town.  I appreciate that a lot.

15          I know that a lot of hearings are happening by Zoom or

16   by telephone.  I think it's -- was very productive to have you

17   both here today.  I just think it is better to have you sitting

18   with each other and sitting with me.  I think the tenor of the

19   hearing may have been different too rather than doing it by

20   telephone.  So I appreciate you coming in.

21          I do other hearings by telephone.  I think I have done

22   them potentially in this case.  I can't remember.  And I'll do

23   it by telephone.  But this was one that I needed to see

24   everybody here and not have people talking over each other,

25   which is what we get on the telephone.

1    So thank you for coming in.  I hope you have good

2    flights back.

3    MR. WATSTEIN:  Thank you for having us.

4    MR. GLAPION:  With younger kids, I'll take any

5    opportunity to travel and spend a night in a hotel that I get.

6    So if you want to order more in-person hearings, your Honor, I

7    can present this to my wife and say here is the order.

8    THE COURT:  How many kids did you say?

9    MR. WATSTEIN:  This is on the record.

10    MR. GLAPION:  I have two, but they are three and

11    five -- oh, we are on the --

12    (Which concluded the proceedings.)

13    CERTIFICATE

14    I certify that the foregoing is a correct transcript
from the digital recording of proceedings in the above-entitled

15    matter to the best of my ability, given the limitation of using
a digital-recording system.

16

17

18    /s/Pamela S. Warren                    October 18, 2024
Official Court Reporter - Retired              Date

19    United States District Court
Northern District of Illinois

20    Eastern Division

21

22

23

24

25