Se73UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **RASHAD WALSTON,** on behalf of himself and all others similarly situated,<br><br>       **Plaintiff,**<br><br>  v.<br><br>**NATIONAL RETAIL SOLUTIONS, INC. D/B/A NRS PAY,**<br><br>       **Defendant.** | Civil Case No.: 24-cv-83<br><br>District Judge: Hon. Sunil R. Harjani<br>Magistrate Judge: Jeffrey T. Gilbert |

**PLAINTIFF'S MOTION FOR RELIEF UNDER RULE 23(d)**

Plaintiff respectfully requests an order restricting Defendant from continued unilateral communications with putative class members; from enforcing in this litigation any agreement obtained from putative class members after the start of this litigation; and from using any information obtained from those absent class members.

**INTRODUCTION**

Defendant, a subsidiary of public company, IDT, made over 500,000 unsolicited telephone calls to putative class members, exposing it to damages north of $150 million.

On November 14, Defendant admitted that it has *continued* to contact these putative class members.[1] Glapion Decl. Ex. A (pp. 5-6).[2] At the same time, Defendant sought to

---

[1] Defendant later sought to claim its admission was based on contact with putative class members who had become its customers. Defendant declined to answer whether the admission would change if customers were excluded. Glapion Decl., Ex. B (p. 9). Further, Defendant's acknowledgment that it is withholding documents related to such communications on work-product grounds indicates that at least some of the communications related to this litigation. *Id.*

[2] For convenience, all pages references are to the overall PDF page.

1

entrench this unilateral communications scheme, successfully arguing that the Court must protect these absent class members from *Plaintiff's* unsolicited communications. *See, e.g.*, [Dkt. 56, pp. 10-12.]

Defendant's counsel has done this before. In opposing class certification in *Katz Chiropractic, Inc. v. Diamond Respiratory Care, Inc.*, the defendant, represented by Attorney Watstein while at his then-firm Kabat Chapman & Ozmer LLP, submitted declarations from approximately a dozen putative members of the class that he had obtained through such pre-certification contact. 340 F.R.D. 383, 387 (N.D. Cal. 2021).

Making this more concerning is Defendant's misconduct with respect to the only individual third-party witness, Michael Hellerman, Plaintiff has been permitted to access. Specifically, Defendant's counsel 1) initiated contact with and attempted to solicit this third-party witness with offers of free (to the witness) representation; 2) lied to both Plaintiff's counsel *and* the Court about this representation; and 3) drafted a sham declaration on behalf of the witness, replete with inaccuracies, to cover its tracks.

If Defendant is willing to do this with a witness to whom it knows Plaintiff has access, what is it doing with witnesses it has successfully blocked Plaintiff from accessing? What is to stop Defendant from inducing putative class members with offers of, e.g., free trials of its services (similar to how it solicited Mr. Hellerman with "free" representation) in order to procure arbitration clauses and/or class action waivers?[3] What is to stop Defendant from drafting inaccurate declarations on behalf of these absent class members to obtain favorable

---

[3] Defendant raised as an affirmative defense "arbitration, class waiver, and release." [Dkt. 70, p. 34.] Defendant applies the first two of these to "Plaintiff and the putative class members[.]" Defendant, however, has not moved to compel arbitration on Plaintiff's claims nor has it argued Plaintiff is subject to a class waiver, which means Defendant believes that at least some of the putative class members are subject to arbitration clauses or class waivers (presumably from a contract).

2

testimony, as it did with Mr. Hellerman?

This is not just paranoia. Defendant's counsel has previously been linked to actions constituting a "threat to the orderly administration of justice." *Fox v. Ritz-Carlton Hotel Company, LLC*, 2023 WL 2866249, *2 (S.D. Fla. Mar. 8, 2023) (disqualifying local counsel with ties to the presiding Magistrate, hired years into the litigation, that Attorney Watstein and his then-firm alleged brought on for the sole purposes of forcing recusal).[4]

Further, defendants frequently try to defeat class actions by surreptitiously obtaining releases or arbitration agreements from absent class members. *See, e.g.*, *Kater v. Churchill Downs Inc.*, 423 F. Supp. 3d 1055, 1062 (W.D. Wash. 2019) (collecting cases); *Cheverez v. Plains All American Pipeline, LP*, 2016 WL 861107 (C.D. Cal. Mar. 3, 2016); *Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758 (N.D. Ohio 2010).

The Court has previously acknowledged concerns about absent class member privacy and recognized its duty to protect absent class members. In the context of denying Plaintiff access to putative class member phone numbers, the Court stated:

> [Y]ou know, as somewhat of a fiduciary for absent class members, I think I have to be cognizant of what kind of invasions of their lives they should be subjected to simply because they are putative members of the class.

October 16 Hearing Transcript, 28:8-29:8.

Consistent with this duty, Defendant, an entity accused of invading class member privacy *en masse* through unsolicited communications, cannot be allowed to re-victimize those same absent class members through *more* unsolicited communications, especially now that it is adversarial to them and it has shown it cannot be trusted to interact honestly and

---

[4] The *Fox* court did not definitively rule on the motives, but the court's decision to disqualify the highly-respected local counsel is telling.

3

appropriately with third party witnesses.

## DISCUSSION

I. **Defendant's actions toward a third-party witness and the allegations in this case require limitations on its right to contact putative class members.**

    a. Legal Standard

Parties "have a right to contact members of the putative class." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981); *see also Williams v. Chartwell Fin Servs., Ltd.*, 204 F.3d 748, 759 (7th Cir. 2000). That said, under Fed. R. Civ. P. 23(d), District Courts have "both the duty and broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil*, 452 U.S. at 100. This includes the authority to restrict communications between parties and prospective class members. *Id.* at 101. "[A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 102. "[S]uch a weighing … should result in a carefully drawn order that limits speech as little as possible[.]" *Id.* A district court "may not exercise the power" to restrict communications "without a specific record showing by the moving party of the particular abuses by which it is threatened." *Id.*

Put another way, a court may restrict communications with a putative class where the potentially restricted party has engaged in or has threatened to engage in "coercive, misleading, or other abusive communications." *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 926 (N.D. Ill. 2013). This is because such restrictions involve "serious restraints on expression" which require "caution on the part of a district court in drafting such an order, and attention to whether the restraint is justified by a likelihood of serious abuses." *Id.* at 104. Courts may,

4

for example, "limit communications that improperly encourage potential class members to not join the suit, especially if they fail to provide adequate information about the pending class action." *Slakov v. Fast Water Heater Partners I, LP*, 2015 WL 6674575, *2 (N.D. Cal. Nov. 2, 2015). Courts also routinely find that a defendant's attempt to impose an arbitration agreement on putative class members, thereby causing the putative class member to waive participation in the lawsuit, constitutes improper and abusive communication. *See, e.g.*, *Kater v. Churchill Downs Inc.*, 423 F. Supp. at 1062; *Jimenez v. Menzies Aviation Inc.*, 2015 WL 4914727, *6 (N.D. Cal. Aug. 17, 2015).

> b. <u>Defendant's misconduct with respect to third-party witness Michael Hellerman shows a threat of coercive, misleading, and/or abusive communications.</u>

On August 19, 2024, Plaintiff's counsel deposed Defendant's Vice President of Marketing, Diana Stern. During that deposition, Ms. Stern named a former employee, Michael Hellerman, as someone with knowledge of NRS' use of the VoiceLogic program. Mr. Hellerman had last worked for NRS in March 2020.

On August 22, 2024, Plaintiff's counsel emailed Mr. Hellerman asking to speak with him about a case he had pending "against NRS for unwanted telephone calls." Glapion Decl., Ex. C (p. 16). Mr. Hellerman did not respond. Plaintiff's counsel followed up again on August 26 and on October 7. *Id* at pp. 16-17.

On October 7, in response to that final follow-up, Mr. Hellerman called Plaintiff's counsel. *Id.* at ¶ 9. Mr. Hellerman confirmed on that call, among other things, that he was not represented and that he had never heard of Attorney Fitzgerald, Attorney Watstein, or Watstein Terepka. Glapion Decl. ¶¶ 10-13.

Later that same day, Plaintiff reached out to Defendant indicating his intent to subpoena Mr. Hellerman's deposition and asked for Defendant's counsel's availability to

5

participate. Glapion Decl., Ex. D (p. 19).

The next day, October 8, Defendant's counsel responded that "[w]e represent Michael and will ask him about his availability[.]" *Id.* at p. 20. Defendant's counsel also professed optimism that Mr. Hellerman could "speak to some of the issues" for which Plaintiff sought to depose Defendant's CEO, Elie Katz, but who Plaintiff has not been able to depose because of Mr. Katz's medical issues. *Id.*

Confused, given Mr. Hellerman's claim the day prior that he had never heard of either of Defendant's counsel, Plaintiff's counsel asked for clarification and if Defendant would produce its representation agreement with Mr. Hellerman. *Id.* at p. 21. Plaintiff's counsel followed up on October 10. *Id.* at p. 22.

Defendant's counsel Fitzgerald responded and accused Plaintiff's counsel of doing something wrong:

> We have represented Michael since August 16. He was under the impression that you represented NRS, which is the only reason he spoke with you. See attached. Had you asked before reaching out to a former NRS employee, whose interests are potentially adverse to your client, we would have told you as much. We reserve the right to raise the issue with the Court, including its impact on the pending motion to compel. In the interim, you are obviously not to contact Michel[sic] further or any other former NRS employee without asking us first if they are represented.

*Id.* at p. 23. Defendant's counsel also shifted gears on Mr. Hellerman's deposition, claiming that Defendant "misunderstood the scope of Michael's involvement" and his deposition would not be "necessary or proportionate." *Id.* In other words, on October 8, Defendant thought Mr. Hellerman was so knowledgeable that his testimony could replace the CEOs, but on October 10, after Plaintiff raised concerns about Defendant's claims of representation, Mr. Hellerman had no information and his deposition was not necessary.

6

Attached to this email was a document[5] dated October 10 and captioned "Declaration of Michael Hellerman." This document stated, in part:

> On August 16, 2024, counsel for NRS, Patrick Fitzgerald of Watstein Terepka LLP, contacted me and advised me that NRS would pay for the firm to represent me in connection with this matter. I agreed to that representation.

Glapion Decl., Ex. E, ¶ 4 (p. 33). Plaintiff's counsel immediately responded to this email that this "declaration" admits to Defendant's counsel's improper solicitation of Mr. Hellerman. *Id.*, Ex. D. (p. 24). Defendant's counsel responded, misstating facts and again accusing Plaintiff's counsel of doing something wrong:

> [Y]ou sent an email that didn't disclose your potential adversity to Mr. Hellerman and that he apparently didn't even respond to. Then you called the guy two months later. … It's clear at this point that you don't think the rules and norms apply to you.

*Id.* at p. 25. Defendant's counsel again sought to block Mr. Hellerman's deposition, claiming it would be a waste of time and money, and requested a conference. *Id.*

After additional back and forth in which Plaintiff's counsel pointed out that 1) Mr. Hellerman initiated the phone call, *id.* at p. 26; and 2) Plaintiff's counsel *did* disclose adversity, *id.* at p. 28, Plaintiff's counsel again asked for a representation agreement. *Id.* at pp. 28-29. Defendant's counsel responded that Plaintiff was "not entitled to that information" and that seeking this information is "nothing but a harassment tactic" to "deflect from your own misconduct." *Id.* at p. 30.

Defendant then immediately used this situation in two briefs filed with the Court. In its Motion to Deny, it accused Plainiff's counsel of "unilaterally contacting a former NRS employee … who … was represented by NRS's counsel." [Dkt. 76, p. 9.] In its Sur-Reply in

---

[5] This hastily-drafted "declaration" does not contain language sufficient for evidentiary use. 28 U.S.C. § 1746; *see also, e.g., Sagdai v. Travelers Home and Marine Insurance Co.*, 639 F. Supp. 3d 1091, 1101 (W.D. Wash. 2022) (excluding declarations that did not substantially comply with 28 U.S.C. § 1746).

Opposition to Plaintiff's Motion for a Protective Order (a different one), Defendant referenced this situation and wrote that "Plaintiff's Counsel also tries to use … another of his own ethical transgressions to further criticize Defense counsel …. Counsel fails to disclose that Plaintiff's counsel misled [Mr. Hellerman] into speaking with him about the case[.]" [Dkt. 73-1.]

But none of this was true. At Mr. Hellerman's November 14 deposition (that Defendant had tried to block), Mr. Hellerman confirmed Defendant's counsel's attempted solicitation:

> Q. [A]re you represented by counsel right now?
> A. Yes.
> Q. Who is your counsel?
> A. Pat Fitzgerald.
> Q. Are you paying for Mr. Fitzgerald's representation?
> A. I am not.
> Q. [H]ow did that representation come about?
> A. He reached out to me.
> Q. And at the time he reached out to you, had you been looking for counsel?
> A. I was not.
> …
> Q. Would you have retained counsel for this if you had to pay for counsel?
> A. No.

Glapion Decl., Ex. F (p. 35), Deposition of Michael Hellerman ("Hellerman Depo."), 8:25-9:15, 42:22-24; *see also id.* at 15:11-24 (confirming the accuracy of paragraph 4 of his Declaration). Mr. Hellerman also confirmed in his deposition that Defendant did not represent him until October 10 at the earliest—*after* Plaintiff's counsel spoke with Mr. Hellerman and *after* Defendant claimed it represented Mr. Hellerman:

> Q: Were you represented by counsel at the time of that [October 7] phone call?
> A: No.
> ***
> Q. …So just to be perfectly clear, on our phone call you were not represented by counsel. Is that correct?
> A. That's right.
> ***
> Q. I can't testify for you, but the date on the declaration is October 10th?

8

> A. Yes. So I retained counsel I guess, if that's how you would refer to it, on the 10th.
> Q. And were you represented by counsel on August 16th?
> A. No.
>
> ***
>
> Q. And my question was, if an attorney told me they represented you in connection with this case since August 16th, is that accurate?
> A. No. I might have had conversations, but I didn't retain anybody, agree with anybody. I didn't.
>
> ***
>
> Q. On October 7th, when we had that phone call, did you believe that you were represented by counsel?
> A. No.

*Id.* at 8:3-6; 41:2-7; 42:6-18; 49:8-13; 60:9-12.

Defendant pushed backed on this testimony in cross-examination, seeking to paint a picture of Mr. Hellerman as unsophisticated and confused as to if and when he was represented. In most cases, this could be solved by reviewing the date Mr. Hellerman signed his representation agreement. Yet, as of the deposition, *no such agreement existed*[6]:

> Q. Have you signed an agreement with any attorney in connection with this deposition?
> A. No.
> Have you signed an agreement with any attorney in connection with the pending lawsuit that my client has against National Retail Solutions?
> A. No.
>
> ***
>
> Q. Between that August 16 conversation with Attorney Fitzgerald, until that October 10 declaration that we've discussed, did you sign anything in connection with this case?
> A. No.
> Q. Did you sign a representation agreement?
> A. No.
> Q. Did you sign an engagement agreement?
> A. No.
> Q. Did you sign anything outlining the scope of their representation of you?
> A. No.

---

[6] While representation agreements are not required to be in writing, "[t]he scope of the representation … shall be communicated to the client, preferably in writing[.]" Illinois RPC 1.5(b). Mr. Hellerman testified that he only "partially" understood the scope of any representation. *Id.* at 54:8-17.

9

Hellerman Depo., 10:20-11:1; 59:21-60-12.

Further, despite Defendant's counsel's accusations regarding Plaintiff's counsel's interactions with Mr. Hellerman, Mr. Hellerman could identify *nothing* Plaintiff's counsel did wrong or to "mislead" him:

> Q. [D]id you at all feel that I deceived you in any way about my role in this case?
> A. No. I didn't understand it. When we spoke, I really didn't understand the relationship or … what transpired.
> ***
> Q. [I]s there anything that I did that you can recall that gave you the impression that I was NRS's counsel?
> A. No, not specifically, no.
>
> ***
> Q. Can you elaborate on how I presented myself that would have made you think I represented NRS?[7]
> A. I just think I didn't understand.
> …
> Q. Was there anything I did that made you believe I represented NRS?
> A. No.

*Id.* at 11:20-25; 19:8-12; 44:14-17, 46:2-4

Finally, Mr. Hellerman testified that Defendant's counsel wrote his "declaration", he signed it with no changes same day it was sent to him, and that it contained inaccuracies in addition to those described above.

> Q. Did you write this declaration?
> A. No.
> Q. Did you make any changes to this declaration?
> A. No.
> Q. Do you understand who wrote this declaration?
> A. Yeah.
> Q. Who wrote this declaration?
> A. The attorneys representing me and NRS.
> …
> Q. Is it your testimony then that you signed it the same day you saw it?
> A. Correct.

---

[7] Referencing paragraph 5 of Mr. Hellerman's "declaration."

10

> \*\*\*
> Q. …True or false, you were an employee of National Retail Solutions until April 2020?[8]
> A. Actually, it was till March.
> Q. So that would be false?
> A. Yeah, that's false.
> Q. And you were involved in NRS's efforts to retain VoiceLogic.[9] Is that true or false?
> A. That's false.

*Id.* at 19:16-20:9; 44:1:9.

   c. <u>The nature of the case warrants caution.</u>

  Defendant is accused of purchasing lists of numbers and sending thousands of ringless voicemails to those numbers without consent. Discovery suggests more than 500,000 such unsolicted ringless voicemails were sent. Plaintiff brought this case to hold Defendant accountable for such brazen harassment. Yet the way this case has developed, *Plaintiff* has been precluded not only from contacting these same putative class members but from even knowing their phone numbers. Defendant, on the other hand, facing exposure in excess of $150 million for its *en masse* violations, is left free to contact and re-victimize those same putative class members, with no oversight, restrictions, or monitoring.

  Inevitably, Defendant will oppose this Motion and point to its Motion to Deny as why Plaintiff cannot have the phone numbers and accuse Plaintiff of seeking to distract. But Defendant's Motion to Deny consists of nothing more than self-interested allegations that will be opposed front to back. For now, it has neither been considered nor fully briefed. Its mere presence on the docket cannot continue to throw this case into chaos or tilt the scales so thoroughly in favor of Defendant on issues such as class member contact. Its mere presence certainly does not satisfy the *Gulf Oil* standard. If it does, then Plaintiff's case about unwanted

---

[8] Referencing paragraph 2 of Mr. Hellerman's "declaration."
[9] Referencing paragraph 2 of Mr. Hellerman's "declaration."

class member contact that Defendant has not even attempted to dismiss despite three opportunities to do so, and Plaintiff's evidence of Defendant's misconduct with respect to Mr. Hellerman, satisfy it tenfold.

## II. Defendant cannot be left to contact absent class members unmonitored.

Defendant's counsel contacted an unrepresented third-party witness who was not looking for counsel, sought to induce his cooperation and testimony through offers of free (to him) legal representation, lied about the status of this representation, and then, to cover it up, first attempted to block his deposition and then drafted a narrative-friendly (but inaccurate) "declaration" for the witness to hurriedly sign. The relevance of this conduct is simple: there is *nothing* currently stopping Defendant from doing the same to absent class members.

If Defendant is willing to act this way with respect to a third party witness to whom it *knows* Plaintiff has access, there are serious concerns about how Defendant might act toward absent class members to whom Plaintiff does *not* have access, especially with $150 million or more worth of reasons to be adversarial. Defendant itself has twice acknowledged concerns with unilateral contact with unrepresented persons to whom Plaintiff's counsel might be adversarial. Glapion Decl., Ex. D., p. 23 (criticizing Plaintiff's counsel for reaching out to Michael Hellerman, to whom Plaintiff might be adversarial); p. 25 (criticizing Plaintiff's counsel on Defendant's mistaken belief that Plaintiff's counsel did not disclose potential adversity to Mr. Hellerman). The same "concerns" apply here.

Finally, on a policy level, courts impose a high burden on formal requests to serve putative class members with interrogatories and even higher to justify taking depositions of putative class members. *Baldwin & Flynn v. National Safety Assocs.*, 149 F.R.D. 598, 600 (N.D. Cal. 1993) (citing *Clark v. Universal Builders, Inc.*, 501 F.2d 324, 340-41 (7th Cir. 1974)). It makes

12

little sense to allow Defendant to circumvent this burden by doing the same thing through clandestine, *ex parte* communications without oversight from the Court or class counsel.

As it stands, there is no monitoring. Plaintiff has successfully been denied access to putative class members just as Defendant sought to block Mr. Hellerman's deposition. Defendant has also sought to hide the scope and magnitude of its conduct, making a highly questionable claim of work-product privilege and refusing to produce a privilege despite the clear law on this issue. *See, e.g. Amarillo v. Artist Senior Living Mgmt LLC*, 2022 WL 672747, *3 (N.D. Ill. Mar. 7, 2022) (Gilbert, J.) Either Defendant has something to hide or really wants to give that impression. Regardless of which it is, leaving Defendant unchecked is not an option.

III. **If Defendant's actions are insufficient to preclude contact with putative class members, then Plaintiff should not be prohibited from such contact.**

Prior to this Motion, no such showing necessary to limit class member communication was made with respect to *either* Party. There is, however, no functional difference between barring Plaintiff's access to the unrestricted phone numbers out of concerns about Plaintiff's contact with putative class members and an order limiting communications between Plaintiff and putative class members. Further, without a corresponding no-contact order on Defendant, the result is to give Defendant, with millions of reasons to hound putative class members into some form of submission, unilateral and unmonitored access to those putative class members.

This is untenable. Though seldom litigated, courts have found "unilateral communications schemes" to be "rife with potential for coercion." *See Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985); *see also Mullen v. GLV, Inc.*, 334 F.R.D. 656, 662 (N.D. Ill. 2020). The *Kleiner* Court held that "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis

13

of a one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatements could well be irreparable." *Id.* at 1203; *see also Bhower v. Bunker Hill Co.*, 689 F. Supp. 1032, 1033 (E.D. Wash. 1985). To be clear, *Kleiner* was in the context of a certified class, but the harm from misstatements and lack of opportunity for rebuttal is still present. And while the *Kleiner* court dealt with egregious misstatements, we have no idea *what* statements Defendant is making here. Subsequently, another court applied *Kleiner* more generally to unilateral communications with putative class members pre-certification, finding "the danger of coercion is real and justifies the imposition of limitations on [defendant's] communications with potential class members." *Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 678 (N.D. Ga. 1999).

This Court has recognized its duty to absent class members pre-certification. October 16 Hearing Transcript, 28:8-28:18. This duty is well-known and long-standing. *See, e.g. Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989) ("[A] district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties.") In some circuits—including Plaintiff's counsel's home circuit—Plaintiff's counsel has this duty as well. *See, e.g. In re General Motors Corp.*, 55 F.3d 768, 801 (3d Cir. 1995), *cert. denied*, 516 U.S. 824 (1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed.") Yet with no insight into the nature, volume, or content of Defendant's communications with absent class members—derived either through the adversarial process or through limitations on communications—it is impossible to exercise this duty.

Furthermore, and practically speaking, presume that near the end of fact discovery or beyond, Defendant produces some number of declarations from absent class members and

14

uses those declarations to attack class certification. Plaintiff will have been deprived of the ability to 1) challenge the propriety and accuracy of statements made therein (as he successfully did with Mr. Hellerman) or 2) determine whether these absent class members were induced to make those statements, as Mr. Hellerman was induced with "free" representation.

At this point, the only viable options that do not work undue prejudice on either Party are to allow *both* Parties to contact absent class members or *neither* party to do so, while also limiting Defendant's use of material or agreements obtained from those communications.

## **CONCLUSION**

Defendant's counsel contacted an unrepresented third-party witness, sought to induce his cooperation and testimony through offers of free (to him) legal representation, lied about the status of this representation, and then, to cover it up, drafted a narrative-friendly (but inaccurate) "declaration" for the witness to hurriedly sign. With no limitation or oversight, class members are at risk of these same kinds of harassing, unethical, and confusing communications.

Accordingly, Plaintiff respectfully requests an order restricting Defendant from continued unmonitored communications with putative class members, pending the joint submission of a more narrowly tailored restriction; from enforcing in this litigation any agreement obtained from putative class members after the start of this litigation (e.g. settlement, arbitration, or class waiver); and prohibiting Defendant from using any information obtained from those absent class members.

Dated: November 29, 2024            s/ Jeremy M. Glapion
                                                       Jeremy M. Glapion
                                                       The Glapion Law Firm, LLC
                                                       1704 Maxwell Drive
                                                       Wall, New Jersey 07719
                                                       Tel: 732-455-9737
                                                       Fax: 732-965-8006
                                                       jmg@glapionlaw.com

                                                      Counsel for Plaintiff and the Putative Class

## CERTIFICATION OF SERVICE

I hereby certify that on November 29, 2024, I filed the foregoing document using the CM/ECF system which will send notice of electronic filing to all counsel of record.