1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS.
2                    CIVIL CASE NO. 24-cv-83

3
                                        :
4    RASHAD WALSTON, on behalf    :
     of himself and all others    :
5    similarly situated,          :   DEPOSITION UPON
                                  :   ORAL EXAMINATION
6         Plaintiffs,             :        OF
                                  :   MICHAEL HELLERMAN
7    V.                           :
                                  :
8    NATIONAL RETAIL              :
     SOLUTIONS, INC. D/B/A NRS    :
9    PAY,                         :
                                  :
10        Defendant.              :
                                  :
11                               :
     -----------------------    X
12
13              TRANSCRIPT of the stenographic notes of
14   the proceedings in the above-entitled matter, as
15   taken by and before ELLEN J. GODINO, CCR, RPR, CRCR,
16   held via ZOOM VIDEOCONFERENCE from various locations,
17   with the witness located at 255 Thompkins Avenue,
18   Brooklyn, New York, on Thursday, November 14, 2024,
19   commencing at 9:30 a.m.
20
21
22
23
24
25

Page 2

1  A P P E A R A N C E S:
2
3  GLAPION LAW FIRM
   BY:  JEREMY GLAPION, ESQ.
4  1704 Maxwell Drive
   Wall, New Jersey 07719
5  732-455-9737
   jmg@glapionlaw.com
6  Attorneys for the Plaintiff
7
8  WATSTEIN TEREPKA
   BY:  PATRICK FITZGERALD, ESQ.
9  1055 Howell Mill Road
   8th Floor
10  Atlanta, Georgia 30318
   404-418-8307
11  pfitzgerald@wtlaw.com
   Attorneys for the Defendant and the Witness
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        I N D E X
2
3  Examinations              Page
4
   M I C H A E L   H E L L E R M A N      4
5
6  EXAMINATION BY MR. GLAPION         4
7
   EXAMINATION BY MR. FITZGERALD       55
8
9  EXAMINATION BY MR. GLAPION         59
10
11
12
13        EXHIBITS
14
   NumberDescription          Page
15
16      No exhibits were marked
17
18
19
20
21
22
23
24
25

Page 4

1       THE REPORTER: The attorneys
2  participating in this deposition acknowledge that I
3  am not physically present in the deposition room and
4  that I will be reporting this deposition remotely.
5  They further acknowledge that, in lieu of an oath
6  administered in person, I will administer the oath
7  remotely.  The parties and their counsel consent to
8  this arrangement and waive any objections to this
9  manner of reporting.  Please indicate your agreement
10  by stating your name and your agreement on the
11  record.
12       MR. GLAPION:  No objection.
13       MR. FITZGERALD:  No objection
14  M I C H A E L   H E L L E R M A N, 255 Thompkins
15  Avenue, Brooklyn, New York, having been duly sworn,
16  testified as follows:
17  EXAMINATION BY MR. GLAPION:
18  Q.   Are you ready for us, thank you.
19       Can you hear me okay, Michael?
20  A.   I can, but my cell phone is not
21  working, so we'll just go --
22  Q.   Do you want -- we can take a second if
23  you want to grab something else?
24       (Off-the-record discussion.)
25  Q.   Good morning, Mr. Hellerman.  Is this

Page 5

1  your first time being deposed?
2  A.   It is.
3  Q.   So congratulations.  I'm only kidding.
4  This won't take long, but I do want to go over some
5  very brief ground rules just to make sure we're on
6  the same page.
7       If you need a break at all during the
8  deposition, let me know.  The only thing I would ask
9  is that if I am in the process of asking a question,
10  or there's a pending answer, that we wait until that
11  answer is complete before we take that break.  Is
12  that okay?
13  A.   Sure.
14  Q.   And if you don't understand my
15  question, please let me know.  I will otherwise
16  assume that you understood it.  If you let me know,
17  I can try to clarify it for you.  Is that fair?
18  A.   That sounds fair to me.
19  Q.   In terms of answering questions, your
20  attorney may object to questions, but unless your
21  attorney instructs you not to answer, you are to
22  answer the question.  Is that understood?
23  A.   Understood.
24  Q.   Thank you.  Are you aware today that
25  you are under oath?

2 (Pages 2 - 5)

Page 6

1    A.    I am aware.
2    Q.    Are you under the influence of any
3  medication, substances, or anything that may impair
4  your ability to testify truthfully or honestly?
5    A.    I am not.
6    Q.    Anything that may impact your memory?
7    A.    Other than the recent election, no.
8    Q.    Oh, gosh, this deposition will go on
9  for much longer than it should if we get into
10  that --
11    A.    Yeah, we'll avoid that topic.
12    Q.    Do you recall speaking with me prior to
13  this deposition?
14    A.    I do, briefly.
15    Q.    And in what form was that conversation?
16    A.    I received an email, a request that I
17  call.  I called you, you asked me a handful of
18  questions, and that was the only conversation we
19  had.
20    Q.    Would you characterize that
21  conversation as cordial?
22    A.    Sure.
23    Q.    Who initiated that phone call?
24    A.    You did.
25    Q.    I called you?

Page 7

1    A.    No.  You sent me an email that
2  requested I make a phone call.
3    Q.    And in terms of the actual phone call,
4  who initiated that phone call?
5    A.    I did.
6    Q.    On that phone call, do you recall the
7  substance of the conversation that we had?
8    A.    Not really.
9    Q.    Do you recall on that -- whether I
10  asked if you were represented by counsel?
11    A.    I don't remember specifically, no.
12    Q.    Do you recall if I asked if you knew
13  the name Ryan Watstein?
14    A.    I don't remember you asking me that,
15  no.
16    Q.    Do you recall if I asked if you knew
17  the name Patrick Fitzgerald?
18    A.    No, I don't recall that from the
19  conversation.
20    Q.    Do you recall if I asked if you had
21  heard of Watstein Terepka?
22    A.    No, I don't remember that either.
23    Q.    I know a lot of these will seem
24  repetitive; it's just, you know, there's a million
25  different ways to ask things, so I just want to make

Page 8

1  sure.
2    A.    Sure.
3    Q.    Bear with me.  Were you represented by
4  counsel at the time of that phone call?
5        MR. FITZGERALD:  Objection.
6    A.    No.
7    Q.    And are you represented by counsel
8  right now?
9        MR. FITZGERALD:  Objection.
10    Q.    You can answer.
11    A.    Oh, although he objected, I can answer?
12        MR. FITZGERALD:  Yeah, you can answer
13  unless I instruct you not to answer.
14    A.    I think I am.
15    Q.    And just to be clear, and I know -- I
16  assume that Pat is objecting to the extent anything
17  is going to get into privilege.  I don't want you to
18  tell me any conversations between you and any of
19  your attorneys.  So if anything is eliciting that,
20  take a second; because my focus is just more on --
21  is not on the conversation, because there's a
22  privilege there that I'm not trying to get involved
23  with.
24    A.    Okay.
25    Q.    But are you represented by counsel

Page 9

1  right now?
2    A.    Yes.
3    Q.    Who is your counsel?
4    A.    Pat Fitzgerald.
5    Q.    Are you paying for Mr. Fitzgerald's
6  representation?
7    A.    I am not.
8    Q.    How did that representation come about,
9  without getting into the substance of any
10  conversation between you and Mr. Fitzgerald, how did
11  that representation come about?
12    A.    He reached out to me.
13    Q.    And at the time he reached out to you,
14  had you been looking for counsel?
15    A.    I was not.
16    Q.    Have you been represented by counsel in
17  any previous lawsuits?
18    A.    In my lifetime?
19    Q.    In your lifetime, have you hired an
20  attorney?
21    A.    Of course, sure.
22    Q.    Do you have an attorney that you
23  typically go to for legal matters?
24    A.    No, not like a family or personal
25  attorney?  My wife.

3 (Pages 6 - 9)

1    Q.    Was your wife involved at all in
2   retaining Mr. Fitzgerald?
3    A.    No.
4    Q.    Do you have a sense of whether
5   Mr. Fitzgerald is being paid for your
6   representation?
7    A.    No idea.
8    Q.    When you mentioned before that
9   Mr. Fitzgerald reached out to you, without getting
10  into the substance of that conversation, how did he
11  reach out to you?
12       MR. FITZGERALD:  Objection.
13    A.    I believe initially an email.
14    Q.    Was there any telephonic communication?
15    A.    I don't believe so, not initially.
16    Q.    Have you signed an agreement with
17  Mr. Fitzgerald for your representation?
18       MR. FITZGERALD:  Objection.
19    A.    You know, I honestly don't remember.
20    Q.    Have you signed an agreement with any
21  attorney in connection with this deposition?
22    A.    No.
23    Q.    Have you signed an agreement with any
24  attorney in connection with the pending lawsuit that
25  my client has against National Retail Solutions?

1    A.    No.
2    Q.    Give me one second.
3          Did you execute a declaration in
4   connection with this matter?
5    A.    Can you expand on that for me?
6    Q.    Sure.  A declaration being a document
7   called "Declaration of Michael Hellerman" which
8   lists various paragraphs of under oath or sworn
9   statements.  Do you recall executing something like
10  that?
11    A.    I'm a terrible witness; I don't
12  remember.
13    Q.    It's completely okay.  I understand it
14  can be a stressful process, and things fly out of
15  your memory.  Especially if you have young kids, I
16  get it.
17    A.    Young kids, a couple of businesses, you
18  know, all that.
19    Q.    I completely understand.
20          Well, actually backing up to our
21  conversation, did you at all feel that I deceived
22  you in any way about my role in this case?
23    A.    No.  I didn't understand it.  When we
24  spoke, I really didn't understand the relationship
25  or what was -- what transpired.

1    Q.    Did you have an understanding of
2   whether I represented National Retail Solutions, or
3   whether I was adverse to National Retail Solutions?
4    A.    In our initial conversation, I did not
5   realize who you represented.
6    Q.    And you had -- you had mentioned
7   previously that I had communicated with you via
8   email initially.  Correct?
9    A.    Yes.
10       MR. GLAPION:  I'm going to share my
11  screen real quick.  Let me see if I can do this
12  correctly, without sharing all kinds of unrelated
13  material.
14    Q.    Can you see this?
15    A.    Yes, sure can.
16    Q.    And do you see the email at the top?
17    A.    Yep.
18    Q.    And in this email it says, "Hi,
19  Michael, I hope this email finds you well.  Sorry to
20  reach back into your past life at NRS, but I am an
21  attorney in New Jersey with a pending lawsuit
22  against NRS for unwanted telephone calls."
23          Do you see that?
24    A.    I do.
25    Q.    Did you receive this email?

1    A.    I may have, but I don't think I read
2   that one.  I read the one that "you may be
3   subpoenaed."  I read that one.
4    Q.    I can scroll down to that one in a
5   moment.
6    A.    Okay.
7    Q.    Was michael@sellingsavvy.com your email
8   address?
9    A.    That's one of my email addresses, yes.
10    Q.    Is that one that's active to actually
11  receive emails?
12    A.    Yes.
13    Q.    Do you ever check your spam folders on
14  that?
15    A.    Rarely.
16    Q.    And the email you're referring to, I'll
17  scroll down, is -- let me find it.  It's clicking
18  away, hold on.  Okay.  It looks like it's -- part of
19  it is cut off, but it's at the top of this page.
20    A.    Sure.
21    Q.    Is that the one you're referring to --
22    A.    I see it.
23    Q.    I mention that --
24       (Cross-talk.)
25       (Court Stenographer clarification.)

Page 14

1    A.   That was the one that got my attention.

2    Q.   Understood.  Do you -- and just to

3 clarify, do you recall whether you received the

4 previous emails or not?

5    A.   I can tell you that the first email I

6 saw was that one.

7    Q.   Did you receive -- well, let me

8 rephrase this.

9        Do you know if you received the emails

10 prior to that point?

11    A.   Not really.  I mean that was the one,

12 that like I said, that one got my attention.  I

13 didn't think I needed to go back and look at the

14 previous ones, if that one caught me, so.

15    Q.   And just to be clear, I'm not trying to

16 be overly difficult on this point.  I'm just trying

17 to understand whether you didn't read the emails or

18 whether you didn't receive the emails.  I'm trying

19 to clarify that aspect of your testimony.

20    A.   If you'd like, I can go and look at my

21 inbox.

22    Q.   I wouldn't ask you to do that, but I

23 appreciate the offer.

24    A.   Sure.

25    Q.   I clicked over to a document.  Do you

Page 15

1 see the new document, "Declaration of Michael

2 Hellerman"?  Is that showing up?

3    MR. FITZGERALD:  I see it.

4    Q.   Do you see it, Michael?

5    A.   I do.

6    Q.   I'm going to scroll down.  Is that your

7 signature?

8    A.   It is.

9    Q.   Do you recall executing this document?

10    A.   I do now.

11    Q.   And in this document, you wrote -- or

12 you testified in this declaration that "Counsel for

13 NRS, Patrick Fitzgerald, contacted me and advised

14 that NRS would pay for the firm to represent me in

15 connection with this matter."

16        Do you see that, in Paragraph 4?

17    A.   Yes.

18    Q.   Is that accurate?

19    A.   Yeah.

20    Q.   And is that your understanding of --

21 excuse me, is your understanding that Mr. Fitzgerald

22 is paid by NRS for your representation?

23    MR. FITZGERALD:  Objection.

24    A.   Yes.

25    Q.   And in paragraph 5, you -- it states,

Page 16

1 "Because of the way Mr. Glapion presented himself, I

2 mistakenly believed that Mr. Glapion represented NRS

3 and assumed he was NRS's counsel."

4        Do you see that?

5    A.   Yes, and that's correct.

6    Q.   A moment ago, and I'll look at the

7 realtime, I believe you testified to that you didn't

8 understand it when we spoke, "we" being you and me

9 in this scenario?

10    A.   Correct.

11    Q.   You didn't understand the relationship.

12    A.   Correct.

13    Q.   Can you reconcile what it says in

14 paragraph 5 about your understanding of the

15 relationship, and that testimony that you just

16 provided?

17    MR. FITZGERALD:  Objection.

18    A.   I understood that you were counsel in

19 this pending lawsuit between NRS and whoever was

20 suing NRS, that's what I understood.  But I didn't

21 understand who you represented.

22    Q.   But here it says that you had assumed I

23 was NRS's counsel.  Did you assume I was NRS's

24 counsel?

25    A.   At first I did, yeah.

Page 17

1    Q.   At what point did that change, if it

2 changed?

3    A.   When I spoke to Patrick Fitzgerald.

4    Q.   So again, I just want to understand, a

5 moment ago you testified that you didn't understand

6 the relationship, but this declaration says that you

7 understood or assumed I represented NRS's counsel.

8 And what I'm trying to understand is how those

9 testimonies are consistent.

10    A.   Okay.

11    Q.   I guess the simple question is:  At the

12 time of the phone call, did you understand that I

13 represented NRS?

14    A.   Well, I misunderstood, thinking you

15 represented NRS.

16    Q.   And if we go back -- and I'll come back

17 to this for a moment.  If we go back to that --

18 those emails, I know you had testified previously

19 that you don't recall seeing this email.

20        How would you interpret the line, "I am

21 an attorney in New Jersey with a pending lawsuit

22 against NRS for unwanted telephone calls"?

23    A.   Yeah, but that could be either side,

24 that's pretty vague.

25    Q.   Do you understand "against"?

1      MR. FITZGERALD: Objection.
2      A.    How I read this was, you're an attorney
3  in New Jersey with a pending lawsuit against NRS.
4  This does not say to me that you represented NRS or
5  you represented someone else. I interpreted it as
6  you represented NRS, when I read that.
7            Maybe I'm bad, but that's how I
8  understood it when I first spoke with you.
9      Q.    So I just want to clarify that
10 testimony a moment ago.
11           You said "when you read it." Are you
12 talking about -- when did you read this?
13     A.    The day that said I'm going to be
14 subpoenaed.
15     Q.    Correct. But I'm referring to this
16 first email, from August 22nd?
17     A.    I never read that one. I read the one
18 that said I was going to be subpoenaed. I never
19 went back and looked at previous emails.
20     Q.    Okay.
21     A.    So if you read one that says, "You're
22 going to be subpoenaed, you know, I hate surprising
23 somebody with a subpoena," then that's what I read.
24     Q.    Yeah, no, and I get that. I am just
25 trying to understand the basis for this paragraph 5

1  in your declaration, that you assumed I was NRS's
2  counsel. Because so far, I --
3      A.    Jeremy, go back to the email that I
4  read.
5      Q.    Correct.
6      A.    I didn't read the previous emails, I
7  only read the one that said, "hey," right?
8      Q.    And I understand that. And I'm not --
9  I am trying to -- is there anything that I did that
10 you can recall that gave you the impression that I
11 was NRS's counsel?
12     A.    No, not specifically, no.
13     Q.    So the assumption that you made that I
14 was NRS's counsel was based on what?
15     A.    I'm guessing based on vagueness.
16     Q.    Did you write this declaration?
17     A.    No.
18     Q.    Did you make any changes to this
19 declaration?
20     A.    No.
21     Q.    Do you understand who wrote this
22 declaration?
23     A.    Yeah.
24     Q.    Who wrote this declaration?
25     A.    The attorneys representing me and NRS.

1      Q.    And do you understand when -- do you
2  know when you first saw this declaration?
3      A.    Go to the page above it. Is it dated?
4      Q.    It looks like it was executed, it was
5  executed on October 10th?
6      A.    That's the day I saw it.
7      Q.    Is it your testimony then that you
8  signed it the same day you saw it?
9      A.    Correct.
10     Q.    Are you good?
11     A.    Yeah, yeah. Just my lack of headphone
12 thing was frustrating, but whatever.
13     Q.    Your camera also keeps blurring you out
14 and everyone else. But it's okay, we're not being
15 recorded, so it's totally fine.
16           You also signed -- you signed this
17 declaration that also states, "Had I realized
18 Mr. Glapion represented a party adverse to NRS, I
19 would have told him that I was represented by
20 counsel and declined to speak with him."
21           Do you see that?
22     A.    Yes.
23     Q.    What counsel were you represented by at
24 the time of our phone call?
25     A.    I was not.

1      MR. FITZGERALD: Objection.
2      Q.    So when you say, "I would have told him
3  I was represented by counsel and declined to speak
4  with him," can you clarify that testimony in light
5  of your testimony that you were not represented by
6  counsel?
7      MR. FITZGERALD: Objection.
8      A.    Can you ask that again?
9      Q.    Sure. In Paragraph 6, you wrote that
10 you would have told me that you're represented by
11 counsel and declined to speak with me if you knew
12 that I was adverse to NRS. Do you see that?
13     A.    Yes.
14     Q.    But your testimony here is that you
15 were not represented by counsel at that time.
16 Correct?
17     A.    Correct.
18     MR. FITZGERALD: Objection.
19     Q.    So had you realized that I represented
20 a party adverse to NRS, can you explain how you
21 could have told me that you were represented by
22 counsel and declined to speak with me?
23     A.    Ask me that again.
24     Q.    Sure. If you were not represented by
25 counsel at the time of our conversation, how would

Page 22

1 you have been able to tell me that you were
2 represented by counsel and declined to speak with
3 me?
4 MR. FITZGERALD: Objection.
5 A. Okay, let's -- I wasn't represented.
6 Therefore, let's just say that because I didn't have
7 representation, I really didn't know my role in this
8 or what my rights in this were. So I probably would
9 not have said anything, if I understood that, you
10 know, this could be used in a lawsuit. How's that?
11 Does that help a little bit?
12 Q. I think so. And I don't want to -- I
13 just want to back up for the moment and say that I
14 am -- I apologize how this process and these
15 questions can seem adversarial, and all of that.
16 A. That's fine.
17 Q. I'm just trying to get information, and
18 sometimes that requires me to ask things five
19 different ways, so. I appreciate your patience with
20 me on this and even being here.
21 Shifting gears to your time at NRS you
22 wrote in this declaration that you were an employee
23 of National Retail Solutions from May 2018 until
24 April 2020. Is that accurate?
25 A. March of 2020 is when I stopped working

Page 23

1 there.
2 Q. So March, not April?
3 A. Right.
4 Q. And what was your final title at NRS?
5 A. Channel manager.
6 Q. Can you explain what a channel
7 manager's primary role is?
8 A. Certainly. So NRS sells, primarily,
9 sells point-of-sale systems. And they do it
10 directly from the company to potential customers.
11 And then they have third-party companies that
12 represent them, and I would recruit third-party
13 companies to represent National Retail Solutions to
14 sell point-of-sale systems to their customers.
15 And then I would manage that group of
16 representatives, I would manage that, their
17 activity.
18 Q. You signed this declaration which
19 states that you were briefly involved in NRS's
20 efforts to retain VoiceLogic.
21 I know it looks like I lost the
22 declaration, I'm sorry, I can pull that back up for
23 you. Do you see that, still?
24 A. Yeah.
25 Q. And it's Paragraph 2. Can you explain

Page 24

1 your understanding of who VoiceLogic is?
2 A. Sure. My understanding is that
3 VoiceLogic is an outbound telemarketing company to
4 reach potential customers.
5 Q. And what was your involvement in NRS's
6 efforts to retain VoiceLogic?
7 A. I didn't have any effort in retaining
8 them.
9 Q. In Paragraph 2, "In that role, I was
10 briefly involved in NRS's efforts to retain
11 VoiceLogic." I'm just trying to --
12 A. Well, that's not really true. I
13 didn't -- my effort wasn't to retain VoiceLogic.
14 That's not -- so what I signed wasn't completely
15 correct; so my bad.
16 I had nothing to do with the -- hiring
17 them or using them. What I was involved with was
18 creating scripts for them to use when making phone
19 calls.
20 Q. You were involved in creating the
21 scripts that would be used on phone calls, is that
22 what you said?
23 A. Correct.
24 Q. So it was -- are you aware of any phone
25 calls that VoiceLogic made using your scripts?

Page 25

1 A. No.
2 Q. Did VoiceLogic make any phone calls on
3 behalf of NRS while you were employed at NRS?
4 A. I don't believe so.
5 Q. Do you know who first brought up or
6 raised the idea of retaining VoiceLogic --
7 A. Not really.
8 Q. At NRS?
9 (Court stenographer clarification.)
10 MR. GLAPION: I said, "Do you know who
11 first brought up or raised the idea of retaining
12 VoiceLogic within NRS."
13 Q. And Mr. Hellerman, what was your answer
14 to that?
15 A. No, I don't.
16 Q. Did you work with Elie Katz in
17 connection with efforts to retain VoiceLogic?
18 A. I worked with Elie Katz in an effort to
19 create the scripts for VoiceLogic to use. Whether
20 we hired them or not, I wasn't part of that
21 decision.
22 Q. When we talk about the scripts for
23 VoiceLogic to use, I want to back up a moment on
24 that. What did you understand that VoiceLogic would
25 be doing on behalf of NRS, if anything?

7 (Pages 22 - 25)

1    A.   I believe that VoiceLogic uses AI to
2  make outbound phone calls. Pretty much, that's it.
3    Q.   What do you mean by "uses AI to make
4  outbound phone calls"?
5    A.   It wasn't a human person calling, so
6  there wasn't a person picking up the phone and
7  dialing the phone; I understood that this was
8  computer driven.
9    Q.   And the scripts you created, were those
10  read by an actual person?
11        MR. FITZGERALD:  Objection.
12    A.   I don't know.
13    Q.   If I had told you that the first NRS
14  VoiceLogic campaign was on January 8, 2020, would
15  that be a point that you were employed at NRS?
16    A.   I was employed then, yeah.
17    Q.   And do you recall any phone calls
18  VoiceLogic made on NRS's behalf in January 2020? I
19  know we're going back four years now, more than four
20  years?
21    A.   No, I wasn't involved with it like
22  that.
23    Q.   Do you know to whom these phone calls
24  were intended to be made?
25    A.   I don't know. I could guess, but I

1  don't know.
2    Q.   And when I -- just to clarify that, I'm
3  not asking for specific people.
4    A.   I get that. I understand.
5    Q.   And what would be your guess on who
6  that is?
7    A.   Store owners.
8    Q.   Would it be current customers of
9  VoiceLogic -- excuse me, current customers of NRS?
10    A.   Not based on the scripts I created.
11    Q.   What were the scripts you created?
12    A.   They were directed towards
13  non-customers; potential customers, leads or
14  prospects.
15    Q.   And they were -- what was the purpose
16  of those scripts?
17    A.   To see if anybody was interested in
18  using a point-of-sale system to run their business,
19  instead of a cash register, probably.
20    Q.   Would you characterize those scripts as
21  telemarketing?
22    A.   Yeah.
23    Q.   During your time there, do you know if
24  it was contemplated that VoiceLogic would make any
25  non-telemarketing calls on NRS's behalf?

1        MR. FITZGERALD:  Objection.
2    A.   No.
3    Q.   No, you don't know, or no, that it was
4  not contemplated?
5    A.   Both.
6    Q.   I believe you referred to the targets
7  of these calls as leads or prospects. Is that
8  correct?
9    A.   Yes.
10    Q.   Can you, for a lay person, explain what
11  a lead or a prospect is, as you use that term?
12    A.   Certainly. So a lead or a prospect
13  would be someone that I would like to do business
14  with, as a vendor of point-of-sale systems; that I
15  see that there is a tremendous benefit for them by
16  employing our technology in their company. And so
17  that's who I would specifically call.
18    Q.   So these are -- in your view, is it
19  fair to say that these are prospective customers of
20  NRS?
21    A.   Absolutely.
22    Q.   Do you know where VoiceLogic got the
23  phone number that it was going to call?
24    A.   I have no idea.
25    Q.   Do you know where NRS obtained the

1  numbers of leads and prospects?
2    A.   No idea.
3    Q.   Do you know if NRS purchased lists of
4  telephone numbers?
5    A.   I wasn't involved in that; I have no
6  idea.
7    Q.   Just to clarify that, whether you were
8  involved in it or not, do you recall whether NRS
9  purchased phone numbers?
10    A.   No, I don't know that.
11    Q.   Have you ever heard of a company called
12  AmeriList?
13    A.   No.
14    Q.   And going back to the phone call that
15  you and I had, I believe it -- do you recall
16  mentioning that NRS purchased phone numbers?
17    A.   I don't recall.
18    Q.   Are you aware of any channels through
19  which NRS obtained telephone numbers of leads or
20  prospects?
21    A.   No, I don't know.
22    Q.   So you just don't know where any of
23  these phone numbers came from?
24    A.   Correct.
25    Q.   And when you and Elie -- or excuse me,

8 (Pages 26 - 29)

Page 30

1 when you were considering hiring VoiceLogic -- and I
2 refer to, when I say "you," I guess I'm speaking
3 about NRS in a sense. But when NRS was considering
4 hiring VoiceLogic when you were there --
5     A.    Yes.
6     Q.    Did you have any phone calls with
7 VoiceLogic?
8     A.    Yes.
9     Q.    Do you recall the nature of that phone
10 call or those phone calls?
11     A.    Yes, it was about script writing.
12     Q.    And when you say "about script
13 writing," can you expand on that, if you remember?
14     A.    Sure. So whether a call is being
15 initiated by a person or a computer, you have to get
16 the attention of the person that you're reaching out
17 to. You also have to qualify whether they're a
18 decision-maker or not, and so you can't just call up
19 and say, "Hey, how are you doing today?" You really
20 want to have a focused, directed conversation.
21     Q.    So is that -- I'm speaking in the
22 context of the conversation you had with VoiceLogic
23 more than I am about the content of the scripts
24 themselves.
25     A.    Well, I'm sorry I interrupted.

Page 31

1     Q.    That's okay. I was just asking about
2 the -- about the conversation with VoiceLogic
3 itself. Are you saying then -- and I don't want to
4 put words in your mouth -- that it was to
5 collaborate on writing a better script?
6     A.    That seems like a fair assessment,
7 sure.
8     Q.    And have you heard of "ringless
9 voicemails"?
10     A.    I wasn't familiar with it when I worked
11 at NRS.
12     Q.    Have you heard of them since?
13     A.    Yeah, but I don't really know what they
14 are. I'm a little bit of a techno idiot.
15     Q.    Do you have any understanding of
16 whether VoiceLogic makes ringless voicemails?
17     A.    I don't know that. I don't really know
18 what that is, exactly.
19     Q.    When you were at NRS, were you familiar
20 with a law called the Telephone Consumer Protection
21 Act?
22     A.    Probably.
23     Q.    Do you know if there was ever a
24 discussion about the Telephone Consumer Protection
25 Act within NRS?

Page 32

1     A.    No.
2     Q.    In your presence?
3     A.    No.
4     Q.    No, you don't know, or no, there was
5 not?
6     A.    Not with me present.
7     Q.    When NRS was inquiring as to
8 VoiceLogic's services while you were there, do you
9 know if any legal analysis was conducted into the
10 phone calls that VoiceLogic would be making?
11     A.    I wouldn't have been privy to that.
12 That wasn't my responsibility or my job.
13     Q.    Do you know if there was any analysis
14 of the TCPA -- excuse me, of the Telephone Consumer
15 Protection Act in the context of these efforts to
16 hire VoiceLogic?
17     A.    No.
18     Q.    No, you don't remember, or no, there
19 was not?
20     A.    There was not, not with me. I have no
21 idea --
22     Q.    Of course.
23     A.    Right?
24     Q.    Right. And that's -- obviously, you
25 can't testify on behalf of things that you weren't

Page 33

1 privy to. So in general, I'm only asking about
2 things that you would have heard, been aware of, or
3 involved in, that you have personal knowledge of.
4         How many scripts did you write for
5 these calls?
6     A.    Probably only one.
7     Q.    Do you remember a specific service or
8 product the script was for?
9     A.    Sure.
10     Q.    What was that?
11     A.    A point-of-sale system.
12     Q.    I'm just going to give you some random
13 abbreviations, I guess they are, and maybe you can
14 shed some light on what they would mean.
15         Do you know what NRS Pay One would be?
16     A.    I know what NRS Pay is. I don't know
17 what the "one" is --
18     Q.    What is NRS Pay?
19     A.    I'm sorry.
20     Q.    What is NRS Pay?
21     A.    NRS Pay is a credit card processing
22 platform.
23     Q.    Do you know what NRS Capital is?
24     A.    I do, actually. I think it's --
25     Q.    What is that?

9 (Pages 30 - 33)

Page 34

1    A.    It's a small loan program.
2    Q.    Do you know what NRS Petro is?
3    A.    I do.
4    Q.    What is that?
5    A.    NRS Petro is a -- was in development
6  when I was there.  NRS Capital wasn't even in
7  existence when I was there.  But NRS Petro was to
8  connect the point-of-sale system with gas pumps.
9        So you pump gas into your car -- most
10  gas stations that have small convenience stores have
11  two completely separate systems, and this was a way
12  to link the two systems together.
13    Q.    And do you know what Fee Buster is?
14    A.    Yeah.  So -- I'm trying to remember the
15  first name of this.  There was the "something" Dobbs
16  Act that was passed about -- 2018, maybe?  2019,
17  something, where proprietors or retailers, or
18  actually anybody, for that matter, could pass on the
19  service fee of credit card processing to the
20  consumer.
21        So what Fee Buster was, was that
22  instead of a retailer absorbing the credit card
23  processing fee, they could pass it on to the
24  retailer in this case.
25    Q.    Thank you.  I want to go back to -- can

Page 35

1  you remind me of your title at the time you left
2  NRS?
3    A.    Channel manager.
4    Q.    Was that your title during your entire
5  employment at NRS?
6    A.    Yes, sir.
7    Q.    And this is something you answered
8  before, and I don't want to scroll to the beginning
9  of realtime, but can you tell me again the role of a
10  channel manager?
11    A.    Sure.  So there were independent
12  companies in the marketplace that sold other
13  products, and we wanted them to sell our products.
14  So I would hunt them down, find them out, and
15  recruit them and then manage them.
16    Q.    Were these other companies the end user
17  of NRS's point-of-sale system?
18    A.    No.
19    Q.    Were they essentially vendors of
20  point-of-sale systems?
21    A.    Sometimes.
22    Q.    I'm trying to understand sort of who --
23  who you were managing, when you said you would find
24  these companies and manage them.  Can you elaborate
25  on who the "them" is?

Page 36

1    A.    Sure.  There would be companies that
2  would sell credit card processing, or sell ATM
3  machines, or sell products to convenience stores,
4  right?  Like the products that the convenience
5  stores sold; they could be selling milk, juice,
6  eggs, and butter.  But because they had a
7  relationship with convenience stores, and bodegas
8  and delicatessens, this was another product that
9  they could put in their portfolio of offerings to
10  their customers.
11    Q.    So and correct me if I'm wrong on this.
12  It doesn't sound like that role typically involved
13  the end user of NRS's products.  Is that correct?
14    A.    That's right.
15    Q.    So can you walk me through how you
16  became involved in communicating with VoiceLogic in
17  your role as a channel manager?
18    A.    Well, from 1998 to 2001, I was a sales
19  trainer.  I worked for a guy, Steve Schiffman; he
20  wrote 25 books on selling.  Every day, I was in
21  front of a classroom training salespeople.  Getting
22  appointments was one of the things that I trained
23  them in how to do.  And script writing was involved
24  in that.
25    Q.    Did someone ask you to be involved in

Page 37

1  this process with VoiceLogic?
2    A.    Sure.
3    Q.    Who would that have been?
4    A.    Probably Elie.
5    Q.    Are you aware of anyone else, while you
6  were at NRS, who was involved in the relationship
7  with VoiceLogic, besides you and Elie?
8    A.    Not really.  Because what I did was
9  really specific, and kind of a small piece of it.  I
10  don't know enough about it to really shed any light
11  on it, sorry.
12    Q.    Going back to -- and this is why I
13  suspect that this deposition should be pretty short,
14  honestly.  There's not a ton more I even have to
15  ask.
16        But going back to the sources of phone
17  numbers, do you have a sense generally, outside of
18  the context of NRS's relationship with VoiceLogic,
19  how NRS would obtain telephone numbers of prospects
20  or leads?
21    A.    Not really.  You know, NRS is a
22  division of IDT.  They're a huge company with huge
23  resources.  I have no idea.
24    Q.    While you were involved at NRS -- or
25  excuse me, while you were employed at NRS, do you

10 (Pages 34 - 37)

Page 38

1  recall ever receiving a complaint about unwanted
2  phone calls?
3      A.   Totally not.
4      Q.   Was this ever discussed within NRS?
5      A.   No.
6      Q.   Was the risk of unwanted phone calls
7  ever discussed with NRS, in your presence?
8      A.   No, not.
9      Q.   Were issues of obtaining consents ever
10 discussed while at NRS, within your presence?
11     A.   No.
12     Q.   Do you know the category or type of
13 telephones -- let me just start that question all
14 over, that's a mess.
15          Do you know whether the VoiceLogic
16 phone calls were meant to be made to a specific type
17 of phone?
18     A.   No.
19     Q.   Do you have any idea why you would
20 still be on VoiceLogic invoices to NRS, as recently
21 as July 2023?
22     A.   I left the company in 2020, I have no
23 idea.
24     Q.   I'm just asking if you have any idea
25 why your name might have been still listed, as of

Page 39

1  July 2023?
2      A.   Not a clue.
3      Q.   Do you have any idea why, at any point,
4  your name would have been listed as the contact
5  person with respect to VoiceLogic's calls on behalf
6  of NRS?
7      A.   No.  All I did was write scripts for
8  that.
9      Q.   So in a situation where you are listed
10 as the contact person at NRS in connection with,
11 say, an invoice for the calls, would that have
12 been -- would you have been the correct contact
13 person for that?
14     A.   No, I knew nothing about that company.
15 No.
16     Q.   Do you know who would have been the
17 correct contact person for that?
18     A.   Honestly, I don't know.
19     Q.   Was Elie hands-on with
20 this relationship with VoiceLogic?
21     A.   No, Elie does a lot of delegation.  He
22 might have -- I'm sure he was involved in some way,
23 shape, or form but he delegated a lot of stuff so.
24     Q.   And I think I asked this before, and
25 I'll just ask it again.

Page 40

1      A.   Yeah.
2      Q.   Besides you and Elie, are there other
3  names associated with this VoiceLogic relationship
4  that you recall?
5      A.   You know, honestly, I don't know.  When
6  I was working there, there were a lot of projects
7  going on.  There were a lot of moving parts.  And,
8  you know -- you know, just like they would pull me
9  in for doing the script, they could have pulled
10 somebody in for doing something else or doing a
11 third thing.  But I really wouldn't know that,
12 because it's just the way that the company
13 functioned.
14     Q.   Gotcha.
15     A.   And there were positives and negatives
16 about it, it's their style, I didn't own it or run
17 it.
18     Q.   Well, I appreciate your candor on this,
19 and I'm never going to sit here and drag a
20 deposition on for longer than it needs to go when
21 someone doesn't have the knowledge that I'm looking
22 for.  And I totally get that.
23          There are a few more things I want to
24 go back to, though.  I don't think we have much
25 longer.

Page 41

1      A.   Absolutely.
2      Q.   So I just want to clarify, going back
3  to our initial conversations, and whether you were
4  represented by counsel or not.  So just to be
5  perfectly clear, on our phone call you were not
6  represented by counsel.  Is that correct?
7      A.   That's right.
8      Q.   And did you, at any point subsequent to
9  that, sign any sort of representation or engagement
10 agreement with any attorney?
11         MR. FITZGERALD:  Objection.
12     A.   The only thing I signed was the piece
13 of paper you showed me.
14     Q.   So your understanding of Mr. Fitzgerald
15 being your attorney comes -- can you explain -- how
16 is he your attorney, I guess is my question?
17         MR. FITZGERALD:  Objection.
18     A.   Doesn't the document basically say that
19 Mr. Fitzgerald represents NRS.  When I was an
20 employee at the time, I would be represented under
21 their -- under their counsel.
22     Q.   So as of -- and I think this is
23 hopefully an easy one, but we spoke on October --
24 you and I spoke on October 7th for -- in terms of --
25 our phone call was October 7th.  Does that match

11 (Pages 38 - 41)

Page 42

1  your recollection?
2      A.   I wouldn't know the specific date, but
3  okay.
4      Q.   I'm just -- I'll throw this back up,
5  just because -- you know what, I won't bother.
6          On October 7th, were you represented by
7  counsel?
8          MR. FITZGERALD:  Objection.
9      A.   I believe that's when I signed that
10 declaration, October 7th, wasn't it?
11     Q.   I can't testify for you, but the date
12 on the declaration is October 10th.
13     A.   Yes.  So I retained counsel I guess, if
14 that's how you would refer to it, on the 10th.
15     Q.   And were you represented by counsel on
16 August 16th?
17         MR. FITZGERALD:  Objection.
18     A.   No.
19     Q.   And you are not paying anything for
20 counsel.  Is that what you testified before?
21     A.   Correct.
22     Q.   Would you have retained counsel for
23 this if you had to pay for counsel?
24     A.   No.
25     Q.   On the phone call that we had, at any

Page 43

1  point, did I tell you what to say?
2      A.   Jeremy, no.
3      Q.   Did I feed you any information?
4      A.   No.
5      Q.   Did I threaten you or coach you in any
6  way?
7      A.   No.
8      Q.   Do you recall in that conversation
9  whether I said something along the lines of, "I
10 appreciate the information, but let's wait until we
11 get you on the record"?
12     A.   I believe you did say that.
13         MR. GLAPION:  I think if you want to
14 take five minutes, Pat, I don't think I have much
15 more, if anything.  I just want to double-check.
16         MR. FITZGERALD:  Does ten minutes work?
17         MR. GLAPION:  Ten minutes works for me,
18 yes.
19         Ellen, we can go off the record.
20         (A brief recess takes place.)
21 BY MR. GLAPION:
22     Q.   All right.  We are almost done,
23 Michael.  I just want to do a little bit of cleanup,
24 and then I believe Pat will have the opportunity to
25 ask questions if he chooses.

Page 44

1          True or false, you were an employee of
2  National Retail Solutions until April 2020?
3      A.   Actually, it was till March.
4      Q.   So that would be false?
5      A.   Yeah, that's false.
6      Q.   And you were involved in NRS's efforts
7  to retain VoiceLogic.  Is that true or false?
8          MR. FITZGERALD:  Objection.
9      A.   That's false.
10     Q.   Because of the way I, Jeremy Glapion,
11 presented myself, you mistakenly believed that I
12 represented NRS.  Is that true or false?
13     A.   True.
14     Q.   Can you elaborate on how I presented
15 myself that would have made you think I represented
16 NRS?
17     A.   I just think I didn't understand.
18     Q.   But what I'm trying to get at is the
19 first part of that, because of the way I presented
20 myself you believed I represented NRS?
21     A.   I just believe it was a little vague.
22     Q.   Did I, at any point, say that I
23 represented NRS?
24     A.   Oh, probably not.
25     Q.   Did I explain to you that I was

Page 45

1  interested in learning about NRS's phone calls?
2      A.   No.
3      Q.   And when you say it was vague, can you
4  elaborate on what was vague about our conversations?
5      A.   I understood it to mean that -- not
6  that to "mean," but that you were an attorney, for
7  lack of better terminology, involved in a lawsuit
8  between whoever the plaintiff is and NRS.
9      Q.   So I just want to be very clear on
10 this, because it's a significant sort of allegation
11 in the legal and ethics space --
12     A.   Yeah.
13     Q.   If I were to have deceived you into
14 thinking I represented NRS.  That's why I'm drilling
15 down on this --
16     A.   That's fine.  I don't believe that you
17 deceived me.  I just believe that I didn't quite
18 understand.
19     Q.   So --
20     A.   There's a difference.
21     Q.   And I appreciate that.
22         So was it anything that I said that
23 made you believe that I represented NRS?
24         MR. FITZGERALD:  Objection.
25     A.   I can't point to anything specifically,

12 (Pages 42 - 45)

Page 46

1 no.
2    Q.    Was there anything I did that made you
3 believe I represented NRS?
4    A.    No.
5         MR. FITZGERALD:  Objection.
6    Q.    Is it true that you assumed that I was
7 NRS's attorney?
8    A.    Yes.
9    Q.    So a moment ago, you testified that you
10 understood our conversation to mean that I was an
11 attorney involved in a lawsuit between whoever the
12 plaintiff is, and NRS.  Is that accurate?
13    A.    Yes.
14    Q.    But you're also now testifying that you
15 assumed that I was NRS's counsel.  Is that correct?
16    A.    Yes, when I say "an attorney involved
17 in," I didn't say who you represented.
18    Q.    So can you clarify what made you assume
19 that I was NRS's counsel, rather than the
20 plaintiff's counsel?
21    A.    I honestly -- I can't give you a
22 specific.
23    Q.    That was your own independent
24 assumption.  Is that fair?
25    A.    Correct.

Page 47

1    Q.    Was there anything that I did to make
2 you assume that?
3         MR. FITZGERALD:  Objection.
4    A.    No.  And if it will give you any more
5 clarity on this, this was the beginning of August,
6 right?
7    Q.    Our phone call?
8    A.    Yeah.
9    Q.    I can refresh your recollection on this
10 with some things, but our phone call was in October,
11 on October 7th?
12    A.    Okay.  I don't know.  I mean, I just --
13 maybe I just didn't read it clearly.
14    Q.    And I just want to drill down on this
15 finally.  Is there any specific thing that I did,
16 that you can point to, that made you assume that I
17 was NRS's counsel?
18    A.    No.
19    Q.    Is it true, if an attorney told me that
20 they represented you in connection with this case
21 since August 16th, is that true?
22    A.    I believe so, yeah.
23    Q.    Before, you've testified that you were
24 not represented at the time of our phone call.  Do
25 you recall that?

Page 48

1    A.    Yes, whatever the date was that I
2 signed that document was when I was then
3 represented.  Before then, I had not made any
4 commitment or agreement with anybody to represent
5 me.
6    Q.    And the document -- I've just shared a
7 document; is this the document you're referring to?
8    A.    That's correct.
9    Q.    And do you see the "Executed on" date?
10    A.    Yes.
11    Q.    So "Executed on October 10, 2024," is
12 that your recollection of when you first retained
13 counsel in this matter?
14    A.    Yes.
15    Q.    So if an attorney represented to me
16 that they represented you in connection with this
17 matter on August 16th, is that true?
18    A.    You have to ask me that again.
19    Q.    If an attorney told me that they
20 represented you in connection with this case since
21 August 16th, is that true?
22         MR. FITZGERALD:  Objection.
23    A.    Yeah.
24    Q.    I feel like we're maybe on a
25 different -- we're talking about different things

Page 49

1 here.  The document that we just discussed was dated
2 October 10th.  Do you remember that?
3    A.    Yes.
4    Q.    And that was the date that you are
5 testifying that you first became represented by
6 counsel.  Correct?
7    A.    Yes.
8    Q.    And my question was, if an attorney
9 told me they represented you in connection with this
10 case since August 16th, is that accurate?
11    A.    No.  I might have had conversations,
12 but I didn't retain anybody, agree with anybody.  I
13 didn't.
14    Q.    I believe we talked before that you and
15 Mr. Fitzgerald spoke on the phone on August 16,
16 2024.  Do you recall that conversation with --
17 excuse me, do you recall that testimony?
18    A.    Yeah.
19    Q.    Had you spoken with Mr. Fitzgerald
20 between August 16, 2024 and our phone call?
21         MR. FITZGERALD:  Objection.
22    A.    The one thing I could say about me is I
23 don't remember dates very well at all.  So this is
24 really not going to give you much clarity.  I don't
25 know.

13 (Pages 46 - 49)

Page 50

1    Q.   How many times have you spoken with
2  Mr. Fitzgerald prior to this deposition?
3    A.   Half a dozen.
4    Q.   How many times did you speak with
5  Mr. Fitzgerald prior to our phone call in October?
6    A.   A couple.
7    Q.   And is it true that the only reason
8  that you spoke to me is because you thought I
9  represented NRS?
10   A.   Yes.
11   Q.   And, again, was there anything I did,
12 specifically, to make you think that I represented
13 NRS?
14   A.   No, sir.
15   Q.   And had I told you or had you been --
16 excuse me, had you been of the assumption that I
17 represented the plaintiff, would you have spoken
18 with me?
19   A.   I might have spoken to you. I don't
20 know how much information I would have given you.
21   Q.   And so then it's not necessarily
22 true -- and correct me if I'm wrong -- that the only
23 reason you spoke with me is that you thought I
24 represented NRS?
25   A.   I did.

Page 51

1    Q.   Right. But is that the only reason you
2  spoke with me, is because you thought I represented
3  NRS?
4    A.   I guess.
5    Q.   At the time of the August 16th call
6  from Mr. Fitzgerald, you testified previously that
7  you were not looking for an attorney. Is that
8  correct?
9         MR. FITZGERALD: Objection.
10        MR. GLAPION: I'll rephrase. I'll
11 rephrase.
12   Q.   Were you looking for an attorney, prior
13 to Mr. Fitzgerald contacting you on August 16th?
14   A.   No.
15   Q.   I believe you testified to this
16 previously, and I just want to get it for sure. Who
17 wrote the declaration that you signed?
18   A.   The law firm.
19   Q.   And did you make any edits to that
20 declaration?
21   A.   Not that I remember.
22   Q.   Did you review the declaration before
23 signing it?
24   A.   I did.
25   Q.   And did you --

Page 52

1    A.   Now that you've reviewed it with me, I
2  realized that my termination date at NRS was really
3  a month earlier, but other than that.
4    Q.   It also -- in this declaration, you
5  wrote -- or excuse me, that you signed states that
6  "On August 16, 2024, when counsel for NRS, Patrick
7  Fitzgerald, contacted you and advised that NRS would
8  pay for the firm to represent you in connection with
9  this matter, you agreed to that representation."
10        Is that accurate?
11   A.   Yeah.
12   Q.   So this goes back to what I was getting
13 at before. Were you represented by counsel on
14 August 16, 2024?
15   A.   I had a conversation with them, but I
16 didn't sign anything.
17   Q.   So as -- after that conversation, did
18 you believe that you were represented by counsel?
19   A.   Okay. I didn't really think about it
20 until I had another conversation about it, or about
21 this whole case. I knew that I -- I knew previously
22 that representation that -- I wasn't really involved
23 in this very much, and I didn't really understand
24 why I would need counsel at all, but.
25   Q.   But I just -- and I'm just trying to

Page 53

1  reconcile a couple of things. When we spoke on the
2  phone on October 7, 2024, did you believe that you
3  were represented by counsel?
4    A.   I'm going to say no. I only believe
5  that I was represented by counsel when I signed a
6  piece of paper that said I was.
7    Q.   And that would have been the October 10
8  document that we have been discussing?
9    A.   I guess, yes.
10   Q.   Do you recall ever signing anything
11 else?
12   A.   No, that's the only thing I signed that
13 I know of.
14   Q.   And just to be very specific, because
15 that question could be very broad and silly.
16        Do you recall ever signing anything
17 else in connection with this case?
18   A.   No.
19        MR. GLAPION: I think that's all I have
20 for now, Pat. If you want to follow up with
21 anything.
22        MR. FITZGERALD: Yeah.
23        Actually, could we take a five-minute
24 break?
25        MR. GLAPION: That's fine with me.

14 (Pages 50 - 53)

Page 54

1      (A brief recess takes place.)
2      MR. GLAPION: I know I said I was done,
3  but I did have a couple more, if you don't mind.
4  And literally just a couple more questions, whenever
5  Michael is ready.
6      THE WITNESS: I'm ready.
7  EXAMINATION BY MR. GLAPION:
8      Q.   I apologize for saying I was done; I
9  had a couple more that I just wanted to ask.
10     Do you understand the scope of your --
11 of Attorney Fitzgerald's representation of you?
12     MR. FITZGERALD: Objection.
13     A.   Can you expand on "scope"?
14     Q.   Do you understand what Attorney
15 Fitzgerald is representing you for?
16     MR. FITZGERALD: Objection.
17     A.   Partially.
18     Q.   What is your understanding of that,
19 what he's representing you for?
20     A.   To both legally advise me, and, you
21 know, to let me know what my rights are. And to
22 represent me in this case against NRS, who was my
23 employer.
24     Q.   Do you know if the representation
25 terminates at the end of this deposition?

Page 55

1      MR. FITZGERALD: Objection.
2      A.   No.
3      Q.   Do you know if the -- do you know --
4  let me back up.
5      Did you believe you needed
6  representation in this matter?
7      A.   No.
8      Q.   Okay.
9      MR. GLAPION: That's all I have, Pat.
10     MR. FITZGERALD: Sure.
11 EXAMINATION BY MR. FITZGERALD:
12     Q.   Michael, I just want to go over this
13 timeline.
14     To start here, you are not an attorney,
15 right. Is that correct?
16     A.   Correct, I never played one on T.V.
17 either.
18     Q.   Right. When we talk about whether or
19 not you're represented, you don't -- you might not
20 know the legal significance of that. Is that
21 correct?
22     A.   That's right, I don't.
23     Q.   Now, you testified in this declaration
24 that I contacted you on August 16th. Do you
25 remember that?

Page 56

1      A.   Yes.
2      Q.   And do you remember speaking with me
3  and, as you testified here, that NRS would pay to
4  represent you in this matter, and that you had
5  representation?
6      A.   Yes.
7      Q.   So you were represented by counsel as
8  of August 16th. Is that correct?
9      A.   Yeah, I looked at my text messages.
10 That's when we first spoke.
11     Q.   That's understandable. I know this was
12 a few months ago.
13     A.   Right.
14     Q.   And now, when you spoke with
15 Mr. Glapion on October 7th, did he tell you that he
16 represented plaintiff in a lawsuit that was adverse
17 to NRS?
18     Michael, did he say that he was suing
19 NRS during your phone call?
20     A.   I don't specifically remember.
21     Q.   Did he explain that you could
22 potentially be liable during that phone call?
23     A.   You know, I don't remember that.
24     Q.   Okay. So previously, you had said that
25 our firm didn't start representing you until

Page 57

1  October 10th, but that's incorrect. Right?
2      A.   Right, we had spoken in August.
3      Q.   Understood.
4      A.   And we'd spoken in August basically to
5  say, you know --
6      MR. GLAPION: I don't want you to get
7  into what you guys talked about. I know it's your
8  client, but I don't want to open the door. I
9  respect the relationship, to the extent it exists.
10     Q.   So when you said previously that you
11 weren't represented until August -- or until
12 October 10, two months later, is it possibly because
13 you didn't really start doing work in this case
14 until then?
15     A.   Yeah.
16     MR. GLAPION: Objection.
17     Q.   Now, I want to go back to -- hold on a
18 second -- now, these are the emails that Jeremy
19 asked you about earlier. He'd asked you about this
20 first email, Jeremy saying that he represented
21 someone against -- in a lawsuit against NRS.
22     Now, the date on this email is
23 August 22nd. Is that correct?
24     A.   That's what I see in front of me, yeah.
25     Q.   So that's about a month and a half

Page 58

1 before you spoke on October. Is that correct?
2    A.   That's correct.
3    Q.   And so is it fair to say that even if
4 you had read this email, you wouldn't have
5 remembered it when you spoke on October 7th?
6    A.   That's also correct.
7    Q.   Now, during the phone call with Jeremy,
8 did he remind you saying, "Hey, I'm suing your
9 former employer"?
10   A.   No.
11   Q.   Now, going back to this declaration,
12 you testified that you didn't make the decision to
13 hire VoiceLogic, which I appreciate that makes
14 sense. But you did work with NRS when it was
15 considering them as a vendor. Is that correct?
16   A.   Yes.
17   Q.   Now, I believe you testified earlier
18 that you didn't think you needed an attorney at the
19 time you and Mr. Glapion spoke. Is that because he
20 didn't explain the potential liability you might
21 face?
22   A.   No, I've never had that conversation
23 with anyone.
24   Q.   If you asked whether you needed an
25 attorney, do you think that might be because you

Page 59

1 yourself are not an attorney?
2    A.   That's probably a good reason.
3    Q.   Okay.
4         MR. FITZGERALD: I think that's
5 everything I had.
6         MR. GLAPION: I've got a few follow-up.
7 And eventually these stop, but I do -- I do have a
8 little bit of follow-up.
9 EXAMINATION BY MR. GLAPION:
10   Q.   Did I ever, in any conversation that
11 you and I had, Mr. Hellerman, say that you might be
12 liable for these phone calls?
13   A.   No.
14   Q.   Did I ever imply that you might be
15 liable for these phone calls?
16   A.   No.
17   Q.   There's been some back-and-forth
18 testimony on when you were represented by counsel.
19 And I hate to keep beating on this point, so let's
20 make it simple.
21        Between that August 16 conversation
22 with Attorney Fitzgerald, until that October 10
23 declaration that we've discussed, did you sign
24 anything in connection with this case?
25   A.   No.

Page 60

1    Q.   Did you sign a representation
2 agreement?
3    A.   No.
4    Q.   Did you sign an engagement agreement?
5    A.   No.
6    Q.   Did you sign anything outlining the
7 scope of their representation of you?
8    A.   No.
9    Q.   On October 7th, when we had that phone
10 call, did you believe that you were represented by
11 counsel?
12   A.   No.
13   Q.   When you testified a moment ago that
14 you reviewed text messages, how many text messages
15 were there?
16   A.   Not very many.
17   Q.   Were they text messages from Attorney
18 Fitzgerald?
19   A.   Yeah.
20   Q.   And were those on the same date as your
21 October 16th phone call?
22   A.   Yeah.
23   Q.   Were they before the phone call or
24 after?
25   A.   I can look; I don't remember.

Page 61

1    Q.   If there's something that would refresh
2 your recollection, what would that be?
3    A.   Text message.
4    Q.   What would you look at?
5    A.   I would just look at my phone.
6    Q.   If you can figure that out, that would
7 be very helpful.
8    A.   Okay.
9    Q.   Before or after the phone call?
10   A.   The conversation was August 16.
11   Q.   Do you recall if that was before you
12 spoke on the phone or after?
13   A.   I believe it was after.
14   Q.   And --
15   A.   So wait, wait, wait. I'm sorry. Could
16 you clarify that?
17        Was it before I had spoken to Pat
18 Fitzgerald or was it before I had spoken with you?
19   Q.   Good clarification.
20        Were the text messages that you are
21 discussing that were with Attorney Fitzgerald,
22 before the phone call or after the phone call with
23 Attorney Fitzgerald?
24   A.   Before.
25   Q.   Okay.

16 (Pages 58 - 61)

Page 62

1    A.    That was on August 16th.
2    Q.    Correct.
3          Did anyone, at any point prior to this
4  deposition, make you concerned that you might be
5  liable for anything alleged in this case?
6    A.    No.
7    Q.    Did anyone ever suggest that you might
8  potentially be liable?
9    A.    No.
10   Q.    Had Watstein Trepka, which is Attorney
11 Fitzgerald's firm --
12   A.    Right.
13   Q.    Indicated that it would represent you
14 for a fee, would you have retained Watstein Trepka?
15   A.    Probably not.
16         MR. GLAPION:  And that's all I have.  I
17 think I'm good.
18         MR. FITZGERALD:  Yes, I'm good, too.
19         MR. GLAPION:  All right.  I think
20 that's everything.
21         (The proceedings concluded at
22 11:22 a.m.)
23
24
25

Page 63

1          C E R T I F I C A T E.
2
3    I, ELLEN J. GODINO, LICENSE NO. Xl0l6l8, a
4  Certified Shorthand Reporter of the State of New
5  Jersey, do hereby certify that prior to the
6  commencement of the examination,
7  MICHAEL HELLERMAN was duly sworn by me to testify
8  to the truth, the whole truth and nothing but the
9  truth.
10   I DO FURTHER CERTIFY that the foregoing is a
11 true and accurate transcript of the testimony as
12 taken stenographically by and before me at the time,
13 place and on the date hereinbefore set forth, to the
14 best of my ability.
15   I DO FURTHER CERTIFY that I am neither a
16 relative nor employee nor attorney nor counsel of
17 any of the parties to this action, and that I am
18 neither a relative nor employee of such attorney or
19 counsel, and that I am not financially interested in
20 the action.
21
22         *Ellen J. Godino*
           ELLEN J. GODINO
23
           CERTIFIED COURT REPORTER
24         *State of New Jersey
           DATED: November 18, 2024.
25

Page 64

1  Walston, Rashad v. National Retail Solutions, Inc.
2  Michael Hellerman (#7003974)
3          E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Michael Hellerman           Date
25

Page 65

1  Walston, Rashad v. National Retail Solutions, Inc.
2  Michael Hellerman (#7003974)
3          ACKNOWLEDGEMENT OF DEPONENT
4    I, Michael Hellerman, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Michael Hellerman           Date
13 *If notary is required
14         SUBSCRIBED AND SWORN TO BEFORE ME THIS
15         _____ DAY OF _____, 20___.
16
17
18         _____
19         NOTARY PUBLIC
20
21
22
23
24
25

17 (Pages 62 - 65)

**[07719 - amerilist]**　　　　　　　　　　　　　　　　Page 1

| 0 |
|---|
| **07719**　2:4 |

**1**

**10**　48:11 53:7
57:12 59:22
**1055**　2:9
**10th**　20:5 42:12
42:14 49:2
57:1
**11:22**　62:22
**14**　1:18
**16**　49:15,20
52:6,14 59:21
61:10
**16th**　42:16
47:21 48:17,21
49:10 51:5,13
55:24 56:8
60:21 62:1
**1704**　2:4
**18**　63:24
**1998**　36:18

**2**

**2**　23:25 24:9
**20**　65:15
**2001**　36:18
**2018**　22:23
34:16
**2019**　34:16
**2020**　22:24,25
26:14,18 38:22
44:2
**2023**　38:21
39:1

**2024**　1:18
48:11 49:16,20
52:6,14 53:2
63:24
**22nd**　18:16
57:23
**24**　1:2
**25**　36:20
**255**　1:17 4:14

**3**

**30318**　2:10

**4**

**4**　3:4,6 15:16
**404-418-8307**
2:10

**5**

**5**　15:25 16:14
18:25
**55**　3:7
**59**　3:9

**6**

**6**　21:9

**7**

**7**　53:2
**7003974**　64:2
65:2
**732-455-9737**
2:5
**7th**　41:24,25
42:6,10 47:11
56:15 58:5
60:9

**8**

**8**　26:14
**83**　1:2
**8th**　2:9

**9**

**9251**　63:22
**9:30**　1:19

**a**

**a.m.**　1:19 62:22
**abbreviations**
33:13
**ability**　6:4
63:14
**able**　22:1
**above**　1:14
20:3 65:7
**absolutely**
28:21 41:1
**absorbing**
34:22
**accurate**　15:18
22:24 46:12
49:10 52:10
63:11
**acknowledge**
4:2,5
**acknowledge...**
65:3
**act**　31:21,25
32:15 34:16
**action**　63:17,20
**active**　13:10
**activity**　23:17

**actual**　7:3
26:10
**actually**　11:20
13:10 33:24
34:18 44:3
53:23
**additions**　65:6
**address**　13:8
**addresses**　13:9
**administer**　4:6
**administered**
4:6
**adversarial**
22:15
**adverse**　12:3
20:18 21:12,20
56:16
**advise**　54:20
**advised**　15:13
52:7
**ago**　16:6 17:5
18:10 46:9
56:12 60:13
**agree**　49:12
**agreed**　52:9
**agreement**　4:9
4:10 10:16,20
10:23 41:10
48:4 60:2,4
**ai**　26:1,3
**allegation**
45:10
**alleged**　62:5
**amerilist**　29:12

[analysis - broad]

**analysis** 32:9
32:13
**answer** 5:10,11
5:21,22 8:10
8:11,12,13
25:13
**answered** 35:7
**answering** 5:19
**anybody** 27:17
34:18 48:4
49:12,12
**apologize** 22:14
54:8
**appended** 65:7
**appointments**
36:22
**appreciate**
14:23 22:19
40:18 43:10
45:21 58:13
**april** 22:24
23:2 44:2
**arrangement**
4:8
**asked** 6:17 7:10
7:12,16,20
39:24 57:19,19
58:24
**asking** 5:9 7:14
27:3 31:1 33:1
38:24
**aspect** 14:19
**assessment**
31:6

**associated** 40:3
**assume** 5:16
8:16 16:23
46:18 47:2,16
**assumed** 16:3
16:22 17:7
19:1 46:6,15
**assumption**
19:13 46:24
50:16
**atlanta** 2:10
**atm** 36:2
**attention** 14:1
14:12 30:16
**attorney** 5:20
5:21 9:20,22
9:25 10:21,24
12:21 17:21
18:2 41:10,15
41:16 45:6
46:7,11,16
47:19 48:15,19
49:8 51:7,12
54:11,14 55:14
58:18,25 59:1
59:22 60:17
61:21,23 62:10
63:16,18
**attorneys** 2:6
2:11 4:1 8:19
19:25
**august** 18:16
42:16 47:5,21
48:17,21 49:10
49:15,20 51:5

51:13 52:6,14
55:24 56:8
57:2,4,11,23
59:21 61:10
62:1
**avenue** 1:17
4:15
**avoid** 6:11
**aware** 5:24 6:1
24:24 29:18
33:2 37:5

**b**

**b** 1:8
**back** 12:20
14:13 17:16,16
17:17 18:19
19:3 22:13
23:22 25:23
26:19 29:14
34:25 37:12,16
40:24 41:2
42:4 52:12
55:4 57:17
58:11 59:17
**backing** 11:20
**bad** 18:7 24:15
**based** 19:14,15
27:10
**basically** 41:18
57:4
**basis** 18:25
**bear** 8:3
**beating** 59:19
**beginning** 35:8
47:5

**behalf** 1:4 25:3
25:25 26:18
27:25 32:25
39:5
**believe** 10:13
10:15 16:7
25:4 26:1 28:6
29:15 42:9
43:12,24 44:21
45:16,17,23
46:3 47:22
49:14 51:15
52:18 53:2,4
55:5 58:17
60:10 61:13
**believed** 16:2
44:11,20
**benefit** 28:15
**best** 63:14
**better** 31:5
45:7
**bit** 22:11 31:14
43:23 59:8
**blurring** 20:13
**bodegas** 36:7
**books** 36:20
**bother** 42:5
**break** 5:7,11
53:24
**brief** 5:5 43:20
54:1
**briefly** 6:14
23:19 24:10
**broad** 53:15

[brooklyn - concluded]                                    Page 3

**brooklyn** 1:18
  4:15
**brought** 25:5
  25:11
**business** 27:18
  28:13
**businesses**
  11:17
**buster** 34:13,21
**butter** 36:6

**c**

**c** 2:1 3:4 4:14
  63:1,1
**call** 6:17,23 7:2
  7:3,4,6 8:4
  17:12 20:24
  28:17,23 29:14
  30:10,14,18
  41:5,25 42:25
  47:7,10,24
  49:20 50:5
  51:5 56:19,22
  58:7 60:10,21
  60:23 61:9,22
  61:22
**called** 6:17,25
  11:7 29:11
  31:20
**calling** 26:5
**calls** 12:22
  17:22 24:19,21
  24:25 25:2
  26:2,4,17,23
  27:25 28:7
  30:6,10 32:10

33:5 38:2,6,16
  39:5,11 45:1
  59:12,15
**camera** 20:13
**campaign**
  26:14
**candor** 40:18
**capital** 33:23
  34:6
**car** 34:9
**card** 33:21
  34:19,22 36:2
**case** 1:2 11:22
  34:24 47:20
  48:20 49:10
  52:21 53:17
  54:22 57:13
  59:24 62:5
**cash** 27:19
**category** 38:12
**caught** 14:14
**ccr** 1:15
**cell** 4:20
**certainly** 23:8
  28:12
**certified** 63:4
  63:23
**certify** 63:5,10
  63:15
**change** 17:1
  64:4,7,10,13,16
  64:19
**changed** 17:2
**changes** 19:18
  65:6

**channel** 23:5,6
  35:3,10 36:17
**channels** 29:18
**characterize**
  6:20 27:20
**check** 13:13
  43:15
**chooses** 43:25
**civil** 1:2
**clarification**
  13:25 25:9
  61:19
**clarify** 5:17
  14:3,19 18:9
  21:4 27:2 29:7
  41:2 46:18
  61:16
**clarity** 47:5
  49:24
**classroom**
  36:21
**cleanup** 43:23
**clear** 8:15
  14:15 41:5
  45:9
**clearly** 47:13
**clicked** 14:25
**clicking** 13:17
**client** 10:25
  57:8
**clue** 39:2
**coach** 43:5
**collaborate**
  31:5

**come** 9:8,11
  17:16
**comes** 41:15
**commencem...**
  63:6
**commencing**
  1:19
**commitment**
  48:4
**communicated**
  12:7
**communicating**
  36:16
**communication**
  10:14
**companies**
  23:11,13 35:12
  35:16,24 36:1
**company** 23:10
  24:3 28:16
  29:11 37:22
  38:22 39:14
  40:12
**complaint** 38:1
**complete** 5:11
  65:8
**completely**
  11:13,19 24:14
  34:11
**computer** 26:8
  30:15
**concerned** 62:4
**concluded**
  62:21

**conducted** 32:9
**congratulations**
5:3
**connect** 34:8
**connection**
10:21,24 11:4
15:15 25:17
39:10 47:20
48:16,20 49:9
52:8 53:17
59:24
**consent** 4:7
**consents** 38:9
**considering**
30:1,3 58:15
**consistent** 17:9
**consumer**
31:20,24 32:14
34:20
**contact** 39:4,10
39:12,17
**contacted**
15:13 52:7
55:24
**contacting**
51:13
**contemplated**
27:24 28:4
**content** 30:23
**context** 30:22
32:15 37:18
**convenience**
34:10 36:3,4,7
**conversation**
6:15,18,21 7:7

7:19 8:21 9:10
10:10 11:21
12:4 21:25
30:20,22 31:2
43:8 46:10
49:16 52:15,17
52:20 58:22
59:10,21 61:10
**conversations**
8:18 41:3 45:4
49:11
**cordial** 6:21
**correct** 12:8
16:5,10,12
18:15 19:5
20:9 21:16,17
24:15,23 28:8
29:24 36:11,13
39:12,17 41:6
42:21 46:15,25
48:8 49:6
50:22 51:8
55:15,16,21
56:8 57:23
58:1,2,6,15
62:2 65:8
**corrections**
65:6
**correctly** 12:12
**counsel** 4:7
7:10 8:4,7,25
9:3,14,16
15:12 16:3,18
16:23,24 17:7
19:2,11,14

20:20,23 21:3
21:6,11,15,22
21:25 22:2
41:4,6,21 42:7
42:13,15,20,22
42:23 46:15,19
46:20 47:17
48:13 49:6
52:6,13,18,24
53:3,5 56:7
59:18 60:11
63:16,19
**couple** 11:17
50:6 53:1 54:3
54:4,9
**course** 9:21
32:22
**court** 1:1 13:25
25:9 63:23
**crcr** 1:15
**create** 25:19
**created** 26:9
27:10,11
**creating** 24:18
24:20
**credit** 33:21
34:19,22 36:2
**cross** 13:24
**current** 27:8,9
**customers**
23:10,14 24:4
27:8,9,13,13
28:19 36:10
**cut** 13:19

**cv** 1:2

**d**

**d** 1:8 3:1
**date** 42:2,11
48:1,9 49:4
52:2 57:22
60:20 63:13
64:24 65:12
**dated** 20:3 49:1
63:24
**dates** 49:23
**day** 18:13 20:6
20:8 36:20
65:15
**deceived** 11:21
45:13,17
**decision** 25:21
30:18 58:12
**declaration**
11:3,6,7 15:1
15:12 17:6
19:1,16,19,22
19:24 20:2,17
22:22 23:18,22
42:10,12 51:17
51:20,22 52:4
55:23 58:11
59:23
**declare** 65:4
**declined** 20:20
21:3,11,22
22:2
**deemed** 65:6
**defendant** 1:10
2:11

**[delegated - explain]**                                                  Page 5

**delegated**
   39:23
**delegation**
   39:21
**delicatessens**
   36:8
**deponent**  65:3
**deposed**  5:1
**deposition**  1:5
   4:2,3,4 5:8 6:8
   6:13 10:21
   37:13 40:20
   50:2 54:25
   62:4
**development**
   34:5
**dialing**  26:7
**difference**
   45:20
**different**  7:25
   22:19 48:25,25
**difficult**  14:16
**directed**  27:12
   30:20
**directly**  23:10
**discussed**  38:4
   38:7,10 49:1
   59:23
**discussing**  53:8
   61:21
**discussion**  4:24
   31:24
**district**  1:1,1
**division**  37:22

**dobbs**  34:15
**document**  11:6
   14:25 15:1,9
   15:11 41:18
   48:2,6,7,7 49:1
   53:8
**doing**  25:25
   30:19 40:9,10
   40:10 57:13
**door**  57:8
**double**  43:15
**dozen**  50:3
**drag**  40:19
**drill**  47:14
**drilling**  45:14
**drive**  2:4
**driven**  26:8
**duly**  4:15 63:7

**e**

**e**  2:1,1 3:1,4,4,4
   4:14,14,14
   63:1,1 64:3,3,3
**earlier**  52:3
   57:19 58:17
**easy**  41:23
**edits**  51:19
**effort**  24:7,13
   25:18
**efforts**  23:20
   24:6,10 25:17
   32:15 44:6
**eggs**  36:6
**either**  7:22
   17:23 55:17

**elaborate**  35:24
   44:14 45:4
**election**  6:7
**eliciting**  8:19
**elie**  25:16,18
   29:25 37:4,7
   39:19,21 40:2
**ellen**  1:15 43:19
   63:3,22
**email**  6:16 7:1
   10:13 12:8,16
   12:18,19,25
   13:7,9,16 14:5
   17:19 18:16
   19:3 57:20,22
   58:4
**emails**  13:11
   14:4,9,17,18
   17:18 18:19
   19:6 57:18
**employed**  25:3
   26:15,16 37:25
**employee**  22:22
   41:20 44:1
   63:16,18
**employer**  54:23
   58:9
**employing**
   28:16
**employment**
   35:5
**engagement**
   41:9 60:4
**entire**  35:4

**entitled**  1:14
**especially**
   11:15
**esq**  2:3,8
**essentially**
   35:19
**ethics**  45:11
**eventually**  59:7
**exactly**  31:18
**examination**
   1:5 3:6,7,9
   4:17 54:7
   55:11 59:9
   63:6
**examinations**
   3:3
**excuse**  15:21
   27:9 29:25
   32:14 37:25
   49:17 50:16
   52:5
**execute**  11:3
**executed**  20:4,5
   48:9,11
**executing**  11:9
   15:9
**exhibits**  3:13
   3:16
**existence**  34:7
**exists**  57:9
**expand**  11:5
   30:13 54:13
**explain**  21:20
   23:6,25 28:10
   41:15 44:25

[explain - gotcha] Page 6

56:21 58:20
**extent** 8:16
57:9

**f**

**f** 63:1
**face** 58:21
**fair** 5:17,18
28:19 31:6
46:24 58:3
**false** 44:1,4,5,7
44:9,12
**familiar** 31:10
31:19
**family** 9:24
**far** 19:2
**fee** 34:13,19,21
34:23 62:14
**feed** 43:3
**feel** 11:21 48:24
**figure** 61:6
**final** 23:4
**finally** 47:15
**financially**
63:19
**find** 13:17
35:14,23
**finds** 12:19
**fine** 20:15
22:16 45:16
53:25
**firm** 2:3 15:14
51:18 52:8
56:25 62:11
**first** 5:1 14:5
16:25 18:8,16

20:2 25:5,11
26:13 34:15
44:19 48:12
49:5 56:10
57:20
**fitzgerald** 2:8
3:7 4:13 7:17
8:5,9,12 9:4,10
10:2,5,9,12,17
10:18 15:3,13
15:21,23 16:17
17:3 18:1 21:1
21:7,18 22:4
26:11 28:1
41:11,14,17,19
42:8,17 43:16
44:8 45:24
46:5 47:3
48:22 49:15,19
49:21 50:2,5
51:6,9,13 52:7
53:22 54:12,15
54:16 55:1,10
55:11 59:4,22
60:18 61:18,21
61:23 62:18
**fitzgerald's** 9:5
54:11 62:11
**five** 22:18
43:14 53:23
**floor** 2:9
**fly** 11:14
**focus** 8:20
**focused** 30:20

**folders** 13:13
**follow** 53:20
59:6,8
**follows** 4:16
**foregoing**
63:10 65:5
**form** 6:15
39:23
**former** 58:9
**forth** 59:17
63:13
**four** 26:19,19
**front** 36:21
57:24
**frustrating**
20:12
**functioned**
40:13
**further** 4:5
63:10,15

**g**

**gas** 34:8,9,10
**gears** 22:21
**general** 33:1
**generally** 37:17
**georgia** 2:10
**getting** 9:9 10:9
36:21 52:12
**give** 11:2 33:12
46:21 47:4
49:24
**given** 50:20
65:9
**glapion** 2:3,3
3:6,9 4:12,17

12:10 16:1,2
20:18 25:10
43:13,17,21
44:10 51:10
53:19,25 54:2
54:7 55:9
56:15 57:6,16
58:19 59:6,9
62:16,19
**glapionlaw.c...**
2:5
**go** 4:21 5:4 6:8
9:23 14:13,20
17:16,17 19:3
20:3 34:25
40:20,24 43:19
55:12 57:17
**godino** 1:15
63:3,22
**goes** 52:12
**going** 8:17
12:10 15:6
18:13,18,22
26:19 28:23
29:14 33:12
37:12,16 40:7
40:19 41:2
49:24 53:4
58:11
**good** 4:25
20:10 59:2
61:19 62:17,18
**gosh** 6:8
**gotcha** 40:14

**grab** 4:23
**ground** 5:5
**group** 23:15
**guess** 17:11
26:25 27:5
30:2 33:13
41:16 42:13
51:4 53:9
**guessing** 19:15
**guy** 36:19
**guys** 57:7

**h**

**h** 3:4,4 4:14,14
64:3
**half** 50:3 57:25
**handful** 6:17
**hands** 39:19
**hate** 18:22
59:19
**headphone**
20:11
**hear** 4:19
**heard** 7:21
29:11 31:8,12
33:2
**held** 1:16
**hellerman** 1:6
4:25 11:7 15:2
25:13 59:11
63:7 64:2,24
65:2,4,12
**help** 22:11
**helpful** 61:7
**hereinbefore**
63:13

**hereto** 65:7
**hey** 19:7 30:19
58:8
**hi** 12:18
**hire** 32:16
58:13
**hired** 9:19
25:20
**hiring** 24:16
30:1,4
**hold** 13:18
57:17
**honestly** 6:4
10:19 37:14
39:18 40:5
46:21
**hope** 12:19
**hopefully** 41:23
**how's** 22:10
**howell** 2:9
**huge** 37:22,22
**human** 26:5
**hunt** 35:14

**i**

**idea** 10:7 25:6
25:11 28:24
29:2,6 32:21
37:23 38:19,23
38:24 39:3
**idiot** 31:14
**idt** 37:22
**illinois** 1:1
**impact** 6:6
**impair** 6:3

**imply** 59:14
**impression**
19:10
**inbox** 14:21
**incorrect** 57:1
**independent**
35:11 46:23
**indicate** 4:9
**indicated** 62:13
**influence** 6:2
**information**
22:17 43:3,10
50:20
**initial** 12:4
41:3
**initially** 10:13
10:15 12:8
**initiated** 6:23
7:4 30:15
**inquiring** 32:7
**instruct** 8:13
**instructs** 5:21
**intended** 26:24
**interested**
27:17 45:1
63:19
**interpret** 17:20
**interpreted**
18:5
**interrupted**
30:25
**invoice** 39:11
**invoices** 38:20
**involved** 8:22
10:1 23:19

24:10,17,20
26:21 29:5,8
33:3 36:12,16
36:23,25 37:6
37:24 39:22
44:6 45:7
46:11,16 52:22
**involvement**
24:5
**issues** 38:9

**j**

**j** 1:15 63:3,22
**january** 26:14
26:18
**jeremy** 2:3 19:3
43:2 44:10
57:18,20 58:7
**jersey** 2:4
12:21 17:21
18:3 63:5,24
**jmg** 2:5
**job** 32:12
**juice** 36:5
**july** 38:21 39:1

**k**

**katz** 25:16,18
**keep** 59:19
**keeps** 20:13
**kidding** 5:3
**kids** 11:15,17
**kind** 37:9
**kinds** 12:12
**knew** 7:12,16
21:11 39:14

52:21,21
**know** 5:8,15,16
7:23,24 8:15
10:19 11:18
14:9 17:18
18:22 20:2
22:7,10 23:21
25:5,10 26:12
26:19,23,25
27:1,23 28:3
28:22,25 29:3
29:10,21,22
31:13,17,17,23
32:4,9,13
33:15,16,16,23
34:2,13 37:10
37:21 38:12,15
39:16,18 40:5
40:5,8,8,11
42:2,5 47:12
49:25 50:20
53:13 54:2,21
54:21,24 55:3
55:3,20 56:11
56:23 57:5,7
**knowledge**
33:3 40:21

**l**

**l** 3:4,4,4 4:14
4:14,14
**lack** 20:11 45:7
**law** 2:3 31:20
51:18
**lawsuit** 10:24
12:21 16:19

17:21 18:3
22:10 45:7
46:11 56:16
57:21
**lawsuits** 9:17
**lay** 28:10
**lead** 28:11,12
**leads** 27:13
28:7 29:1,19
37:20
**learning** 45:1
**left** 35:1 38:22
**legal** 9:23 32:9
45:11 55:20
**legally** 54:20
**liability** 58:20
**liable** 56:22
59:12,15 62:5
62:8
**license** 63:3
**lieu** 4:5
**life** 12:20
**lifetime** 9:18,19
**light** 21:4 33:14
37:10
**line** 17:20 64:4
64:7,10,13,16
64:19
**lines** 43:9
**link** 34:12
**listed** 38:25
39:4,9
**lists** 11:8 29:3
**literally** 54:4

**little** 22:11
31:14 43:23
44:21 59:8
**loan** 34:1
**located** 1:17
**locations** 1:16
**long** 5:4
**longer** 6:9
40:20,25
**look** 14:13,20
16:6 60:25
61:4,5
**looked** 18:19
56:9
**looking** 9:14
40:21 51:7,12
**looks** 13:18
20:4 23:21
**lost** 23:21
**lot** 7:23 39:21
39:23 40:6,7

**m**

**m** 3:4,4 4:14,14
**machines** 36:3
**made** 19:13
24:25 26:18,24
38:16 44:15
45:23 46:2,18
47:16 48:3
65:5
**make** 5:5 7:2
7:25 19:18
25:2 26:2,3
27:24 47:1
50:12 51:19

58:12 59:20
62:4
**maker** 30:18
**makes** 31:16
58:13
**making** 24:18
32:10
**manage** 23:15
23:16 35:15,24
**manager** 23:5
35:3,10 36:17
**manager's** 23:7
**managing**
35:23
**manner** 4:9
**march** 22:25
23:2 44:3
**marked** 3:16
**marketplace**
35:12
**match** 41:25
**material** 12:13
**matter** 1:14
11:4 15:15
34:18 48:13,17
52:9 55:6 56:4
**matters** 9:23
**maxwell** 2:4
**mean** 14:11
26:3 33:14
45:5,6 46:10
47:12
**meant** 38:16
**medication** 6:3

**[memory - objection]** Page 9

**memory** 6:6 11:15
**mention** 13:23
**mentioned** 10:8 12:6
**mentioning** 29:16
**mess** 38:14
**message** 61:3
**messages** 56:9 60:14,14,17 61:20
**michael** 1:6 4:19 11:7 12:19 13:7 15:1,4 43:23 54:5 55:12 56:18 63:7 64:2,24 65:2,4 65:12
**milk** 36:5
**mill** 2:9
**million** 7:24
**mind** 54:3
**minute** 53:23
**minutes** 43:14 43:16,17
**mistakenly** 16:2 44:11
**misunderstood** 17:14
**moment** 13:5 16:6 17:5,17 18:10 22:13 25:23 46:9

60:13
**month** 52:3 57:25
**months** 56:12 57:12
**morning** 4:25
**mouth** 31:4
**moving** 40:7

**n**

**n** 2:1 3:1,4 4:14
**name** 4:10 7:13 7:17 34:15 38:25 39:4
**names** 40:3
**national** 1:8 10:25 12:2,3 22:23 23:13 44:2 64:1 65:1
**nature** 30:9
**necessarily** 50:21
**necessary** 65:6
**need** 5:7 52:24
**needed** 14:13 55:5 58:18,24
**needs** 40:20
**negatives** 40:15
**neither** 63:15 63:18
**never** 18:17,18 40:19 55:16 58:22
**new** 1:18 2:4 4:15 12:21 15:1 17:21

18:3 63:4,24
**non** 27:13,25
**northern** 1:1
**notary** 65:13 65:19
**noted** 65:7
**notes** 1:13
**november** 1:18 63:24
**nrs** 1:8 12:20 12:22 15:13,14 15:22 16:2,19 16:20 17:13,15 17:22 18:3,4,6 19:25 20:18 21:12,20 22:21 23:4,8 25:3,3,8 25:12,25 26:13 26:15 27:9 28:20,25 29:3 29:8,16,19 30:3,3 31:11 31:19,25 32:7 33:15,16,18,20 33:21,23 34:2 34:5,6,7 35:2,5 37:6,19,21,24 37:25 38:4,7 38:10,20 39:6 39:10 41:19 44:12,16,20,23 45:8,14,23 46:3,12 50:9 50:13,24 51:3 52:2,6,7 54:22

56:3,17,19 57:21 58:14
**nrs's** 16:3,23 16:23 17:7 19:1,11,14 23:19 24:5,10 26:18 27:25 35:17 36:13 37:18 44:6 45:1 46:7,15 46:19 47:17
**number** 28:23
**numberdescri...** 3:14
**numbers** 29:1,4 29:9,16,19,23 37:17,19

**o**

**oath** 4:5,6 5:25 11:8
**object** 5:20
**objected** 8:11
**objecting** 8:16
**objection** 4:12 4:13 8:5,9 10:12,18 15:23 16:17 18:1 21:1,7,18 22:4 26:11 28:1 41:11,17 42:8 42:17 44:8 45:24 46:5 47:3 48:22 49:21 51:9 54:12,16 55:1

**[objection - point]**

57:16
**objections** 4:8
**obtain** 37:19
**obtained** 28:25
29:19
**obtaining** 38:9
**obviously**
32:24
**october** 20:5
41:23,24,25
42:6,10,12
47:10,11 48:11
49:2 50:5 53:2
53:7 56:15
57:1,12 58:1,5
59:22 60:9,21
**offer** 14:23
**offerings** 36:9
**oh** 6:8 8:11
44:24
**okay** 4:19 5:12
8:24 11:13
13:6,18 17:10
18:20 20:14
22:5 31:1 42:3
47:12 52:19
55:8 56:24
59:3 61:8,25
**ones** 14:14
**open** 57:8
**opportunity**
43:24
**oral** 1:5
**outbound** 24:3
26:2,4

**outlining** 60:6
**outside** 37:17
**overly** 14:16
**own** 40:16
46:23
**owners** 27:7

**p**

**p** 2:1,1
**page** 3:3,14 5:6
13:19 20:3
64:4,7,10,13,16
64:19
**paid** 10:5 15:22
**paper** 41:13
53:6
**paragraph**
15:16,25 16:14
18:25 21:9
23:25 24:9
**paragraphs**
11:8
**part** 13:18
25:20 44:19
**partially** 54:17
**participating**
4:2
**parties** 4:7
63:17
**parts** 40:7
**party** 20:18
21:20 23:11,12
**pass** 34:18,23
**passed** 34:16
**past** 12:20

**pat** 8:16 9:4
43:14,24 53:20
55:9 61:17
**patience** 22:19
**patrick** 2:8
7:17 15:13
17:3 52:6
**pay** 1:9 15:14
33:15,16,18,20
33:21 42:23
52:8 56:3
**paying** 9:5
42:19
**pending** 5:10
10:24 12:21
16:19 17:21
18:3
**people** 27:3
**perfectly** 41:5
**person** 4:6 26:5
26:6,10 28:10
30:15,16 39:5
39:10,13,17
**personal** 9:24
33:3
**petro** 34:2,5,7
**pfitzgerald**
2:11
**phone** 4:20
6:23 7:2,3,4,6
8:4 17:12
20:24 24:18,21
24:24 25:2
26:2,4,6,7,17
26:23 28:23

29:9,14,16,23
30:6,9,10
32:10 37:16
38:2,6,16,17
41:5,25 42:25
45:1 47:7,10
47:24 49:15,20
50:5 53:2
56:19,22 58:7
59:12,15 60:9
60:21,23 61:5
61:9,12,22,22
**physically** 4:3
**picking** 26:6
**piece** 37:9
41:12 53:6
**place** 43:20
54:1 63:13
**plaintiff** 2:6
45:8 46:12
50:17 56:16
**plaintiff's**
46:20
**plaintiffs** 1:6
**platform** 33:22
**played** 55:16
**please** 4:9 5:15
**point** 14:10,16
17:1 23:9,14
26:15 27:18
28:14 33:11
34:8 35:17,20
39:3 41:8 43:1
44:22 45:25
47:16 59:19

62:3
**portfolio** 36:9
**positives** 40:15
**possibly** 57:12
**potential** 23:10
24:4 27:13
58:20
**potentially**
56:22 62:8
**presence** 32:2
38:7,10
**present** 4:3
32:6
**presented** 16:1
44:11,14,19
**pretty** 17:24
26:2 37:13
**previous** 9:17
14:4,14 18:19
19:6
**previously** 12:7
17:18 51:6,16
52:21 56:24
57:10
**primarily** 23:8
**primary** 23:7
**prior** 6:12
14:10 50:2,5
51:12 62:3
63:5
**privilege** 8:17
8:22
**privy** 32:11
33:1

**probably** 22:8
27:19 31:22
33:6 37:4
44:24 59:2
62:15
**proceedings**
1:14 62:21
**process** 5:9
11:14 22:14
37:1
**processing**
33:21 34:19,23
36:2
**product** 33:8
36:8
**products** 35:13
35:13 36:3,4
36:13
**program** 34:1
**projects** 40:6
**proprietors**
34:17
**prospect** 28:11
28:12
**prospective**
28:19
**prospects**
27:14 28:7
29:1,20 37:19
**protection**
31:20,24 32:15
**provided** 16:16
**public** 65:19
**pull** 23:22 40:8

**pulled** 40:9
**pump** 34:9
**pumps** 34:8
**purchased** 29:3
29:9,16
**purpose** 27:15
**put** 31:4 36:9

**q**

**qualify** 30:17
**question** 5:9,15
5:22 17:11
38:13 41:16
49:8 53:15
**questions** 5:19
5:20 6:18
22:15 43:25
54:4
**quick** 12:11
**quite** 45:17

**r**

**r** 2:1 3:4 4:14
63:1 64:3,3
**raised** 25:6,11
**random** 33:12
**rarely** 13:15
**rashad** 1:4 64:1
65:1
**rather** 46:19
**reach** 10:11
12:20 24:4
**reached** 9:12
9:13 10:9
**reaching** 30:16

**read** 13:1,2,3
14:17 18:2,6
18:11,12,17,17
18:21,23 19:4
19:6,7 26:10
47:13 58:4
65:5
**ready** 4:18 54:5
54:6
**real** 12:11
**realize** 12:5
**realized** 20:17
21:19 52:2
**really** 7:8 11:24
14:11 22:7
24:12 25:7
30:19 31:13,17
37:8,9,10,21
40:11 49:24
52:2,19,22,23
57:13
**realtime** 16:7
35:9
**reason** 50:7,23
51:1 59:2 64:6
64:9,12,15,18
64:21
**recall** 6:12 7:6
7:9,12,16,18,20
11:9 14:3 15:9
17:19 19:10
26:17 29:8,15
29:17 30:9
38:1 40:4 43:8
47:25 49:16,17

53:10,16 61:11
**receive** 12:25
13:11 14:7,18
**received** 6:16
14:3,9
**receiving** 38:1
**recent** 6:7
**recently** 38:20
**recess** 43:20
54:1
**recollection**
42:1 47:9
48:12 61:2
**reconcile** 16:13
53:1
**record** 4:11,24
43:11,19
**recorded** 20:15
**recruit** 23:12
35:15
**refer** 30:2
42:14
**referred** 28:6
**referring** 13:16
13:21 18:15
48:7
**refresh** 47:9
61:1
**register** 27:19
**relationship**
11:24 16:11,15
17:6 36:7 37:6
37:18 39:20
40:3 57:9

**relative** 63:16
63:18
**remember** 7:11
7:14,22 10:19
11:12 30:13
32:18 33:7
34:14 49:2,23
51:21 55:25
56:2,20,23
60:25
**remembered**
58:5
**remind** 35:1
58:8
**remotely** 4:4,7
**repetitive** 7:24
**rephrase** 14:8
51:10,11
**reporter** 4:1
63:4,23
**reporting** 4:4,9
**represent**
15:14 23:12,13
48:4 52:8
54:22 56:4
62:13
**representation**
9:6,8,11 10:6
10:17 15:22
22:7 41:9 52:9
52:22 54:11,24
55:6 56:5 60:1
60:7
**representatives**
23:16

**represented**
7:10 8:3,7,25
9:16 12:2,5
16:2,21 17:7
17:13,15 18:4
18:5,6 20:18
20:19,23 21:3
21:5,10,15,19
21:21,24 22:2
22:5 41:4,6,20
42:6,15 44:12
44:15,20,23
45:14,23 46:3
46:17 47:20,24
48:3,15,16,20
49:5,9 50:9,12
50:17,24 51:2
52:13,18 53:3
53:5 55:19
56:7,16 57:11
57:20 59:18
60:10
**representing**
19:25 54:15,19
56:25
**represents**
41:19
**request** 6:16
**requested** 7:2
**required** 65:13
**requires** 22:18
**resources**
37:23
**respect** 39:5
57:9

**responsibility**
32:12
**retail** 1:8 10:25
12:2,3 22:23
23:13 44:2
64:1 65:1
**retailer** 34:22
34:24
**retailers** 34:17
**retain** 23:20
24:6,10,13
25:17 44:7
49:12
**retained** 42:13
42:22 48:12
62:14
**retaining** 10:2
24:7 25:6,11
**review** 51:22
**reviewed** 52:1
60:14
**right** 8:8 9:1
19:7 23:3
32:23,24 36:4
36:14 41:7
43:22 47:6
51:1 55:15,18
55:22 56:13
57:1,2 62:12
62:19
**rights** 22:8
54:21
**ringless** 31:8,16
**risk** 38:6

**road**  2:9
**role**  11:22 22:7
  23:7 24:9 35:9
  36:12,17
**room**  4:3
**rpr**  1:15
**rules**  5:5
**run**  27:18
  40:16
**ryan**  7:13

**s**

**s**  2:1 64:3
**sale**  23:9,14
  27:18 28:14
  33:11 34:8
  35:17,20
**sales**  36:18
**salespeople**
  36:21
**saw**  14:6 20:2,6
  20:8
**saying**  31:3
  54:8 57:20
  58:8
**says**  12:18
  16:13,22 17:6
  18:21
**scenario**  16:9
**schiffman**
  36:19
**scope**  54:10,13
  60:7
**screen**  12:11
**script**  30:11,12
  31:5 33:8

36:23 40:9
**scripts**  24:18
  24:21,25 25:19
  25:22 26:9
  27:10,11,16,20
  30:23 33:4
  39:7
**scroll**  13:4,17
  15:6 35:8
**second**  4:22
  8:20 11:2
  57:18
**see**  12:11,14,16
  12:23 13:22
  15:1,3,4,16
  16:4 20:21
  21:12 23:23
  27:17 28:15
  48:9 57:24
**seeing**  17:19
**seem**  7:23
  22:15
**seems**  31:6
**sell**  23:14 35:13
  36:2,2,3
**selling**  36:5,20
**sellingsavvy....**
  13:7
**sells**  23:8,9
**sense**  10:4 30:3
  37:17 58:14
**sent**  7:1
**separate**  34:11
**service**  33:7
  34:19

**services**  32:8
**set**  63:13
**shape**  39:23
**share**  12:10
**shared**  48:6
**sharing**  12:12
**shed**  33:14
  37:10
**shifting**  22:21
**short**  37:13
**shorthand**  63:4
**showed**  41:13
**showing**  15:2
**side**  17:23
**sign**  41:9 52:16
  59:23 60:1,4,6
**signature**  15:7
  63:22
**signed**  10:16,20
  10:23 20:8,16
  20:16 23:18
  24:14 41:12
  42:9 48:2
  51:17 52:5
  53:5,12
**significance**
  55:20
**significant**
  45:10
**signing**  51:23
  53:10,16
**silly**  53:15
**similarly**  1:5
**simple**  17:11
  59:20

**sir**  35:6 50:14
**sit**  40:19
**situated**  1:5
**situation**  39:9
**small**  34:1,10
  37:9
**sold**  35:12 36:5
**solutions**  1:8
  10:25 12:2,3
  22:23 23:13
  44:2 64:1 65:1
**somebody**
  18:23 40:10
**sorry**  12:19
  23:22 30:25
  33:19 37:11
  61:15
**sort**  35:22 41:9
  45:10
**sound**  36:12
**sounds**  5:18
**sources**  37:16
**space**  45:11
**spam**  13:13
**speak**  20:20
  21:3,11,22
  22:2 50:4
**speaking**  6:12
  30:2,21 56:2
**specific**  27:3
  33:7 37:9
  38:16 42:2
  46:22 47:15
  53:14

**specifically**
7:11 19:12
28:17 45:25
50:12 56:20
**spoke** 11:24
16:8 17:3 18:8
41:23,24 49:15
50:8,23 51:2
53:1 56:10,14
58:1,5,19
61:12
**spoken** 49:19
50:1,17,19
57:2,4 61:17
61:18
**start** 38:13
55:14 56:25
57:13
**state** 63:4,24
**statements**
11:9
**states** 1:1 15:25
20:17 23:19
52:5
**stating** 4:10
**stations** 34:10
**stenographer**
13:25 25:9
**stenographic**
1:13
**stenographic...**
63:12
**steve** 36:19
**stop** 59:7

**stopped** 22:25
**store** 27:7
**stores** 34:10
36:3,5,7
**stressful** 11:14
**stuff** 39:23
**style** 40:16
**subpoena**
18:23
**subpoenaed**
13:3 18:14,18
18:22
**subscribed**
65:14
**subsequent**
41:8
**substance** 7:7
9:9 10:10
**substances** 6:3
**suggest** 62:7
**suing** 16:20
56:18 58:8
**sure** 5:5,13
6:22 8:1,2 9:21
11:6 12:15
13:20 14:24
21:9,24 24:2
30:14 31:7
33:9 35:11
36:1 37:2
39:22 51:16
55:10
**surprising**
18:22

**suspect** 37:13
**sworn** 4:15
11:8 63:7
65:14
**system** 27:18
33:11 34:8
35:17
**systems** 23:9,14
28:14 34:11,12
35:20

**t**

**t** 63:1,1 64:3,3
**t.v.** 55:16
**take** 4:22 5:4
5:11 8:20
43:14 53:23
**taken** 1:15
63:12
**takes** 43:20
54:1
**talk** 13:24
25:22 55:18
**talked** 49:14
57:7
**talking** 18:12
48:25
**targets** 28:6
**tcpa** 32:14
**techno** 31:14
**technology**
28:16
**telemarketing**
24:3 27:21,25
**telephone**
12:22 17:22

29:4,19 31:20
31:24 32:14
37:19
**telephones**
38:13
**telephonic**
10:14
**tell** 8:18 14:5
22:1 35:9 43:1
56:15
**ten** 43:16,17
**terepka** 2:8
7:21
**term** 28:11
**terminates**
54:25
**termination**
52:2
**terminology**
45:7
**terms** 5:19 7:3
41:24
**terrible** 11:11
**testified** 4:16
15:12 16:7
17:5,18 42:20
46:9 47:23
51:6,15 55:23
56:3 58:12,17
60:13
**testify** 6:4
32:25 42:11
63:7
**testifying** 46:14
49:5

**testimonies**
 17:9
**testimony**
 14:19 16:15
 18:10 20:7
 21:4,5,14
 49:17 59:18
 63:11 65:8
**text** 56:9 60:14
 60:14,17 61:3
 61:20
**thank** 4:18 5:24
 34:25
**thing** 5:8 20:12
 40:11 41:12
 47:15 49:22
 53:12
**things** 7:25
 11:14 22:18
 32:25 33:2
 36:22 40:23
 47:10 48:25
 53:1
**think** 8:14 13:1
 14:13 22:12
 33:24 39:24
 40:24 41:22
 43:13,14 44:15
 44:17 50:12
 52:19 53:19
 58:18,25 59:4
 62:17,19
**thinking** 17:14
 45:14

**third** 23:11,12
 40:11
**thompkins**
 1:17 4:14
**thought** 50:8
 50:23 51:2
**threaten** 43:5
**throw** 42:4
**thursday** 1:18
**till** 44:3
**time** 5:1 8:4
 9:13 17:12
 20:24 21:15,25
 22:21 27:23
 35:1 41:20
 47:24 51:5
 58:19 63:12
**timeline** 55:13
**times** 50:1,4
**title** 23:4 35:1,4
**today** 5:24
 30:19
**together** 34:12
**told** 20:19 21:2
 21:10,21 26:13
 47:19 48:19
 49:9 50:15
**ton** 37:14
**top** 12:16 13:19
**topic** 6:11
**totally** 20:15
 38:3 40:22
**towards** 27:12
**trained** 36:22

**trainer** 36:19
**training** 36:21
**transcript** 1:13
 63:11 65:5,8
**transpired**
 11:25
**tremendous**
 28:15
**trepka** 62:10
 62:14
**true** 24:12 44:1
 44:7,12,13
 46:6 47:19,21
 48:17,21 50:7
 50:22 63:11
 65:8
**truth** 63:8,8,9
**truthfully** 6:4
**try** 5:17
**trying** 8:22
 14:15,16,18
 17:8 18:25
 19:9 22:17
 24:11 34:14
 35:22 44:18
 52:25
**two** 34:11,12
 57:12
**type** 38:12,16
**typically** 9:23
 36:12

| u |
| --- |

**under** 5:25 6:2
 11:8 41:20,21

**understand**
 5:14 11:13,19
 11:23,24 14:17
 16:8,11,21
 17:4,5,8,12,25
 18:25 19:8,21
 20:1 25:24
 27:4 35:22
 44:17 45:18
 52:23 54:10,14
**understandable**
 56:11
**understanding**
 12:1 15:20,21
 16:14 24:1,2
 31:15 41:14
 54:18
**understood**
 5:16,22,23
 14:2 16:18,20
 17:7 18:8 22:9
 26:7 45:5
 46:10 57:3
**united** 1:1
**unrelated**
 12:12
**unwanted**
 12:22 17:22
 38:1,6
**use** 24:18 25:19
 25:23 28:11
**used** 22:10
 24:21
**user** 35:16
 36:13

**uses** 26:1,3
**using** 24:17,25
  27:18

**v**

**v** 1:7 64:1 65:1
**vague** 17:24
  44:21 45:3,4
**vagueness**
  19:15
**various** 1:16
  11:8
**vendor** 28:14
  58:15
**vendors** 35:19
**videoconfere...**
  1:16
**view** 28:18
**voicelogic**
  23:20 24:1,3,6
  24:11,13,25
  25:2,6,12,17,19
  25:23,24 26:1
  26:14,18 27:9
  27:24 28:22
  30:1,4,7,22
  31:2,16 32:10
  32:16 36:16
  37:1,7,18
  38:15,20 39:20
  40:3 44:7
  58:13
**voicelogic's**
  32:8 39:5
**voicemails** 31:9
  31:16

**w**

**wait** 5:10 43:10
  61:15,15,15
**waive** 4:8
**walk** 36:15
**wall** 2:4
**walston** 1:4
  64:1 65:1
**want** 4:22,23
  5:4 7:25 8:17
  17:4 18:9
  22:12,13 25:23
  30:20 31:3
  34:25 35:8
  40:23 41:2
  43:13,15,23
  45:9 47:14
  51:16 53:20
  55:12 57:6,8
  57:17
**wanted** 35:13
  54:9
**watstein** 2:8
  7:13,21 62:10
  62:14
**way** 11:22 16:1
  34:11 39:22
  40:12 43:6
  44:10,19
**ways** 7:25
  22:19
**we've** 59:23
**went** 18:19
**wife** 9:25 10:1

**witness** 1:17
  2:11 11:11
  54:6
**words** 31:4
**work** 25:16
  43:16 57:13
  58:14
**worked** 25:18
  31:10 36:19
**working** 4:21
  22:25 40:6
**works** 43:17
**write** 19:16
  33:4 39:7
**writing** 30:11
  30:13 31:5
  36:23
**wrong** 36:11
  50:22
**wrote** 15:11
  19:21,24 21:9
  22:22 36:20
  51:17 52:5
**wtlaw.com**
  2:11

**x**

**x** 1:11 3:1
**xl0l6l8** 63:3

**y**

**yeah** 6:11 8:12
  15:19 16:25
  17:23 18:24
  19:23 20:11,11
  23:24 26:16

  27:22 31:13
  34:14 40:1
  44:5 45:12
  47:8,22 48:23
  49:18 52:11
  53:22 56:9
  57:15,24 60:19
  60:22
**years** 26:19,20
**yep** 12:17
**york** 1:18 4:15
**young** 11:15,17

**z**

**zoom** 1:16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.