UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **RASHAD WALSTON,** on behalf of himself and all others similarly situated,<br><br>      **Plaintiff,**<br><br>  v.<br><br>**NATIONAL RETAIL SOLUTIONS, INC. D/B/A NRS PAY,**<br><br>      **Defendant.** | Civil Case No.: 24-cv-83<br><br>District Judge: Hon. Sunil R. Harjani<br>Magistrate Judge: Jeffrey T. Gilbert |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR RELIEF UNDER RULE 23(d)**

  On August 16, Michael Hellerman was not looking for an attorney. On August 16, Mr. Hellerman had no interest in paying for an attorney. On August 16, Defendant's counsel, believing Mr. Hellerman had crucial information, contacted him anyway and offered representation paid for by Defendant "to the extent [his] participation was required." Such conduct has been described as "not unethical … [but] not charitable either" and as giving "an appearance of impropriety." *U.S. v. Occidental Chem. Corp.*, 606 F. Supp. 1470, 1475 (W.D.N.Y. 1985).

  Exacerbating matters is that Defendant's highly experienced counsel did not memorialize the terms of that engagement in a written agreement. The entire attorney-client relationship ostensibly developed over a single text message and an eight-minute phone call.

  Defendant's counsel then left Mr. Hellerman in the lurch for two months until it scrambled to put together a declaration on Mr. Hellerman's behalf that contained basic factual inaccuracies (regardless of who was at fault for those inaccuracies).

1

These are undisputed, incontrovertible facts, no matter how many declarations Defendant submits and how much more testimony it obtains.[1]

These lapses of judgment had repercussions. For example, Defendant trots out a litany of reasons why Mr. Hellerman's deposition testimony may have been inaccurate, including being confused about the meaning and timing of being "represented". However, confusion about the scope, existence, and timing of representation is the very thing a written representation agreement is meant to prevent. *See In re Seare*, 493 B.R. 158, 202-203 (D. Nev. 2013).

Rather than take ownership of this mistake, Defendant rages against Plaintiff's counsel for contacting Mr. Hellerman in the first place, despite no permission being needed to contact third-party former employees. *E.g.*, *Orlowski v. Dominick's Finer Foods, Inc.*, 937 F. Supp. 723, 728 (N.D. Ill. 1996) (collecting cases).

If this were a test to see if Defendant's counsel could be trusted to interact fairly with third-party witnesses, they failed with flying colors. Defendant's counsel's interactions with Mr. Hellerman, to whom Defendant is not adversarial, show a "threat" of "coercive, misleading, or other abusive communications" toward putative class members, to whom it is. *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 926 (N.D. Ill. 2013).

I. **Defendant's counsel's lapses of judgment require caution.**

Defendant spends much of its brief acting as if discipline were sought. It is not. Plaintiff would not wield the ethical rules in this fashion. The only issue is whether Defendant's counsel, with a recent history of walking right up to the line, did so again in its

---

[1] With the caveat that because Defendant's brief is redacted in part, Plaintiff cannot fully respond or incorporate the redacted material into this reply.

interaction with a third-party witness in a way that justifies limitations or at least oversight on its interactions with *other* third-party witnesses.

That is why the primary relief Plaintiff seeks is narrow: a *temporary* bar on Defendant's communications with putative class members until the Parties submit a proposal on the contours of a permanent one.[2] The form that the proposal might take is unclear,[3] but wholly unrestricted and unmonitored communication is untenable.

### A. Solicitation of a third-party witness is criticized even if not unethical.

Again, Plaintiff takes no position on whether Defendant's counsel's solicitation of Mr. Hellerman was technically in violation of the rule against solicitation. It does not matter because it created the appearance of impropriety. As one court wrote in evaluating an offer of free representation to a former employee of the defendant, "[w]hile the conduct of [the attorneys] was not unethical, it was not charitable either." *Occidental Chemical Corp.*, 606 F. Supp. at 1475. The *Occidental* court proceeded to bar the defendant from soliciting former employees on behalf of the attorneys, holding:

> I believe there **is an appearance of impropriety** when a law firm directly or indirectly mails an offer of legal services to future witnesses…. [T]he court believes that if it is possible to avoid a negative appearance, conduct giving rise to it should be prevented.

*Id.* at 1477. It then concluded that while it was not improper for the attorneys to represent these witnesses, "it appears improper to permit the firms … to give unsolicited notice of their availability at no cost[.]" *Id.*

---

[2] Plaintiff also requested that Defendant be prohibited from using anything obtained prior to any oversight but agrees that this relief would go too far on the current facts.

[3] One option which Plaintiff has thought about but has been hesitant to suggest is the appointment of a special master who could, among other things, review in real time Defendant's and/or Plaintiff's communications with putative class members pre-certification. This would also have the benefit of forcing the Parties to exist in the same reality on other discovery disputes.

Similarly, a court in the Northern District found that a law firm's representation of defendant's former employers, paid for by defendant, "is remunerative employment" and such an offer, "if made before the deponent can evaluate his need for legal assistance" may be coercive. *Aspgren v. Montgomery Ward & Co., Inc.*, 1984 WL 49011 (N.D. Ill. Nov. 19, 1984). It then prohibited the law firm from offering such representation to witnesses unless and until the witness asks about hiring counsel. *Id.* at *6. Defendant's counsel here ostensibly took Mr. Hellerman from not needing an attorney to fully retaining them over the course of a single text message and an eight-minute phone call—unlikely enough time for Mr. Hellerman to evaluate his need for legal assistance.

Another issue is that Mr. Hellerman explicitly testified he would not have retained an attorney if he had to pay for one. [Dkt. 108-1, 42:44-24.] As such, Defendant's counsel's offer of "free" representation is material and coercive and calls into question his credibility as a witness. Given Defendant's similarly coercive relationship with some putative class members (especially those that are its clients) and its willingness to use incentives to obtain testimony (the way it incentivized Mr. Hellerman with free representation), caution is warranted.

**B. The lack of a written agreement with Mr. Hellerman shows poor judgment.**

"The scope of the representation … shall be communicated to the client, preferably in writing[.]" Model Rules of Professional Conduct, 1.5(b). "A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent." *Id.* at 1.2(c). "A lawyer shall not accept compensation for representing a client from one other than the client unless … the client gives informed consent." *Id.* at 1.8(f). While none of these provisions *require* a written representation agreement, the lack of one is certainly unwise and shows poor judgment. It is unclear how informed consent could have

4

been obtained orally over a single text message and eight-minute conversation, and Mr. Hellerman clearly was (and remains) confused about the scope of his representation.

Defendant claims that "given Mr. Hellerman's limited involvement", it "followed its normal practice" of not asking a former employee to sign a written engagement letter. [Dkt. 118, p.6.] This strains credulity on multiple levels. First, it is unclear how Defendant's counsel could believe that Mr. Hellerman had such limited involvement that it did not need a written engagement letter, yet it was imperative to represent Mr. Hellerman to "protect him" from Plaintiff. Second, as of October 8, Defendant's counsel believed Mr. Hellerman potentially had sufficient knowledge to stand in for the *current CEO*. [Dkt. 101-1, p. 20.] Finally, a "normal practice" of not requiring written engagement letters is almost unheard of, if for no other reason than strong encouragement from malpractice insurance carriers.

## II. Defendant's coercive and adversarial relationship with putative class members—and efforts to hide those communications—justify caution.

In addition to Defendant's lapses of judgment with respect to the only third-party witness to date, Defendant has taken pains to prevent its communications with class members from discovery. Further, with respect to at least some of the putative class members, Defendant is in a coercive relationship that courts consider problematic.

### A. Defendant's efforts to hide communications justify oversight.

Defendant has sought to hide its communications with putative class members on the argument that because its *counsel*—rather than it directly—orchestrated the communications, they are not discoverable because its counsel is not a party.

Plaintiff already briefed the lack of merit of this position and will not repeat those arguments here. [Dkt. 102, 113.] For Defendant to make *that* the hill to fight on, despite the near-unanimous rejection of this argument, is concerning.

5

### B. Defendant is in a coercive relationship with *some* putative class members.

"Courts have identified two circumstances in which party communications with class members may be considered coercive: unilateral communications, in other words, communications made by only one side in the case; and the existence of a business relationship between class members and the class opponent." *Mullen v. GLV, Inc.*, 334 F.R.D. 656, 662 (N.D. Ill. 2020). Both concerns are implicated, as only Defendant can communicate with putative class members and it has previously claimed that some of the putative class members are its customers.[4] [Dkt. 112, p. 4.] Considering the focus of communications limitations is on the "threat" of "coercive, misleading, or other abusive communications", *Reid*, 964 F. Supp. 2d at 926, there is now a demonstrated threat of two of the three.

Defendant's position that any such relationship is not coercive because Defendant has competitors is unpersuasive. Whether a putative class member can just leave Defendant for a competitor would depend on the nature of any contract.

### III. The lengths to which Defendant must go to defend itself here suggests caution.

Had Defendant's counsel acted "by the books" with respect to Mr. Hellerman, its opposition would be simple: "here is our representation agreement." But it did not. So, instead, it was required to file a 19-page brief with invented facts, redactions preventing Plaintiff from fully addressing its arguments, and a request that the Court allow for live testimony from a witness who *just testified* and was subject to cross-examination.

Importantly, while discussed below, the focus on the nuances of Mr. Hellerman's testimony and relationship with counsel is something of a sideshow. The point is not whether

---

[4] While Defendant has yet to identify which telephone numbers in the class list belong to its customers, despite Plaintiff's requests for this information, it has previously confirmed that it had communications with putative class members that it believed to be its customers.

Mr. Hellerman's testimony or declaration was *technically* accurate or inaccurate, or if Defendant's counsel could *technically* solicit Mr. Hellerman the way it did, or *technically* represent him without a written agreement. Instead, it is the cumulative effect of all the "technicallys" needed to address the appearance of impropriety that shows the necessity of limitations on or oversight of Defendant's contact with putative class members.

### A. Invented and contradictory facts

1. <u>Mr. Hellerman's declaration contradicts his under-oath testimony (and is unbelievable on its face).</u>

Plaintiff does not move to strike Mr. Hellerman's declaration, but under prevailing law, he would be within his right to do so. Mr. Hellerman's declaration specifically contradicts his under-oath deposition testimony. For example, Mr. Hellerman claims that "once he had a chance to look back at [his] phone", he was able to confirm "that I agreed to the firm representing me on August 16, 2024" and faults Plaintiff for not following up further. [Dkt. 118-2, ¶ 4.] But Plaintiff explored this August 16 conversation and Mr. Hellerman still did not believe it qualified as representation. The snippets below are in order:

> Mr. Glapion: …[I]f an attorney told me they represented you in connection with this case since August 16th, is that accurate?
> Mr. Hellerman: No. I might have had conversations, but I didn't retain anybody, agree with anybody. I didn't.

[Dkt. 108-1, 49:8-13.]

> Mr. Fitzgerald: So you were represented by counsel as of August 16th. Is that correct?
> Mr. Hellerman: Yeah, I looked at my text messages. That's when we first spoke.

*Id.* at 56:7-10.

> Mr. Glapion: On October 7th, when we had that phone call, did you believe that you were represented by counsel?
> Mr. Hellerman. No.

7

*Id.* at 60:9-12. Mr. Hellerman also calls it misleading for Plaintiff "to take issue with the statement that [he] was briefly involved in NRS's efforts to retain VoiceLogic." [Dkt. 118-2, ¶ 12.] But, again, this was specifically discussed:

> Mr. Glapion: And you were involved in NRS's efforts to retain VoiceLogic. Is that true or false?
> Mr. Hellerman: That's false.

[Dkt. 108-1, 44:6-9.]

Even Mr. Hellerman's claim that he was "confused" because of the stress of a recent adoption is problematic. Not because it is not true—as any new parent would agree, it certainly is plausible—but because Plaintiff's counsel asks at the outset of every deposition, including this one, whether the witness is dealing with anything that might impact their ability to remember or testify, precisely to avoid issues like this. Mr. Hellerman identified only "the recent election." [Dkt. 108-1, 6:6-7.]

Mr. Hellerman's declaration also spends a significant amount of time pointing out that he was so unfamiliar with legal terminology and the legal industry in general that he misunderstood the meaning of "against NRS". Yet, remarkably, he was able to opine on "a continued cultural shift in the legal world … where lawyers distort irrelevant facts to serve their purposes." [Dkt. 118-2, ¶ 13.] This does not pass the smell test.

In addition, *every* "fact" in Mr. Hellerman's declaration could have been obtained through cross-examination. This is one of the more inexplicable aspects of Defendant's opposition and request for live testimony. Mr. Hellerman's declaration claims Plaintiff's "characterization of [his] testimony is deceptive" and faults Plaintiff's counsel for "not follow[ing] up" on a point with him. [Dkt. 118-2, ¶¶ 4, 13.] But not only did Plaintiff quote Mr. Hellerman's own words, *in context*, he attached the full deposition transcript so the Court

8

could see for itself. [Dkt. 108-1.] "Following up" on or contextualizing testimony that might need clarification is Mr. Hellerman's counsel's job on cross-examination. Their failure to do so does not make his elicited testimony deceptive or warrant a mulligan.

2. <u>Mr. Hellerman's declaration is still unclear on his representation.</u>

Mr. Hellerman's declaration indicates that he "agreed to NRS retaining Watstein Terepka LLP to represent me in connection with this case, to the extent my participation was required." [Dkt. 118-2, ¶ 2.] But no representation agreement was entered into at this time, and by his own admission, Watstein Terepka's representation was only "to the extent [his] participation was required." The most plausible reading of this, coupled with the absence of a representation agreement, is that Watstein Terepka *intended* to represent Mr. Hellerman should he become involved in the case (e.g., as a defendant, which was never a possibility, or as a witness at a deposition), at which point they would formally engage.

While oral agreements are permissible, they are still contracts and must meet the requirements of contract formation. Based on what is unredacted, it is unclear how something as vague as "to the extent required" can form a contract.

3. <u>Plaintiff never threatened to sue Mr. Hellerman.</u>

Plaintiff never threatened to sue Mr. Hellerman. Mr. Hellerman even testified that he was never threatened with liability. In Plaintiff counsel's first email with Mr. Hellerman, he wrote, "you're not a defendant (or potential defendant….)" [Dkt. 101-1, p. 16.] Defendant points to the opening paragraph of Plaintiff's representation agreement in which Plainitff's counsel agreed to represent Plaintiff's "interests in a matter against [NRS] … and any of their … employees." Ascribing to this a "threat" to sue Mr. Hellerman—*a non-employee*—is absurd. Plaintiff never had, and does not have, an interest in suing Mr. Hellerman.

That said, if Defendant's counsel undertook Mr. Hellerman's representation because

9

it believed Plaintiff might sue Mr. Hellerman directly, there are serious questions about possible conflicts of interest because their interests are not aligned. For example, if Mr. Hellerman were sued, Defendant could (and likely would) seek to reduce (or escape) its own liability by pinning the TCPA violations on an employee (such as Mr. Hellerman) gone rogue.

### B. Live testimony

Defendant's request for live testimony to address the appearance of impropriety regarding its counsel's interactions with *one* witness justifies caution in allowing it unrestricted and/or unmonitored access to thousands more.

## IV. Privileged communications

Because Mr. Hellerman reviewed the text message exchange with Mr. Fitzgerald at his deposition to refresh his recollection, attorney-client privilege was waived as to that exchange and redaction is both improper and unnecessary. *E.g. Bailey v. Meister Brau, Inc.*, 57 F.R.D. 11, 13 (N.D. Ill. 1972).

## CONCLUSION

Plaintiff respectfully requests that Defendant be prevented from continued contact with putative class members pending the joint submission of a proposal on a more permanent limitation or more permanent requirements.

Dated: December 23, 2024

s/ Jeremy M. Glapion
Jeremy M. Glapion
The Glapion Law Firm, LLC
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732-455-9737
Fax: 732-965-8006
jmg@glapionlaw.com

Counsel for Plaintiff and the Putative Class