## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **RASHAD WALSTON,** on behalf of himself and all others similarly situated,<br><br>    **Plaintiff,**<br>v.<br><br>**NATIONAL RETAIL SOLUTIONS, INC. D/B/A NRS PAY,**<br><br>    **Defendant.** | Civil Case No.: 24-cv-83<br><br>District Judge: Hon. Sunil R. Harjani<br><br>Magistrate Judge: Jeffrey T. Gilbert |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DENY CLASS CERTIFICATION

**TABLE OF CONTENTS**

BACKGROUND ....................................................................................................................3

   I.   The representation. ........................................................................................................3

       A.   Pre-representation. ..............................................................................................3
       B.   Counsel's representation agreements. .............................................................3
       C.   Amended Agreements. .......................................................................................3

            1.   Defendant's lackadaisical effort to obtain the agreements. ....................4
            2.   Plaintiff promptly amended the agreements. ..........................................4

       D.   The Operative Agreement. .................................................................................6

   II.   Settlement ......................................................................................................................6

       A.   Plaintiff offered a settlement conference; Defendant ignored the offer. ........6
       B.   Defendant's repeated misuse of settlement conversations................................7

DISCUSSION .......................................................................................................................8

   I.   Counsel and Plaintiff more than satisfy adequacy. ......................................................8

            1.   Counsel satisfies adequacy. ....................................................................9
            2.   Plaintiff is an exceptional class representative......................................10
            3.   Defendant's views of Plaintiff's financial situation are irrelevant. .........11

   II.   Candor with the Court. ................................................................................................12

       A.   Counsel's June 14 email. ..................................................................................12
       B.   Defendant's Motion. ........................................................................................13

   III.   Terms, Conduct, and Prejudice. .................................................................................14

       A.   Legal Standard .................................................................................................14

            1.   Generally ...............................................................................................14
            2.   Applicability of ethical rules in class actions.........................................15
            3.   Use of ethical rules for non-disciplinary remedies. ...............................16

       B.   Springing Fee Provision (Identified: July 23; Removed: July 30)..............................17

            1.   The Springing Fee Provision was never used or triggered....................17
            2.   The Springing Fee Provision caused no prejudice to the class.............18

       C.   Statutory Cap (Identified: September 18; Removed: September 25)...........................19

            1.   The Statutory Cap was never used or triggered....................................20
            2.   The Statutory Cap caused no prejudice to the class..............................20

       D.   Reasonable Offer Restriction (Identified August 13; Removed September 25). ............21

            1.   The Reasonable Offer Restriction was never used...............................21
            2.   The Reasonable Offer Restriction caused no prejudice to the class. ......22

   IV.   Defendant's expert report is improper. .......................................................................22

       A.   The report goes beyond the expert's own expertise. ......................................22
       B.   Defendant's counsel's deposition conduct taints the expert's testimony. ......23

CONCLUSION....................................................................................................................23

TABLE OF AUTHORITIES

**Cases**

*Blanchard v. EdgeMark Fin. Corp.*
175 F.R.D. 293 (N.D. Ill. 1997)................................................................. 15

*Creative Montessori Learning Centers v. Ashford Gear LLC*
662 F.3d 913 (7th Cir. 2011) .................................................................. 14

*Eggleston v. Chicago* Journeyman
657 F.2d 890 (7th Cir. 1981) .................................................................. 1

*First Nat'l Bank v. Lowrey*
375 Ill. App. 3d 181 (1st Dist. 2007)........................................................ 21

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*
332 F.3d 976 (6th Cir. 2003) .................................................................. 8

*In re General Motors Corp.*
55 F.3d 768 (3d Cir. 1995)..................................................................... 16

*In re Grievance Proceeding*
171 F. Supp. 2d 81 (D. Conn. 2001)........................................................ 15

*In re Ocean Bank*
2007 WL 1063042 (N.D. Ill. Apr. 9, 2007) ............................................ 4, 14

*In re Pfizer Inc.*
282 F.R.D. 38 (S.D.N.Y. 2012) .............................................................. 17

*Jamison v. First Credit Servs.*
290 F.R.D. 92 (N.D. Ill. 2013)................................................................ 4, 14

*Keim v. ADF MidAtlantic, LLC*
328 F.R.D. 668 (S.D. Fla. 2018)............................................................. 5, 14, 22

*Lanteri v. Credit Pro. Ass'n L.P.*
2018 WL 4625657 (S.D. Ind. Sep. 26, 2018) .......................................... 4, 14

*Loatman v. Summit Bank*
174 F.R.D. 592 (D.N.J. 1997)................................................................. 16, 17, 20, 21

*Phillips v. Asset Acceptance, LLC*
736 F.3d 1076 (7th Cir. 2013) ............................................................... 11

*Reliable Money Order, Inc. v. McKnight Sales Co.*
704 F.3d 489 (7th Cir. 2013) .......................................................... passim

*Sliwa v. Bright House Networks, LLC*
    333 F.R.D. 255 (M.D. Fla. 2019)..................................................................... 4, 14, 15

*Steimel v. Wernert*
    823 F.3d 902 (7th Cir. 2016) ................................................................................. 8, 9

*Tataru v. RGS Financial*
    2021 WL 38142 (N.D. Ill. Jan. 4, 2021) ............................................................... 4, 14

*Van v. Ford Motor Co.*
    334 F.R.D. 249 (N.D. Ill. 2019)................................................................................... 9

*Victorino v. FCA US LLC*
    322 F.R.D. 403 (S.D. Cal. 2017) .............................................................................. 22

*Weckesser v. Knight Enters. S.E., LLC*
    392 F. Supp. 3d 631 (D.S.C. 2019) .......................................................................... 21

*Williams v. Board of Ed. Of City of Chicago*
    2022 WL 4182434 (N.D. Ill. Sept. 13, 2022) .......................................................... 15

*Williams v. Cent. Transp. Int'l, Inc.*
    2014 WL 5823112 (E.D. Mo. Nov. 7, 2014) ............................................................ 21

**Rules**

Model R. Prof. Conduct ................................................................................................ 2, 16

**Treatises**

Newberg and Rubenstein on Class Actions
    § 19.2 (6th ed., 2024) ................................................................................................. 16

"It is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining [adequacy]…. [I]t is a bit like permitting a fox … to take charge of the chicken house."

*Eggleston v. Chicago* Journeyman, 657 F.2d 890, 895 (7th Cir. 1981).

On October 19, 2023, prior engaging Attorney Glapion ("Counsel"), Plaintiff sent Defendant a demand letter giving Defendant five days to respond or Plaintiff would pursue litigation, "including a potential class [action]." Defendant failed to respond within five days. When Defendant's CEO called three weeks later—again, *prior* to the involvement of Counsel—his approach solidified Plaintiff's desire to pursue a class action:

> I want other people to get justice. It hasn't been me that's just been harmed by this company, in my opinion. One thing I didn't mention earlier, the phone call I got from Mr. Elie Katz [Defendant's CEO], he … attempted to try to intimidate me, belittle me, make me feel less than…. And you know, that was hurtful to me. So after that conversation, what went through my head, I thought if they're willing to do this to me, have they done this to other people?

Deposition of Rashad Walston ("Walston Dep."), 163:13-164:7 (pp. 19-20.)

On December 19, Plaintiff authorized Counsel to file the instant class action—the exact consequence Plaintiff had promised. Alongside this authorization, Plaintiff executed a "Duties of a Class Representative Form", affirming his desire to pursue a class action.

To any reasonable mind, it would be clear that Plaintiff independently intended the class action now before the Court. But not to Defendant. Instead, Defendant *and* its expert suggest that Plaintiff's pursuit of a class action is a sham because Plaintiff is not wealthy enough to forego an individual settlement.

To make this condescending argument more palatable, Defendant points to three long-removed and never-implicated terms in Plaintiff's and Counsel's representation agreements that it contend prove Counsel, not Plaintiff, was driving the bus all along, thereby rendering

both Plaintiff and Counsel inadequate to represent the proposed class. But Defendant's argument begins and ends with the historical existence of those terms.

Neither Defendant nor its expert can identify a single instance in which the removed terms were relied upon in this litigation. For good reason—they never were.

To the contrary, the only "conduct" Defendant can identify is Plaintiff and Counsel's immediate removal of the terms at issue, which is the *exact step* its own expert would advise. Deposition of Mary Robinson ("Robinson Dep."), 21:13-22; 23:8-15 (pp. 2-4.)

Nor can they point to a single occasion when these terms were triggered. For good reason—they never were.

To the contrary, Defendant's own expert testified: "this case never got to a point where anything was literally triggered. There was not a point at which Walston would have owed fees under this agreement." Robinson Dep., 308:12-15 (p. 37.)

Nor can Defendant point to a single case—anywhere, in any jurisdiction—finding a plaintiff or purported class counsel inadequate on nothing more than the inclusion of dormant terms in a representation agreement that were removed immediately upon identification and before they could impact a case. For good reason—they do not exist.

To the contrary, every judge in the Northern District, and most (if not all) judges nationwide, have found such issues can be cured via amendment.

In short, Defendant's Motion is another effort to brute force its way out of this case. Whereas last time it sought to misuse good faith settlement negotiations in an ill-advised Motion to Enforce Settlement, this time it seeks to misuse the RPC, just as the 7th Circuit and the rules themselves warn against. *See Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 499 (7th Cir. 2013); Model R. of Prof. Conduct Preamble[20].

2

## BACKGROUND

I. **The representation.**

A. **Pre-representation.**

Defendant's expert describes the pre-representation period as the most relevant to determining Plaintiff's objectives. Robinson Dep. 348:16-24 (p. 40.) On October 19, 2023, prior to engaging Attorney Glapion, Plaintiff Walston sent Defendant a demand letter giving Defendant five days to respond or face a class action. Ex. A[1] (pp. 14-16). Defendant failed to timely respond. When Defendant finally called Plaintiff three weeks after delivery—*prior* to the involvement of Counsel—its approach solidified Plaintiff's desire to pursue a class action. Walston Dep., 163:13-164:7 (pp. 19-20.)

B. **Counsel's representation agreements.**

Shortly after this call, Plaintiff engaged Counsel via representation agreement dated November 21, 2023 ("First Agreement"). Ex. B (pp. 18-24). The First Agreement authorized Counsel to investigate Plaintiff's claims, but did not authorize a lawsuit without executing a subsequent agreement with a specified paragraph removed. That subsequent agreement was executed on December 19, 2023. ("Second Agreement".)[2] Ex. C (pp. 26-33). Plaintiff simultaneously executed a "Duties of a Class Representative" form. *Id.* (p. 32.) On January 3, Plaintiff (through Counsel) informed Defendant (twice) that he would not be entertaining any further individual offers. Ex. D (pp. 35-36.)

C. **Amended Agreements.**

---

[1] All exhibits are attached to the Declaration of Jeremy M. Glapion ("Glapion Decl."). Depositions are separate. Parenthetical page references are to the PDF page of the comprehensive declaration or the corresponding deposition. Highlights have been added by Counsel unless otherwise indicated.

[2] The First and Second Agreements were Counsel's standard agreements, so the terms included therein do not reflect any concerns specific to Plaintiff Walston. Glapion Decl., ¶¶ 9-10.

1. <u>Defendant's lackadaisical effort to obtain the agreements.</u>

On March 13, 2024, Defendant served Requests for Production, one of which sought Plaintiff's representation agreement(s). On April 19 (the due date), Counsel told Defendant's counsel that Plaintiff would not produce copies of the representation agreements but would reconsider if Defendant identified case law to the contrary. Glapion Decl., ¶¶ 12-19; Ex. E (pp. 41-42). Defendant agreed to provide this. *Id.* Defendant said nothing further in April.

Or May. Or June. Or most of July.

It was not until July 23—an inexplicable gap of 95 days from when Counsel requested case law[3]—that Defendant resurrected the issue and provided a single relevant case. Ex. F (p. 45.) It did not spend "months" trying to obtain Plaintiff's representation agreement, as it claims. It spent a single Rule 37 call and then tabled the issue for more than three months.

2. <u>Plaintiff promptly amended the agreements.</u>

The case Defendant provided was straightforward: Springing Fee Provisions could be problematic to class certification if they remained in the agreement at the time of class certification, but the remedy was to amend the agreement, *not* deny certification. *In re Ocean Bank,* 2007 WL 1063042, *6 (N.D. Ill. Apr. 9, 2007) (St. Eve, J.)

In addition to Judge St. Eve, *every judge in the Northern District to confront this issue has found the same. See Tataru v. RGS Financial*, 2021 WL 38142, *7 (N.D. Ill. Jan. 4, 2021) (Tharp, J.); *Jamison v. First Credit Servs.*, 290 F.R.D. 92, 105 n.6 (N.D. Ill. 2013) (Kendall, J.)

Nationwide is similar and includes at least two of Defendant's counsel's cases. *See Lanteri v. Credit Pro. Ass'n L.P.*, 2018 WL 4625657, *5-6 (S.D. Ind. Sep. 26, 2018) (Attorney Penn); *Sliwa v. Bright House Networks, LLC*, 333 F.R.D. 255, 276, 278 (M.D. Fla. 2019)

---

[3] A similarly inexplicable 88 days if linked to Plaintiff's April 26 deposition.

4

(Attorney Watstein); *Keim v. ADF MidAtlantic, LLC*, 328 F.R.D. 668, 691-92 (S.D. Fla. 2018).[4]

Accordingly, when confronted with Defendant's case law on July 23, and after reviewing the landscape described above, Plaintiff and Counsel revised the agreement *within a week* to remove the Springing Fee Provision. ("Third Agreement"). Ex. G (pp. 65-71.) The day after that revision, July 31, Counsel produced the representation agreements, redacted by mutual agreement. Ex. F (pp. 48-49.)

This timing is crucial for two reasons. First, it shows that Plaintiff and Counsel acted promptly to produce the agreements *and* address identified terms. Defendant's expert testified that whereas a months-long resistance might suggest Counsel's guilty mind, prompt production would suggest the opposite. Robinson Depo., 102:19-103:2 (pp. 16-17.) Second, much of Defendant's Motion is linked to the presence of the Springing Fee Provision at the time it made its June settlement offer. Had Defendant provided the case law at any point prior to June 4, however, the Springing Fee Provision would have been removed before its offer.

A similar delay played out for the Statutory Cap. On August 13, Defendant identified the Reasonable Offer Restriction as potentially problematic and demanded production of the unredacted agreements. Glapion Decl., ¶ 28. On August 16, the Parties conferred and Plaintiff asked if Defendant would agree to identify any other terms with which it took issue. *Id.* at ¶ 30. Defendant declined. *Id.* at ¶ 31. On August 21, Plaintiff produced the unredacted agreements alongside an interrogatory asking it to identify any problematic terms. *Id.* at ¶ 34. It was not until September 18 that Defendant identified the Statutory Cap. *Id.* at ¶ 35. *The next day*, Counsel drafted an agreement without the Reasonable Offer Restriction and Statutory

---

[4] Defendant does not distinguish these opinions, instead deriding them as "signal[ing] to lawyers that they are free to adopt unethical agreements" and "encourag[ing] misconduct." [Def.'s Mot., p. 22.]

Cap. *Id.* at ¶¶ 36-37.

Prior to executing the new agreement, Counsel offered to allow Defendant's expert to review the draft for other perceived issues. Defendant sarcastically responded, **"[w]e're not inclined to ask our experts to provide you with legal advice."** Ex. H (pp. 73-74.)

### D. The Operative Agreement.

On September 25, Plaintiff and Counsel fully executed the amended representation agreement. ("Operative Agreement"). Ex. I (pp. 76-82.) The Operative Agreement, produced to Defendant *prior to its Motion*, does not contain the terms about which Defendant complains.[5]

## II. Settlement

### A. Plaintiff offered a settlement conference; Defendant ignored the offer.

The only settlement offer Defendant made in this case prior to the removal of the terms at issue was a June 12 settlement offer of $35,000, split $25,000 to Plaintiff and $10,000 to Counsel ("June Offer"). Ex. J (pp. 84). Defendant's counsel alternatively suggested having a settlement conference. *Id.*

Within an hour, Counsel responded and reiterated Plaintiff's long-held position on individual settlement. In this same response, Counsel offered a settlement conference:

> If you give us the class data…I will strongly encourage my client to agree to a settlement conference…[Y]our client doesn't want to settle as a class, my client does not want to settle individually. So, I'd be potentially open to a settlement conference where we are both bringing positions on settlement the other side does not want to do…

---

[5] Any arguments based thereupon are therefore waived. Further, the Operative Agreement provides the *client* with full authority to choose any individual settlement allocation he sees fit, consistent with the representation agreement's promise that the client will not have to pay for the firm's services. *Id.* While Defendant's expert could not believe this was intended, it was. Counsel was tired of Defendant's baseless claims about Counsel's control.

*Id.* at pp. 86. Defendant's counsel ignored this offer then and hides it now. Why? Because it is fatal to its "control" argument. The Court need not take it from Plaintiff. In a 2018 motion for a settlement conference in a putative TCPA class action, Defendant's counsel wrote:

> [Defendant] respectfully requests the Court to order the parties to engage in a settlement conference before a magistrate judge in light of … (3) most importantly, Plaintiff's counsel's use of an unethical and unenforceable term in their engagement letter to prohibit Plaintiff from settling this case on an individual basis—which has rendered settlement discussions… futile.

*Sliwa v. Bright House Networks, LLC*, 16-cv-235, Dkt. 147, (M.D. Fla. 2018) (Ex. K (p. 88.)) Mr. Watstein concluded this provision "create[d] an impermeable barrier to meaningful settlement discussions" that a conference before the magistrate judge could solve. *Id.* (p. 98.) Yet here, despite Defendant's reliance on Plaintiff's *April* deposition as evidence of improper control, Ex. F (p. 45), Defendant's counsel ignored Plaintiff's June 12 proposal.

### B. Defendant's repeated misuse of settlement conversations.

During pre-litigation settlement negotiations, and prior to Counsel's involvement, Defendant's CEO called Plaintiff directly and sought to "intimidate" and "belittle" him. Walston Dep., 163:10-165:9 (pp. 19-21.) Those negotiations failed.

Undeterred, Defendant used the failed negotiations in a Motion to Force a Settlement. All the way back in *June*, Plaintiff made clear the short-sightedness of this approach:

> Defendant's … attempt[] to enforce preliminary discussions as if they amounted to a binding settlement discourage[s] such discussions. It is difficult to imagine any potential plaintiff or plaintiff's counsel wanting to engage with Defendant…after learning of Defendant's Motion here.

[Dkt. 25, p. 12.] Your Honor denied the motion as "wholly without merit". [Dkt. 31.]

Ten days later, Defendant made its June Offer. Ex. J (p. 84.) In making it, Defendant characterized it as "significantly more than Mr. Walston could recover on his best day in court[.]" *Id.* But Defendant was again drawing from a playbook its counsel had run previously.

A few years prior, in a putative TCPA class action, Defendant's counsel made the plaintiff an individual settlement offer and used nearly identical language ("more than Plaintiff could get on his best day in court"). Ex. L (p. 104.) When negotiations fell apart, Defendant's counsel used those failed negotiations—a recurring theme—to claim plaintiff was inadequate and unethical for trying to sell out the class. Ex. M (p. 137.)

Counsel raised this concern in response to the June Offer. Ex. J (p. 86.) Counsel raised it again in a phone call on July 9. Defendant's counsel conceded he made this argument before and could make it here if Plaintiff negotiated too aggressively. Glapion Decl., ¶¶ 50-58.

On October 9, Plaintiff made a class-wide settlement demand. Defendant claims that this settlement demand would net Counsel "substantial attorney's fees" and faults it for not proposing "an incentive award for his client."[6] [Def.'s Mot., p. 9]. Once again, Defendant misuses settlement negotiations, making it impossible for the Parties, in discussing settlement, "to abandon their adversarial tendencies…. [and] to make hypothetical concessions, offer creative *quid pro quos*, and generally make statements that would otherwise belie their litigation efforts." *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir. 2003). This compulsion—not just here, but in multiple cases—has far more to do with Plaintiff's refusal to engage than anything Counsel has done.

## DISCUSSION

## I.    Counsel and Plaintiff more than satisfy adequacy.

Plaintiff "bears the burden of showing, by a preponderance of the evidence, that a proposed class meets the requirements of Federal Rule of Civil Procedure 23." *Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016).

---

[6] It appropriately mentioned neither fees nor an incentive award.

Adequacy under Rule 23 requires the Court to find that "the representative parties will fairly and adequately protect the interests of the class." This means that the "claims and interests of the named Plaintiff[] must not conflict with those of the class, the class representatives must have sufficient interest in the outcome of the case, and class counsel must be experienced and competent." *Id.* (citing *Van v. Ford Motor Co.*, 334 F.R.D. 249, 282 (N.D. Ill. 2019)). For Counsel, this includes "counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the resources counsel will commit to the case." *Reliable*, 704 F.3d at 498 n.7.

### 1. Counsel satisfies adequacy.

Attorney Glapion has extensive experience litigating TCPA matters on an individual and a class-wide basis. Since 2015, Attorney Glapion has been appointed lead or co-lead counsel in some of the strongest class TCPA settlements in the history of the statute.. *See Willis et al. v. IHeartMedia, Inc.*, Case No. 16-CH-02455 (Cook County, Feb. 19, 2016) (co-lead; $8.5 million); *Allard et al. v. SCI Direct, Inc.*, Case No. 17-cv-4692 (N.D. Illinois) (sole lead; $15 million); *Griffith v. ContextMedia, Inc.*, Case No. 16-cv-2900 (N.D. Illinois) (co-lead; $2.9 million); *Walker v. Highmark BCBS Health Options, Inc.*, 2020 U.S. Dist. LEXIS 225998 (W.D. Pa. Dec. 13, 2022) (sole lead; $1.85m); *DeSouza v. AeroCare Holdings LLC*, 22-cv-1047 (M.D. Fla. Aug. 7, 2023) (co-lead; over $5 million). The *Griffith* settlement is the largest per-claimant settlement in the history of the TCPA, with an average payment to claiming class members of nearly $7,500.

Throughout, Attorney Glapion's reputation has remained spotless, and his integrity has never been questioned. Attorney Glapion has never been found to be inadequate counsel.

Attorney Glapion has also recovered over $1 million for clients in hundreds of

9

individual TCPA cases. Attorney Glapion's familiarity with the underlying law has and will continue to serve the putative class well. *See* Glapion Decl, ¶¶ 64-78.

Attorney Glapion's work on this case has been extensive, covering more than 100 discovery requests, including key foreign discovery necessitating hiring foreign counsel and navigating a seldom used letter rogatory process; numerous Rule 37 conferences; extensive motion practice; extensive deposition practice (defending Plaintiff's, conducting three, and requesting four more); multiple hearings both in person and remotely. *Id.* ¶¶ 79-89. Plaintiff, through Counsel, has actively fought to protect absent class members. *E.g.*, [Dkt. 101.]

In total, Attorney Glapion has committed more than 450 hours and $20,000 to this case. Glapion Decl., ¶¶ 79-89. By comparison, Attorney Glapion spent 216 hours and approximately $30,000 in total on the record-setting *Griffith* matter. Counsel has no concerns with these expenses or the ability to continue to devote time and resources to this class.

### 2. Plaintiff is an exceptional class representative.

Plaintiff, for his part, has been exceptional. He has timely responded to Defendant's discovery requests. He has asked insightful questions, made suggestions, corrections, and clarifications, and has not hesitated to provide his input. Glapion Decl., ¶¶ 90-92. He sat for a lengthy deposition at which his character and demeanor were irrelevantly attacked.

Plaintiff Walston is also knowledgeable about all aspects of the case, including some of the more nuanced elements of class actions. *See, e.g.* Walston Dep., 93:8-22 (p. 5) (correctly characterizing his lawsuit); 142:10-24 (p. 9) (recognizing his role to be an advocate for other people); 144:19-145:9 (pp. 10-11) (recognizing his recovery in a class action would be limited to what the class gets); 147:20-148:6 (pp. 12-13) (accurately describing his role as a class representative); 148:7-149:1 (pp. 13-14) (describing what had occurred in the case to date);

188:12-15 (p. 25) (judge decides if a class settlement is fair); 191:13-19 (p. 28) (correctly defining class action). In fact, Plaintiff testified that the class representative (not Counsel) decides whether to settle a class. Walston Dep., 188:16-20 (p. 25). Plaintiff also explained his desire to pursue this as a class over individual settlement. *Id.* at 163:13-164:7 (pp. 19-20.)

There is no conflict of interest between Plaintiff and the putative class. Plaintiff's far-more-than-nominal interest, participation, and knowledge more than satisfies the "nominal" role of a class representative. *See Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080 (7th Cir. 2013) (Posner, J.) (describing obligations of class representative).

### 3. Defendant's views of Plaintiff's financial situation are irrelevant.

Defendant's briefing and expert report repeatedly make gratuitous and irrelevant references to Plaintiff's "financial circumstances". For example, they cite a 2004 bankruptcy to segue into incredulity that Plaintiff would not accept an individual settlement. [Def.'s Mot., p. 5.] They condescendingly claim individual settlement—no matter the amount—is in his best interest. *Id.* at pp. 4-5.

At Defendant's expert's deposition, Counsel explored what a 20-year-old bankruptcy has to do with Plaintiff's current financial circumstances. Ms. Robinson indicated that Defendant's $35,000 offer "means something different to someone in those circumstances than it would to someone who has got a trust fund." Robinson Dep., 83:14-18 (p. 14.) Ms. Robinson then assumed that Plaintiff's financial circumstances "didn't change" in those 20 years because "it would have been necessary for him to have a different outlook on how he would … earn money" which she considered "unlikely." *Id.* at 83:22-84:12 (pp. 14-15.) She sarcastically granted, however, that "he could have won the lottery"—an outcome apparently

deemed more likely than Plaintiff's own efforts.[7] *Id.* at 84:6-7 (p. 15.) She later conditioned the applicability of ethical rules on Plaintiff's wealth. *Id.* at 199:22-200:20 (pp. 26-27.)

## II. <u>Candor with the Court.</u>

### A. Counsel's June 14 email.

On June 11, the Court ordered Counsel to discuss the possibility of individual settlement with Plaintiff. Counsel complied that same day via a 20-minute phone call with Plaintiff. Ex. N (p. 145). The result was exactly what was relayed to the Court: Plaintiff had no interest in individual settlement. Ex. O (p. 147).

Defendant claims this was misleading because Counsel "could effectively veto any individual settlement offer[.]" [Def.'s Mot., p. 17.] Defendant assumes its conclusion that Plaintiff's disinterest in settlement was linked to any term in his representation agreement. Neither Defendant nor its expert have any evidence for this. Robinson Dep., 264:3-268:22 (pp. 31-35.) Plaintiff also did not recall the existence of any "penalty" provisions. Walston Dep. 166:23-167:22 (p. 23). Plaintiff confirms in his declaration submitted that none of these terms had any bearing on his disinterest in individual settlement. Declaration of Rashad Walston ("Walston Decl."), ¶ 18. Counsel had no reason to believe otherwise.

In fact, Defendant has been told repeatedly since January that Plaintiff has no interest in individual settlement. Ex. D (pp. 35-39.) Even after removal of all the terms with which Defendant takes issue, Plaintiff remains disinterested in an individual settlement. Walston Decl., ¶¶ 12-17. Neither Defendant nor its expert can explain this. Defendant's expert testified that this continued refusal weighs in favor of the terms being irrelevant to his decision, as

---

[7] This campaign to belittle Plaintiff goes back to Defendant's CEO's first conversation with him and continued at his deposition, where Defendant's counsel began by berating Plaintiff for not shaking Plaintiff's counsel's hand fast enough. Walston Dep. 6:12-8:11 (pp. 2-4.)

Plaintiff and Counsel have maintained all along. Robinson Dep., 269:7-20 (p. 36.)

**B. Defendant's Motion.**

While on the topic of candor: Defendant owed the Court and Counsel more of it in its Motion. It falsely claims it spent months trying to obtain Plaintiff's representation agreements. It hides Counsel's offer of a settlement conference. It omits the concerns it has previously raised about "selling out" the class.

One of the more egregious examples is its reordering of Plaintiff's deposition testimony to create a false narrative. Defendant wrote:

> [Mr. Walston] parroted Counsel's position that he wasn't interested in individual settlement and wanted "justice for other people[.]" [Walston Dep.] **at 155:21-23. When NRS asked why,** Plaintiff explained that it was after "speaking with legal counsel, Mr. Glapion…."

[Def.'s Mot., p. 5.] But 155:21-23 (p. 15) has nothing to do with settlement. The language Defendant (mis)quotes appears later. Walston Dep., 163:13-164:7 (pp. 19-20.)

Rather than a clerical error, this appears intentional. Plaintiff *did* discuss obtaining justice for other people, as quoted previously, but Defendant re-orders its placement to argue that Plaintiff "parroted Counsel's position" because when Defendant drilled down—"when NRS asked why"— Plaintiff said it arose after "speaking with legal counsel." Defendant's argument does not work without this deceitful re-arrangement.

Whatever Defendant's forthcoming excuse, the true context of the conversation paints the precise opposite picture. The "justice" language was a direct pushback against Defendant's counsel's suggestion that settlement was Counsel's decision:

Q. So why is it that you would not be willing to settle this case individually?

A. That's something I have to discuss with my legal team, Mr. Glapion.

Q. But I'm not asking your legal team, I'm asking you … If what you're telling me is that this is your lawyer's decision, fine. But –

A. No, that's not what I was telling you.

Q. Okay. Then tell me, why is it that you would not be interested in settling the case individually?

A. …I want other people to get justice…

Walston Dep., 162:18-164:7 (pp. 18-20.)

## III. __Terms, Conduct, and Prejudice.__

### A. Legal Standard

#### 1. Generally

Alleged misconduct "that creates a serious doubt that counsel will represent the class loyally requires denial of class certification." *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011). "Serious doubt" exists when counsel's misconduct "prejudices the class or creates a direct conflict between counsel and the class" or "when the misconduct jeopardizes the court's ability to reach a just and proper outcome in the case." *Reliable*, 704 F.3d at 498-99.

Most courts considering terms in a representation agreement impacting adequacy have found that amendment of the agreement, rather than denial of certification, is the remedy. *See, e.g.*, *Tataru*, 2021 WL 38142 at *7; *Lanteri*, 2018 WL 4625657 at *5-6; *In re Ocean Bank*, 2007 WL 1063042 at *6; *Jamison*, 290 F.R.D. at 105 n.6; *Keim*, 328 F.R.D. at 691-92; *Sliwa*, 333 F.R.D. at 276, 278.

*Sliwa* was Defendant's counsel's case. There, Defendant asserted—in an opposition to a Motion for Certification—that "counsel are unethically controlling this litigation to protect their own financial interests to the detriment of Plaintiff and the class, rendering both counsel and Plaintiff inadequate and precluding certification." 333 F.R.D. 276. The court found that the removal of the provision made it moot with respect to adequacy, and that this was not a

14

class certification issue. *Id.* at 278.

At bottom, *Reliable* requires serious mis*conduct* to justify denial, and other than Counsel's immediate removal of the terms at issue before they could impact this case, the only *conduct* Defendant and its expert identify is the inclusion of the terms in the first place.

Defendant's citations do not help it. In *In re Grievance Proceeding,* the committee found that terms in a representation agreement expressly delegating to the attorney full discretion to accept, reject, or convey settlement offers violated the Connecticut Rules of Professional Conduct. 171 F. Supp. 2d 81, 85 (D. Conn. 2001). The committee referred to this as a **"relatively minor violation"** because while "the Agreement violated the Rules", the attorney's conduct did not as the accused attorney **"did not actually rely on rights purportedly granted by the Agreement".** *Id.* at 85.

In *Williams v. Board of Ed. Of City of Chicago*, the plaintiff had surrendered all *class-related* authority and decision-making. 2022 WL 4182434, *2 (N.D. Ill. Sept. 13, 2022). This is inapposite. Here, there is *no* surrender of class authority. Plaintiff has not offered, nor would Counsel accept, such a surrender.

### 2. Applicability of ethical rules in class actions.

Much of the tension Defendant identifies is attributable to "the unqualified application of the ethical principals[sic] designed for the individual action, without adaptation to the unique nature of the class procedure, compromis[ing] both the ethical standards and the effectiveness of the class litigation." *Blanchard v. EdgeMark Fin. Corp.*, 175 F.R.D. 293, 307 (N.D. Ill. 1997).

For example, Defendant cites cases in the Seventh Circuit finding no duty to a *putative* class, but many leading commentators, as well as Counsel's home circuit, disagree. Newberg

and Rubenstein on Class Actions, § 19.2 (6th ed., 2024) ("[T]here is little doubt that an attorney pursuing a class suit has some duty to the prospective class and generally must act in the class's best interests."); *In re General Motors Corp.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed.")

In the District of New Jersey (Counsel's home district), Judge Simandle—Chief at the time Counsel clerked—wrote an opinion decrying settlement offers in excess of a putative lead plaintiff's damages, made in an effort to convince plaintiff to abandon the putative class, as "the most sinister and manipulative settlement strategy" and "the hallmark of an oppressive litigation strategy." *Loatman v. Summit Bank*, 174 F.R.D. 592, 603 (D.N.J. 1997).[8]

### 3. Use of ethical rules for non-disciplinary remedies.

Both the Model Rules *and* the Seventh Circuit strongly caution against allowing a party to invoke the Rules of Professional Conduct as a basis for a non-disciplinary remedy in pending litigation. Specifically, comment 20 to the Model Rules states:

> Violation of a Rule should not … create any presumption in such a case that a legal duty has been breached. In addition, violation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation.… [T]he purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons.

Model R. Prof. Conduct, Preamble[20]; *Reliable*, 704 F.3d at 499. It is often the case, as it is here, that a defendant's goal is not to protect the class, plaintiff, or public, but to "object to class counsel who are, in fact, best suited to protect the class and represent its interests, so that the defendant can seek new class counsel who will more readily compromise the claims of

---

[8] This is not to say commentators, or the Third Circuit, can overrule the Seventh, but rather that the Court should not impute nefarious intent into terms that are arguably over-protective of the putative class given this tension and that the Court is dealing with agreements drafted against this backdrop.

the class." *In re Pfizer Inc.*, 282 F.R.D. 38, 48 (S.D.N.Y. 2012). "It is this presumption of strategic behavior by class action defendants that has convinced courts to preclude, or severely limit, their ability to raise alleged ethical violations in the context of class certification." *Id.*

This is why the focus of *Reliable* and related opinions is on actual *conduct* within the litigation itself, not the mere possibility of conduct or whether an ethical rule was technically violated. Here, outside of the inclusion of the terms themselves, Defendant has no evidence of misconduct wrought through the terms. Such conduct does not exist.

**B. Springing Fee Provision (Identified: July 23; Removed: July 30).**

The Springing Fee Provision stated:

> While you retain the right to accept any settlement offer from defendant, you further agree that if you accept a settlement offer against the written advice of the firm, and the settlement offer does not provide for payment of attorney's fees equaling or exceeding the base lodestar amount, you will be responsible for payment of our base lodestar amount.

The Springing Fee Provision was intended to allow Counsel to protect the putative class from situations where a class defendant litigates to the brink and then bypasses the attorney-client relationship to make "sinister" and "manipulative" settlement offers direct to the plaintiff (e.g. through party-to-party contact or at their deposition) to encourage the plaintiff to abandon the putative class. *Loatman*, 174 F.R.D. at 603; [Dkt. 57-1, ¶ 18.]

With that said, Counsel acknowledges that most courts have found that the Springing Fee Provision is problematic if present at certification because it could usurp the plaintiff's role. While that concern is mitigated here—the Provision only applied to individual settlement, Robinson Dep. 192:6-10 (p. 24)—Counsel immediately removed this provision.

### 1. The Springing Fee Provision was never used or triggered.

The Springing Fee Provision was immediately removed and was never triggered.[9] Importantly, the Springing Fee Provision was not self-activating. Instead, it required a settlement offer that Counsel advised the client in writing to reject. This never happened. Counsel did not provide any advice to reject Defendant's settlement $35,000 settlement offer (the only one it made) and Defendant has no evidence to the contrary. Robinson Dep. 64:18-66:25 (pp. 10-12.) In fact, Defendant's arguments foreclose this possibility. It claims that Counsel never relayed its $35,000 offer. [Dkt. 76, pp. 2, 6.] This cannot be true if Counsel relied on the Springing Fee Provision. Robinson Dep., 194:8-17 (p. 25.)

Further, Plaintiff did not recall the existence of the Springing Fee Provision. Walston Dep., 166:23-167:4 (pp. 22-23.) He confirms its irrelevance in his Declaration. Walston Decl., ¶ 18. Instead, he made clear that he found Defendant's conduct toward him so offensive, including on the settlement call conducted before Counsel was retained, that he decided to seek justice for everyone else they may have harmed. Walston Dep., 163:13-164:7 (pp. 19-20.)

Even Defendant's expert acknowledged that "this case never got to a point where anything was literally triggered. There was not a point at which Walston would have owed fees under this agreement." Robinson Dep., 308:12-15 (p. 37.)

2.  The Springing Fee Provision caused no prejudice to the class.[10]

The only prejudice to the class Defendant identifies from the Springing Fee Provision is that it ostensibly prevented Plaintiff from taking an individual settlement in the best interest

---

[9] Counsel has *never* used this provision in any case—ever.

[10] *Reliable* also notes that conduct can defeat adequacy if it "jeopardizes the court's ability to reach a just and proper outcome in the case." 704 F.3d at 498-99. The analysis seems largely the same. The terms were never used and were removed with ample time before class certification to address any concerns the Court might have about its impact on its ability to reach a just and proper outcome.

of the class. [Def.'s Mot., p. 20.] Defendant offers nothing to suggest that an individual settlement would have been in the best interests of the class here. Further, because the Springing Fee Provision was not used or recalled, the Provision prevented nothing. As such, it did not and could not have had any prejudicial effect on the class, especially prejudice that could not be cured through removal months ahead of class certification.

### C. Statutory Cap (Identified: September 18; Removed: September 25).

The Statutory Cap appeared twice. In the first instance, where a defendant was willing to separate damages and fees in a settlement, it allowed Counsel to choose between the highest of three different fee calculations as a starting point in negotiations: lodestar, one-third contingency, or, in a statutory damages case, "the difference between the total settlement amount and [client's] maximum permitted statutory damages." If a defendant was unwilling to separate, it made the highest of those three categories the "assumption" as to allocation.

One of the primary goals[11] of the Statutory Cap was to balance the obligations Counsel has to a named plaintiff and the obligations both have to an uncertified class. It effectively removed any incentive for a putative lead plaintiff to leverage the claims of absent class members for their own benefit, while still allowing the lead plaintiff to realize their best day in court. It was also meant to curb any risk that mere engagement in individual settlement negotiations beyond the value of plaintiff's case would result in arguments that *plaintiff* is inadequate because he sought to sell out the class, because he literally could not.

This case is a perfect illustration. Defendant argues that the Cap prevented it from making a $350,000 settlement offer on maximum damages that it (incorrectly) calculated as

---

[11] The other was concerns about fee sharing with non-lawyers in fee-shifting cases with a low statutory damage cap (e.g. the FDCPA). Defendant's expert testified that a contingency-fee agreement in such a situation might implicate fee sharing concerns, as Counsel suspected in creating this provision. Robinson Dep. 378:4-12 (p. 34.) The Statutory Cap prevents this.

$10,500. [Dkt. 76, p. 16.] But it prevented no such thing. It simply prevented Defendant from using an "oppressive", "sinister", and "manipulative" settlement offer to decapitate the putative class, *Loatman*, 174 F.R.D. at 603, using the type of individual settlement negotiations Defendant *also* finds improper and unethical. *Supra*, pp. 7-8.

If this provision missed the mark, it was too far in favor of the class.

### 1. The Statutory Cap was never used or triggered.

Just like the previous provisions, the Statutory Cap was immediately removed and never triggered. First, Defendant's highest settlement offer was $35,000 with "$25,000 to [Plaintiff] and $10k to counsel[.]" Ex. J (p. 84.) As Defendant was willing to separate damages and fees, Counsel was only authorized to potentially *negotiate* a split tied to the Statutory Cap. Plaintiff was not interested in an individual settlement, so there was no attempt to negotiate. Neither Defendant nor its expert has evidence to the contrary. Robinson Dep. 71:7-10 (p. 13).

Second, Plaintiff's own records—long produced to Defendant—show *at least* 19 received calls. Glapion Decl., ¶ 46. If the Statutory Cap were invoked on Defendant's $35,000 offer (which it was not), Plaintiff would receive $28,500—19 times $1,500—and Plaintiff's counsel would receive $6,500, which is a *low* 18.6 percent of the settlement. This split is ethically unproblematic, Robinson Dep. 233:12-234:9 (pp. 28-29), and reflects a split more favorable to Plaintiff than Defendant's *own proposal*.

Finally, Defendant's arguments again foreclose the applicability of the Statutory Cap. If Counsel's lodestar exceeded its $35,000 offer as it claims, the Statutory Cap was *not* the "highest" of the categories Counsel could use as a starting point in negotiations.

### 2. The Statutory Cap caused no prejudice to the class.

As discussed, the primary goal of the Statutory Cap was to allow a Plaintiff seeking

statutory damages to achieve their best day in court while simultaneously *protecting* the interests of the putative class from "sinister" and "manipulative" settlement tactics. *Loatman*, 174 F.R.D. at 603. Given this purpose and that the Cap was never used or triggered, it caused no prejudice to the putative class.

**D. Reasonable Offer Restriction (Identified August 13; Removed September 25).**

The Reasonable Offer Restriction stated "[w]e will notify you immediately of the terms of any reasonable settlement offers we receive." This provision was removed on September 25 and was never intended to do anything more than promote efficiency and comity.

1. <u>The Reasonable Offer Restriction was never used.</u>

Defendant has no evidence that Counsel failed to convey a settlement offer because Counsel considered it unreasonable. Further, there is no absolute duty to convey settlement offers that the client has indicated would be unacceptable. "An attorney has an 'absolute duty' to convey any settlement offer to the client *unless it has been rejected in advance*." *First Nat'l Bank v. Lowrey*, 375 Ill. App. 3d 181, 197 (1st Dist. 2007) (emphasis added); Model R. Prof. Conduct, 1.4(a)[2]. Defendant's expert agrees, writing "[t]he client could agree to reject all offers of individual settlement if that was the client's wish." [Dkt. 76-3, pp. 11, n. 1.]

As one court wrote, in interpreting an identical provision to the Model Rule 1.4 and declining to disqualify an attorney for failing to transmit settlement offers:

> [W]here … plaintiff has signed a declaration attesting to his regular communication with his attorneys and authorization to decline settlement offers that do not account for the damages of putative class members, it would not be in the plaintiff's best interest to disqualify counsel[.]

*Williams v. Cent. Transp. Int'l, Inc.*, 2014 WL 5823112, *3 (E.D. Mo. Nov. 7, 2014); *e.g. Weckesser v. Knight Enters. S.E., LLC*, 392 F. Supp. 3d 631, 637 (D.S.C. 2019) (interpreting identical provision and finding no issues in allowing attorney to reject individual settlement offers).

At Plaintiff's April 26 deposition, consistent with his representations from the outset, Plaintiff stated repeatedly that he had no interest in an individual settlement, for reasons having nothing to do with terms in his agreement. Walston Dep., 160:22-161:12; 163:10-164:7 (pp. 16-17; 19-20.) Accordingly, in line with Plaintiff's wishes, the RPC, *Lowrey*, and Defendant's own expert, Counsel was not required to convey those offers to Plaintiff.

Even if Counsel were required to transmit the $35,000 immediately, "failure of counsel to communicate a settlement offer, itself, does not demonstrate inadequacy of counsel under Rule 23[.]" *Victorino v. FCA US LLC*, 322 F.R.D. 403, 409 (S.D. Cal. 2017); *Keim*, 328 F.R.D. at 690-691 (recognizing "tall order of balancing" obligations to the client and putative class, and that "the extent to which an attorney should discuss and evaluate a settlement offer with his client" depends on a host of factors, **including the reasonableness of the offer**.)

### 2.  The Reasonable Offer Restriction caused no prejudice to the class.

Defendant presents no evidence that an offer was not conveyed because it was considered "unreasonable." Instead, Plaintiff simply had no interest in an individual settlement, which was made clear to Defendant before, during, and after it made its $35,000 offer. Again, whatever may be said about the propriety of the unused Reasonable Offer Restriction as it pertains to Plaintiff individually, it was not prejudicial to the class.

## IV.  **Defendant's expert report is improper.**

### A.  **The report goes beyond the expert's own expertise.**

Though Plaintiff does not separately move to strike Defendant's expert report, on preference of the Court, it is improper. Ms. Robinson's task was to review Counsel's representation agreement for RPC violations "that would reflect on Counsel's adequacy". [Dkt. 76-3, pp. 4-5.] But Ms. Robinson admitted she is not an expert on class certification issues or adequacy. Robinson Dep., 34:23-35:7 (pp. 8-9.) She has never litigated, defended, or

adjudicated a class case. *Id.* at 30:21-31:15 (pp. 6-7.). She expressed knowledge of only "some" of what goes into adequacy. *Id.* at 143:6:11; 144:3-20 (pp. 20-21.) As such, Ms. Robinson was not an expert on the very task for which she was hired.[12] [Dkt. 76-3, pp. 4-5.]

**B. Defendant's counsel's deposition conduct taints the expert's testimony.**

Tainting Ms. Robinson's testimony further is Defendant's counsel conduct during the deposition. Mr. Watstein interrupted with speaking objections and witness coaching, Robinson Dep. 65:19-66:5 (pp. 11-12), 140:5-141:6 (pp. 18-19), 167:1-168:2 (pp. 22-23); insulted Counsel's questions as "absurd" and "ridiculous", *id.* at 267:11-17 (p. 34), 380:12-22 (p. 42); accused Counsel of lying, *id.* at 140:23-141:6 (pp. 18-19); and ranted about his personal circumstances, *id.* at 380:6-381-23 (pp. 42-43.)

Most egregiously, Defendant's counsel interjected literal testimony for the witness during questioning on a crucial claim in Ms. Robinson's report—that Counsel's communications with the Court were misleading "without disclosing that the client's position was dictated by the terms of the engagement agreement". Specifically, when Counsel asked about Ms. Robinson's evidence for the claim that the client's position "was dictated" by the terms, or evidence that Counsel believed this to be so, Mr. Watstein interjected before the witness could answer: "[t]he existence of the agreement." *Id.* at 267:2-7 (p. 34.)

Plaintiff does not move for sanctions, but such behavior—especially outright testifying for the witness on such a core issue—is indefensible given the stakes of Defendant's Motion.

<u>**CONCLUSION**</u>

Respectfully, Defendant's Motion should be denied in full.

---

[12] Ms. Robinson's report also repeatedly draws improper legal conclusions and applies law to facts. She has previously had reports limited for the same overreach. *See Client Funding Solutions Corp. v. Crim*, 943 F. Supp. 2d 849, 863 (N.D. Ill. 2013); *see also* Ex. P (pp. 155-164).

Dated: December 27, 2024        s/ Jeremy M. Glapion

Jeremy M. Glapion
The Glapion Law Firm, LLC
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732-455-9737
Fax: 732-965-8006
jmg@glapionlaw.com

Counsel for Plaintiff and the Putative Class