## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **RASHAD WALSTON,** on behalf of himself and all others similarly situated,<br><br>**Plaintiff,**<br><br>**v.**<br><br>**NATIONAL RETAIL SOLUTIONS, INC. D/B/A NRS PAY,**<br><br>**Defendant.** | Civil Case No.: 24-cv-83<br><br>District Judge: Hon. Sunil R. Harjani<br><br>Magistrate Judge: Jeffrey T. Gilbert<br><br>**Declaration of Jeremy M. Glapion in Opposition to Defendant's Motion to Deny** |

I, Jeremy M. Glapion, declare as follows:

1.      I am attorney for Plaintiff and the putative class in this matter.

2.      I make this declaration based on my own personal knowledge in support of Plaintiff's Opposition to Defendant's Motion to Deny Class Certification.

### Pre-retention of Counsel

3.      On or about October 19, Plaintiff sent a demand letter to Defendant. **Ex. A.**

### Plaintiff's Retention of Counsel

4.      Plaintiff engaged me to represent him and a putative class via representation agreement dated November 21, 2023.

5.      Prior to this engagement, I had no personal or professional relationship with Plaintiff Walston.

6.      This initial representation agreement ("First Agreement") is best characterized as an investigation agreement, as it did not authorize the filing of a lawsuit until a second agreement was executed removing the paragraph prohibiting the filing of a lawsuit. **Ex. B.**

7.      On December 19, 2023, Plaintiff and I executed a new agreement ("Second Agreement") with this language removed. **Ex. C**.

8.      On that same date, Plaintiff executed document called "Duties of a Class Representation", which explains to Plaintiff his duties as a representative and ensures that he understood he was signing up with the goal of representing a class. *Id.*

9.      This process—investigatory agreement followed by amended agreement plus class duties form—is my standard protocol prior to initiating a class action, to ensure claims are well-grounded in fact and law, and the client would make a good representative.

10.      Nothing in these agreements was unique to Plaintiff Walston.

11.      On January 3, after back and forth with Defendant on the production of evidence it claimed to have that would be exculpatory, and Defendant's failed efforts to accept the expired settlement offer from the demand letter, I informed Defendant (twice) of Plaintiff's desire to forego individual settlement and that he would not be considering individual settlement offers. **Ex. D**.

## Production of Representation Agreements

12.      On March 13, Defendant served discovery requests, one of which asked for a copy of Plaintiff's representation agreements with me.

13.      On April 19—the same day Plaintiff's responses were due—the Parties were scheduled for a Rule 37 call on Defendant's production.

14.      On that call, I informed Defendant's counsel that Plaintiff's forthcoming responses and production would withhold Plaintiff's representation agreements.

15.      Defendant's counsel indicated that this issue is something it would move to compel immediately.

16.     I further indicated that the agreements were not being withheld due to a desire to hide anything, but the position was instead my default position in line with the opinions of numerous courts in the District and nationwide.

17.     I further indicated that if there were cases to the contrary, Plaintiff and I would be happy to change our minds and produce the agreements.

18.     Defendant expressed a willingness to provide this case law.

19.     I memorialized this offer in an email following this April 19 call. **Ex. E**.

20.     On April 26, Defendant took Plaintiff's deposition in Chicago.

21.     Defendant did not provide the requested case law—or even mention the representation agreement issue again—until July 23. **Ex. F**.

22.     After Defendant provided this case law, I reviewed it.

23.     During my review of this case law, I understood that the provision in the provided case, *In re Ocean Bank*, 2007 WL 1063042 (N.D. Ill. Apr. 9, 2007), was similar to the Springing Fee Provision, and that the *Ocean Bank* court found removal of that provision was proper to cure any adequacy concerns.

24.     Accordingly, I proposed producing redacted agreements, and Defendant agreed to this proposal. **Ex. F**.

25.     In addition, I had not relied on the "Springing Fee Provision" here (or in any case), so in an abundance of caution, and in consultation with Plaintiff, I removed it.

26.     On July 30, Plaintiff and I executed a new agreement ("Third Agreement") with this provision removed. **Ex. G**.

27.     On July 31, I produced this amended agreement (and the previous agreements) to counsel, with heavy redactions as agreed. [Dkt. 76-1, PDF pp. 51-75.]

28.     On August 13, Defendant sent a letter requesting the unredacted agreements. *Id.* at PDF pp. 77-78; Ex. F.

29.     I responded that same night, pushing back on some of the claims made and offering my availability for further discussion. *Id.* at PDF p. 45; **Ex. F**.

30.     On the ensuing telephone call on August 16, I offered to produce the unredacted agreements if Defendant would agree to identify any other terms with which it had an issue.

31.     On August 20, Defendant declined. *Id.* at PDF p. 43; **Ex. F**.

32.     At no point on this call did I say the "Springing Fee" was meant to prevent clients from settling the case if Counsel did not want to settle.

33.     Instead, the Springing Fee was meant to was meant to preserve the attorney-client relationship by preventing a defendant from driving up litigation costs by litigating to the brink, only to bypass counsel to make a predatory offer direct to plaintiff (e.g. at their deposition) to convince plaintiff to abandon the class (without consulting with counsel as to the legal impact of even entering into such negotiations).

34.     On August 21, I produced the unredacted agreements anyway, alongside interrogatories asking it to identify problematic terms. **Ex. F**.

35.      On September 18, Defendant identified the Statutory Cap as a term with which it took issue.

36.     I had not relied on this provision here (or in any case), so in an abundance of caution, and in consultation with Plaintiff, on September 19, I drafted a new agreement with this provision removed.

37.     Similarly, I had not relied on the Reasonable Offer Restriction here (or in any case), so in an abundance of caution, I also removed this provision from the September 19 draft.

38.     On September 20, prior to executing this second amendment and concerned that nothing would be good enough for Defendant, I took what I considered to be an extraordinary step of offering to let Defendant or its expert review the representation agreement *before* full execution, to ensure no further issues. **Ex. H.**

39.     Defendant declined, sarcastically replying "we're not inclined to ask our experts to provide you with legal advice." *Id.*

40.     On September 25, Plaintiff and I fully executed the September 19 draft ("Operative Agreement"). **Ex. I.**

<div align="center">

**Settlement**

</div>

41.     The Court is already aware of Defendant's efforts to use pre-litigation settlement discussions to enforce a settlement here. [Dkt. 31.]

42.     On June 12, at 11:00 AM eastern, Defendant's counsel, Attorney Watstein, emailed me an individual settlement offer of "$35,000 to confidentially settle [Plaintiff's] claims, with $25k to him and $10k to counsel—unless Mr. Walston decides to split the amount differently." Ex. J.

43.     In response, I reiterated Plaintiff's position on individual settlement but offered a settlement conference.

44.     Defendant ignored this offer, despite previously arguing that a settlement offer is necessary to pierce issues of control. Ex. K.

45.    In addition, Attorney Watstein specifically wrote that this offer was "significantly more than Mr. Walston could recover on his best day in court[.]" *Id.*

46.    First, this is not true. Plaintiff's records, long produced to Defendant, show at least 19 received calls, meaning his maximum statutory damages would be at least $28,500—more than the $25,000 offered to him.

47.    Second, Attorney Watstein's "best day in court" language was similar to language he had used in a case a few years prior in making an offer to a lead plaintiff in a TCPA case. Ex. L.

48.    When those settlement negotiations fell apart (for reasons not clear from the record), Attorney Watstein's client sought to use those failed negotiations to accuse that plaintiff of extortion and have him declared inadequate. *See Jeffrey Katz Chiropractic, Inc. v. Diamond Respiratory Care, Inc.*, 20-cv-04108, Dkt. 37, p. 22:11-15; *see also id.*, pp. 6:19-20, 24:18-19.

49.    I have attached the brief as **Ex. M**.

50.    In my response to Defendant's June Offer, I relayed my concerns about Defendant's misuse of individual settlement negotiations, writing that Plaintiff "does not trust even engaging in individual settlement conversations with your client, because the expectation is that you would just that against him in class cert if those conversations failed." Ex. J.

51.    On July 8, I received a call from Attorney Paul Heeringa of Manatt, Phelps & Phillips, indicating that he would be joining Defendant's litigation team.

52.     I have worked opposite Attorney Heeringa in previous TCPA cases involving other parties, but prior to this call, I had no indication he was or would be involved in the instant matter.

53.     We spoke for approximately 30 minutes, during which Attorney Heeringa broached the topic of individual settlement between NRS and Plaintiff, given that we had settled several other matters individually over the past few years.

54.     I reiterated to Attorney Heeringa that Plaintiff's position on individual settlement had not changed, and that we remained concerned that even engaging in individual settlement discussions at the level suggested would raise "sell out" concerns.

55.     The following night, I emailed Attorney Watstein regarding the call from Attorney Heeringa, and Attorney Watstein offered to call me.

56.     On that call, I explained the call with Attorney Heeringa, and again explained my client's position on individual settlement, including the concerns about being accused of "selling out the class".

57.     In response, Attorney Watstein stated that I was "smart" to pick up on that risk, that he had made that argument before, but that Plaintiff here should not be concerned with that unless he came in too aggressively.

58.     This is to the best of my recollection, so while the phrasing might not be exact, I left that conversation confident that Defendant's $35,000 offer was an attempt to trap Plaintiff into negotiations it would use against Plaintiff.

59.     Furthermore, the day before Defendant's offer, on June 11 at 4:22 PM eastern, I spoke with Plaintiff via telephone (for 20 minutes), as instructed, to assess and understand his position on settlement. **Ex. N.**

60.     I accurately relayed the contents of that call to the Court via email on June 14.

**Ex. O.**

61.     I had no reason to believe, nor do I have current reason to believe, that Plaintiff felt constrained by any provision in any representation agreement he had signed, or that his disinterest in individual settlement was at all linked to any terms therein.

62.     Dating back to January, I have repeatedly told Defendant that there is no interest in individual settlement.

63.     I have attached several such examples in **Ex. D.**

<div align="center">

**Relevant Experience**

</div>

64.     I am the founder of Glapion Law Firm and a member in good standing of the State Bars of New Jersey and New York. I make this declaration based on my own personal knowledge. If called upon to testify, I could and would testify competently to the truth of the matters stated herein.

65.     Glapion Law Firm is a plaintiff-side consumer protection firm with a focus on cases alleging violations of the Telephone Consumer Protection Act, Fair Debt Collection Practices Act, and consumer fraud.

66.     Since May 2015, I have recovered over $1 million for clients in hundreds of individual TCPA matters.

67.     In addition, I have been appointed lead counsel in five separate TCPA class actions:

a.     *Willis et al. v. IHeartMedia, Inc.*, Case No. 16-CV-02455 (Cook County, Feb. 19, 2016) (co-lead counsel in successfully administered, $8.5m non-reversionary TCPA class settlement);

b. *Allard et al. v. SCI Direct, Inc.*, Case No. 16-cv-01033 (M.D. Tenn. 2016) (sole lead counsel in successfully administered, $15 million non-reversionary TCPA class settlement);

c. *Griffith v. ContextMedia, Inc.*, Case No. 16-cv-2900 (N.D. Illinois 2018) (co-lead counsel in successfully administered, $2.9 million, non-reversionary TCPA class settlement);

d. *Walker v. Highmark BCBS Health Options, Inc.*, 2020 U.S. Dist. LEXIS 225998 (W.D. Pa. Dec. 13, 2022) (sole lead counsel in a finally approved $1.85m TCPA class action settlement, which was successfully administered).

e. *Desouza v. Aerocare Holdings LLC; AdaptHealth Corp.*, 22-cv-1047 (M.D. Fla.) (co-lead counsel in $5,238,000 TCPA class action settlement, which was successfully administered).

68.   To the best of my knowledge, the *Griffith v. ContextMedia* settlement is one of the largest, if not the largest, per-class-member settlements in the history of the TCPA.

69.   Claiming class members received $7,500 on average, and one class member received more than $35,000.

70.   To the best of my knowledge, the *Allard v. SCI Direct, Inc.* settlement ranks within the top 25 non-reversionary TCPA settlements in the history of the TCPA.

71.   To the best of my knowledge, the *Walker v. Highmark* and *Griffith v. ContextMedia* settlements rank near the top of efficiency, as measured by the per claimant recovery divided by the hours spent on the case.

72.     In particular, in the *Walker* settlement, I achieved $4 per hour spent on the case, in a space where most settlement struggle to even approach $1 per hour by the same metric.

73.     Despite running a small and efficient practice, I have achieved these settlements through hard-fought litigation with highly-reputable defense firms, such as Baker Donelson, Wilson Elser, DLA Piper, Faegre Drinker, K&L Gates, Sheppard Mullin, and Reed Smith.

74.     I have never been found to be inadequate to represent a class.

75.     I have also been an invited panelist on TCPA issues, including at the PCI Northeast General Counsel Conference.

76.     Prior to founding Glapion Law Firm, I was an attorney at the law firm of Lieff Cabraser Heimann & Bernstein, LLP ("LCHB") in New York (2013-2015), a law clerk to The Honorable Freda L. Wolfson (D.N.J.) (2013), and an associate at Gibson Dunn & Crutcher (2012-2013).

77.     While at LCHB, I was the primary associate on several high-profile consumer protection matters, including TCPA class cases such as *Henrichs v. Wells Fargo Bank, N.A.*, Case No. 13-CV-05434 (N.D. Cal.); *Ossola v. American Express Co.*, Case No. 13-cv-04836 (N.D. Ill.); and *Balschmiter v. TD Auto Finance, LLC*, Case No. 13-cv-01186 (E.D. Wisc.).

78.     My experience in the matters listed above, as well as my knowledge of the TCPA gained through my handling numerous TCPA actions (both class and individual), has allowed me to develop the skills to successfully and capably manage the legal, factual, and procedural issues that accompany TCPA class actions, and to evaluate the merits of this case and the submitted settlement.

**Work On This Case**

79.     At the time of this filing, I have worked more than 450 hours on this case and spent or committed (i.e. including anticipated invoices not yet paid) more than $20,000.

80.     I have served, on Plaintiff's behalf, 76 Requests for Production, 54 Requests for Admission, and 19 Interrogatories.

81.     I have defended Plaintiff's deposition, deposed Defendant's expert witness, one of Defendant's employees, and a third-party former employee.

82.     I have requested 4 more depositions (one of Defendant's employees; one of Defendant's CEO; one of Defendant itself; and one of Defendant's third-party vendor).

83.     Defendant has yet to provide dates for the former three, despite requests pending for months.

84.     The latter will take place likely in February.

85.     I have pursued foreign discovery, which necessitated hiring foreign counsel and navigating the seldom used letter rogatory process.

86.     This process has gone incredibly smoothly and efficiently.

87.     Despite Defendant's belief this would take years, the foreign documents would have been produced in mid-December if Defendant had not delayed matters at the last second (with minimal explanation).

88.     I have initiated numerous Rule 37 conferences, necessitating multiple amendments and revisions to Defendant's written discovery; filed multiple Motions to Compel; and participated in numerous other phone calls and conferences, both in person and virtually.

89.     I have successfully opposed at least one dispositive Motion (Defendant's Motion to Enforce Settlement) and have affirmatively filed or opposed numerous others, as a review of the lengthy and tense docket shows.

## Plaintiff's Participation

90.     Plaintiff has been one of the most capable and attentive putative class representatives with whom I've worked.

91.     He has timely responded to any request, question, or concern I've had; every discovery request; he has asked insightful questions, made suggestions, corrections, and clarifications, and has not hesitated to provide input on thoughts, facts, and strategy.

92.     Plaintiff has been exceptionally knowledgeable, as evidenced at his deposition, and I believe he will continue to serve the class well.

## Defendant's Expert

93.     Attached hereto is Magistrate Judge McShain's May 7, 2024 opinion in *Kormi v. Choate*, Case No. 16-cv-9415, docket entry 498, in which Judge McShain's significantly limits Ms. Robinson's for going beyond the proper scope of an expert report and drawing legal conclusions, and referencing another case that found the same. **Ex. P.**

94.     I declare under penalty of perjury that, to the best of my knowledge and recollection, the foregoing is true and correct.

Executed on this 27th day of December, 2024, at Manasquan, New Jersey.

*/s/ Jeremy M. Glapion*
Jeremy M. Glapion

# EXHIBIT A

October 19, 2023

National Retail Solutions, Inc.
NRS Pay
520 Broad Street
Newark, NJ 07102

Attn: Eli Korn, Chief Operation Officer

Delivered via USPS certified mail

**Re: Violations of the Telephone Consumer Protection Act (TCPA)**

Dear Mr. Eli Korn;

I'm contacting you today regarding communications to my phone that are in violation of the TCPA. Each of these unwelcome and unwanted communications were made using an (automated telephone dialing system, automated message, or both), and were made without my express, prior, written consent, as required by law. The illegal communications came to my phone number, 773-368-4088, as follows:

1. 03/07/2022, 2:34 pm CST, from number, 973-649-9264

2. 05/19/2022, 12:28 pm CST, from number, 973-649-9264

3. 08/08/2022, 3:11 pm CST, from number, 973-649-9264

4. 03/20/2023, 3:57 pm CST, from number, 973-649-9264

5. 05/04/2023, 4:22 pm CST, from number, 973-649-9264

6. 07/31/2023, 11:48 am CST, from number, 973-649-9264

7. 10/12/2023, 3:37 pm CST, from number, 973-649-9264

47 U.S.C. §227(b) stipulates that it shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted because of an existing business relationship.

The TCPA also provides for a private right of action, with each violation entitling me to a $500 penalty, which can be increased to $1,500 per violation, in the event such a violation is deemed to have been willfully or knowingly made. Reasonable court costs for bringing a private right of action against your company are also recoverable in the event of a successful action for those violations.

In the absence of the federally required, express, prior, written consent, or any qualifying, "existing business relationship", you have violated the TCPA as indicated above, thus affording me the right to pursue the statutory penalties described above, as well as the reasonable court costs.

Based on the number of communications detailed above, the statutory penalties to which I would be entitled total $10,500. However, in the interest of helping you avoid the imposition and expense of civil litigation, I would like to afford you an opportunity to settle this matter for the amount of $9,800. In exchange for that amount, I will forgo any civil action, release your company of all claims associated with the illegal communications named herein, and consider the matter closed.

In as much as I'm confident that the facts of this case would not support any manner of tenable defense for your company, I would urge you to carefully consider accepting this generous, good faith offer to settle. Should you decline it, or fail to respond within 5 days from its time-tracked delivery, please know that I reserve the right to pursue civil action as described herein, in state or federal court, and will seek all available injunctive and monetary relief made available to me under applicable state and federal statutes, up to and including a potential class

certification. You should fully expect a lengthy and detailed discovery process to accompany that suit.

Additionally, I would insist that you give me every assurance that the offending communications that are the subject of this matter be the very last that I receive. I would also encourage you to take the necessary steps to ensure compliance with state and federal statutes moving forward, not only as a matter of protection from civil liability, but also as a courtesy to the millions of American consumers who are consistently plagued with these types of unwanted, illegal communications.

I look very forward to your response, within 5 days of your receipt of this notice, as directed above. I would ask that all further communication be in writing, if only as a means by which the content of such communication will be memorialized.

Respectfully,

Rashad Walston
PO Box 43322
Chicago, IL 60643

email: rwwalston@hotmail.com

# EXHIBIT B

## STANDARD TERMS OF ENGAGEMENT

I, Rashad Walston, ("you, your") retain **THE GLAPION LAW FIRM, LLC**, located at 1704 Maxwell Drive, Wall, NJ, ("we, us, our, firm, attorneys"), to represent your interests in a matter against National Retail Solutions, Inc., and any of their affiliates, subsidiaries, related entities, agents and employees thereof for claims based on violations of the Telephone Consumer Protection Act ("TCPA") and other potential claims related to the nuisance telephone calls (such as invasion of privacy) (collectively, "Claims").

Your current mailing address (no PO box) is:

████████████████████ Chicago, IL 60643

Your telephone number (if an unwanted calls case, the number that received or is receiving the unwanted calls):

████████████4088

The wireless carrier for the listed number:

Cricket

Your best contact number if it differs from the above:

### Attorney Client Relationship

Your communications with us are protected by our ethical obligation of confidentiality and by the evidentiary rule of attorney-client privilege. You should be open and forthright with us so that we have all information relevant to your representation. Please note that when we represent a legal entity (corporation, limited liability company, or partnership); our attorney-client relationship is with the entity alone and, unless otherwise stated, is not with its officers, directors, shareholders, partners, members, or affiliates.

**NOTIWTHSTANDING ANYTHING ELSE IN THIS AGREEMENT, THIS AGREEMENT DOES NOT OBLIGATE EITHER PARTY TO PROCEED WITH A LAWSUIT. PRIOR TO THE INITIATION OF ANY LAWSUIT, THE PARTIES WILL NEED TO ENTER INTO A NEW AGREEMENT WITH THIS LANGUAGE REMOVED.**

## Responsibilities

As your attorneys, we have a duty of independent professional judgment, confidentiality, loyalty, and diligence. As our client, you have a duty of cooperation, honesty, and candor.

As your attorneys, we will conduct a full and thorough investigation of your case and proceed, or decline to proceed, accordingly. If, after an investigation, we choose not to pursue this case, we may terminate this agreement. You will owe us nothing.

As your attorneys, we are under no obligation to initiate or defend post-trial motions or post-trial appeals regarding the Claims unless specifically agreed to in writing.

As your attorneys, we retain final decision making authority with respect to matters of strategy, including, but not limited to, whether and how to oppose certain motions; whether and how to raise particular arguments; and whether and how to plead or dismiss particular claims. This list is not exhaustive.

As our client, you have a duty to preserve all documents that are or may become relevant to the litigation. You also have a duty to be reasonably available to answer questions or provide information as necessary.

As our client, you confirm that you have not assigned or transferred, and will not assign or transfer, all or part of your Claims to any person and that you have not signed, and will not sign, any other contingency fee agreement with any other lawyer or law firm with respect to the Claims, while this agreement remains in force.

As our client, you understand and agree that we may ask one or more other law firms to assist us in our representation of you with respect to the Claims, but that we will not do so without obtaining prior written consent from you.

As our client, you confirm that you have provided us with honest information regarding the facts and merits of your case, and have not withheld any information that, in your best judgment, would be relevant to our decision to take this case or our strategy in pursuing this case. _RW_

As our client, you confirm that you took no steps to intentionally manufacture any claim against you, such as by voluntarily subjecting yourself to the behavior about which you now complain (e.g. intentionally soliciting calls you now claim to be unwanted or unsolicited). _RW_

## Electronic Communications

For speed and efficiency, we will commonly use e-mail, cellular telephones and facsimile to communicate with you. However, it is possible that these types of communications could be intercepted or misrouted. By signing this agreement, you consent to these communications.

## Association With Outside Counsel

From time to time, we may choose to associate ourselves with attorneys and law firms other than those included in the definition of "we, us, our, firm, attorneys" above. This may include, but is not limited to, local counsel (an attorney licensed in the court in which we intend to file, and a requirement in many courts for us to litigate if we are not licensed in that state or court) or by entering into a joint prosecution agreement ("JPA") with other firms with similar cases (already on file or otherwise).

Ordinarily, this will not affect your arrangement with us. We will still be your lawyers. We will still be litigating this case. We may just have assistance. Ordinarily, this also does not impact any fees you may owe us, as we agree with any outside counsel what percentage of the overall fee they will receive, depending on the circumstances.

Should we associate with outside counsel, we will notify you in writing via email, unless you indicate another method is preferred. Your response to that email agreeing to our association with outside counsel constitutes a modification of this paragraph to include in the table below the outside counsel with whom we, as if written directly therein.

| Attorney(s) | Reason | Percentage of Total Fee |
|---|---|---|
|  |  |  |

## Representing Adverse Interest

As long as we represent you, we will not provide services for another person whose interests are adverse to yours within the same subject matter of our relationship or in any claim involving you, without your written consent.

## Legal Fees

You will not have to pay for the firm's services.

We may ask the other party to pay attorneys' fees and costs. You agree that we are entitled to any such money awarded or specified in any settlement agreement as costs and attorneys' fees for our work on this case. You agree that this amount shall be negotiated by us. In so negotiating, we will seek an amount equal to the greater of 1) the firm's hourly rate (currently $650/hour) times hours worked (**"base lodestar amount"**), 2) our actual costs plus one-third (1/3) of the full amount of any settlement or judgment, or 3) in case in which your damages are primarily or exclusively statutory in nature, the difference between the total settlement amount and your maximum permitted statutory damages.

Should any award be provided in a "lump sum" payment without separating out attorneys' fees and costs, it is assumed that our fees are the greater of 1) the firm's hourly rate (currently $650/hour) times hours worked (**"base lodestar amount"**), 2) our actual costs plus one-third (1/3) of the full amount of any settlement or judgment, or 3) in a case in which your damages are primarily or exclusively statutory in nature, the difference between the total settlement amount and your maximum permitted statutory damages.

It is expressly understood that in the event that the attorneys are unsuccessful in recovering money in this action, **you will not be responsible to reimburse the attorneys for any out of pocket costs or legal fees**.

You understand that the firm may be making a fee application to the Court to recover attorneys' fees and costs associated with this matter. You agree to fully cooperate with the firm with respect to all fee applications.

Should the matter be certified as a class or collective action (including certification for the purposes of settlement only), the Court will be required to approve any settlement. In such a circumstance, the firm shall be entitled only to those fees approved by the Court, in the form prescribed by the Court (e.g. to be paid separately or out of the settlement fund).

If a matter brought as a class action at any point ceases to be a class action (such as through denial of class certification), the firm may elect to withdraw from representing you for your individual claim. You owe the firm nothing in such a circumstance. Should the firm not elect to withdraw, the provisions of this agreement remain in force as applicable to individual claims.

We record and calculate the time spent for all services rendered in increments of on tenth of an hour (1/10). This includes telephone calls (minimum charge of .2 hours), preparing and reviewing letters, documents or other correspondence (minimum charge of .3 hours), travel time to and from meetings and the Court, legal research, preparation of pleadings and other related documents, negotiations and any other services relating to this matter.

## Settlement

We will not settle any matter without your approval. We will notify you immediately of the terms of any reasonable settlement offers we receive. You have the absolute right to accept or reject any settlement offer. If you do not respond to three attempted communications (regarding a settlement offer) from this office – including the sending of a certified letter – then we can accept and sign the agreement and release on behalf of the client.

While you retain the right to accept any settlement offer from defendant, you further agree that if you accept a settlement offer against the written advice of the firm, and the settlement offer does not provide for a payment of attorney's fees equaling or exceeding the base lodestar amount, **y**ou will be responsible for payment of our base lodestar amount.

## Tax Treatment

**You understand that this firm is not a tax advisor and has not and will not give tax advice as to the tax consequences of any recovery in this matter. The firm recommends that you seek advice of an accountant or other tax professional for this purpose. This is especially so in light of the 2017 Tax Bill. In some situations, attorneys' fees may not be deductible. Please check with your accountant.** _RW_

## Terminating the Representation

You have the right to discharge us at any time by putting your decision in writing and mailing it to our offices. In that event, you agree to pay for services rendered up to the date of discharge. If we are your attorneys of record in any proceeding, you will sign and return a substitution-of-attorney form as soon as you receive it from us.

We may withdraw from your representation at any time prior to the filing of any formal legal proceeding before a court or other judicial or quasi-judicial body, with no costs due from you to us. However, should there be a deadline of which we are aware, we will endeavor to assist you in identifying new counsel, or take whatever steps necessary to preserve, or assist you in preserving, those deadlines, prior to withdrawal. This paragraph does not limit our ability to withdraw subsequent to initiating a formal legal proceeding on grounds supported in law or in equity.

We may mutually agree to terminate the attorney-client relationship, in which case such an agreement needs to be made in a writing signed by both you and the firm. Should we mutually agree to terminate the relationship, you will owe us nothing.

## Retention of Closed Files

If you request, when our representation ends, we will promptly return to you all of your papers and property, whether you have paid for them or not.

## No Guarantees

We do not guarantee any particular result. Any opinion we offer is not a guarantee.

## Entire Agreement

This document contains our entire agreement. There are no other promises, statements, or agreements about the services we will perform.

## No Oral Modifications

Any modifications to this agreement must be in writing and sign by both of parties. Oral modifications will not be valid.

## Severability

If any part of this agreement is held to be invalid, the rest of the agreement remains in effect.

## Applicable Law

The laws of the State of New Jersey will govern the interpretation of this agreement.

## Child Support Judgment Search

**Pursuant to New Jersey law (N.J.S.A. 2A:17-56.23b) law firms are required to perform a Child Support Judgment Search prior to releasing any funds received on behalf of a client via settlement or judgment. If the search reveals that, a child support judgment exist then that judgment must be satisfied out of the "Net Proceeds" before any funds can be released to the client. The statute defines "Net Proceeds" as any amount of money, in excess of $2,000, payable to the prevailing party or beneficiary after attorney fees, witness fees, court fees, fees for health care providers, etc. The statute also provides that the cost of the Judgment Search (approximately $10.00 per person) is chargeable against the net proceeds as a cost of settlement. This firm will comply with the requirements of this statute.**

## Effective Date

This agreement will take effect upon the signing by both of us.

AGREED: *Rashad Walston*
Rashad Walston (Nov 21, 2023 13:21 CST)
RASHAD WALSTON

Dated: 21/11/2023

THE GLAPION LAW FIRM LLC

AGREED: Jeremy M. Glapion (Nov 21, 2023 14:23 EST)
Jeremy M. Glapion
THE GLAPION LAW FIRM

Dated: 21/11/2023

# Walston (NRS) Rep Agreement

**Final Audit Report** 2023-11-21

| | |
|---|---|
| Created: | 2023-11-21 |
| By: | Jeremy Glapion (jmg@glapionlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAkZ6qdgY-R6sIao9-6By-tLsUQc33corT |



Adobe Acrobat Sign

# EXHIBIT C

## STANDARD TERMS OF ENGAGEMENT

I, RASHAD WALSTON, ("you, your") retain **THE GLAPION LAW FIRM, LLC**, located at 1704 Maxwell Drive, Wall, NJ, ("we, us, our, firm, attorneys"), to represent your interests in a matter against National Retail Solutions, Inc., and any of their affiliates, subsidiaries, related entities, agents and employees thereof for claims based on violations of the Telephone Consumer Protection Act ("TCPA") and other potential claims related to the nuisance telephone calls (such as invasion of privacy) (collectively, "Claims").

Your current mailing address (no PO box) is:

███████████████████████ Chicago, IL 60643

Your telephone number (if an unwanted calls case, the number that received or is receiving the unwanted calls):

█████████████4088

The wireless carrier for the listed number:

Cricket

Your best contact number if it differs from the above:

### Attorney Client Relationship

Your communications with us are protected by our ethical obligation of confidentiality and by the evidentiary rule of attorney-client privilege. You should be open and forthright with us so that we have all information relevant to your representation. Please note that when we represent a legal entity (corporation, limited liability company, or partnership); our attorney-client relationship is with the entity alone and, unless otherwise stated, is not with its officers, directors, shareholders, partners, members, or affiliates.

### Responsibilities

As your attorneys, we have a duty of independent professional judgment, confidentiality, loyalty, and diligence. As our client, you have a duty of cooperation, honesty, and candor.

As your attorneys, we will conduct a full and thorough investigation of your case and proceed, or decline to proceed, accordingly. If, after an investigation, we choose not to pursue this case, we may terminate this agreement. You will owe us nothing.

As your attorneys, we are under no obligation to initiate or defend post-trial motions or post-trial appeals regarding the Claims unless specifically agreed to in writing.

As your attorneys, we retain final decision making authority with respect to matters of strategy, including, but not limited to, whether and how to oppose certain motions; whether and how to raise particular arguments; and whether and how to plead or dismiss particular claims. This list is not exhaustive.

As our client, you have a duty to preserve all documents that are or may become relevant to the litigation. You also have a duty to be reasonably available to answer questions or provide information as necessary.

As our client, you confirm that you have not assigned or transferred, and will not assign or transfer, all or part of your Claims to any person and that you have not signed, and will not sign, any other contingency fee agreement with any other lawyer or law firm with respect to the Claims, while this agreement remains in force.

As our client, you understand and agree that we may ask one or more other law firms to assist us in our representation of you with respect to the Claims, but that we will not do so without obtaining prior written consent from you.

As our client, you confirm that you have provided us with honest information regarding the facts and merits of your case, and have not withheld any information that, in your best judgment, would be relevant to our decision to take this case or our strategy in pursuing this case. _RW_

As our client, you confirm that you took no steps to intentionally manufacture any claim against you, such as by voluntarily subjecting yourself to the behavior about which you now complain (e.g. intentionally soliciting calls you now claim to be unwanted or unsolicited). _RW_

## Electronic Communications

For speed and efficiency, we will commonly use e-mail, cellular telephones and facsimile to communicate with you. However, it is possible that these types of communications could be intercepted or misrouted. By signing this agreement, you consent to these communications.

## Association With Outside Counsel

From time to time, we may choose to associate ourselves with attorneys and law firms other than those included in the definition of "we, us, our, firm, attorneys" above. This may include, but is not limited to, local counsel (an attorney licensed in the court in which we intend

to file, and a requirement in many courts for us to litigate if we are not licensed in that state or court) or by entering into a joint prosecution agreement ("JPA") with other firms with similar cases (already on file or otherwise).

Ordinarily, this will not affect your arrangement with us. We will still be your lawyers. We will still be litigating this case. We may just have assistance. Ordinarily, this also does not impact any fees you may owe us, as we agree with any outside counsel what percentage of the overall fee they will receive, depending on the circumstances.

Should we associate with outside counsel, we will notify you in writing via email, unless you indicate another method is preferred. Your response to that email agreeing to our association with outside counsel constitutes a modification of this paragraph to include in the table below the outside counsel with whom we, as if written directly therein.

| Attorney(s) | Reason | Percentage of Total Fee |
|---|---|---|

### Representing Adverse Interest

As long as we represent you, we will not provide services for another person whose interests are adverse to yours within the same subject matter of our relationship or in any claim involving you, without your written consent.

### Legal Fees

You will not have to pay for the firm's services.

We may ask the other party to pay attorneys' fees and costs. You agree that we are entitled to any such money awarded or specified in any settlement agreement as costs and attorneys' fees for our work on this case. You agree that this amount shall be negotiated by us. In so negotiating, we will seek an amount equal to the greater of 1) the firm's hourly rate (currently $650/hour) times hours worked **("base lodestar amount")**, 2) our actual costs plus one-third (1/3) of the full amount of any settlement or judgment, or 3) in case in which your damages are primarily or exclusively statutory in nature, the difference between the total settlement amount and your maximum permitted statutory damages.

Should any award be provided in a "lump sum" payment without separating out attorneys' fees and costs, it is assumed that our fees are the greater of 1) the firm's hourly rate (currently $650/hour) times hours worked **("base lodestar amount")**, 2) our actual costs plus one-third (1/3) of the full amount of any settlement or judgment, or 3) in a case in which your damages are primarily or exclusively statutory in nature, the difference between the total settlement amount and your maximum permitted statutory damages.

It is expressly understood that in the event that the attorneys are unsuccessful in recovering money in this action, **you will not be responsible to reimburse the attorneys for any out of pocket costs or legal fees**.

You understand that the firm may be making a fee application to the Court to recover attorneys' fees and costs associated with this matter. You agree to fully cooperate with the firm with respect to all fee applications.

Should the matter be certified as a class or collective action (including certification for the purposes of settlement only), the Court will be required to approve any settlement. In such a circumstance, the firm shall be entitled only to those fees approved by the Court, in the form prescribed by the Court (e.g. to be paid separately or out of the settlement fund).

If a matter brought as a class action at any point ceases to be a class action (such as through denial of class certification), the firm may elect to withdraw from representing you for your individual claim. You owe the firm nothing in such a circumstance. Should the firm not elect to withdraw, the provisions of this agreement remain in force as applicable to individual claims.

We record and calculate the time spent for all services rendered in increments of on tenth of an hour (1/10). This includes telephone calls (minimum charge of .2 hours), preparing and reviewing letters, documents or other correspondence (minimum charge of .3 hours), travel time to and from meetings and the Court, legal research, preparation of pleadings and other related documents, negotiations and any other services relating to this matter.

### Settlement

We will not settle any matter without your approval. We will notify you immediately of the terms of any reasonable settlement offers we receive. You have the absolute right to accept or reject any settlement offer. If you do not respond to three attempted communications (regarding a settlement offer) from this office – including the sending of a certified letter – then we can accept and sign the agreement and release on behalf of the client.

While you retain the right to accept any settlement offer from defendant, you further agree that if you accept a settlement offer against the written advice of the firm, and the settlement offer does not provide for a payment of attorney's fees equaling or exceeding the base lodestar amount, you will be responsible for payment of our base lodestar amount.

### Tax Treatment

**You understand that this firm is not a tax advisor and has not and will not give tax advice as to the tax consequences of any recovery in this matter. The firm recommends that you seek advice of an accountant or other tax professional for this purpose. This is especially so in light of the 2017 Tax Bill. In some situations, attorneys' fees may not be deductible. Please check with your accountant.** _RW_

### Terminating the Representation

You have the right to discharge us at any time by putting your decision in writing and mailing it to our offices. In that event, you agree to pay for services rendered up to the date of

discharge. If we are your attorneys of record in any proceeding, you will sign and return a substitution-of-attorney form as soon as you receive it from us.

We may withdraw from your representation at any time prior to the filing of any formal legal proceeding before a court or other judicial or quasi-judicial body, with no costs due from you to us. However, should there be a deadline of which we are aware, we will endeavor to assist you in identifying new counsel, or take whatever steps necessary to preserve, or assist you in preserving, those deadlines, prior to withdrawal. This paragraph does not limit our ability to withdraw subsequent to initiating a formal legal proceeding on grounds supported in law or in equity.

We may mutually agree to terminate the attorney-client relationship, in which case such an agreement needs to be made in a writing signed by both you and the firm. Should we mutually agree to terminate the relationship, you will owe us nothing.

## Retention of Closed Files

If you request, when our representation ends, we will promptly return to you all of your papers and property, whether you have paid for them or not.

## No Guarantees

We do not guarantee any particular result. Any opinion we offer is not a guarantee.

## Entire Agreement

This document contains our entire agreement. There are no other promises, statements, or agreements about the services we will perform.

## No Oral Modifications

Any modifications to this agreement must be in writing and sign by both of parties. Oral modifications will not be valid.

## Severability

If any part of this agreement is held to be invalid, the rest of the agreement remains in effect.

## Applicable Law

The laws of the State of New Jersey will govern the interpretation of this agreement.

## Child Support Judgment Search

**Pursuant to New Jersey law (N.J.S.A. 2A:17-56.23b) law firms are required to perform a Child Support Judgment Search prior to releasing any funds received on behalf of a client via settlement or judgment. If the search reveals that, a child support judgment**

exist then that judgment must be satisfied out of the "Net Proceeds" before any funds can be released to the client. The statute defines "Net Proceeds" as any amount of money, in excess of $2,000, payable to the prevailing party or beneficiary after attorney fees, witness fees, court fees, fees for health care providers, etc. The statute also provides that the cost of the Judgment Search (approximately $10.00 per person) is chargeable against the net proceeds as a cost of settlement. This firm will comply with the requirements of this statute.

<u>**Effective Date**</u>

This agreement will take effect upon the signing by both of us.

AGREED: _Rashad Walston_
Rashad Walston (Dec 19, 2023 19:18 CST)
RASHAD WALSTON

Dated: 19/12/2023

THE GLAPION LAW FIRM LLC

AGREED: _____
Jeremy M. Glapion
THE GLAPION LAW FIRM

Dated: 19/12/2023

Duties of a Class Representative

1. A class representative represents the interests of all members of the class in litigation to recover money damages for the class.

2. A class representative must have claims that are typical of those of the class, and thus involve common issues of law or of fact shared with all other class members.

3. A class representative always considers the interests of the class just as the class representative would consider his or her own interests.

4. A class representative preserves all documents (including e-mail) and physical evidence that currently exists or may come to exist during the pendency of the litigation that are or may become relevant to the litigation and understands that the failure to so preserve (e.g., by sending to counsel for preservation) may result in legal sanctions against the class representative, up to and including monetary penalties or the dismissal of the class representative's claim(s).

5. A class representative refrains from discussing the case in any public forum, including on social media such as Facebook or Twitter, recognizing that there is a high likelihood that any such public comments will end up before the Court and may jeopardize the class representative's ability to represent the class.

6. A class representative participates actively in the lawsuit, such as by testifying at deposition and trial, answering written interrogatories, and by keeping aware of the status and progress of the lawsuit.

7. A class representative recognizes and accepts that any resolution of the lawsuit, such as by settlement or dismissal, is subject to court approval, and must be in the best interests of the class as a whole.

8. A class representative accepts the possibility that, in the event the case is lost, the court may assess certain of defendants' costs of litigation against the class representatives. To the extent permitted by law and the applicable Rules of Professional Responsibility, however, Attorneys will pay these costs.

9. A class representative is not required to be particularly sophisticated or knowledgeable with respect to the subject of the lawsuit. However, the class representative should be interested, on a continuous basis, in the progress of the lawsuit, and must provide class counsel and the court with all relevant facts of which the class representative is aware.

10. A class representative volunteers to represent many other people with similar claims and damages, because the class representative believes that it is important that all benefit from the lawsuit equally because a class lawsuit will save time, money, and effort, and thus will benefit all parties and the court, as well as because the class action is an important tool to assure compliance with the law, applicable standards and duties of care, and to ensure just compensation to all those similarly situated.

I have reviewed and acknowledge my duties as a class representative in these proceedings.

Dated: 19/12/2023

Signed: _Rashad Walston_
Rashad Walston (Dec 19, 2023 19:18 CST)

Printed Name: Rashad Walston

# Updated Rep Agreement & Class Duties Form

Final Audit Report 2023-12-20

| | |
|---|---|
| Created: | 2023-12-19 |
| By: | Jeremy Glapion (jmg@glapionlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAABFiSJcWQYA8IL7IAnuCGvlF7fg2anK3B |

## "Updated Rep Agreement & Class Duties Form" History



Adobe Acrobat Sign

# EXHIBIT D

 **Gmail**

Jeremy Glapion <jmg@glapionlaw.com>

---

## National Retail Solutions and Rashad Walston

---

**Jeremy Glapion** <jmg@glapionlaw.com>
To: Alison R <Alison.Ellis@hklaw.com>
Cc: Abraham J <Abe.Colman@hklaw.com>

Wed, Jan 3, 2024 at 1:47 PM

Alison:

I have been doing this awhile, and this is the first time a potential defendant has tried the "we accepted your client's pro se offer before he revoked it!" approach to avoid a suit, rather than just providing the exculpatory evidence I've been told is forthcoming. I believe this tells me all I need to know to proceed with our suit.

In any event, your letter was not an unequivocal acceptance of any previous demand. It was instead expressly "contingent" on additional terms, and further requested confirmation. For clarity, we reject the amount, decline those terms, and do not confirm.

Further of note, the offer to which you refer—sent on October 19, 2023—expressly required acceptance within five days of delivery. I also believe, though I need to confirm, that your client responded to my client's letter with a significantly lower amount, thereby rejecting the original demand.

In any event, your client's offer is rejected, any demands your client believes to be outstanding and acceptable are, again, unequivocally withdrawn, and we will not be entertaining any further individual settlement offers.

Finally, as a result of your client's approach to this matter, we no longer intend to wait until January 5.

Thank you,

Jeremy

--



**Jeremy M. Glapion**
Partner

jmg@glapionlaw.com | 732.455.9737

Glapion Law Firm | www.glapionlaw.com
1704 Maxwell Drive
Wall, NJ 07719

[Quoted text hidden]

 **Gmail**

Jeremy Glapion <jmg@glapionlaw.com>

---

## National Retail Solutions and Rashad Walston

---

**Jeremy Glapion** <jmg@glapionlaw.com>
To: Alison R <Alison.Ellis@hklaw.com>
Cc: Abraham J <Abe.Colman@hklaw.com>

Wed, Jan 3, 2024 at 2:56 PM

Hi Alison:

I will not get into privileged communications between my client and I. That said, I believe I have adequately responded to your question and offer. My *client* rejects your $9,800 offer. We will not counter nor entertain further individual offers without a material change in law or fact, as my client intends to focus his efforts on representing the forthcoming putative class.

Best,
Jeremy

--



**Jeremy M. Glapion**
Partner

jmg@glapionlaw.com | 732.455.9737

Glapion Law Firm | www.glapionlaw.com
1704 Maxwell Drive
Wall, NJ 07719

[Quoted text hidden]



Jeremy Glapion <jmg@glapionlaw.com>

---

## Walston v. NRS

---

**Jeremy Glapion** <jmg@glapionlaw.com>                                             Wed, Jun 12, 2024 at 12:07 PM
To: Ryan Watstein <Ryan@wtlaw.com>

Ryan:

Thank you for your email. Please see my responses.

> Thus, and in line with the Court's stated desire for the parties to resolve this case on an individual basis, please convey that NRS offers $35,000 to confidentially settle his claims, with $25k to him and $10k to counsel—unless Mr. Walston decides to split the amount differently.  This offer will remain open until EOD next Wednesday.

There was no stated desire for the Parties to resolve this case individually. Just as the Court asked me if my client would resolve individually, it asked your client if it would resolve on a class-wide basis. ==Yesterday I conferred with my client as requested by the Court and confirmed there is zero interest in an individual settlement at this point. I intend to notify the court accordingly.==

> It is hard to see why Mr. Walston wouldn't prefer this outcome, given his initial $9,800 demand.

Because not everyone is selfishly only out for themselves. I believe Mr. Walston made this clear when you pressed him on this point at the deposition.

> Based on our preliminary research, it will take at least a year to go through that process and cost at least tens of thousands of dollars, which will reduce his potential individual recovery accordingly.

Based on my research it will take several months. This is not ideal, but I imagine this is in part why your client chose to use a foreign entity to do its bidding. I further imagine, however, your client has enough relevant documents for class certification, though it has continued its refusal to produce anything.

> First, no one else has complained about NRS's calls, which NRS doesn't conduct anymore out of an abundance of caution.

So, give us the class data that we have repeatedly requested. Assuming spotless internal record keeping, few complaints suggest a small class. I have been consistent with both you and previous counsel that my goal here isn't to make you face a class action just for the sake of facing a class action. If the class is tiny or there is exculpatory evidence (e.g. consent), let me know.

> Second, while we sympathize with Plaintiff's annoyance at the calls he erroneously received, NRS is not a bad actor.  In fact, its owners donate most of their proceeds to charitable causes.

If we are trying to be candid, let's be candid. These calls were not "erroneously received". Your client gave my client's number—which it obtained from some third party database—to Voicelogic to do exactly what it did. Also, your client's "owner" is IDT—which paid for and owend the telephone number your client used on the calls. I do not believe IDT donates its proceeds to charitable causes.

> Third, as the judge noted, Plaintiff has a "long way to go" in this case.  There are substantial barriers to any recovery on the merits and at class certification.  Very few of these cases are certified, and we've

never had one certified in 400+ TCPA class actions.

I do not believe the Judge is privy to just how straightforward this case is.

As for your track record, you're an excellent attorney. But my track record is similarly strong. I have never had class cert denied, and several of my TCPA class cases are among the largest per-class member recovery in the history of the statute. So, something will have to give here.

> I think it would be helpful to have a settlement conference with a Magistrate Judge.  If your client still
> wants to pursue class claims after that, fine.  But I think all parties would benefit from taking this in front
> of a neutral.

My client still wants to pursue class claims *now*. Nothing has changed, and your client's approach to settlement has been in bad faith. Not only does my client not want to settle individually, he does not trust even engaging in individual settlement conversations with your client, because the expectation is that you would just use that against him in class cert if those conversations failed.

You took your shot at him at your deposition right from the outset and sought to drive a wedge between client and counsel. You missed. I anticipate your Motion to Enforce will be denied, and I imagine the Magistrate will call us in front of him anyway to understand why your client has produced 0 documents since April 17.

If you want to cut through the nonsense and get to the bottom of this, let's do that then. If you give us the class data—the lists of numbers (or at least count of numbers) you gave to VoiceLogic for the purpose of making prerecords; the prerecord transcripts or files themselves; and whatever campaign metrics showing connect/etc VoiceLogic provides—I will strongly encourage my client to agree to a settlement conference. Note: nothing in this is intended to abrogate requests served or limit those requests in any way.

Just as your client doesn't want to settle as a class, my client does not want to settle individually. So, I'd be potentially open to a settlement conference where we are both bringing positions on settlement the other side does not want to do, but I cannot do that without class data.

Best,
Jeremy

--



**Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

[Quoted text hidden]

 **Jeremy Glapion <jmg@glapionlaw.com>**

---

## Walston - Rule 37 Deficiency to Plaintiff

**Jeremy Glapion** <jmg@glapionlaw.com>                                      Tue, Aug 13, 2024 at 9:04 PM
To: Patrick Fitzgerald <pfitzgerald@wtlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Hi Pat and Ryan:

I am happy to work with you on this, but it's a bit of a weird hill to fight on.

- We again disagree with your characterization of Mr. Walston's testimony. He never said anything close to "counsel controls settlement".
- *Lowrey*, the case you cited, notes that the duty to relay settlement offers does not apply if it has been rejected in advance.
- I am truly not sure how many ways I can tell you this, but the client *has no interest in an individual settlement*. This is truly a "no means no" situation. This is not a negotiating tactic. Your settlement offers have been rejected because my client is doing his job as class rep. He told you this at his depo, and was quite clear on his reasoning (and it had nothing to do with fear of fees). 163:10-164:7.
- Again, without getting into privileged communications, I will also confirm that rejection of your previous settlement offers was re-confirmed subsequent to the amendment.
- It is unclear to what "additional evidence" you refer at the beginning of page 2 suggesting there are additional terms relevant to adequacy. If there are other terms about which you are concerned, I will look at the agreement for them and disclose them, as I did with the settlement terms.
- The suggestion that I took the time to amend the agreement and re-produce it, but really just kept the "offending" provision in, is silly. If I were that unethical, wouldn't I have just redacted this provision in the December 19 agreement?
- More broadly, all of the cases you cited make clear that issues with the retainer agreement can be cured by amendment. That's what we did in an abundance of caution. I'm not sure what more you want.

I am available to discuss, if needed, tomorrow (8/14) between 1-3 pm eastern and Friday between 11 am and 3 pm.

--

 **Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

On Tue, Aug 13, 2024 at 8:01 PM, Patrick Fitzgerald <pfitzgerald@wtlaw.com> wrote:

> Jeremy,
>
> Please see the attached regarding the engagement letters.
>
> Pat
>
> **Patrick J. Fitzgerald (bio)**
>
> WATSTEIN TEREPKA LLP
>
> P: (404) 400-3382

# EXHIBIT E



**Jeremy Glapion <jmg@glapionlaw.com>**

---

## Re: (NRS) Rule 37 Call

Patrick Fitzgerald <pfitzgerald@wtlaw.com>                     Sun, Apr 21, 2024 at 2:00 PM
To: Jeremy Glapion <jmg@glapionlaw.com>
Cc: "jeff@jgbrownlaw.com" <jeff@jgbrownlaw.com>, Ryan Watstein <Ryan@wtlaw.com>

Hi Jeremy,

Regarding RFP 7:  We're going to ask our client, but they're observing Passover, so we won't have an answer before Thursday.  Also, our client has made appropriate arrangements to preserve evidence.


Pat

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA <sup>LLP</sup>

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Friday, April 19, 2024 at 4:04 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** jeff@jgbrownlaw.com <jeff@jgbrownlaw.com>, Ryan Watstein <Ryan@wtlaw.com>
**Subject:** Re: (NRS) Rule 37 Call

[Warning – external]

Pat & Ryan:


Pleasure speaking with you. I am following up to memorialize a few points. Please let me know if you disagree or recall differently, or if I missed anything.

- Regarding RFP 7, asking for the identities of persons who made the calls to my client, I understand that your client does not have that data at this time. I suggested, however, providing information on the names of the persons who, at minimum, had access to the VoiceLogic account from which it seems some of the calls emanated. I believe this is fairly contemplated in the request, so please let me know if your client will produce this information.
- You agreed to amend the responses to clarify:

    - RFP 8 - the only responsive document is NRS 15-17
    - Nothing is being intentionally withheld on the basis of the objections

- I indicated, regarding my RFPs, that we would not be producing the representation agreement, and you indicated a willingness to provide case law supporting its production and we would discuss.

In addition, although not discussed on the call, I remain concern about the record keeping here. Though I hope this was already done on or before January 3, 2024, please take all necessary steps to preserve all call data covering the class

period, including the data kept with any third-party (such as VoiceLogic).


Thank you,

Jeremy



--

| | **Jeremy M. Glapion** |
|---|---|
| Image removed by sender. | Partner |
| | Glapion Law Firm |
| | 1704 Maxwell Drive |
| | Wall, New Jersey 07719 |

[Quoted text hidden]

# EXHIBIT F

 **Gmail**

**Jeremy Glapion <jmg@glapionlaw.com>**

---

## Walston - Rule 37 Deficiency to Plaintiff
21 messages

---

**Patrick Fitzgerald** <pfitzgerald@wtlaw.com>                                    Tue, Jul 23, 2024 at 10:05 PM
To: Jeremy Glapion <jmg@glapionlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>

Hi Jeremy,

We're following up regarding Plaintiff's refusal to produce his engagement agreement in response to Request for Production No. 41.  As explained below, Mr. Walston's deposition testimony establishes that the agreement is relevant to Mr. Walston and your adequacy to represent the proposed class and that such information cannot be obtained by other means.  Accordingly, we request that Plaintiff produce the agreement in its entirety.

As to relevancy, during Mr. Walston's deposition, he testified that the engagement agreement gave counsel authority to approve or reject settlements.  Walston Dep. 166:23-168:14.  The agreement is therefore relevant to Mr. Walston's adequacy as class representative.  *See In re Ocean Bank*, 2007 WL 1063042, at 7 (N.D. Ill. Apr. 9, 2007) (noting that if class counsel can veto any settlement or insist on settling when the named representative wants to go to trial, then the named representative is arguably inadequate because he cannot make critical decisions about the litigation).

Counsel's control over settlement also raises a class loyalty concern, which independently establishes relevance.  Specifically, an engagement letter that denies a plaintiff authority to settle violates Ill. Sup. Ct. R. 1.2(a).  That would create a serious question as to whether class counsel can represent the class loyally.  *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) ("Misconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification.").

Mr. Walston was also unable to confidently testify about other contents of the engagement letter, establishing that its production is necessary.  For example, Mr. Walston testified that he was "not 100 percent sure" whether he could settle individually without incurring a monetary penalty.  Walston Dep. 166:23-167:4.

As Defendant has established both relevance and necessity, your reliance on *Blaise v. Transworld Sys. Inc.*, is misplaced.  2022 WL 3026946, at *2 (N.D. Ill. Aug. 1, 2022).

Given this context, we request the prompt production of the engagement letter.  If Plaintiff refuses, please provide your availability to meet and confer regarding Request No. 41.

Sincerely,


**Patrick J. Fitzgerald (bio)**
WATSTEIN TEREPKA LLP
P: (404) 400-3382
pfitzgerald@wtlaw.com
www.wtlaw.com

---

**Jeremy Glapion** <jmg@glapionlaw.com>                                    Wed, Jul 24, 2024 at 10:09 AM
To: Jeffrey Brown <jeff@jgbrownlaw.com>

--



**Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

[Quoted text hidden]

**Jeremy Glapion** <jmg@glapionlaw.com>                    Wed, Jul 24, 2024 at 10:13 AM
To: Patrick Fitzgerald <pfitzgerald@wtlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Hi Pat:

Received. While I disagree with your characterization of Plaintiff's testimony (he clearly said he wasn't 100% sure), we are discussing on this end what, if anything, we are willing to produce absent a court order. I will circle back hopefully later today.

Best,
Jeremy


--



**Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

[Quoted text hidden]

**Jeffrey Brown** <jeff@jgbrownlaw.com>                    Wed, Jul 24, 2024 at 11:18 AM
To: Jeremy Glapion <jmg@glapionlaw.com>

On Jul 24, 2024, at 9:09 AM, Jeremy Glapion <jmg@glapionlaw.com> wrote:

I don't agree with their characterization and I suspect they'd back down if we fought on this, but we really have nothing to hide, imo.

Any issues with producing the attached?

[Quoted text hidden]

[Quoted text hidden]

&lt;Updated Rep_Redacted.pdf&gt;

---

**Jeremy Glapion** &lt;jmg@glapionlaw.com&gt;                    Wed, Jul 24, 2024 at 11:29 AM
To: Jeffrey Brown &lt;jeff@jgbrownlaw.com&gt;

█████████████████████████████████████████████████████████████████

--



**Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

On Wed, Jul 24, 2024 at 11:18 AM, Jeffrey Brown &lt;jeff@jgbrownlaw.com&gt; wrote:

███████████████████████████████████████████████████████████████████

On Jul 24, 2024, at 9:09 AM, Jeremy Glapion &lt;jmg@glapionlaw.com&gt; wrote:

██████████████████████████████████████████████████████████████

---

**Jeffrey Brown** &lt;jeff@jgbrownlaw.com&gt;                    Wed, Jul 24, 2024 at 11:50 AM
To: Jeremy Glapion &lt;jmg@glapionlaw.com&gt;

██████████████████████████████████████████████████████████████

JEFFREY GRANT BROWN, P.C.
ATTORNEY AT LAW
65 West Jackson Blvd.
Suite 107
Chicago, Illinois  60604
Jeff@jgbrownlaw.com
Tel:  312.789.9700
Fax:  312.789.9702
www.JGBrownLaw.com


On Jul 24, 2024, at 10:29 AM, Jeremy Glapion <jmg@glapionlaw.com> wrote:

---

**Jeremy Glapion** <jmg@glapionlaw.com>                                          Wed, Jul 24, 2024 at 12:06 PM
To: Patrick Fitzgerald <pfitzgerald@wtlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Hi Pat:

Without waiving our disagreement with your position, we would be willing to produce a redacted version of the operative representation agreement and its attached "Duties of a Class Representative" document, that leaves unredacted:

1. The opening paragraph showing the Parties to the agreement
2. The section headers
3. Parts necessary for definitions of terms used in other unredacted sections
4. Parts related to any situations dealing with potential reimbursement or lack thereof from Plaintiff to Counsel
5. Parts related to settlement and authority to settle

Note: the agreement I am offering to produce is dated December 19, 2023. It replaced a previous version of the agreement, dated November 21, 2023. The two agreements are identical in all relevant respects.

Let me know if this is acceptable or we need to discuss further.

--



**Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737


On Tue, Jul 23, 2024 at 10:05 PM, Patrick Fitzgerald <pfitzgerald@wtlaw.com> wrote:
[Quoted text hidden]

---

**Patrick Fitzgerald** <pfitzgerald@wtlaw.com>                                   Mon, Jul 29, 2024 at 8:01 PM
To: Jeremy Glapion <jmg@glapionlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Hi Jeremy,

Reserving our right to demand full production, your proposal works.

Pat


**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA LLP

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Wednesday, July 24, 2024 at 12:07 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

Hi Pat:


Without waiving our disagreement with your position, we would be willing to produce a redacted version of the operative representation agreement and its attached "Duties of a Class Representative" document, that leaves unredacted:

1. The opening paragraph showing the Parties to the agreement
2. The section headers
3. Parts necessary for definitions of terms used in other unredacted sections
4. Parts related to any situations dealing with potential reimbursement or lack thereof from Plaintiff to Counsel
5. Parts related to settlement and authority to settle

Note: the agreement I am offering to produce is dated December 19, 2023. It replaced a previous version of the agreement, dated November 21, 2023. The two agreements are identical in all relevant respects.


Let me know if this is acceptable or we need to discuss further.

Image removed by sender.


--

Image removed by sender.

**Jeremy M. Glapion**

Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

[Quoted text hidden]

**Jeremy Glapion** <jmg@glapionlaw.com>                    Mon, Jul 29, 2024 at 10:02 PM
To: Patrick Fitzgerald <pfitzgerald@wtlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

OK great. I will work to get this to you this week.

--



**Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

On Mon, Jul 29, 2024 at 8:01 PM, Patrick Fitzgerald <pfitzgerald@wtlaw.com> wrote:

Hi Jeremy,

Reserving our right to demand full production, your proposal works.

Pat

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA <sup>LLP</sup>

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Wednesday, July 24, 2024 at 12:07 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

Hi Pat:

Without waiving our disagreement with your position, we would be willing to produce a redacted version of the operative representation agreement and its attached "Duties of a Class Representative" document, that leaves unredacted:

1. The opening paragraph showing the Parties to the agreement
2. The section headers
3. Parts necessary for definitions of terms used in other unredacted sections
4. Parts related to any situations dealing with potential reimbursement or lack thereof from Plaintiff to Counsel
5. Parts related to settlement and authority to settle

Note: the agreement I am offering to produce is dated December 19, 2023. It replaced a previous version of the agreement, dated November 21, 2023. The two agreements are identical in all relevant respects.

Let me know if this is acceptable or we need to discuss further.

--

**Jeremy M. Glapion**

Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

[Quoted text hidden]

---

**Patrick Fitzgerald** <pfitzgerald@wtlaw.com>                    Tue, Aug 13, 2024 at 8:01 PM
To: Jeremy Glapion <jmg@glapionlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Jeremy,

Please see the attached regarding the engagement letters.

Pat

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA LLP

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Monday, July 29, 2024 at 10:02 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

OK great. I will work to get this to you this week.

Image removed by sender.

--

Image removed by sender. | **Jeremy M. Glapion**
[Quoted text hidden]

[Quoted text hidden]

---

📄 **Walston adv. NRS - Deficiency Letter.pdf**
144K

---

**Jeremy Glapion** <jmg@glapionlaw.com>                    Tue, Aug 13, 2024 at 9:04 PM
To: Patrick Fitzgerald <pfitzgerald@wtlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Hi Pat and Ryan:

I am happy to work with you on this, but it's a bit of a weird hill to fight on.

- We again disagree with your characterization of Mr. Walston's testimony. He never said anything close to "counsel controls settlement".
- *Lowrey*, the case you cited, notes that the duty to relay settlement offers does not apply if it has been rejected in advance.
- I am truly not sure how many ways I can tell you this, but the client *has no interest in an individual settlement*. This is truly a "no means no" situation. This is not a negotiating tactic. Your settlement offers have been rejected because my client is doing his job as class rep. He told you this at his depo, and was quite clear on his reasoning (and it had nothing to do with fear of fees). 163:10-164:7.
- Again, without getting into privileged communications, I will also confirm that rejection of your previous settlement offers was re-confirmed subsequent to the amendment.
- It is unclear to what "additional evidence" you refer at the beginning of page 2 suggesting there are additional terms relevant to adequacy. If there are other terms about which you are concerned, I will look at the agreement for them and disclose them, as I did with the settlement terms.
- The suggestion that I took the time to amend the agreement and re-produce it, but really just kept the "offending" provision in, is silly. If I were that unethical, wouldn't I have just redacted this provision in the December 19 agreement?
- More broadly, all of the cases you cited make clear that issues with the retainer agreement can be cured by amendment. That's what we did in an abundance of caution. I'm not sure what more you want.

I am available to discuss, if needed, tomorrow (8/14) between 1-3 pm eastern and Friday between 11 am and 3 pm.

--

 | **Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

On Tue, Aug 13, 2024 at 8:01 PM, Patrick Fitzgerald <pfitzgerald@wtlaw.com> wrote:

Jeremy,

Please see the attached regarding the engagement letters.

Pat

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA <sup>LLP</sup>

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Monday, July 29, 2024 at 10:02 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

OK great. I will work to get this to you this week.

[Quoted text hidden]
[Quoted text hidden]

---

**Patrick Fitzgerald** <pfitzgerald@wtlaw.com>                    Thu, Aug 15, 2024 at 8:47 PM
To: Jeremy Glapion <jmg@glapionlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Jeremy,

Our position is that we've made a sufficient showing to obtain the engagement letter.  I'm available to jump on a call tomorrow at 230, let me know if that works.

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA <sup>LLP</sup>

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Tuesday, August 13, 2024 at 9:04 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

Hi Pat and Ryan:


I am happy to work with you on this, but it's a bit of a weird hill to fight on.

- We again disagree with your characterization of Mr. Walston's testimony. He never said anything close to "counsel controls settlement".
- *Lowrey*, the case you cited, notes that the duty to relay settlement offers does not apply if it has been rejected in advance.
- I am truly not sure how many ways I can tell you this, but the client *has no interest in an individual settlement*. This is truly a "no means no" situation. This is not a negotiating tactic. Your settlement offers have been rejected because my client is doing his job as class rep. He told you this at his depo, and was quite clear on his reasoning (and it had nothing to do with fear of fees). 163:10-164:7.
- Again, without getting into privileged communications, I will also confirm that rejection of your previous settlement offers was re-confirmed subsequent to the amendment.
- It is unclear to what "additional evidence" you refer at the beginning of page 2 suggesting there are additional terms relevant to adequacy. If there are other terms about which you are concerned, I will look at the agreement for them and disclose them, as I did with the settlement terms.
- The suggestion that I took the time to amend the agreement and re-produce it, but really just kept the "offending" provision in, is silly. If I were that unethical, wouldn't I have just redacted this provision in the December 19 agreement?
- More broadly, all of the cases you cited make clear that issues with the retainer agreement can be cured by amendment. That's what we did in an abundance of caution. I'm not sure what more you want.

I am available to discuss, if needed, tomorrow (8/14) between 1-3 pm eastern and Friday between 11 am and 3 pm.


--



**Jeremy M. Glapion**

Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

[Quoted text hidden]




---

Jeremy Glapion <jmg@glapionlaw.com>                                    Thu, Aug 15, 2024 at 8:51 PM
To: Patrick Fitzgerald <pfitzgerald@wtlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

That works for me

--



**Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

On Thu, Aug 15, 2024 at 8:47 PM, Patrick Fitzgerald <pfitzgerald@wtlaw.com> wrote:

Jeremy,

Our position is that we've made a sufficient showing to obtain the engagement letter. I'm available to jump on a call tomorrow at 230, let me know if that works.

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA LLP

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Tuesday, August 13, 2024 at 9:04 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

Hi Pat and Ryan:

I am happy to work with you on this, but it's a bit of a weird hill to fight on.

- We again disagree with your characterization of Mr. Walston's testimony. He never said anything close to "counsel controls settlement".
- *Lowrey*, the case you cited, notes that the duty to relay settlement offers does not apply if it has been rejected in advance.
- I am truly not sure how many ways I can tell you this, but the client *has no interest in an individual settlement*. This is truly a "no means no" situation. This is not a negotiating tactic. Your settlement offers have been rejected because my client is doing his job as class rep. He told you this at his depo, and was quite clear on his reasoning (and it had nothing to do with fear of fees). 163:10-164:7.
- Again, without getting into privileged communications, I will also confirm that rejection of your previous settlement offers was re-confirmed subsequent to the amendment.
- It is unclear to what "additional evidence" you refer at the beginning of page 2 suggesting there are additional terms relevant to adequacy. If there are other terms about which you are concerned, I will look at the agreement for them and disclose them, as I did with the settlement terms.
- The suggestion that I took the time to amend the agreement and re-produce it, but really just kept the "offending" provision in, is silly. If I were that unethical, wouldn't I have just redacted this provision in the December

19 agreement?
- More broadly, all of the cases you cited make clear that issues with the retainer agreement can be cured by amendment. That's what we did in an abundance of caution. I'm not sure what more you want.

I am available to discuss, if needed, tomorrow (8/14) between 1-3 pm eastern and Friday between 11 am and 3 pm.

--

**Jeremy M. Glapion**

Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

[Quoted text hidden]

---

**Patrick Fitzgerald** <pfitzgerald@wtlaw.com>                                    Fri, Aug 16, 2024 at 9:51 PM
To: Jeremy Glapion <jmg@glapionlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Hi Jeremy,

Here's the production I mentioned.

Pat

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA LLP

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Thursday, August 15, 2024 at 8:51 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

That works for me

 Image removed by sender.

--

 Image removed by sender. | **Jeremy M. Glapion**

[Quoted text hidden]

[Quoted text hidden]

---

 **NRS000606 - NRS001132.pdf**
2807K

---

**Jeremy Glapion** <jmg@glapionlaw.com>                                    Fri, Aug 16, 2024 at 9:57 PM
To: Patrick Fitzgerald <pfitzgerald@wtlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Hi Pat:

Thank you. There appears to be an error in this production as the majority of the "NRS Product" column appears as the excel error "#Ref!"

Without the native document, I cannot tell why this is, or if this is an error in the conversion from excel to PDF, etc.

Can you look into this?

--

 | **Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

On Fri, Aug 16, 2024 at 9:51 PM, Patrick Fitzgerald <pfitzgerald@wtlaw.com> wrote:

Hi Jeremy,

Here's the production I mentioned.

Pat

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA LLP

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Thursday, August 15, 2024 at 8:51 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

That works for me

[Quoted text hidden]
[Quoted text hidden]

---

**Jeremy Glapion** <jmg@glapionlaw.com>
To: Jeffrey Brown <jeff@jgbrownlaw.com>

Sat, Aug 17, 2024 at 3:42 PM



**Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

---------- Forwarded message ----------
From: Patrick Fitzgerald <pfitzgerald@wtlaw.com>
[Quoted text hidden]

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

--



**Jeremy M. Glapion**

Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

[Quoted text hidden]

---

**Jeff Brown** <jeff@jgbrownlaw.com>                    Sat, Aug 17, 2024 at 10:23 PM
To: Jeremy Glapion <jmg@glapionlaw.com>



On Aug 17, 2024, at 3:42 PM, Jeremy Glapion <jmg@glapionlaw.com> wrote:



[Quoted text hidden]

---

**Patrick Fitzgerald** <pfitzgerald@wtlaw.com>          Sun, Aug 18, 2024 at 12:01 PM
To: Jeremy Glapion <jmg@glapionlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Hi Jeremy,

I have the same error (so it's not an issue converting from Excel to PDF). I asked our IT team for help.

In the meantime, I didn't receive an invite from Veritext for Exhibit Share.

Pat


**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA LLP

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Friday, August 16, 2024 at 9:58 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>

**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

<span style="color:red">[Warning – external]</span>

Hi Pat:

<span style="color:purple">Thank you. There appears to be an error in this production as the majority of the "NRS Product" column appears as the excel error "#Ref!"</span>

<span style="color:purple">Without the native document, I cannot tell why this is, or if this is an error in the conversion from excel to PDF, etc.</span>

<span style="color:purple">Can you look into this?</span>



--

 | **Jeremy M. Glapion**

[Quoted text hidden]


[Quoted text hidden]

---

**Jeremy Glapion** <jmg@glapionlaw.com>                Sun, Aug 18, 2024 at 12:08 PM
To: Patrick Fitzgerald <pfitzgerald@wtlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

I did not either. I followed up, but if it does not come through I will send you and Ryan the three documents I intend to use (as well as the Court reporter so he can pre-mark them). I won't copy Mr. Ash, however, so I will leave it to you to get those to him/the client.

--

 **Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737


<span style="color:purple">On Sun, Aug 18, 2024 at 12:01 PM, Patrick Fitzgerald <pfitzgerald@wtlaw.com> wrote:</span>

Hi Jeremy,

I have the same error (so it's not an issue converting from Excel to PDF). I asked our IT team for help.

<span style="color:purple">In the meantime, I didn't receive an invite from Veritext for Exhibit Share.</span>

<span style="color:purple">Pat</span>

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA LLP

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Friday, August 16, 2024 at 9:58 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

Hi Pat:

Thank you. There appears to be an error in this production as the majority of the "NRS Product" column appears as the excel error "#Ref!"

Without the native document, I cannot tell why this is, or if this is an error in the conversion from excel to PDF, etc.

Can you look into this?

[Quoted text hidden]
[Quoted text hidden]

---

**Patrick Fitzgerald** <pfitzgerald@wtlaw.com>                    Tue, Aug 20, 2024 at 8:15 AM
To: Jeremy Glapion <jmg@glapionlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Regarding the engagement letter: We cannot agree to your proposal limiting our using the engagement letter to identify terms that give rise to a conflict within a certain amount of time. Defendant is entitled to the unredacted agreement, and we cannot predict the relevance of the terms sight-unseen. Please let us know by Wednesday if Defendant will produce the unredacted letter.

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA LLP
P: (404) 400-3382
pfitzgerald@wtlaw.com
www.wtlaw.com

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Thursday, August 15, 2024 at 8:51 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

That works for me

Image removed by sender.

--

Image removed by sender. | **Jeremy M. Glapion**

[Quoted text hidden]

[Quoted text hidden]

---

**Jeremy Glapion** <jmg@glapionlaw.com>                          Wed, Aug 21, 2024 at 1:56 PM
To: Patrick Fitzgerald <pfitzgerald@wtlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>

Hi Pat:

Attached, please find the unredacted representation agreement, as well as Plaintiff's Fourth Set of Interrogatories (8 & 9).
I will calendar these as due on September 20, 2024.

--

 | **Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

On Tue, Aug 20, 2024 at 8:15 AM, Patrick Fitzgerald <pfitzgerald@wtlaw.com> wrote:
Regarding the engagement letter: We cannot agree to your proposal limiting our using the engagement
letter to identify terms that give rise to a conflict within a certain amount of time. Defendant is entitled to
the unredacted agreement, and we cannot predict the relevance of the terms sight-unseen. Please let us
know by Wednesday if Defendant will produce the unredacted letter.

**Patrick J. Fitzgerald (bio)**
WATSTEIN TEREPKA LLP
P: (404) 400-3382
pfitzgerald@wtlaw.com
www.wtlaw.com

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Thursday, August 15, 2024 at 8:51 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, Jeffrey Brown <jeff@jgbrownlaw.com>
**Subject:** Re: Walston - Rule 37 Deficiency to Plaintiff

[Warning – external]

That works for me

[Quoted text hidden]
[Quoted text hidden]

---

**2 attachments**

**RWW1264-1270 - July 30 rep agreement.pdf**
814K

**Plaintiff's Fourth Rogs (8-9).pdf**
95K

# EXHIBIT G

## STANDARD TERMS OF ENGAGEMENT

**I, RASHAD WALSTON,** ("you, your") retain **THE GLAPION LAW FIRM, LLC**, located at 1704 Maxwell Drive, Wall, NJ, ("we, us, our, firm, attorneys"), to represent your interests in a matter against National Retail Solutions, Inc., and any of their affiliates, subsidiaries, related entities, agents and employees thereof for claims based on violations of the Telephone Consumer Protection Act ("TCPA") and other potential claims related to the nuisance telephone calls (such as invasion of privacy) (collectively, "Claims").

Your current mailing address (no PO box) is:

██████████████████████ Chicago, IL 60643

Your telephone number (if an unwanted calls case, the number that received or is receiving the unwanted calls):

█████████ 088

The wireless carrier for the listed number:

Cricket

Your best contact number if it differs from the above:

### Attorney Client Relationship

Your communications with us are protected by our ethical obligation of confidentiality and by the evidentiary rule of attorney-client privilege. You should be open and forthright with us so that we have all information relevant to your representation. Please note that when we represent a legal entity (corporation, limited liability company, or partnership); our attorney-client relationship is with the entity alone and, unless otherwise stated, is not with its officers, directors, shareholders, partners, members, or affiliates.

### Responsibilities

As your attorneys, we have a duty of independent professional judgment, confidentiality, loyalty, and diligence. As our client, you have a duty of cooperation, honesty, and candor.

As your attorneys, we will conduct a full and thorough investigation of your case and proceed, or decline to proceed, accordingly. If, after an investigation, we choose not to pursue this case, we may terminate this agreement. You will owe us nothing.

As your attorneys, we are under no obligation to initiate or defend post-trial motions or post-trial appeals regarding the Claims unless specifically agreed to in writing.

As your attorneys, we retain final decision making authority with respect to matters of strategy, including, but not limited to, whether and how to oppose certain motions; whether and how to raise particular arguments; and whether and how to plead or dismiss particular claims. This list is not exhaustive.

As our client, you have a duty to preserve all documents that are or may become relevant to the litigation. You also have a duty to be reasonably available to answer questions or provide information as necessary.

As our client, you confirm that you have not assigned or transferred, and will not assign or transfer, all or part of your Claims to any person and that you have not signed, and will not sign, any other contingency fee agreement with any other lawyer or law firm with respect to the Claims, while this agreement remains in force.

As our client, you understand and agree that we may ask one or more other law firms to assist us in our representation of you with respect to the Claims, but that we will not do so without obtaining prior written consent from you.

As our client, you confirm that you have provided us with honest information regarding the facts and merits of your case, and have not withheld any information that, in your best judgment, would be relevant to our decision to take this case or our strategy in pursuing this case. _RW_

As our client, you confirm that you took no steps to intentionally manufacture any claim against you, such as by voluntarily subjecting yourself to the behavior about which you now complain (e.g. intentionally soliciting calls you now claim to be unwanted or unsolicited). _RW_

## Electronic Communications

For speed and efficiency, we will commonly use e-mail, cellular telephones and facsimile to communicate with you. However, it is possible that these types of communications could be intercepted or misrouted. By signing this agreement, you consent to these communications.

## Association With Outside Counsel

From time to time, we may choose to associate ourselves with attorneys and law firms other than those included in the definition of "we, us, our, firm, attorneys" above. This may include, but is not limited to, local counsel (an attorney licensed in the court in which we intend

to file, and a requirement in many courts for us to litigate if we are not licensed in that state or court) or by entering into a joint prosecution agreement ("JPA") with other firms with similar cases (already on file or otherwise).

Ordinarily, this will not affect your arrangement with us. We will still be your lawyers. We will still be litigating this case. We may just have assistance. Ordinarily, this also does not impact any fees you may owe us, as we agree with any outside counsel what percentage of the overall fee they will receive, depending on the circumstances.

Should we associate with outside counsel, we will notify you in writing via email, unless you indicate another method is preferred. Your response to that email agreeing to our association with outside counsel constitutes a modification of this paragraph to include in the table below the outside counsel with whom we, as if written directly therein.

| Attorney(s) | Reason | Percentage of Total Fee |
|---|---|---|
| Jeffrey Grant Brown | Local Counsel | 10% |
| Sam Gebrael | Assistance Obtaining Canadian Documents | 0% |

## **Representing Adverse Interest**

As long as we represent you, we will not provide services for another person whose interests are adverse to yours within the same subject matter of our relationship or in any claim involving you, without your written consent.

## **Legal Fees**

You will not have to pay for the firm's services.

We may ask the other party to pay attorneys' fees and costs. You agree that we are entitled to any such money awarded or specified in any settlement agreement as costs and attorneys' fees for our work on this case. You agree that this amount shall be negotiated by us. In so negotiating, we will seek an amount equal to the greater of 1) the firm's hourly rate (currently $650/hour) times hours worked (**"base lodestar amount"**), 2) our actual costs plus one-third (1/3) of the full amount of any settlement or judgment, or 3) in case in which your damages are primarily or exclusively statutory in nature, the difference between the total settlement amount and your maximum permitted statutory damages.

Should any award be provided in a "lump sum" payment without separating out attorneys' fees and costs, it is assumed that our fees are the greater of 1) the firm's hourly rate (currently $650/hour) times hours worked (**"base lodestar amount"**), 2) our actual costs plus one-third (1/3) of the full amount of any settlement or judgment, or 3) in a case in which your damages are primarily or exclusively statutory in nature, the difference between the total settlement amount and your maximum permitted statutory damages.

It is expressly understood that in the event that the attorneys are unsuccessful in recovering money in this action, **you will not be responsible to reimburse the attorneys for any out of pocket costs or legal fees**.

You understand that the firm may be making a fee application to the Court to recover attorneys' fees and costs associated with this matter. You agree to fully cooperate with the firm with respect to all fee applications.

Should the matter be certified as a class or collective action (including certification for the purposes of settlement only), the Court will be required to approve any settlement. In such a circumstance, the firm shall be entitled only to those fees approved by the Court, in the form prescribed by the Court (e.g. to be paid separately or out of the settlement fund).

If a matter brought as a class action at any point ceases to be a class action (such as through denial of class certification), the firm may elect to withdraw from representing you for your individual claim. You owe the firm nothing in such a circumstance. Should the firm not elect to withdraw, the provisions of this agreement remain in force as applicable to individual claims.

We record and calculate the time spent for all services rendered in increments of on tenth of an hour (1/10). This includes telephone calls (minimum charge of .2 hours), preparing and reviewing letters, documents or other correspondence (minimum charge of .3 hours), travel time to and from meetings and the Court, legal research, preparation of pleadings and other related documents, negotiations and any other services relating to this matter.

### Settlement

We will not settle any matter without your approval. We will notify you immediately of the terms of any reasonable settlement offers we receive. You have the absolute right to accept or reject any settlement offer. If you do not respond to three attempted communications (regarding a settlement offer) from this office – including the sending of a certified letter – then we can accept and sign the agreement and release on behalf of the client.

### Tax Treatment

**You understand that this firm is not a tax advisor and has not and will not give tax advice as to the tax consequences of any recovery in this matter. The firm recommends that you seek advice of an accountant or other tax professional for this purpose. This is especially so in light of the 2017 Tax Bill. In some situations, attorneys' fees may not be deductible. Please check with your accountant.** _RW_

### Terminating the Representation

You have the right to discharge us at any time by putting your decision in writing and mailing it to our offices. In that event, you agree to pay for services rendered up to the date of discharge. If we are your attorneys of record in any proceeding, you will sign and return a substitution-of-attorney form as soon as you receive it from us.

We may withdraw from your representation at any time prior to the filing of any formal legal proceeding before a court or other judicial or quasi-judicial body, with no costs due from you to us. However, should there be a deadline of which we are aware, we will endeavor to assist you in identifying new counsel, or take whatever steps necessary to preserve, or assist you in preserving, those deadlines, prior to withdrawal. This paragraph does not limit our ability to withdraw subsequent to initiating a formal legal proceeding on grounds supported in law or in equity.

We may mutually agree to terminate the attorney-client relationship, in which case such an agreement needs to be made in a writing signed by both you and the firm. Should we mutually agree to terminate the relationship, you will owe us nothing.

### Retention of Closed Files

If you request, when our representation ends, we will promptly return to you all of your papers and property, whether you have paid for them or not.

### No Guarantees

We do not guarantee any particular result. Any opinion we offer is not a guarantee.

### Entire Agreement

This document contains our entire agreement. There are no other promises, statements, or agreements about the services we will perform.

### No Oral Modifications

Any modifications to this agreement must be in writing and sign by both of parties. Oral modifications will not be valid.

### Severability

If any part of this agreement is held to be invalid, the rest of the agreement remains in effect.

### Applicable Law

The laws of the State of New Jersey will govern the interpretation of this agreement.

### Child Support Judgment Search

**Pursuant to New Jersey law (N.J.S.A. 2A:17-56.23b) law firms are required to perform a Child Support Judgment Search prior to releasing any funds received on behalf of a client via settlement or judgment. If the search reveals that, a child support judgment exist then that judgment must be satisfied out of the "Net Proceeds" before any funds can be released to the client. The statute defines "Net Proceeds" as any amount of money, in**

**excess of $2,000, payable to the prevailing party or beneficiary after attorney fees, witness fees, court fees, fees for health care providers, etc. The statute also provides that the cost of the Judgment Search (approximately $10.00 per person) is chargeable against the net proceeds as a cost of settlement. This firm will comply with the requirements of this statute.**

## Effective Date

This agreement will take effect upon the signing by both of us.

AGREED: _Rashad Walston_  Dated:  30/07/24
Rashad Walston ( Jul 30, 2024 13:13 CDT)
RASHAD WALSTON

THE GLAPION LAW FIRM LLC

AGREED: _____  Dated:  30/07/24
( Jul 30, 2024 14:54 EDT)
Jeremy M. Glapion
THE GLAPION LAW FIRM

# STANDARD TERMS OF ENGAGEMENT

Final Audit Report 2024-07-30

| | |
|---|---|
| Created: | 2024-07-30 |
| By: | Jeremy Glapion (jmg@glapionlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAEli0OUBK8-7XLGNNCvTCuu-mysxseDF8 |



Adobe Acrobat Sign

# GZJ KDKV'J "

 **Jeremy Glapion <jmg@glapionlaw.com>**

---

## Re: In re Amerilist Subpoena

Patrick Fitzgerald <pfitzgerald@wtlaw.com>                    Mon, Sep 23, 2024 at 10:11 PM
To: Jeremy Glapion <jmg@glapionlaw.com>
Cc: Ryan Watstein <Ryan@wtlaw.com>, "jeff@jgbrownlaw.com" <jeff@jgbrownlaw.com>

Jeremy,

Here's the third report. That's correct regarding Rui and Elie – they both still work for NRS. We'll follow up on your proposal regarding the engagement letter, but we're not inclined to ask our experts to provide you with legal advice.

**Patrick J. Fitzgerald (bio)**

WATSTEIN TEREPKA LLP

P: (404) 400-3382

pfitzgerald@wtlaw.com

www.wtlaw.com

---

**From:** Jeremy Glapion <jmg@glapionlaw.com>
**Date:** Friday, September 20, 2024 at 9:20 PM
**To:** Patrick Fitzgerald <pfitzgerald@wtlaw.com>
**Cc:** Ryan Watstein <Ryan@wtlaw.com>, jeff@jgbrownlaw.com <jeff@jgbrownlaw.com>
**Subject:** Re: In re Amerilist Subpoena

[Warning – external]

Pat:

Thank you for this. Hopefully my method helped. I will wait for the third native document.

Regarding Elie and Rui's health: thank you for the update. I presume Rui is still working for NRS, though, just remotely? I am willing to take his deposition remotely (or even audio only for him if there are issues with screens). Elie similar. I am disinclined to do written deposition questions despite throwing the idea out there, but I am willing to be very flexible on accommodations.

Finally, a quick update: I have prepared an amended representation agreement removing the terms with which you've taken issue. While I recognize (and obviously disagree with) your position that amendment does not cure your perceived issues (which again I disagree are issues), I am open to the idea of allowing your ethics expert to review the redline agreement *before* execution. I went through it carefully trying to figure out *anything* else you guys might take issue with now that I understand your mentality on it, but I'd rather not have to do it again after this.

Let me know.


Best,

Jeremy

Image removed by sender.


--


Image removed by sender. | **Jeremy M. Glapion**

[Quoted text hidden]


[Quoted text hidden]

---

📊 **Copy of NRS_001700, CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER (1).xlsx**
392K

# EXHIBIT I

## AMENDED TERMS OF ENGAGEMENT

I, Rashad Walston, ("you, your") retain **THE GLAPION LAW FIRM, LLC**, located at 1704 Maxwell Drive, Wall, NJ, ("we, us, our, firm, attorneys"), to represent your interests in a matter against National Retail Solutions, Inc., and any of their affiliates, subsidiaries, related entities, agents and employees thereof for claims based on violations of the Telephone Consumer Protection Act ("TCPA") and other potential claims related to the nuisance telephone calls (such as invasion of privacy) (collectively, "Claims").

Your current mailing address (no PO box) is:

████████████████████ hicago, IL 60655

Your telephone number (if an unwanted calls case, the number that received or is receiving the unwanted calls):

██████████ 088

The wireless carrier for the listed number:

Cricket (at the time of calls); Xfinity (current)

Your best contact number if it differs from the above:

### Attorney Client Relationship

Your communications with us are protected by our ethical obligation of confidentiality and by the evidentiary rule of attorney-client privilege. You should be open and forthright with us so that we have all information relevant to your representation. Please note that when we represent a legal entity (corporation, limited liability company, or partnership); our attorney-client relationship is with the entity alone and, unless otherwise stated, is not with its officers, directors, shareholders, partners, members, or affiliates.

### Responsibilities

As your attorneys, we have a duty of independent professional judgment, confidentiality, loyalty, and diligence. As our client, you have a duty of cooperation, honesty, and candor.

As your attorneys, we will conduct a full and thorough investigation of your case and proceed, or decline to proceed, accordingly. If, after an investigation, we choose not to pursue this case, we may terminate this agreement. You will owe us nothing.

As your attorneys, we are under no obligation to initiate or defend post-trial motions or post-trial appeals regarding the Claims unless specifically agreed to in writing.

As our client, you have a duty to preserve all documents that are or may become relevant to the litigation. You also have a duty to be reasonably available to answer questions or provide information as necessary.

As our client, you confirm that you have not assigned or transferred, and will not assign or transfer, all or part of your Claims to any person and that you have not signed, and will not sign, any other contingency fee agreement with any other lawyer or law firm with respect to the Claims, while this agreement remains in force.

As our client, you understand and agree that we may ask one or more other law firms to assist us in our representation of you with respect to the Claims, but that we will not do so without obtaining prior written consent from you.

As our client, you confirm that you have provided us with honest information regarding the facts and merits of your case, and have not withheld any information that, in your best judgment, would be relevant to our decision to take this case or our strategy in pursuing this case. _RW_ (initial)

As our client, you confirm that you took no steps to intentionally manufacture any claim against you, such as by voluntarily subjecting yourself to the behavior about which you now complain (e.g. intentionally soliciting calls you now claim to be unwanted or unsolicited). _RW_ (initial)

## Electronic Communications

For speed and efficiency, we will commonly use e-mail, cellular telephones and facsimile to communicate with you. However, it is possible that these types of communications could be intercepted or misrouted. By signing this agreement, you consent to these communications.

## Association With Outside Counsel

From time to time, we may choose to associate ourselves with attorneys and law firms other than those included in the definition of "we, us, our, firm, attorneys" above. This may include, but is not limited to, local counsel (an attorney licensed in the court in which we intend to file, and a requirement in many courts for us to litigate if we are not licensed in that state or court) or by entering into a joint prosecution agreement ("JPA") with other firms with similar cases (already on file or otherwise).

Ordinarily, this will not affect your arrangement with us. We will still be your lawyers. We will still be litigating this case. We may just have assistance. Ordinarily, this also does not impact

any fees you may owe us, as we agree with any outside counsel what percentage of the overall fee they will receive, depending on the circumstances.

Should we associate with outside counsel, we will notify you in writing via email, unless you indicate another method is preferred. Your response to that email agreeing to our association with outside counsel constitutes a modification of this paragraph to include in the table below the outside counsel with whom we, as if written directly therein.

| Attorney(s) | Reason | Percentage of Total Fee |
|---|---|---|
| Jeffrey Grant Brown | Local Counsel | ████████ |
| Sam Gebrael | Assistance Obtaining Canadian Documents | |

## **Representing Adverse Interest**

As long as we represent you, we will not provide services for another person whose interests are adverse to yours within the same subject matter of our relationship or in any claim involving you, without your written consent.

## **Legal Fees**

You will not have to pay for the firm's services.

We may ask the other party to pay attorneys' fees and costs. You agree that we are entitled to any such money awarded or specified in any settlement agreement as costs and attorneys' fees for our work on this case. You agree that this amount shall be negotiated in the first instance by us. In so negotiating, we will seek an amount equal to the greater of 1) the firm's hourly rate (currently $650/hour) times hours worked (**"base lodestar amount"**) or 2) our actual costs plus one-third (1/3) of the full amount of any settlement or judgment. Regardless of what we negotiate, however, you retain final say over the final allocation and may choose a different allocation by putting it in writing to us (including via email). In certain circumstances, our "base lodestar amount" will potentially exceed your own award. In rare circumstances, our "base lodestar amount" will exceed your total settlement. You will *not* be responsible for payment of the difference.

Should any award or settlement be provided in a "lump sum" payment without separating out attorneys' fees and costs, it is assumed that our fees are the greater of 1) the firm's hourly rate (currently $650/hour) times hours worked (**"base lodestar amount"**), or 2) our actual costs plus one-third (1/3) of the full amount of any settlement or judgment. You retain final say over the final allocation, however, and may choose a different allocation than either of the previous assumptions by putting it in writing to us (including via email). In certain circumstances, our "base lodestar amount" will potentially exceed your own award. In rare circumstances, our "base lodestar amount" will exceed your total settlement. You will *not* be responsible for payment of the difference.

It is expressly understood that in the event that the attorneys are unsuccessful in recovering money in this action, **you will not be responsible to reimburse the attorneys for any out of pocket costs or legal fees**.

You understand that the firm may be making a fee application to the Court to recover attorneys' fees and costs associated with this matter. You agree to fully cooperate with the firm with respect to all fee applications.

Should the matter be certified as a class or collective action (including certification for the purposes of settlement only), the Court will be required to approve any settlement. In such a circumstance, the firm shall be entitled to those fees approved by the Court, in the form prescribed by the Court (e.g. to be paid separately or out of the settlement fund).

If a matter brought as a class action at any point ceases to be a class action (such as through denial of class certification), the firm may elect to withdraw from representing you for your individual claim. You owe the firm nothing in such a circumstance. Should the firm not elect to withdraw, the provisions of this agreement remain in force as applicable to individual claims.

We record and calculate the time spent for all services rendered in increments of on tenth of an hour (1/10). This includes telephone calls (minimum charge of .2 hours), preparing and reviewing letters, documents or other correspondence (minimum charge of .3 hours), travel time to and from meetings and the Court, legal research, preparation of pleadings and other related documents, negotiations and any other services relating to this matter.

### Settlement

We will not settle any matter (individual or class) without your approval. We will notify you of any settlement offer about which we are obligated to notify you under any applicable law(s) or rules (such as applicable Court rules, orders, Local Rules, Federal Rules, and/or Rules of Professional Conduct) or about which you ask us to notify you. You have the absolute right to accept or reject any settlement offer. If you do not respond to three attempted communications (regarding a settlement offer) from this office – including the sending of a certified letter – then we can accept and sign the agreement and release on your behalf.

### Tax Treatment

**You understand that this firm is not a tax advisor and has not and will not give tax advice as to the tax consequences of any recovery in this matter. The firm recommends that you seek advice of an accountant or other tax professional for this purpose. This is especially so in light of the 2017 Tax Bill. In some situations, attorneys' fees may not be deductible. Please check with your accountant.** _RW_ **(initial)**

### Terminating the Representation

You have the right to discharge us at any time by putting your decision in writing and mailing it to our offices. In that event, you agree to pay for services rendered up to the date of discharge. If we are your attorneys of record in any proceeding, you will sign and return a substitution-of-attorney form as soon as you receive it from us.

We may withdraw from your representation at any time prior to the filing of any formal legal proceeding before a court or other judicial or quasi-judicial body, with no costs due from you to us. However, should there be a deadline of which we are aware, we will endeavor to assist you in identifying new counsel, or take whatever steps necessary to preserve, or assist you in preserving, those deadlines, prior to withdrawal. This paragraph does not limit our ability to withdraw subsequent to initiating a formal legal proceeding on grounds supported in law or in equity.

We may mutually agree to terminate the attorney-client relationship, in which case such an agreement needs to be made in a writing signed by both you and the firm. Should we mutually agree to terminate the relationship, you will owe us nothing.

## Retention of Closed Files

If you request, when our representation ends, we will promptly return to you all of your papers and property, whether you have paid for them or not.

## No Guarantees

We do not guarantee any particular result. Any opinion we offer is not a guarantee.

## Entire Agreement

This document contains our entire agreement. There are no other promises, statements, or agreements about the services we will perform.

## No Oral Modifications

Any modifications to this agreement must be in writing and sign by both of parties. Oral modifications will not be valid.

## Severability

If any part of this agreement is held to be invalid, the rest of the agreement remains in effect.

If any part or provision of this agreement is found to be preclusive of class certification, for any reason, that part or provision is null and void upon said finding, or upon certification of the class, whichever comes first.

## Applicable Law

The laws of the State of New Jersey will govern the interpretation of this agreement. Nothing in this provision is intended to determine which state's or forum's Rules of Professional Conduct apply to any litigation filed pursuant to this Agreement.

## Child Support Judgment Search

      **Pursuant to New Jersey law (N.J.S.A. 2A:17-56.23b) law firms are required to perform a Child Support Judgment Search prior to releasing any funds received on behalf of a client via settlement or judgment. If the search reveals that, a child support judgment exist then that judgment must be satisfied out of the "Net Proceeds" before any funds can be released to the client. The statute defines "Net Proceeds" as any amount of money, in excess of $2,000, payable to the prevailing party or beneficiary after attorney fees, witness fees, court fees, fees for health care providers, etc. The statute also provides that the cost of the Judgment Search (approximately $10.00 per person) is chargeable against the net proceeds as a cost of settlement. This firm will comply with the requirements of this statute.**

<u>**Effective Date**</u>

      This agreement will take effect upon the signing by both of us.

AGREED: *Rashad Walston*
Rashad Walston (Sep 20, 2024 22:04 CDT)
_____
RASHAD WALSTON

Dated:   20/09/24

THE GLAPION LAW FIRM LLC

AGREED: Jeremy M. Glapion (Sep 25, 2024 00:00 EDT)
_____
Jeremy M. Glapion
THE GLAPION LAW FIRM

Dated:   25/09/24

# STANDARD TERMS OF ENGAGEMENT

Final Audit Report                                    2024-09-25

| Created: | 2024-09-20 |
|---|---|
| By: | Jeremy Glapion (jmg@glapionlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA4VUJ0VBCcy-x39F642z6yTOIFSBuK6Nm |




Adobe Acrobat Sign

GZJ KDKV'L''

 Gmail

**Jeremy Glapion <jmg@glapionlaw.com>**

---

## Walston v. NRS

2 messages

---

**Ryan Watstein** <Ryan@wtlaw.com>                                          Wed, Jun 12, 2024 at 11:00 AM
To: Jeremy Glapion <jmg@glapionlaw.com>

Hi Jeremy,


I wanted to follow up on yesterday's hearing.  Obviously, the parties disagree about whether there was a settlement.  But as we made clear in our motion to enforce, NRS wants to avoid the time and expense of additional litigation, including the expense associated with a possible evidentiary hearing, which the Court indicated might be necessary to resolve the settlement question.  Thus, and in line with the Court's stated desire for the parties to resolve this case on an individual basis, please convey that NRS offers $35,000 to confidentially settle his claims, with $25k to him and $10k to counsel—unless Mr. Walston decides to split the amount differently.  This offer will remain open until EOD next Wednesday.


As you know, this is significantly more than Mr. Walston could recover on his best day in court, and is almost three times what he would get if the Court agrees with us that there was a settlement.  It is hard to see why Mr. Walston wouldn't prefer this outcome, given his initial $9,800 demand.  That's even more true in this case given the contemplated letters rogatory.  Based on our preliminary research, it will take at least a year to go through that process and cost at least tens of thousands of dollars, which will reduce his potential individual recovery accordingly.


Given your statements yesterday about Plaintiff not being interested in individual settlement because he wants to represent the class, I wanted to make a couple additional points.  First, no one else has complained about NRS's calls, which NRS doesn't conduct anymore out of an abundance of caution.  Second, while we sympathize with Plaintiff's annoyance at the calls he erroneously received, NRS is not a bad actor.  In fact, its owners donate most of their proceeds to charitable causes.  Third, as the judge noted, Plaintiff has a "long way to go" in this case.  There are substantial barriers to any recovery on the merits and at class certification.  Very few of these cases are certified, and we've never had one certified in 400+ TCPA class actions.  Statistically speaking, the most likely outcome is that Mr. Walston spends years litigating this case and ultimately ends taking an individual settlement less than we are offering now.


I think it would be helpful to have a settlement conference with a Magistrate Judge.  If your client still wants to pursue class claims after that, fine.  But I think all parties would benefit from taking this in front of a neutral.


Please provide this communication to your client and let us know his response to having a settlement conference by Friday so that we can report back to the Court.


Thanks,

-Ryan


**Ryan D. Watstein (bio)**

WATSTEIN TEREPKA LLP

P: 404-782-0695

ryan@wtlaw.com

www.wtlaw.com

---

**Jeremy Glapion** <jmg@glapionlaw.com>                    Wed, Jun 12, 2024 at 12:07 PM
To: Ryan Watstein <Ryan@wtlaw.com>

Ryan:

Thank you for your email. Please see my responses.

> Thus, and in line with the Court's stated desire for the parties to resolve this case on an individual basis, please convey that NRS offers $35,000 to confidentially settle his claims, with $25k to him and $10k to counsel—unless Mr. Walston decides to split the amount differently. This offer will remain open until EOD next Wednesday.

There was no stated desire for the Parties to resolve this case individually. Just as the Court asked me if my client would resolve individually, it asked your client if it would resolve on a class-wide basis. Yesterday I conferred with my client as requested by the Court and confirmed there is zero interest in an individual settlement at this point. I intend to notify the court accordingly.

> It is hard to see why Mr. Walston wouldn't prefer this outcome, given his initial $9,800 demand.

Because not everyone is selfishly only out for themselves. I believe Mr. Walston made this clear when you pressed him on this point at the deposition.

> Based on our preliminary research, it will take at least a year to go through that process and cost at least tens of thousands of dollars, which will reduce his potential individual recovery accordingly.

Based on my research it will take several months. This is not ideal, but I imagine this is in part why your client chose to use a foreign entity to do its bidding. I further imagine, however, your client has enough relevant documents for class certification, though it has continued its refusal to produce anything.

> First, no one else has complained about NRS's calls, which NRS doesn't conduct anymore out of an abundance of caution.

So, give us the class data that we have repeatedly requested. Assuming spotless internal record keeping, few complaints suggest a small class. I have been consistent with both you and previous counsel that my goal here isn't to make you face a class action just for the sake of facing a class action. If the class is tiny or there is exculpatory evidence (e.g. consent), let me know.

> Second, while we sympathize with Plaintiff's annoyance at the calls he erroneously received, NRS is not a bad actor. In fact, its owners donate most of their proceeds to charitable causes.

If we are trying to be candid, let's be candid. These calls were not "erroneously received". Your client gave my client's number—which it obtained from some third party database—to Voicelogic to do exactly what it did. Also, your client's "owner" is IDT—which paid for and owend the telephone number your client used on the calls. I do not believe IDT donates its proceeds to charitable causes.

Third, as the judge noted, Plaintiff has a "long way to go" in this case. There are substantial barriers to any recovery on the merits and at class certification. Very few of these cases are certified, and we've never had one certified in 400+ TCPA class actions.

I do not believe the Judge is privy to just how straightforward this case is.

As for your track record, you're an excellent attorney. But my track record is similarly strong. I have never had class cert denied, and several of my TCPA class cases are among the largest per-class member recovery in the history of the statute. So, something will have to give here.

I think it would be helpful to have a settlement conference with a Magistrate Judge. If your client still wants to pursue class claims after that, fine. But I think all parties would benefit from taking this in front of a neutral.

My client still wants to pursue class claims *now*. Nothing has changed, and your client's approach to settlement has been in bad faith. Not only does my client not want to settle individually, he does not trust even engaging in individual settlement conversations with your client, because the expectation is that you would just use that against him in class cert if those conversations failed.

You took your shot at him at your deposition right from the outset and sought to drive a wedge between client and counsel. You missed. I anticipate your Motion to Enforce will be denied, and I imagine the Magistrate will call us in front of him anyway to understand why your client has produced 0 documents since April 17.

If you want to cut through the nonsense and get to the bottom of this, let's do that then. If you give us the class data—the lists of numbers (or at least count of numbers) you gave to VoiceLogic for the purpose of making prerecords; the prerecord transcripts or files themselves; and whatever campaign metrics showing connect/etc VoiceLogic provides—I will strongly encourage my client to agree to a settlement conference. Note: nothing in this is intended to abrogate requests served or limit those requests in any way.

Just as your client doesn't want to settle as a class, my client does not want to settle individually. So, I'd be potentially open to a settlement conference where we are both bringing positions on settlement the other side does not want to do, but I cannot do that without class data.

Best,
Jeremy

--



**Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

[Quoted text hidden]

# EXHIBIT K

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

| | |
|---|---|
| STEPHAN H. SLIWA,<br>on behalf of himself and all others similarly<br>situated,<br><br>                                Plaintiff,<br><br>     v.<br><br>BRIGHT HOUSE NETWORKS, LLC and<br>ADVANCED TELESOLUTIONS, INC.,<br><br>                         Defendants. | Case No. 2:16-cv-00235-JES-MRM |

## DEFENDANT BRIGHT HOUSE NETWORKS LLC'S
## MOTION FOR SETTLEMENT CONFERENCE

Defendant Bright House Networks, LLC ("BHN"), through its undersigned counsel, hereby moves pursuant to 28 U.S.C. § 473(b)(4)-(5) and Rule 16(a)(5) of the Federal Rules of Civil Procedure for the Court to refer this case to a settlement conference before a United States Magistrate Judge.

## I.      INTRODUCTION

BHN respectfully requests the Court to order the parties to engage in a settlement conference before a magistrate judge in light of (1) several recent decisions that substantially impact the merits of Plaintiff's Telephone Consumer Protection Act ("TCPA") claim, (2) Plaintiff's counsel's failure to keep Plaintiff apprised of settlement negotiations and other facts pertinent to settlement, and (3) most importantly, Plaintiff's counsel's use of an unethical and unenforceable term in their engagement letter to prohibit Plaintiff from settling this case on an individual basis—which has rendered settlement discussions, including private mediation, futile.

First, this Court denied class certification in *Tillman v. Ally Financial*, No. 2:16-CV-313-FTM-99CM, 2017 WL 7194275, at *1 (M.D. Fla. Sept. 29, 2017), *reconsideration denied*, No. 2-16-CV-313-FTM-99CM, 2017 WL 8314651 (M.D. Fla. Nov. 20, 2017), a nearly identical putative TCPA class action. Since the parties' unsuccessful attempt to mediate this case, Mr. Tillman chose not to appeal that decision, leaving it the law of this Court. For the same reasons certification was denied in *Tillman* and other recent cases, certification will also be denied in this case. In addition, in *ACA International v. Federal Communications Commission*, 885 F.3d 687, 692 (D.C. Cir. 2018), the D.C. Circuit vacated years of Federal Communications Commission ("FCC") rulings that improperly expanded the statutory language of the TCPA—rulings Plaintiff relied on in filing this lawsuit. That controlling decision substantially eviscerates Plaintiff's TCPA claim,[1] another compelling reason for Plaintiff to consider settling this case on an individual basis.

Second, Plaintiff's deposition testimony establishes he was not informed of BHN's prior settlement offer until weeks after his counsel unilaterally rejected it. His testimony also shows he was not informed that he may not succeed on his claims or that he would receive substantially less than Defendants already offered should the case proceed as a class action. Plaintiff also was apparently erroneously led to believe that putative class members would have no right to pursue individual actions against BHN should he settle this case.

Third, Plaintiff believes he is bound by an unethical term in his engagement letter with class counsel that requires him to retroactively pay the *entirety of counsel's hourly fees*—presumably hundreds of thousands of dollars—should he accept an individual settlement against

---

[1] Defendants have numerous other dispositive defenses to Plaintiff's two substantive claims, including Plaintiff's tag-along FCCPA claim. BHN addresses only the impact of *ACA International* in this Motion because of its significance and the fact that it was decided after the parties' private mediation.

his counsel's wishes.  As explained in the expert opinion of Joseph A. Corsmeier,[2] attached hereto,

that provision is an unethical and unenforceable restraint on Plaintiff's control over settlement.

For these reasons, a settlement conference before a magistrate judge is necessary.  It is the

only way the parties will be able to meaningfully discuss settlement of this action before all parties

incur significant expense briefing class certification and dispositive motions.

## II.    BACKGROUND

Plaintiff is a veteran in his late sixties who is, unfortunately, being taken advantage of.  (Ex.

1 – Declaration of Ryan D. Watstein ("Watstein Dec.") ¶ 6, Ex. B (Expert Report of Joseph A.

Corsmeier ("Expert Report")), Ex. 4 at 18:5–6, 107:10.)   In December 2015, he brought an

individual action against BHN alleging that BHN purportedly violated the TCPA by calling

Plaintiff in an attempt reach a BHN subscriber who previously owned the same cellular phone

number.  (D.E. 1.)  Plaintiff's counsel later added Advanced Telesolutions, Inc. ("ATS") as a

defendant and transformed the case into a putative class action, though Plaintiff did not sign the

class action engagement letter until almost a year after his counsel asserted class allegations on his

behalf.  (D.E. 36, 45.)

On August 28, 2017, BHN sent Plaintiff's counsel a letter conveying an opening offer of a

confidential[3] sum to settle his individual claims against Defendants BHN and ATS.[4]  (Watstein

Dec. ¶ 3).  BHN conveyed this offer—which would have been life-changing for Plaintiff and far

---

[2] BHN intends to use this expert opinion to show that neither Plaintiff nor his counsel are adequate for class certification purposes, but it will also help the Court understand why a settlement conference before a Magistrate Judge is necessary.

[3] Upon the Court's request, BHN will provide the dollar amount for *in camera* review or will, with the Court's approval, file the same under seal.

[4] In addition to his TCPA claim, Plaintiff brings a tag-along individual claim against BHN under the FCCPA.  For various reasons beyond the scope of this motion, that claim has no merit.

exceeded the amount he could hope to recover if a class were certified[5]—in attempt to avoid the significant defense costs it faced going forward.

Less than twenty-four hours—and in fact less than one business hour—later, Plaintiff's counsel rejected the settlement offer without a counter, noting Plaintiff was allegedly only interested in a "class-wide" settlement offer.[6]  (Watstein Dec. ¶ 4.)  In other words, a settlement that would be lucrative for counsel but would net Plaintiff less than Defendants had already offered.

On October 5, 2017, BHN deposed Plaintiff.  (Expert Report, Ex. 4.)  At deposition, Plaintiff testified he was not even made aware of BHN's prior settlement offer, which included a list of reasons why it made sense to resolve the matter on an individual basis, until mid-September 2017.  (*Id.*, Ex. 4 at 155:16–25, 157:14–158:2.)  That was *well after counsel rejected it* on Plaintiff's behalf, and *well after the September 6 expiration* of BHN's offer.

During his deposition Plaintiff also expressed he did not understand, presumably because he was not informed, that the putative class members could proceed with their claims if he settled on an individual basis.  (*Id.* at 156:10–19, 174:23–175:2.)  He also testified he did not understand that there were various reasons (explained in BHN's settlement offer letter) as to why he may not be successful with his case—reasons that have since come to pass with the *Tillman* and *ACA International* decisions (as well as two recent Circuit Court decisions issued in reliance on *ACA*

---

[5] Subject to infrequent exceptions in cases unlike this one, a review of the amounts awarded to named plaintiff(s) in other TCPA cases prosecuted by Plaintiff's counsel proves this to be true. (Expert Report, Ex. 4 at 167:5–171:21.)  At deposition, Plaintiff testified that he knew nothing of these awards or that they were routinely lower than the settlement offer conveyed by Defendants. (*Id.*)

[6] BHN's counsel conveyed the offer at 8:08 p.m. on August 28, and Plaintiff's counsel rejected it at 9:49 a.m. on August 29.  (Watstein Dec. ¶ 4.)  Plaintiff's counsel then told their client about it weeks later.

*International*).  (*Id.* at 156:21–57:13.)  In fact, he was not even aware that the D.C. Circuit was considering a challenge to the FCC's interpretation of the TCPA that would be binding in every Circuit and could substantially impact his likelihood of success on the merits—a decision that has since been issued in Defendants' favor.  (*Id.* at 157:10–13.)

Perhaps most importantly, Plaintiff could not accept Defendants' individual settlement offer—even though it was a "whole lot of money" to him—because a clause in his retention agreement requires him to *retroactively pay the entirety of class counsel's hourly fees* should he decide to settle against his lawyers' wishes (the "Settlement Restriction")—even fees incurred *more than a year before Plaintiff even signed the engagement letter*.  (*Id.* at 165:5–14, 173:17–74:13; *see also id.* at 163:24–164:2.)  Plaintiff stated he "don't have no money," is living on a "fixed income," and "couldn't afford [to purchase] another phone."  (*Id.* at 28:14–17, 68:18–20.)  As such, he explained, he would never be able to pay his class counsel's hourly fees.  (*Id.* at 163:24–164:2.)  And with respect to the Settlement Restriction, Plaintiff testified: "<u>that's not right</u>" and "<u>I don't like it</u>."  (*Id.* at 163:4–165:19 (emphasis added).)

The following month, the parties attended a mediation session with Mediator Jay M. Cohen.  (Joint Status Report Regarding Mediation, filed December 12, 2017, D.E. 118, ¶ 1.)  Given the Settlement Restriction, Defendants were not optimistic that mediation before a private mediator would be successful.  And it ultimately was not, for reasons BHN would like to but cannot go into in this filing given the confidentiality rules applicable to the mediation.  (*Id*. at ¶ 2.)

Since mediation, (1) the plaintiff in *Tillman*, a nearly identical putative TCPA class action, decided not to appeal this Court's order denying class certification, and (2) the D.C. Circuit issued a decision in *ACA International*.  Even more recently—within the last couple weeks, in fact—two

Circuit courts issued decisions based on *ACA International*, both of which are favorable for Defendants here.

On April 25, 2018, BHN's counsel asked Plaintiff's counsel, in person, whether Plaintiff would reconsider individual settlement and about the prospect of attending a settlement conference in light of *ACA International* and *Tillman*. (Watstein Dec. ¶ 5.) Plaintiff's counsel rejected BHN's request out of hand, without speaking with Plaintiff. (*Id.*) In fact, Plaintiff's counsel only claimed to consult with their client about the prospect of a settlement conference after (a) BHN called Plaintiff's counsel and told them BHN intended to file this motion, and (b) Plaintiff's counsel saw BHN's ethics expert report (which highlighted Plaintiff's counsel's several ethical transgressions, including their several failures to inform Plaintiff about settlement discussions). (*Id.* ¶ 7.)

Given these facts—and in particular the unethical provision in the retainer agreement that prevents Plaintiff from even considering an individual settlement larger than he could recover if the case proceeds as a class action—BHN now moves this Court to order the parties to participate in a settlement conference with a Magistrate Judge.

## III.   ARGUMENT

### A.    This Court Has the Authority to Order a Settlement Conference.

Federal Rule of Civil Procedure 16(a)(5) provides that "[i]n any action, the court may order the attorneys . . . to appear before one or more pretrial conferences for such purposes as . . . facilitating settlement." The court "may require that a party or its representative be present or reasonably available by other means to consider possible settlement." Fed. R. Civ. P. 16(c)(1); *see also Slater v. Erin Capital Mgmt., LLC*, No. 17-61300-CIV, 2017 WL 6503980, at *1 (S.D. Fla. Dec. 11, 2017). Local Rule 9.03(a) flows from the Federal Rules and states: "Upon order by the presiding judge, any civil action or claim may be referred by the Court to a mediation conference, providing the action or claim has not already been arbitrated." Even though the parties

have already attended private mediation, this Court can and should order a settlement conference, for the reasons explained below.

**B.    Recent Decisions Substantially Reduce Plaintiff's Likelihood of Success.**

Since the parties attended mediation, precedent has developed that drastically impacts the viability of Plaintiff's case and merits the reinstatement of settlement discussions with Plaintiff. Specifically, the plaintiff in *Tillman* chose not to appeal this Court's decision denying class certification and the D.C. Circuit issued a controlling decision in *ACA International*.

**1.    *Tillman* Precludes Certification of the Putative Class.**

In *Tillman*, this Court denied certification of a putative class in a very similar "wrong number" TCPA case.  In that decision, the Court rejected a proposed class of persons who the defendant allegedly called without consent by searching the defendant's call records for disposition codes allegedly indicating a lack of consent (i.e. "wrong number" or "do not call" notations).  Like *Tillman*, this is not a typical TCPA case that involves mass telemarketing calls or blast faxes to random persons who never consented to receive calls or faxes in the first place, where class certification is often granted.  Rather, this case involves informational calls made **solely** to numbers provided by BHN's subscribers.  All such subscribers provided prior consent to receive calls from BHN both by giving their numbers to BHN in the first instance and agreeing to one of several versions of a subscriber agreement that conveyed express contractual consent to call such numbers for any reason.  Thus, individual issues—such as (1) who was the user of the phone at the time of the call, (2) whether that person was a BHN subscriber or a non-subscriber receiving a "wrong number" call, and (3) whether the BHN subscriber was legally entitled to and did in fact revoke consent—will predominate over common ones.  Indeed, even more so than in *Tillman*,

thousands of mini-trials would be required to ascertain the class in this case, meaning Rule 23's predominance requirement cannot be met and this matter cannot proceed on a class basis.[7]

        2.    *ACA International* Substantially Reduces Plaintiff's Likelihood of Success on the Merits.

And with respect to the merits of Plaintiff's claims, the D.C. Circuit's recent landmark— and controlling[8]—decision in *ACA International* vacated the FCC's interpretations of the TCPA on which Plaintiff relied in filing this lawsuit. First, the D.C. Circuit specifically rejected the FCC's overbroad interpretation of the type of technology that constitutes an "automatic telephone dialing system" ("ATDS") and triggers liability under the TCPA. *ACA Int'l v. FCC*, 885 F.3d 687, 692 (D.C. Cir. 2018). Among other things, the court held that the FCC's determination that calling equipment qualifies as an ADTS based on "its potential functionalities" of dialing random or sequential numbers, *id.* at 695, was an "unreasonable, and impermissible, interpretation" of the TCPA. *Id.* at 697. The D.C. Circuit also rejected the FCC's interpretation of "which functions qualify a device as an autodialer," specifically vacating the FCC's prior findings that a predictive

---

[7] Other recent cases decided since this case was mediated compel the same result reached by this Court in *Tillman. See, e.g.*, *Bridge v. Credit One Fin.*, 294 F. Supp. 3d 1019, 1035–41 (D. Nev. 2018) (denying certification of TCPA class because "individual issues . . . predominate and render the class action an inferior method to fairly and efficiently adjudicate the TCPA claims of the proposed members"); *Ginwright v. Exeter Fin. Corp.*, 280 F. Supp. 3d 674, 674 (D. Md. 2017) (accord).

[8] The D.C. Circuit's rulings on the FCC's interpretations of the TCPA are binding outside of the D.C. Circuit under the Hobbs Act. *See GTE S., Inc. v. Morrison*, 199 F.3d 733, 743 (4th Cir. 1999) (holding that once cases are consolidated pursuant to § 2112(a), chosen circuit becomes "the sole forum for addressing challenges to the validity of the FCC's rules"); *see also, e.g.*, *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 467 (6th Cir. 2017), *as corrected on denial of reh'g en banc* (Sept. 1, 2017), *cert. denied*, 138 S. Ct. 1284 (2018); *CE Design Ltd. V. Prism Bus. Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010) ("In passing the Hobbs Act, Congress vested the power of agency review of final FCC orders exclusively in the courts of appeals," which allows "uniform, nationwide interpretation of the federal statute by the centralized expert agency created by Congress" to enforce the TCPA.); *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008).

dialer qualifies as an ATDS even if it does not generate random or sequential numbers, as the plain language of the statute requires. *Id.* at 701–703. The D.C. Circuit also set aside the FCC's "treatment of reassigned numbers as a whole," including (1) the one-call safe harbor (held to be arbitrary and capricious), and (2) the FCC's interpretation that a "called party" who can consent to calls is the actual recipient of a call, as opposed to the intended recipient. *Id.* at 708–708.

Here, the systems BHN and ATS used to make the calls at issue did not have the capacity to perform the two statutorily-defined functions of an ATDS: "to store or produce telephone numbers to be called, using a random or sequential number generator" and "to dial such numbers."[9] 47 U.S.C § 227(a)(1). This absolves Defendants of any liability for allegedly using an ATDS, one of the two bases of liability under the TCPA. *Id.* (imposing liability for using an ATDS or playing a recorded message without the called party's consent). This is the exact conclusion reached by the Third Circuit, the only circuit court to address the question of what functionalities render calling equipment an ATDS after *ACA International*:

> There can be little doubt [plaintiff] suffered great annoyance as a result of the unwanted text messages. But those messages were sent precisely because the prior owner of [plaintiff's] telephone number had affirmatively opted to receive them, not because of random number generation. The TCPA's prohibition on autodialers is therefore not the proper means of redress.

*Dominguez v. Yahoo, Inc*., — F.3d —, 2018 WL 3118056, at *4 (3d Cir. June 26, 2018).

---

[9] The majority of FCC commissioners have also confirmed their support for an interpretation of the TCPA that relies on the plain language of the statute as to what constitutes an ATDS. *See, e.g., Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Declaratory Ruling and Order* ("2015 FCC Order"), CG Docket No. 02-278, WC Docket No. 07-135, FCC 15-72, 30 FCC Rcd 7961 at *8074–77 (rel. Jul. 10, 2015) (A. Pai dissenting); *Id.* at 8087–90 (M. O'Rielly dissenting); *see also Stmt. of Comm. Brendan Carr on D.C. Circuit Decision in* ACA Int'l v. FCC, Mar. 16, 2018), available at https://docs.fcc.gov/public/attachments/DOC-349769A1.pdf (last visited 6/18/18).

And here, Defendants had the implicit and express contractual consent of the intended recipient—BHN's customer who provided the number at issue (on several occasions) and contractually agreed to receive calls on it. Thus, should the FCC clarify on remand that "called party" includes the intended recipient, Defendants will have *no* liability under the TCPA, even for calls that may have played a recorded message. *See id.* The FCC is poised to do this, as (1) it issued a notice and opportunity to comment (on May 14, 2018) on how to interpret "called party" in the wake of the *ACA International* decision,[10] and (2) the majority of the current FCC appears to agree that "called party" should be interpreted to include the intended recipient.[11]

Thus, *ACA International* drastically impacts the value of this case and could end up eliminating Defendants' potential liability entirely. As such, it is a compelling reason for the parties to revisit settlement—a reason Plaintiff is almost certainly unaware of.

### C. A Conference Before a Magistrate Judge Is Necessary to Ensure a Meaningful Settlement Discussion.

Despite these new developments, which BHN believes preclude class certification and confirm that Plaintiff's claims will also fail on the merits, this case will be significantly expensive for all parties to litigate through class certification and summary judgment. It is for this reason that BHN tried to revisit settlement discussions by asking Plaintiff's counsel to agree to a conference to discuss individual settlement. As explained above, however, counsel immediately

---

[10] *Consumer and Gov't Affairs Bureau Seeks Comment on Interpretation of the TCPA In Light of The D.C. Circuit's ACA Int'l Decision*, FCC, May 14, 2018, available at https://docs.fcc.gov/public/attachments/DA-18-493A1.pdf (last visited 6/18/2018).

[11] 2015 FCC Order, CG Docket No. 02-278, WC Docket No. 07-135, FCC 15-72, 30 FCC Rcd 7961 at *8077–81 (rel. Jul. 10, 2015) (A. Pai dissenting); *Id.* at 8094–95 (M. O'Rielly dissenting); *see also Stmt. of Comm. Brendan Carr on D.C. Circuit Decision in* ACA Int'l v. FCC, Mar. 16, 2018), available at https://docs.fcc.gov/public/ attachments/DOC-349769A1.pdf (last visited 6/18/18).

refused, without consulting with their client.[12]  Additionally—and as is also explained above and in the attached expert report—Plaintiff (1) has not be timely informed of BHN's settlement communications in the past, in violation of the Florida Rules of Professional Conduct, (2) does not understand the hurdles he faces on his substantive claims and at class certification, (3) does not understand that other class members may bring their own claims should he settle individually, and (4) does not understand that he will receive much less than BHN already offered if he is successful at getting a class certified.  Most importantly though, Plaintiff is also restrained by the unethical Settlement Restriction in his retention agreement with class counsel, which violates the Florida Rules of Professional Conduct.[13]  (*See generally* Expert Report.)

Absent judicial intervention, these issues create an impermeable barrier to meaningful settlement discussions.  Thus, BHN requests the Court order the parties to engage in a settlement conference before a Magistrate Judge.

## **CONCLUSION**

For the foregoing reasons, BHN respectfully requests that the Court order the parties to attend a settlement conference before a Magistrate Judge.  Without such a conference, the parties will not have a meaningfully opportunity to discuss settlement, Defendants will needlessly incur significant defense costs, and Plaintiff will ultimately recover nothing or much less than he could recover if the case were settled before Defendants incur expense briefing class certification and summary judgment.

---

[12]  Plaintiff's counsel purported to discuss BHN's request for a settlement conference with their client only after BHN produced its ethics expert's report and reiterated it would be filing this Motion.  (Watstein Dec. ¶ 7.)  Counsel's claim that Plaintiff rejected BHN's request for a settlement conference to discuss individual settlement is nonetheless unsurprising, as the Settlement Restriction renders Plaintiff powerless to accept an individual settlement.

[13]  BHN suspects the same unethical term was used by Plaintiff's counsel in *Tillman*, though relevant filings appear to be under seal.

Dated: July 13, 2018

K ABAT  C HAPMAN  &  O ZMER  LLP

By  */s/ Ryan D. Watstein*
Ryan D. Watstein (Fla. Bar No. 93945)
Nathan D. Chapman (Fla. Bar No. 028873)
171 17th Street NW, Suite 1550
Atlanta, GA 30363
Telephone: (470) 447-0600
Facsimile: (470) 447-0615
Email: rwatstein@kcozlaw.com
        nchapman@kcozlaw.com

*Attorneys for Defendant Bright House
Networks, LLC*

## <u>LOCAL RULE 3.01(G) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), attorneys for BHN hereby certify they have conferred with counsel for Plaintiff Stephan H. Sliwa, who advised Plaintiff opposes a settlement conference.

July 13, 2018

<div align="right">

<u>/s/ Ryan D. Watstein</u>_____

Ryan D. Watstein

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ Ryan D. Watstein_____
Ryan D. Watstein

# EXHIBIT L



RYAN D. WATSTEIN
DIRECT DIAL: (404) 400-7307
E-MAIL: rwatstein@kcozlaw.com

July 12, 2021

**VIA ELECTRONIC MAIL**

Patrick H. Peluso
Taylor T. Smith
Woodrow & Peluso, LLC
3900 East Mexico Ave., Suite 300
Denver, Colorado 80210
ppeluso@woodrowpeluso.com
tsmith@woodrowpeluso.com

**Exhibit
5**
8/12/2021

     RE:    ***Jeffery Katz Chiropractic, Inc. v. Diamond Respiratory Care, Inc.***
               **N. D. Cal. Case No. 3:20-cv-04108**
               **FRE 408 Confidential Settlement Communication**

Dear Counsel:

I write to explain, in conjunction with the attached declarations of a preliminary sampling of putative class members all verifying their consent to receive faxes from Diamond, that the alleged TCPA case here is not certifiable. In recognition of this, and to avoid wasting additional resources continuing to litigate his case, Diamond is willing to offer Plaintiff an individual settlement of $10,000, subject to the terms at the end of this letter.

Diamond's offer is far more than Plaintiff could ever get by proceeding with the case, for the following reasons, explained in more detail below:

1. Plaintiff would receive significantly more by accepting $10,000 now than he could ever receive, after many months and dollars down the road, even in the unlikely event he prevailed in this putative class action.

2. A class could never be certified because, even if a class existed here (it does not), individual issues predominate over common ones, as confirmed by the nine declarations enclosed with this letter, all verifying that Diamond obtained consent before faxing.

Patrick H. Peluso
Taylor T. Smith
Page 2
July 12, 2021

3. The longer this case continues, the higher litigation costs will be. These costs will reduce the amount of money that Plaintiff could receive, even *if* he won, which he will not.

It is entirely up to Plaintiff to decide whether he wants to accept $10,000 now. Under the law and rules of professional ethics, only he is entitled to decide whether settling this case is right for him, not his lawyers. *See, e.g.*, *Nehad v. Mukasey*, 535 F.3d 962, 970 (9th Cir. 2008) (citing *In re Falco*, 188 Cal. App. 3d 1004, 1018 (1987) ("[o]nly the client ... may decide whether to make or accept an offer of settlement."). And he has every reason to accept $10,000.

*First*, $10,000 is more than Plaintiff could get on his best day in court. If a class is certified, as the complaint seeks, Plaintiff will not get paid on his individual claim; rather, he can only receive his small share of the class award and a possible incentive award. Diamond's offer is likely to be several multiples of these potential amounts combined, based on other class awards recently granted in this district. *See, e.g.*, *Richards v. Chime Financial, Inc.*, No. 19-cv-06864, 2021 WL 2075689, at *12-13 (N.D. Cal. May 24, 2021) (denying request for $500 class award where class representatives "would be receiving significantly more money as compared to the other Class Members"); *Adkins v. Facebook, Inc.*, No. C 18–05982, 2021 WL 1817047, at *7 (N.D. Cal. May 6, 2021) (granting $500 award instead of "unreasonably high" request for $5,000). And even if Plaintiff obtains a class recovery, it will be months, if not years, before he gets his small share.

*Second*, Diamond will defeat class certification. Put simply, there is no class here of unconsented fax recipients. And, even if some businesses did not consent received faxes, several individual issues will predominate over common ones, including consent and how a transmission was received, as the attached preliminary sampling of putative class members confirms.

To be clear, Diamond's business practice was only to send faxes to individuals to whom it had procured consent, which is a complete defense to a junk fax TCPA claim. *See, e.g.*, *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 619-20 (3rd Cir. 2020) ("Prior express consent can be deduced from a message-recipient's voluntary provision or knowing release of his or her number to a message-sender, such that a message is solicited and thus not prohibited by the TCPA if the message relates to the reason the number was provided.") (cleaned up); *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1101 (11th Cir. 2019) (franchisee's provision of fax number amounted to prior express consent to receive communications from franchisor's affiliates who obtained fax number from franchisee database); *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011) (voluntary publication of fax number in industry directory amounted to prior express permission). Additionally, many businesses to which Diamond sends transmissions receive them via "virtual fax" services that receive transmissions over the internet, not over a telephone line, another dispositive defense. *See Daisy, Inc. v. Mobile Mini, Inc.*, 489 F. Supp.3d 1287, 1297 (M.D. Fla. 2020) ("At bottom, it is clear Congress did not view one wasted minute spent reviewing a junk fax received through e-mail as a concrete injury.").

Thus, the individualized questions concerning whether putative class members consented and whether they utilized electronic fax services preclude class certification. Indeed, as the enclosed declarations demonstrate, it will be necessary to individually examine **every** recipient of the fax to determine consent and the device upon which they received the fax. Thus, the case is

Patrick H. Peluso
Taylor T. Smith
Page 3
July 12, 2021

not suitable for class treatment. *See, e.g., Gorss Motels, Inc. v. Otis Elevator Co.*, No. 3:16-CV-1781 (KAD), 2019 WL 1490102 (D. Conn. Apr. 4, 2019) (denying class certification due to individualized issues regarding consent to receive faxes); *E&G, Inc. v. Mount Vernon Mills, Inc.*, No. 6:17-CV-318-TMC, 2019 WL 4034951, at *1 (D.S.C. Aug. 22, 2019) (same).

In many instances, Diamond even spoke to potential fax recipients by telephone to obtain verbal consent to send faxes. These individualized questions regarding the consent obtained from fax recipients forecloses the possibility of class certification. *See Craftwood II, Inc. v. Wurth Louis and Co.*, No. SA CV 17-00606, 2018 WL 6258883, at *7 (denying class certification because case did not present "a scenario where a company distributed junk faxes to the population at large" and defendant provided evidence of consent as to at least some fax recipients); *Licari Family Chiropractic, Inc. v. eClinical Works, LLC*, No. 8:16-cv-3461, 2019 WL 7423551, at *10 (M.D. Fla. Sept. 16, 2019) (denying class certification where defendant "presented evidence that it received consent from a variety of sources and inquiry into each source will require individual scrutiny").

Aside from the fact that individual issues predominate, class treatment will additionally fail for lack of ascertainability and numerosity, as there is no uniform, non-individualized way to even determine who received the particular fax at issue or whether a sufficiently numerous class of persons did—and Plaintiff has certainly not uncovered any way of doing so via J-Blast's subpoena response or otherwise in discovery.[1] Even if it were possible to accurately make that determination (and it is not), there is still no uniform, non-individualized way to identify and exclude putative class members who consented or who received the fax on a virtual machine. Based on Diamond's business practice of only sending faxes to those with whom it had a business relationship or otherwise consented, a class of businesses that received transmissions without consent would not likely even meet the numerosity requirement. Further, the Supreme Court's recent decision in *TransUnion LLC v. Ramirez*, No. 20-927, 2021 WL 2599472 (2021) is a further bar to any potential class treatment here because the great majority of any putative class will not even have standing where, as here, they consented to the fax, received it on a virtual machine, or otherwise suffered no concrete injury. *Id.* at *26 ("To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing.").

<u>*Third*</u>, and finally, it is in Plaintiff's financial interest to settle this matter now, rather than to wait and potentially recover nothing. The longer this case goes on, the higher his lawyer's out-of-pocket costs will be. Those costs will reduce the amount of money that could go to Plaintiff. Indeed, the costs of experts and depositions would quickly exceed Plaintiff's maximum recovery, leaving him with nothing, assuming he could prevail on the merits and certify a class. And even if Plaintiff were to prevail and obtain class certification, it would likely be many more months before he would recover *any* money, which would be significantly less than the $10,000 offered today. Thus, under no circumstances is it in Plaintiff's best financial interests to refuse $10,000 and continue with this action instead.

---

[1]  It is worth noting that the list produced by J-Blast in response to the subpoena does not even contain the Plaintiff's number on it.

Patrick H. Peluso
Taylor T. Smith
Page 4
July 12, 2021

In sum, Diamond believes it will win this lawsuit, for the reasons explained above, as well as others. Diamond also recognizes the considerable expense it will incur if the parties continue to litigate this case. Diamond thus would rather resolve this matter now by paying Plaintiff $10,000 than litigate this case further.

Any settlement must also include standard terms such as confidentiality and non-disparagement in favor of Diamond, confirmation that you are unaware of any other plaintiffs with potential claims against Diamond, a general release in favor of Diamond and its affiliates/employees, and dismissal of Plaintiff's individual claims with prejudice.

Please provide this offer letter directly to your client and fully discuss its substance with him. We would appreciate your response by **5 p.m. PST on July 12, 2020**, at which point this offer will expire. Please call me if you have any questions or wish to discuss.

Sincerely,

*/s/ Ryan D. Watstein*

Ryan D. Watstein

Enclosures
cc:     Paul A. Grammatico (pgrammatico@kcozlaw.com)

GZJ KDKV'O '''

Paul A. Grammatico (SBN 246380)
pgrammatico@kcozlaw.com
KABAT CHAPMAN & OZMER LLP
333 S. Grand Avenue, Suite 2225
Los Angeles, CA 90071
Telephone: (213) 493-3980
Facsimile: (404) 400-7333

*Counsel for Defendant*

(Counsel continued on following page)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY KATZ CHIROPRACTIC, INC., a California corporation, individually and on behalf of all others similarly situated | Case No. 3:20-cv-04108-CRB |
| Plaintiff, | **DEFENDANT, DIAMOND RESPIRATORY CARE, INC.'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION** |
| vs. | |
| DIAMOND RESPIRATORY CARE, INC., a California Corporation | Date:   December 3, 2021 |
| | Time:   10:00 a.m. |
| Defendant. | Crtrm: 6 |
| | Honorable Charles R. Breyer |

Ryan D. Watstein (*Pro Hac Vice*)
rwatstein@kcozlaw.com
KABAT CHAPMAN & OZMER LLP
171 17th Street NW, Suite 1550
Atlanta, GA 30363
Telephone: (404) 400-7300
Facsimile: (404) 400-7333

*Counsel for Defendant*

Rebecca Davis (SBN 271662)
rebecca@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Telephone: (510) 836-4200
Facsimile: (510) 836-4205

Patrick H. Peluso (*Pro Hac Vice*)
ppeluso@woodrowpeluso.com
Taylor T. Smith (*Pro Hac Vice*)
tsmith@woodrowpeluso.com
Woodrow & Peluso, LLC
3900 East Mexico Ave., Suite 300
Denver, CO 80210
Telephone: (720) 213-0675
Facsimile: (303) 927-0809

*Counsel for Plaintiff*

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT................................................1

II.     FACTUAL BACKGROUND. .......................................................................................3

        A.      Background on Diamond and How It Obtained Consent. ......................................3

        B.      Plaintiff Sues, Despite Not Knowing If It Has a Relationship with Diamond. .......4

        C.      Counsel Failed to Apprise Plaintiff of Important Information about Its Claims.....6

        D.      The Proposed Class Includes Numerous Members Who Did Not Receive a
                Fax Because It Is Impossible to Determine Who Received It. ...............................6

III.    RULE 23'S STRICT REQUIREMENTS. ......................................................................7

IV.     ARGUMENT. ..............................................................................................................8

        A.      The Court Should Deny Class Certification Because There Is No
                Ascertainable or Identifiable Class. ..................................................................8

        B.      The Court Should Deny Class Certification Because Plaintiff Cannot Satisfy
                Rule 23(b)(3) or 23(b)(2)................................................................................10

                1.      With Regard to 23(b)(3), Individual Issues Predominate over Common
                        Ones. ...................................................................................................10

                        a)      Consent. ...................................................................................11

                        b)      Standing. ..................................................................................15

                        c)      Whether the Fax Was Received on a Virtual Fax. ........................17

                2.      With Regard to 23(b)(3), a Class Action Is Not Superior. ........................18

                3.      With Regard to 23(b)(2), the Ninth Circuit Has Barred Certification of
                        TCPA Classes and, in Any Event, Certification Is Inappropriate for
                        Various Other Reasons. .........................................................................19

        C.      The Court Should Deny Class Certification Because Plaintiff Cannot Satisfy
                Any of the Elements of 23(a). .........................................................................21

                1.      Plaintiff Cannot Satisfy Numerosity. ......................................................21

                2.      Plaintiff Cannot Satisfy Commonality. ....................................................21

                3.      Neither Class Counsel Nor Plaintiff Are Adequate to Represent the
                        Class. ...................................................................................................22

                4.      Plaintiff Is Not Typical of the Classes It Seeks to Represent....................24

V.      CONCLUSION. ..........................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013) ................................................................................................7

*Arnold v. United Artists Theatre Cir., Inc.*,
    158 F.R.D. 439 (N.D. Cal. 1994) .........................................................................25

*Astiana v. Ben & Jerry's Homemade, Inc.*,
    2014 WL 60097 (N.D. Cal. Jan. 7, 2014)..............................................................9

*Bais Yaakov of Spring Valley v. ACT, INC.*,
    12 F. 4th 81 (1st Cir. 2021) ...........................................................................12, 13

*Balschmiter v. TD Auto Fin. LLC*,
    303 F.R.D. 508 (E.D. Wis. 2014) ........................................................................20

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ...............................................................................9

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
    631 F.3d 939 (9th Cir. 2011) ...............................................................................20

*Chinitz v. Intero Real Est. Servs.*,
    2020 WL 7391299 (N.D. Cal. July 22, 2020) .....................................................8, 9

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ................................................................................................7

*Connelly v. Hilton Grand Vacations Co., LLC*,
    294 F.R.D. 574 (S.D. Cal. 2013) .........................................................................20

*Cordoba v. DIRECTV, LLC*,
    942 F.3d 1259 (11th Cir. 2019) ...........................................................................16

*Cordoba v. DIRECTV, LLC*,
    2020 WL 5548767 (N.D. Ga. July 23, 2020) ......................................................16

*Craftwood II, Inc. v. Wurth Louis & Co.*,
    2018 WL 6258883 (C.D. Cal. Oct. 2, 2018) ............................................12, 13, 14

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ...............................................................................20

*Espejo v. Santander Consumer USA, Inc.*,
    2016 WL 6037625 (N.D. Ill. Oct. 14, 2016) ..................................................18, 19

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

*Evans v. IAC/Interactive Corp.*,
244 F.R.D. 568 (C.D. Cal. 2007)................................................................24

*Gannon v. Network Tel. Servs., Inc.*,
2013 WL 2450199 (C.D. Cal. June 5, 2013)...................................15, 18

*Hayes v. Wal-Mart Stores, Inc.*,
725 F. 3d 349 (3d Cir. 2013) ...............................................................10

*Jackson v. Motel 6 Multipurpose, Inc.*,
130 F.3d 999 (11th Cir. 1997)...............................................................11

*Jamison v. First Credit Servs., Inc.*,
290 F.R.D. 92 (N.D. Ill. 2013) .......................................................9, 11, 20

*Kahu v. Vital Pharmaceuticals, Inc.*,
621 Fed. Appx. 945 (11th Cir. 2015) .....................................................15

*Katz v. Capital Med. Educ., LLC*,
2021 WL 3472809 (D.S.C. Aug. 6, 2021)...............................................10

*Licari Fam. Chiropractic Inc. v. eClinical Works, LLC*,
2019 WL 7423551 (M.D. Fla. Dec. 16, 2019) .............................12, 13, 14

*Manigo v. Time Warner Cable, Inc.*,
2017 WL 5149225 (C.D. Cal. Apr. 4, 2017)...........................................22

*Marcus v. BMW of N. Am., LLC*,
687 F.3d 583 (3d Cir. 2012) .................................................................15

*Marlo v. United Parcel Serv.*,
639 F.3d 942 (9th Cir. 2011) ...............................................................10

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012) ...............................................................16

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000)................................................................23

*Meja v. DHL Express (USA), Inc.*,
2016 WL 9450680 (C.D. Cal. Feb. 25, 2016) ........................................11

*Minkler v. Kramer Labs., Inc.*,
2013 WL 3185552 (C.D. Cal. Mar. 1, 2013) ..........................................11

*Nebraska Press Assn. v. Stuart*,
427 U.S. 539 (1976) ...........................................................................20

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014)................................................................19

*Perez v. Metabolife Int'l, Inc.*,
    218 F.R.D. 262 (S.D. Fla. 2003) ................................................................9

*Raffin v. Medicredit, Inc.*,
    2018 WL 6011551 (C.D. Cal. May 11, 2018) ........................................23

*Revitch v. Citibank, N.A.*,
    2019 WL 1903247 (N.D. Cal. Apr. 28, 2019) ................................. 12, 13

*Shamblin v. Obama for Am.*,
    2015 WL 1909765 (M.D. Fla. May 27, 2020) ................................. 15, 18

*Shuckett v. DialAmerica Mktg., Inc.*,
    2019 WL 3429184 (S.D. Cal. July 30, 2019) ..........................................16

*Silver v. Pennsylvania Higher Educ. Assistance Agency*,
    2020 WL 607054 (N.D. Cal. Feb. 7, 2020) ..................................... 12, 14

*Sliwa v. Bright House Networks, LLC*,
    333 F.R.D. 255 (M.D. Fla. 2019) ............................................................21

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ............................................................................16

*Trenz v. On-Line Administrators, Inc.*,
    2020 WL 5823565 (C.D. Cal. Aug. 10, 2020) ................................ 12, 14

*True Health Chiropractic Inc. v. McKesson Corp.*,
    2020 WL 7664484 (N.D. Cal. Dec. 24, 2020) ........................................17

*True Health Chiropractic, Inc. v. McKesson Corp.*,
    896 F.3d 923 (9th Cir. 2018) ............................................................ 11, 12

*True Health Chiropractic, Inc. v. McKesson Corp.*,
    No. 4:13-cv-2219 (N.D. Cal. Oct. 8, 2021) ............................................18

*In re Twitter Inc. Sec. Litig.*,
    326 F.R.D. 359 (N.D. Cal. 2018) ............................................................24

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ................................................................................11

*US W. Commc'ns, Inc. v. Hamilton*,
    224 F.3d 1049 (9th Cir. 2000) ................................................................17

*Victorino v. FCA USA LLC*,
    322 F.R.D. 403 (S.D. Cal. 2017) ............................................................24

*Vigus v. S. Illinois Riverboat/Casino Cruises*,
    274 F.R.D. 229 (S.D. Ill. 2011) ..............................................................19

iv

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................. 8, 21, 22

*Wortman v. Air New Zealand*,
   326 F.R.D. 549 (N.D. Cal. Aug. 8, 2018) .......................................... 8, 9

*In re Yasmin*,
   2012 WL 865041 (S.D. Ill. Mar. 13, 2012) .......................................... 11

**Other Authorities**

*In Re Amerifactors Fin. Grp., LLC, Decl. Ruling*,
   34 F.C.C. Rcd. 11950 (FCC Dec. 9, 2019) ........................................... 17

*In the Matter of Westfax, Inc. Pet. for Consideration & Clarification*,
   30 F.C.C. Rcd. 8620 (2015) ............................................................ 17

**Statutes**

47 U.S.C. § 227 ............................................................................. 17

**Rules**

Fed. R. Civ. P. 23 ................................................. 2, 7, 8, 10, 18, 20, 21, 22, 24

**Constitution**

U.S. Const., Amend. I ....................................................................... 20

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT.

At the beginning of a pandemic, during a time when sanitizer was scarce, a small healthcare company ("Diamond") sent a targeted fax to consenting, existing clients—medical offices—letting them know that it had an available supply of hand sanitizer.  Most would consider attempting to aid the medical community during a time of a need a good deed—but not Plaintiff.  Instead, Plaintiff, a serial TCPA filer, saw an opportunity and sued, ultimately attempting to extract a payment 166 to 500 times its max possible recovery.  Plaintiff and its counsel's willingness to abandon the class and seek an extortionate settlement for Plaintiff's individual claim is not surprising because there is no possible class here to certify, as the numerous "class member" declarations attached hereto establish.

Nonetheless, when Diamond declined to bow to the outrageous demand, Plaintiff pressed forward.  Now, armed with zero evidence, Plaintiff seeks to certify a class of people whose fax numbers were obtained through a "generalized sales process" that is not defined and does not exist.  In addition to the obvious problem of certifying a class based on "generalized" interactions, the class is unidentifiable and administratively infeasible.  Indeed, Plaintiff concedes that the list of fax numbers comprising its asserted class contains thousands of numbers that never even a received a fax.  And Plaintiff fails to propose any way, much less an administratively feasible way, to identify the members of the supposed class who received a transmission, if any, much less after providing their fax number through a "generalized sales process," whatever that means.

But the biggest problem for Plaintiff is this: a litany of individualized inquiries predominate over any common questions.  That is because Diamond, as a rule, faxed only numbers for which it had obtained consent, which is a complete defense to a TCPA claim.  Thus, thousands of mini-trials will be required as to every number to determine the interaction through which Diamond

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

obtained consent, precluding class certification. The putative class member declarations and other evidence attached hereto establish this.

This evidence also establishes that mini-trials would be required to determine the historical user of the fax number, whether that user actually received a fax, and whether the fax was received on a traditional fax or an internet-based fax service. If the latter, which the attached declarations show are used by putative class members, Ninth Circuity authority dictates such class members have no claim. Plaintiff offers *nothing* in its Motion—neither evidence nor argument—to show that these problems can be overcome or that a trial could feasibly proceed here without violating Diamond's due process rights to assert these and other dispositive defenses as to every claimant.

Thus, the fact-intensive individual inquiries here (which Plaintiff ignores) would overwhelm any common issues at a class trial, precluding certification of a damages class under F.R.C.P. 23(a)(3)—as the numerous cases cited herein establish. And Plaintiff cannot evade its inability to show predominance and superiority under 23(a)(3) via an injunctive class under 23(a)(2) for a litany of reasons—including because binding authority bars certification under that provision where, as here, the class would be entitled to monetary damages.

Plaintiff also fails to satisfy *any* of the remaining requirements of Rule 23, and Plaintiff bears the burden to prove all of them. For example, Plaintiff cannot establish commonality for the reasons described above, nor can it show numerosity or typicality, as it has not shown that a *single* person (including Plaintiff) falls within its class definition. And even if there were not numerous other reasons to deny class certification here, Plaintiff and its counsel are inadequate representatives. Indeed, their unethical actions in soliciting declarations that "contained false statements"—this is a quote from class member declarations—and seeking an extortionate individual settlement from a struggling, small business during a pandemic prove them unfit to prosecute this action individually, much less on behalf of an entire class.

2

Diamond respectfully requests the Court deny Plaintiff's motion for class certification.

## II.     FACTUAL BACKGROUND.

### A.     Background on Diamond and How It Obtained Consent.

Diamond is a small healthcare company that provides respiratory therapy and medical equipment to patients with chronic lung disease, various end stage disorders, and more recently people recovering from COVID-19.  Rice Decl. ¶ 5.  Diamond sells its products to clinicians and directly to patients who have prescriptions for the medical equipment.  *Id.*

As part of its business, Diamond communicates daily with prospective and current customers over the phone and via facility visits.  *Id.* ¶ 6; Diamond Dep. (Grammatic Decl., Ex. A) at 30:17–21.  Diamond's customers often communicate by fax because they are subject to HIPAA. Rice Decl. ¶ 8.  Diamond's sales process is not static or uniform; rather, Diamond encourages its sales representatives to interact with customers face-to-face and over the phone to organically develop relationships with their customers.  *Id.* ¶ 7; Diamond's Resp. to Interrog. 18 (Grammatico Decl., Ex. D).  Diamond does not have a sales script, and there is no specific method by which sales reps must obtain contact information or consent to contact them.  Rice Decl. ¶ 7.

Because of these practices, Diamond's current and prospective customers consent to receive faxes from Diamond in various ways.  *See* Rice Decl. ¶¶ 6–10; *see also*, Decls. of Ibarra, Rances, Medina, Rodriguez, Politico, Stadler, Ramos, Avila, Briceno, O'Campo-Cruz, Castellanos, Castillo, Quinonez, and Ambartsumian (collectively "Customer Decls.") (establishing consent for Diamond to send faxes like the one at issue).  This includes obtaining express permission to send marketing and informational materials in the context of an individualized overview of Diamond's business, and simply asking to send them information, by fax or otherwise, including information on promotions or products.  Rice Decl. ¶¶ 6, 10; Diamond Dep. at 85:1–15, 73:1–7.  Prospective and current customers also regularly give Diamond's reps their business cards during facility visits

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

in response to Diamond's description of its business services, thereby expressing a desire to receive information (including advertisements) regarding Diamond's products via the contact information provided. Rice Decl. ¶ 9.

Diamond's customers, which include many physician's offices, typically have numerous employees, who come and go over time, and Diamond typically communicates with the employees, not the actual physicians. *Id*. ¶ 11; *see generally*, Customer Decls. ("There are **multiple** people at the Office that communicate with Diamond . . . ." (emphasis added)).

Diamond uses a customer relationship management system (or "CRM") to maintain the contact information of its customers. Rice Decl. ¶ 12. The fax numbers to which the hand-sanitizer fax at issue in this case were attempted to be sent were primarily culled from this source. *Id*. In connection with Plaintiff's Motion, Diamond and its counsel engaged in time-intensive interviews of almost two dozen physicians' offices from Diamond's CRM, which took over a collective approximately 130 hours. *Id*. ¶¶ 14–15. All of them confirmed they had prior relationships with Diamond and, during the course, gave consent to send faxes like the hand-sanitizer fax at issue. Aragon Decl. ¶¶ 6–7.[1] Fourteen of these were willing to sign sworn statements saying so. *See generally*, Customer Decls. (establishing consent to send faxes like the one at issue). It would take similar individual examinations of every individual or entity to determine when and how such individual or entity consented to receive faxes. Rice Decl. at ¶ 16.

**B.    Plaintiff Sues, Despite Not Knowing If It Has a Relationship with Diamond.**

Plaintiff is a chiropractic clinic owned and run by Jeffrey Katz, who also served as Plaintiff's designated deposition witness. Katz Dep. (Grammatico Decl., Ex. B) at 17:13–25. Katz is also a serial TCPA filer who has filed so many suits that he struggles to remember any of them.

---

[1] Plaintiff (at 17) claims that it was "underhanded" to compile evidence to defend itself by interviewing putative class members regarding consent. That accusation is unfounded and incredible. *See* Grammatico Decl. ¶ 5. What suits that term is Plaintiff's attempts to solicit false statements from the declarants in an effort to put a small company out of business for trying to help its clients during a pandemic. *See* Avila Supp. Decl.; Rances Supp. Decl.

*Id.* at 10:17–25, 11:1–18. The basis of Plaintiff's case is its alleged receipt of a fax stating "HAND SANITIZER NOW IN STOCK" that it allegedly received from Diamond on or about April 23, 2020. Compl., Ex. A. Importantly, however, this is not a "blast fax" case where an advertisement is sent out *en masse* to the general public. This was a one-off transmission during a pandemic that was sent only to customers, who consented in various ways. As Diamond explained during its deposition, the fax was intended "to let clinicians know that this product, which was in very, very short supply [] at the beginning of the pandemic -- this was to let clinicians know that we had this available." Diamond Dep. at 54:12–18. Diamond elaborated further on the purpose of the fax:

> We have to go back to the beginning of the pandemic … if you remember … there was nothing on the shelves … there was -- you know, food was even, to some degree, scarce. Before that, cleaners started to become quite scarce. On our side, in the home care side, there was -- there was just nothing. All of the supplies were going to the hospitals. Home care had this dire situation where we had no cleaners, we had no supplies, we couldn't get gloves, we couldn't get masks, so we came across this particular product in a supply that was more than we needed for our use. We offered that to our -- you know, call them our referral partners or the people that send us stuff because it was -- this was a dire situation. We couldn't safely see patients in the home without an adequate sanitizer.

*Id.* at 55:21–56:13.

Where Diamond saw an opportunity to assist home care providers of very ill patients with a badly needed product and save lives, Katz—who did not even see the fax before it was sent to his attorney—saw an opportunity to continue profiteering off the TCPA. *See* Katz Dep. at 51:22–52:21. Plaintiff apparently had no reservations about this, despite confirming the same points regarding hand sanitizer during the early stages of the pandemic. In particular, Katz acknowledged during his deposition that:

- Plaintiff was in need of hand sanitizer at the time it received the fax (*Id.* at 55:9–13);
- There was a shortage of hand sanitizer at that time in the medical community (*Id.* at 55:19–20); and
- He did not know whether his office purchased hand-sanitizer from Diamond (*Id.* at 56:14–17).

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Katz also testified he has multiple employees and does not know if any of them have a relationship with Diamond.  *Id.* at 61:13–17.  And while he did claim that he did not provide his fax number to Diamond, he also did not inquire (so he cannot know) whether any of his employees did.  *See, e.g., id.* at 37:18–24 (Q: Do you recall ever having requested additional information from a salesperson who entered your office? A: Not at the moment. Not that I recall: Q: What about the other chiropractor who works in your office? A: I wouldn't know, but most likely she would not respond to solicitors.").

Further highlighting Plaintiff's inadequacy as a class representative, Katz acknowledged:

- He did not make the decision to hire his attorneys in this case (*Id.* at 65:6–21);
- He never reviewed—and his attorneys never showed him—the detailed individual settlement offer Diamond conveyed to him (*Id.* at 83:3–10, Ex. C);
- He demanded $250K in an individual settlement (*Id.* at 85:20–86:5); and
- He spent no more than two hours participating in the case, excluding his deposition, since its inception (*Id.* at 70:3–9).

**C.    Counsel Failed to Apprise Plaintiff of Important Information about Its Claims.**

In July 2021, Diamond sent a detailed letter to Plaintiff's counsel explaining why this case could never be certified, attaching nine putative class member declarations.  Grammatico Decl., Ex. C. It explained that Diamond only faxed individuals from whom it had procured consent.  *Id.* at 2–3.  In response, Plaintiff agreed to abandon his class claims but demanded $250,000 to do so, which is 500 times the available statutory damages (166 times even if Plaintiff proved willfulness—which he cannot do because the fax was intended to be sent to consenting recipients).  Katz Dep. at 84:6–12, 85:20–86:19.  Katz testified that he had never even seen the letter.  *Id.* at 82:22–83:18.

**D.    The Proposed Class Includes Numerous Members Who Did Not Receive a Fax Because It Is Impossible to Determine Who Received It.**

Plaintiff's motion seeks to certify the following class:

> All persons who, from the date June 22, 2016, through the date notice is sent to the Class, received at least one telephone facsimile message substantially

6

similar to Exhibit B [the hand-sanitizer fax] where prior express permission or invitation to send the faxes was supposedly obtained by Diamond through its general sales process.

In support, Plaintiff asserts (at 4) that it has a "fax list" with 19,985 fax numbers. In the next breath, however, Plaintiff concedes that, of the 19,985 intended recipients on the list, he only has proof that jBlast, the third party that sent the fax, attempted to send the fax to 17,219 numbers—that is the total number of faxes reflected on the jBlast Job Summary Reports. *See* Motion, Ex. C (jBlast Job Summary Reports). And, further, because the jBlast Summary Reports do not show any fax numbers and jBlast produced no records pertaining to the subject fax, there is no evidence whatsoever regarding what numbers the fax was actually sent to. For example, we do not know which of the 17,219 actually received the fax of the intended 19,985. In other words, Plaintiff concedes that he has no evidence regarding to what numbers the fax was sent, and its proposed "class list" contains thousands of individuals who definitively never received a fax. But the ascertainability problem is even worse than that because the jBlast Reports also demonstrate that there are thousands of additional numbers that were removed prior to transmission or for which the transmission failed—meaning there are thousands of additional numbers on the proposed list that will lack standing because they did not receive a fax. *See id.*; Clark Decl. ¶¶ 4–7. Further, jBlast confirmed that it has no information regarding to whom the fax was sent, when it was sent, and whether it was received on an internet-based "virtual fax" service. Clark Decl. ¶¶ 4–7.

## III. RULE 23'S STRICT REQUIREMENTS.

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). To police this exception, Rule 23 imposes "stringent requirements" for certification. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013). "Rule 23 does not set forth a mere pleading standard"; rather, a "party seeking class certification must affirmatively demonstrate his

7

compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Certification is proper only if "the trial court is satisfied, after a rigorous analysis," that Rule 23 is satisfied. *Id.* It is Plaintiff's burden to prove, by a preponderance, that Rule 23's stringent requirements are met. *Id.* at 351; *Wortman v. Air New Zealand*, 326 F.R.D. 549, 554 (N.D. Cal. Aug. 8, 2018) (Breyer, J.) (same).

Meeting this burden is "a three-step process. First, plaintiffs must demonstrate that an identifiable and ascertainable class exists … Second, plaintiffs must meet the four explicit requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy … Third, plaintiffs must show their proposed classes fulfill one of Rule 23(b)'s three requirements." *Wortman*, 326 F.R.D. at 554 (cleaned up). Plaintiff seeks certification under two provisions of Rule 23(b). It seeks to certify a "damages class"' under (b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods[.]" Plaintiff also seeks to certify an injunctive relief class under (b)(2), which requires the defendant "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief [] is appropriate respecting the class as a whole[.]"

Here, Plaintiff cannot meet its burden on any of these three steps.

## IV. ARGUMENT.

### A. The Court Should Deny Class Certification Because There Is No Ascertainable or Identifiable Class.

"A class is not ascertainable unless membership can be established by means of objective, verifiable criteria[.]" *Id.* at 555 (cleaned up). Relatedly, ascertainability requires the class definition be such that it is administratively feasible for the court to ascertain whether an individual is a member before trial. *Chinitz v. Intero Real Est. Servs.*, No. 18-CV-05623, 2020 WL 7391299, at *7 (N.D. Cal. July 22, 2020) (quot. omitted). Here, Plaintiff claims its class is comprised of

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

businesses who (a) received a fax; (b) where their consent was "supposedly" obtained through a "general sales process." This class fails both ascertainability requirements.

*First*, Plaintiff's class is not objectively defined because it is impossible to determine who "supposedly" consented "through [Diamond's] general sales process." Plaintiff offers no description of what the "general sales process" is, which is unsurprising because there is no specific process. Rather, the evidence establishes that Diamond's customers consented to receive faxes from Diamond in various ways, including by asking Diamond to fax them. *See* Rice Decl. ¶¶ 6–10. Therefore, the Motion fails at the outset because the class is hopelessly vague. *See, e.g.*, *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 266–67 (S.D. Fla. 2003) (denying certification where class definitions vague and thus unmanageable).

*Second*, Plaintiff proposes no administratively feasible way to ascertain whether an individual is a member, twice over.[2] Initially, there is no way to determine who consented via the "general sales process," as explained immediately above. Additionally, Plaintiff has no way to identify who received a fax, which is the other prerequisite to class membership. *See Chinitz*, 2020 WL 7391299, at *7. Plaintiff concedes that its proposed "fax list" (intended recipients) has **thousands** of numbers that did not receive a fax. Motion at 4:20–27. And it also contains additional **thousands** of numbers that were removed prior to transmission or for which the transmission failed. *See* Motion, Ex. C; Clark Decl. ¶¶ 4–7. There is also no evidence regarding what numbers the fax was actually transmitted. *See* Clark Decl. ¶¶ 4–7. Given these problems, Plaintiff (by his own admission) has no idea which numbers received a fax and is forced to suggest (at 7) that potential claimants "submit some records, such as affidavits or other supporting

---

[2]    As this Court has stated, and as Plaintiff's Motion acknowledges, although "the ascertainability requirement is not explicitly required by the Federal Rules of Civil Procedure … courts in this district routinely require plaintiffs to demonstrate it as part of Rule 23 class certification motions." *Wortman*, 326 F.R.D. at 554 n.3 (Breyer, J.); Motion at 6:25–28; *accord Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10-4387, 2014 WL 60097, at *1 (N.D. Cal. Jan. 7, 2014). Under *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1127-28 (9th Cir. 2017), "administrative feasibility" is viewed as encompassed under the superiority requirement of 23(b)(3).

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

documentation . . . to establish class membership."

But this proposal fails. Plaintiff has submitted no method and offered no evidence for how the Court would identify historic users of the fax numbers on the list. And even if that could be done in a reliable and administratively feasible process (it cannot), Plaintiff would still face the insurmountable problem of how to prove class membership via receipt of a fax on a class-wide basis. Very few people, if any, will recall receiving the fax (*see generally* Customer Decls), and submitting a copy of the fax proves nothing because it could simply be printed from the docket. Just as Plaintiff cannot use declarations to prove whether defenses do or do not apply, *see infra* at IV.B.1, Plaintiff cannot use them to establish class membership without violating Diamond's Due Process rights. Accordingly, the Motion fails because the class is not ascertainable. *See Katz v. Capital Med. Educ., LLC*, No. 3:20-cv-02524, 2021 WL 3472809, at *6 (D.S.C. Aug. 6, 2021) (denying motion to certify TCPA fax case where no "feasible method for identification of fax recipients"). [3]

**B.     The Court Should Deny Class Certification Because Plaintiff Cannot Satisfy Rule 23(b)(3) or 23(b)(2).**

**1.     With Regard to 23(b)(3), Individual Issues Predominate over Common Ones.**

Pursuant to Rule 23(b)(3), Plaintiff must prove: (1) common issues "predominate over questions affecting only individual members"; and (2) a class action is "superior" to other methods of adjudicating this dispute. *Marlo v. United Parcel Serv.*, 639 F.3d 942, 947 (9th Cir. 2011). To show predominance, Plaintiff must "establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those that are

---

[3]     Contrary to Plaintiff's argument (at 8), Diamond is not required to anticipate class actions that might be filed against it and enact recordkeeping practices—not required by any law—to help identify members of future class actions. *See Hayes v. Wal-Mart Stores, Inc.*, 725 F. 3d 349, 356 (3d Cir. 2013) ("[T]he nature or thoroughness of a defendant's record keeping does not alter the plaintiff's burden to fulfill Rule 23's requirements. . . . Rule 23's requirements cannot be relaxed or adjusted on the basis of [Plaintiff's] assertion that [Defendant's] records are of no help to him.").

10

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

subject only to individualized proof.'" *Minkler v. Kramer Labs., Inc.*, No. CV 12-9421, 2013 WL 3185552, *5 (C.D. Cal. Mar. 1, 2013). Critically, the evidence used to satisfy predominance must be "sufficient to sustain a jury finding as to [liability] if it were introduced in each [plaintiff's] individual action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016). It is Plaintiff's burden to prove that individualized inquiries are not necessary and will not predominate. *See In re Yasmin*, No. 3:09–md–02100, 2012 WL 865041, at *21 n.51 (S.D. Ill. Mar. 13, 2012) ("It is not defendant's burden … to prove that class certification is improper."); *accord Meja v. DHL Express (USA), Inc.*, No. CV-15-890, 2016 WL 9450680, at *6–7 (C.D. Cal. Feb. 25, 2016).

Here, even if Plaintiff could ***identify*** its proposed class (it cannot), mini-trials would still be required on a litany of issues to determine whether Defendants are ***liable*** to each of the proposed class members. Thus, Plaintiff has not and cannot satisfy its burden to show that common issues predominate over those "subject only to individualized proof" at trial, as it must. *See Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (cit. omitted).

### a) Consent.

"Prior express invitation or permission," *i.e.*, consent, is a complete defense to a TCPA claim. *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018). Under Ninth Circuit authority, where a defendant offers evidence that customers consented to receive the fax in a variety of ways, that defeats predominance, thus precluding class certification. *Id.*; *see also Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 106–07 (N.D. Ill. 2013) (denying class certification where consent defense would require a series of "mini-trials" to determine liability). This is particularly true where, as here, the consent defense is "based on individual communications and personal relationships between [the defendant's] representatives and their customers." *True Health*, 896 F.3d at 931 (affirming denial of class certification as to fax recipients whose consent defendant obtained via "individual communications and personal

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

relationships" because "[t]he variation in such communications and relationships" defeated predominance).

Following *True Health*, courts in this circuit and across the country have continued to deny class certification where the question of consent "will devolve into individualized inquiries which would overwhelm the trial." *See Revitch v. Citibank, N.A.*, No. C 17-06907, 2019 WL 1903247, at *4 (N.D. Cal. Apr. 28, 2019) (denying class certification on that basis); *Silver v. Pennsylvania Higher Educ. Assistance Agency*, No. 14-CV-00652, 2020 WL 607054, at *11 (N.D. Cal. Feb. 7, 2020) (denying certification where "the need to inquire into the parties' specific statements and actions to make such determination [about each potential class member's consent] effectively eliminate[d] classwide proof on that issue"); *Craftwood II, Inc. v. Wurth Louis & Co.*, No. SACV1700606, 2018 WL 6258883, at *8 (C.D. Cal. Oct. 2, 2018) (individualized questions regarding consent defeated predominance where company distributed faxes to customers who consented to receive them rather than population at large).[4]

In *True Health*, the Ninth Circuit held that "[a] defendant can produce evidence of a predominance-defeating consent defense in a variety of ways" 896 F.3d at 932. This includes through "individual communications and personal relationships between [defendant's] representatives and their customers." *Id.* Here, Diamond submitted evidence—deposition testimony, written discovery responses, a declaration of its President, a declaration of its sales manager, and over a dozen customer declarations—that it sent the subject fax to customers who consented to receive it. And this evidence establishes that most, if not entirely all, consented to receive marketing and other faxes through direct conversations with Diamond's sales

---

[4]    *See also Trenz v. On-Line Administrators, Inc.*, No. 2:15-CV-08356-JLS-KS, 2020 WL 5823565, at *8 (C.D. Cal. Aug. 10, 2020) (decertifying class where plaintiff's subclass proposal "fail[ed] to account for the 'nearly endless' permutations" of methods by which defendants obtained consent); *Bais Yaakov of Spring Valley v. ACT, INC.*, 328 F.R.D. 6, 13 (D. Mass. 2018), *aff'd*, 12 F. 4th 81 (1st Cir. 2021); *Licari Fam. Chiropractic Inc. v. eClinical Works, LLC*, No. 8:16-CV-3461 , 2019 WL 7423551, at *11 (M.D. Fla. Dec. 16, 2019).

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

representatives.[5]    Rice Decl. ¶¶ 6–10;  Diamond Dep. at 84:24–86:6, 161:4–24, 168:3–169:9, 177:14–178:24;  Customer Decls.   More specifically, some customers expressly requested that Diamond fax them information about its products, while others gave consent to receive faxes upon Diamond's request.   Rice Decl. ¶¶ 8, 10;  Diamond Dep. at 84:24–85:15.   Indeed, Diamond obtained more than a dozen declarations from the intended recipients of the faxes at issue, most of whose numbers appear on the purported "class list."  *See, e.g.*, Quinonez Decl. (explaining Dr. Joel Doughten's office has done business with Diamond for at least 13 years and stating, "In the context of this business relationship and during its communications with Diamond, the Office voluntarily provided its fax number to Diamond and consented to receiving faxes providing its express invitation or permission to Diamond, including to receive [the subject fax]."); Aragon Decl. ¶¶ 6–7.

Thus, Diamond has presented sufficient evidence of consent, obtained by a variety of methods, based on individual communications and long-standing relationships with its customers. See *Licari*, 2019 WL 7423551, at *11 (holding the defendant "provided sufficient, non-speculative evidence demonstrating that the issue of consent is individualized and will predominate in this matter," which consisted of deposition testimony of its CEO and corporate representative and employee declarations as to the various ways defendant obtained consent, as well as customer declarations attesting they consented to receive the fax); *Revitch*, 2019 WL 1903247, at *4 (same); *Bais*, 328 F.R.D. at 13 (same); *Craftwood*, 2018 WL 6258883, at *8 (finding sufficient evidence of consent defense based on customer declarations stating, "I am a longtime customer of [the defendant].  I have received fax advertisements from [the defendant].  I consented to receive those (and other) faxes.").   To the extent that Plaintiff or any purported class members disputes this

---

[5]     Plaintiff (at 1) argues it is significant that Diamond has no written record of consent; however, no such record is legally required, and, further, this argument ignores the circumstances surrounding how Diamond obtained consent—which was often through sales representatives receiving contact information contemporaneously with consent to receive faxes.  *See* Rice Decl. ¶ 6–10.  Thus, the very existence of the fax numbers in Diamond's database is evidence of consent.  *See id*; Diamond Dep. at 84:24–87:24.  Regardless, Diamond has established consent through the declarations of putative class members.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

evidence, individualized inquiries will be required to resolve such disputes—including cross examination of multiple current and former employees from the various physicians' offices at issue. *See Silver*, 2020 WL 607054, at *11; *Craftwood*, 2018 WL 6258883, at *8; *Licari*, 2019 WL 7423551, at *11. Individualized investigations into consent would be particularly important here, because the physician's offices comprising Diamond's customers have numerous employees who come and go—and Diamond typically communicates with them, not the actual physicians. Rice Decl. ¶ 11; *see generally*, Customer Decls. Because Diamond has provided sufficient, non-speculative evidence of consent, it is Plaintiff's burden to show that consent is susceptible to common proof. *See Silver*, 2020 WL 607054, at *12 (cit. omitted); *Trenz*, 2020 WL 5823565, at *8 (cleaned up). Plaintiff has not and cannot do so.

Plaintiff attempts to argue otherwise by suggesting Diamond had a generalized sales process in which consent was never obtained—but this is flatly contracted by the evidence. Indeed, this is not a case where a defendant had a specific, legally deficient sales script that all its salespeople followed, or where a defendant purchased a list of non-consenting members of the public. *See* Rice Decl. ¶ 7. Instead, Diamond's sales reps interacted with and organically developed relationships with their customers, often over a period of years. *Id.*; *see generally* Customers Decls. Every single personal interaction between Diamond's sales representatives and their customers was necessarily unique. Accordingly, this case will be rife with individualized consent issues necessitating "mini trials" to determine liability as to every fax recipient. A fact finder would have to hear testimony about the recollections of all Diamond's sales representatives and thousands of current and former employees of physicians' offices regarding conversations that occurred over five years ago. *See Silver*, 2020 WL 607054, at *17 (denying class certification in TCPA case due to "the need to inquire into the parties' specific statements and actions to make such determination"). Thus, Plaintiff cannot satisfy its burden to show that common issues

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

predominate.

Nor can affidavits solve this problem—to the extent Plaintiff suggests that, which is unclear—as Diamond would be entitled to contest each. Indeed, as consent is a complete defense to Plaintiff's TCPA claim, Diamond is entitled to **prove** at trial that it had consent to send **every** fax. Thus, the exact type of fact disputes that would be typical here—whom Diamond communicated with and what was said—would require cross examination and discovery as to multiple current and ex-employees for even one office. That is proven true even by looking at Plaintiff's own individual case, as Katz was unable to confirm his office had no relationship with Diamond, or that none of the people in his office had spoken with Diamond. *See* Katz Dep. at 61:13–17; 37:18–24.[6]

Accordingly, class certification must be denied because of consent alone. *See Shamblin v. Obama for Am.*, No. 8:13-cv-2428-T-33TBM, 2015 WL 1909765, at *7 (M.D. Fla. May 27, 2020) (recognizing "constitutional right to a jury determination as to whether any person consented to receiving calls to their cellular telephone.") (cit. omitted); *Gannon v. Network Tel. Servs., Inc.*, No. CV-12-9777, 2013 WL 2450199, at *4 (C.D. Cal. June 5, 2013), *aff'd*, 628 F. App'x 551 (9th Cir. 2016); *Kahu v. Vital Pharmaceuticals, Inc.*, 621 Fed. Appx. 945, 948 (11th Cir. 2015); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012) ("Forcing [Defendants] to accept **as true** absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications.") (emphasis added).

**b)    Standing.**

---

[6]      Diamond anticipates that Plaintiff will produce a supplemental declaration from Rosa Briceno in which she now states she does "not recall" if Diamond was given consent. But this apparent memory lapse simply **confirms** Diamond's point: an individualized inquiry into thousands of persons' fading recollections is required to determine consent. Further, it is noteworthy that Ms. Briceno did not change her prior statements that her company uses a "virtual fax" service (which is alone a dispositive individualized issue as explained *infra*) and that it has done business with Diamond for years. Finally, the circumstances by which Plaintiff's counsel obtained this declaration calls it into question, considering other putative class members confirmed Plaintiff's counsel was not clearly identifying himself and was seeking false testimony. *See* Avila Supp. Decl.; Rances Supp. Decl. And presumably Plaintiff's counsel attempted to contact **all** of these declarants, but could obtain no additional declarations.

15

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021) held that all putative class members must have standing to recover. *See also Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012) ("[N]o class may be certified that contains members lacking Article III standing."). Accordingly, Plaintiff must be able to resolve standing on a class wide basis, or else certification must be denied on predominance grounds. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019) (remanding case because "individualized issue of standing will predominate over common issues in the case, when it appears that a large portion of the class does not have standing . . . and making that determination for these members will require individualized inquiries").[7]

Here, individualized inquiries would be required for each putative class member to determine both if they even received a fax from Diamond ***and*** if they suffered any injury from the fax. This is evidenced by the fact that Plaintiff's proposed class list contains thousands of numbers that Plaintiff concedes received no fax, in addition to all the other recipients that suffered no injury (and thus will lack standing) because they consented to receiving such faxes or were not even aware that they received them. *See Shuckett v. DialAmerica Mktg., Inc.*, No. 17CV2073, 2019 WL 3429184, at *3 (S.D. Cal. July 30, 2019) (finding plaintiff suffered no concrete harm and thus lacked standing under the TCPA where she received a single call and there was no evidence she noticed it); *TransUnion*, 141 S. Ct. at 2205 ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to ***independently*** decide whether a plaintiff has suffered a concrete harm under Article III.") (emphasis added); Motion at 4:20–27, Group Ex C.; Clark Decl. ¶¶ 4–7; *see generally* Customer Decls. Thus, the question of whether each class member has standing must be resolved individually, as to each class member, defeating predominance. *See Cordoba*, 2020 WL 5548767, at *4–7 (denying certification

---

[7] The district court then denied certification after the remand on predominance grounds. *Cordoba v. DIRECTV, LLC*, No. 1:15-CV-3755, 2020 WL 5548767, at *4–7 (N.D. Ga. July 23, 2020).

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

on remand).

### c) Whether the Fax Was Received on a Virtual Fax.

In addition to the individualized issues regarding consent and standing, Plaintiff faces the unsolvable problem of whether the fax was received on an internet-based virtual fax machine or a traditional fax machine. The Consumer and Government Affairs Bureau of the FCC has held that "an 'online fax service' is not a 'telephone facsimile machine' under the TCPA." *True Health Chiropractic Inc. v. McKesson Corp.*, 2020 WL 7664484, at *4 (N.D. Cal. Dec. 24, 2020); *see In Re Amerifactors Fin. Grp., LLC, Decl. Ruling*, CG Docket No. 02-278, CG Docket No. 05-338, DA 19-1247, 34 FCC Rcd 11950 (FCC Dec. 9, 2019). Thus, if a fax is received on an online fax service, as opposed to a traditional machine, there is no viable TCPA claim because "an online fax service . . . falls outside the scope of the statutory prohibition." *True Health*, 2020 WL 7664484, at *4.[8] Further, "the Ninth Circuit has indicated that [because of the Hobbs Act] district courts do not have jurisdiction to question the validity of FCC final orders, and district courts have recognized this limitation." *Id.* at *6; *US W. Commc'ns, Inc. v. Hamilton*, 224 F.3d 1049, 1055 (9th Cir. 2000), *as amended on reh'g* (Sept. 13, 2000).

Here, in addition the other individualized inquiries, Plaintiff cannot establish with class-wide proof whether a particular fax was received on a traditional machine or an online fax—and we know from the Customer Declarations that many of the putative class members did not exclusively use a traditional fax machine. *See, e.g.*, Briceno Decl., Castellanos Decl.; GLAD & MUSCOLINO, FAX MARKET PULSE: TRENDS, GROWTH AND OPPORTUNITIES, IDC (2017), 12–13 (https://www.opentext.com/file_source/OpenText/en_US/PDF/opentext-idc-survey-fax-marketpulse%20-en.pdf.) (last visited October 11, 2021) (estimating that only 36% of monthly fax

---

[8]     This makes sense because the TCPA applies to faxes sent "as a fax over a telephone line to a device that meets the statutory definition of 'telephone facsimile machine[.]'" *In the Matter of Westfax, Inc. Pet. for Consideration & Clarification*, 30 F.C.C. Rcd. 8620, 8623 (2015). An online fax is sent over the internet, not a regular telephone line, and thus online faxes fall outside the plain language of the TCPA.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

volume was sent or received using standalone fax machines).  Further, jBlast (which sent the transmissions) confirmed that it has no method to determine whether the subject fax was received on a traditional fax machine or a via an internet-based "virtual fax" service.  Clark Decl. ¶ 6. Plaintiff does not even acknowledge this issue, much less prove, as is its burden, that it has a viable way of resolving it.

This too precludes a finding of predominance, as a Court in this District held just this week. *See* Minute Entry for Proceedings, *True Health Chiropractic, Inc. v. McKesson Corp.*, No. 4:13-cv-2219, [Dkt. 485] (N.D. Cal. Oct. 8, 2021) (decertifying class where consumers failed to submit class-wide proof that fax was received via traditional machines rather than online fax services).

**2.** **With Regard to 23(b)(3), a Class Action Is Not Superior.**

Class certification should also be denied because, here, "a class action" is not "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  As noted, were this case to be certified, Plaintiff would first face the impossible task of identifying historic users of the fax numbers at issue and whether the numbers actually received a fax, and then the parties would have to conduct thousands of mini-trials about consent, standing, whether the fax was received on a traditional machine, etc.  Diamond would then be entitled, as a matter of due process, to call tens of thousands of witnesses at trial to resolve those issues.  *See Shamblin*, 2015 WL 1909765 at *7; *Gannon*, 2013 WL 2450199, at *4.  No such class action could *ever* be tried.

Moreover, the TCPA provides "built-in incentives for aggrieved plaintiffs to litigate individually" rather than on a class-wide basis: statutory damages of $500 to $1,500 for a single fax.  *Espejo v. Santander Consumer USA, Inc.*, No. 11 C 8987, 2016 WL 6037625 at *12 (N.D. Ill. Oct. 14, 2016).  The superiority of individual actions holds true even where there are just a few faxes involved, as recipients are free to file in small claims court, a "more speedy" venue.  *See*

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

*Vigus v. S. Illinois Riverboat/Casino Cruises*, 274 F.R.D. 229, 238 (S.D. Ill. 2011) (putative TCPA class members "have a quick, adequate and superior remedy in other more speedy venues such as, for example, a small claims court").

In sum, combining "the substantial difficulties involved in identifying putative class members" and the numerous individual inquiries that would be necessary at trial with "the admitted and demonstrated incentive of individuals to sue on their own behalf compels the conclusion that class treatment . . . is neither necessary nor superior to individual actions which have done, and can do, the same." *Espejo*, 2016 WL 6037625 at *12.

> **3.** **With Regard to 23(b)(2), the Ninth Circuit Has Barred Certification of TCPA Classes and, in Any Event, Certification Is Inappropriate for Various Other Reasons.**

Plaintiff also moves to certify a class under 23(b)(2), which permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" This section applies "'only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant . . . .'" *Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014) (quoting *Dukes*, 564 U.S. at 360). The "primary role of this provision has always been the certification of civil rights class actions." *Id*.

Here, Plaintiff cannot certify a class under 23(b)(2) for the same reasons described above: there is no uniform injunction that could possibly be entered because the Court would need to examine individualized issues regarding standing and consent (among others) for **every** putative class member. Indeed, the Court could not issue a blanket injunction against Diamond for simply legally pursuing its business activities by contacting its consenting customers, as that would violate

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Diamond's rights to free speech. *See, e.g., Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 559 (1976) ("[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.").

In addition to this dispositive point, there is no 23(b)(2) class for various other reasons. *First*, it is not even possible to evaluate Plaintiff's claim to certify a class seeking injunctive relief because Plaintiff does not specify what specific injunction it is seeking. *See* Fed R. Civ. P. 23 Subdivision (b)(2) advisory committee's note to 1966 amendment ("This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate.").

*Second*, the Ninth Circuit has made explicit that "Rule 23(b)(2) 'does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011) (quoting *Dukes*, 564 U.S. at 360). Here, anyone who received a fax in violation of the TCPA would be entitled to $500 (and Plaintiff is seeking such an award for each class member). Compl. ¶ 11. Thus, even if there were a viable injunctive relief class (there is not), binding authority compels that such a class may not be certified here. *See Connelly v. Hilton Grand Vacations Co., LLC*, 294 F.R.D. 574, 579 (S.D. Cal. 2013) (holding the availability of statutory damages renders "Plaintiffs' TCPA claims . . . ineligible for Rule 23(b)(2) certification") (citing *Dukes*); *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 516 (E.D. Wis. 2014).

*Third*, Plaintiff has no standing to obtain injunctive relief because it would have to "demonstrate a real and immediate threat of repeated injury in the future." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011) (en banc). Plaintiff cannot do that because its only contention is that Diamond sent it one fax over a year a half ago. Katz Dep. at 72:5–8.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

**C.    The Court Should Deny Class Certification Because Plaintiff Cannot Satisfy Any of the Elements of 23(a).**

In addition to failing to satisfy the requirements of Rule 23(b), Plaintiff cannot even satisfy the generally laxer requirements of Rule 23(a)(1), though it bears the burden of establishing each.

**1.    Plaintiff Cannot Satisfy Numerosity.**

Plaintiff fails to satisfy Rule 23(a)(1), which requires it to prove that its proposed classes are "so numerous that joinder of all members is impracticable."  Here, Plaintiff claims "Diamond *sent* thousands of faxes during the relevant time period."  But, that statement is irrelevant: the proposed class seeks certification of everyone who "*received* a fax where consent was obtained "*through its general sales process*."  There is no evidence that even *one* individual received the fax whereby consent was supposedly obtained through this alleged "general sales process," as there is no evidence about what that term means and what was said during that process.  *See* Rice Decl. ¶¶ 6–7 (stating that no such process exists and that consent is obtained in a variety of ways).  Further, Plaintiff has not produced evidence that more than 40 people received the fax, much less that 40 people received it unsolicited via technology subject to the TCPA (a traditional machine).  This is Plaintiff's burden, and Plaintiff has failed to meet it.  *See Sliwa v. Bright House Networks, LLC*, 333 F.R.D. 255, 273 (numerosity not satisfied even in TCPA case involving millions of calls because plaintiff had not satisfied his burden of proving, with evidence, that sufficient number of call recipients met the proposed class definition) (quot. omitted).

**2.    Plaintiff Cannot Satisfy Commonality.**

To show "commonality" Plaintiff must prove: (1) all class members "suffered the same injury"; and (2) that this common injury is "capable of classwide resolution" through proceedings generating "common answers" that "resolve an issue that is central to the validity of the claims in one stroke."  *Dukes*, 564 U.S. at 349–50.  Thus, the presence of a significant number of uninjured persons in the class is fatal to certification, especially where individualized examinations are

needed to determine who (if anyone) was injured. *See Manigo v. Time Warner Cable, Inc.*, No.: 2:16-cv-06722, 2017 WL 5149225, at *4 (Apr. 4, 2017) (C.D. Cal. Apr. 4, 2017) (denying certification for lack of commonality where plaintiffs offered no evidence of a uniform policy requiring late meal or rest breaks and defendants produced declarations of "nine putative class members who confirm[ed] they [we]re not victims of any purported meal or rest break violations and thus not injured at all").

Here, certification should be denied because **none** of the issues Plaintiff identified would truly resolve Diamond's liability. The primary issues central to liability are: (1) whether Diamond had consent to send the fax; (2) whether putative class members received the fax; and (3) if so, whether they received it as an electronic transmission or on a traditional fax machine. None of these primary issues will "generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350–51. For example, whether Diamond obtained consent to send a fax does not generate a common answer—it must be analyzed on an individual basis, considering that Diamond has no "general sales process" and routinely obtains consent from customers via differing in-person interactions. Rice Decl. ¶¶ 6–10; *see generally* Customer Decls. That is similarly true with regard to whether a fax was ever received at all and whether it was received on a traditional fax machine.[9] Thus, because the case cannot be tried with Plaintiff's experience as a stand-in for all putative class members, Plaintiff fails to establish commonality. *See Manigo*, 2017 WL 5149225, at *4 (denying certification where plaintiffs "fail[ed] to identify common questions the answer to which would resolve an issue central to liability").

### 3. Neither Class Counsel Nor Plaintiff Are Adequate to Represent the Class.

Rule 23(a) requires that the party or parties representing a class "will fairly and adequately

---

[9]    Plaintiff raises other supposed common questions which fare no better, such as whether the fax contained an opt-out notice, whether Diamond acted willfully, whether Diamond sent the fax, and whether the faxes were advertisements—**none** of which matter unless: (1) a fax was actually received; (2) without consent; and (3) on a traditional fax machine.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

protect the interests of the class."  A class representative is only adequate where the representative and their counsel do not have any conflicts of interest with the other class members and where the representative and their counsel will prosecute the action vigorously on behalf of the class.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).

Plaintiff is inadequate because it has demonstrated that it has not and will not vigorously prosecute the action on behalf of the class.  Katz testified at his deposition that he only minimally participated in preparing the Complaint and that he spent approximately two hours total working on the case.  And in response to the $10,000 settlement offer Diamond made to avoid mounting legal expenses—which was already over six times the statutory amount of $1,500 Plaintiff could recover on its individual claim—Katz demanded **$250,000**.  That exorbitant sum[10] is **166 to 500 times** what Plaintiff's maximum individual recovery could be, which demonstrates that Plaintiff is willing to not only abandon the class for its own self gain but also to abuse the machinery of class action litigation to extort a small healthcare company trying to help people during a pandemic.  Katz Dep. at 84:6–12, 85:20–86:19.  Accordingly, Plaintiff lacks honesty and credibility regarding its motives in bringing this action and its willingness to vigorously pursue relief for the entire class.  *See Raffin v. Medicredit, Inc.*, No. CV154912, 2018 WL 6011551, at *7 (C.D. Cal. May 11, 2018) ("the honesty and credibility of a class representative is a relevant consideration … because an untrustworthy plaintiff could reduce the likelihood of prevailing ….").  There is no question that Plaintiff is merely a pawn driven entirely by its attorneys, as demonstrated by its policy of immediately directing any fax solicitations it receives to its designated "junk faxes" attorney, Mr. Heidapour.  Katz Dep. at 52:8–54:8.  Katz did not even read the fax at issue; in fact, he did not even know whether his office had a relationship with Diamond or purchased any hand sanitizer from it.  *Id.* at 54:6–14, 56:16–17, 57:1–4.  Accordingly, Plaintiff does not meet the low threshold

---

[10]  Katz apparently sought to be paid $125K for each hour of work he put into the case.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

of knowledge required to serve as class representative. *See, e.g.*, *In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 359 (N.D. Cal. 2018).

Additionally, the class is not adequately represented by counsel. Anything "pertinent to counsel's ability to fairly and adequately represent the interests of the class" bears on the class certification decision. FED. R. CIV. P. 23(g)(1)(B). Counsel's "'unethical conduct, both before and during the litigation, is relevant to determining whether counsel is adequate under Rule 23.'" *Victorino v. FCA USA LLC*, 322 F.R.D. 403, 408 (S.D. Cal. 2017). The "degree of unethical conduct justifying a finding of inadequacy is high, and often turns on counsel's integrity and candor." *Id.* (citing *White*, 993 F. Supp. 2d at 1171).

Here, counsel is controlling this litigation to further its own financial interests to the detriment of Plaintiff and the class, which is evidenced by: engaging in unethical and coercive conduct by soliciting putative class members without informing them as to his role in the case and asking them to sign under oath declarations containing false statements (*see* Avila Supp. Decl.; Rances Supp. Decl. (stating Plaintiff's counsel left her a voicemail that "d[id] not clearly identify his firm" and asked her to sign a draft declaration that "contained false statements")); demanding a settlement figure 166 to 500 times what Plaintiff's maximum individual statutory recovery could be (Katz Dep. at 84:6–12, 85:20–86:19); and failing to apprise Plaintiff of information about this case—specifically Plaintiff testified that it had never seen the settlement letter that Diamond submitted to Plaintiff (*Id.* at 82:16–83:10, Ex. C). *See Evans v. IAC/Interactive Corp.*, 244 F.R.D. 568, 578–80 (C.D. Cal. 2007) (finding inadequate class counsel who "included statements in Plaintiffs' declarations that were . . . admittedly false" and failed to "ensure the accuracy of the statements Plaintiffs were being asked to swear to.").

### 4. Plaintiff Is Not Typical of the Classes It Seeks to Represent.

Plaintiff also fails to show that its claims are typical. *See* FED. R. CIV. P. 23(a)(3). In

---

24

particular, Plaintiff is not even a member of the class; it offers no evidence that it went through a "general sales process." And, to the extent there is any "process," Plaintiff is not a member based on the testimony of Katz that Plaintiff did not give Diamond its fax number, which would be the exception, not the rule—which was to **obtain** consent. This precludes certification. *See Arnold v. United Artists Theatre Cir., Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994) ("[C]lass representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members"). In addition, it is far from clear that Plaintiff even has a viable claim in this case, as it will need to be determined at trial in its individual case whether it had any prior relationship with Diamond in which it provided consent—because Katz testified that he did not know. Katz. Dep. at 61:7–62:3. Plaintiff is also not typical of members of the putative class who had virtual (non-traditional) fax services. *See, e.g.*, Briceno Decl.; Castellanos Decl.

## V.    CONCLUSION.

Plaintiff fails to meet its burden that the proposed class is ascertainable, that common issues predominate, and that a class action is the superior method to resolve its claims, nor does it fare any better in establishing that uniform class-wide injunctive relief is appropriate, legal, or even possible. Similarly, Plaintiff fails to meet its burden as to **any** of the elements of 23(a). Nor can it, as the evidence—declarations, deposition testimony, discovery responses, and sworn statements from putative class members and jBlast—proves that trying this case on a class-wide basis would be impossible.

At the end of the day, Diamond is a small company that reached out to its customer base of medical practitioners during the early stages of a pandemic to offer hand sanitizer to those who badly needed it. Plaintiff, a professional litigant, who was unharmed and unaffected by receipt this fax, which may have saved lives, seeks to put Diamond out of business for doing so. Respectfully, Diamond requests that the Court reject Plaintiff's unscrupulous scheme, and deny certification.

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1   DATED: October 13, 2021                    **KABAT CHAPMAN & OZMER LLP**

2                                              By: */s/ Paul A. Grammatico*
                                                   Paul A. Grammatico
3

4                                              *Counsel for Defendant*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1

**PROOF OF SERVICE**

2

3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

4

5

     I am employed in the County of Los Angeles, State of California; I am over the age of 18 and not a party to the within action; my business address is 333 S. Grand Avenue, Suite 2225, Los Angeles, California 90071.

6

7

8

     On October 13, 2021, I served the foregoing document(s) described as **DEFENDANT, DIAMOND RESPIRATORY CARE, INC.'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION** on the interested parties to this action by delivering a copy thereof in a sealed envelope addressed to each of said interested parties at the following address(es): SEE ATTACHED LIST

9

10

☐    **(BY MAIL)** I am readily familiar with the business practice for collection and processing of correspondence for mailing with the United States Postal Service. This correspondence shall be deposited with the United States Postal Service this same day in the ordinary course of business at our Firm's office address in Los Angeles, California. Service made pursuant to this paragraph, upon motion of a party served, shall be presumed invalid if the postal cancellation date of postage meter date on the envelope is more than one day after the date of deposit for mailing contained in this affidavit.

11

12

13

14

☒    **(BY ELECTRONIC SERVICE)** by causing the foregoing document(s) to be electronically filed using the Court's Electronic Filing System which constitutes service of the filed document(s) on the individual(s) listed on the attached mailing list.

15

16

17

☐    **(BY E-MAIL SERVICE)** I caused such document to be delivered electronically via e-mail to the e-mail address of the addressee(s) set forth in the attached service list.

18

19

☐    **(BY FACSIMILE)** I caused the above-referenced document to be transmitted to the interested parties via facsimile transmission to the fax number(s) as stated on the attached service list.

20

21

☒    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

22

23

     Executed on October 13, 2021, at Los Angeles, California.

24

25

                        */s/ Paul A. Grammatico*
                        Paul A. Grammatico

26

27

28

**SERVICE LIST**

Rebecca Davis
LOZEAU DRURY LLP
Email: rebecca@lozeaudrury.com

Patrick H. Peluso
Taylor T. Smith
Woodrow & Peluso, LLC
Email: ppeluso@woodrowpeluso.com
Email: tsmith@woodrowpeluso.com

*Counsel for Plaintiffs*

# EXHIBIT N

**verizon**✓
**business**

PO BOX 489
NEWARK, NJ 07101−0489

KEYLINE
|||ıı|ı|ı|ı|ıı|ı|ıı|ı|ıı|ı|ıı|ı|ı|ı|ı|ı|ı|

GLAPION LAWFIRM



**Total Charges Due by July 18, 2024**

| Pay from phone | Pay on the Web | Questions: |
|---|---|---|
| #PMT (#768) | My Verizon at www.vzw.com | 1.800.922.0204 or *611 from your phone |

**verizon**✓
**business**

GLAPION LAWFIRM



**verizon**√
business

| | | | Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|---|---|---|

## Detail for Jeremy Glapion: ██████0024

## Voice

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Chrgs | LD/Other Chrgs | Total |
|------|------|--------|------|------------|-------------|-------------|------|---------------|----------------|-------|
| 6/11 | 4:22P | 773-368-4088 | Peak | PlanAllow | Sea Girt NJ | Chicago IL | 20 | --- | --- | --- |

GZJ KKV'Q'''

 **Jeremy Glapion <jmg@glapionlaw.com>**

---

## Walston v. NRS - 24-cv-83 - Plaintiff's Settlement Position

**Jeremy Glapion <jmg@glapionlaw.com>**                         Fri, Jun 14, 2024 at 9:34 AM
To: lynette_santiago@ilnd.uscourts.gov

Hi Lynette:

Thank you again for your work to date on this case.

I represent Plaintiff in the above-captioned matter.

Pursuant to docket entry 28, I am writing to confirm that Plaintiff does not have any interest in an individual settlement or a settlement conference to that end. I confirmed this through discussing directly and at length with Plaintiff on June 11.

We are always interested in discussing a class-wide resolution.

I am happy to further clarify Plaintiff's position and reasoning here, if the Court requests.

Thank you,
Jeremy

--

   **Jeremy M. Glapion**
Partner

Glapion Law Firm
1704 Maxwell Drive
Wall, New Jersey 07719

Tel.: 732-455-9737

# EXHIBIT P

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NAGIN KORMI,

      Plaintiff,

   v.

ANTIONETTE CHOATE AND DAVID L. LEE,

      Defendants.

No. 16 CV 9415

Magistrate Judge McShain

## ORDER

Pending before the Court are the parties' motions *in limine* [443, 444, 447, 448].[1] The Court recently issued rulings on some of the parties' requests in these motions [482, 494, 496]. This order rules on the remaining outstanding issues and requests in the parties' motions *in limine*. The Court incorporates the background section and relevant legal standards from those prior orders.

## Discussion

## I. Plaintiff's Motions *in Limine* [447]

### A. MIL No. 2 – Defendants' Advice/Admonitions to Plaintiff Regarding Prior Mediation

In connection with the allegations made in paragraphs 35 and 36 of plaintiff's amended complaint, [27] ¶¶ 35–36, and in light of the Court's March 12, 2024 ruling on the 2013 mediation [440], plaintiff requests that the Court enter an order holding the following:

(1)     Defendants' advice that the "purported 'paper trail' relating to a prior mediation conducted would adversely affect [Plaintiff's case against her former employer] and, in particular, [Plaintiff's] damage claims" was inconsistent with governing Illinois law; and

(2)     If Plaintiff's underlying case against her former employer had gone to trial, Plaintiff's former employer would have been

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

prohibited from making any reference to the mediation or any communication concerning it.

[447] 3. Plaintiff seeks a ruling as a matter of law on two allegations in its amended complaint but has provided no reason for the Court to do so prior to trial.

Defendants dispute the factual allegations in paragraphs 35 and 36 of the amended complaint. [64] 14–15; [65] 14–15. In opposition, defendants assert this is an improper motion *in limine* as there has been no summary judgment as to the issue of whether defendants' advice was "consistent with Illinois law." [454] 4.

The Court denies the motion. Plaintiff may argue at trial that defendants gave certain advice and that advice was wrong, provided such an argument is supported by the evidence and conforms with the Court's pretrial rulings, and defendants may refute that claim.

B.   **MIL No. 3 – Require Defendants to Adduce All Evidence Relevant to their Rebuttal of the Presumption of Fraud Concerning Self-Dealing During Their "Cross Examination" in Plaintiff's Case in Chief**

Plaintiff asserts that once she establishes a *prima facie* case on her breach of fiduciary duty claim, the law then imposes a presumption that defendants breached their fiduciary duties and defendants must rebut that presumption with clear and convincing evidence that their representation (and the settlement agreement which resulted from it) was fair and did not result from any undue influence. [447] 4 (citing *Ball v. Kotter*, 723 F.3d 813, 826–27 (7th Cir. 2013)). Plaintiff describes what defendants specifically must demonstrate to rebut the presumption of self-dealing in this case as follows:

In this case, they must offer clear and convincing evidence that (1) the Retention Agreement, Assignment and, ultimately, the Settlement Agreement were offered by the lawyers with unquestionable good faith and with complete disclosure; (2) the client entered into the Retention Agreement, Assignment and Settlement agreement with a full understanding of all facts and their legal importance; and (3) the client's ultimate decision to settle her case was free from undue influence, and the settlement the Defendants demanded she consummate was fair to her.

[*Id.*] (citing *Ball*, 723 F.3d at 829, citing *Bruzas v. Richardson*, 945 N.E.2d 1208, 1215 (Ill. App. Ct. 2011)).

Plaintiff asserts that according to *Ball*, the Court shall decide whether the presumption has been rebutted after an evidentiary hearing. [447] 4 (citing *Ball*, 723 F.3d at 828, citing *Spring Valley Nursing Ctr., L.P. v. Allen*, 977 N.E.2d 1230, 1234 (Ill. App. Ct. 2012)). Plaintiff proposes that judicial economy will be best served by requiring defendants to present their evidence to overcome the presumption during their rehabilitative cross examination in plaintiff's case-in-chief. [*Id.*] According to plaintiff, the Court can then decide the applicable burdens of proof on plaintiff's breach of fiduciary duty claim "well in advance of the final conference on jury instructions and closing arguments." [*Id.*] 4–5.

This issue of "undue influence" relates to plaintiff's allegations surrounding the retention agreement and the assignment, and eventually the settlement agreement. At the time the parties briefed this request, defendants noted that the Court had not determined "that the Retention Agreement or the Settlement Agreement were legally or ethically improper." [454] 4. Defendants argued that there could be no presumption of fraud or undue influence with respect to the retainer agreement and assignment because defendants were not yet representing plaintiff at that point. [*Id.*] 5. In its April 29, 2024 order, the Court ruled as a matter of law that defendants' fiduciary duties did not attach at the time of the assignment and that the assignment was not void. [482] 3–13, 31. Accordingly, there is no remaining allegation that defendants breached a fiduciary duty to plaintiff or engaged in self-dealing as to the retention agreement and assignment.

Furthermore, there is no presumption of fraud or undue influence as to the settlement agreement because that was not a transaction or agreement between defendants and plaintiff. [454] 5; *see Maksym v. Loesch*, 937 F.2d 1237, 1242 (7th Cir. 1991) (noting that a presumption of undue influence only arises when the attorney enters into a transaction with his client during the existence of the fiduciary relationship); *Block v. Rosenberg*, No. 20 C 1053, 2021 WL 2660730, at *3 (N.D. Ill. June 29, 2021) (same); *Estate of Alford v. Shelton*, 89 N.E.3d 391, 397 (Ill. 2017) ("A presumption of fraud arises when a fiduciary benefits from a transaction involving the principal."). And plaintiff's allegations that defendants exercised undue influence in advising or "forcing" plaintiff to enter into the settlement agreement stem from plaintiff's assertion that defendants had a conflict of interest arising from the void and unenforceable assignment. Again, the Court has since ruled as a matter of law that the assignment is not void. The Court denies plaintiff's Motion *in Limine* No. 3 as moot.

### C. MIL No. 4 – Bar Evidence of Extrinsic Facts, Prior Acts, and Propensity Evidence

Plaintiff anticipates that at trial, defendants will seek to offer evidence of plaintiff's purported prior acts and/or plaintiff's "propensity to act" for improper

purposes. [447] 5. Plaintiff requests that under Federal Rule of Evidence 404, the Court bar evidence of the following:

a)  purported evidence that Plaintiff has a pattern or practice of "reneging" on agreements;

b)  purported evidence concerning the reasons why the attorney who represented Plaintiff prior to Defendants withdrew from the representation;

c)  purported evidence of Plaintiff's consultation with attorneys during the time that she was represented by Defendants concerning potential malpractice claims she might have against her former counsel;

d)  purported evidence concerning Deloitte's unproven allegation that Plaintiff had contrived a document in discovery;

e)  purported evidence of Plaintiff's employment experience at Intuit (after she was terminated by Deloitte and before she retained the Defendants) and the reasons/circumstances concerning the termination of her employment;

f)  a purported email from a purported landlord of the plaintiff concerning any aspect of Plaintiff's landlord tenant relationship;

g)  purported evidence concerning any other legal dispute involving the Plaintiff; and

h)  Plaintiff's personal beliefs and/or activities.

[*Id.*] 5. The Court denies this request as premature. The Court presumes the parties will follow the Federal Rules of Evidence and expects the parties to follow the procedures and limitations of the Court's pretrial ruling during trial. Plaintiff's Motion *in Limine* No. 4 is denied.

## II.   Defendants' Motions *in Limine* [443]

### A.   MIL No. 1 – Bar Examination of Witnesses Regarding the Illinois Rules of Professional Conduct Without First Having Provided the Rules and Comments to the Witness

Defendants argue that questioning any witness at trial about the Illinois Rules of Professional Conduct without providing the witness with the full text of the rules would be highly prejudicial. [443] 2. Defendants do not cite any case law in support of their assertion that the Court should require that any witness being questioned and testifying on the content and nature of the Illinois Rules of Professional Conduct, and whether defendants' representation of plaintiff properly conformed to the requirements of the rules, must first be provided the complete text of the rules. The Court denies defendants' Motion *in Limine* No. 1. The parties will be permitted to use

4

admitted exhibits freely and will be expected to follow the Federal Rules of Evidence to properly refresh witness recollection at trial, if necessary, with the Rules.

## B.     MIL No. 4 – Bar Evidence Regarding Count III of the Plaintiff's Amended Complaint

Defendants request that the Court bar evidence of previously dismissed Count III of plaintiff's amended complaint alleging that defendants failed to return plaintiff's expense retainer and failed to provide her with a copy of her underlying litigation file. [443] at 8. *See* [27] ¶¶ 65–74 (Count III of amended complaint), ¶¶ 18(c), 53 (alleging that defendants did not spend any of the $10,000 cost retainer "war chest" and that defendants "failed to return this 'war chest' to" plaintiff after settlement was reached in October 2014 and "did not return such funds until June, 2016"). In February of 2017, defendants filed motions to dismiss plaintiff's amended complaint. [30, 31]. In a June 7, 2017 decision, Judge St. Eve granted in part and denied in part defendants' motions and dismissed Count III of the amended complaint:

> Defendants argue that Count III does not state a cause of action and improperly seeks injunctive relief. Indeed, Plaintiff's allegations in Count III pertain to her breach of fiduciary duty claim as alleged in Count I, and thus Defendants are put on notice that Plaintiff's breach of fiduciary duty claim incorporates these allegations. That being said, the proper way for Plaintiff to get the recovery she seeks is to file a motion to compel the underlying litigation files under Rule 37(a) and substantiate her motion with the necessary legal memorandum and exhibits. With this caveat, the Court grants Defendants' motion to dismiss Count III without prejudice.

[58] 4–5.

Defendants assert that discovery has concluded and plaintiff has presented no expert opinion in support of her Count I breach of fiduciary duty claim addressing what actions defendants purportedly should have taken and when they should have acted to return plaintiff's unused expense retainer and plaintiff's files from the underlying case. [443] 9. Defendants argue that because expert testimony is required to establish the standard of care and the Illinois "common knowledge" exception does not apply,[2] any testimony alleging that defendants violated a fiduciary duty to

---

[2] Defendants argue that "it would not be readily apparent to a lay juror (1) whether a duty to return the cost retainer and/or files existed; (2) at what time the Defendants were required to return the cost retainer and/or files; (3) the method by which the cost retainer and/or files would have been properly returned; (4) and what specific files and/or amounts that the Defendants were required to return." [443] 9–11 (citing *Barth v. Reagan*, 564 N.E.2d 1196 (Ill. 1990); *Ball v. Kotter*, 723 F.3d 813 (7th Cir. 2013)).

plaintiff or were otherwise wrongful in their handling of plaintiff's cost retainer and files would be improper, as well as highly prejudicial to defendants. [*Id.*] 9–12.

In response, plaintiff states that she "has not revived Count III and will not seek relief associated with the recovery and condition of the materials accumulated by" defendants in the underlying case but asserts that she "does seek to adduce evidence concerning the economic consequences of Defendant's failure to return her $10,000 cost retainer 18 months after [Defendant Lee] returned her security retainer." [455] 6. Plaintiff accordingly argues that she should be permitted to adduce evidence of defendants' failure to meet their fiduciary duties to protect and timely return plaintiff's property (*i.e.*, money and files). [*Id.*] 6–7 (citing Ill. Sup. Ct. R. 1.15 (2010)). Plaintiff also disagrees with defendants' assertion that the "common knowledge" exception does not apply and expert testimony is required to establish the standard of care for defendants' failure to timely return the cost retainer. Plaintiff characterizes this as a "plain and obvious breach of duty and the Rules of Professional Conduct," arguing that no expert opinion is necessary to prevail on an allegation of breach of duty "that a jury with common knowledge and an ability to read can easily assess." [*Id.*] 7 (quoting *House v. Maddox*, 360 N.E.2d 580, 584 (Ill. App. Ct. 1977) ("applying common knowledge exception to expert testimony requirement where lawyer failed to meet widely recognized time deadline that was 'so grossly apparent . . . that a layman would have no difficulty in appraising it'")).

Count I of the amended complaint claiming breaches of fiduciary duty alleges that defendants "failed to safeguard Plaintiff's cost retainer in a separate and identifiable Trust account and failed to return such funds, or take diligent efforts to return such funds, at the conclusion of their representation in violation of" Illinois Rule of Professional Conduct 1.15. [27] ¶ 56(h). Count I also asserts that defendants are jointly and severally liable to plaintiff "for all of the damages which they should have reasonably anticipated would results from their breaches of fiduciary duty," including the "damages sustained in connection with the 20-month delay in returning Plaintiff's $10,000 cost retainer." [*Id.*] 23–24 at ¶ 59(d).

Although plaintiff's expert Mary Robinson opines on the Illinois Rules of Professional Conduct, as the Court concludes below, Robinson's expert report does not mention Rule 1.15 or the cost retainer, *see* [444-3], nor was Rule 1.15 discussed during Robinson's deposition, *see* [444-4]. *See infra* III.A.3.c (Court's ruling prohibiting Robinson from testifying at trial as to defendants' alleged violations of Rule 1.15). In addressing the broad relief requested by defendants in their motion to exclude Robinson's testimony, the Court also concludes below that an attorney's handling of client funds and property, accompanied by many layers of requirements and exceptions enumerated in Rule 1.15, is not within "the common knowledge of laypersons." *See infra* III.A.3.d. But as further explained below, the Court will refuse to essentially strike or bar whole allegations or paragraphs from the plaintiff's

amended complaint via motions that address only evidentiary matters for trial and the testimony of experts.

To the extent that allegations in Count III overlap with allegations in Count I of the amended complaint, the Court denies defendants' Motion *in Limine* No. 4. The Court will not strike allegations from the amended complaint, but this ruling is subject to the Court's other pretrial rulings, most notably that Rule 1.15 does not fall within the "common knowledge" rule and that expert testimony is required to establish the standards of care.

## III.   Defendants' *Daubert* and Expert-Related Motions *in Limine* [444]

### A.   Mary Robinson

Mary Robinson, an Illinois attorney and former Administrator of the Attorney Registration and Disciplinary Commission of the Illinois Supreme Court, is plaintiff's proposed expert on professional responsibility who will opine regarding defendants' fiduciary obligations to their client. [460] 2. Defendants' motion seeks to limit and/or exclude Robinson's expert testimony in three ways: (1) bar Robinson from opining that defendants violated the Illinois Rules of Professional Conduct as providing impermissible legal conclusions; (2) bar Robinson from testifying that the assignment is illegal, void, unenforceable, unethical, or the like; and (3) bar Robinson from testifying as to allegations that defendants violated Rules of Professional Conduct 1.0, 1.4, 1.5, 1.15, or 1.16. *See* [444] 29–33, 33–34, 35–37.[3]

### 1.   Impermissible Legal Conclusions

Defendants criticize Robinson's expert report as offering impermissible legal conclusions and argue that "Robinson should not be permitted to offer opinions to the effect that the Defendants violated any of the Rules of Professional Conduct." [444] 30–33.

"Opinions that amount to legal conclusions do not assist the trier of fact, and expert testimony that is 'largely on purely legal matters and made up of solely legal conclusions' is not admissible." *Client Funding Sols. Corp. v. Crim*, 943 F.Supp.2d 849, 863 (N.D. Ill. 2013) (quoting *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003)). *See also CDX Liquidating Tr. ex rel. CDX Liquidating Tr. v. Venrock Assocs.*, 411 B.R. 571, 587 (N.D. Ill. 2009) ("Expert testimony about the governing law is barred under Rule 403 because it would be a waste of time if witnesses or counsel should duplicate the judge's statement of the law, and it would intolerably confound the jury to have it stated differently. . . . [The proffered expert] cannot judge what Defendants did or did not do; nor whether they

---

[3] Defendants' motion includes a fourth request as to Robinson's expert opinion, [444] 46–58, which the Court addressed in its May 6, 2024 order. [493, 494].

violated the law in that if he were to opine (and to explain how) their conduct constituted a breach of fiduciary duty, he would necessarily be deeming Plaintiff's version of the facts to be the credible account, which is prohibited. After all, the issue of whether Defendants breached their duties is an issue for the trier of fact to decide.").

In *Client Funding Solutions Corporation v. Crim*, third party plaintiff Crim proffered Robinson as her ethics expert and third party defendant VLG's motion *in limine* sought to exclude Robinson's opinion that VLG "breached its fiduciary duties of competence and loyalty to" Crim. 943 F.Supp.2d at 863. VLG argued that this opinion was improper "because whether VLG breached its fiduciary duty is a legal conclusion for the Court." *Id.* Judge Dow agreed and granted the motion "to the extent that Robinson may not testify that any conduct by VLG . . . constituted a breach of fiduciary duty." *Id.* Judge Dow clarified that Robinson was allowed to "testify as to the professional and ethical obligations imposed on attorneys and may provide her take on the 'concrete information' of record that the fact-finder may consider in drawing its own conclusions as to whether VLG . . . breached their fiduciary duties." *Id.* at 863–64. *See Webster Bank, N.C. v. Pierce & Assocs., P.C.*, No. 16-cv-2522, 2020 WL 616467, at *4 (N.D. Ill. Feb. 10, 2020) ("In considering whether the proposed testimony is improper, courts and parties must recognize the difference between stating a legal conclusion (which is not permitted) and providing concrete information against which to measure abstract legal concepts (which is permitted).").

Similarly, in *Webster Bank, N.C.*, plaintiff alleged legal malpractice under Illinois law asserting that defendant negligently handled a suit-on note claim. Defendant moved to strike plaintiff's expert, G. Patrick Murphy, a practicing attorney and retired federal judge. The court denied the motion, but barred Murphy from testifying to legal conclusions:

> Murphy will not be permitted to offer the following testimony as it amounts to legal conclusions that impinges on the duty of the jury: "Pierce's action is an egregious violation of the standard of care" (Dkt. 174, Ex. B, 11), "Pierce's actions evidence a conscious indifference by Pierce to Webster," (*Id.*) "[t]he unauthorized dismissal of the second action on February 26, 2014 by Pierce is a deviation of the standard of care." (*Id.*)

> Murphy can testify as to the standard of care, what reasonably careful lawyers would have done, and what mistakes Pierce made. Murphy cannot tell the jury that Pierce violated the standard of care—that is the very question the jury will answer. It is the jury's role to determine whether Pierce violated the standard of care, not Murphy's. *See Halcomb v. Washington Metropolitan Area Transit Authority*, 526 F. Supp. 2d 24, 27 (D.D.C. 2007) ("[A]n expert may offer

8

his opinion as to facts, that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied."). Murphy may also testify as to causation for Webster's damages in terms of attorneys' fees and costs. But any causation testimony must be based on Pierce's conduct, not on conclusory statements that Pierce violated the standard of care. Again, Murphy may testify that Pierce's actions caused Webster to irretrievably lose its cause of action against Ms. Jasinski, that Pierce could have prevailed on the underlying suit-on-note action if it behaved differently, and that reasonably careful Illinois attorneys would have behaved differently. But Murphy cannot conclusively state that Pierce violated the standard of care.

*Webster Bank, N.C.*, 2020 WL 616467, at *5.

For these reasons, the Court grants defendants' request to bar Robinson from offering legal conclusions, including testimony that defendants violated the Illinois Rules of Professional Conduct or breached their fiduciary duties. *See, e.g.*, [444-3] 6 (opining that defendants, "in failing to exercise reasonable care and skill, breached the fiduciary duty of loyalty required of Illinois attorneys"), 6 (stating that defendants "violated their duties as fiduciaries" and acted "in violation of Rule 1.8(i)"), 7 (opining that defendants "fail[ed] to comply with the requirements of Rule 1.8(a)"), 8 (stating that defendants "violated their duties as fiduciaries to [p]laintiff, and are deemed to have secured her assent to the assignment by means of undue influence").

### 2. Bar Robinson from testifying that the assignment is illegal, void, unenforceable, *etc.*

The Court grants defendants' motion to bar Robinson[4] from testifying that the assignment is illegal, void, unenforceable, unethical, or the like. [444] 33–35. In its April 29, 2024 order, the Court ruled as a matter of law that defendants' fiduciary duties did not attach at the time of the assignment and that the assignment was not void. [482] 3–13, 31. Robinson herself acknowledged during her deposition that if her conclusion regarding the assignment were incorrect, her opinion as to Illinois Rule of Professional Conduct 1.8(a) (addressing when lawyers entered into business transactions with clients) would be negated. [444-4] 16 (Tr. 55:18–24, 56:1–12). Accordingly, any opinions by Robinson relating to the assignment are excluded and corresponding objections to those opinions are moot.

---

[4] Defendants' motion more broadly requests that the Court "bar plaintiff and plaintiff's witnesses and experts (specifically including Robinson) from making any statements, offering or eliciting testimony or opinions, or making any arguments that relate, refer or pertain to the assignment as illegal, void, unenforceable, unethical, or the like." [444] 33, 35. However, this goes beyond the purported scope of this motion (*i.e.,* experts) and the motion's applicable heading focusing on Bucheit and Robinson. But the Court's ruling on that legal issue applies to all aspects of the trial, and thus this restriction defendants seek has already been ruled upon.

### 3. Failure to Opine on Rules 1.0, 1.4, 1.5, 1.15, or 1.16 in the Expert Report

Defendants' expert-related motions *in limine* include a section particularly directed at the opinions of Robinson but generally requesting that the Court bar plaintiff and plaintiff's witnesses and experts[5] from making or eliciting any testimony, opinions, or arguments that relate, refer, or pertain to accusations in the amended complaint that are unsupported by expert opinions, more specifically, plaintiff's allegations that defendants violated certain Illinois Rules of Professional Conduct. [444] 35–37, 40.

Count I of the amended complaint alleges that defendants breached their fiduciary duties to plaintiff in the underlying case by, *inter alia*, violating several Illinois Rules of Professional Conduct. *See* [27] ¶¶ 3, 5, 49, 55–56. Defendants seek to bar references to Rules 1.0, 1.4, 1.5, 1.15, and 1.16 because plaintiff has failed to provide expert testimony substantiating any purported violations of these rules. [464] 20. Accordingly, defendants argue such allegations must be excluded from trial because it is generally required that the standard of care against which an attorney defendant's conduct will be measured be established through expert testimony, and failure to present expert testimony is usually fatal to a plaintiff's case. [444] 35–37 (citing *Barth v. Reagan*, 564 N.E.2d 1196, 1199–1200 (Ill. 1990); *Ball v. Kotter*, 723 F.3d 813, 823–24, 829 (7th Cir. 2013)). Defendants point out that although the amended complaint alleges defendants violated Rules 1.0(e), 1.2, 1.4, 1.5, 1.8, 1.15, and 1.16, Robinson's expert report only opines on Rules 1.2, 1.7,[6] and 1.8.[7] [444] 36–37 (citing [27] ¶ 56; [444-3] 6–9). Defendants argue that because plaintiff has not offered expert opinion testimony to substantiate plaintiff's allegations relating to Rules 1.0(e), 1.4, 1.5, 1.15, or 1.16, it would be inappropriate and highly prejudicial for plaintiff to present those allegations to the jury. [*Id.*] 36–37.

In response, plaintiff simply asserts that she "is entitled to augment her legal malpractice claim with reference to the Rules of Professional Conduct." [460] 23–24. In support, plaintiff quotes one Illinois state court case stating that "[b]ecause legal malpractice actions involve conduct failing to adhere to certain minimum standards, ethical standards are relevant considerations." [*Id.*] (quoting *Brannen v. Seifert*, 1 N.E.3d 1096, 1116–17 (Ill. App. Ct. 2013)). It is not clear to the Court how this quote supports plaintiff's position, nor how it refutes defendants' assertion that without

---

[5] The only other expert that defendants identify in this section is Bucheit, but the Court has previously ruled on defendants' requests in this section of defendants' motion as to Bucheit. *See* [482] 26–28 (granting defendants' request as to Bucheit's Opinion 1 but denying as to Opinion 2).

[6] Although Robinson's expert report opines on Rule 1.7(a)(1), [444-3] 7–8, the amended complaint does not allege violations of Rule 1.7. *See* [27].

[7] Robinson's report also generally addresses attorneys' duties to "act toward their client with the highest degree of honesty, candor, fairness, good faith, and undivided loyalty." [444-3] 6.

expert testimony opining on these rules of professional conduct, plaintiff cannot sustain her allegations as to those rules. Furthermore, the *Brannen* case upon which plaintiff relies involved the question of whether jury instructions including the text of the attorney disciplinary rules were improper. *Brannen*, 1 N.E.3d at 1116–17.

"It is true that, under Rule 26, experts must provide written reports with 'complete statement[s] of all opinions the witness[es] will express and the basis and reasons for them.'" *Ploss v. Kraft Foods Grp., Inc.*, 637 F.Supp.3d 561, 579 (N.D. Ill. 2022) (quoting Fed. R. Civ. P. 26(a)(2)(B)(i)). "But an expert report need not cover every detail of what an expert might say in his or her forthcoming testimony. The purpose of an expert report 'is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion ... so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary.'" *Huntington Chase Condo. Ass'n v. Mid-Century Ins. Co.*, 379 F.Supp.3d 687, 703 n.8 (N.D. Ill. 2019) (alteration in original) (quoting *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009)). *See also Smith v. City of Chi.*, No. 15-cv-03467, 2019 WL 4825232, at *5 (N.D. Ill. Oct. 1, 2019) (quoting *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010)) (same). And "experts are not 'strictly limited' to the words in their reports." *Ploss*, 637 F.Supp.3d at 579 (quoting *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009)). "Even testimony outside the scope of experts' reports does not automatically render such testimony inadmissible. Rather, in such circumstances, courts must assess whether the experts' non-disclosure—the testimony they offer ostensibly beyond that promised in the experts' reports—'was justified or harmless.'" *Id.* (quoting *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)). *See also* Fed. R. Civ. P. 37(c)(1); *Johnson v. C. R. Bard, Inc.*, 77 F.4th 641, 646 (7th Cir. 2023) ("The consequences for violating these rules can be dire. Under Rule 37(c)(1), '[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness ... at a trial, unless the failure was substantially justified or is harmless.'"); *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010) ("The consequence of non-compliance with Rule 26(a)(2)(B) is exclusion of an expert's testimony ... unless the failure was substantially justified or is harmless.") (cleaned up).

## a.     Rules 1.0(e) and 1.4

The Court does not agree with defendants' assertion that plaintiff has not offered expert testimony to substantiate her allegations relating to Rules 1.0(e) (defining informed consent) and 1.4 (addressing communication with and keeping a client informed). [444] 37. Directly citing these rules, Robinson's expert report states that "[t]o secure informed consent, a lawyer must provide sufficient information and explanation to allow a client to understand the significance of a decision, the material risks involved and available alternatives." [444-3] 8.

However, in applying these rules and their standard to the case, Robinson only opines on whether defendants secured plaintiff's informed consent as to the assignment of her claim for statutory attorneys' fees. [444-3] 8. The amended complaint alleges much broader violations, stating that defendants "failed to obtain Plaintiff's informed consent concerning most aspects of her representation in violation of Rule 1.0(e)[.]" [27] 19–20 at ¶ 56(a). As to Rule 1.4, the amended complaint alleges that defendants failed to properly inform plaintiff "regarding all of the circumstances necessary to obtain Plaintiff's informed consent and failed to explain matters to Plaintiff sufficiently to permit her to make informed decisions regarding her representations[.]" [*Id.*] 20 at ¶ 56(c). *See also* [*id.*] 20–21 at 56(e) (allegations involving Rule 1.4, but in relation to the assignment). Throughout the amended complaint, plaintiff refers to moments during the representation that defendants did not acquire her informed consent. *See* [27] 14 at ¶ 39 (alleging defendants never discussed nor sought plaintiff's informed consent to joint motion to extend fact discovery deadlines), 15 at ¶ 39 (alleging defendants never informed plaintiff that an additional discovery had been conducted), 15 at ¶ 41 ("Prior to the entry of the 'agreed' motion, Plaintiff did not provide informed consent for Defendants to enter into any agreement which would defer Defendants' obligation to conduct discovery and prepare the case for trial."), 16 at ¶ 45 (alleging that after July 2014, defendants "decided not to take further discovery or hire any consultants or experts" and that defendants "made such decisions without obtaining Plaintiff's informed consent"). Robinson's report provides no expert opinion on defendants' alleged violations of Rule 1.0(e) or Rule 1.4 as to any other aspect of defendants' representation. The Court reiterates that with the Court's ruling as a matter of law that the assignment was not void, plaintiff is barred from arguing or providing any expert testimony as to the assignment, including Robinson's testimony. *See supra* III.A.2; [482] 10–13.

Rule 1.4 was also mentioned at Robinson's deposition. *See* [444-4] 17, 29, 35–37. "Questions asked at depositions may expand the scope of the expert's testimony." *Guarantee Tr. Life Ins. Co. v. Am. Med. & Life Ins. Co.*, 291 F.R.D. 234, 237 (N.D. Ill. July 26, 2013). *See In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 659 (N.D. Ill. 2006) (stating that questions asked at a deposition that go beyond the reports "may well have a bearing on the permissible scope of testimony at trial").

The first mention of Rule 1.4 during Robinson's deposition involved "quantum meruit" and when that constitutes a material circumstance that the attorney would have to advise a client about. [444-4] 17 (Tr. 63:10–24, 64:1–18). The second discussion of Rule 1.4 was more general:

Q.   We previously talked about what that rule requires. Would you agree with me that there's no boilerplate that an attorney can turn to that tells them what to advise a client under a particular set of circumstances?

A.     I agree that there's no boilerplate, yes.

Q.     An attorney, in order to comply with 1.4, must rely on, among other things, their own understanding of the client and the client's ability to best receive information?

A.     That would be relevant.

Q.     To determine how best to provide a client with the information reasonably necessary for the client to make an informed decision, the attorney would draw on their experience of past communications with that client to ensure that they're communicating effectively?

A.     Yes.

[*Id.*] 35 (Tr. 136:21–24, 137:1–24), 36 (Tr. 138:1–24, 139:1–4). These questions and responses during Robinson's deposition did not expand the scope of Robinson's testimony to include opinions on whether defendants obtained plaintiff's informed consent about discovery and extensions of discovery deadlines in the underlying case.

And the final referral to Rule 1.4 in Robinson's deposition clarified that Robinson offered no opinion as to Rule 1.4 and the settlement: "Well, my section of the report is clearly directed at the first end of the representation. . . . And it had nothing to do with – I don't think I've offered a 1.4 opinion on the settlement." [*Id.*] 37 (Tr. 142: 22–24, 143:2–4). *See also* [*id.*] 36 (Tr. 140:21–24, 141:1), 37 (Tr. 142:9–14). Robinson herself therefore indicates that the focus of her expert report was the beginning of the representation and that she has provided no opinion on whether defendants violated Rule 1.4 in connection with the settlement.

While Robinson's opinions focus on the assignment, the Court denies the defendants' motion as to Rules 1.0(e) and 1.4. Robinson may testify as to Rules 1.0(e) and 1.4, but any further testimony she offers at trial as to those rules must also fall within the scope of her expert report and deposition testimony. This ruling is also subject to the Court's pretrial rulings, to include that the assignment is not void and that Robinson may not testify to legal conclusions within the jury's domain.

### b.     Rule 1.5

The amended complaint also alleges that defendants collected an unreasonable fee in light of the limited amount of work they performed and that defendants failed to advise plaintiff about the effect withdrawing their representation would have on the fees in violation of Rule 1.5. [27] 20 at ¶ 56(d), 22 at ¶ 56(k). *See* Ill. Sup. Ct. R.

1.5(a), (f)(2) (2010). Robinson's expert report does not opine on Rule 1.5, but the rule did come up once during Robinson's deposition:

Q.    Are there any admonishments or forms of advice that an attorney is required to give to a prospective client in relation to a potential contingency fee arrangement between an attorney and that prospective client?

A.    I would say that the bear minimum would have to be in writing, and it would have to be the essential terms have to be spelled out.

. . .

A.    Well, whatever rule 1.5 requires to be in writing, yes.

Q.    Well, right. So 1.5 is the ethical obligation on the attorney and, furthermore, says that any contingency fee needs to be in writing?

A.    Yes.

Q.    My question is more so an attorney sitting across the table from a client, a prospective client proposing to that person entering into a contingency fee agreement with that attorney in order for that attorney to handle that person's matter, is there any advice that that attorney is required to give that person?

A.    Beyond what is required under 1.5, I would say not unless there's some unusual -- different about the case.

Q.    1.5 doesn't require advice, it simply requires that that advice has to be in writing?

A.    Well, it requires that the agreement include some recitations so that the client understands what the actual terms are.

Q.    Okay. Such as?

A.    It doesn't require advice beyond that, right.

. . .

Q.    I'm talking about advice that this attorney must communicate to the client rather than the contents of the contingency fee agreement.

14

A.    Beyond that, probably not. Depends on the case.

[444-4] 28.

As the Court noted in the preceding section, "[q]uestions asked at depositions may expand the scope of the expert's testimony." *Guarantee Tr. Life Ins. Co.*, 291 F.R.D. at 237. *See also In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. at 659 (stating that questions asked at a deposition that go beyond the reports "may well have a bearing on the permissible scope of testimony at trial"). However, Robinson's deposition did not add any opinion as to plaintiff's allegations that defendants collected an unreasonable fee in light of the purportedly limited amount of work they performed or that defendants failed to inform plaintiff of the effect withdrawing their representation would have on the fees.

Again, the Court denies defendants' motion as to Rule 1.5, as Robinson may testify as to the content of the rule and her understanding of it, again subject to the scope of her report and deposition testimony, as well as the Court's prior rulings on the legal issue of the assignment and barring Robinson from testifying as to legal conclusions within the jury's domain.

### c.    Rules 1.15 and 1.16

The amended complaint alleges that defendants violated Rule 1.15 by "fail[ing] to safeguard Plaintiff's cost retainer in a separate and identifiable Trust account and failed to return such funds, or take diligent efforts to return such funds, at the conclusion of their representation[.]" [27] 22 at ¶ 56(h). Rule 1.15 involves the general duties of a lawyer regarding safekeeping property. *See* Ill. Sup. Ct. R. 1.15 (2010). The amended complaint also alleges that defendants violated Rule 1.16, which involves lawyers declining or terminating a representation, by threatening to withdraw as plaintiff's counsel "knowing that any attempted withdrawal would result in a material adverse effect on Plaintiff's interests." [27] 22 at ¶ 56(i). To the extent this "material adverse effect on Plaintiff's interests" refers to the assignment, any such allegation is no longer viable. *See supra* III.A.2; [482] 10–13. For example, the amended complaint's other allegations under Rule 1.16 clearly refer to and involve the assignment. *See* [27] 21 at ¶ 56(g), 22 at ¶ 56(j). Now that the Court has ruled as a matter of law that the assignment is void, these allegations are excluded from the case.

Nevertheless, Robinson's expert report does not mention Rules 1.15 or 1.16. *See* [444-3]. Nor were these rules discussed during Robinson's deposition. *See* [444-4]. It would not be harmless to allow plaintiff to present expert testimony at trial on topics that the expert did not opine on in either her report or during her deposition. Plaintiff needed to convey the full substance and scope of Robinson's opinion so that

defendants could be "ready to rebut, to cross-examine, and to offer a competing expert if necessary.'" *Huntington Chase Condo. Ass'n*, 379 F.Supp.3d at 703 n.8.

The Court prohibits plaintiff from presenting testimony from Robinson at trial as to defendants' alleged violations of Illinois Rules of Professional Conduct 1.15 and 1.16.

### d. Scope of the Requested Relief

The Court acknowledges that defendants' motion requests a broader scope of relief than the Court is addressing in this ruling. Defendants argue that plaintiff "has failed to sustain most of her allegations in Count I through expert testimony" and that because expert testimony is required to establish the standard of care, plaintiff should not be allowed to present those accusations to the jury. [444] 35–37. There is a disconnect between the relief requested in the header to this section of defendants' motion ("Bar Bucheit and Robinson From Offering Gratuitous Testimony Regarding Breaches of the Standard of Care or Fiduciary Duties, or Violations of the Rules of Professional Conduct") and the overall scope of the motion itself which was filed as addressing experts, and then the broader relief requested at the end of this particular section of the motion:

> Wherefore, the Defendants respectfully request that this Honorable Court enter an Order barring the Plaintiff, and her witnesses, experts and attorneys, from making any statements, offering or eliciting any testimony or opinions, or making any arguments, directly or indirectly, that relate, refer or pertain to accusations in the Plaintiff's Amended Complaint that are unsupported by expert opinions and/or expert criticisms of actions or omissions that did not proximately cause any of the Plaintiff's asserted damages.

[444] 35–37, 40. This latter requested relief—*i.e.*, to essentially dismiss certain allegations from the amended complaint and plaintiff's claims—goes beyond the purported scope of a motion to limit and/or bar opinions in Robinson's expert testimony at trial and certainly goes beyond the purported focus of this motion (*i.e.*, experts) and the motion's applicable heading.

As noted earlier, the Court recognizes that "[g]enerally, a plaintiff must establish the standard of care against which the defendant attorney's conduct must be measured through expert testimony, and the failure to present expert testimony is typically fatal to the plaintiff's case. *See Barth v. Reagan*, 564 N.E.2d 1196, 1199–1200 (Ill. 1990)." *Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, 2022 WL 540662, at *1 (N.D. Ill. Feb. 23, 2022). *See also Jones v. Chi. HMO Ltd. of Ill.*, 730 N.E.2d 1119, 1130 (Ill. 2000) ("Expert testimony is necessary to establish both (1) the standard of care expected of the professional[,] and (2) the professional's deviation

from the standard."); *Advincula v. United Blood Servs.*, 678 N.E.2d 1009, 1021 (Ill. 1996) (stating that "in professional negligence cases, unlike negligence actions in general, the plaintiff bears a burden to establish the standard of care through expert witness testimony"). "Illinois courts, however, have carved out a niche from this general requirement, known as the 'common knowledge rule.'" *Ball v. Kotter*, 723 F.3d 813, 822 (7th Cir. 2013) (citing *House*, 360 N.E.2d at 584). Under this "common knowledge rule," "no expert testimony is needed 'where the professional's conduct is so grossly negligent . . . that a layperson could readily appraise it[.]" *Id.* (alterations in original) (quoting *Advincula*, 678 N.E.2d at 1021). *See also Hatchett v. W2X, Inc.*, 993 N.E.2d 944, 966 (Ill. App. Ct. 2013) (stating that the "general rule does not apply where the common knowledge of laypersons allows them to recognize the attorney's negligence"). Although defendants' motion refers to the common knowledge rule, [444] 35–36, it does not evaluate whether any of the rules Robinson failed to opine on in her report fall within this exception. Rather, defendants make a blanket assertion that because Robinson failed to include Rules 1.0, 1.4, 1.5, 1.15, and 1.16 and plaintiff provides no other expert witness opining on these rules, then plaintiff is prohibited from raising these allegations at trial.

"[T]he Illinois Rules of Professional Conduct and the affirmative obligations required under them and Illinois case law are relevant to the standard of care." *Ball*, 723 F.3d at 822 (citing *Owens v. McDermott*, 736 N.E.2d 145, 157 (Ill. App. Ct. 2000)). But because the Rules "do not establish a separate duty or cause of action" and are "not an independent font of liability," "a violation of the Rules in and of itself does not establish liability in a legal malpractice case, and there is a difference between having a 'duty' to do something under the Rules and determining just what that 'something'—i.e., the standard of care—encompasses." *Id.* at 823. And "what is required to satisfy a more complex 'duty'—one based on a professional's *skill*—is different than when an attorney misses a deadline, fails to comply with a statute of limitations, or completely neglects to take any action regarding a case." *Id.* (emphasis in original) (citing *Barth*, 564 N.E.2d at 1201). "'Standard of care' is an abstract concept to a non-attorney, especially in a legal malpractice claim where the particular type of services rendered to [clients] are material to the analysis, and attorneys are subject to unique duties and limitations . . . ." *Signal Fin. Holdings*, 2022 WL 540662, at *2.

The nuances of what constitutes "informed consent" under Rules 1.0(e) and 1.4 are not within the common knowledge of laypersons. *See Ball*, 723 F.3d at 823–24 ("Some negligence is obvious; other types are not. Communicating with clients and recognizing conflicts of interest in a legal transaction do not fit within these 'obvious' examples or the purview of a lay juror."). So too the reasonableness of the fee defendants charged plaintiff, particularly in light of the many factors to consider under Rule 1.5, does not present a situation "where the record discloses obvious and explicit carelessness in defendant's failure to meet the duty of care owed by him to plaintiff[.]" *Id.* at 822 (quoting *Brainerd v. Kates*, 386 N.E.2d 586, 589 (Ill. App. Ct.

1979)). As to Rule 1.15, an attorney's handling of client funds and property, accompanied by many layers of requirements and exceptions, is not within "the common knowledge of laypersons." Nor is the question of whether the representation was terminated "without material adverse effect on the interests of the client" under Rule 1.16.[8]

In short, the allegations in this case do not involve "the most obvious cases of negligence," *Signal Fin. Holdings*, 2022 WL 540662, at *2, such that a layperson could readily appraise it. Expert testimony is therefore required to establish the standards of care as to the allegations in the second amended complaint that defendants violated the Illinois Rules of Professional Conduct.

So, the motion is granted in so much as expert testimony is required to establish the standards of care. However, the Court refuses to reach the full breadth of defendants' requested relief and will not essentially strike or bar whole allegations or paragraphs from the plaintiff's amended complaint via this motion that addresses only the testimony of experts Robinson and Bucheit. The Court has addressed particularized and specific argument raised by defendants as to both experts and their testimony will be subject to those rulings and the Court's other rulings, for example on the legal issue of the assignment.

## B.    Kathleen Graham

As part of her breach of fiduciary duty claim, plaintiff alleges that certain non-monetary terms of the underlying settlement agreement, particularly the "no future employment" clause, prohibit her from obtaining gainful employment. [444] 41. *See* [27] ¶¶ 50, 59(a). Defendants raise another *Daubert* challenge, arguing that plaintiff should be barred from offering opinions provided by Kathleen Graham in her expert report and during her deposition because Graham's opinions employed "flawed and unreliable methodology." [444] 41.

"In performing its gatekeeper role under Rule 702 and *Daubert*, 'the district court must engage in a three-step analysis before admitting expert testimony.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). The Court "'must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting *Myers*, 629 F.3d at 644). Defendants attack Graham's opinions under the second prong: "Methodologically speaking, Graham's opinions derive from building upon one flawed assumption after another to reach a conclusion that while testable, was never tested."

---

[8] The Court notes that the amended complaint contains allegations that defendants violated Rule 1.16 in connection with the assignment. [27] 21 at ¶ 56(g), 22 at ¶ 56(j). Now that the Court has ruled as a matter of law that the assignment is void, these allegations are excluded from the case.

[444] 46. Although they do not explicitly identify it as such, defendants also raise an issue with Graham's qualifications, which falls under prong one: "Graham was clear that she was not retained to offer a legal interpretation. . . . Graham has no legal training . . . . Thus, she had no basis to analogize the 'no future employment' clause to a non-compete agreement in the first instance." [*Id.*] 44.

Plaintiff describes Graham as an executive search, recruitment, and compensation consultant and offers her as an expert to opine on economic consequences of Section 12 of the Settlement Agreement. [468] 6. The district court's "'gatekeeping' obligation . . . applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge.'" *Gopalratnam*, 877 F.3d at 779 (alteration in original) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)). *See also Lees*, 714 F.3d at 521 (noting that "the *Daubert* analysis applies to all expert testimony under Rule 702, not just scientific testimony"). And because "there are many different kinds of experts, and many different kinds of expertise," the test of reliability is flexible. *Gopalratnam*, 877 F.3d at 780 (quoting *Kumho Tire*, 526 U.S. at 141, 150). The Advisory Committee Notes to Rule 702 emphasize that "[a]n opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist." Fed. R. Evid. 702, Advisory Committee Note (2000). *See id.* ("While the relevant factors for determining reliability will vary from expertise to expertise, the amendment rejects the premise that an expert's testimony should be treated more permissively simply because it is outside the realm of science.").

In short, "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." *Id.* "The district court holds broad discretion in its gatekeeper function of determining the relevance and reliability of the expert opinion testimony." *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017) (citing *Kumho Tire*, 526 U.S. at 141). And "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 142 (emphasis in original).

Plaintiff's amended complaint alleges that defendants forced her into a settlement that was not fair to her, which included a nonmonetary "no future employment or relationship" clause:

> To ensure that Employer would settle the case and agree to pay them legal fees, Defendants abandoned negotiation efforts which would protect Plaintiff's interests in the nonmonetary terms of the Settlement Agreement. In particular, Defendants failed to properly protect Plaintiff's privacy, professional reputation and ability to seek and obtain future employment in the consulting industry. Defendants insisted that Plaintiff agree to disclose to any future employer that she would be

19

unable to work on matters which in any way related to Employer or any of its clients. Given the nature of Plaintiff's training, employment experience with multiple consulting firms and interest in further developing her career in the consulting profession, Plaintiff's ability to offer her services to traditional consulting firms and traditional consulting clients was effectively eliminated by this provision in the Settlement Agreement. Defendants also insisted the Plaintiff agree not to apply for future employment with Employer, even though Defendants knew, or should have known, that the Equal Employment Opportunity Commission advised that such agreements constituted unlawful retaliation under applicable federal statutes.

[27] ¶¶ 50, 59(a).

Graham's expert report opines that "certain aspects of the Settlement Agreement were and are unreasonable, unprecedented, and caused harm to" plaintiff. [444-5] 6. In Section I of her report, Graham criticizes five paragraphs of the settlement agreement: (1) Section 1(a) defining the scope of "Deloitte entities,"[9] (2) Section 12(a), (3) Section 12(b), (4) Section 12(c), and (5) Section 12(d). [*Id.*] 6–9.

**12. No Future Employment or Relationship.** a) Kormi expressly waives and releases any and all rights or claims (if any) to employment, re-employment, assignment or reinstatement with or to any Deloitte Entity insofar as Kormi is aware of the identity of the same as a Deloitte Entity and insofar as the same has not otherwise ended its relationship with Deloitte Consulting. Kormi further specifically agrees not to seek or accept a position or assignment as an employee or to seek or accept a position or assignment as a direct contractor with or to any Deloitte Entity (herself, or by seeking or accepting a position or assignment with another person or entity where she knows or has reason to know that such position or assignment would involve her providing services to a Deloitte Entity (hereinafter, a "direct subcontractor")) of which she is aware is a Deloitte Entity, insofar as such Deloitte Entity has not otherwise ended its relationship with Deloitte Consulting. For avoidance of doubt, the foregoing sentence is not breached solely by Kormi (x) responding to a blind ad, to a written solicitation that does not reveal the name of the employer, or to a written solicitation from an employer whose name does not make it reasonably apparent that it is

---

[9] "'Deloitte Entities' shall mean Deloitte Consulting, Deloitte LLP, Deloitte & Touche LLP, Deloitte Tax LLP, Deloitte Financial Advisory Services LLP, Deloitte Services LP, the Deloitte Touche Tohmatsu verein, Deloitte Global Services Limited, Deloitte Global Services Holdings Limited, Deloitte Touche Tohmatsu Limited ('DTTL') and any and all DTTL associate and member firms, and all their respective past, present and future parent companies, subsidiaries, other affiliates, divisions, related entities, and joint venturers, and all their respective predecessors, successors, transferees and assigns." [182] 1.

affiliated with any of the Deloitte Entities, in each case unless Kormi otherwise is or reasonably should be aware that the entity in question is one of the Deloitte Entities, or (y) seeking or accepting a position or assignment with another person or entity that performs services for a Deloitte Entity, as long as she neither knows nor bas reason to know that such position or assignment would involve her providing services to a Deloitte Entity; and, in each case, provided further that nothing herein limits or restricts the Deloitte Entities' other respective rights under this Section 12, including without limitation to cease any further interviewing, consideration, employment or retention (if any) that may result from any such response by Kormi.

b) In the event that Kormi does seek or obtain a position or assignment as an employee or a direct contractor (including a direct subcontractor) with or to any of the Deloitte Entities (whether or not in breach of this Agreement), it is agreed and understood that this Agreement shall constitute good cause and a legitimate and non-discriminatory basis for the applicable Deloitte Entity or Deloitte Entities: 1) to refuse to accept an application for employment or proposal for retention or assignment as a direct contractor (including a direct subcontractor) from or involving Kormi; 2) to refuse to interview Kormi; 3) to refuse to hire or retain or accept an assignment of Kormi; and 4) in the event Kormi is somehow hired, rehired, assigned or retained in contravention of this Agreement, to terminate Kormi's employment, assignment or retention including any agreement for same, in each case without cost or obligation except as and to the extent expressly provided in Section 12(c) below.

c) Without limiting the foregoing in any way, in the event that Kormi at any time is or becomes employed by an entity that subsequently directly or indirectly is acquired by or merges with Deloitte Consulting or any of the other Deloitte Entities (an 'Acquired/Merged Entity'), Deloitte Consulting or its Acquired/Merged Entity can terminate Kormi's employment (including if such employment is with any of the Deloitte Entities) and this Agreement shall constitute good cause and a legitimate and non-discriminatory basis for doing so. In that event, such termination of Kormi's employment will be treated for severance and other benefit purposes (to the extent permitted under applicable plans, policies and law) as an economic postmerger/acquisition layoff. The Parties understand and agree that Deloitte Consulting or its Acquired/Merged Entity shall not be obligated to create or offer any particular type or minimum of severance or other benefits above, but rather shall, under the foregoing circumstances, allow Kormi to receive the same severance and other benefits, as applicable, as other similarly

situated employees (i.e., with comparable titles and years of experience) laid off in that acquisition or merger by Deloitte Consulting and any such severance or other benefit would be conditioned on Kormi's obligation to agree to and abide by the same terms and conditions as required by any severance plan or policy generally applicable to such other similarly situated employees (including without limitation any generally applicable requirement to sign a release of claims as a condition of any such severance or other benefit).

d) If Deloitte Consulting or any of the other Deloitte Entities engages a contractor that employs or has retained Kormi (whether directly or through any subcontractor), Deloitte Consulting or any of the other Deloitte Entities can instruct the contractor that Kormi is not to work on the engagement as a condition of the engagement, but shall not request that the contractor terminate Kormi's employment with such contractor.

[182] 17–19.

In Section II of her report, Graham opines that had Kormi not signed the 2014 settlement agreement, there is a "high probability" that she would have obtained certain titles and salary ranges. [444-5] 10, 14. But at her deposition, Graham testified that she is not offering an opinion that Plaintiff lost out on certain dollar figures as a result of the settlement aIgreement (despite the chart that appears as Exhibit 4 to Graham's report with specific dollar figures). [444-6] (Tr. 84:21–24; 85:1–22).

With an emphasis on Section I of Graham's report, defendants identify the flaw in Graham's methodology "driving all of her conclusions" as Graham's "conclusion that the 'no future employment' clause is a non-compete agreement[.]" [444] 43. *See also* [464] 21 ("Graham equates the subject provision in the Underlying Settlement Agreement to a non-compete provision. This is akin to equating a grape to a carrot."), 22 ("[Graham] goes from the underlying settlement clause as Point A, to a non-compete agreement as Point B, to a requirement to disclose the non-compete or be in jeopardy for not disclosing it as Point C, to being unemployable as Point D. But her methodology crumbles when one realizes that one cannot actually go from Point A to Point B."). Plaintiff's opposition brief provides little argument on this point, simply stating that "[t]his is not a methodological 'flaw' worthy of a *Daubert*-related motion": "If Defendants are asserting that the employment restrictions in a 'non-compete' provision are not comparable to the 'No Future Employment' clause, that is the subject of cross examination and closing argument." [460] 21–22.

Defendants assert that the "no future employment" provision in paragraph 12(a) of the settlement agreement "can only be described as a <u>pro</u>-compete agreement

because it allows her to work for Deloitte's competitors, and it was methodological error for Graham to attempt analogy between legal polar opposites." [444] 44 (emphasis in original). *See also* [464] [21] ("Not only is the subject provision not a non-compete clause, it is actually a please-do-compete clause."). In contrast, Graham throughout her report and in her deposition testimony refers to this same provision as a non-compete provision.

In defining and articulating what noncompetition contracts, agreements, and covenants are, Black's Law Dictionary provides the following:

> A promise, usu. in a sale-of-business, partnership, or employment contract, not to engage in the same type of business for a stated time in the same market as the buyer, partner, or employer.

> Noncompetition covenants are valid to protect business goodwill in the sale of a company. In employment contexts, requiring the employee, after leaving the employment, not to do a particular type of work, they are disfavored as restraints of trade. Courts generally enforce them for the duration of the relationship, but provisions that extend beyond that relationship must be reasonable in scope, time, and territory.

Covenant, *Black's Law Dictionary* (11th ed. 2019). The "no-future employment" condition in the settlement agreement does not require plaintiff "not to engage in the same type of business for a stated time in the same market as" her former employer. Nor is it "requiring the employee," here, plaintiff, "after leaving the employment, not to do a particular type of work[.]"

Graham's deposition testimony confirms her incorrect impression that the "no future employment" clause in Section 12 is a non-compete provision:

> Q.    Would you consider the language that was in this particular settlement agreement involving Ms. Kormi to be a noncompete clause?

> A.    The word noncompete means an agreement not to compete between an employer and an employee, and looking at the terms in that Section 12, it was a highly restrictive employee agreement between a former employee and the employer. That would be a noncompete.

[444-6] 9 (Tr. 30:1–9). This is not just a matter of Graham's choice of words. A non-compete and a no-rehire are not synonymous. Even if both types of conditions may constitute a "highly restrictive employee agreement between a former employee and

23

the employer" because of the limitations imposed on the employee, that does not mean the two covenants are the same.

But the Court recognizes that Graham is likely attempting to liken the restraints inherent in the "no future employment" sections to those imposed by non-compete provisions. For example, citing Deloitte's website, Graham's report states that Deloitte "is 'one of the largest professional services organizations in the United States . . . providing services to over 80 percent of the Fortune 500,' with 'a key component of Deloitte LLP's strategy is growth through acquisition,' and 'Deloitte has more than 263,900 professionals at member firms delivering services . . . in more than 150 countries and territories.'" [444-5] 6 (alterations in original). Graham opines that "[t]he consequence of not limiting this Agreement's scope to just Deloitte Consulting basically leaves Kormi with very limited employment opportunities in the consulting industry." [Id.] Although not explicitly stated in Graham's report this way, the implication appears to be that due to Deloitte's size and prevalence in the consulting industry, as well as its potential future growth, plaintiff's future employment within the consulting industry is severely limited in a way similar to a non-compete's restrictions on an individual's abilities to work in a certain industry.

In opining that the "no rehire" conditions are "unreasonable, unprecedented, and caused harm to" plaintiff, Graham relies on "fairly standard practice[s]" and data from non-compete agreements. In other words, Graham applies the industry standards and practices of non-compete agreements to the "no rehire" provision in the settlement agreement at Section 12. The same is true for Graham's other opinions. [Id.] 7, 8, 9. The report also opines on the imposed duration of the "no future employment" condition, asserting that although the provision expires after eleven years, "[i]t is highly irregular for even a senior non-owner executive to receive more than a two year non-compete, which is in line with *Society for Human Resource Management's (SHRM)* November 28, 2017 article 'Are Noncompete Agreements Right for You?' by Rita Zeidner." [Id.] 9. Graham simply equates the no rehire with a non-compete with no explanation or even acknowledgement of how the two differ or the different circumstances surrounding each. Rather, what Graham has presented in her report and deposition testimony are clear statements that she considers the settlement agreement's "no-rehire" condition *to be* a non-compete.

But all of these points raised by the defense go to the weight of Graham's testimony, as opposed to her methodology. The Seventh Circuit has acknowledged that even "'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). *See also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt."). "The district court holds broad discretion in its gatekeeper

function of determining the relevance and reliability of the expert opinion testimony." *Krik*, 870 F.3d at 674 (citing *Kumho Tire Co.*, 526 U.S. at 141). And "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142 (emphasis in original). "Rejection of expert testimony is the exception, not the rule." *Mill Creek Country Club, Inc. v. Evergreen All. Golf Ltd., LP*, No. 19 C 1971, 2023 WL 2838536, at *3 (N.D. Ill. Apr. 7, 2023) (citing Fed. R. Evid. 702, Advisory Comm. Notes (2000)). All of these proposed flaws in Graham's terminology, comparisons, and opinions raised by the defense will be brought out on cross examination, as they were during her deposition. The Court is also not concerned that these flaws will confuse the jury.[10] For these reasons, the defendants' motion to exclude Graham is denied.

## IV. Plaintiff's Expert-Related Motions *in Limine* [448]

### A. David Rolewick

Defendants produce Illinois attorney David Rolewick as their legal expert to opine on how a reasonably careful attorney would act under the circumstances and whether the specific actions of defendants in the underlying case were in keeping with that standard. *See* [453] 2, 4; [448] 13–18 (expert report and resume of David Rolewick). *Compare* [444-1] 3 (plaintiff's expert Bucheit proffered to opine on the knowledge, skill, and care a reasonably careful lawyer would have exercised under the circumstances). Plaintiff seeks to bar and/or limit the scope of Rolewick's expert testimony.

### 1. Overarching Objection to Rolewick's Report as Deficient Under Rule 26

Plaintiff first argues as a threshold matter that Rolewick's report does not supply the basis and reasons for his opinions or the data he considered in forming his opinions. [448] 2 (citing Fed. R. Civ. P. 26). Plaintiff includes this "basis for exclusion" in several objections to specific statements made in Rolewick's report.

Rule 26 requires expert reports to contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). "Expert reports cannot be 'sketchy, vague, or preliminary in nature.'" *Chappel v. SBC-Ameritech*, 2007 WL 2076028, at *1 (N.D. Ill. July 13, 2007) (quoting *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)). "Rather, expert reports must be 'detailed and complete' so that 'opposing counsel is not forced to

---

[10] "[T]he Supreme Court's overriding concern in *Daubert* was with the problem of jury exposure to confusing and unreliable expert testimony." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 372 F.Supp.2d 1104, 1122 (N.D. Ill. 2005) (citing *Daubert*, 509 U.S. at 595–97).

depose an expert in order to avoid ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources.'" *Id.* (quoting *Salgado by Salgado*, 150 F.3d at 741 n.6). "The consequence of non-compliance with Rule 26(a)(2)(B) is 'exclusion of an expert's testimony ... "unless the failure was substantially justified or is harmless.""" *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010) (quoting *Gicla v. United States*, 572 F.3d 407, 410 (7th Cir. 2009), quoting Fed. R. Civ. P. 37(c)(1)). *See also Johnson v. C. R. Bard, Inc.*, 77 F.4th 641, 646 (7th Cir. 2023) ("The consequences for violating these rules can be dire. Under Rule 37(c)(1), '[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness ... at a trial, unless the failure was substantially justified or is harmless.'").

Rolewick's expert report begins with a list of the documents he reviewed before providing his opinions on whether defendants' conduct breached the standard of care required of them or their fiduciary duty as plaintiff's counsel. [448] 13–14. This list includes the opinion of plaintiff's expert, Mary Robinson; the transcripts of defendants', plaintiff's, and plaintiff's first attorney's depositions and accompanying exhibits; and client emails produced by Defendant Choate. [*Id.*] Rolewick's report states that he "also reviewed case law that [he] considered relevant to the claims in the case." [*Id.*] 14.

In her reply brief, plaintiff criticizes Rolewick's report for failing to list or mention the case law he reviewed with any specificity. [462] 10. "But an expert report need not cover every detail of what an expert might say in his or her forthcoming testimony. The purpose of an expert report 'is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion ... so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary.'" *Huntington Chase Condo. Ass'n v. Mid-Century Ins. Co.*, 379 F.Supp.3d 687, 703 n.8 (N.D. Ill. 2019) (alteration in original) (quoting *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009)). *See Smith v. City of Chi.*, No. 15-cv-03467, 2019 WL 4825232, at *5 (N.D. Ill. Oct. 1, 2019) (quoting *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010)) (same). *See also Walsh*, 583 F.3d at 995 ("In our view, the district court erred in concluding that whatever flaws existed in the expert reports that the Walshes submitted went to their admissibility, as opposed to their weight. When one bears in mind the purpose of the Rule 26 reports, there is no reason to find that these reports were insufficient to alert the defendants to the best strategy for combating the Walshes' case."); *Duro Inc. v. Walton*, 2021 WL 4453741, at *12 (N.D. Ind. Sept. 29, 2021) (explaining that the reason for Rule 26's "disclosure requirement is so that 'opposing counsel is not forced to depose an expert in order to avoid ambush at trial'") (quoting *Salgado by Salgado*, 150 F.3d at 741 n.6). Notably, after receiving disclosure of Rolewick's expert report, plaintiff did not depose Rolewick. *See Richman v. Sheahan*, 415 F.Supp.2d 929, 940 (2006) (stating that "by waiting until after the close of discovery, the plaintiff has waived any conceivable

claim that the reports adversely affected their ability to depose the expert"). The Court will not exclude Rolewick based on this general objection.

## 2. Specific Individual Statements in Rolewick's Report

Plaintiff's motion includes a chart of eleven statements that she argues the Court must exclude from Rolewick's report and bar from Rolewick's testimony. [448] 2–4 (citing [448] 13–15). The Court presents and addresses these challenges in the format provided by plaintiff, as well as with defendants' responses. *See* [453] 4–8.

First, several of the statements that plaintiff seeks to exclude involve Rolewick's opinions on at what point defendants owed plaintiff a fiduciary duty and the validity of the assignment. Now that the Court has ruled as a matter of law that defendants owed no fiduciary duty to plaintiff at the time of the assignment and that the assignment itself was not void, *see* [482] 3–13, these topics and any related objections are no longer at issue:

- "[A] as [sic] attorneys who were considering engagement to represent a potential client they did not yet have a fiduciary relationship with Ms. Kormi and were therefore not obligated to advise her in writing to seek the advice of other counsel before signing and entering into a contract for legal services with them."
- "The engagement agreement and assignment of attorney fees claim entered into by Ms. Kormi and the defendants is not prohibited by case law in the Seventh Circuit Court of Appeals and the assignment of the attorney fees claim is suggested to attorneys in at least one Seventh Circuit Court of Appeals opinion and recognized in other opinions."
- "The assignment 'does not violate the Illinois Rules of Professional Conduct; and even if it did, it would be enforceable.'"
- "The Assignment 'did not violate any rule of law, since the decisions of the Court of Appeals of the Seventh Circuit is the law of the Seventh Circuit until it is otherwise determined by the Court of Appeals of the Seventh Circuit en banc or the United States Supreme Court.'"
- "[N]or did the defendants taking the assignment breached the standard of care imposed on lawyers practicing in Illinois."

[448] 2–4 (citing [448] 13–15). Accordingly, the Court denies plaintiff's requests to exclude these statements as moot.

On the remaining objections, the Court rules as follows.

| Portion of Challenged Rolewick Testimony | Bases for Exclusion | Basis for Admissibility |
| --- | --- | --- |
|  |  |  |

| Page 2: "The defendants did not put themselves in a position where their interests and that of their client were adverse." | This is a fact question for the jury. | The opinion is not fully stated by Plaintiff. . . . This explanation of his opinion is the method endorsed by the Seventh Circuit, as he explains why the Defendants were allowed to negotiate the transfer of the assignment and not run afoul of their fiduciary obligations, i.e. elevate their interests over the clients. |
|---|---|---|

As defendants point out, plaintiff's motion does not quote the entire sentence from Rolewick's report. [453] 5. Rolewick's report states that "*[b]y taking an assignment of Ms. Kormi's attorney fees claim in her suit against Deloitte*, the defendants did not put themselves in a position where their interests and that of their client were adverse." [448] 14 (emphasis added). Immediately following that sentence, Rolewick opines that "[t]he contingent fee portion of the engagement agreement negated any adversity of shifting settlement amounts away from the attorney fee settlement in favor of the basic settlement amount." *Id.* Read in full, this is another opinion relating to the assignment, which the Court has ruled is not void as a matter of law and on which there is no longer any need for experts to opine during trial. Accordingly, this challenge is denied as moot.

| Portion of Challenged Rolewick Testimony | Bases for Exclusion | Basis for Admissibility |
|---|---|---|
| Page 3: "It should also be noted that a contract for legal services entered into by an attorney and her client is not necessarily rendered unenforceable in all cases if it violates the rules of professional conduct." | Speculation unrelated to any facts or other basis in support thereof. | No objection. |

Plaintiff challenges this statement as speculation unrelated to any facts or other basis in support thereof. [448] 3 (citing [448] 15). Defendants state that they

28

have no objection. [453] 6. Accordingly, defendants are barred from eliciting this testimony from Rolewick at trial.

| Portion of Challenged Rolewick Testimony | Bases for Exclusion | Basis for Admissibility |
|---|---|---|
| Page 3: "Having accomplished what they concluded was the best possible result for their client through negotiations, they had a right to withdraw if their client refused their advice which was based on their reasonable belief that trying the case had a high likelihood of resulting in a less favorable result for their client or failure" | The purported opinion is not tied to a date, so the trier of fact cannot determine if Rolewick is referring to the $150,000 offer of judgment, or the much higher settlement offer that was made in September, 2014.<br><br>Moreover, Defendants never sought to withdraw; they only threatened to withdraw. The opinion does not identify any standard of care or duty as to when or whether an attorney may appropriately threaten to withdraw. | The opinion is based on Mr. Rolewick's review of thousands of pages of testimony and email exchanges between the Defendant attorneys and Plaintiff. Mr. Rolewick has linked his review of records, his experience as an attorney to the facts. He has a basis for his opinion. Plaintiff has the opportunity to crossexamine Mr. Rolewick. A court examining a *Daubert* challenge is a gatekeeper, not an arbiter of truth: "The key to the gate is not the ultimate correctness of the expert's conclusions." *Schultz v. Azko Nobel Paints LLC*, 721 F.3d 426, 431 (7th Cir. 2013) |

Plaintiff's first and second objections to this statement (that it is not tied to a date and that defendants "never sought to withdraw; they only threatened to withdraw") do not constitute reasons to exclude the expert testimony. Rather, plaintiff will have the chance to cross-examine Rolewick at trial to clarify these points.

Plaintiff also raises her overarching objection that this statement "does not identify any standard of care or duty as to when or whether an attorney may appropriately threaten to withdraw." [448] 3. More specifically, Rolewick's report does not identify the standard for an attorney's "right to withdraw." It is clear to the Court that Rolewick is a seasoned attorney who is applying the general standard of what a reasonable attorney would do under the circumstances, just as plaintiff's

expert, Bucheit, does in his report. Again, this is not a reason to exclude Rolewick's testimony and opinions as inadmissible, but rather a purported weakness in Rolewick's report that goes to the weight of the evidence before the jury. *See Walsh*, 583 F.3d at 992, 995 ("In our view, the district court erred in concluding that whatever flaws existed in the expert reports that the Walshes submitted went to their admissibility, as opposed to their weight."). Plaintiff's request to exclude this opinion is denied.

Finally, although not explicitly identified as such, statements in rows 9, 10, and 11 in plaintiff's chart all appear to involve *Daubert* challenges. Plaintiff's expert-related motions *in limine* do not mention *Daubert* or the applicable standards. *See* [448] 1–2. However, plaintiff's objections to these last three statements in her chart seeking to limit Rolewick's expert testimony include (among other criticisms) attacks on Rolewick's qualifications. [448] 4. *See* [453] 1 (defendants' opposition brief demonstrating they are also apparently not aware that plaintiff raises these challenges: "In this case, Plaintiff does not dispute that both Mr. Rolewick and Mr. DeGrand are qualified as experts by knowledge, skill, experience, training or education."). Plaintiff's reply brief does not mention *Daubert* either or provide any helpful argument. *See* [462].

"In *Daubert*, the Supreme Court interpreted Rule 702 to require 'the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand.'" *Gopalratnam*, 877 F.3d at 778 (quoting *Krik*, 870 F.3d at 674). "In performing its gatekeeper role under Rule 702 and *Daubert*, 'the district court must engage in a three-step analysis before admitting expert testimony.'" *Id.* at 779 (quoting *Myers*, 629 F.3d at 644). Under the first prong of this analysis, the Court "must determine whether the witness is qualified[.]" *Id.* (quoting *Myers*, 629 F.3d at 644).

"In regard to qualifications, Federal Rule of Evidence 702 allows parties to introduce expert opinions if the expert has the requisite 'knowledge, skill, experience, training, or education.'" *Client Funding Sols. Corp.*, 943 F.Supp.2d at 859 (quoting Fed. R. Evid. 702). "Anyone who has relevant expertise and can offer responsible opinion testimony that is helpful to a judge or jury may qualify as an expert witness." *Id.* (citing *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)). "In assessing an expert's qualifications, a court should consider the proposed expert's full range of education, experience, and training." *Id.* (citing *LG Elec. U.S.A., Inc. v. Whirlpool Corp.*, 661 F.Supp.2d 940, 951 (N.D. Ill. 2009)). "The question we must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" *Gayton*, 593 F.3d at 617 (alteration in original) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). "Because we are not concerned with the witness's general qualifications but instead with his 'foundation for ... answer[ing] a specific question[,] ... we must look at each of the conclusions [the expert] draws

individually to see if he has the adequate education, skill, and training to reach them.'" *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016) (alterations in original) (quoting *Gayton*, 593 F.3d at 617). "This fact-intensive inquiry depends in part on the area of specialty and the scope of the opinion expressed . . . ." *Rivera v. Guevara*, No. 12-CV-04428, 2018 WL 3093339, at *6 (N.D. Ill. June 22, 2018).

As a whole, the Court agrees that Rolewick's report is fairly bare bones and does not analyze or refer to the facts of the case with much specificity. *See Landeen v. PhoneBILLit, Inc.*, 519 F.Supp.2d 844, 848 (S.D. Ind. Sept. 11, 2007) (agreeing that the expert's report was "nothing but legal conclusions without factual foundation and without evidence that [the expert was] unusually qualified to testify to the standard of care for a lawyer"). "However, the Seventh Circuit has ruled that the nature of the statements alone is not sufficient justification to preclude the testimony because Federal Rule of Evidence 705 . . . 'allows experts to present naked opinions.'" *Id.* (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1339 (7th Cir. 1989)).[11] *See also supra* IV.A.1 (Court's ruling declining to exclude Rolewick's expert report based on plaintiff's general objection that Rolewick's report is deficient under Rule 26).

| Portion of Challenged Rolewick Testimony | Bases for Exclusion | Basis for Admissibility |
|---|---|---|
| Page 3: "The defendants provided clear analysis based on their study of provable facts, experience and knowledge upon which their client could then make an informed decision." | The facts upon which this opinion is based are undisclosed. Moreover, Rolewick is not qualified to opine on whether the client was adequately advised to make an informed decision, nor qualified to opine about whether any consent the Defendants extracted from the Plaintiff was "informed consent" based on the Illinois Rules of Professional Conduct.<br><br>Furthermore, the opinion presents a fact question for the jury (based on | Under Rule 703, Rolewick has provided the basis for his opinions, namely his review of thousands of pages of deposition testimony and emails. The opinion is the type permitted by the Seventh Circuit. *United States v. Davis*, 471 F.3d at 789. |

---

[11] *See* Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion–and give the reasons for it–without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination.").

| | facts not disclosed in the opinion). | |
|---|---|---|

Plaintiff argues this opinion should be excluded because, *inter alia*, Rolewick is not qualified to opine on whether the client was adequately advised to make an informed decision, nor qualified to opine about whether any consent defendants extracted from plaintiff was "informed consent" based on the Illinois Rules of Professional Conduct. [448] 4. The Court surmises that this refers to Illinois Rules of Professional Conduct 1.0(e) and 1.4. Ill. Sup. Ct. R. 1.0(e), 1.4 (2010).

"[I]n a legal malpractice suit, an expert on the standard of professional care does not necessarily need to be qualified by experience in the particular specialty; a lawyer may instead be qualified by studying the law, i.e., by 'knowledge' rather than 'experience' under Rule 702, but general legal training and even standing in the local legal community do not always qualify a lawyer to opine on the standard of professional care." *Rivera*, 2018 WL 3093339, at *6 (collecting and comparing cases). In *Crim*, for example, the court granted a motion to exclude expert testimony because although the attorney expert "ha[d] more than two decades of experience as a successful trial lawyer, [he] ha[d] not demonstrated that he ha[d] any particular skill, experience, education, or training in the often specialized and complex matters of professional responsibility." *Crim*, 943 F.Supp.2d at 862–63. By contrast, in *Cox*, the court found that although it was true that the proposed expert "lack[ed] experience in prosecuting or defending legal malpractice or attorney disciplinary actions," the expert nevertheless had "significant practical experience representing clients, particularly in commercial transactions," and the instant question was whether the attorneys met the standard of care when they represented their clients in a real estate transaction. *Cox as Tr. for Est. of Cent. Ill. Energy Coop. v. Evans*, 457 F.Supp.3d 634, 647 (C.D. Ill. 2020). The court noted that "[a]s a practicing attorney, [the expert] would have been required to understand the rules of professional conduct governing his practice of law and to follow those rules. Those obligations encompassed the dispute at issue [t]here—ascertaining the standard of care for an attorney." *Id.* The court therefore found that the defendant satisfied its burden of establishing that the expert possessed the requisite knowledge and experience to opine on whether the attorneys met the standard of care. *Id.* (quoting *Hall*, 840 F.3d at 929 ("The fact that an expert may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility.")).

The Court denies plaintiff's request to exclude this statement. At the time he authored his report, Rolewick was an Illinois-licensed attorney who had been practicing and representing clients in Illinois for approximately forty-three years. [448] 16–18. It is clear to the Court that Rolewick is a seasoned attorney who is applying the general standard of what a reasonable attorney would do under the circumstances, just as plaintiff's expert, Bucheit, does in his report. And any criticism

that Rolewick is applying his own experience as a general litigator rather than any specialized knowledge of ethics and the Illinois Rules of Professional Conduct goes toward weight rather than admissibility.

Finally, in challenging the following two statements from Rolewick's report, plaintiff argues there is no basis for Rolewick's opinions and that he is not qualified to offer these opinions because he is not an expert in employment law litigation. [448] 4.

| Portion of Challenged Rolewick Testimony | Bases for Exclusion | Basis for Admissibility |
|---|---|---|
| Page 3: "Their experienced belief of the likely result of trial and their client's failure to accept their opinion and recommendation could render their continued engagement unreasonably difficult." | Defendants were engaged to take Plaintiff's case to trial if an acceptable settlement could not be reached.<br><br>Rejecting a settlement offer does not render an engagement that contemplates a trial "unreasonably difficult."<br><br>Moreover, the opinion does not include the expert's assessment of the standard applicable to an "unreasonably difficult" attorney-client relationship.<br><br>Furthermore, Rolewick is not an expert in employment law litigation and is not qualified to evaluate or validate the Defendants "experienced belief." | Rolewick is qualified by experience to opine when the lawyer/client relationship becomes unreasonably difficult and its effect on continued representation. As set forth in his resume, he has background and experience in litigated and non-litigated matters. He has experience in representing clients. He has knowledge regarding the Rules of Professional Conduct. *Cox as Trustee v. Evans*, 457 F.Supp.3d 634, 647 (C.D.IL 2020) (attorney in Illinois required to understand the Rules of Professional Conduct governing his practice). Furthermore, whether an expert is a "specialist" goes to weight not admissibility. *Id.* The opinion is the type permitted by the Seventh Circuit. *United States v. Davis*, 471 F.3d at 789. |

33

| | | |
|---|---|---|
| Page 3: "The high likelihood of a trial result being less satisfactory than the settlement offer was not in the interest of the client or her attorneys." | There is no basis for Rolewick's assessment of the likelihood of success in the underlying case. Rolewick is not offered as an expert in employment law litigation. He is offered as an expert concerning ethical duties. | Rolewick relied on the data listed in 703. Including deposition transcripts and exhibits thereto. *See also Cox*, supra, the purported expertise in the field of employment law goes to weight not admissibility. |

There is an important distinction to be made in legal malpractice cases as to expert testimony opining on the merits of the underlying case-within-a-case versus testimony as to the standard of what a reasonable attorney would have done under the circumstances during representation of the client in the underlying case. Rolewick can testify that it is difficult for an attorney to continue representing a client who does not accept the attorney's advice or opinions. Rolewick is not opining on the merits of that advice or those opinions as it relates to the facts of the underlying employment case. So too can Rolewick testify that, assuming defendants' experienced belief of the likely result of trial to be true, defendants acted as reasonably careful attorneys would have under the circumstances. Rolewick is not opining on the accuracy or correctness of defendants' valuation of the underlying employment case or defendant's conclusions and opinions on the likely result of trial. Again, any criticism that Rolewick is applying his own experience as a general litigator and not as an employment lawyer can be emphasized on cross examination. It goes toward the weight of Rolewick's expert opinion testimony, not admissibility. Plaintiff has not established that under *Daubert*, Rolewick is not qualified to opine on the knowledge, skill, and care a reasonably careful lawyer would have exercised under the circumstances.

<center>* * * * * *</center>

As detailed above, the Court grants in part and denies in part plaintiff's motion to bar and/or limit the scope of Rolewick's expert testimony. The Court reiterates that Rolewick may not testify at trial as to legal conclusions by, for example, stating that defendants did not breach their fiduciary duties to plaintiff or did not breach the standard of care imposed on them as practicing attorneys in representing plaintiff in the underlying lawsuit. *See* [448] 14.

<center>34</center>

## B. Luke DeGrand

Defendants produce Luke DeGrand as an expert to opine on how defendants[12] handled aspects of the underlying litigation and settlement negotiations, as well as to respond to plaintiff's expert Bucheit. DeGrand Report, p. 1.[13] The Court notes that DeGrand was not deposed in this case.

Plaintiff argues DeGrand's report is "rife with inadmissible testimony and should be limited in various ways." [448] 5. Plaintiff provides arguments in a narrative format before turning again to a chart of individual statements from DeGrand's report that plaintiff asserts the Court should exclude. In her reply brief, plaintiff acknowledges that based on the parties' briefing, it appears that with respect to Bucheit and DeGrand, at least, "the better course is to leave the experts to defend their opinions on cross-examination." [462] 12.

First, plaintiff criticizes DeGrand for providing his own summary/statement of the facts relating to the underlying case, and for drawing conclusions of ultimate facts. [448] 5 (citing DeGrand Report, p. 22). *See also* [*id.*] 7 (arguing that "DeGrand inappropriately offers opinions on ultimate questions for fact, thus invading the province of the jury"). Plaintiff argues it is not for the expert to provide facts, as that invades the province of the jury. Plaintiff also asserts that DeGrand's "narrative cannot be offered as a substitute or summary of evidence that may have been presented in the underlying case." [448] 5. As defendants point out, plaintiff cites no authority in support of her assertion. [453] 8.

DeGrand's summary in his report of the relevant facts is not an impermissible "application of the law to the facts,' which 'invades the province of . . . the jury[.]" *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F.Supp.3d 1029, 1097 (N.D. Ill. 2022) (quoting *Anderson v. City of Chi.*, 454 F. Supp. 3d 808, 819 (N.D. Ill. 2020)). Rather, it reflects compliance with Rule 26's requirement that expert reports not only contain "a complete statement of all opinions the witness will express" but also must include "the facts or data considered by the witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). Plaintiff's expert, Bucheit, also includes a summary of facts in his expert report. *See* [444-1] 4–6, 9–14.

Second, plaintiff points out that DeGrand's report includes a three-page discussion of the mediation process and emphasizes the Court's March 12, 2024 ruling as to the mediation. [448] 5–6. *See* [440]. Plaintiff requests that the Court bar

---

[12] DeGrand's expert report specifically states that he was "retained by Bryan J. Kirsch of the Law Offices of Edward J. Kozel to review and render opinions regarding aspects of the handling of litigation and settlement negotiations *by attorney David Lee* . . . ." DeGrand Report, p. 1 (emphasis added). DeGrand's report nevertheless includes Defendant Choate in discussions of the case and actions taken.
[13] DeGrand's expert report was originally filed on the docket but withdrawn after the parties and Judge Schenkier agreed it contained a substantial amount of confidential information. *See* [141].

DeGrand "from discussing any other 'facts' which the Court has found inadmissible through the date of his testimony." [448] 5–6. The Court expects the parties to abide by its rulings and to ensure that their experts do not run afoul of any of the Court's applicable pretrial orders.

Third, plaintiff argues that DeGrand should be barred from testifying to any part of the opinions expressed in Section III.A of his report. [448] 7 (citing DeGrand Report, pp. 33–44). Plaintiff contends that DeGrand offers "impermissible opinions to the effect that the settlement" in the underlying case was "objectively reasonable." [*Id.*] 6 (citing DeGrand Report, p. 33). Specifically, plaintiff criticizes DeGrand's application of the test for whether a decision to settle is reasonable as articulated in *Daily*: "whether, considering the totality of the circumstances, a prudent litigant in the position of the plaintiffs would have chosen to settle." DeGrand Report, p. 33 (quoting *Daily v. Greensfelder, Hemker & Gale, P.C.*, 98 N.E.3d 604, 616 (Ill. App. Ct. 2018)). Plaintiff argues that "the test the Court should apply is whether 'the plaintiff can show that [she] settled for a lesser amount than [she] could reasonably expect without the malpractice.'" [448] 6 (alterations in original) (quoting *Merritt v. Goldenberg*, 841 N.E.2d 1003, 1010 (Ill. App. Ct. 2005)).

Section III.A of DeGrand's report provides his opinion, to a reasonable degree of professional certainty, that "the settlement that Lee and his co-counsel achieved for Kormi in 2014 was objectively reasonable under the circumstances[.]" *See* DeGrand Report, pp. 1, 33–41. Upon reviewing the parties' arguments and the cases cited by each party, the Court is not convinced that DeGrand applied the incorrect law or standard as a matter of law such that this entire section of his expert report should be excluded. Plaintiff appears to criticize DeGrand for only opining on whether the settlement was "reasonable" under the circumstances and characterizes the appropriate question as "whether Plaintiff would have obtained a better result in the underlying case without the breaches of fiduciary duty, divided interests, and coercion that contaminated the Defendants' representation from the outset to the end." [448] 6. This goes to weight but is not a basis to exclude.

And there is nothing to indicate that *Daily* is not good law; the case has not been overturned or questioned and it involves an analysis of "existing Illinois law":

> [I]n Illinois the test for the reasonableness of the decision to settle, as well as the amount of the settlement, is objective rather than subjective. *See Central Mutual Insurance Co. v. Tracy's Treasures, Inc.*, 2014 IL App (1st) 123339, ¶ 56, 385 Ill.Dec. 904, 19 N.E.3d 1100. The test for whether the decision to settle is reasonable is whether, considering the totality of the circumstances, a prudent litigant in the position of the plaintiffs would have chosen to settle. *Id.* As to the reasonableness of the amount of the settlement, the test is—considering the totality of facts surrounding the lawsuit, including the risk of going to trial—what

36

amount a reasonable litigant in the position of the plaintiffs would have settled for on the merits of the claims of the doctors and SSM in the underlying lawsuit. *See id.*

*Daily*, 98 N.E.3d at 616. *See also CE Design Ltd. v. Franklin Edison Corp.*, 2022 WL 523052, at *6 (Ill. App. Ct. Feb. 22, 2022) (quoting *Daily*). The Court denies plaintiff's request to exclude Section III.A of DeGrand's expert report.

Additionally, plaintiff argues the Court should bar DeGrand's opinion testimony criticizing Bucheit's "incorrect damages calculations" because DeGrand mischaracterizes Bucheit's report. [448] 7–8 (citing DeGrand Report, p. 43). Plaintiff asserts that DeGrand based his opinion on the mistaken belief that Bucheit opined on what plaintiff necessarily would have received in the underlying litigation rather than on Deloitte's "worst day in court." [*Id.*] Plaintiff similarly faults DeGrand's opinions on plaintiff's standard of care expert for cherry-picking citations from a limited number of cases. [*Id.*] 8 (citing DeGrand Report, p. 35). However, these criticisms go toward the weight and credibility of DeGrand's opinion rather than admissibility and are appropriately addressed on cross examination.

Plaintiff provides a table of twenty-one additional statements that she argues are also inadmissible. [448] 8–11. Plaintiff states that some of these statements should be excluded before trial and that the Court "may wish to reserve" ruling on others until DeGrand's testimony. [*Id.*] 8. Plaintiff's chart does not distinguish these two categories and plaintiff does not indicate which objections the Court should rule on during trial. The Court addresses these statements out of the order presented by plaintiff in an effort to group similar objections together.

As plaintiff recognized in her reply brief, it appears that with respect to Bucheit and DeGrand, at least, "the better course is to leave the experts to defend their opinions on cross-examination." [462] 12. The following statements from DeGrand's report that plaintiff challenges are good examples of testimony that is more appropriately attacked on cross examination:

| Portion of Challenged DeGrand Testimony | Bases for Exclusion | Basis for Admissibility |
|---|---|---|
| Page [2]: "In my opinion, Kormi was well served by Lee's representation. Lee pursued, in a manner that was at once tenacious and professional,… He also demonstrated continued | Improper argument; Improper mischaracterization of evidence; Inadmissible under Rules 402, 403, and 702 | The opinion relates to the standard of care. Whether Lee breached the standard of care is a question of fact for the jury to decide on the basis of expert testimony. Barth, 139 Ill. 2d at 407. |

| | | |
|---|---|---|
| dedication to the client's interests despite client demands that made his job more difficult." | | DeGrand is an experienced employment law attorney and is qualified to analyze, critique, and give opinions about how the underlying case was litigated. See *supra*, 3 c, e, f. If DeGrand's standard-of-care opinions are barred for the reason stated, so too should Plaintiff's witnesses be barred from offering any standard of care opinions. |
| Page 37: "Because Kormi was unable to establish a causal relationship between many of her poor performance evaluations and any protected activity . . ." | Improper opinion that invades the province of the jury in the malpractice action | Kormi testified in the underlying litigation that she was unaware of any animosity toward her by the Deloitte personnel who prepared her performance evaluations, and that testimony negatively affected her ability to prove retaliation, and to prove that her poor performance evaluations were a pretext to discriminatory intent. This is information that forms the basis of an employment lawyer's assessment of the strengths and weaknesses of a case, and in that sense is information relevant to whether Defendants breached the standard of care. See *supra*, 3a,c,e. |

| Page 44: "These limitations apply outside the context of litigation and settlement agreements; with respect to Kormi's agreement to settle her litigation against Deloitte, these limitations are inapt." | Improper legal opinion that is a question of law for the Court | The opinion relates to the standard of care. Whether Lee breached the standard of care is a question of fact for the jury to decide on the basis of expert testimony. *Barth*, 139 Ill. 2d at 407. If DeGrand's standard-of-care opinions are barred for the reason stated, so too should Bucheit's standard-of-care opinions (Opinions 1, 2, 3 and 7) be barred. See *supra*, 3a,c,e. |

All of these opinions are subject to cross examination and plaintiff has not shown that they are inadmissible.

As to the first row, plaintiff's bases for finding these statements inadmissible are perfunctory and unexplained. For example, plaintiff does not indicate how these statements mischaracterize the evidence. Nor does plaintiff explain why Rules 402 and 403 preclude DeGrand from testifying to these statements. And although plaintiff alleges that these statements are inadmissible under Rule 702, plaintiff does not indicate upon which aspect of Rule 702 she bases her challenge.

"In regard to qualifications, Federal Rule of Evidence 702 allows parties to introduce expert opinions if the expert has the requisite 'knowledge, skill, experience, training, or education.'" *Client Funding Sols. Corp.*, 943 F.Supp.2d at 859 (quoting Fed. R. Evid. 702). And the text of the rule states that a witness who is qualified as an expert may testify if the proponent of the expert demonstrates that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

39

Fed. R. Evid. 702. The Court does not know under which of these aspects plaintiff challenges DeGrand as an expert or DeGrand's testimony as running afoul of Rule 702. *But see, e.g.*, DeGrand Report, p. 84 (DeGrand's resume indicating his experience as a practicing employment law attorney in Illinois).

As to row two, this statement is found in the portion of DeGrand's report opining on the merits and deficiencies of the underlying case and defendants' assessment of the likely outcome of summary judgment. DeGrand is not opining on a question for the jury and he can be cross examined on these statements.

The statement in row three is also admissible opinion and subject to cross examination.

But plaintiff also challenges many of DeGrand's statements as providing impermissible legal conclusions, which DeGrand is prohibited from testifying to at trial:

| Portion of Challenged DeGrand Testimony | Bases for Exclusion | Basis for Admissibility |
|---|---|---|
| Page [1]: "Lee did not commit legal malpractice in recommending that settlement to his client." | Improper legal opinion that is a question of fact for the jury to decide | The opinion relates to the standard of care. Whether Lee breached the standard of care is a question of fact for the jury to decide on the basis of expert testimony. *Barth*, 139 Ill. 2dat [sic] 407. If DeGrand's standard-of-care opinions are barred for the reason stated, so too should Plaintiff's expert witnesses be barred from offering any standard-of-care opinions. |
| Page [1]: "The Bucheit report contains no opinion that the 2014 settlement was unreasonable or that Kormi's claims had | Improper legal opinion and argument that is a question of law for the Court in the malpractice case. | This is a statement of fact, not opinion. The Bucheit report in fact does not set forth the subject opinions. Experts are permitted to give |

| ultimate merit, and in my view such opinions are a prerequisite to finding that Kormi was harmed by Lee's conduct." | | opinions about facts. See *supra* 3a. |
|---|---|---|
| Page [1]: ". . . because Kormi has not shown that she was denied an employment opportunity (or had one terminated) based on Section 12, it does not appear that Kormi is in a position to establish that she was materially harmed by the existence of that contractual provision in any event." | Improper legal opinion.<br><br>Further, Mr. DeGrand has not been offered as an expert to testify regarding Plaintiff's material harm | DeGrand's opinion relates to damages, which is a question of fact, not of law. *Hanumadass v. Coffield, Ungaretti & Harris*, 311 Ill. App. 3d 94, 101 (1st Dist. 1999). Moreover, DeGrand specifically opined that the terms of the Settlement Agreement were objectively reasonable, and DeGrand must be permitted to explain the bases for that opinion. Additionally, neither Lee's Rule 26(a)(2) disclosure of DeGrand and his opinions, nor DeGrand's opinions themselves, limit the scope of his opinions as suggested by Kormi's objection. If DeGrand's opinions on Kormi's damages are barred for the reason stated, so too should Plaintiffs' experts be barred from offering the same opinions. |
| Page 41: "The Opinions of Plaintiff's Expert to the Contrary Are Speculative and Fail to Establish . . ." | Improper legal opinion that is ultimately a question for the jury to decide; argument | The opinion relates to the standard of care. Whether Lee breached the standard of care is a |

| | | question of fact for the jury to decide <u>on the basis of expert testimony</u>. *Barth*, 139 Ill. 2d at 407. If DeGrand's standard-of-care opinions are barred for the reason stated, so too should Bucheit's standard-of-care opinions (Opinions 1, 2, 3 and 7) be barred. See also *supra*, 3f |

As the Court applied to Robinson's and Rolewick's expert reports, and as the Court has stated is applicable to all expert opinions in this case, DeGrand may not testify at trial as to legal conclusions. *See Client Funding Sols. Corp.*, 943 F.Supp.2d at 863; *Webster Bank, N.C.*, 2020 WL 616467, at *4. Opining, for example, that Defendant "Lee did not commit legal malpractice" is an impermissible legal conclusion and DeGrand is barred from testifying to such conclusions at trial.

By contrast, the statements from pages thirty-five through thirty-seven of DeGrand's expert report that plaintiff asserts recite the law do not constitute improper legal opinions:

| Portion of Challenged DeGrand Testimony | Bases for Exclusion | Basis for Admissibility |
|---|---|---|
| Pages 35–37: recitation of the law on FMLA interference, FMLA/ADA retaliation, Title VII sex discrimination, Title VII hostile work environment, Title VII retaliation, and ADA discrimination | Improper legal opinions regarding the meaning of statutes and questions of law | These are not opinions but rather contextual recitations that form the basis of an employment lawyer's assessment of the strengths and weaknesses of a case, and in that sense is are facts relevant to whether Defendants breached the standard of care. Further, DeGrand is permitted to testify regarding the factual bases and reasons for his opinions including, *inter alia*, that Plaintiff would not have prevailed |

| | | in her underlying claim. See *supra*, 3a,c,e. |

Rule 26 requires expert reports to contain "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i). Plaintiff criticized Rolewick's expert report for failing to provide the legal bases supporting his opinions and for failing to provide reference to specific cases. *See* [448] 2, 3. Although plaintiff does not provide specific examples of the statements that she believes should be barred, the Court has reviewed the pages of DeGrand's report to which plaintiff points and concludes that they do not provide improper legal opinions. Rather, DeGrand is providing context and the basis for his opinions, as well as supporting case cites—information which plaintiff criticizes Rolewick for omitting from his report. The Court denies plaintiff's request to exclude these statements, as DeGrand is permitted to testify to what he reviewed to form his opinions and the basis for those opinions. Of course, nothing in the Court's ruling should be interpreted to mean that the parties are not free to object to expert testimony during trial if they feel it begins to amount to an impermissible instruction on the law. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F.Supp.3d at 1097 (collecting cases).

Next, plaintiff challenges several statements as improper opinions that infringe on factual questions for the jury to decide. [448] 15, 16, 20–21.

| Portion of Challenged DeGrand Testimony | Bases for Exclusion | Basis for Admissibility |
|---|---|---|
| Page 22: "Deloitte terminated Kormi's employment on June 8, 2010 based on her performance history." | Improper opinion that is a factual question for the jury to decide (the parties dispute why Plaintiff's employment was terminated, as Deloitte provided her with multiple varying reasons) | This is a statement of fact, not opinion. While Kormi may have disputed whether the reason stated by Deloitte for her termination was genuine or pretext, the stated reason from Deloitte was her poor performance reviews. Deloitte's position in this regard is relevant because it is a factor that Lee considered in evaluating the strengths and weaknesses of the |

| | | underlying case, including settlement and verdict potentials, and in that sense is a fact relevant to whether Lee breached the standard of care. See *supra* 3a,c. |
|---|---|---|
| Page 32: ". . . Lee and Choate continued to negotiate settlement with counsel for Deloitte. These negotiations were extensive and detailed. . . . Kormi was involved in and kept apprised of these negotiations. . . . By August 11, 2014, Lee and Choate successfully negotiated an increase in Deloitte's monetary offer . . ." | Improper opinion that is a factual question for the jury to decide and is also argument | The opinion relates to the standard of care. Whether Lee breached the standard of care is a question of fact for the jury to decide on the basis of expert testimony. *Barth*, 139 Ill. 2d at 407. If DeGrand's standard-of-care opinions are barred for the reason stated, so too should Plaintiffs' expert witnesses be barred from offering any such opinions. Further, DeGrand must be permitted to testify regarding facts supporting his opinions. See *supra*, 3a,c,e |
| Page 36: "Finally, it does not appear that Holston had the power to hire, fire, demote, discipline or transfer a Senior Consultant like Kormi . . ." | Improper opinion that invades the province of the jury | This is not an opinion but rather a contextual observation that forms the basis of an employment lawyer's assessment of the strengths and weaknesses of a case, and in that sense is an observation relevant to whether Lee breached the standard of care. See *supra*, 3a,c,e. |

| | | |
|---|---|---|
| Page 44: "That, however, was not the intent of [Lee and Choate's] communication." | Improper opinion that is a factual question for the jury to decide | This is not an opinion, but an observation derived from the immediately following sentence, in which DeGrand quotes from an email from Choate to Kormi: "Rather, with time limited to respond to the pending Offer of Judgment, Choate provided Kormi with a 'quick first cut' of a damage and probability analysis, and explicitly noted that a 'much more elaborate damage and probability analysis can be made.' (ChoateProd0034823-25)" It is thus an observation of a fact that provides a basis (amongst others) of DeGrand's opinion that the Defendants did not breach the standard of care in providing this "quick first cut" damages and probability analysis. See *supra*, 3a,c,e. |
| Page 45: "Section 12 of the 2014 settlement agreement (including its sunset provision) was heavily negotiated, with Kormi's extensive involvement and consent." | Improper opinion that is a factual question for the jury to decide; argument | The opinion relates to the standard of care. Whether Lee breached the standard of care is a question of fact for the jury to decide on the basis of expert testimony. *Barth*, 139 Ill. 2d at 407. If DeGrand's standard-of- |

45

| | | care opinions are barred for the reason stated, so too should Bucheit's standard-of-care opinions (Opinions 1, 2, 3 and 7) be barred. See also *supra* 3, a, c, e. |
| --- | --- | --- |

Defendants assert that these are "contextual observations" and not the kinds of facts that will be decided by the jury. Included in Rule 26 is the requirement that expert reports contain "a complete statement of all opinions the witness will express" and "the facts or data considered by the witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). Furthermore, statements within these portions to which plaintiff objects are also appropriate opinions from DeGrand on the standard of care. *See, e.g.*, [448] 9–10 ("Kormi was involved in and kept apprised of these negotiations."), 11 (opining that that the "no future employment" section of the settlement agreement was "heavily negotiated, with Kormi's extensive involvement and consent"). And these are issues that plaintiff may raise on cross examination. The Court denies plaintiff's request to exclude these statements.

Plaintiff challenges several statements based on relevancy as well:

| Portion of Challenged DeGrand Testimony | Bases for Exclusion | Basis for Admissibility |
| --- | --- | --- |
| Page 24: "On June 12, 2012, Peel sent a settlement demand to then-counsel for Deloitte. In this letter, a copy of which was sent to Kormi, Peel demanded . . ." | Irrelevant under Rules 402 and 403; 2012 settlement demands by attorney who withdrew not relevant to Defendant's conduct and whether they met or failed to meet the requisite standard of care. | This is relevant to DeGrand's opinion that the settlement agreement terms that were ultimately reached were objectively reasonable. See *supra* 3a,c. Further, DeGrand's testimony regarding the settlement negotiations, demands, offers, and mediation will conform to this Court's March 12, 2024 ruling and be limited to that evidence which the Court ruled to be admissible. |
| | | |

| Pages 35-39: all references to Judge Darrah and his assumed proclivities for ruling on matters, e.g., page 39: "In the period between January 1, 2011 and July 1, 2014, Judge Darrah considered 17 motions for summary judgment in [employment cases] . . . and granted summary judgment in favor of the defense in 11 (approximately 65%) of those cases." | Irrelevant under Fox v. Seiden, 2016 IL App (1st) 141984, ¶ 16 (Ill. App. 1 Dist., 2016) ("The objective in a legal malpractice case is to consider what the result 'should have been' not what the particular underlying trial court would have done.") | *Fox* is inapposite. It involved a hypothetical ruling by the trial court that would have been error and reversible as a matter of law. Kormi does not contend that Judge Darrah's summary judgment rulings in similar cases were error and reversible as a matter of law. Moreover, this is the type of evidence a prudent attorney would consider in assessing the strengths and weaknesses of a similar case, i.e. past rulings from the same Judge who would be making rulings in the case, including settlement and verdict potentials, and in that sense is a fact relevant to whether Lee breached the standard of care. These are facts that DeGrand considered in forming his opinions regarding the likelihood of success in Plaintiff's underlying case. See *supra*, 3e. |
| Page 39: "In the period between January 1, 2011 and July 1, 2014, Judge Darrah considered 17 motions for summary judgment in cases classified as 'civil rights/ employment,' 'civil rights/ disability' and "FMLA." | Irrelevant under Rules 402 and 403; irrelevant under *Fox v. Seiden*, 2016 IL App (1st) 141984, ¶ 16 (Ill.App. 1 Dist., 2016) ("The objective in a legal malpractice case is to consider what the result | *Fox* is inapposite. It involved a hypothetical ruling by the trial court that would have been error and reversible as a matter of law. Kormi does not contend that Judge Darrah's history of ruling on summary judgment in |

| He granted summary judgment in favor of the defense in 11 (approximately 65%) of those cases." | 'should have been' not what the particular underlying trial court would have done.") | similar cases was error and reversible as a matter of law. Moreover, this is the type of evidence a prudent attorney would consider in assessing the strengths and weaknesses of a similar case, including settlement and verdict potentials, and in that sense is a fact relevant to whether Lee breached the standard of care. These are facts that DeGrand considered in forming his opinions regarding the likelihood of success in Plaintiff's underlying case. See *supra*, 3e. |

The first statement regarding 2012 settlement efforts is part of DeGrand's summary of facts from the underlying case. *See* DeGrand Report, p. 24. This history provides context and relates to plaintiff's allegations surrounding the settlement agreement. Next, DeGrand's report provides these statements about Judge Darrah in opining on the existence of "significant risks that Kormi's claims would not survive summary judgment." DeGrand Report, page 35. DeGrand includes this discussion in response to plaintiff's expert Bucheit's opinion that it is "highly likely" that one or more of plaintiff's claims would have survived summary judgment. The Court thus questions whether "relevance" is the correct objection upon which to challenge these statements; for example, the implications of Judge Darrah's summary judgment statistics on plaintiff's underlying employment case strike the Court as potentially relevant, but speculative. And whether an expert's report amounts to mere speculation is something to be addressed on cross examination. As a result, subject to proper foundation, the Court declines to exclude these statements.

Plaintiff raises two hearsay objections to third party reports and articles cited by DeGrand in his report:

| Portion of Challenged DeGrand Testimony | Bases for Exclusion | Basis for Admissibility |
|---|---|---|
| Page 39: "A 2008 report prepared by the Federal Judicial Center noted that summary judgment motions by defendants are more common, more likely to be granted, and more likely to terminate the litigation, in employment discrimination cases than other types of litigation." | Hearsay, no exception applies; irrelevant under Rules 402 and 403 | Admissible under Rule 703 and *Grant v. Chemrex, Inc.*, 1997 U.S. Dist. LEXIS 6058, *20 (N.D. Ill., April 23, 1997) (expert witnesses allowed to rely on hearsay in forming their opinions, as long as their opinions are based on the type of evidence reasonably relied on by experts in that particular field); in stark contrast to the failure of Kormi's expert, Bucheit, to employ proper methodology. *See also Adel v. Greensprings of Vermont, Inc.*, 363 F.Supp.2d 683, 692 (D.VT. 2005) ("[A]n expert may expand his or her knowledge by consulting colleagues and journal articles… Thus, as long as an expert witness is building upon a base of expertise, the Federal Rules of Evidence allow an expert to consult journal articles and colleagues when forming an opinion.") Moreover, this is the type of evidence a prudent attorney would consider in assessing the strengths and weaknesses of a similar case, including settlement and verdict |

49

| | | potentials, and in that sense is a fact relevant to whether Lee breached the standard of care. See *supra*, 3e. |
|---|---|---|
| Page 40: "A 2007 article observed that 'empirical studies on outcomes in employment discrimination litigation all reach the same conclusion: Plaintiffs have little chance of success.' Kotkin, *Outing Outcomes: An Empirical Study of Confidential Employment Discrimination Settlements*, 64 Wash. & Lee L. Rev. 111 (2007)." | Hearsay, no exception applies; irrelevant under Rules 402 and 403 | See immediately preceding position. |

Defendants argue that these statements are admissible under Federal Rule of Evidence 703, which "was intended to liberalize the rules relating to expert testimony," *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005), by providing that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. However, Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Loeffel Steel Prods.*, 387 F.Supp.2d at 808 (citing *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir.2002); *TK–7 Corp. v. The Estate of Barbouti*, 993 F.2d 722, 731–34 (10th Cir. 1993); *In re James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992)). *See also Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, 2017 WL 2178504, at *4 (N.D. Ill. May 16, 2017) (same). "*Daubert* pointed out that Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'" *Kumho Tire*, 526 U.S. at 148 (quoting *Daubert*, 509 U.S. at 592) (pointing out that experts may testify to opinions, including those that are not based on firsthand knowledge or observation). "The Rules grant that latitude to all experts, not just to 'scientific' ones." *Id.*

50

Beyond raising general "hearsay" objections, plaintiff provides no argument on why these two statements are not appropriately included in DeGrand's report under Rule 703. *See* [462] (plaintiff's reply brief). For example, "expert testimony relying on the opinions of others should be rejected if the testifying expert's opinion is too speculative or if the underlying basis is faulty." *Angelopoulos*, 2017 WL 2178504, at *4 (citing *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000)). Plaintiff has not demonstrated that either the 2007 article or the 2008 report cited in DeGrand's report are speculative or faulty. Furthermore, "[u]nder Rule 703, an expert may rely on hearsay in formulating his opinion, but the underlying hearsay is not admissible for the truth of the matter asserted." *Id.* (citing *Loeffel Steel Prods.*, 387 F.Supp.2d at 808). *See TK–7 Corp.*, 993 F.2d at 734 (stating that "the hearsay is admitted for the limited purpose of informing the jury of the basis of the expert's opinion and not for proving the truth of the matter asserted"). Plaintiff provides no argument that defendants or DeGrand are seeking to prove the truth of the articles' assertions that "summary judgment motions by defendants are more common, more likely to be granted, and more likely to terminate the litigation, in employment discrimination cases than other types of litigation" and/or that "empirical studies on outcomes in employment discrimination litigation all" conclude that "plaintiffs have little chance of success." *See* DeGrand Report, pp. 39–40. While the articles themselves are inadmissible hearsay, DeGrand is permitted to testify that he reviewed these reports as part of a basis for forming his opinions on whether defendants met the standard of care in assessing the strengths and weaknesses of plaintiff's employment case, particularly in the context of summary judgment, trial verdict, and settlement potentials. *Id.* at pp. 33–41.

Finally, plaintiff raises challenges to statements in DeGrand's expert report that relate to other requests made by the parties in this case:

| Portion of Challenged DeGrand Testimony | Bases for Exclusion | Basis for Admissibility |
|---|---|---|
| Page 20: "Deloitte took the position that Kormi's April 5, 2010 email had been fabricated. . . . Kormi was unable to explain the discrepancy." | Subject to non-expert Motion *in Limine* No. 4. No property [sic] foundation; improper assertion of fact. No effort by DeGrand to investigate the truth of Deloitte's position. Beyond the scope of expert testimony. Further irrelevant and subject to Rule 403. | The assertion is not improper – Deloitte actually did take the position that Kormi fabricated evidence. Deloitte's position in this regard is relevant because it is a factor that Lee considered in evaluating the strengths and weaknesses of the underlying case, including settlement and |

51

| | | verdict potentials, which is proper fodder for expert opinion. See *supra*, 3a,c,e,f. Further, this fact also relevant to whether Lee breached the standard of care. |
| --- | --- | --- |
| Page 38, footnote 25: "Kormi herself testified that her employment with Intuit terminated, not because it was temporary, but because she perceived that she was the victim of national origin discrimination." | Inadmissible "other acts" evidence under Rules 402, 403, and 404(b) | Kormi has told different people different stories as to why her Intuit employment terminated. This evidence is admissible under Rule 608(b). *See also*, Defendants' Opposition to Kormi's Motion *in Limine* No. 4. |
| Page 34: "[Identity of Mediatory] is a respected and experienced judge and mediator; during [his/her] fourteen years on the bench as a United States Magistrate Judge for the Northern District of Illinois, [Mediator] conducted over 1,500 mediations . . ." | Barred by the Court's March 12, 2024 ruling | DeGrand's testimony regarding the settlement negotiations, demands, offers, and mediation will conform to this Court's March 12, 2024 ruling and be limited to that evidence which the Court ruled to be admissible. |

As to the first row, DeGrand includes this information from page twenty of his expert report in his summary of the facts in the record from the underlying employment case. *See* DeGrand Report, pp. 2–23. Plaintiff cites no case law in support of her assertion that DeGrand, as an expert witness, had an obligation to investigate the truth of these facts. Raising doubts and criticisms of an expert is appropriately done on cross examination. So too can plaintiff raise a "no proper foundation" objection to DeGrand's testimony at trial. And DeGrand does not appear to be opining on the truth of Deloitte's position, but rather merely states that this was Deloitte's position. DeGrand Report, p. 20. As for plaintiff's assertion that this statement is subject to plaintiff's Motion *in Limine* No. 4 asking the Court to bar "prior acts" and

propensity evidence under Federal Rule of Evidence 404,[14] the Court has now denied this request as premature and articulated its expectation that the parties are familiar with the Federal Rules of Evidence and will follow the procedures and limitations of these rules during trial. *See supra* I.C. The Court applies the same ruling to the statement in the first row.

Similarly, plaintiff's objection in the second row argues that this statement constitutes inadmissible "other acts" evidence under Rules 402, 403, and 404(b). [448] 10. This information is also the subject of plaintiff's Motion *in Limine* No. 4, which seeks to bar under Rule 404 "purported evidence of Plaintiff's employment experience at Intuit (after she was terminated by Deloitte and before she retained the Defendants) and the reasons/circumstances concerning the termination of her employment." [447] 5. Again, the Court notes that it has denied plaintiff's Motion *in Limine* No. 4 as premature, *see supra* I.C, and applies the same ruling as to the second row.

As to the third row, the Court notes that DeGrand's expert report (like all the expert reports in this case) was authored long before the Court's March 12, 2024 ruling on the 2013 mediation, the mediation privilege, and the evidentiary limitations imposed therein [440]. The Court expects the parties, their witnesses, and their experts to comply with the Court's previous rulings. *See supra* I.A. This testimony is excluded as to the identity and qualifications of the mediator.

## Conclusion

For the foregoing reasons, the Court rules on the following portions of the parties' respective motions *in limine*:

- Plaintiff's Motion in Limine No. 2 is denied;
- Plaintiff's Motion in Limine No. 3 is denied;
- Plaintiff's Motion in Limine No. 4 is denied;
- Defendants' Motion in Limine No. 1 is denied;
- Defendant's Motion in Limine No. 4 is denied;
- Defendants' motion to limit the testimony of Mary Robinson is granted in part and denied in part;
- Defendants' motion to exclude Kathleen Graham as an expert is denied;
- Plaintiff's motion to bar and/or limit the testimony of David Rolewick is granted in part and denied in part; and
- Plaintiff's motion to limit the testimony of Luke DeGrand is granted in part and denied in part.

---

[14] *See* [447] 5 (requesting the Court bar under Rule 404 "purported evidence concerning Deloitte's unproven allegation that Plaintiff had contrived a document in discovery").

In light of the large number of pretrial motions filed by the parties and the Court's piecemeal rulings on those motions, the Court emphasizes that the parties are to holistically apply all of these rulings to their witnesses and exhibits where applicable. The Court further emphasizes its various rulings as to the parties' experts. For example, no expert will be permitted to testify to legal conclusions within the Court's domain, facts that invade the province of the jury, or conclusions contrary to the Court's rulings as to the assignment.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: May 7, 2024**