Page 1

1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
3    _____

     RASHAD WALSTON, on behalf of      )   CIVIL CASE NO.
4    himself and all others            )   24-cv-83
     similarly situated,               )
5                                      )
              Plaintiff,               )
6                                      )
        VS.                            )
7                                      )
     NATIONAL RETAIL SOLUTIONS, INC.   )
8    D/B/A NRS PAY,                    )
                                       )
9             Defendant.               )
     _____)
10
11
12
13
14
15               REMOTE DEPOSITION OF
16                  MARY ROBINSON
17
18
19
20
21
22
     TAKEN:  December 18, 2024
23   TIME:   9:30 a.m.
     JOB NO. NJ 7066096
24   PAGES:  1 To 393
     STENOGRAPHICALLY REPORTED BY:
25   Brandi Bigalke, RPR, RSA, CSR NO. 084-4870

Page 21

1      common though.

2           Q.    Well, let's start to bring it home a

3      little bit, a little closer to home.

4                 Let's say this particular attorney

5      was being accused of terms in their representation

6      agreement, would you suggest that the attorney

7      remove those terms from the representation

8      agreement?

9           A.    Yes.

10                MR. WATSTEIN:  Object to form of the

11     question.

12     BY MR. GLAPION:

13          Q.    But is that something you would

14     suggest if, in fact, you had concerns about the

15     proprietary of those terms?

16          A.    If I had concerns about the terms, I

17     would absolutely recommend that the terms be

18     eliminated from any future agreements.  And I would

19     tell my client that if he or she didn't do that,

20     the ARDC is not going to close the file, that the

21     only way to get the file closed is to assure that

22     you're not going to do this again.

23          Q.    Is there any significance that you

24     would find in the promptness of removing those

25     terms?

                                                      Page 22

 1           A.      It would be -- that would be very

 2      fact specific.  Sometimes it would be very

 3      relevant.  Sometimes it wouldn't be as important.

 4           Q.      And what's an occasion that it would

 5      be very relevant, in your opinion?

 6           A.      Well, okay.  So are we on retention

 7      agreements?  Let's just say --

 8           Q.      I'm trying to stick to the area of

 9      retention agreements just to sort of try to drill

10      down on this hypothetical that is more relevant to

11      the deposition at hand.

12           A.      All right.  There would be a spectrum

13      of -- I'm trying to think of some that are less

14      important.  Let me start at the other end, okay.

15                   Let's say that lawyer has a retention

16      agreement and it does not comply with the rule for

17      referral fee agreements, and the lawyer has a

18      referral fee agreement with another lawyer, there's

19      just nothing that that lawyer can do to fix that

20      situation.  Okay.

21                   But I would certainly recommend that,

22      and we would put in the response that the lawyer

23      now understands the requirements, and would

24      henceforth, you know, always implement them.

25                   I don't think that that would -- that

Page 23

1    would be a necessary step, but it would not

2    necessarily address the issue of the referral fee.

3    Now, that's an example.

4              I mean, if a lawyer has made --

5         Q.    Can I interrupt, because I just want

6    to clarify something you said.

7         A.    Yeah.

8         Q.    You said you don't think that would

9    be a necessary step?  Or that would be a necessary

10   step, the removal of --

11        A.    It would be a necessary step, yes.

12   It would be a necessary step.  Because, you know,

13   if you go to discipline and you say, Well, this

14   doesn't really matter.  They're going to say, No,

15   it does.  It's a rule.  You have to comply with it.

16             And if you dig in -- those are the

17   only times we took certain cases.  For instance,

18   violation of the rule preventing direct contact

19   with represented party.  There were a handful of

20   cases we took where the lawyer just did it

21   intentionally and then took other steps that made

22   it worse.

23             But for the most part, those types of

24   communications often happen in a way that doesn't

25   result in any real problems.  It angers some

Page 24

```
 1      lawyer, but it doesn't actually cause prejudice to
 2      the client.
 3                  And if the lawyer in question, the
 4      respondent says, Yeah, I get it, and I don't do
 5      that again, that's fine.  We can all move on.
 6                  But if that lawyer digs in and says,
 7      No, I have the right to do it, and I will do it
 8      again, that was one case we had to bring because
 9      the lawyer would not back down on that.
10           Q.    Going back to the referral fee
11      situation that you had mentioned before.  I believe
12      you said that there's -- if the agreement does not
13      comply with the rule for referral fee agreements,
14      there's just nothing that the lawyer can do to fix
15      that situation.  So I want to ask a little bit
16      about that.
17                  If that provision had never been
18      used, a referral fee had never been paid, and it
19      was removed, would that be considered in any way
20      relevant to the decision to impose discipline?
21           A.    Yes.  When I say, "it can't be
22      fixed," I just mean, it can't be fixed for purposes
23      of what's already happened.  It doesn't mean that
24      there will necessarily be a discipline case.
25           Q.    So if it were the case that the
```

```
                                               Page 30
 1              Q.     And sorry.  So outside of this case
 2      that you just talked about involving the NCAA
 3      concussion litigation, have you ever --
 4              A.     I think it was the NCAA concussion.
 5      It might have been something else, but I was pretty
 6      sure it was NCAA, right.
 7              Q.     Outside of this case, have you ever
 8      submitted a report in which you were asked to opine
 9      on counsel's adequacy?
10              A.     Not that I recall.  It's possible,
11      but I don't recall it now.
12              Q.     And you don't recall if you submitted
13      a report in that first case you discussed, correct?
14              A.     I think I submitted a declaration.
15              Q.     Do you happen to have that case cite?
16              A.     No, I'd have to go look.  I could go
17      look.
18              Q.     I'm sure that's something that Ryan
19      would provide after, but we don't have to deal with
20      that at the moment.
21                     Have you ever filed a class action as
22      an attorney?
23              A.     No, no.
24              Q.     Have you ever defended a class action
25      as an attorney?
```

```
                                              Page 31

 1              A.     No.
 2              Q.     Have you ever adjudicated a class
 3      action as an attorney?
 4              A.     I don't know what you would mean by
 5      that, but no, I'm sure I haven't.  Adjudicated?
 6              Q.     So I'll clarify.
 7                     Have you ever been a mediator of a
 8      class case?
 9              A.     Oh, no.
10              Q.     Have you ever been an arbitrator for
11      a class case?
12              A.     No.
13              Q.     Have you ever been a judge for a
14      class case?
15              A.     No.
16              Q.     Can you --
17              A.     Wait.  You know, I'm not sure.  I had
18      a role as a monitor in a class action.
19              Q.     Can you elaborate on what that
20      means --
21              A.     -- on any of the categories that you
22      mentioned?
23                     (Simultaneous speaking.)
24      BY MR. GLAPION:
25              Q.     It could.  Could you elaborate on
```

Page 34

1        Q.    Yes.  What were you tasked with when
2    asked to write this report?
3        A.    We were asked to address whether
4    certain circumstances -- you know, certain factual
5    matters that had -- we were asked to accept,
6    violated the rules of professional conduct.
7              And we understood that it was for
8    purposes of assessing adequacy, and so we
9    understood that that was like the background.  I
10   mean, to the extent that the, you know, to what
11   extent did -- if we saw violations, did they
12   involve considerations relevant to adequacy.
13       Q.    Would you consider yourself a class
14   action expert?
15             MR. WATSTEIN:  Object to the form of
16   the question.
17             THE WITNESS:  No, but I'm not sure
18   what that would be, right.
19   BY MR. GLAPION:
20       Q.    But would you consider yourself a
21   class action expert?
22       A.    Why don't I?
23       Q.    No, no.  Excuse me.  I'm just making
24   sure.
25             Would you consider yourself a class

```
                                                    Page 35
 1      action expert?
 2              A.     I don't think so, no.
 3              Q.     Would you consider yourself an expert
 4      on the Rule 23 requirement of adequacy?
 5              A.     Not more than -- no.  Not more than
 6      lawyers who have -- who work with it on a regular
 7      basis.
 8              Q.     Was your -- do you understand what I
 9      mean when I say, "your task in writing this
10      report"?
11                     Do you understand that question?
12              A.     I didn't, but I -- I tried to answer
13      it as best I could.
14              Q.     You did.  And what I meant by that
15      was simply when you were retained to write this
16      report, what were you asked to do, and I think you
17      answered that.
18                     So using that same definition of
19      "task," was your task to make the case for
20      plaintiff's counsel's inadequacy?  Or to evaluate
21      plaintiff's counsel's inadequacy?
22                     MR. WATSTEIN:  Object to the form of
23      the question.  Misstates her prior testimony as to
24      what her task was.
25                     MR. GLAPION:  You can answer.
```

Page 64

1      facts provided to you were inaccurate, it could

2      impact the accuracy of your report?

3              A.      Depending on which facts, yes.

4              Q.      But it's possible that if a fact were

5      inaccurate upon which you relied, it could impact

6      the accuracy of your report, correct?

7              A.      Yes.

8              Q.      Between January 3rd, 2024, and

9      September 25th, 2024, are you aware if defendant

10     made any settlement offers in this case?

11             A.      It's my understanding that in June,

12     defendant made a settlement offer, an offer to

13     settle your client's individual claim.

14             Q.      Do you recall the amount of that

15     settlement offer?

16             A.      $35,000.

17             Q.      Did plaintiff's counsel advise

18     Mr. Walston, the plaintiff, in writing prior to

19     July 31st to reject any of defendant's settlement

20     offers?

21             A.      I did not see a writing.

22             Q.      Do you have any evidence that

23     plaintiff's counsel advised Mr. Walston in writing,

24     prior to July 31st, to reject any of defendant's

25     settlement offers?

Page 65

```
 1            A.     I did -- I don't have evidence that
 2      plaintiff's counsel did that in writing.  Right.
 3            Q.     Do you have any evidence that
 4      plaintiff's counsel did that orally?
 5            A.     Evidence, no.  I don't have access to
 6      your communications with your client, no.
 7            Q.     Did you ask for those communications?
 8            A.     I really believe in the
 9      attorney-client privilege.  I would never ask for
10      those communications.
11            Q.     Did -- so again, I said -- I think I
12      spoke generally about settlement offers.  But let's
13      talk specifically about that $35,000 offer.
14                   Do you have any evidence that
15      plaintiff's counsel advised plaintiff in writing,
16      prior to July 31, 2024, to reject that $35,000
17      offer?
18            A.     In writing, no.  Absolutely not.
19                   MR. WATSTEIN:  Jeremy, are you
20      offering to waive the attorney-client privilege?
21                   MR. GLAPION:  I'm not.  I'm just
22      asking about if she has any evidence for this
23      proposition.
24                   MR. WATSTEIN:  Okay.  So you're
25      asking her if she's viewed privileged
```

Page 66

1 communications, but you're not willing to turn

2 those privileged communications --

3       MR. GLAPION: We're not going to do

4 this on the record. I'm happy to have this

5 conversation off the record.

6 BY MR. GLAPION:

7    Q. Just to clarify. You again said,

8 "not in writing."

9      Do you have any evidence that

10 plaintiff's counsel advised Mr. Walston orally to

11 reject any of defendant's settlement offers?

12       MR. WATSTEIN: Object to form of the

13 question.

14       THE WITNESS: Nothing -- no, nothing

15 specific. I mean, I have a sense that -- no, not a

16 specific direction, no.

17 BY MR. GLAPION:

18    Q. What do you mean? I'm sorry --

19    A. I don't have evidence that you

20 explicitly directed your client not to accept the

21 $35,000 offer.

22    Q. Do you have any evidence that

23 plaintiff's counsel threatened to advise plaintiff

24 in writing to reject that $35,000 settlement offer?

25    A. No.

Veritext Legal Solutions

800-227-8440                973-410-4040

Page 71

```
 1              A.     No.
 2                     MR. WATSTEIN:  Object to the form of
 3         the question.
 4    BY MR. GLAPION:
 5              Q.     I'm sorry.  What was your answer?
 6              A.     No.
 7              Q.     Do you have any evidence that
 8         plaintiff's counsel sought to negotiate any fee at
 9         all with defendant in this case?
10              A.     No.
11              Q.     If I refer to the "springing fee
12         provision," do you understand what I'm referring
13         to?
14              A.     I do.
15              Q.     And I'm going to use that terminology
16         because it's the one that defendants used in their
17         motion to deny, and I think you used it in your
18         report, so just to be on the same page.
19                     What is the springing fee provision?
20              A.     The springing fee provision stated
21         that if Mr. Walston agreed to a settlement and your
22         firm informed him -- I don't remember if it was in
23         writing, but it might have been -- that the firm
24         disagreed, didn't think that the settlement was
25         appropriate or should be accepted, then Mr. Walston
```

Page 83

1    report.  And I will just represent, and I can
2    certainly confirm this, that the current agreement
3    was dated December 25th, or fully executed on
4    December 25.  Does that sound familiar?
5             A.    Yeah.  That sounds right.
6             Q.    I want to review some of the Factual
7    Background section.  You noted that the plaintiff
8    has been self-employed since 2013, operating
9    multiple unsuccessful businesses, have been named
10   as a defendant in multiple collection's actions and
11   declared bankruptcy in 2004.
12                   Do you see that?
13            A.    Yes.
14            Q.    Can you explain the relevance of this
15   material.
16            A.    Well, his $35,000 means something
17   different to someone in those circumstances than it
18   would to someone who has got a trust fund.
19            Q.    And when you say "those
20   circumstances," I'm just -- what were plaintiff's
21   financial circumstances as of January 3rd, 2024?
22            A.    All I know is what he testified to in
23   his deposition, and I don't think that he was asked
24   about a specific -- that specific date.  I mean,
25   if -- I assume that they didn't change

Page 84

1       dramatically.

2               Q.      Why do you assume that?

3               A.      Well, because he -- to change

4       dramatically, it would have been necessary for him

5       to have a different outlook on how he would -- how

6       he would earn money.  Or he could have won the

7       lottery for all I know.

8                       I mean, that's absolutely unlikely,

9       but it's possible.  So I don't think that it's

10      absolutely sure that his circumstances were the

11      same, but I do think that it's unlikely that they

12      were significantly different.

13              Q.      And unlikely you said because he

14      would have to have changed his outlook on money; is

15      that what you said?

16              A.      Well, on how to make money.  He

17      was -- he was not making much money based on the

18      efforts he had undertaken.

19              Q.      And how do you know that?

20              A.      Just his testimony, and then that he

21      ended up in bankruptcy.

22              Q.      When was that bankruptcy?

23              A.      I don't remember.

24              Q.      In the factual background that you

25      wrote, it says, "He declared bankruptcy in 2004."

```
                                              Page 102

 1              What is the relevance that they spent
 2      months trying to obtain plaintiff's engagement
 3      letter?
 4          A.    Okay.  The relevance could -- it
 5      would include this is a basis for wondering if or
 6      speculating or suspecting that the plaintiff's
 7      counsel did not want to reveal terms in the
 8      engagement agreement.
 9              It's also -- I know that -- and I
10      wasn't looking at it from this perspective, but I
11      do understand that it -- well, I did consider too
12      from this perspective, and that is that during the
13      entire time that the -- that the defense did not
14      have -- was looking to get but couldn't get the
15      engagement letter, the terms that have been
16      objected to were operative and were controlling the
17      representation agreement between plaintiff's
18      counsel and plaintiff.
19          Q.    So if NRS did not spend months trying
20      to obtain plaintiff's engagement letter, would that
21      suggest the opposite of what you just said the
22      relevance was?
23          A.    If there had been no -- if the
24      agreement had been produced when first requested,
25      then there would not be a basis for concluding that
```

```
1       plaintiff's counsel didn't want to disclose certain

2       terms that are at issue right now.

3                   That I would agree on.  Otherwise --

4           Q.      Do you recall -- I'm sorry.

5                   Otherwise, what was that last part?

6           A.      Well, it certainly doesn't impact how

7       long the agreement was -- for what period the

8       agreement was -- what do I want to say -- governing

9       your relationship with the client while the case

10      proceeded.

11          Q.      How long was it between defendant

12      asking for plaintiff's engagement letter and

13      plaintiff's counsel's production of the engagement

14      letter?

15          A.      I don't know exactly, but I think I

16      would be paying more attention to plaintiff's

17      counsel's production of an unredacted version.

18          Q.      So I believe that's a reference to

19      the initial production, which was redacted,

20      correct?

21          A.      Yes.

22          Q.      Do you recall whether the -- excuse

23      me.

24                  Did you review whether those

25      redactions were unilateral, or by mutual agreement?
```

```
                                             Page 140

 1      that a plaintiff trying to use the class mechanic

 2      to leverage a higher individual settlement renders

 3      that plaintiff inadequate, would you agree or

 4      disagree?

 5                  MR. WATSTEIN:  Object to form of the

 6      question, calls for speculation, and leaves out a

 7      ton of facts.

 8                  MR. GLAPION:  We're not going to do

 9      fact -- speaking --

10                  MR. WATSTEIN:  I'll ask questions on

11      redirect, but you're absolutely attempting to

12      mislead the witness by sussing out all relevant

13      information about the hypothetical you're asking

14      about.

15                  Mary, I would just ask that when you

16      answer a hypothetical question, make sure you have

17      every single fact that you need if he's asking you

18      for an opinion.

19                  MR. GLAPION:  We can go off the

20      record if you need to deal with this, but we're not

21      going to do speaking objections on the record.

22      BY MR. GLAPION:

23          Q.    The question was not targeted at

24      anything or anyone.  The question was simply the

25      fact --
```

Page 141

1                    MR. WATSTEIN:  Yes, it was.

2                    MR. GLAPION:  Ryan, you're not

3        testifying.

4                    MR. WATSTEIN:  Don't lie on the

5        record.  We know exactly what it was targeted to,

6        Jeremy.

7        BY MR. GLAPION:

8             Q.    Mary, the question was simple, I

9        think, and if you don't understand it please ask me

10        to clarify.

11                    If an attorney said that a plaintiff

12        was inadequate for seeking a settlement in excess

13        of his individual settlement while a punitive class

14        action was pending, would you agree or disagree?

15             A.    That the client was inadequate?

16             Q.    That the was inadequate, yes.

17        Inadequate class --

18                    (Simultaneous speaking.)

19                    THE COURT REPORTER:  Hang on a

20        minute.  You all are speaking over each other.

21                    Mr. Watstein, would you, please,

22        repeat your objection.

23                    MR. WATSTEIN:  My objection is that

24        it calls for speculation, asks for a hypothetical

25        without providing the facts that would be necessary

Page 143

1 mechanic for a higher individual settlement for
2 themselves; yes or no?
3           A.     I would say that under -- that there
4 are circumstances where that would be permitted,
5 yes.
6           Q.     And because part of what you opined
7 on here is adequacy I assume you have an
8 understanding of what goes into the adequacy
9 inquiry on Rule 23, correct?
10          A.     I have an understanding of some of
11 what goes into the adequacy.
12          Q.     What is your understanding of what
13 goes into the adequacy requirement?
14          A.     For purposes of this opinion, my
15 understanding is that the named plaintiff must be
16 prepared and able to take control of the
17 litigation, and not just defer to the lawyer who is
18 representing the plaintiff class.  And that the --
19 that in order to be adequate, the representative
20 has to understand that his or her obligations to
21 the class require some independent control of the
22 case.  And not just deferring to the defense
23 attorney.
24          Q.     And what --
25          A.     Or the plaintiff's attorney.  I'm

Page 144

1     sorry.

2              Q.     That's okay.

3                     What is your understanding of the

4     adequacy requirement for plaintiff's counsel in

5     general?  And then certainly you can talk about it

6     as you understand it in this case as well.

7                     But my first question is what is your

8     understanding about the adequacy of counsel

9     requirement in general?

10             A.     There are several aspects to it.  I

11    mean one, some are just logistical.  Does the

12    lawyer have the right experience in class action

13    work, and does the lawyer have the capability of

14    supporting whatever the expenses of the lawsuit

15    will be?  Those are somewhat logistical.  Does the

16    lawyer have any obligations that are contrary to

17    the interests of the class?

18                    Then, I mean, like I say, I know that

19    there are several parts of this, but I'm not coming

20    up with anything else right now.

21             Q.     The reason this sort of side quest

22    came up, and maybe we can drill down on this

23    particular part further.

24                    You had testified that the lawyer has

25    no obligation to a punitive class before

```
                                           Page 167
 1                    MR. WATSTEIN:  Object to form of the
 2     question.  Are you asking statutory damages or
 3     statutory damages plus statutorily permitted actual
 4     damages because we haven't talked at all about the
 5     latter?
 6                    MR. GLAPION:  Sure.  I'm talking
 7     about statutory damages.
 8                    THE WITNESS:  And no other damages?
 9     BY MR. GLAPION:
10         Q.    Plaintiff pursues a statutory damages
11     TCPA case and takes it to trial 20 calls, wins
12     everything, full stop, willfulness, trebling,
13     everything, what would the plaintiff be entitled to
14     recover?
15                    MR. WATSTEIN:  And disclaims their
16     actual damages?
17                    MR. GLAPION:  Ryan, can we
18     please stop --
19                    MR. WATSTEIN:  Jeremy, you are asking
20     misleading questions.
21                    Are you asking the witness to assume
22     that the plaintiff has disclaimed part of their
23     damages case, or are you asking about just the
24     statutory damages component?  That's unclear.
25                    MR. GLAPION:  I am not on the witness
```

Page 168

1     here.  If the witness needs clarification the

2     witness can seek it.

3     BY MR. GLAPION:

4          Q.    Do you understand my question, Mary?

5          A.    Well, first of all, I thought you

6     were going to do the math for me.  So let's just

7     get the math down and then I can go back.

8               20 calls times, what, assuming treble

9     damages, right?

10         Q.    Correct.  We're assuming the maximum

11    statutory damages that the plaintiff could recover

12    at trial.

13         A.    So that's, what, 40,000?  No.  20

14    times -- this is embarrassing.

15         Q.    No, it's okay.

16               Can we agree that 1500 times 20 is

17    30,000?

18         A.    Yes.  We were there before.

19         Q.    We were there.  And I wasn't trying

20    to trip you up on that.  Sorry to throw more math

21    at you.

22         A.    All right.

23         Q.    So when we're talking strictly

24    statutory damages, can you explain a situation in

25    which the plaintiff could recover more at trial in

Page 192

1      Q.      Right.  And I think --

2      A.      You just passed it.

3      Q.      It should be at the second paragraph

4   of Page 4, is that what you're referring to?

5      A.      Yeah.

6      Q.      So your understanding of the

7   springing fee provision is that it did not apply to

8   class settlement?

9      A.      I think that that's true.  Right.  I

10  think it's not necessary to anyway, right.

11     Q.      And this provision notes that "Should

12  the matter be certified as a class or collective

13  action, the Court will be required to approve any

14  settlement."

15          Do you see that?

16     A.      Yes.

17     Q.      So at the time that as you mentioned

18  the Court appoints someone, plaintiff here, as

19  class representative, have they ceded control of

20  the ability to settle through this agreement?

21     A.      No.  And I didn't say that the

22  provisions necessarily meant that they were ceding

23  control over the entire case.  But a number of

24  courts have found a client's willingness to

25  concede -- well, I think the inclusion of a

Page 194

1          Q.      Sorry, I maybe misspoke.  Page 12.

2          A.      I got it.  Right.

3          Q.      If counsel never transmitted the

4    $35,000 settlement offer to plaintiff, how could

5    counsel have invoked the springing fee provision?

6          A.      Unless I misunderstand the question,

7    I don't think that I was saying that he could have.

8          Q.      To be clear, my question isn't

9    necessarily saying that this is definitively

10   something you said.

11                 I'm just asking you if it is true

12   that you wrote that "counsel did not transmit the

13   $35,000 settlement offer to his client," how could

14   counsel have invoked the 30 -- excuse me, the

15   springing fee provision?

16         A.      That would not have been invoke-able

17   without transmitting the offer.

18         Q.      Do you have any evidence of whether

19   plaintiff's counsel transmitted the 35,000 offer to

20   Plaintiff Walston?

21         A.      My understanding is that there was no

22   response to the offer until -- well, the only

23   response to the offer was that Mr. Walston was not

24   interested in an individual settlement.

25         Q.      And from --

1    representation, there should be limits on the don't

2    give me any offer.  It should have a range of time.

3    There should be a reason that it's not being

4    transmitted to the client.

5         Q.    Is the client's representation that

6    they do not want an individual settlement not a

7    reason to trans -- or not a reason in that example?

8         A.    I wouldn't say that.  My concern is

9    that the document itself is internally inconsistent

10   or it is inconsistent with that position.

11              I mean, if there's not a

12   representation -- if there is representation on

13   those claims, then there is just no basis for a

14   reasonable request of the client -- by a client to,

15   you know, represent me on this, but don't tell me

16   if anybody makes any offers.

17              I mean at that point it might be,

18   okay, I'm not representing you on that.

19         Q.    So -- well, I want to -- so this is

20   going to come back to a few things because I'm not

21   following this.

22              If a client hit the lottery, as you

23   said that Mr. Walston could have but you didn't

24   know if he had.  Probably unlikely.

25              If Mr. Walston was the Mega Millions

Page 200

1    winner, would it be appropriate for Mr. Walston to

2    say, I don't want an individual settlement, all I

3    want is damages for everyone they harmed, would

4    that be appropriate in that scenario?

5        A.    Yes.

6        Q.    So if part of the reason that you

7    find this position I guess odd, your view on

8    Mr. Walston's financial situation?

9        A.    Well, yes.  I mean, he might be

10   signing up for paying tens and tens of thousands of

11   dollars for the benefit of getting the defendant to

12   be called out.  I mean, if class action proceeds

13   and there's no resolution -- no favorable

14   resolution, then he's on the hook for the lawyer's

15   fees.  And I do find that extremely unlikely.  I

16   don't think I've ever seen that before.

17             But yes, I can imagine if there was

18   some very wealthy person who had a particular gripe

19   that they might very well reasonably decide to

20   pursue that.

21       Q.    You wrote that "If a class action

22   proceeds and there's no resolution, he's on the

23   hook for the lawyer's fees."

24             Where is that coming from?

25       A.    Well, your agreement.  Because if the

Page 233

1    recognize what you're trying to do, but we've been
2    this route.  It would be max.  1500 times whatever
3    you said the calls might be.
4         Q.    So in that scenario though, could the
5    statutory cap have been triggered on defendant's
6    $35,000 offer?
7              And I'll be specific.  If statutory
8    damage max was $45,000, because 30 times 1500 is
9    45,000, and defendant offered $35,000, would that
10   implicate a statutory cap?
11        A.    No.
12        Q.    And how about a scenario where the
13   maximum statutory damages were $24,000 and
14   defendant offered $35,000, could that implicate the
15   statutory cap?
16        A.    I think it could.
17        Q.    And in that scenario how much in
18   fees -- assuming the statutory cap is implicated,
19   how much in fees would plaintiff's counsel be
20   entitled to?
21        A.    About a third.
22        Q.    And I'll represent, and if you want
23   to check my math you can, that 35,000 minus 24,000
24   is 11,000.  Would you agree that that would be
25   counsel's entitlement under that provision?

Page 234

1          A.     Yes.

2          Q.     And 11,000 I'll represent, again you

3     can check it if you need to, is about 31 and a half

4     percent of 35,000.

5                 Do you agree with that?

6          A.     Sounds about right.

7          Q.     Is a 31.5 percent contingency fee

8     problematic in your experience?

9          A.     No.  Not in general, no.

10         Q.     So if plaintiff had -- in the

11    scenario where the statutory damages would not

12    result in an excessive contingency fee, did the

13    statutory damages cap cause harm to plaintiff?

14                MR. WATSTEIN:  Object to form of the

15    question.  Calls for speculation.

16                THE WITNESS:  The fact that -- I

17    mean, the fact that that provision essentially

18    gives plaintiff's counsel a piece of the action,

19    then the plaintiff is being -- well, I mean then

20    the rules are violated and the concern is that the

21    lawyer shouldn't be allowed to have that much

22    control of the case.

23    BY MR. GLAPION:

24         Q.     And I want -- you talked about a

25    piece of the action.

Page 250

1    class action, and the attorney will likely obtain
2    more if the Court awards it, is there a conflict
3    between the client and the attorney at that point?
4            A.    Well, the conflict would arise to
5    the -- if there were a conflict, it would arise at
6    the time of the agreement governing the
7    relationship.  And then depending on how that
8    agreement reads, the conflict could be exacerbated
9    or addressed.
10           Q.    So from the inception of an agreement
11   in which the attorney and the client are pursuing a
12   class action, there was a conflict at least with
13   respect to fee incentives, or excuse me, financial
14   incentives.
15                 Would you agree with that?
16           A.    Yes.
17           Q.    And that conflict can only be waived
18   in your understanding by informed consent?
19           A.    Yes.
20           Q.    And what forms could that informed
21   consent take?
22           A.    Under the AVN auto rules and under
23   New Jersey rules, the informed consent has to be in
24   writing.
25           Q.    What was the -- what about the

Page 264

1    agreements tell the Court, not what he's done

2    since.

3              Q.    That wasn't my question.

4              The -- do you believe, is it your

5    view that the terms prior to amendment contributed

6    to plaintiff -- plaintiff's refusal to consider

7    individual settlement?

8              A.    I don't think that I have an opinion

9    on what the subjective impact of those terms were

10   one way or the other.

11             Q.    If -- would it weigh one way or the

12   other if plaintiff's categorical refusal to

13   consider individual settlement continued after the

14   removal of the terms?

15             A.    Because I'm not questioning his

16   choices, right, I'm only questioning the fact that

17   he was willing to agree to cede his individual

18   authority to his counsel and his counsel felt that

19   it was necessary to put him under those

20   constraints, all I'm saying is that those would be

21   violations of the rules that a court could consider

22   in determining adequacy.

23             Q.    That's not strictly true.  And I

24   don't want to drill down on this too much but --

25   and I can share the screen.

Page 265

1            On Page 20 you wrote that,

2    Plaintiff's counsel's communications with the Court

3    regarding individual settlement and that client

4    does not have interest in individual settlement

5    were misleading without disclosing that the

6    client's position was dictated by the terms of the

7    engagement agreement.

8            Do you recall writing that?

9        A.    I see.  Yes.

10       Q.    So what I'm trying to understand is

11   what evidence do you have that counsel -- excuse

12   me, that plaintiff's position was dictated by the

13   terms of the engagement agreement?

14       A.    I suppose I could have used a

15   different word.  It was certainly that -- I would

16   say that his position was constrained by the terms

17   of the engagement agreement.

18       Q.    But this is not a -- this is not a

19   hypothetical here.

20            What evidence do you have that

21   plaintiff's position was constrained by the terms

22   of the engagement agreement?

23       A.    I suppose I could have said would

24   have been.  I mean, the concern I had here is that

25   the judge says talk to him and the response is

Page 266

1       okay.  Whereas the reality is he's committed to

2       certain -- he's agreed to certain provisions that

3       would -- that would materially limit his ability to

4       consider a settlement.

5               Q.      You just testified, and I want to

6       reconcile these:  I don't think I have an opinion

7       on what the subjective impact of what those terms

8       were one way or the other.

9                       Is saying the client's position was

10      dictated by the terms of the engagement agreement a

11      subjective opinion -- or an opinion on the

12      subjective impact of those terms one way or the

13      other?

14              A.      I'm not trying to talk about his

15      subjective.  I'm talking about the objective impact

16      of the terms of the agreement in terms what of

17      judge -- if you say to say judge, sure, I'll talk

18      to him, and the point is no, he's not talking and

19      here's some of the reason why he shouldn't be

20      talking.

21              Q.      Do you have evidence that -- sorry to

22      interrupt you.

23                      Do you have evidence that counsel did

24      not talk to plaintiff in response to the judge's

25      order?

```
 1                A.      No.

 2                Q.      Do you have any evidence that counsel

 3       had any reason to believe that the client position

 4       was being dictated by the terms of the engagement

 5       agreement?

 6                       MR. WATSTEIN:  The existence of the

 7       agreement.

 8                       THE WITNESS:  I would say that --

 9                       MR. GLAPION:  You're not testifying,

10       Ryan.

11                       MR. WATSTEIN:  Well, it's all just so

12       absurd.  We've spent six hours talking about

13       basically everything except what Mary's opinion is

14       about.

15                       MR. GLAPION:  I'm asking about

16       specific language from the opinion, but you can

17       certainly include that in your rely.

18       BY MR. GLAPION:

19                Q.      Mary, I'm asking specifically about

20       this language that the client's position was

21       dictated by the terms of the engagement agreement.

22                       What evidence do you have that the

23       client's position was dictated by the terms of the

24       engagement agreement?

25                A.      As I said, I should have said limited
```

```
1    by the terms of the engagement agreement.  They are
2    there whether or not you feel that he was paying no
3    attention to them.  I don't know why they'd be
4    there if they didn't have a purpose.  So yes, I
5    considered that.  So that's not evidence.
6              But I do -- I don't think it's unfair
7    to say that he was -- that his openness and ability
8    to consider an individual settlement were
9    restricted by the agreement.  And, you know, do I
10   know -- does he know whether you're going to try
11   and enforce those?  I don't know, maybe you told
12   him you weren't going to try and enforce those.
13   But then I ask myself why are they there.  So
14   that's --
15        Q.    You said you don't think it's unfair
16   to say that his openness and ability to consider
17   individual settlement was restricted by the
18   agreement.
19              Do you have evidence that he felt his
20   openness and ability to consider an individual
21   settlement was restricted by the agreement?
22        A.    I don't have evidence, no.
23              MR. WATSTEIN:  Objection asked and
24   answered --
25   BY MR. GLAPION:
```

Page 269

1          Q.     Other than the agreement itself,
2    other than the inclusion of the terms in the
3    agreement itself, do you have reason to believe
4    plaintiff's counsel suspected that plaintiff's
5    position was being dictated by those terms?
6          A.     No.
7          Q.     In the circumstances where plaintiff
8    has continued to maintain the same position on
9    individual settlement after the removal of the
10   terms, does that weigh in any way on whether
11   plaintiff's previous position was dictated by the
12   terms in the agreement?
13         A.     In any way?  I would say it might
14   weigh in some way.
15         Q.     In what way would that weigh?
16         A.     It might weigh as evidence that he
17   was -- he was completely -- it could be, but I'm
18   not saying it is or certainly not binding or
19   definitive evidence that he wouldn't discuss an
20   individual settlement regardless of the terms.
21         Q.     And of course I'm not trying to --
22   you can't know what's in someone's brain and I'm
23   not trying to have you play --
24         A.     I try to tell my certain family
25   members that I do.

```
                                          Page 308

 1              Q.     Okay.  But what I want to make sure I

 2      understand is isn't the existence of the terms in

 3      the agreement by itself -- doesn't that

 4      automatically have an effect -- I mean it's a

 5      contract, right?

 6              A.     Correct.  Right.  It has -- it can

 7      have an impact regardless of whether -- I mean,

 8      when I think about whether something would have

 9      been triggered, it would depend on -- I mean, it

10      was primarily comparing alternatives where one of

11      the -- one is the highest.  Okay.

12                     And so we never -- this case never

13      really got to a point where anything was literally

14      triggered.  There was not a point at which Walston

15      would have owed fees under this agreement.  But in

16      terms of what he could reasonably expect would

17      become his obligations, then that can have an

18      impact.

19                     So when I say "triggered," I would

20      only be referring to when it actually became

21      applicable.  And when it actually governed the

22      next, you know, something that he would owe.

23              Q.     Right.  Right.  And I guess as a

24      follow up to that.

25                     The existence of the terms in the
```

Page 346

1      want the record to be clear on this point.

2                    Are you aware of any disciplinary

3      cases where this type of fee provision was even

4      presented?

5             A.     No, I'm not.

6             Q.     And I think that's -- you said that

7      you'd never even seen a combination of settlement

8      restrictions like existed in this agreement before

9      in your career, right?

10            A.     That's true.  Right.

11            Q.     You were asked -- there were

12     questions about standard terms and form agreements.

13            A.     Yes.

14            Q.     And I guess I have this question for

15     you.  If in fact there were an agreement with one

16     or several unethical terms, would the fact that it

17     was used multiple times against multiple clients be

18     a mitigating or aggravating factor?

19            A.     It would not be mitigating.  It would

20     potentially be aggravating.

21            Q.     And I think I just have one more

22     question, and it's more of just a clarifying

23     question.  Might have been Mr. Glapion's last

24     question.

25                    Can you hold on just one second.

Page 347

1      I've just got to stop one minute for my daughter.

2                    MR. GLAPION:  Go ahead.

3                    (Off the record.)

4      BY MR. WATSTEIN:

5           Q.     As I was mentioning, one of if not

6      the last question that Mr. Glapion asked was about

7      the current agreement and the effect that the

8      current agreement has.  And I just wanted to be

9      very clear because we just looked at the current

10     agreement.

11                  To the extent that the current

12     agreement still contains a provision that would

13     mean in the instance of an individual settlement

14     the plaintiff would get nothing and the lawyer

15     would get all of the fees or all of the recovery,

16     does that current agreement still have some degree

17     of the same problems as the prior agreements in

18     terms of the way it impacts the class

19     representative's ability to make individual

20     settlement decisions?

21          A.     I would say that it certainly

22     continues to have an impact and it essentially

23     could eliminate any value to the client of pursuing

24     an individual settlement.  And so that would be a

25     disincentive.  I don't know that it was -- it's as

Page 348

1    punitive but.

2         Q.    Right.  It's not as punitive as a

3    provision that might require the client to pay the

4    lawyer back?

5         A.    Right.

6         Q.    But it still is -- it still has the

7    effect of disincentivizing individual settlement?

8         A.    Yes.

9              MR. WATSTEIN:  That's all the

10   questions I have.

11             MR. GLAPION:  I'm going to try to

12   speed run through this.  I wrote them down so you

13   can get out of here, Ryan, and you as well, Mary.

14                  FURTHER EXAMINATION

15   BY MR. GLAPION:

16        Q.    What is the best source that you can

17   think of the client's intent before he contacted

18   Glapion Law Firm?

19        A.    The best source of identifying the

20   client's intent?

21        Q.    Yes.

22        A.    Well, probably his own conduct, which

23   would have included trying to settle the individual

24   claim.

25        Q.    I'm going to share -- I'm going to

Page 378

1      FDCPA says $1,000 statutory damages cap plus

2      attorneys' fees.

3                  A.      Got it.

4                  Q.      Under a contingency fee agreement,

5      would that $6,000 settlement invite concerns about

6      fee sharing with a nonlawyer?

7                  A.      And that would depend on who you

8      asked.

9                  Q.      But there's differences of opinion on

10     that is what you're saying, correct?

11                 A.      There's differences of opinion,

12     correct.

13                 Q.      My question is on that same $6,000

14     settlement with the statutory cap applied, does

15     that concern about fee sharing with a lawyer

16     disappear -- excuse me, with a nonlawyer, does that

17     disappear in light of a statutory cap?

18                      MR. WATSTEIN:  Object to form of the

19     question.

20                      THE WITNESS:  I don't think it does.

21     BY MR. GLAPION:

22                 Q.      Well, in that same 6,000 settlement

23     what would the breakdown be with the statutory cap

24     applied?

25                 A.      One and five.

```
                                            Page 380

 1            Q.    So in a situation where the client

 2      cannot recover amounts above $1,000, does that not

 3      address that particular concern?

 4                  MR. WATSTEIN:  Object to form of the

 5      question.  Asked and answered.

 6                  And, Brandi, can you tell me how long

 7      the plaintiff has had on the record because I think

 8      we're getting close to seven hours.  I've had my

 9      kids in here.  You know, this is ridiculous --

10                  MR. GLAPION:  This is honestly my

11      last question, Ryan.

12                  MR. WATSTEIN:  It's ridiculous.  It's

13      getting ridiculous.  I have my kids solo tonight.

14                  I want the record to reflect it's

15      8:20 p.m. I'm here single parenting with a 4 year

16      old and 6 year old.  Jeremy has been asking the

17      same questions over and over and over again for

18      seven hours.  And I've had it.

19                  So, Brandi, would you please let me

20      know how long Jeremy has had on the record because

21      if it's a minute over seven, this deposition is

22      over.

23                  MR. GLAPION:  Are you done?

24                  MR. WATSTEIN:  I am done.

25                  MR. GLAPION:  And let the record
```

```
                                              Page 381

 1      reflect --

 2                      MR. WATSTEIN:  We've been going on

 3      for 15 minutes on the same question.

 4                      (Simultaneous speaking.)

 5                      MR. WATSTEIN:  I'm waiting for Brandi

 6      to answer how long we've been on the record before

 7      we...

 8                      THE COURT REPORTER:  So, Counsel, I'm

 9      going to go off the record to figure that out.

10                      MR. WATSTEIN:  How long do you have,

11      Jeremy?

12                      MR. GLAPION:  This is literally my

13      last topic.

14                      MR. WATSTEIN:  Ask the question.

15                      MR. GLAPION:  Let's lower our voices,

16      please.  Thank you.

17                      MR. WATSTEIN:  Jeremy, I'm not

18      raising my noise.  I'm speaking sternly.  Okay.

19      Don't try to create a false record.

20                      MR. GLAPION:  I don't want to argue

21      with you.  Let me continue questioning the

22      witness --

23                      MR. WATSTEIN:  Finish.  Finish.

24      BY MR. GLAPION:

25              Q.      Regarding that the $6,000 settlement
```