# EXHIBIT 1

Page 1

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION
3    _____

     RASHAD WALSTON, on behalf of    )  CIVIL CASE NO.
4    himself and all others          )  24-cv-83
     similarly situated,             )
5                                    )
             Plaintiff,              )
6                                    )
       VS.                           )
7                                    )
     NATIONAL RETAIL SOLUTIONS, INC. )
8    D/B/A NRS PAY,                  )
                                     )
9             Defendant.             )
     _____)
10
11
12
13
14
15              REMOTE DEPOSITION OF
16                 MARY ROBINSON
17
18
19
20
21
22
     TAKEN:  December 18, 2024
23   TIME:   9:30 a.m.
     JOB NO. NJ 7066096
24   PAGES:  1 To 393
     STENOGRAPHICALLY REPORTED BY:
25   Brandi Bigalke, RPR, RSA, CSR NO. 084-4870

Page 15

1     might get a different look.

2           Q.    So just going back to what you said,

3     "mitigating or aggravating, depending on the

4     circumstances," I'm assuming that mitigating would

5     be no disciplinary history; is that correct?

6           A.    No.  There's a lot of other

7     circumstances, but that would definitely be

8     included.

9                 Mitigating could also be a series of

10    events that put the lawyer in a very pressured

11    situation.  They could be professional.  They could

12    be family.  They could be personal.  Where -- and

13    typically, if those issues were raised, there would

14    be doctors who would be involved and opine on

15    whether or not those factors contributed to the

16    conduct occurring.

17          Q.    Are mitigating factors something that

18    would be responsible -- or the responsibility of

19    the accused attorney to raise?  Or is it something

20    that the ARDC would independently seek out?

21          A.    I would say that it was -- it's a

22    mixture that -- in terms of, you know, the legal

23    answer to that would be that it's the attorney's

24    burden to raise that.

25                When we would make decisions about

Page 16

1    what sanction we were going to ask for, one of the

2    major considerations was what caused this and, you

3    know, is it going to happen again?

4              And so to that extent, our

5    investigation would also include information about

6    how it all came to be, because we would want to

7    make a recommendation that would address what

8    actually had happened and why.

9              I mean, for instance, if somebody had

10   a serious alcohol problem, the typical resolution

11   of that might be some suspension, but then after

12   that followed by a period of probation.

13             And it wasn't good enough to just do

14   a suspension, because if the person kept drinking,

15   they were trouble on the other side of the

16   suspension.  And so, you know, that was part of our

17   job to pay attention to all that.

18             But, you know, literally it was up to

19   the attorney or respondent to raise mitigation.

20        Q.    Thank you.  And I'm sure we'll go

21   back through some more of your ARDC experience.

22             I want to shift now to what your

23   current role is.  So what is your current role?

24        A.    Okay.  So after I left the ARDC and

25   until now, I have been doing legal work but only in

```
1        the context of ethics issues.  So I do expert
2        witness work.  I do -- I did for a while, do a
3        lot -- I did lawyer discipline defense.
4                      I've done judicial discipline
5        defense.  And then I have a whole segment of
6        case -- of what I call "my consulting work."  I
7        have clients who call me when they have an issue
8        and they're trying to make some decisions.  I
9        sometimes write private opinions for them about
10       issues.  And all of my clients are lawyers.
11            Q.    You mentioned that you do -- or you
12       mentioned that you did lawyer and judicial
13       discipline defense.
14                      Did I understand that correctly?
15            A.    I don't think I could hear you.  I'm
16       sorry, Jeremy.
17            Q.    I'm sorry.  Let me move my microphone
18       up a little bit.
19                      You said that you did previously do
20       lawyer and judicial --
21            A.    I did.
22            Q.    -- disciplinary defense?  Or you
23       still do lawyer and judicial disciplinary defense?
24            A.    I've been trying not to, but then,
25       you know, somebody who is an old client calls and I
```

Page 18

```
 1        say okay.  But for the most part, I -- to the
 2        extent that I'll do it, I'm just preparing
 3        responses to allegations in a case where I don't
 4        think it's going to end up as a case.
 5                     I did take -- recently I took one
 6        case that was a formal discipline case.  But for
 7        the most part, I am trying to age out -- to ease
 8        out of the discipline work.
 9             Q.    But that's something you used to do
10        more of that work, correct?
11             A.    Yes.  Yep.
12             Q.    And can you walk me through a little
13        bit how you would come to be involved on the
14        defense side of a disciplinary complaint.
15                     I guess, would the lawyer approach
16        you, or how would that work?
17             A.    Yes, the lawyer would approach me.  I
18        have -- they come from a couple of different
19        avenues.  I and my three partners have the most
20        experience and the most -- we're the most
21        well-known among the Illinois lawyers who do
22        attorney discipline.
23                     All three of my partners were former
24        ARDC attorneys.  And so a lot of times somebody
25        just emails and says, Would you or one of your
```

Page 19

1       partners represent me on this?

2                   Oftentimes another client sends

3       someone.  You know, some of our clients have

4       practices in areas where they get numerous

5       complaints, not because they're bad lawyers, but

6       because the nature of the practice causes certain

7       factors to combine and they get complaints.

8                   So it comes from any number of

9       sources.  Lots of referrals from other lawyers.

10          Q.      So a lawyer -- going back to what you

11      said.  A lawyer emails you and says, I'm having

12      this issue or I'm being accused of this.

13                  What would be your next step in that

14      process?

15          A.      I would say, Could you send me the

16      ARDC complaint or give me the names of whoever

17      would be in opposition to you?  I'll run it.  I'll

18      run a check.  I'll run a conflict check.  And then

19      right now, what I do is, I run -- you know, we have

20      a database, but we also do send emails to each

21      other because -- anyway, it's safer that way.

22                  And then so I'll run a conflict check

23      by sending an email around to my partners and ask,

24      Who is available.

25          Q.      And let's say that you've -- there's

Page 20

```
 1      no conflict and this attorney retains your services
 2      and tells you the issue.  Are there some common
 3      first things you would do in terms of preparing a
 4      defense for this attorney?
 5            A.    Sure.  I'm trying to think if there's
 6      some major, you know, categories I could give you.
 7      You know, let's see, I guess that we just
 8      understand from our experience what factors will
 9      trigger the ARDC to go one way or the other.
10                 And so we obviously ask as many
11      questions as we can to find out what we know to be
12      relevant considerations.  We can tell by looking at
13      what the complainant has identified what's going to
14      trigger the ARDC, make sure we get the information
15      and any documentation we need to answer that.
16            Q.    Would you -- sorry.  Go ahead,
17      continue.  I'm sorry.
18            A.    Sometimes we would review court
19      records, transcripts, pleadings.
20            Q.    Would you -- if the action that was
21      subject to the complaint was still ongoing or in
22      progress, would you advise -- are there
23      circumstances where you'd advise stopping those
24      actions?
25            A.    Sure, there would be.  It's not
```

Page 21

1    common though.

2         Q.    Well, let's start to bring it home a

3    little bit, a little closer to home.

4              Let's say this particular attorney

5    was being accused of terms in their representation

6    agreement, would you suggest that the attorney

7    remove those terms from the representation

8    agreement?

9         A.    Yes.

10             MR. WATSTEIN:   Object to form of the

11   question.

12   BY MR. GLAPION:

13        Q.    But is that something you would

14   suggest if, in fact, you had concerns about the

15   proprietary of those terms?

16        A.    If I had concerns about the terms, I

17   would absolutely recommend that the terms be

18   eliminated from any future agreements.  And I would

19   tell my client that if he or she didn't do that,

20   the ARDC is not going to close the file, that the

21   only way to get the file closed is to assure that

22   you're not going to do this again.

23        Q.    Is there any significance that you

24   would find in the promptness of removing those

25   terms?

Page 22

```
 1          A.     It would be -- that would be very

 2    fact specific.  Sometimes it would be very

 3    relevant.  Sometimes it wouldn't be as important.

 4          Q.     And what's an occasion that it would

 5    be very relevant, in your opinion?

 6          A.     Well, okay.  So are we on retention

 7    agreements?  Let's just say --

 8          Q.     I'm trying to stick to the area of

 9    retention agreements just to sort of try to drill

10    down on this hypothetical that is more relevant to

11    the deposition at hand.

12          A.     All right.  There would be a spectrum

13    of -- I'm trying to think of some that are less

14    important.  Let me start at the other end, okay.

15               Let's say that lawyer has a retention

16    agreement and it does not comply with the rule for

17    referral fee agreements, and the lawyer has a

18    referral fee agreement with another lawyer, there's

19    just nothing that that lawyer can do to fix that

20    situation.  Okay.

21               But I would certainly recommend that,

22    and we would put in the response that the lawyer

23    now understands the requirements, and would

24    henceforth, you know, always implement them.

25               I don't think that that would -- that
```

Page 23

```
 1      would be a necessary step, but it would not
 2      necessarily address the issue of the referral fee.
 3      Now, that's an example.
 4                   I mean, if a lawyer has made --
 5           Q.     Can I interrupt, because I just want
 6      to clarify something you said.
 7           A.     Yeah.
 8           Q.     You said you don't think that would
 9      be a necessary step?  Or that would be a necessary
10      step, the removal of --
11           A.     It would be a necessary step, yes.
12      It would be a necessary step.  Because, you know,
13      if you go to discipline and you say, Well, this
14      doesn't really matter.  They're going to say, No,
15      it does.  It's a rule.  You have to comply with it.
16                   And if you dig in -- those are the
17      only times we took certain cases.  For instance,
18      violation of the rule preventing direct contact
19      with represented party.  There were a handful of
20      cases we took where the lawyer just did it
21      intentionally and then took other steps that made
22      it worse.
23                   But for the most part, those types of
24      communications often happen in a way that doesn't
25      result in any real problems.  It angers some
```

Page 24

1      lawyer, but it doesn't actually cause prejudice to
2      the client.
3                    And if the lawyer in question, the
4      respondent says, Yeah, I get it, and I don't do
5      that again, that's fine.  We can all move on.
6                    But if that lawyer digs in and says,
7      No, I have the right to do it, and I will do it
8      again, that was one case we had to bring because
9      the lawyer would not back down on that.
10         Q.    Going back to the referral fee
11     situation that you had mentioned before.  I believe
12     you said that there's -- if the agreement does not
13     comply with the rule for referral fee agreements,
14     there's just nothing that the lawyer can do to fix
15     that situation.  So I want to ask a little bit
16     about that.
17                   If that provision had never been
18     used, a referral fee had never been paid, and it
19     was removed, would that be considered in any way
20     relevant to the decision to impose discipline?
21         A.    Yes.  When I say, "it can't be
22     fixed," I just mean, it can't be fixed for purposes
23     of what's already happened.  It doesn't mean that
24     there will necessarily be a discipline case.
25         Q.    So if it were the case that the

Page 25

```
 1      lawyer said, This provision is in there, but I've
 2      never paid a referral fee, would that be
 3      something -- would the lack of use be considered an
 4      imposing discipline?
 5              A.      Yes.
 6              Q.      So I want to shift a little bit into
 7      the actual report itself.  You wrote in your
 8      report -- which I'm looking at it now.  I'm not
 9      going to screen share unless you need me to -- that
10      since 2007 you've been retained and identified as
11      an expert witness on legal, ethics and professional
12      responsibility issues in over 50 cases; is that
13      accurate?
14              A.      Yes.
15              Q.      Have you been retained as an expert
16      on class certification issues?
17              A.      Yes.
18              MR. WATSTEIN:  Object to form of the
19      question.
20      BY MR. GLAPION:
21              Q.      Outside of this case, have you been
22      retained as an expert on class certification
23      issues?
24              A.      Yes.
25              Q.      Can you provide examples of some of
```

Page 26

1     those cases?

2           A.     Yes.  I did declarations in a couple

3     antitrust cases; one involving broiler chickens,

4     another that's on the table right now is PVC pipes.

5     I'm trying to think.

6                  I've advised lawyers involved in

7     those cases -- in those kinds of cases, more often

8     than I have done formal ethics opinions.

9           Q.     On what topics would you advise the

10    lawyers in those kinds of cases?

11          A.     Conflicts is a big one.  And, you

12    know, in the antitrust cases, the conflicts at

13    issue involved questions as to whether or not

14    subclasses needed separate representation.

15                 Conflicts every now and then arise

16    because a lawyer has or one of the lawyers involved

17    has a client -- another client that might have a

18    conflict with the class or with, you know, might

19    create -- might raise some sort of a conflict.

20                 Sometimes, you know, it's -- you get

21    to the point where it's really granular, and down

22    deep you've got a couple of class members who are,

23    like, divorced from each other, and there's liens

24    that can affect what would happen in terms of

25    dispersement.

Page 27

```
 1           Q.     Prior to this case, have you ever
 2      been retained to advise on a counsel's adequacy to
 3      represent a class?
 4           A.     Yes.
 5                  MR. WATSTEIN:  Object to form of the
 6      question.
 7      BY MR. GLAPION:
 8           Q.     What case was that?  Or which
 9      cases --
10           A.     That's a very good question.  I'm
11      really -- I'm trying to think now.  Hold on.
12                  Okay.  One was very unique.  I think
13      it was the NCAA concussion case, where it had
14      something to do with the NCAA.  My client had
15      already been appointed to the steering committee or
16      maybe she was lead counsel.  I can't remember.
17                  But one bad day she woke up and found
18      out that an employee that they had hired during the
19      pandemic and who had never actually come to their
20      office and who was doing review, document review,
21      was also doing document review for the outside firm
22      that was supporting the defense.
23                  So I mean, when she bought -- so she
24      raised the issue, and yes, that was an issue of
25      whether or not she had -- she was adequate.
```

Page 28

```
1            Q.    And I -- I ask this in part because
2      in my past life, I was involved in the NFL
3      concussion litigation, and it may have overlapped
4      with the NCAA.
5                  Can you tell me who that client was?
6      I don't know if that's something you can share.
7            A.    I don't remember that I filed
8      anything in that case, so I'd rather not.
9            Q.    Okay.  I just wanted to make sure it
10     wasn't my, you know, my former boss or something
11     like that that would create some kind of strange
12     issues.
13                 Do you recall your conclusion in that
14     case as to whether this particular client was
15     adequate?
16           A.    Well, what I addressed was whether
17     she had complied with her ethical obligations.  And
18     the steps that the firm -- she and her firm had
19     taken were reasonable.
20                 And, you know, their employee lied to
21     them.  Plus he was never at the office.  There was
22     really no opportunity -- well, there weren't
23     significant opportunities for anything that he
24     might have learned to creep back into their
25     knowledge base.
```

```
                                                    Page 29

 1                      So, you know, some of it just had to

 2        do with -- you know, was -- did she have actual

 3        access to information from the defense.

 4             Q.    Have you ever submitted a report in

 5        which you were asked to opine on -- or excuse me.

 6        Let me re ask that.

 7                      Have you ever submitted a report on

 8        which you opined on counsel's adequacy to represent

 9        a class prior to this case?

10                      MR. WATSTEIN:  Object to the form of

11        the question.

12                      THE WITNESS:  As I said, I might have

13        submitted a report in that case.  I might have.

14                      MR. GLAPION:  And Brandi, sorry to

15        interrupt.  The realtime is showing all the

16        objections of Mr. Glapion.

17                      THE COURT REPORTER:  No, I do.  I see

18        that.  I must have just -- it will be fixed.  It

19        will be fixed.

20                      MR. GLAPION:  That's okay.  Yeah, I

21        just want to make sure the Court doesn't think I'm

22        objecting to my own questions.

23                      THE COURT REPORTER:  Yes, this is a

24        rough, so...

25        BY MR. GLAPION:
```

```
                                            Page 30
1           Q.    And sorry.  So outside of this case
2      that you just talked about involving the NCAA
3      concussion litigation, have you ever --
4           A.    I think it was the NCAA concussion.
5      It might have been something else, but I was pretty
6      sure it was NCAA, right.
7           Q.    Outside of this case, have you ever
8      submitted a report in which you were asked to opine
9      on counsel's adequacy?
10          A.    Not that I recall.  It's possible,
11     but I don't recall it now.
12          Q.    And you don't recall if you submitted
13     a report in that first case you discussed, correct?
14          A.    I think I submitted a declaration.
15          Q.    Do you happen to have that case cite?
16          A.    No, I'd have to go look.  I could go
17     look.
18          Q.    I'm sure that's something that Ryan
19     would provide after, but we don't have to deal with
20     that at the moment.
21                Have you ever filed a class action as
22     an attorney?
23          A.    No, no.
24          Q.    Have you ever defended a class action
25     as an attorney?
```

Page 275

1    done anything wrong, I mean would that be the end
2    of the story?  Does that resolve the problems with
3    the use of that provision?
4         A.    No, it doesn't.  I mean, for one
5    thing, the 1.5 provides that a lawyer shall not --
6    I forget -- I think contract for, but charge or
7    take an unreasonable fee.  So there's a prohibition
8    on just agreeing to an unreasonable fee.  So there
9    still remains that violation.
10             And then everything else would just
11   depend on circumstances.  There's a lot of
12   different things that could influence how it
13   would -- how it would appear if the change was
14   made.
15        Q.    Okay.  I just want to ask a very
16   straightforward question because this was confusing
17   me today a lot.
18             Is there any conceivable point to the
19   springing fee, the statutory cap provisions other
20   than impairing the client's right to settle when
21   the lawyer doesn't want the client to settle?
22        A.    I don't think so.  I haven't come up
23   with one.  And I'll say this, I said it to you.  I
24   have not seen -- I have seen springing fees and
25   they're fairly condemned, but I've never seen the

Page 276

1       cap, the statutory cap fee before.  That provision.

2               Q.     And that's despite having represented

3       many plaintiffs' class action lawyers?

4               A.     That's right.

5               Q.     Okay.  In ADRC proceeding --

6                      MR. GLAPION:  ARDC.

7       BY MR. WATSTEIN:

8               Q.     In an ARDC proceeding, if a client

9       for example comes to the body with a complaint, how

10      are complaints resolved if there are issues of

11      attorney-client privilege that need to be pried

12      into in order to determine whether the lawyer did

13      something wrong or the degree of misconduct?

14              A.     I would say that for the most part,

15      when I was there I considered it absolutely

16      impermissible for us to try to break privilege

17      unless there was an evidentiary ground to do so.

18      All right.  So it's not at all uncommon for the

19      ARDC lawyers to challenge -- I shouldn't say that.

20                     It happens that ARDC lawyers will

21      challenge privilege on the basis of the crime fraud

22      exception or something, you know, some other

23      circumstances, but privilege itself pertains.

24              Q.     Well, the client can waive privilege

25      though, right?

Page 277

1          A.     Oh, yeah, the client can waive it.
2     And there are many times when the client will do
3     that in order to make the complaint.  Right.
4          Q.     So the client is the one making the
5     complaint, they're totally free to say, well,
6     here's all my communications with my lawyer and
7     then you can go to the lawyer and ask for more
8     about those communications, right?
9          A.     Right.  If the client waives, you
10    know, the door is open completely.
11         Q.     Okay.  And I want to get at a very
12    specific problem though.
13                Let's say that the complaint comes
14    from somebody who is not a client.
15         A.     Right.
16         Q.     The complainant brings to the
17    disciplinary committee's attention what the
18    committee views is a significant issue that may be
19    pervasive.
20                The lawyer's response is, well, I
21    didn't -- I might have had these impermissible
22    provisions, but I didn't make any attempts to
23    enforce any of them.
24                Where the committee is left with a
25    problem of objective evidence of ethical violations

Page 278

1     and the lawyer's response is, well, I never

2     enforced them, I gave my client full informed

3     consent, basically I acted totally contrary to

4     those provisions.  What does the committee do to

5     resolve that issue?

6            A.     There's a couple different things.

7     One is just record the lawyer and find -- the

8     decision makers could find that they don't accept

9     the lawyer's testimony.

10            Another would be to -- okay.  I had

11     this a minute ago.  A lawyer has a certain amount

12     of leeway to reveal confidential information in

13     order to defend against allegations.  And if

14     there's room for invoking that, we would -- you

15     know, ARDC's lawyers would invoke that and then

16     it's very much like the Fifth Amendment in civil

17     cases.  You can draw a negative inference if the

18     lawyer doesn't -- still doesn't, you know, will not

19     reveal.

20            Q.     Not to risk retreading a question I

21     just asked, but I think we established a minute ago

22     that the provisions at issue -- well, I'll just ask

23     you open-ended.

24            Do the provisions that we've talked

25     about today, there's two or three of them,

1    effectively take the decision to settle a case

2    individually out of the client's hands and put it

3    in the lawyer's hands?

4         A.    If there were a challenge to this

5    agreement, that's exactly how it would be

6    interpreted.  Right.  Exactly.

7              I mean, it's possible that, you know,

8    when we're trying to litigate this that there would

9    be a finding that the provision was inappropriate

10   and won't be enforced against -- you know, it's

11   against public policy or something of that nature.

12   But right.  Each of these -- and they're unusual.

13   They're extreme in terms of the potential penalties

14   that the client could face.

15        Q.    And can you see a need -- this is

16   what I've been trying to square throughout the

17   whole day today.

18              Can you see a need to include these

19   provisions if it were true that the client

20   adamantly and 100 percent without return only

21   wanted to pursue a class resolution for other

22   people?

23        A.    No, I don't see -- I can't imagine

24   why else they would be there.  Right.

25        Q.    Why else as in other than to restrict

Page 280

```
 1     that?
 2          A.     Other than, right, to contain it.
 3     Right.
 4          Q.     Right.  Does the ARDC have the
 5     ability to remedy any harm that these provisions
 6     may have already caused, like preventing a
 7     settlement from taking place that could have taken
 8     place?
 9          A.     No, no.  I mean the ARDC's impact is
10     always going forward.  And as I said before, the
11     focus is on preventing future harm to other clients
12     or members of the public or to the integrity of the
13     profession.  So no, the impact is always going
14     forward.
15               And ARDC doesn't for instance --
16     there's one exception.  That would be that ARDC has
17     some authority to require restitution, but that's
18     typically limited to when a lawyer has taken money,
19     not malpractice damages typically.  You know, so
20     that would be the one other, you know, remedial
21     option that could be used.
22          Q.     Okay.  And when I say -- I know that
23     we've been using the term ARDC.  But I guess in
24     your experience does the ARDC function similarly to
25     other state or similar ethics boards that
```

1      investigate lawyers?

2          A.     On the principles that we're talking

3      about; the structures can be very different.

4          Q.     Okay.

5          A.     But right.

6          Q.     And what is the body that would

7      enforce -- let's say there was a complaint about

8      these agreements, what is the body that would

9      enforce that complaint or adjudicate that

10     complaint?

11         A.     First the staff attorneys would

12     investigate, you know, probably interview

13     Mr. Walston, other things.  And then if it appears

14     that there's ground for seeking discipline, then

15     the staff attorney asks for authority to file a

16     complaint, and it has to come from what's called

17     the inquiry board.  And the inquiry board sits in

18     panels of three; two lawyers, one nonlawyer.

19            And if the inquiry panel agrees to

20     approve the filing of a complaint, then it is heard

21     by a hearing board panel, which again these are

22     volunteers; two lawyers, one nonlawyer.  They

23     conduct a hearing that -- it's like a bench trial.

24     It's formal, rules of evidence apply, things of

25     that nature.

Page 282

1             Lots of steps here.  Lawyers are very
2     well protected by process.  Then if either party
3     objects to the recommendation of the hearing board,
4     it goes to an appellate tribunal that also sits in
5     panels of three, also volunteers.
6             And then after that it has -- if
7     discipline is to be imposed, it has to go to the
8     Illinois Supreme Court.  The lower boards have the
9     authority to reprimand a lawyer, otherwise any
10    discipline has to be imposed by the Illinois
11    Supreme Court.  So there can be -- it eventually
12    goes to the Supreme Court.
13            You know, sometimes by petition to
14    review what the review board had done or sometimes
15    by consent petitions like Jeremy asked me about
16    earlier.
17        Q.    Right.  And then in terms of just the
18    actual ethical body.  Is it in fact the ARDC that
19    would investigate a complaint like that?
20        A.    Yeah.
21        Q.    About these provisions, or would it
22    be some other body?
23        A.    No, it is.  And it's sort of
24    confusing.  I mean the initials stand for Attorney
25    Registration and Disciplinary Commission.  There's

Page 283

1    a commission, which is like a board of directors

2    that oversees the operation.  Then they hire the

3    administrator, subject to the Supreme Court's

4    approval.  And then there was a staff.

5              And so the investigative work would

6    be done by the staff.  And if there's a request to

7    proceed, the staff lawyers would present the case.

8    All right.  But the -- those panels that I told you

9    about, they're all part of the ARDC and they do the

10   initial adjudicating.  But as I say, eventually it

11   all goes to the Supreme Court.

12        Q.    Understood.  And does the ARDC have

13   the ability to remove any appearance of impropriety

14   that these provisions that we talked about today

15   might have caused in the class action while they

16   were in place?

17        A.    No.

18        Q.    And does the ARDC have the ability to

19   retroactively remove any limits that these

20   provisions placed on plaintiff's ability to control

21   the case?

22        A.    No.

23        Q.    Okay.  So is the sole forum for

24   potentially remedying those issues the Court in

25   which the action is pending?

```
 1          A.      Probably.  Right.  Yeah.  ARDC
 2    doesn't have any authority over anyone but lawyers.
 3    And it has only authority to essentially recommend
 4    discipline, which only the Court can impose.
 5          Q.      What was Mr. -- we talked a lot
 6    about, you know, what may or may not have been the
 7    case given communications between Mr. Glapion and
 8    his client that we haven't seen today, right?
 9          A.      Yes.
10          Q.      I want to ask about some objective
11    things though.
12                  What objectively was Mr. Walston's
13    goal in this lawsuit before Mr. Glapion got
14    involved?
15          A.      I don't think there was a lawsuit
16    before --
17          Q.      The dispute.  Sorry.
18          A.      The dispute.  What he sought was
19    damages for his individual claim.
20          Q.      As in money?
21          A.      Money, right.
22          Q.      And do we know that because of the
23    demand letter that he sent asking for money?
24          A.      Yes.
25          Q.      And do we also know that because of
```

Page 285

```
1      the conversation that he had within NRS's CEO that
2      was part of his deposition where he said that he
3      would take even less than that?
4               A.      Yes.
5               Q.      Okay.  So we have objective evidence
6      that Mr. Walston wanted money before Mr. Glapion
7      got involved; is that right?
8               A.      That's right.
9               Q.      Okay.  And then after Mr. Glapion got
10     involved we are told that -- and Mr. Walston
11     testified that his intentions changed, right?
12              A.      Yes.
13              Q.      Are you aware -- well, let me ask you
14     this as well.
15                      In Mr. Walston's past cases and I
16     know you haven't studied them all, but is it your
17     understanding that all of those cases -- in all of
18     those cases Mr. Walston also wanted and obtained
19     money, that that was the purpose of pursuing them?
20              A.      Right.  I do recall that.  Are you
21     talking about like the fair debt --
22              Q.      Yes.
23              A.      -- practices, yeah.
24              Q.      Other than that objective evidence of
25     what Mr. Walston has sought in past cases and what
```

Page 286

1     he's sought in this case before Mr. Glapion got
2     involved, is there any other objective evidence of
3     what Mr. Walston wanted to achieve in this
4     litigation?
5          A.    I don't recall.  I mean the
6     circumstances we've just traced seem to be the most
7     compelling.
8          Q.    And so what changed objectively was
9     Mr. Glapion representing Mr. Walston?
10         A.    Objectively in terms of what we know,
11    yes.
12         Q.    Right.  And again, I would ask you a
13    lot more questions if I had the communications but
14    I don't.  So I'm just asking you based on what
15    objectively we have.
16              And to this same point isn't one of
17    the main issues in your report and in your
18    testimony that circumstances change in litigation
19    and that a client has to have the ability to change
20    his mind or her mind about what their goals are
21    based on the circumstances of the litigation;
22    defenses, claims, et cetera?
23         A.    I would say that that's definitely
24    true.  It's definitely important in terms of what
25    I've tried to lay out here.  And it would, you

Page 287

1    know, how that gets implemented would depend a lot
2    on the case -- on the circumstances of the case.
3    But there would have to be clarity in the client's
4    understanding of the options and there would have
5    to be an objectively reasonable basis for
6    understanding why the client is discounting any
7    major opportunities.
8            Q.    Right.  And that's -- I think that's
9    particularly true for clients whose financial
10   circumstances might dictate that money would be a
11   bigger motivator for them than others; is that
12   right?
13           A.    I would say so.  And also I would pay
14   most attention to the sophistication of the client.
15   If you're talking about somebody who is making a
16   decision on a business matter that they addressed,
17   you know, dozens and dozens of times in the past
18   and they are a frequent user of legal services and
19   they have a pretty good understanding of things,
20   that's very different for that person to make a,
21   you know, a widely, you know, a very broad decision
22   ruling out certain options.
23           Q.    Right.  And going back to the issue
24   of circumstances changing and the client having to
25   have the ability to change their mind.  By

Page 288

1      Mr. Glapion's implications, his client changed his
2      mind once, right, at least about what he wanted?
3              A.      In terms of before he met
4      Mr. Glapion?
5              Q.      Correct.  So originally we know he
6      wanted money and then after that we're being told
7      he wants, quote, justice for the class --
8              A.      Yes.
9              Q.      -- right?
10             So he could have changed his mind
11     again, right?
12             A.      He could have changed his mind again.
13     And let's just say, you know, a child had a sudden
14     illness that was going to result in some new
15     expenses, you know, that would be something that a
16     parent might very well say, oh, well, whatever I
17     thought yesterday, that 35,000 sounds really good
18     right now.
19             Q.      Right.  Exactly.  And that's my
20     point.  And I'm not saying he did or he would have.
21     I'm just saying that he changed his mind once, he
22     could have changed it again, right?
23             A.      Yes.
24             Q.      And he very well could have gone back
25     to what he originally wanted and what he originally

Page 289

```
 1        wanted in the other lawsuits that he pursued which
 2        was money, right?
 3               A.     Correct.
 4               Q.     But your whole point in your opinion
 5        is that the engagement agreement took away that
 6        choice effectively?
 7               A.     It limited that choice for sure.
 8               Q.     Well, let me drill down on that.
 9               A.     Okay.
10               Q.     I want to be very clear about this
11        because it limited the choice for certain monetary
12        offers?
13               A.     Right.
14               Q.     But for other monetary offers, and
15        depending on the version that we're talking about,
16        it would have completely taken it away all together
17        unless he wanted to pay his own lawyer, right?
18               A.     Right.  It didn't take it away all
19        together.  It just made it very costly, potentially
20        very costly.
21               Q.     And it took away the incentives to
22        going back to the original plan, which was getting
23        money?
24               A.     Right.
25               Q.     Okay.  And this is important, but
```

Page 290

1    what I'm trying to understand is if Mr. Walston was
2    presented with two identical agreements, one
3    agreement that just contains a standard contingency
4    fee agreement and that's it, and then the other
5    agreement is really any variation of the agreements
6    prepared here.
7                    In your opinion, would an informed
8    consumer of legal services ever choose -- with all
9    else being equal, ever choose the agreements at
10   issue here?
11           A.      In my opinion, no.  I mean there's no
12   benefit to them.
13           Q.      Right.  Is that fact one of the
14   things that is inconsistent with the rules?
15                   Well, let me ask is that fact one of
16   the things that's inconsistent with Mr. Glapion's
17   obligations to his client?
18           A.      You know, let me just say it is a
19   lawyer's obligation to make clear, to always
20   clearly and completely inform a client of what the
21   options are, and the significance of choosing any
22   particular option.  And that is not limited by the
23   client early on saying, I would like to only do
24   this.  It's still the lawyer's obligation to
25   explain what the other alternatives are and, you

Page 291

1     know, the ramifications of the choices.

2                 Is that the question, I hope?

3          Q.    Yeah.  And let me kind of clarify the

4     question.  I think it's really this.

5                 The issue is Mr. Glapion asked you to

6     assume or asked you whether you had evidence that

7     he did not communicate all of these -- all of the

8     ramifications of the agreement to his client,

9     right?

10         A.    Yes.

11         Q.    So what I'm trying to understand is

12    with the question I just asked about what a

13    reasonable consumer would have done, if it is true

14    that Mr. Glapion informed his client of the

15    ramifications of this agreement, then why would he

16    have signed it and not just gone to another lawyer

17    who doesn't use it?

18               MR. GLAPION:  I haven't been

19    objecting, but I don't know what that question was.

20    So objection; compound, leading, et cetera.

21    BY MR. WATSTEIN:

22         Q.    Do you understand the question, Mary?

23         A.    I think I do.  I would say that, you

24    know, in my experience clients don't spend a lot of

25    time considering specific provisions.  They don't

Page 292

1    always read things carefully.  And they hear
2    what -- and they have certain expectations and they
3    just assume that that's going to be the case.  All
4    right.  And in my experience consumers who do not
5    usually use lawyers would never have thought it
6    would make any sense at all for them to pay a
7    lawyer to do a class action if -- just because they
8    decided to settle something; an individual claim.
9    That it just -- there's a common sense.
10                   I mean, I give consumers a lot of
11   credit for having common sense and common sense
12   just doesn't support the impact of -- I mean the
13   reasons for -- any good reason including those
14   provisions, but also it doesn't support a
15   conclusion that clients would regularly agree to
16   those knowing what they accomplish.
17        Q.     Right.  And I guess my follow-up
18   question to that is:  Isn't that evidence, at least
19   some evidence in your professional opinion that
20   Mr. Walston was not adequately informed about the
21   impact of these provisions?
22        A.     Well, it is some evidence.  And, you
23   know, I have to add that based on a number of the
24   questions that Mr. Glapion asked me, that is the
25   kind of -- that would be basis for a disciplinary

Page 293

1      board to come to a conclusion in a case.  Okay,

2      sorry, that just doesn't make sense.  That is not

3      consistent with regular -- with normal experience.

4           Q.    And Mr. Glapion asked about the

5      promptness of removing terms and whether that's a

6      factor that the board, the disciplinary board might

7      consider in I guess evaluating whether prosecuting

8      case or determining the degree of misconduct.

9                 Do you remember that?

10          A.    Yes.

11          Q.    Okay.  And I want to ask something

12     very specific about that.

13          A.    Okay.

14          Q.    Is there a difference in -- let me

15     just ask about this specific case so that I don't

16     confuse anybody.

17                In this specific case when we

18     initially asked for the engagement agreement and

19     set aside the amount of time that it took us to get

20     the engagement agreement, Mr. Glapion removed the

21     springing fee provision before we called it out as

22     a problem.  And so what I want to ask is if at the

23     ARDC -- ADRC?

24          A.    At the ARDC.

25          Q.    At the ARDC if a lawyer is brought in

1    for a potential issue, and let's -- if a lawyer is

2    brought in for a potential issue and then they're

3    asked to produce their engagement agreement --

4            A.      Yeah.

5            Q.      -- but the issue you called out

6    doesn't relate to the engagement agreement.

7            A.      Okay.

8            Q.      But before they turn over the

9    engagement agreement they make all these revisions

10   and they turn it over.

11           A.      Right.

12           Q.      Does that -- is that the kind of

13   thing that makes the lawyer look better to the

14   disciplinary committee, that they only changed

15   something after --

16           A.      No.

17           Q.      -- they had to turn something over?

18           A.      The typical reaction was that that

19   was sneaky, and would weigh against the lawyer.

20           Q.      Right.  And so that's what I'm trying

21   to tease out here.  Okay.  Because I would agree

22   with Mr. Glapion that if without us even raising

23   the issue, he caught something in his agreement and

24   he revised it, and later when we requested the

25   agreement in the ordinary course he says, oh, here

Page 295

1     are the agreements, here's the original and then I
2     caught something so here's the one that I revised.
3                     You know, mea culpa.  But here he
4     revised the agreement not because we knew what was
5     in it, he revised the agreement because we asked
6     for it.  And so what I am -- and he knew what to
7     revise.
8                     So what I'm asking you is in your
9     professional experience, is the fact that a lawyer
10    calls out a specific provision that they're not
11    asked about in advance and identifies it on their
12    own, does that suggest to you a higher degree of
13    culpability or a lower degree of culpability?
14         A.    I would call it, it would be evidence
15    of the lawyer's understanding that the provision
16    wasn't appropriate.  I mean, I would call it
17    evidence of guilty mind.
18         Q.    Right.  Okay.  Thank you.
19                    And what if you had found -- what if
20    you also found out on top of that that the lawyer
21    had been employing that provision for a really long
22    time because he had never been required to turn it
23    over before, would that further weigh in favor of
24    culpability?
25         A.    I think it would, yes.

Page 296

1          Q.    Just to be clear about your class
2     action experience.  You didn't list earlier or in
3     your report every single class action issue that
4     you've ever advised on, right?
5          A.    That's correct.
6          Q.    Okay.  Just so the record is clear,
7     I'm sure you can't remember every class action
8     issue that you've advised on in your entire career
9     that you've seen come across in your practice; is
10    that right?
11         A.    That would be true, right.
12         Q.    And you do represent a number of
13    plaintiff's class action attorneys; do I have that
14    right?
15         A.    You do.  I tried counting them out.
16    I'd say that there's maybe at least five that do
17    exclusively that work and then another five that do
18    it sometimes.  And I've consulted with them on
19    certain issues, yeah.
20         Q.    And you said you've seen the
21    springing fee before and that's widely frowned on
22    or something like that; is that right?
23         A.    Well, I haven't seen it in an
24    agreement.  I have seen cases, but more often than
25    not ethics opinions addressing it.

Page 297

1      Q.     Okay.  And my next question was going
2   to be have you ever seen one of your clients
3   employing -- a class action clients employing a
4   springing fee or statutory cap?
5      A.     No.
6      Q.     And if they came to you with that,
7   what would you tell them?
8      A.     I would say what were you thinking?
9   What is this?  You know, what's the purpose here?
10     Q.     And as to the statutory cap
11  provision, is it your understanding that the TCPA
12  actually also permits actual damages in addition to
13  statutory damages?
14     A.     The who?
15     Q.     Is it your understanding that the
16  TCPA allows for actual damages in addition to
17  statutory?
18     A.     It's my understanding that somebody
19  can ask for both types of damages for a violation,
20  yes.
21     Q.     Right.  Did you find it strange that
22  Mr. Glapion kept limiting all of his questions to
23  statutory damages only?
24     A.     I didn't notice.  Oh, I see what
25  you're saying.  Well, it seems to me to be ignoring

1    the obvious.  You know, the elephant in the room is

2    the nonstatutory damages so.

3              Q.      Right.  In other words, by couching

4    everything for his client's recovery solely in the

5    terms of statutory damages, it's ignoring the fact

6    that his client could also recover actual damages?

7              A.      Right.  And the ability to recover

8    actual damages did and I think does influence how

9    to interpret the provisions that we're talking

10   about in terms of what kind of impact they could

11   have.

12             Q.      Did you see anything in the agreement

13   where Mr. Walston agreed to waive his actual

14   damages?

15             A.      No.

16             Q.      Did you see any sort of written

17   disclaimer from Mr. Glapion to Mr. Walston that

18   informed him of, you know --

19             A.      No.

20             Q.      -- got informed consent for a waiver

21   of actual damages?

22             A.      No.  I mean in contrast the

23   description of the scope of the representation

24   includes actual damages.  And so there's an

25   indication that that's -- that that is part of the

Page 299

1      representation.

2              Q.      And would an attorney -- in that

3      instance where let's just assume what's in the

4      agreement and set aside what we don't know, which

5      is what other conversations occurred.

6              A.      Right.

7              Q.      An agreement that agrees to pursue a

8      client's TCPA damages and potentially other common

9      law claims and those both allow for actual damages,

10     would the attorney's obligation by virtue of the

11     agreement include pursuing such damages?

12             A.      Yes.

13             Q.      Have you -- scratch that.

14                     Are class action lawyers subject to

15     the ethics rules just the same as all other

16     lawyers?

17             A.      Yes.  I mean, the rules are written

18     to cover any type of practice, yes.

19             Q.      In other words, they don't get any

20     special immunity because they claim to be

21     prosecuting claims of other people?

22             A.      No, but there are attributes of class

23     actions that are different.

24             Q.      Sure.

25             A.      So application in that context can

Page 300

1    differ some.  Yeah.

2         Q.    And there's no -- well, scratch that.

3    That's too confusing.

4         A.    Don't confuse me.

5              MR. GLAPION:  It's getting late.

6              MR. WATSTEIN:  I'm just looking

7    through my notes here.

8              THE WITNESS:  Okay.

9    BY MR. GLAPION:

10        Q.    Mr. Glapion asked you earlier if you

11   were an expert on Rule 23, adequacy.

12             Do you remember that?

13        A.    Yes.

14        Q.    Are you an expert on attorney ethics

15   rules?

16        A.    Yes.

17        Q.    Are you an expert on whether -- well,

18   let me just ask you this one follow-up question.

19             Is that what you actually offered an

20   opinion on in this case --

21        A.    Yes.

22        Q.    -- primarily?

23        A.    Yes.  That's what I intended to offer

24   an opinion on.

25        Q.    The reference to adequacy to be clear

Page 301

1      was -- well, strike that.  Just to close the loop
2      on something I asked earlier.
3                  Is the goal of discipline to right
4      wrongs in a particular ongoing litigation?
5           A.    No.  Except to the extent, as I
6      mentioned before, sometimes restitution would be
7      ordered and would accomplish that.
8           Q.    Like if a client stole money --
9           A.    Yeah.
10          Q.    If an attorney stole money from a
11     client's trust fund or something?
12          A.    Uh-huh.  Right.
13          Q.    Mr. Glapion asked if you would
14     consider -- he asked a lot about mitigating
15     factors, and I won't go into detail on those.  I
16     will ask a couple of things.
17                  Would you consider a -- well,
18     Mr. Glapion asked if you would consider a
19     mitigating factor to be people willing to testify
20     about a lawyer's veracity and character, right?
21          A.    Yes.
22          Q.    Isn't it true that basically anyone
23     or that most people would have someone who would
24     say they can talk positively about someone's
25     character and veracity --

Page 302

1         A.      You would hope.

2         Q.      -- for lawyers?

3         A.      I know, I know.  And it's the rare

4    case where there are not such witnesses, but there

5    have been rare cases.  And I think what happens is

6    that a lot of lawyers are embarrassed and don't

7    want to ask the people the who would come and

8    testify for them.

9         Q.      Right.  Right.  I suppose it also --

10   I know you said that's like a mitigating factor or

11   something that's considered --

12        A.      Yes.

13        Q.      -- in most cases?

14        I suppose it would also be considered

15   who the people are, right?

16        A.      Right.

17        Q.      Like is it a sitting Supreme Court

18   justice --

19        A.      Right.

20        Q.      -- you know, that sort of thing,

21   right?

22        A.      They just get more -- yeah, more

23   weight.  And a lot of it too is, you know, they can

24   testify to reputation, but they can also testify to

25   some more specific things like pro bono work that

1       the lawyer does, or, you know, personal favors that

2       the lawyer has done.  You know, generosity, things

3       like that.  But they're not limited to only

4       reputation.

5              Q.     Right.  And we touched on this a

6       little bit, but to close the loop.

7                     Is it relevant in a disciplinary

8       proceeding that someone only fixes a problem once

9       they're caught?

10             A.     I would say that it can be relevant,

11      but it never undoes what's done.  And the relevance

12      would be dependent on the facts of the case.

13             Q.     Right.  But in other words, you don't

14      get as many brownie points for fixing something

15      once you're caught than you would for fixing

16      something before you're caught, right?

17             A.     Definitely true.  And there's a fair

18      amount of -- I mean, the boards recite that often

19      as don't try and ask us to think that you did

20      something good here.  You didn't do anything until

21      you were caught.

22             Q.     Right.  And related to that.  If

23      there is evidence that someone who is being

24      investigated tried to avoid having to produce

25      information that they knew would be damaging,

1     rather than just came forward with it immediately,

2     is that also something that goes into the calculous

3     of the disciplinary proceeding?

4          A.    It can be, right.  Very case

5     dependent.

6          Q.    In other words, is immediate candor

7     considered --

8          A.    Oh, yeah.

9          Q.    -- better than avoiding production?

10         A.    Yes.

11         Q.    Mr. Walston {sic} asked about whether

12    we had -- whether we had conveyed his offer to have

13    you review his engagement letter.

14           Do you remember that?

15         A.    I didn't understand that.

16         Q.    Would it have been appropriate for

17    you to give advice to Mr. Glapion in a matter where

18    you'd been retained to provide the opinion that you

19    provided?

20         A.    I wouldn't do that.

21         Q.    Okay.  Are any of the mitigating

22    factors that were discussed in cross {sic} relevant

23    to whether any harm that might have been caused by

24    the provisions can be undone?

25         A.    Not that I recall, no.

Page 305

1          Q.     Okay.  Just going through a couple of
2     the other potential mitigating factors.  I just
3     want to ask you a couple of things and ask if they
4     might be relevant in a disciplinary proceeding.
5                 Would it be potentially relevant if
6     the conduct at issue resulted in an economically
7     destitute client not having a chance to receive a
8     life-changing amount?
9          A.     If that client came forward and was
10    unhappy about that, yes.
11         Q.     Right.  Would it be relevant that a
12    violation of the rules was the result of the
13    lawyer's pecuniary interest rather than his
14    client's interest?
15         A.     That's always an aggravating factor,
16    yes.
17         Q.     And would another aggravating factor
18    be false statements that were made either to a
19    court or a disciplinary board?
20         A.     Yes.  Always.
21         Q.     Mr. Glapion asked some questions
22    about how you knew his lodestar or why you believed
23    his lodestar would be more than $35,000 as of early
24    June.  Do you remember that?
25         A.     Yes.

1          Q.     Okay.  You've been an attorney for
2     how long?
3          A.     Come January it will be 50 years.
4          Q.     And you've been in private practice
5     for, what, around 20 years?
6          A.     The most recent 20 I was in private
7     practice for, 10 years before I went to the ARDC.
8          Q.     Okay.  So if I told you -- and I ran
9     these numbers today, if I told you that our firm
10    had -- I want to tell you exact number -- 472 hours
11    in the Walston matter by June of 2024 that resulted
12    from depositions that involved travel, multiple
13    pleadings, substantive briefing, a hearing on the
14    substantive briefing, investigation, numerous
15    client conferences, a Rule 26 report and other
16    occurrences, in your experience would it be
17    reasonable that plaintiff's counsel would have had
18    at least 10 percent of that time?
19         A.     At least, right.  My experience is
20    that it's rare for there to be more than a
21    one-third/two-thirds differential.  And it's all --
22    there's lots of specific reasons for it to go one
23    way or the other, but there's only so much you can
24    control.
25         Q.     Right.  I guess my question is do you

```
 1      see any reasonable way that all of that activity
 2      could have been performed in 54 hours?  Especially
 3      with travel?
 4            A.    No.  Right.
 5            Q.    Okay.  So does that inform your --
 6      the reasonableness of your belief about what
 7      Mr. Glapion's lodestar would have been at that
 8      time?
 9            A.    Yes.
10            Q.    And you believe it would have been
11      more than 35,000?
12            A.    I think it would have been a lot more
13      than 35,000.  Right.
14            Q.    Has Mr. Glapion offered to show you
15      his time records from that period to disprove that
16      it was more than 35,000?
17            A.    No.
18            Q.    We talked a lot about -- we used a
19      lot of the terminology "triggering" during the
20      deposition, and I want the record to be clear about
21      what that means because I don't think I am.
22                  Mr. Glapion asked a lot of questions
23      about whether a specific provision was triggered.
24      Do you remember that?
25            A.    Yes.
```

1          Q.     Okay.  But what I want to make sure I
2     understand is isn't the existence of the terms in
3     the agreement by itself -- doesn't that
4     automatically have an effect -- I mean it's a
5     contract, right?
6          A.     Correct.  Right.  It has -- it can
7     have an impact regardless of whether -- I mean,
8     when I think about whether something would have
9     been triggered, it would depend on -- I mean, it
10     was primarily comparing alternatives where one of
11     the -- one is the highest.  Okay.
12               And so we never -- this case never
13     really got to a point where anything was literally
14     triggered.  There was not a point at which Walston
15     would have owed fees under this agreement.  But in
16     terms of what he could reasonably expect would
17     become his obligations, then that can have an
18     impact.
19               So when I say "triggered," I would
20     only be referring to when it actually became
21     applicable.  And when it actually governed the
22     next, you know, something that he would owe.
23          Q.     Right.  Right.  And I guess as a
24     follow up to that.
25               The existence of the terms in the

Page 309

1    agreement, assuming Walston read them and
2    understood them, wouldn't that by definition have
3    had an impact on Mr. Walston and his ability to do
4    certain things in the case such as settle the case
5    individually just by virtue of being in the
6    agreement because they governed his contractual
7    rights?
8              A.    They -- yes.
9              Q.    And another related question is once
10   NRS was aware of the provisions in the agreement
11   and -- including the current agreement which we'll
12   go through -- I'll go through shortly, if
13   Mr. Walston would recover nothing because of the
14   way the agreement is worded, when NRS made an offer
15   of say $50,000, and that disincentivized NRS from
16   making that offer, I mean isn't the agreement --
17   the agreement is having an effect there even if
18   it's not triggered, right?
19             A.    Right.  If that -- yeah.
20             Q.    That's what I said.  I don't want to
21   record to be confused about what "triggered" means.
22                   Because if NRS didn't make an offer
23   because it wouldn't have had any effect on
24   Mr. Walston because he didn't have any incentive to
25   take it because he wouldn't get paid anything, I

```
                                              Page 310

 1      mean, isn't that the provisions serving their

 2      purpose?

 3              A.      It would -- yes, it would be.  Yes.

 4              Q.      And so that would also be the

 5      provisions potentially causing harm to Mr. Walston?

 6              A.      Yes.

 7              Q.      In other words, it doesn't have to

 8      be -- or it is not necessarily the case that the

 9      harm only occurs if a potential provision is

10      triggered by the making of an offer of a certain

11      amount?

12              A.      Correct.

13              Q.      Do all of the provisions that we

14      discussed today, the springing fee, the statutory

15      cap, those provisions, do those all have the impact

16      of increasing or the potential impact of increasing

17      fee recovery for the lawyer?

18              A.      Potential impact, yes, because to the

19      extent that they would cause Mr. Walston to

20      disregard any ability to pursue just his individual

21      claim, then his only option at that point is to

22      stay part of the class.

23                      I mean, not his only option, his only

24      option for any recovery would be as part of the

25      class.
```

1          Q.     Right.  And that remains true even
2     under the current agreement, right?
3                  Because under the current
4     agreement -- and we can go through it in a minute,
5     but under the current agreement he might not have
6     to pay his lawyer back but he still wouldn't
7     recover anything on an individual basis in most
8     settlement offer scenarios?
9          A.     I'm having a hard time wrapping my
10    brain around that right now.  I don't want to say
11    yes or no.
12         Q.     Sure.  We'll look at the provision in
13    a minute.  I'll get through my questions and then
14    we'll go back to the provision.  So we can scratch
15    that for now.
16                  So we talked about whether the law
17    gives the attorney the ability to basically get
18    blanket settlement authority earlier, right?
19         A.     Right.
20         Q.     When I say "blanket settlement
21    authority" I mean like an absolute I will only ever
22    settle for this amount or I will never settle for
23    that amount.  Do you understand what that means?
24         A.     I do.  Right.  So it would really
25    govern what offers could or would have to be

Page 312

1       transmitted.  Not -- I mean it's really not --
2       there are very limited circumstances under which a
3       lawyer can settle on behalf of a client.  Even
4       under direction.
5               Q.      And that's what I want to kind of
6       drill down on.
7                       I guess you had said that generally
8       speaking it's permissible to delegate settlement
9       authority to the lawyer within certain parameters,
10      did I understand your testimony correctly?
11              A.      Right.  Right.  I mean there was a
12      Supreme Court opinion, and it was a discipline
13      case, that involved a personal injury lawyer who
14      would often have clients who would go -- who aren't
15      easy to contact.  And so the lawyer would ask for a
16      Power of Attorney to authorize the lawyer to come
17      to a settlement.
18                      And the Court said that that's
19      inappropriate.  And in fact if you're going to be
20      asking for any authority to make decisions without
21      consulting the client, you have to keep your
22      request within ranges.  Reasonable ranges.  Like
23      for what period of time do you have that authority.
24      And typically high or low.  You know, not just no,
25      I can't take anything.  Yeah, so ranges.

Page 313

```
 1           Q.      Right.   Okay.   And that's what I'm
 2      trying to drill down on.
 3                   And I've done this many times with
 4      clients.   We could be in a settlement negotiation,
 5      say in a commercial breach of contract case, and
 6      the client gives me a million dollars of authority
 7      to settle the case -- you know, settle it for up to
 8      a million dollars, and it's like over the next two
 9      weeks.
10           A.      Uh-huh.
11           Q.      However -- so that would be
12      permissible, right, because --
13           A.      It would.
14           Q.      -- it's time limited and dollar
15      limited?
16           A.      And you're talking about a
17      sophisticated client.
18           Q.      And I'm talking about a sophisticated
19      client, right.   So this is exactly what I'm trying
20      to drill down on.
21                   As the client's level of
22      sophistication goes down, the need to check in and
23      have more communications more frequently goes up,
24      right?
25           A.      Right.   It does.   And that's because
```

Page 314

1    the client doesn't have the kind of experience that

2    informs the client on what to expect.

3             I mean your client, the one you were

4    talking about has probably been down this road more

5    than once and has a pretty good idea of, you know,

6    the -- what the other side is going to do.  And

7    what his own options are.  But that would not be

8    true of an unsophisticated client.

9         Q.    Right.  So while it may be okay --

10    well, let me just ask this.

11            So given that this is not a -- would

12    you call this a rule of reason basically?

13    Something like that?

14         A.    Yes.  You know, but that's true of

15    all the rules, okay.  All the rules of conduct are

16    applied as rules of reason.  And yes, what's

17    reasonable with one type of client is often

18    reasonable -- not reasonable with another.

19         Q.    Right.  I guess what I'm trying to

20    say is -- let's go back to my hypothetical of the

21    million dollars of settlement authority over the

22    next two weeks.

23            Imagine the case doesn't settle and

24    if we have ballistic litigation and now there's

25    another million dollars of legal fees that would be

1    involved.  Would I be correct to say that it would

2    be entirely unreasonable for me to just assume that

3    that settlement authority that was given to me six

4    months ago, even if the client didn't specifically

5    revoke it, for me to assume that that was still on

6    the table, notwithstanding all the changed

7    circumstances and not even go back to my client

8    before rejecting the offer -- an offer?

9            A.      I agree.  Yes.  That would -- right.

10           Q.      Right.  Again I have lived this

11   circumstance and that's why I'm using this.  So for

12   me, I basically use a test would the client want to

13   know about the dollar change because of maybe their

14   financial condition or changed facts in the case

15   and how sophisticated they are.

16           A.      Right.

17           Q.      And so -- right.

18           A.      And what would you need to know about

19   whether there are changed circumstances.

20           Q.      With the client, right?

21           A.      Right.

22           Q.      Exactly.  So then what I'm trying to

23   understand is how could it be possibly be -- just

24   based on my own experience, how could it possibly

25   be permissible in a punitive class action where the